## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

COMMONWEALTH OF MASSACHUSETTS; DANA NESSEL, on behalf of the people of the State of Michigan; STATE OF ILLINOIS; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF COLORADO; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF DELAWARE; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs - Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants - Appellants.*

ASSOCIATION OF AMERICAN MEDICAL COLLEGES; THE AMERICAN ASSOCIATION OF COLLEGES OF PHARMACY; THE ASSOCIATION OF SCHOOLS AND PROGRAMS OF PUBLIC HEALTH; THE CONFERENCE OF BOSTON TEACHING HOSPITALS, INC.; GREATER NEW YORK HOSPITAL ASSOCIATION,

*Plaintiffs - Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants - Appellants.*

ASSOCIATION OF AMERICAN UNIVERSITIES; AMERICAN COUNCIL ON EDUCATION; ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES; BRANDEIS UNIVERSITY; BROWN UNIVERSITY; CARNEGIE MELLON UNIVERSITY; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; THE UNIVERSITY OF CHICAGO; CORNELL UNIVERSITY; THE GEORGE WASHINGTON UNIVERSITY; JOHNS HOPKINS UNIVERSITY; MASSACHUSETTS INSTITUTE OF TECHNOLOGY; TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA; UNIVERSITY OF ROCHESTER; TRUSTEES OF TUFTS COLLEGE; THE CALIFORNIA INSTITUTE OF TECHNOLOGY,

*Plaintiffs - Appellees*,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services; JAY BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health,

*Defendants - Appellants.*

On Appeal from the United States District Court for the District of Massachusetts

## JOINT APPENDIX – VOLUME I

(*Counsel listed on next page*)

Katherine Dirks
Amanda Hainsworth
Allyson Slater
Chris Pappavaselio
OFFICE OF THE ATTORNEY GENERAL
1 Ashburton Place
Boston, MA 02108
(617) 963-2277

*Lead Counsel for Plaintiffs-Appellees*
*in Case No. 25-1343*
(*Additional Counsel Listed on Brief*)

John P. Bueker
Douglas H. Hallward-Driemeier
Stephanie A. Webster
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
(617) 951-7951

*Counsel for All Plaintiffs-Appellees*
*in Case No. 25-1344*

Paul D. Clement
Erin E. Murphy
James Y. Xi
Kyle R. Eiswald
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

*Counsel for Plaintiffs-Appellees Association*
*of American Universities, Association of*
*Public and Land-grant Universities, and*
*American Council on Education*
*in Case No. 25-1345*

Courtney L. Dixon
Jeffrey E. Sandberg
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, APPELLATE STAFF
950 Pennsylvania Ave. NW, Rm. 7214
Washington, DC 20530
(202) 305-1754

*Counsel for All Defendants-Appellants*
*in Case Nos. 25-1343, 25-1344, 25-1345*

Ishan K. Bhabha
Lindsay C. Harrison
Lauren J. Hartz
Elizabeth Henthorne
Shoba Pillay
Zachary C. Schauf
Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Ave. NW, Ste. 900
Washington, DC 20001
(202) 639-6000

*Counsel for All Plaintiffs-Appellees*
*in Case No. 25-1345*

*Commonwealth of Massachusetts v. NIH*, **No. 25-1343**
*Association of American Medical Colleges v. NIH*, **No. 25-1344**
*Association of American Universities v. HHS*, **No. 25-1345**

### JOINT APPENDIX CONTENTS

## VOLUME I:

**Case No. 1:25-cv-10338,** *Commonwealth of Massachusetts v. NIH*:

Docket sheet, Case No. 1:25-cv-10338 (D. Mass.) ...................................J.A. 1

Complaint, ECF No. 1 (Feb. 10, 2025) .................................. J.A. 21

Declaration of Katherine Dirks, ECF No. 6 (Feb. 10, 2025) ................. J.A. 80

Exhibit 1:  NIH Notice NOT-OD-25-068, Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates (Feb. 7, 2025) ...................................................................J.A. 87

Exhibit 2: OMB, *Major Savings and Reforms: Budget of the U.S. Government, Fiscal Year 2018* (2017) (excerpts).....................................J.A. 91

Exhibit 3: OMB, *Major Savings and Reforms, Budget of the U.S. Government, Fiscal Year 2020* (2019) (excerpts).....................................J.A. 95

Exhibit 4: NIH Notice NOT-OD-24-110, Notice of Legislative Mandates in Effect for FY 2024 (Apr. 30, 2024) ............................... J.A. 99

Exhibit 5: NIH (@NIH), X (Feb. 7, 2025, 6:19 PM), https://x.com/NIH/status/1888004759396958263........................ J.A. 105

Exhibit 6: NIH, *Why Should I Participate in a Clinical Trial?* (last visited Feb. 9, 2025).................................................................J.A. 109

Exhibit 7: Declaration of Ken A. Dill, of the State University of New York (Feb. 9, 2025)................................................................J.A. 111

Exhibit 8: Declaration of Rafael Jaime, of the United Automobile, Aerospace and Agricultural Implement Workers of America, Local 4811 (Feb. 9, 2025).............................................. J.A. 115

Exhibit 9: Declaration of Theresa A. Maldonado, of the University of California (Feb. 9, 2025) ............................................ J.A. 119

Exhibit 10: Declaration of Cassandra Moseley, of Colorado State University (Feb. 9, 2025) ........................................................ J.A. 127

Exhibit 11: Declaration of Donald M. Elliman, Jr., of the University of Colorado Anschutz Medical Campus (Feb. 9, 2025) ... J.A. 131

Exhibit 12: Declaration of Justin Schwartz, of the University of Colorado Boulder (Feb. 9, 2025) ................................................. J.A. 137

Exhibit 13: Declaration of Dr. Pamir Alpay, of the University of Connecticut (Feb. 9, 2025) ........................................... J.A. 143

Exhibit 14: Declaration of Michael C. Crair, of Yale University (Feb. 9, 2025) ................................................. J.A. 149

Exhibit 15: Declaration of Dr. Tony Allen, of Delaware State University (Feb. 9, 2025) ................................................. J.A. 155

Exhibit 16: Declaration of Miguel Garcia-Diaz, of the University of Delaware (Feb. 9, 2025) ............................................ J.A. 158

Exhibit 17: Declaration of Dr. Gireesh Gupchup, of Southern Illinois University (Feb. 9, 2025) ....................................... J.A. 163

Exhibit 18: Declaration of Dr. Joseph T. Walsh, Jr., of the University of Illinois System (Feb. 9, 2025) ..................................... J.A. 168

Exhibit 19: Declaration of Denise Barton, of the University of Massachusetts, with attachments (Feb. 9, 2025).............................. J.A. 173

Exhibit 20: Declaration of Dr. Bruce E. Jarrell, of the University of Maryland, Baltimore (Feb. 9, 2025)............................ J.A. 200

Exhibit 21: Declaration of Dr. Darryl J. Pines, of the University of Maryland, College Park (Feb. 9, 2025) ....................... J.A. 206

Exhibit 22: Declaration of Ryan Low, of the University of Maine System (Feb. 9, 2025)............................................. J.A. 213

Exhibit 23: Declaration of Arthur Lupia, of the University of Michigan (Feb. 9, 2025) ................................................. J.A. 217

Exhibit 24: Declaration of Douglas A. Gage, Ph.D., of Michigan State University (Feb. 9, 2025)......................................... J.A. 221

Exhibit 25: Declaration of Ezemanari M. Obasi, Ph.D., of Wayne State University (Feb. 9, 2025) ............................................. J.A. 226

Exhibit 26: Declaration of Jennifer Rexford, of Princeton University (Feb. 9, 2025)................................................. J.A. 230

Exhibit 27: Declaration of J. Michael Gower, of Rutgers, the State University of New Jersey (Feb. 9, 2025) ............................ J.A. 236

Exhibit 28: Declaration of James Paul Holloway, of the University of New Mexico (Feb. 9, 2025) ........................................ J.A. 241

Exhibit 29: Declaration of Gloria J. Walker, of Nevada State University (Feb. 9, 2025) ................................................ J.A. 245

Exhibit 30: Declaration of David W. Hatchett, of the University of Nevada, Las Vegas (Feb. 9, 2025) .............................. J.A. 249

Exhibit 31: Declaration of Ben Friedman, of the Research Foundation of The State University of New York, with attachments (Feb. 9, 2025) ............................................... J.A. 253

Exhibit 32: Declaration of Peter Barr-Gillespie, Ph.D., of Oregon Health and Science University (Feb. 9, 2025) ..................... J.A. 323

Exhibit 33: Declaration of Dr. Bethany Diane Jenkins, of the University of Rhode Island (Feb. 9, 2025)......................................... J.A. 329

Exhibit 34: Declaration of Dr. Greg Hirth, of Brown University (Feb. 9, 2025) ................................................ J.A. 339

Exhibit 35: Declaration of Todd Conklin, of Care New England Health System (Feb. 9, 2025) ............................... J.A. 349

Exhibit 36: Declaration of Bharat Ramratnam, M.D., of Lifespan Corporation d/b/a Brown University Health (Feb. 9, 2025) ........... J.A. 353

Exhibit 37: Declaration of Katherine Tracy, of the University of Nevada, Reno (Feb. 9, 2025)......................................... J.A. 356

Exhibit 38: Declaration of Kirk Dombrowski, of the University of Vermont and State Agricultural College (Feb. 9, 2025) ............... J.A. 361

Exhibit 39: Declaration of Mari Ostendorf, of the University of Washington (Feb. 9, 2025) ............................................ J.A. 367

Exhibit 40: Declaration of Leslie Anne Brunelli, of Washington State University (Feb. 9, 2025)..................................... J.A. 376

Exhibit 41: Declaration of Dorota Grejner-Brzezinska, of the University of Wisconsin-Madison (Feb. 9, 2025) ............................ J.A. 386

Exhibit 42: Declaration of Kristian O'Connor, of the University of Wisconsin-Milwaukee (Feb. 9, 2025)......................... J.A. 394

Exhibit 43: Declaration of Jeni Kitchell, of California State University (Feb. 10, 2025)............................................... J.A. 398

Order Granting Plaintiff States' *Ex Parte* Emergency Motion for Temporary Restraining Order, ECF No. 25 (Feb. 10, 2025) ............... J.A. 406

Status Report and Declaration of Michael Lauer, ECF No. 46 (Feb. 11, 2025) ................................................................. J.A. 408

Declaration of Liza Bundesen and attached exhibits, ECF No. 73-1 (Feb. 14, 2025).............................................................. J.A. 415

Supplemental Declaration of Katherine Dirks, ECF No. 82 (Feb. 18, 2025) ...................................................................... J.A. 430

Exhibit 44: *NIH Grants Policy Statement* (Apr. 2024) (*excerpts: pp. i-viii; I-1 to I-47; IIA-1 to IIA-2, IIA-64 to IIA-102*) ............. J.A. 434

Exhibit 45: Bill & Melinda Gates Foundation, *Indirect Cost Policy* (Feb. 1, 2017) ......................................................... J.A. 531

Exhibit 46: Robert Wood Johnson Foundation, *Indirect Cost Rate Policy* ........................................................................ J.A. 539

Exhibit 47: Smith Richardson Foundation, *Our Mission and History* (accessed Feb. 15, 2025) ...................................... J.A. 552

Exhibit 48: Carnegie Corporation of New York, *Our Approach* ......... J.A. 556

Exhibit 49: Jennifer Adams, *Fostering Equitable Grantmaking through Indirect Cost Coverage*, David & Lucile Packard Foundation (Jan. 18, 2024) .............................................. J.A. 562

Exhibit 50: Declaration of Vassilis L. Syrmos, of the University of Hawai'i (Feb. 17, 2025)................................... J.A. 566

Exhibit 51: Declaration of Dr. Penny Gordon-Larsen, of the University of North Carolina at Chapel Hill (Feb. 18, 2025) ............ J.A. 573

Exhibit 52: Declaration of Sally Morton, of Arizona State University, with attachments (Feb. 17, 2025)................................. J.A. 577

Exhibit 53: Declaration of Jason A. Wilder, of Northern Arizona University, with attachments (Feb. 18, 2025)..................... J.A. 586

Exhibit 54: Declaration of Tomás Díaz de la Rubia, of the University of Arizona, with attachments (Feb. 18, 2025)................. J.A. 594

Status Report and Declaration of Liza Bundesen, ECF No. 98 (Feb. 25, 2025) .................................................................. J.A. 606

Transcript of Motion Hearing Held on Feb. 21, 2025, ECF No. 99 ...................................................................... J.A. 611

Notice of Appeal, ECF No. 113 (Apr. 8, 2025)................................. J.A. 696

**VOLUME II:**

**Case No. 1:25-cv-10340,** *Association of American Medical Colleges v. NIH:*

Docket sheet, Case No. 1:25-cv-10340 (D. Mass.) ............................. J.A. 700

Complaint, ECF No. 1 (Feb. 10, 2025) ............................................... J.A. 710

Declaration of Heather A. Pierce, of the Association of
American Medical Colleges, ECF No. 5-1 (Feb. 10, 2025) .................. J.A. 736

Order Granting Plaintiffs' Emergency Motion for Temporary
Restraining Order, ECF No. 8 (Feb. 10, 2025) .................................... J.A. 740

Declarations in Support of Plaintiffs' Motions for Injunction
Relief, ECF No. 37 (Feb. 18, 2025) ..................................................... J.A. 742

    Exhibit A: Dr. Valerie Montgomery Rice, Morehouse School
    of Medicine (Feb. 12, 2025) .............................................................. J.A. 745

    Exhibit B: Dr. Jeannette South-Paul, Meharry Medical College
    (Feb. 13, 2025) .................................................................................. J.A. 753

    Exhibit C: Dr. Gyongyi Szabo, Beth Israel Deaconess
    Medical Center and Beth Israel Lahey Health (Feb. 17, 2025) ......... J.A. 763

    Exhibit D: Gilbert Hai Tran, Attain Partners (Feb. 15, 2025) ........... J.A. 769

    Exhibit E: Dr. Anupam Agarwal, Heersink School of
    Medicine, University of Alabama at Birmingham (Feb. 12,
    2025) ................................................................................................. J.A. 783

    Exhibit F: Dr. L. Lee Hamm, Tulane University School of
    Medicine (Feb. 12, 2025) .................................................................. J.A. 786

    Exhibit G: Rob Rutenbar, University of Pittsburgh (Feb. 13,
    2025) ................................................................................................. J.A. 791

    Exhibit H: Dr. C. Ronald Kahn, Joslin Diabetes Center (Feb.
    16, 2025) ........................................................................................... J.A. 800

    Exhibit I: Dr. Tina L. Cheng, Cincinnati Children's Hospital
    Medical Center (Feb. 18, 2025) ........................................................ J.A. 806

    Exhibit J: Dr. Clifford Hudis, American Society of Clinical
    Oncology (Feb. 18, 2025) ................................................................. J.A. 810

    Exhibit K: Calaneet Balas, The ALS Association (Feb. 18,
    2025) ................................................................................................. J.A. 816

<u>Exhibit L</u>: Patricia A. Gentile, Ed.D, LAM Foundation (Feb. 17, 2025).........................................................................J.A. 820

Notice of Appeal, ECF No. 57 (Apr. 8, 2025) ...................................J.A. 826

**Case No. 1:25-cv-10346,** *Association of American Universities v. HHS:*

Docket sheet, Case No. 1:25-cv-10346 (D. Mass.) .............................J.A. 830

Complaint, ECF No. 1 (Feb. 10, 2025) ..............................................J.A. 855

Attachments to Plaintiffs' Motion for Temporary Restraining Order, ECF No. 2:

    <u>Exhibit 1</u>: Declaration of Barbara R. Snyder, of Association of American Universities (Feb. 10, 2025)..............................................J.A. 905

    <u>Exhibit 2</u>: Declaration of Peter McDonough, American Council on Education (Feb. 10, 2025) ...........................................J.A. 913

    <u>Exhibit 3</u>: Declaration of Mark Becker, Association of Public & Land-grant Universities (Feb. 10, 2025) .....................................J.A. 917

    <u>Exhibit 4</u>: Declaration of Steven F. Karel, of Brandeis University (Feb. 10, 2025)................................................................J.A. 925

    <u>Exhibit 5</u>: Declaration of Dr. Greg Hirth, of Brown University (Feb. 10, 2025)..............................................................................J.A. 933

    <u>Exhibit 6</u>: Declaration of Theresa A. Maldonado, of University of California (Feb. 10, 2025)..........................................J.A. 942

    <u>Exhibit 7</u>: Declaration of David A. Tirrell, California Institute of Technology (Feb. 10, 2025).........................................................J.A. 950

    <u>Exhibit 8</u>: Declaration of Theresa S. Mayer, Carnegie Mellon University (Feb. 10, 2025)................................................................J.A. 957

    <u>Exhibit 9</u>: Declaration of J. Michael Oakes, Case Western Reserve University (Feb. 10, 2025) .................................................J.A. 968

    <u>Exhibit 10</u>: Declaration of Anne R. Sullivan, Columbia University (Feb. 10, 2025)................................................................J.A. 973

    <u>Exhibit 11</u>: Declaration of Robert A. Harrington, M.D. of Cornell University (Feb. 10, 2025).................................................J.A. 980

    <u>Exhibit 12</u>: Declaration of Dr. David F. Kotz, of Dartmouth College (Feb. 10, 2025) ................................................................J.A. 990

Exhibit 13: Declaration of David Paul Norton, of the University of Florida (Feb. 10, 2025) ................................................ J.A. 999

Exhibit 14: Declaration of John H. Shaw, of Harvard University (Feb. 10, 2025) ............................................ J.A. 1007

Exhibit 15: Declaration of Laurent Heller, of Johns Hopkins University (Feb. 10, 2025) ............................................ J.A. 1018

Exhibit 16: Declaration of Dr. Darryl J. Pines, of University of Maryland, College Park (Feb. 10, 2025) ....................................... J.A. 1031

Exhibit 17: Declaration of Ian A. Waitz, of Massachusetts Institute of Technology (Feb. 10, 2025) ......................................... J.A. 1038

Exhibit 18: Declaration of Arthur Lupia, of the University of Michigan (Feb. 10, 2025) .............................................. J.A. 1048

Exhibit 19: Declaration of Douglas A. Gage, Ph.D., of Michigan State University (Feb. 10, 2025) .................................... J.A. 1051

Exhibit 20: Declaration of Anshuman Razdan, of the University of Oregon (Feb. 10, 2025) ............................................. J.A. 1056

Exhibit 21: Declaration of Elizabeth Duggins Peloso, of the University of Pennsylvania (Feb. 10, 2025) .................................... J.A. 1066

Exhibit 22: Declaration of Jennifer Rexford, of Princeton University (Feb. 10, 2025) ............................................. J.A. 1072

Exhibit 23: Declaration of Amy K. Dittmar, of Rice University (Feb. 10, 2025) ............................................. J.A. 1077

Exhibit 24: Declaration of Stephen Dewhurst, Ph.D., of the University of Rochester, (Feb. 10, 2025) ....................................... J.A. 1085

Exhibit 25: Declaration of J. Michael Gower, of Rutgers, the State University of New Jersey (Feb. 10, 2025) ..................................... J.A. 1096

Exhibit 26: Declaration of William Wertheim, of the State University of New York, Stony Brook, with attachments (Feb. 10, 2025) ............................................. J.A. 1101

Exhibit 27: Declaration of Bernard Arulanandam, of Tufts University (Feb. 10, 2025) ............................................. J.A. 1124

Exhibit 28: Declaration of Ishwar K. Puri, of the University of Southern California (Feb. 10, 2025) ................................. J.A. 1133

Exhibit 29: Declaration of C. Cybele Raver, of Vanderbilt University (Feb. 10, 2025) ............................................. J.A. 1156

Exhibit 30: Declaration of David J. Gray, of Washington University in St. Louis (Feb. 10, 2025) .......................................... J.A. 1166

Exhibit 31: Declaration of Dorota Grejner-Brzezinska, of the University of Wisconsin-Madison (Feb. 10, 2025) ........................ J.A. 1175

Exhibit 32, *Examining The Overhead Cost of Research*, Joint Hearing before the Subcommittee on Research and Technology and Subcommittee on Oversight, House Committee on Science, Space, and Technology (115th Cong.) (May 24, 2017) .............................. J.A. 1182

Attachments to Plaintiffs' Reply in Support of Motion for Temporary Restraining Order, ECF No. 81:

Exhibit 1: Declaration of Erin J. Adams, of the University of Chicago (Feb. 18, 2025) ................................................................. J.A. 1291

Exhibit 2: Declaration of Jennifer Lodge, of Duke University (Feb. 18, 2025)........................................................................................ J.A. 1298

Exhibit 3: Declaration of Robert H. Miller, of The George Washington University (Feb. 18, 2025) ........................................ J.A. 1308

Exhibit 4: Declaration of Dr. Douglas A. Girod, of the University of Kansas (Feb. 18, 2025)............................................................. J.A. 1321

Exhibit 5: Declaration of Shashank Priya, of the University of Minnesota (Feb. 18, 2025)............................................................. J.A. 1331

Exhibit 6: Declaration of Eric J. Perreault, of Northwestern University (Feb. 18, 2025)............................................................. J.A. 1343

Notice of Appeal, ECF No. 101 (Apr. 8, 2025)................................ J.A. 1354

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25−cv−10338−AK

Commonwealth of Massachusetts, et al v. National Institutes of Health, et al
Assigned to: District Judge Angel Kelley
related Cases:  1:25−cv−10346−AK
               1:25−cv−10340−AK
Case in other court:  USCA − First Circuit, 25−01343
Cause: 05:702 Administrative Procedure Act

Date Filed: 02/10/2025
Date Terminated: 04/04/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

## Plaintiff

**Commonwealth of Massachusetts**　　represented by　**Katherine B. Dirks**
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617−963−2277
Fax: 617−727−3076
Email: katherine.dirks@mass.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allyson T Slater**
Massachusetts Attorney General's Office
1 Ashburton Place
Boston, MA 02108
617−727−2200
Email: allyson.slater@mass.gov
*ATTORNEY TO BE NOTICED*

**Chris Pappavaselio**
Massachusetts Attorney General's Office
One Ashburton Place
Boston, MA 02108
213−219−0765
Email: chris.pappavaselio2@mass.gov
*ATTORNEY TO BE NOTICED*

## Plaintiff

**Attorney General Dana Nessel**
*On behalf of the people of the State of Michigan*　　represented by　**Joshua S. Smith**
Michigan Department of Attorney General
Corrections Division
P.O. Box 30217
Lansing, MI 48909
517−335−3055
Fax: 517−335−7157
Email: smithj191@michigan.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Linus Banghart−Linn**
Michigan Department of Attorney General
P.O. Box 30212
Lansing, MI 48909
517−335−7622
Email: banghart−linnl@michigan.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chris Pappavaselio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Illinois**                    represented by  **Alex Hemmer**
Illinois Attorney General's Office
115 S. LaSalle Street
23rd Floor
Chicago, IL 60603
312–814–5526
Email: alex.hemmer@ilag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chris Pappavaselio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**R. Sam Horan**
Office of the Illinois Attorney General
115 S. La Salle St.
Chicago, IL 60603
312–405–5354
Email: richard.horan@ilag.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Arizona**                    represented by  **Joshua Bendor**
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
602–542–8958
Email: joshua.bendor@azag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of California**                    represented by  **Chris Pappavaselio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Ambar**
Office of The Attorney General
300 S. Spring St.
Suite 1702
Los Angeles, CA 90013
213–453–3598
Email: daniel.ambar@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Emilio Eugene Varanini , IV**
Office of the California Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
415–703–5908
Email: emilio.varanini@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Sophia TonNu**
Office of The Attorney General
455 Golden Gate Avenue

Suite #11000
San Francisco, CA 94102
415–510–3529
Email: sophia.tonnu@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

State of Connecticut      represented by    **Michael Skold**
State of Connecticut Office of the Attorney
General
165 Capitol Avenue
Ste 5000
Hartford, CT 06106
860–808–5316
Fax: 860–808–5387
Email: michael.skold@ct.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

State of Colorado      represented by    **Shannon Wells Stevenson**
Colorado Department of Law
Office of the Attorney General
1300 Broadway
Denver, CO 80203
720–508–6749
Email: shannon.stevenson@coag.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

State of Delaware      represented by    **State of Delaware**
PRO SE

**Plaintiff**

State of Hawaii      represented by    **Kalikoonalani Diara Fernandes**
Department of the Attorney General, State
of Hawaii
425 Queen Street
Honolulu, HI 96813
808–586–1360
Email: kaliko.d.fernandes@hawaii.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chris Pappavaselio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Dana Day**
State of Hawaii – Department of the
Attorney General
425 Queen Street
Honolulu, HI 96813
808–586–1346
Email: david.d.day@hawaii.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

State of Maine      represented by

**J.A. 3**

**State of Maine**
PRO SE

**Plaintiff**

**State of Maryland**                    represented by    **Adam Kirschner**
                                                            Office of the Attorney General– State of
                                                            Maryland
                                                            200 Saint Paul Place
                                                            Baltimore, MD 21202
                                                            410–576–6424
                                                            Email: akirschner@oag.state.md.us
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Chris Pappavaselio**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Minnesota**                   represented by    **Elizabeth C. Kramer**
                                                            Minnesota Attorney General's Office
                                                            Solicitor General
                                                            445 Minnesota Street
                                                            Ste 600
                                                            St. Paul, MN 55101
                                                            651–757–1010
                                                            Email: liz.kramer@ag.state.mn.us
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Nevada**                      represented by    **Heidi Parry Stern**
                                                            Nevada Attorney General's Office
                                                            Solicitor General
                                                            1 State of Nevada Way
                                                            Ste 100
                                                            Las Vegas, NV 89119
                                                            702–486–3594
                                                            Email: hstern@ag.nv.gov
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Chris Pappavaselio**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of New Jersey**                  represented by    **State of New Jersey**
                                                            PRO SE

**Plaintiff**

**State of New Mexico**                  represented by    **State of New Mexico**
                                                            PRO SE

**Plaintiff**

**State of New York**                    represented by    **Molly Thomas–Jensen**
                                                            NYS Office of The Attorney General
                                                            28 Liberty Street

18th Floor
New York, NY 10005
212–416–8679
Email: molly.thomas–jensen@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of North Carolina**                    represented by **Daniel Paul Mosteller**
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919–716–6026
Email: dmosteller@ncdoj.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Oregon**                    represented by **Christina Beatty–Walters**
Oregon Department of Justice
100 SW Market St
Portland, OR 97201
971–673–1880
Email: tina.beattywalters@doj.oregon.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Rhode Island**                    represented by **Jordan Broadbent**
RI Department of Attorney General
150 South Main Street
Providence, RI 02903
401–274–4400
Email: jbroadbent@riag.ri.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Vermont**                    represented by **Jonathan T Rose**
Office of the Attorney General
109 State Street
Montpelier, VT 05609
802–793–1646
Email: jonathan.rose@vermont.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Washington**                    represented by **Spencer Wade Coates**
State of Washington Attorney General's
Office
800 5th Ave Ste. 2000
Seattle, WA 98104
206–287–4173
Email: spencer.coates@atg.wa.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ellen E Range**
State of Washington Attorney General's
Office
7141 Cleanwater Drive SW

Olympia, WA 98501
360–709–6470
Email: ellen.range@atg.wa.gov
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Wisconsin**                      represented by **Aaron Bibb**
Wisconsin Department of Justice
17 West Main St.
Madison, WI 53703
608–266–0810
Email: bibbaj@doj.state.wi.us
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Matthew Memoli, M.D., M.S.**              represented by **Brian Lea**
*in his official capacity as Acting Director*
*of the National Institutes of Health*
DOJ–OASG
950 Pennylvania Avenue NW
Washington, DC 22101
202–445–8823
Email: brian.lea@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin VanLandingham**
DOJ–Civ
1100 L St. NW
Washington, DC 20530
202–307–1134
Email: kevin.p.vanlandingham@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Marcus S Sacks**
DOJ–Civ
1100 L St., N.W.
Washington, DC 20530
202–307–1104
Email: marcus.s.sacks@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Thomas Ports , Jr**
DOJ–Enrd
P.O. Box 875
Ben Franklin Station
Washington, DC 20044
202–307–1105
Email: thomas.ports@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Department of Health and Human**     represented by **Brian Lea**
**Services ( HHS)**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin VanLandingham**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marcus S Sacks**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Ports , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dorothy Fink**
*in her official capacity as Acting
Secretary of the U.S. Department of
Health and Human Services*

represented by **Brian Lea**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin VanLandingham**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marcus S Sacks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Ports , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**National Institutes of Health**

represented by **Brian Lea**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin VanLandingham**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marcus S Sacks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Ports , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**
**Cody Hart**

**Amicus**
**Derrill Fussell**

**Amicus**

**Massachusetts Biotechnology Council,
Inc.**

represented by **Eric M. Gold**
Manatt, Phelps & Phillips
177 Huntington Avenue, Suite 2500
Boston, MA 02115
617–646–1423
Email: egold@manatt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Cities, Counties, and Mayors**

represented by

**Jonathan Benjamin Miller**
Public Rights Project
490 43rd Street, #115
Oakland, CA 94609
646–831–6113
Email: jon@publicrightsproject.org
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/10/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health Filing fee: $ 405, receipt number AMADC–10832195 (Fee Status: Filing Fee paid), filed by COMMONWEALTH OF MASSACHUSETTS. (Attachments: # 1 Civil Cover Sheet, # 2 Category Form)(Dirks, Katherine) (Entered: 02/10/2025) |
| 02/10/2025 | 2 | NOTICE of Appearance by Chris Pappaselio on behalf of COMMONWEALTH OF MASSACHUSETTS (Pappaselio, Chris) (Entered: 02/10/2025) |
| 02/10/2025 | 3 | NOTICE of Appearance by Katherine B. Dirks on behalf of COMMONWEALTH OF MASSACHUSETTS (Dirks, Katherine) (Entered: 02/10/2025) |
| 02/10/2025 | 4 | Emergency MOTION for Temporary Restraining Order by State of Maine, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, COMMONWEALTH OF MASSACHUSETTS, State of Vermont, State of Washington, State of Wisconsin, Attorney General Dana Nessel on behalf of the People of the State of Michigan, State of Illinois, State of Arizona, State of California, State of Connecticut, State of Colorado, State of Delaware, State of Hawaii.(Dirks, Katherine) (Entered: 02/10/2025) |
| 02/10/2025 | 5 | MOTION for Leave to File Excess Pages *in Memorandum in Support of Temporary Restraining Order* by State of Maine, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, COMMONWEALTH OF MASSACHUSETTS, State of Vermont, State of Washington, State of Wisconsin, Attorney General Dana Nessel on behalf of the People of the State of Michigan, State of Illinois, State of Arizona, State of California, State of Connecticut, State of Colorado, State of Delaware, State of Hawaii.(Dirks, Katherine) (Entered: 02/10/2025) |
| 02/10/2025 | 6 | DECLARATION re 4 Emergency MOTION for Temporary Restraining Order by COMMONWEALTH OF MASSACHUSETTS. (Attachments: # 1 Exhibit 1, NOT–OD–25–068: Supplemental Guidance, # 2 Exhibit 2, Major Savings FY 2018 (excerpts), # 3 Exhibit 3, Major Savings FY 2020 (excerpts), # 4 Exhibit 4, NOT–OD–24–110, # 5 Exhibit 5, NIH X Post, # 6 Exhibit 6, NIH – Why Should I Participate in a Clinical Trial, # 7 Exhibit 7, NY Ken Dill Declaration, # 8 Exhibit 8, CA Rafael Jaime Declaration, # 9 Exhibit 9, CA UC Declaration, # 10 Exhibit 10, CO Moseley Declaration, # 11 Exhibit 11, CO Elliman Declaration, # 12 Exhibit 12, CO Schwartz Declaration, # 13 Exhibit 13, CT UConn Declaration, # 14 Exhibit 14, CT Yale Declaration, # 15 Exhibit 15, DE Allen Declaration, # 16 Exhibit 16, DE UD Declaration, # 17 Exhibit 17, IL SIU Declaration, # 18 Exhibit 18, IL UI Declaration, # 19 Exhibit 19, MA Barton Declaration, # 20 Exhibit 20, MD Jarrell Declaration, # 21 Exhibit 21, MD Pines Declaration, # 22 Exhibit 22, ME Low Declaration, # 23 Exhibit 23, MI Lupia Declaration, # 24 Exhibit 24, MI MSU Declaration, # 25 Exhibit 25, MI Wayne State Declaration, # 26 Exhibit 26, NJ Princeton Declaration, # 27 Exhibit 27, NJ Rutgers Declaration, # 28 Exhibit 28, NM UNM Declaration, # 29 Exhibit 29, NV NSU Declaration, # 30 Exhibit 30, NV UNLV Declaration, # 31 Exhibit 31, NY Friedman Declaration, # 32 Exhibit 32, OR Barr–Gillespie Declaration, # 33 Exhibit 33, RI URI Declaration, # 34 Exhibit 34, RI Brown Declaration, # 35 Exhibit 35, RI CNE Declaration, # 36 Exhibit 36, RI Ramratnam Declaration, # 37 Exhibit 37, NV UNR Declaration, # 38 Exhibit 38, VT Dombrowski Declaration, # 39 Exhibit 39, WA UW Declaration, # 40 Exhibit 40, WA WSU Declaration, # 41 Exhibit 41, WI UW–Madison Declaration, # 42 Exhibit 42, WI O'Connor Declaration, # 43 Exhibit 43, CA CSU Declaration)(Pappaselio, Chris) (Entered: 02/10/2025) |
| 02/10/2025 | 7 | ELECTRONIC NOTICE of Case Assignment. District Judge Angel Kelley assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (CEH) (Entered: |

| | | 02/10/2025) |
|---|---|---|
| 02/10/2025 | 8 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** <u>5</u> MOTION for Leave to File Excess Pages *in Memorandum in Support of Temporary Restraining Order*.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (CEH) (Entered: 02/10/2025) |
| 02/10/2025 | <u>9</u> | MOTION for Leave to Appear Pro Hac Vice for admission of Shannon Stevenson Filing fee: $ 125, receipt number AMADC–10833062 by State of Colorado. (Attachments: # <u>1</u> Certificate of Shannon Stevenson)(Pappavaselio, Chris) (Entered: 02/10/2025) |
| 02/10/2025 | <u>10</u> | MOTION for Leave to Appear Pro Hac Vice for admission of Alex Hemmer Filing fee: $ 125, receipt number AMADC–10833098 by State of Illinois. (Attachments: # <u>1</u> Certification of Alex Hemmer)(Pappavaselio, Chris) (Entered: 02/10/2025) |
| 02/10/2025 | 11 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** <u>9</u> Motion for Leave to Appear Pro Hac Vice Added Shannon Stevenson.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen–current–pacer–accounts.htm#link–account.<br><br>(CEH) (Entered: 02/10/2025) |
| 02/10/2025 | <u>12</u> | MEMORANDUM in Support re <u>4</u> Emergency MOTION for Temporary Restraining Order filed by State of Maine, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, COMMONWEALTH OF MASSACHUSETTS, State of Vermont, State of Washington, State of Wisconsin, State of Illinois, State of Arizona, State of California, State of Connecticut, State of Colorado, State of Delaware, State of Hawaii. (Dirks, Katherine) (Entered: 02/10/2025) |
| 02/10/2025 | <u>13</u> | MOTION for Leave to Appear Pro Hac Vice for admission of Angela Cai Filing fee: $ 125, receipt number AMADC–10833112 by State of New Jersey. (Attachments: # <u>1</u> Certificate of Angela Cai)(Pappavaselio, Chris) (Entered: 02/10/2025) |
| 02/10/2025 | <u>14</u> | MOTION for Leave to Appear Pro Hac Vice for admission of Spencer Coates, Ellen Range Filing fee: $ 250, receipt number AMADC–10833132 by State of Washington. (Attachments: # <u>1</u> Certificate of Spencer Coates, # <u>2</u> Certificate of Ellen Range)(Pappavaselio, Chris) (Entered: 02/10/2025) |
| 02/10/2025 | <u>15</u> | MOTION for Leave to Appear Pro Hac Vice for admission of Jonathan Rose Filing fee: $ 125, receipt number AMADC–10833159 by State of Vermont. (Attachments: # <u>1</u> Certificate of Jonathan Rose)(Pappavaselio, Chris) (Entered: 02/10/2025) |
| 02/10/2025 | <u>16</u> | MOTION for Leave to Appear Pro Hac Vice for admission of Aaron Bibb Filing fee: $ 125, receipt number AMADC–10833188 by State of Wisconsin. (Attachments: # <u>1</u> Certificate of Aaron Bibb)(Pappavaselio, Chris) (Entered: 02/10/2025) |
| 02/10/2025 | <u>17</u> | MOTION for Leave to Appear Pro Hac Vice for admission of Molly Thomas–Jensen, Rabia Muqaddam Filing fee: $ 250, receipt number AMADC–10833221 by State of New York. (Attachments: # <u>1</u> Certificate of Molly Thomas–Jensen, # <u>2</u> Certificate of Rabia Muqaddam)(Pappavaselio, Chris) (Attachment 2 replaced on 3/21/2025 with corrected version provided by counsel) (CEH). (Entered: 02/10/2025) |
| 02/10/2025 | <u>18</u> | District Judge Angel Kelley: ORDER entered. Standing Order Regarding Motion Practice. (CEH) (Entered: 02/10/2025) |
| 02/10/2025 | 19 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** <u>10</u> Motion for Leave to Appear Pro Hac Vice Added Alex Hemmer. |

| | | |
|---|---|---|
| | | **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen–current–pacer–accounts.htm#link–account.<br><br>(CEH) (Entered: 02/10/2025) |
| 02/10/2025 | 20 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** <u>13</u> Motion for Leave to Appear Pro Hac Vice Added Angela Kai.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/10/2025) |
| 02/10/2025 | 21 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** <u>14</u> Motion for Leave to Appear Pro Hac Vice Added Spencer W. Coates, and Ellen Range.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/10/2025) |
| 02/10/2025 | 22 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** <u>15</u> Motion for Leave to Appear Pro Hac Vice Added Jonathan Rose.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/10/2025) |
| 02/10/2025 | 23 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** <u>16</u> Motion for Leave to Appear Pro Hac Vice Added Aaron J. Bibb.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register** |

| | | |
|---|---|---|
| | | **for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/10/2025) |
| 02/10/2025 | 24 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 17 Motion for Leave to Appear Pro Hac Vice Added Molly Thomas−Jensen, and Rabia Muqaddam.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/10/2025) |
| 02/10/2025 | 25 | District Judge Angel Kelley: ORDER GRANTING PLAINTIFF STATES' EX PARTE EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER. (MAL) (Entered: 02/10/2025) |
| 02/10/2025 | 26 | ELECTRONIC NOTICE Setting Hearing on Motion 4 Emergency MOTION for Temporary Restraining Order :<br><br>Motion Hearing set for 2/21/2025 10:00 AM in Courtroom 8 (In person only) before District Judge Angel Kelley. (MAL) (Entered: 02/10/2025) |
| 02/11/2025 | 27 | MOTION for Leave to Appear Pro Hac Vice for admission of Elizabeth Kramer Filing fee: $ 125, receipt number AMADC−10834484 by State of Minnesota. (Attachments: # 1 Certificate of Elizabeth Kramer)(Pappavaselio, Chris) (Entered: 02/11/2025) |
| 02/11/2025 | 28 | MOTION for Leave to Appear Pro Hac Vice for admission of Christina Beatty−Walters Filing fee: $ 125, receipt number AMADC−10834507 by State of Oregon. (Attachments: # 1 Certificate of Christina Beatty−Walters)(Pappavaselio, Chris) (Entered: 02/11/2025) |
| 02/11/2025 | 29 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael K. Skold Filing fee: $ 125, receipt number AMADC−10834520 by State of Connecticut. (Attachments: # 1 Certificate of Michael Skold)(Pappavaselio, Chris) (Entered: 02/11/2025) |
| 02/11/2025 | 30 | MOTION for Leave to Appear Pro Hac Vice for admission of Daniel Mosteller Filing fee: $ 125, receipt number AMADC−10834532 by State of North Carolina. (Attachments: # 1 Certificate of Daniel Mosteller)(Pappavaselio, Chris) (Entered: 02/11/2025) |
| 02/11/2025 | 31 | MOTION for Leave to Appear Pro Hac Vice for admission of Jordan Broadbent Filing fee: $ 125, receipt number AMADC−10834549 by State of Rhode Island. (Attachments: # 1 Certificate of Jordan Broadbent)(Pappavaselio, Chris) (Entered: 02/11/2025) |
| 02/11/2025 | 32 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 27 Motion for Leave to Appear Pro Hac Vice Added Elizabeth Kramer.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at |

| | | |
|---|---|---|
| | | https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account. |
| | | (CEH) (Entered: 02/11/2025) |
| 02/11/2025 | 33 | NOTICE of Appearance by Molly Thomas−Jensen on behalf of State of New York (Thomas−Jensen, Molly) (Entered: 02/11/2025) |
| 02/11/2025 | 34 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 28 Motion for Leave to Appear Pro Hac Vice Added Christina L. Beatty−Walters.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/11/2025) |
| 02/11/2025 | 35 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 29 Motion for Leave to Appear Pro Hac Vice Added Michael K. Skold.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/11/2025) |
| 02/11/2025 | 36 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 30 Motion for Leave to Appear Pro Hac Vice Added Daniel P. Mosteller.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(CEH) (Entered: 02/11/2025) |
| 02/11/2025 | 37 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 31 Motion for Leave to Appear Pro Hac Vice Added Jordan Broadbent.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm. |

| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney. |
|---|---|---|
| | | (CEH) (Entered: 02/11/2025) |
| 02/11/2025 | 38 | MOTION for Leave to Appear Pro Hac Vice for admission of Joshua Bendor Filing fee: $ 125, receipt number AMADC–10834626 by State of Arizona. (Attachments: # 1 Certificate of Joshua Bendor)(Pappavaselio, Chris) (Entered: 02/11/2025) |
| 02/11/2025 | 39 | NOTICE of Appearance by Jonathan T Rose on behalf of State of Vermont (Rose, Jonathan) (Entered: 02/11/2025) |
| 02/11/2025 | 40 | Summons Issued as to Dorothy Fink, Matthew Memoli, M.D., M.S., National Institutes of Health, U.S. Department of Health and Human Services ( HHS). **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (LBO) (Entered: 02/11/2025) |
| 02/11/2025 | 41 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 38 Motion for Leave to Appear Pro Hac Vice Added Joshua D. Bendor. |
| | | **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm. |
| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney. |
| | | (CEH) (Entered: 02/11/2025) |
| 02/11/2025 | 42 | MOTION for Leave to Appear Pro Hac Vice for admission of Sophia TonNu, Emilio Varanini, Daniel Ambar Filing fee: $ 375, receipt number AMADC–10834750 by State of California. (Attachments: # 1 Certificate of Sophia TonNu, # 2 Certificate of Emilio Varanini, # 3 Certificate of Daniel Ambar)(Pappavaselio, Chris) (Entered: 02/11/2025) |
| 02/11/2025 | 43 | MOTION for Leave to Appear Pro Hac Vice for admission of Linus Banghart–Linn Filing fee: $ 125, receipt number AMADC–10835675 by Attorney General Dana Nessel. (Attachments: # 1 Certificate of Linus Banghart–Linn)(Pappavaselio, Chris) (Entered: 02/11/2025) |
| 02/11/2025 | 44 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 42 Motion for Leave to Appear Pro Hac Vice Added Sophia T. TonNu, Emilio Varanini, and Daniel Ambar. |
| | | **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm. |
| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney. |
| | | (CEH) (Entered: 02/11/2025) |
| 02/11/2025 | 45 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 43 Motion for Leave to Appear Pro Hac Vice Added Linus Banghart–Linn. |

| | | |
|---|---|---|
| | | **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register−account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen−pro−hac−vice.htm. |
| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney. |
| | | (CEH) (Entered: 02/11/2025) |
| 02/11/2025 | 46 | STATUS REPORT by Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health. (Attachments: # 1 Declaration of Dr. Michael Lauer)(Sacks, Marcus) (Entered: 02/11/2025) |
| 02/11/2025 | 47 | NOTICE of Appearance by Thomas Ports, Jr on behalf of Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health (Ports, Thomas) (Entered: 02/11/2025) |
| 02/11/2025 | 48 | NOTICE of Appearance by Kevin VanLandingham on behalf of Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health (VanLandingham, Kevin) (Entered: 02/11/2025) |
| 02/11/2025 | 49 | NOTICE of Appearance by Aaron Bibb on behalf of State of Wisconsin (Bibb, Aaron) (Entered: 02/11/2025) |
| 02/11/2025 | 50 | NOTICE of Appearance by Marcus S Sacks on behalf of Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health (Sacks, Marcus) (Entered: 02/11/2025) |
| 02/12/2025 | 51 | MOTION for Leave to Appear Pro Hac Vice for admission of Kalikoonlani D. Fernandes, David D. Day Filing fee: $ 250, receipt number AMADC−10837233 by State of Hawaii. (Attachments: # 1 Certificate of Kalikoonlani D. Fernandes, # 2 Certificate of David D. Day)(Pappavaselio, Chris) (Entered: 02/12/2025) |
| 02/12/2025 | 52 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING 51** Motion for Leave to Appear Pro Hac Vice Added Kalikoonlani D. Fernandes and David D. Day. |
| | | **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** |
| | | Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account. (CEH) (Entered: 02/12/2025) |
| 02/12/2025 | 53 | NOTICE of Appearance by Daniel Ambar on behalf of State of California (Ambar, Daniel) (Entered: 02/12/2025) |
| 02/12/2025 | 54 | NOTICE of Appearance by Emilio Eugene Varanini, IV on behalf of State of California (Varanini, Emilio) (Entered: 02/12/2025) |
| 02/12/2025 | 55 | Assented to MOTION for Leave to File Excess Pages by Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health.(Sacks, Marcus) (Entered: 02/12/2025) |
| 02/13/2025 | 56 | NOTICE of Appearance by Jordan Broadbent on behalf of State of Rhode Island (Broadbent, Jordan) (Entered: 02/13/2025) |
| 02/13/2025 | 57 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING 55** Assented to MOTION for Leave to File Excess Pages. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include – Leave to file granted on (date of order)– in the caption of the document. (CEH) (Entered: 02/13/2025) |

| | | |
|---|---|---|
| 02/13/2025 | 58 | MOTION for Leave to Appear Pro Hac Vice for admission of Adam Kirschner Filing fee: $ 125, receipt number AMADC–10839011 by State of Maryland. (Attachments: # 1 Certificate of Adam Kirschner)(Pappavaselio, Chris) (Entered: 02/13/2025) |
| 02/13/2025 | 59 | MOTION for Leave to Appear Pro Hac Vice for admission of R. Sam Horan Filing fee: $ 125, receipt number AMADC–10839794 by State of Illinois. (Attachments: # 1 Certificate of R. Sam Horan)(Pappavaselio, Chris) (Entered: 02/13/2025) |
| 02/13/2025 | 60 | District Judge Angel Kelley: ELECTRONIC ORDER entered. The Court directs counsel in all three actions to coordinate and submit a joint statement, to include proposed speakers and time limits for argument at the February 21, 2025 motion hearing, no later than 12:00 P.M. on February 19, 2025. The Court will issue its order as to the argument schedule on February 20, 2025. The joint statement should be filed in all three matters.<br><br>The Court further directs Defendants to submit a single, consolidated opposition to the Motion for a Temporary Restraining Order. The single opposition should be filed in all three matters.<br><br>Associated Cases: 1:25–cv–10338–AK, 1:25–cv–10340–AK, 1:25–cv–10346–AK. (MAL) (Entered: 02/13/2025) |
| 02/13/2025 | 61 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 58 Motion for Leave to Appear Pro Hac Vice Added Adam Kirschner.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen–current–pacer–accounts.htm#link–account.<br><br>(CEH) (Entered: 02/13/2025) |
| 02/13/2025 | 62 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 59 Motion for Leave to Appear Pro Hac Vice Added R. Sam Horan.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register–account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen–pro–hac–vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(CEH) (Entered: 02/13/2025) |
| 02/13/2025 | 63 | NOTICE of Appearance by Adam Kirschner on behalf of State of Maryland (Kirschner, Adam) (Entered: 02/13/2025) |
| 02/13/2025 | 64 | NOTICE of Appearance by Christina Beatty–Walters on behalf of State of Oregon (Beatty–Walters, Christina) (Entered: 02/13/2025) |
| 02/13/2025 | 65 | MOTION for Leave to Appear Pro Hac Vice for admission of Heidi Parry Stern Filing fee: $ 125, receipt number AMADC–10840810 by State of Nevada. (Attachments: # 1 Certificate of Heidi Parry Stern)(Pappavaselio, Chris) (Entered: 02/13/2025) |
| 02/14/2025 | 66 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 65 Motion for Leave to Appear Pro Hac Vice Added Heidi Parry Stern.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be |

| | | |
|---|---|---|
| | | found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account. (CEH) (Entered: 02/14/2025) |
| 02/14/2025 | 67 | NOTICE of Appearance by Richard Samuel Horan on behalf of State of Illinois (Horan, Richard) (Entered: 02/14/2025) |
| 02/14/2025 | 68 | MOTION for Leave to File Amicus Brief filed by Cody R. Hart and Derrill J. Fussell. (Additional attachment(s) added on 2/14/2025: # 1 PROPOSED BRIEF OF AMICI CURIAE "The People" Cody R. Hart and Derrill Fussell IN OPPOSITION TO PLAINTIFF STATE OF WASHINGTON APPEARENCE AND MOTIONING, # 2 Certification of the people Cody R. Hart and Derrill Fussell In Support of Motion for Leave to Appear as Amici Curiae, # 3 Declaration of Service) (CEH). Modified on 2/14/2025 to correct docket entry and replace documents previously submitted at Dkt 69 to current entry. NEF regenerated to all parties (CEH). (Entered: 02/14/2025) |
| 02/14/2025 | 69 | ~~PROPOSED BRIEF OF AMICI CURIAE "The People" Cody R. Hart and Derrill Fussell IN OPPOSITION TO PLAINTIFF STATE OF WASHINGTON APPEARENCE AND MOTIONING filed by Cody Hart, Derrill Fussell. (Attachments: # 1 Declaration of Service, # 2 Certification of the people Cody R. Hart and Derrill Fussell In Support of Motion for Leave to Appear as Amici Curiae) (CEH)~~ Modified on 2/14/2025 to correct entry, please refer to Dkt 68 . NEF regenerated to all parties (CEH). (Entered: 02/14/2025) |
| 02/14/2025 | 70 | NOTICE of Appearance by Brian Lea on behalf of Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health (Lea, Brian) (Entered: 02/14/2025) |
| 02/14/2025 | 71 | NOTICE of Appearance by Heidi Parry Stern on behalf of State of Nevada (Stern, Heidi) (Entered: 02/14/2025) |
| 02/14/2025 | 72 | MOTION for Extension of Time to Feb. 14, 2025 to File *Consolidated Opposition Brief* by Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health.(VanLandingham, Kevin) (Entered: 02/14/2025) |
| 02/14/2025 | 73 | Opposition re 4 Emergency MOTION for Temporary Restraining Order filed by Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health. (Attachments: # 1 Bundesen Decl.)(VanLandingham, Kevin) (Entered: 02/14/2025) |
| 02/15/2025 | 74 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 72 Motion for Extension of Time to File. (MAL) (Entered: 02/15/2025) |
| 02/17/2025 | 75 | MOTION Leave to File a Single, Consolidated Reply Brief of 25 Pages by State of Maine, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, Commonwealth of Massachusetts, State of Vermont, State of Washington, State of Wisconsin, Attorney General Dana Nessel, State of Illinois, State of Arizona, State of California, State of Connecticut, State of Colorado, State of Delaware, State of Hawaii.(Dirks, Katherine) (Entered: 02/17/2025) |
| 02/17/2025 | 76 | AFFIDAVIT OF SERVICE Executed by Commonwealth of Massachusetts. All Defendants. Acknowledgement filed by Commonwealth of Massachusetts. (Attachments: # 1 Affidavit of service on D. Mass. USAO)(Pappavaselio, Chris) (Entered: 02/17/2025) |
| 02/18/2025 | 77 | Opposition re 75 MOTION Leave to File a Single, Consolidated Reply Brief of 25 Pages filed by Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health. (Ports, Thomas) (Entered: 02/18/2025) |
| 02/18/2025 | 78 | District Judge Angel Kelley: ELECTRONIC ORDER entered. As the Court sees little difference between three ten−page briefs and one, consolidated thirty−page brief, Plaintiffs' request to file a single, consolidated reply brief of thirty (30) pages is **GRANTED**.<br><br>The above resolves the motions filed at: 25−cv−10338−AK [Dkt. 75], 25−cv−10340−AK [Dkt. 32], and 25−cv−10346−AK [Dkt. 76].<br><br>Associated Cases: 1:25−cv−10338−AK, 1:25−cv−10340−AK, 1:25−cv−10346−AK (MAL) (Entered: 02/18/2025) |

| 02/18/2025 | 79 | NOTICE of Appearance by Sophia TonNu on behalf of State of California (TonNu, Sophia) (Entered: 02/18/2025) |
|---|---|---|
| 02/18/2025 | 80 | MOTION for Leave to File *Memorandum of Law as Amicus Curiae in Support of Plaintiffs' Motion for A Temporary Restraining Order* by Massachusetts Biotechnology Council, Inc..(Gold, Eric) (Entered: 02/18/2025) |
| 02/18/2025 | 81 | REPLY to Response to 4 Emergency MOTION for Temporary Restraining Order filed by State of Maine, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, Commonwealth of Massachusetts, State of Vermont, State of Washington, State of Wisconsin, Attorney General Dana Nessel, State of Illinois, State of Arizona, State of California, State of Connecticut, State of Colorado, State of Delaware, State of Hawaii. (Dirks, Katherine) (Entered: 02/18/2025) |
| 02/18/2025 | 82 | Second AFFIDAVIT of Katherine Dirks in Support re 4 Emergency MOTION for Temporary Restraining Order filed by State of Maine, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, Commonwealth of Massachusetts, State of Vermont, State of Washington, State of Wisconsin, Attorney General Dana Nessel, State of Illinois, State of Arizona, State of California, State of Connecticut, State of Colorado, State of Delaware, State of Hawaii. (Attachments: # 1 Exhibit 44, # 2 Exhibit 45, # 3 Exhibit 46, # 4 Exhibit 47, # 5 Exhibit 48, # 6 Exhibit 49, # 7 Exhibit 50, # 8 Exhibit 51, # 9 Exhibit 52, # 10 Exhibit 53, # 11 Exhibit 54)(Dirks, Katherine) (Entered: 02/18/2025) |
| 02/18/2025 | 83 | ELECTRONIC NOTICE Setting Hearing on Emergency MOTION for Temporary Restraining Order (Dkt. 4 in 1:25−cv−10338−AK); (Dkt. 5 in 1:25−cv−10340−AK); and (Dkt. 2 in 1:25−cv−10346−AK).

Audio access to the hearing will be available to the media and public (max. 1000 participants). Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html.

For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here.

Motion Hearing set for 2/21/2025 10:00 AM in Courtroom 8 (In person with remote access provided) before District Judge Angel Kelley.

Associated Cases: 1:25−cv−10338−AK, 1:25−cv−10340−AK, 1:25−cv−10346−AK (MAL) (Entered: 02/18/2025) |
| 02/19/2025 | 84 | District Judge Angel Kelley: ELECTRONIC ORDER entered. As the motion neither identifies an appropriate interest nor sufficient reasons as to why the matters asserted are relevant to the disposition of the case, 68 MOTION for Leave to File Amicus Brief filed by Cody R. Hart and Derrill J. Fussell is **DENIED**. (MAL) (Entered: 02/19/2025) |
| 02/19/2025 | 85 | District Judge Angel Kelley: ELECTRONIC ORDER entered. As the motion is unopposed, properly identifies the movant's interest, and provides information relevant to the disposition of the case, MOTION for Leave to File Memorandum of Law as Amicus Curiae in Support of Plaintiffs' Motion for A Temporary Restraining Order by Massachusetts Biotechnology Council, Inc. is **GRANTED**.

The above resolves the motions filed at: 25−cv−10338−AK [Dkt. 80], 25−cv−10340−AK [Dkt. 35], and 25−cv−10346−AK [Dkt. 79].

Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document.

Associated Cases: 1:25−cv−10338−AK, 1:25−cv−10340−AK, 1:25−cv−10346−AK (MAL) (Entered: 02/19/2025) |

| | | |
|---|---|---|
| 02/19/2025 | 86 | District Judge Angel Kelley: ELECTRONIC ORDER entered. On February 13, 2025, this Court ordered the parties to submit a joint statement to include a proposed list of issues, speakers, and time limits for the motion hearing scheduled for February 21, 2025.<br><br>The Court **ADOPTS** the proposed schedule, as submitted jointly by the parties.<br><br>Associated Cases: 1:25−cv−10338−AK, 1:25−cv−10340−AK, 1:25−cv−10346−AK (MAL) (Entered: 02/19/2025) |
| 02/19/2025 | 87 | Copy re 84 Order on Motion for Leave to File, mailed to Cody R. Hart and Derrill J. Fussell on 2/19/2025. (CEH) (Entered: 02/19/2025) |
| 02/19/2025 | 88 | NOTICE of Appearance by Joshua Bendor on behalf of State of Arizona (Bendor, Joshua) (Entered: 02/19/2025) |
| 02/19/2025 | 89 | Assented to MOTION for Leave to File *Proposed Amicus Brief* by Cities, Counties, and Mayors. (Attachments: # 1 Exhibit Proposed Amicus Brief)(Miller, Jonathan) (Entered: 02/19/2025) |
| 02/20/2025 | 90 | District Judge Angel Kelley: ELECTRONIC ORDER entered. As the motion is unopposed, properly identifies the movants' interest, and provides information relevant to the disposition of the case, MOTION for Leave to File Proposed Amicus Brief by Cities, Counties, and Mayors is **GRANTED**.<br><br>The above resolves the motions filed at: 25−cv−10338−AK [Dkt. 89], 25−cv−10340−AK [Dkt. 42], and 25−cv−10346−AK [Dkt. 85].<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include − Leave to file granted on (date of order)− in the caption of the document.<br><br>Associated Cases: 1:25−cv−10338−AK, 1:25−cv−10340−AK, 1:25−cv−10346−AK (MAL) (Entered: 02/20/2025) |
| 02/20/2025 | 91 | AMICUS BRIEF filed by Cities, Counties, and Mayors . (Miller, Jonathan) (Entered: 02/20/2025) |
| 02/20/2025 | 92 | AMICUS BRIEF filed by Massachusetts Biotechnology Council, Inc. . (Gold, Eric) (Entered: 02/20/2025) |
| 02/20/2025 | 93 | NOTICE of Appearance by Ellen E Range on behalf of State of Washington (Range, Ellen) (Entered: 02/20/2025) |
| 02/20/2025 | 94 | NOTICE of Appearance by Spencer Wade Coates on behalf of State of Washington (Coates, Spencer) (Entered: 02/20/2025) |
| 02/21/2025 | 95 | Electronic Clerk's Notes for proceedings held before District Judge Angel Kelley: Motion Hearing held on 2/21/2025 re Emergency MOTION for Temporary Restraining Order (Dkt. 4 in 1:25−cv−10338−AK); (Dkt. 5 in 1:25−cv−10340−AK); and (Dkt. 2 in 1:25−cv−10346−AK).<br><br>The Court heard oral argument on the pending motions and took the matter under advisement.<br><br>(Court Reporter: Linda Walsh at lwalshsteno@gmail.com.)(Attorneys present: Dirks, Unikowsky, Bueker, Lea)<br><br>Associated Cases: 1:25−cv−10338−AK, 1:25−cv−10340−AK, 1:25−cv−10346−AK (MAL) (Entered: 02/21/2025) |
| 02/21/2025 | 96 | District Judge Angel Kelley: ELECTRONIC ORDER entered. For the reasons stated on the record at the February 21, 2025, motion hearing, the existing temporary restraining order is extended and will remain in effect until further order is issued resolving the request for a preliminary injunction.<br><br>Associated Cases: 1:25−cv−10338−AK, 1:25−cv−10340−AK, 1:25−cv−10346−AK (MAL) (Entered: 02/21/2025) |

| 02/21/2025 | 97 | NOTICE of Appearance by Allyson T Slater on behalf of Commonwealth of Massachusetts (Slater, Allyson) (Entered: 02/21/2025) |
|---|---|---|
| 02/25/2025 | 98 | STATUS REPORT by Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), National Institutes of Health. (Attachments: # 1 Exhibit Declaration of Dr. Liza Bundesen)(Ports, Thomas) (Entered: 02/25/2025) |
| 02/26/2025 | 99 | Transcript of Motion Hearing held on February 21, 2025, before Judge Angel Kelley. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Linda Walsh at lwalshsteno@gmail.com. Redaction Request due 3/19/2025. Redacted Transcript Deadline set for 3/31/2025. Release of Transcript Restriction set for 5/27/2025. Associated Cases: 1:25−cv−10338−AK, 1:25−cv−10340−AK, 1:25−cv−10346−AK (DRK) (Entered: 02/26/2025) |
| 02/26/2025 | 100 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above−captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25−cv−10338−AK, 1:25−cv−10340−AK, 1:25−cv−10346−AK(DRK) (Entered: 02/26/2025) |
| 02/28/2025 | 101 | NOTICE of Appearance by Linus Banghart−Linn on behalf of Attorney General Dana Nessel (Banghart−Linn, Linus) (Entered: 02/28/2025) |
| 02/28/2025 | 102 | MOTION for Leave to Appear Pro Hac Vice for admission of Joshua Sean Smith Filing fee: $ 125, receipt number AMADC−10865360 by Attorney General Dana Nessel. (Attachments: # 1 Certificate of Joshua Smith)(Pappavaselio, Chris) (Entered: 02/28/2025) |
| 02/28/2025 | 103 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** 102 Motion for Leave to Appear Pro Hac Vice Added Joshua Sean Smith.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen−current−pacer−accounts.htm#link−account.<br><br>(CEH) (Entered: 02/28/2025) |
| 03/03/2025 | 104 | NOTICE of Appearance by Joshua S. Smith on behalf of Attorney General Dana Nessel (Smith, Joshua) (Entered: 03/03/2025) |
| 03/05/2025 | 105 | District Judge Angel Kelley: MEMORANDUM AND ORDER ON MOTION FOR PRELIMINARY INJUNCTION entered.<br><br>For the reasons stated in the attached memorandum, Plaintiffs' Motion for Preliminary Injunction is **GRANTED**.<br><br>The Defendants and their officers, employees, servants, agents, appointees, and successors are hereby enjoined from taking any steps to implement, apply, or enforce the Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Costs Rates (NOT−OD−25−068), issued by the Office of the Director of the National Institutes of Health on February 7, 2025, in any form with respect to institutions nationwide until further order issued by this Court.<br><br>The above resolves the motions filed at: 25−cv−10338−AK [Dkt. 4], 25−cv−10340−AK [Dkt. 5], and 25−cv−10346−AK [Dkt. 2].<br><br>Associated Cases: 1:25−cv−10338−AK, 1:25−cv−10340−AK, 1:25−cv−10346−AK (MAL) (Entered: 03/05/2025) |
| 03/07/2025 | 106 | NOTICE of Appearance by David Dana Day on behalf of State of Hawaii (Day, David) (Entered: 03/07/2025) |

| | | |
|---|---|---|
| 03/21/2025 | 107 | NOTICE of Appearance by Michael Skold on behalf of State of Connecticut (Skold, Michael) (Entered: 03/21/2025) |
| 04/04/2025 | 108 | Assented to MOTION for Permanent Injunction – *Motion to Convert Order on Preliminary Injunction into Order on Permanent Injunction and to Enter Final Judgment* – by Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health. (Attachments: # 1 Text of Proposed Order)(Ports, Thomas) (Entered: 04/04/2025) |
| 04/04/2025 | 109 | Assented to MOTION to Stay *all Deadlines* by U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health. (Attachments: # 1 Text of Proposed Order)(Ports, Thomas) (Entered: 04/04/2025) |
| 04/04/2025 | 110 | District Judge Angel Kelley: ELECTRONIC ORDER entered **GRANTING** DEFENDANTS' ASSENTED–TO MOTION TO CONVERT ORDER ON PRELIMINARY INJUNCTION INTO ORDER ON PERMANENT INJUNCTION AND ENTER FINAL JUDGMENT. The above resolves the motions filed at: 25–cv–10338–AK [Dkt. 108], 25–cv–10340–AK [Dkt. 52], and 25–cv–10346–AK [Dkt. 96].<br><br>Associated Cases: 1:25–cv–10338–AK, 1:25–cv–10340–AK, 1:25–cv–10346–AK (MAL) (Entered: 04/04/2025) |
| 04/04/2025 | 111 | District Judge Angel Kelley: ELECTRONIC ORDER entered **DENYING** as moot DEFENDANTS' ASSENTED–TO MOTION TO STAY ALL DEADLINES. The above resolves the motions filed at: 25–cv–10338–AK [Dkt. 109], 25–cv–10340–AK [Dkt. 53], and 25–cv–10346–AK [Dkt. 97].<br><br>Associated Cases: 1:25–cv–10338–AK, 1:25–cv–10340–AK, 1:25–cv–10346–AK (MAL) (Entered: 04/04/2025) |
| 04/04/2025 | 112 | District Judge Angel Kelley: FINAL JUDGMENT AND PERMANENT INJUNCTION entered.<br><br>Associated Cases: 1:25–cv–10338–AK, 1:25–cv–10340–AK, 1:25–cv–10346–AK (MAL) (Entered: 04/04/2025) |
| 04/08/2025 | 113 | NOTICE OF APPEAL as to 112 Permanent Injunction by Matthew Memoli, M.D., M.S., U.S. Department of Health and Human Services ( HHS), Dorothy Fink, National Institutes of Health. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 4/28/2025. (Ports, Thomas) (Entered: 04/08/2025)** |
| 04/08/2025 | 114 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 113 Notice of Appeal. (MAP) (Entered: 04/08/2025) |
| 04/08/2025 | 115 | USCA Case Number 25–1343 for 113 Notice of Appeal,,, filed by U.S. Department of Health and Human Services ( HHS), Matthew Memoli, M.D., M.S., National Institutes of Health, Dorothy Fink. (MAP) (Entered: 04/08/2025) |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF THE STATE OF MICHIGAN, STATE OF ILLINOIS, STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF CONNECTICUT, STATE OF COLORADO, STATE OF DELAWARE, STATE OF HAWAI'I, STATE OF MAINE, STATE OF MARYLAND, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW YORK, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, and STATE OF WISCONSIN,<br><br>      Plaintiffs,<br><br>         v.<br><br>NATIONAL INSTITUTES OF HEALTH; MATTHEW MEMOLI, M.D., M.S., in his official capacity as Acting Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and DOROTHY FINK, in her official capacity as Acting Secretary of the U.S. Department of Health and Human Services,<br><br>      Defendants. | Case No. _____ |

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

1.      The Commonwealth of Massachusetts, Attorney General Dana Nessel on behalf of the People of the State of Michigan, State of Illinois, State of Arizona, State of California, State of Connecticut, State of Colorado, State of Delaware, State of Hawai'i, State of Maine, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, State of Washington and State of Wisconsin ("Plaintiff States") bring this action to protect their states and residents from unlawful action by the National Institutes of Health ("NIH") that will devastate critical public health research at universities and research institutions in the United States.  Without relief from NIH's action, these institutions' cutting-edge work to cure and treat human disease will grind to a halt.

2.      This suit concerns the "indirect cost rates" for NIH's research funding.  High-level research requires funds not just for the costs that can be directly attributed to the specific work of a particular project, but also the indirect costs that support multiple projects.  These costs are broken up into "facilities" and "administration" costs.  For example, in order to conduct research, a university needs buildings, and needs to maintain those buildings and supply them with heat and electricity.  A university also needs the infrastructure necessary to comply with legal, regulatory, and reporting requirements.  These facilities costs cannot be attributed to any particular research project, but are still necessary for any research to occur.  And university staff need administrative support, including clerical staff, IT support, cybersecurity and data respositories, as well as staff to administer the university as a whole.  Again, these administrative costs support the university as a whole, and help make research possible without being attributable to any specific grant or project.

2

3.      Effectively halting research to cure and treat human disease will directly impact the well-being of the Plaintiff states' citizens, who are the beneficiaries of research creating treatments, such as modern gene editing, vaccines such as flu vaccines, and cures for diseases like cancer, infectious diseases, and addiction.  The well-being of the Plaintiff States' citizens also will be adversely affrected by the halting of research involving a better understanding of health conditions.  These universities and research institutions are vital economic and social institutions in each state, employing thousands of their citizens, educating and training thousands more, and creating investment and partnering opportunities with the private sector.

4.      Research institutions negotiate indirect cost rates with the federal government through a carefully regulated process, governed by regulations promulgated by the Office of Management and Budget ("OMB") and the Department of Health and Human Services ("HHS").  Those indirect cost rates are based on each institution's unique needs and cost structure and derive from documented and actual costs experienced for that institution. Typically, after the research institution's specific indirect cost rate is negotiated, it is memorialized in an executed agreement that applies to all of that institution's federal grants. After that agreement is executed, the federal government audits the research institution's indirect costs to ensure that they fall within the negotiated indirect cost rate and the calculations that supported it.

5.      The agency may deviate from the negotiated rate only when required by federal statute or regulation, or when the deviation is individually sought and justified through a decision-making process that identifies the criteria and circumstances justifying that decision in specified instances.

3

6.      In 2017, during his first administration, President Trump made a budget proposal that would have reduced the indirect cost rate for research institutions to an across-the-board, categorical rate of 10%.  Congress unequivocally responded to ward off such a change to the calculation of indirect cost rates.  In 2018, Congress enacted an appropriations rider prohibiting HHS or NIH from spending appropriated funds "to develop or implement a modified approach to" the reimbursement of "indirect costs" and "deviations from negotiated rates."  Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat 348, § 226.  That rider has remained in effect through every appropriations law governing HHS to this day.  *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 224.

7.      On February 7, 2025, NIH nonetheless issued a guidance document pronouncing that all indirect cost rates for NIH grants would be reduced to 15%, in Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates* (the "Rate Change Notice").  This reduction applies not only to new grants but to existing grants, and becomes effective on February 10, 2025, just one business day after the Rate Change Notice issued.

8.      The effects of the Rate Change Notice will be immediate and devastating. Medical schools, universities, research institutions, and other grant recipients across the country have already budgeted for (and incurred obligations based on) the specific indirect cost rates that had been negotiated and formalized with the federal government through the designated statutory and regulatory legal process.  This agency action will result in layoffs, suspension of clinical trials, disruption of ongoing research programs, and laboratory closures.  As the Guidance acknowledges, NIH's work and the institutions that NIH supports serve to "enhance health, lengthen life, and reduce illness and disability."  NIH's extraordinary attempt to disrupt

**J.A. 24**

all existing and future grants not only poses an immediate threat to the nation's research

infrastructure, but will also have a long-lasting impact on its research capabilities and its ability

to provide life-saving breakthroughs in scientific research.

9.      The Rate Change Notice violates the Administrative Procedure Act ("APA") in

multiple ways.  The Rate Change Notice is arbitrary and capricious in, among other ways, its

failure to articulate the bases for the categorical rate cap of 15%, its failure to consider the grant

recipients' reliance on their negotiated rates, and its disregard for the factual findings that

formed the bases for the currently operative negotiated indirect cost rates.  The Rate Change

Notice contravenes Congress's express directives in the appropriation acts governing the NIH,

and HHS's own regulations that prohibit NIH from requiring such categorial, indiscriminate

changes to indirect cost rates.  In issuing the Rate Change Notice, the NIH has also acted

beyond its statutory authority, and has failed to promulgate the change using notice and

comment rulemaking.

10.      The Court should set aside the Rate Change Notice and enjoin any actions taken

to implement its directives.

## JURISDICTION AND VENUE

11.      This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 701-706;

the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47; and federal regulations

in the Code of Federal Regulations governing federal grants.  The Court has jurisdiction pursuant

to 28 U.S.C. § 1331.

12.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1).  Defendants

are United States agencies or officers sued in their official capacities. The Commonwealth of

Massachusetts is a resident of this judicial district and a substantial part of the events or

omissions giving rise to this Complaint occurred within the District of Massachusetts.

# PARTIES

**A.    Plaintiff States**

13.    The Commonwealth of Massachusetts is a sovereign state of the United States of America.  Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

14.    Attorney General Dana Nessel is Michigan's chief law enforcement officer and is authorized to act in federal court on behalf of the People of the State of Michigan on matters of public concern.  Mich. Comp. Laws § 14.28.

15.    The State of Illinois is a sovereign state of the United States of America.  Illinois is represented by Attorney General Kwame Raoul, who is the chief law enforcement officer of Illinois.

16.    The State of Arizona is a sovereign state in the United States of America. Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

17.    The State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

18.    The State of Colorado, represented by and through its Attorney General Phil Weiser, is a sovereign state of the United States. The Attorney General acts as the chief legal representative of the state, and is authorized under section 24-31-101, C.R.S., to pursue this action.

19.    The State of Connecticut is a sovereign state in the United States of America. Connecticut is represented by Attorney General William Tong, who is the chief law enforcement officer of Connecticut.

20.     The State of Delaware is a sovereign state in the United States of America. Delaware is represented by Attorney General Kathy Jennings, who is the chief law enforcement officer of Delaware.

21.     The State of Hawai'i is a sovereign state of the United States of America. Hawai'i is represented by Attorney General Anne Lopez who is the chief law enforcement officer of Hawai'i.

22.     The State of Maine is a sovereign state of the United States of America. Maine is represented by Attorney General Aaron Frey who is the chief law enforcement officer of Maine.

23.     The State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

24.     The State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Attorney General Keith Ellison who is the chief legal officer of Minnesota.

25.     The State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.

26.     The State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

27.     The State of Nevada is a sovereign state of the United States of America. Nevada is represented by Attorney General Aaron Ford who is the chief law enforcement officer of Nevada.

7

**J.A. 27**

28.     The State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez who is the chief law enforcement officer of New Mexico.

29.     The State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.

30.     The State of Oregon is a sovereign state in the United States of America. The State of Oregon is represented by Attorney General Dan Rayfield, who is the chief legal officer of Oregon. Attorney General Rayfield is authorized by statute to file suit in federal court on behalf of the State of Oregon to protect the interests of the state. ORS 180.060.

31.     The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

32.     The State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity Clark, who is the chief law enforcement officer of Vermont. Attorney General Clark is authorized to initiate litigation on Vermont's behalf.

33.     The State of Washington is a sovereign state in the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

34.     The State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Attorney General Josh Kaul who is the chief law enforcement officer of Wisconsin.

**B.     Defendants**

35.     Defendant the National Institutes of Health is an agency of the United States Government, established pursuant to 42 U.S.C. § 281, and is housed within the U.S. Department of Health and Human Services.

36.     Defendant Matthew Memoli, M.D., M.S., is Acting Director of NIH.  He is sued in his official capacity.

37.     Defendant U.S. Department of Human and Health Services is a federal cabinet agency that houses NIH.  HHS is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 551.

38.     Defendant Dorothy Fink, M.D., is the Acting Secretary of HHS.  She is sued in her official capacity.

## FACTUAL BACKGROUND

**NIH's Funding of Medical and Public Health Research in the United States**

39.     The NIH is the primary source of federal funding for medical and public health research in the United States.  In Fiscal Year 2023, NIH spent over $35 billion on almost 50,000 competitive grants to more than 300,000 researchers.

40.     NIH grants have funded public health research that have led to innumerable scientific breakthroughs, ranging from the Human Genome Project to the development of the MRI to the discovery of treatments for cancers of all types.  Dozens of NIH-supported scientists have earned Nobel Prizes for their groundbreaking scientific work.

41.     Most NIH-funded research occurs outside of federal government institutions, including at state universities and colleges, private institutions of higher education, and other research institutions.  This approach allows NIH to fund a diverse array of institutions, promote competition for research grants, and facilitate the training of the next generation of researchers.

42.     Plaintiff States' state universities and colleges, as well as other research institutions, depend heavily on NIH funding to support medical research.  At any given time, individual research universities may depend on thousands of NIH grants that support independent research projects across multiple university facilities.

43.     The NIH competitive grantmaking process begins with a notice of funding opportunities for a specific topic followed by new application submissions.  *See* NIH Grants Policy Statement, U.S. Dep't of Health & Hum. Servs. (rev. Apr. 2024) ("NIHGPS"), at I-51.

44.     After a formal review process that includes peer review, the NIH issues a legally binding Notice of Award ("NOA") to selected grant recipients stating that funds may be requested.  *Id.* at IIA-59.

45.     The grant awards are generally not lump-sum awards.  Rather, they are grant amounts using cost-based accounting systems, under which grant recipients are authorized to recover their actual, documented costs for conducting research after the grant is awarded.

46.     An NOA is issued for the initial budget period and each subsequent budget period, and it reflects any future-year expectations for the continuation of the funded project.

47.     "Once the [NOA] is signed or money is drawn, the [NOA] and the grant terms are binding on the grantee and the government."  *U.S. ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674, 681 (E.D. Pa. 2009).  "An [NOA] constitutes an 'obligation,'" and the NIH is "committed to funding the grant for the current budget period due to dependency upon the

annual Congressional appropriations process." *Id.* Accordingly, any failure of the NIH to comply with the terms of an NOA in the middle of a budget period—such as by modifying payment of "go forward expenses"—would constitute a breach of the NIH's obligations.

**Direct Costs and Indirect Costs of Research Programs**

48.     After receiving an NIH grant, a grantee submits annual Research Performance Progress Reports, outlining their "direct costs" and their "indirect costs" to the agency.

49.     "Direct costs" are those costs that are attributed directly to a specific research project supported by the grant.

50.     For example, direct costs may include the cost of a specialized piece of equipment designated for that research project, salaries for the research staff who perform the research, stipends for graduate students, research equipment, and materials and supplies used in experiments (e.g., reagents).

51.     "Indirect costs" are those costs that are necessary for research but cannot be attributed and allocated directly to a specific research project.

52.     Indirect costs may include expenses such as building construction and maintenance, utilities, laboratory equipment, and cleaning costs. Indirect costs may also include research administration, which includes the work of safety and regulatory committees that are mandated by the federal government for certain research programs, as well as other support staff whose services apply to multiple research projects. In addition, indirect costs may include equipment necessary to comply with specialized ventilation requirements, or research quarters and facilities suitable for optimizing biosafety and radiation safety.

53.     Indirect costs are just as vital as direct costs because they likewise cover necessary costs for research projects.  Indirect costs are an essential part of the cost of scientific progress and medical advances.

54.     Indirect costs are vital to conducting research that advances American stature in international technological advancement, medical research, and life-saving technologies.  They support the fundamental expense of simply providing a location and staff to facilitate the research that would otherwise not be funded through direct costs.

55.     For example, a university which is funded to conduct cancer therapy research also must fund the physical maintenance of a laboratory and pay for the staff who manage the laboratory and lab equipment, such as operational staff who are not themselves researchers.

56.     "Indirect costs" are defined in 45 C.F.R. § 75.414(a) to include "facilities" and "administration."

57.     The "facilities" category of indirect costs is "defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses."  *Id.*  This category includes the costs of the physical infrastructure necessary for carrying out research, such as construction and maintenance of specialized facilities and laboratories.  Facilities costs are indirect costs because they cannot be attributed to an individual project.  Nevertheless, if those facilities expenditures are not made, research in that building cannot occur.

58.     For example, a single building may house numerous research groups engaging in multiple NIH-funded projects, such that the cost of the building's construction and maintenance cannot be attributed solely to one individual project.  Nevertheless, without the building's construction and maintenance, research in that building cannot occur.

59.     The "administration" category is defined as "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities'" (including cross allocations from other pools, where applicable).  45 C.F.R. § 75.414(a).  This category includes costs related to the administrative and compliance activities required to conduct federally sponsored research, such as human and animal research review boards, financial reporting and purchasing, training and education, and managing potential conflicts of interest.

60.     For example, a single employee or group of employees may handle necessary administrative activities across multiple NIH grants, and the costs of employing those individuals cannot be attributed to an individual research project.

**The Negotiation and Establishment of Indirect Cost Rates with the Federal Government**

61.     Federal regulations require research institutions to express their indirect costs as a rate:  the proportion of their total costs that cannot be attributed or allocated to individual research projects.

62.     As a simplified example, a federal grant may award $100,000 to a grant recipient to conduct a specific research project.  If the grant recipient's indirect cost rate is 20%, then the grant award becomes $120,000, after adding the indirect costs.

63.     Federal regulations prescribe a detailed methodology for negotiating indirect cost rates.  Typically, a single agency, such as HHS, negotiates an indirect cost rate with a research institution.  As part of those negotiations, federal regulations require institutions to conduct comprehensive cost analyses that follow detailed federal directives governing reasonable and allowable indirect costs.  For example, if an institution seeks to recover the cost of building

maintenance, it must document those costs and then attribute those costs to their research programs.

64.     The federal agency then reviews and verifies these proposals, resulting in extensive back-and-forth negotiation on an indirect cost rate.

65.     Once the indirect cost rate for a research institution is negotiated, the research institution and the federal agency most typically enter into a Negotiated Indirect Cost Rate Agreement ("NICRA").  That indirect cost rate is then binding on the entire federal government during the period that the negotiated rate is in effect.  The default term for such agreements, under the OMB regulations, is five years.

66.     After the indirect cost rate is agreed upon and the actual indirect costs are incurred, federal agencies can conduct audits to ensure that the negotiated indirect cost rate conforms to the actual indirect costs that are incurred.  The indirect cost rate is then adjusted if the audit establishes that the institution has recovered excess costs.

**Indirect Cost Rates in the Administration of NIH Grants**

67.     NIH is required to use the indirect cost rate negotiated with a research institution in its NICRA unless a deviation from that rate is "required by statute or regulation" or is "approved by a Federal awarding agency head or delegate based on documented justification as described in [45 C.F.R. § 75.414(c)(3)]."  45 C.F.R. § 75.414(c)(1).

68.     To deviate from a negotiated indirect cost rate, 45 C.F.R. § 75.414(c)(3) requires that "[t]he HHS awarding agency must implement, and make publicly available, the policies, procedures and general decision making criteria that their programs will follow to seek and justify deviations from negotiated rates."

14

**J.A. 34**

69.     Pursuant to 45 C.F.R. § 75.414(c)(4), "the HHS awarding agency must include in the notice of funding opportunity the policies relating to indirect cost rate reimbursement, matching, or cost share as approved."  Moreover, "the HHS agency should incorporate discussion of these policies into their outreach activities with non-Federal entities prior to the posting of a notice of funding opportunity."  *Id.*

70.     The NIHGPS sets out for NIH grant recipients "the policy requirements that serve as the terms and conditions of NIH grant awards."  Regarding reimbursement of indirect costs, the NIHGPS confirms that these rates are to be negotiated with one of several "agenc[ies] with cognizance for F&A/indirect cost rate (and other special rate) negotiation."  NIHGPS at IIA-68.

71.     The NIHGPS further provides that "[i]f a subrecipient already has a negotiated indirect cost rate established with their cognizant agency for indirect cost, the negotiated rate must be used."  *Id.* at IIA-69.

72.     Negotiated rates vary from institution to institution.

73.     The primary reason for this variation is that different institutions conduct different types of research.  Scientific laboratories tend to be far more expensive to build and maintain than generic office buildings.  As such, an institution engaging in biomedical research will likely have a higher indirect cost rate than an institution primarily engaged in social science research.

74.     Even in the context of biomedical research, some types of research require incurring more indirect costs than others.  If a particular institution invests in an expensive piece of lab equipment that supports multiple lines of research, that institution will have higher indirect cost rates than a different institution that does not use expensive shared lab equipment, or an institution that has expensive equipment devoted to only one line of research.

15

75.      Institutions with higher-than-average negotiated indirect cost rates are typically those that support facility-intensive types of research, including:  biocontainment laboratories that support immunology, virology, and microbiology research involving dangerous biological pathogens; cord blood bank and stem cell transplant facilities; animal facilities; and resources to support genomic, proteomic and metabolomics analysis and processing.

76.      Local conditions may also affect indirect cost rates.  The costs of construction, renovation, utilities, and wages vary significantly by region.

**Prior Attempts to Limit Indirect Cost Rates Governing NIH Grants**

77.      In 2017, the first Trump Administration released a budget proposal that would have slashed the indirect cost rate to a uniform, across-the-board rate of 10%.

78.      The budget proposal generated alarm that such a change would bring research programs throughout the country to a halt.

79.      To avert those consequences, Congress enacted an appropriations rider prohibiting HHS or NIH from spending appropriated funds "to develop or implement a modified approach to" the reimbursement of "indirect costs" and "deviations from negotiated rates." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, § 226.

80.      That rider has since remained in effect, unbroken year by year, through every appropriations law governing HHS.

81.      It remains in effect to this day, in the now-operative statute.  *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 224.

**NIH's Rate Change Notice**

82.      On February 7, 2025, the Office of the Director of NIH issued a document, titled "Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates"

16

**J.A. 36**

(hereinafter, "Rate Change Notice").  The Rate Change Notice announced that "[f]or any new grant issued, and for all existing grants to [institutions of higher education, or "IHEs"] retroactive to the date of issuance of this Supplemental Guidance, award recipients are subject to a 15 percent indirect cost rate."  It further explained that "[p]ursuant to this Supplemental Guidance, there will be a standard indirect rate of 15% across all NIH grants for indirect costs in lieu of a separately negotiated rate for indirect costs in every grant."

83.    The Rate Change Notice purports to rely on 45 C.F.R. § 75.414(c)(1) for authority to set a single, uniform indirect cost rate of 15%.  But that regulatory provision requires that, in order to deviate from a negotiated indirect cost rate absent a statutory or regulatory requirement to do so, NIH must comply with 45 C.F.R § 75.414(c)(3)'s requirement that the agency "implement, and make publicly available, the policies, procedures, and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates."  45 C.F.R § 75.414(c)(3).  And pursuant to the regulatory provision that immediately follows, NIH "must include" such "policies relating to indirect cost rate reimbursement" "in the notice of funding opportunity."  45 C.F.R § 75.414(c)(4).

84.    The Appendix to this regulation, referenced in the Rate Change Notice, and entitled "Appendix III to Part 75—Indirect (F&A) Costs Identificaton and Assignment, and Rate Determination for Institutions of Higher Education (IHES)," reinforces the inappropriateness of relying on this regulation to make such a categorical change.  In particular, it states in § C.7: "Except as provided in paragraph (c)(1) of §75.414 Federal agencies must use the negotiated rates for indirect (F&A) costs in effect at the time of the initial award throughout the life of the Federal award. Award levels for Federal awards may not be adjusted in future years as a result of

17

**J.A. 37**

changes in negotiated rates.  'Negotiated rates' per the rate agreement include final, fixed, and predetermined rates and exclude provisional rates."

85.    Notices of funding opportunity provided to insittutions in Plaintiff States did not contain policies issued pursuant to 45 C.F.R § 75.414(c)(3) upon which NIH now seeks to justify deviations from their negotiated rates to the 15% rate announced in the Rate Change Notice. Rather, according to NIH, the Rate Change Notice itself "implements and makes publicly available NIH's updated policy deviating from the negotiated indirect cost rate for new grant awards and existing grant awards, effective as of the date of this Guidance's issuance."

**Plaintiff States' Indirect Costs and Negotiated Indirect Cost Rates**

86.    Institutions in each of the Plaintiff States have negotiated indirect cost rates with NIH and have executed agreements setting forth those rates.

87.    Some Plaintiff States' institutions of higher education are arms or instrumentalities of Plaintiff States, and the injuries to those institutions are also injuries to Plaintiff States.  Plaintiff States therefore have standing to bring this suit on their behalf.  *See Biden v. Nebraska*, 143 S. Ct. 2355, 2365-68 (2023); *Peters v. Bd. of Trs. of S. Ill. Univ.*, 816 N.E.2d 1, 3 (Ill. App. Ct. 2004) ("There are numerous decisions finding that a state university and its board of trustees are arms of the State.").

88.    The Rate Change Notice will have immediate, severe destructive effects on research universities, medical schools, and scientific institutes and programs throughout the country.  These institutions not only contribute significantly to protecting the health of the plaintiff states' citizens through their research, but are also important economic drivers for the plaintiff states – employing thousands of their citizens and leveraging additional investment in the states.

89.    In Federal fiscal year 2024, 219 organizations in Massachusetts received NIH funding to support 5,783 projects.  The total funding was $3.46 billion, of which approximately $1 billion or more were to support indirect costs of the projects.

90.    Included in these figures are 501 awards to UMass campuses for a total of $248 million, or which more than $80 million were for indirect costs.  The UMass system, with its five campuses, is the largest provider of talent to the Massachusetts economy.

91.    The University of Massachusetts Chan Medical School ("UMass Chan Medical School") receives a total of approximately $200 million in NIH grant funding annually. Approximately $62 million of this funding is derived from indirect cost allocations.

92.    UMass Chan Medical School has a NICRA with NIH, effective as of June 6, 2023.  The Indirect Cost Rate in UMass Chan Medical School's NICRA is 67.5%, with certain direct cost categories (such as equipment, patient care costs, and subcontracts) exempted from calculating the indirect cost rate, resulting in a blended indirect cost rate of just under 45% on the NIH grant portfolio of UMass Chan Medical School.

93.    UMass Chan Medical School has relied on its NICRA in preparing its operating budget and in incurring obligations to support its research programs.  The loss of these funds will immediately impact UMass Chan Medical School's ability to draw critical funds used to pay expenses associated with utilities and basic maintenance on the operational research facilities, debt service, payroll, and other infrastructure associated with UMass Chan Medical School's research and clinical trials.

94.    The Rate Change Notice, cutting indirect cost rates to 15%, would result in a loss to UMass Chan Medical School of $40 to $50 million annually that UMass Chan Medical School uses to support its research programs.

**J.A. 39**

95.     For UMass Chan Medical School, NIH's reduction of the indirect cost rate will eliminate approximately $40 to $50 million dollars in funding that UMass Chan Medical School uses to support its research programs. The loss of these funds will immediately impact UMass Chan Medical School's ability to draw critical funds used to pay expenses associated with utilities and basic maintenance on the operational research facilities, debt service, payroll, and other infrastructure associated with UMass Chan Medical School's research and clinical trials.

96.     In Federal fiscal year 2024, UMass Amherst will receive approximately $44.8 million dollars in funding from NIH.  Of that total amount, approximately $13.1 million dollars are for indirect costs, based on the NIH Federal indirect cost rate of 61%.

97.     An example of an NIH-funded project at UMass Amherst is "Massachusetts AI and Technology Center for Connected Care in Aging and Alzheimer's Disease (MAITC)," supported by the National Institute on Aging.  The project is a collaboration of UMass Amherst and Brigham and Women's Hospital, also involving Brandeis University, Massachusetts General Hospital, and Northeastern University.  MAITC fosters interdisciplinary research on the development, validation, and translation of AI-enhanced technologies to improve connections between older adults, caregivers, and clinicians in order to more effectively support the care of people living with Alzheimer's disease and related dementias.  MAITC provides support to other universities and private sector entities to support projects that accomplish this mission. Administrative support for the project is provided in part from the F&A reimbursements from NIH.

98.     In Michigan, the University of Michigan, the State's flagship research university, conducts life-saving and groundbreaking medical and technological research.  In 2024, the University of Michigan conducted approximately $801 million in NIH-funded research.  The

University of Michigan has negotiated an Indirect Cost Rate of 56%. A reduction to 15% would eliminate approximately $181 million in funding. This would impact 425 NIH-funded trials currently underway, including 161 trials aimed at saving lives.

99.    Michigan State University is the nation's pioneer land-grant university, and maintains human health research initiatives including translational neuroscience (with a focus on Alzheimer's and Parkinson's diseases), pediatrict and human development (including autism), obstetrics, gynecology, reproductive health, cancer and stroke. MSU receives NIH funding of approximately $136 million, and has negotiated an Indirect Cost Rate of 57%. A reduction to 15% would mean a loss of approximately $27 million that MSU uses to support its research programs. This would disrupt such important initiatives as Grand Rapids Innovation Park, MIRACLE Center, and MSU's partnership with Henry Ford Health. The precipitous reduction in funding would imperil thousands of Michigan jobs, not only in health science research, but also up to a thousand construction jobs, as MSU and Henry Ford Health are currently constructing a new research building in Detroit.

100.    Wayne State University in Detroit receives a total of $80 million in NIH grant funding annually. Wayne State University's negotiated indirect cost rate is 54%. A reduction to 15% will mean an immediate impact on Wayne State University's ability to pay expenses related to facilities operational costs and debt service, research personnel, clinical trials, grants management, regulatory compliance, core research facilities and services, equipment and supplies, and more.

101.    Illinois is home to dozens of world-class universities, public and private, including ten universities recognized by the Carnegie Classification of Institutions of Higher

Education as having "high" or "very high" research activity.[1]  According to NIH's grants database, all ten of Illinois's high-research universities received NIH grants for the 2022, 2023, and 2024 fiscal years.[2]

102.    At least nine public Illinois universities currently have NIH grants or subgrants: Chicago State University, Eastern Illinois University, Governor's State University, Illinois State University, Northeastern Illinois University, Northern Illinois University, Southern Illinois University, the University of Illinois Chicago, and the University of Illinois Urbana-Champaign. Five of these universities—Illinois State University, Northern Illinois University, Southern Illinois University, the University of Illinois Chicago, and the University of Illinois Urbana-Champaign—are high-research universities that obtain substantial grant funding from NIH.

103.    The Rate Change Notice would have a devastating effect on Illinois's research institutions, forcing them to curtail planned spending, reduce their scientific output, and limit research opportunities for students.

104.    The University of Illinois Chicago ("UIC") and the University of Illinois Urbana-Champaign ("UIUC"), for example, received more than $325 million in NIH funding during FY 2024.  The universities rely on those funds to conduct life-saving medical research, including roughly 400 ongoing clinical trials, that researchers cannot undertake without the laboratories, high-speed data processing, hazardous waste disposal, regulatory compliance staff, patient safety

---

[1]  *See* Search Results for Doctoral Universities with High or Very High Research Activity in Illinois, Carnegie Classification of Insts. of Higher Educ., https://carnegieclassifications.acenet.edu/institutions/?inst=&basic2021__du%5B%5D=15&basic2021__du%5B%5D=16&stabbr%5B%5D=IL (last visited Feb. 9, 2025).
[2]  *See NIH Awards by Location & Organization*, NIH, https://report.nih.gov/award/index.cfm (last visited Feb. 9, 2025).

protocols, maintenance, and basic administrative support covered by NIH grants as indirect costs.

105.    UIC and UIUC currently have negotiated base indirect cost rates of approximately 60% for on-campus research.  The Rate Change Notice would reduce those rates by nearly 75%, costing the University of Illinois system approximately $67 million in annual funding.  In the short term, the cutback would force the universities to redirect funds from other projects, reducing their ability to deliver critical education, research, and service functions.  In the long term, UIC and UIUC would inevitably need to reduce their research activities, including by conducting fewer clinical trials, likely producing fewer medical breakthroughs for the public.

106.    Southern Illinois University also relies on roughly $20.2 million in currently active NIH awards to conduct cutting-edge medical research that has yielded new treatments for cancer, neurodegenerative disorders like Alzheimer's disease and Parkinson's disease, and diabetes.  The University also depends on NIH funding to prepare students to enter careers in science, technology, engineering, and mathematics.  Those activities create an array of indirect but unavoidable costs, including for lab and equipment maintenance, researcher support for investigation and presentation opportunities, research safety protocols, student researcher development, and infrastructure support.

107.    Southern Illinois University's three campuses currently have negotiated indirect cost rates of between 44.5% and 48.5%.  The Rate Change Notice would reduce those rates by nearly two thirds and cost the University approximately $4.5 million in funding.  This loss of funding would impair the University's ability to maintain research facilities; to obtain equipment and supplies; to fund research compliance practices; and to develop facilities for new faculty—

and, thus, to hire those new faculty.  It would also harm the University's efforts to provide students with research experience.

108.    Other Illinois public universities would experience similar harms.  Both Illinois State University and Northern Illinois University, for instance, would see their indirect cost rates reduced by roughly 70%, resulting in the loss of hundreds of thousands of dollars across the two institutions.  These cuts would cause the universities to reduce or eliminate positions for staff or students and lessen their research outputs.

109.    In Arizona, the University of Arizona had over $170 million in NIH funding in FY 2024.  Arizona State University's Tempe Campus was awarded over $65 million in NIH funding in FY 2024.  A reduction in the indirect cost rate would result in the loss of millions of dollars in Arizona's state university funding.

110.    In California, the University of California's ("UC") 21 health professional sciences schools, five NCI-designated cancer centers, and six academic medical centers are widely recognized as among the best in the nation, and they are international leaders in the education of health professionals, in research that develops new cures and treatments, and in public service that provides healthcare for all Californians regardless of ability to pay.  The University of California is one of the nation's leading research institutions, with almost 9% of all U.S. academic research being conducted by UC researchers. Biomedical advancements at UC include the first radiation treatment for cancer, research contributing to the first flu vaccine, the discovery of the role of LDL and HDL cholesterol in heart disease, the invention of modern gene editing, and much more.  Federal funds are UC's single most important source of support for its research, accounting for more than half of UC's total research awards.  In FY 2023, UC received a total of over $2 billion in NIH contract and grant funding.  The reduction of federal funding to

24

**J.A. 44**

the UCs as set forth in the NIH Notice would be devastating for the UC system.  It would result

in broad reduction of services, including impact on education, delivery of care to patients, and

research.  Many individuals (including faculty, staff, and students), programs, and initiatives

receiving federal funding almost certainly would be forced to significantly scale back or halt

their research.  This outcome will be potentially devastating to the research projects, to the

training of new medical personnel, and to the University's research enterprise, regardless of

discipline.

111.    The California State Universities are largest public university system in the

United States, and consists of 23 campuses. In the last audited year, the CSU campuses received

approximately $158 million in NIH funds.  The Negotiated Indirect Cost Rate for those funds

ranged from 20 to 50%, and the new cap will impact their ability to maintain their current

programs.

112.    In Colorado, research institutions received a total of $566.8 million in NIH grants

in 2024.  Of the 47 grant recipients in Colorado, the University of Colorado Anschutz Medical

Campus ("AMC") received the most funding with $360 million in annual awards.  The AMC is

the state's only academic medical research campus and supports more than 1,000 clinical trials

with more than 14,000 enrollments in research studies last year in a broad array of investigations

across the health spectrum. This includes new cancer therapies, studies of novel cardiovascular

devices, and new approaches for Alzheimer's disease among many others.

113.    The AMC has a NICRA with NIH, effective as of May 2023.  The Indirect Cost

Rate in the AMC NICRA is 56%.  AMC's total effective indirect cost rate, calculated as the

average of active awards, for NIH funding is 34.2%.  NIH's reduction of the AMC's indirect cost

rate will eliminate approximately $74 million in annual funding that the AMC uses to support its

research programs. The loss of these funds will immediately impact the AMC's ability to draw critical funds used to pay expenses and continue its research.

114.    NIH is one of the top federal sponsors of the University of Colorado, Boulder campus, with annual awards totaling $77.9 million in FY 2024. NIH funding at the University of Colorado Boulder includes funding for biomedical research,  pharmaceutical developments, circulation and vascular therapies, research essential to improving health and well-being by understanding cognitive decline, reducing substance abuse, improving access to health care, reducing crime and violence, enhancing resilience and response to natural disasters, and more.

115.    The University of Colorado Boulder has a Negotiated Indirect Cost Rate Agreement with NIH, effective as of July 1, 2021.  The Indirect Cost Rate in the University of Colorado Boulder's NICRA is 56.5%.  The University of Colorado Boulder's total blended indirect cost rate, calculated as the average indirect cost rate of active awards, for NIH funding is 46.7%.  NIH's reduction of the University of Colorado Boulder's indirect cost rate will eliminate approximately $11.7 million based on FY 2024 expenditures that the University of Colorado Boulder uses to support its research programs.  The loss of these funds will immediately impact the University of Colorado Boulder's ability to draw critical funds used to pay expenses associated with maintaining the University's critical research infrastructure and support.

116.    Colorado State University has a robust NIH-funded research portfolio, including public health, veterinary translational medicine, infectious disease, prion-related diseases, and cancer research.  This research is supported by approximately $203.3 million from the NIH for grants with active project periods as of February 10, 2025.  CSU has a Negotiated Indirect Cost Rate Agreement with the Department of Health and Human Services, effective as of September 29, 2022.  The current Indirect Cost Rate in CSU's NICRA is 54% for On Campus Organized

Research.  CSU's total blended indirect cost rate for NIH funded grants with active project periods as of February 10, 2025 is 45.3%.

117.    NIH's reduction of CSU's indirect cost rate for grants will eliminate approximately $4.2 million in funding annually that CSU uses to support its research programs. The reduction of these reimbursements will immediately impact CSU's ability to draw critical funds essential to its ability to perform research.

118.    In Connecticut, the University of Connecticut ("UConn") has a NICRA with HHS, effective as of September 27, 2024. The current Indirect Cost Rate in UConn's NICRA for on-campus research is 61%.  University of Connecticut at Hartford ("UCH") has a NICRA with DHHS, effective as of March 29, 2022, with a current indirect cost rate of 66.5%.

119.    The blended indirect cost rate for NIH funding across UConn and UCH was 42.73% for fiscal year 2024.  NIH's reduction of indirect cost rates will eliminate approximately $35 million annually in funding that is used to support their research programs.  The loss of these funds will immediately impact UConn's and UCH's ability to draw funds used to pay for, among other things, maintaining research facilities and supporting administrative functions that ensure compliance with NIH rules and regulations, which are designed to ensure research is conducted safely and lawfully.

120.    In Delaware, Delaware State University ("DSU") has a NICRA with NIH, effective as of September 11, 2024.  The Indirect Cost Rate in DSU's NICRA is 46% for on-campus work and 26% for work off campus.

121.    NIH's reduction of DSU'S indirect cost rate will eliminate approximately $1.4 million year in NIH funding that DSU uses to support its biomedical research programs.  The loss of these funds will immediately impact DSU's ability to draw critical funds used to pay

**J.A. 47**

expenses associated with research, including salaries of research support personnel, stipends for doctoral students, maintenance of facilities, and other infrastructure supporting research.

122.    In Hawaiʻi, the University of Hawaiʻi at Mānoa is Hawaiʻi's flagship research university, and the University of Hawaiʻi system of ten campuses includes the John A. Burns School of Medicine (JABSOM), the University of Hawaiʻi Cancer Center (a National Cancer Institute designated center), the School of Pharmacy, the Nancy AtmosperaWalch School of Nursing and Dental Hygiene, and the Myron Thompson School of Public Health. All of these Schools, Colleges and Centers conduct translational and fundamental research, and the University is supported by 175 awards and subawards from the NIH with a current value of $211 million.  NIH's reduction of the University of Hawaiʻi's current negotiated indirect cost rate of 56.5 percent at the JABSOM and the Cancer Center alone will eliminate approximately $15 million in funding that the University of Hawaii uses to support its research programs, including ongoing clinical trials and debt service payments.

123.    In Maine, the University of Maine System has a NICRA with NIH, effective as of April 23, 2024.  The Indirect Cost Rates in the NICRA range from 26.00% to 47.70%.  The University of Maine System's on campus research indirect cost rate for NIH funding is 47.70%.

124.    NIH's reduction of the University of Maine System's indirect cost rate will eliminate approximately $1.4 million in funding that the university uses to support its research programs. The loss of these funds will immediately impact the university's ability to draw critical funds used to pay expenses associated with operation and maintenance of complex facilities and critical research equipment, procurement of goods, compliance with applicable laws and grant provisions, payroll related to individuals not directly associated with the awards, and similar costs.

125.    In Maryland, the University of Maryland at Baltimore ("UMB") conducts life-saving research that is supported annually by $245 million in direct funding from NIH and $75 million in passthrough funding from NIH.  UMB has a NICRA with NIH, effective as of October 24, 2023.  The Indirect Cost Rate in UMB's NICRA is 55.5%.

126.    NIH's reduction of UMB's Indirect Cost Rate will eliminate $49.5 million annually in NIH indirect and passthrough funding that UMB uses to support its research programs.

127.    In Minnesota, according to NIH's own database, NIH has awarded more than $67 million to institutions in Minnesota in 2025, primarily the Mayo Clinic and University of Minnesota.

128.    In Nevada, the University of Nevada, Las Vegas ("UNLV") advances research in genomics, personalized medicine, brain health, and other health areas supported by $44.8 million from NIH.  UNLV's Indirect Cost Rate is 51% pursuant to its NICRA with NIH.  Its total blended indirect cost rate for NIH funding is 47.2%.  NIH's reduction of the indirect cost rate to 15% will eliminate approximately $2.7 million in funding annually.  The loss of these funds will hinder UNLV's ability to pay facilities costs, make payroll, retain staff,  and maintain infrastructure used to support research and ongoing clinical trials, among other negative impacts.

129.    The University of Nevada, Reno ("UNR") advances interdisciplinary research supported by $72.3 million from NIH.  UNR's indirect cost rate is 47% pursuant to its NICRA with NIH.  UNR's total blended indirect cost rate for NIH funding is 24.1%.  NIH's reduction of UNR's indirect cost rate will eliminate approximately $4 million per year in indirect costs funding.  This loss will negatively impact infrastructure used to support research, clinical trials, staff and payroll, regulatory compliance, and facilities costs and maintenance.

130.    Nevada State University ("NSU") is Nevada's state college.  Its research is supported by $633,871 from NIH and is a subaward of UNR.  NSU's indirect cost rate is 39% pursuant to its NICRA with the Department of Health and Human Services (DHHS).  Its total blended indirect cost rate for NIH funding is 30%. NIH's reduction of indirect costs to 15% will eliminate approximately $15,177 in funding used for the development of new projects, academic programs, and staff; software and technology; facilities repairs and maintenance; and other research infrastructure.

131.    In New Jersey, institutions received a total of more than $405 million in NIH grant funding in FY 2024.[3]  The institutions that receive such funding include public institutions of higher education and research, such as Rutgers, the State University of New Jersey, Rutgers Biomedical and Health Sciences, Rowan University, Rowan University School of Osteopathic Medicine, the College of New Jersey, Montclair State University, the New Jersey Institute of Technology, and more.  Moreover, public and private research institutions in New Jersey collaborate on cutting-edge research. That includes NIH-supported programs in consortium with Princeton University at Rutgers Cancer Institute of NJ, which is New Jersey's sole National Cancer Institute-designated Comprehensive Cancer Center.  NIH funds also support the New Jersey Alliance for Clinical and Translational Science, a partnership among four institutions: Rutgers University, Princeton University, the New Jersey Institute of Technology, and RWJBarnabas Health.

132.    A 15% indirect cost rate cap would seriously harm State entities and their ability to pursue existing and future research.  For example, Rutgers is the recipient of approximately

---

[3] https://report.nih.gov/award/index.cfm?ot=&fy=2024&state=NJ&ic=&fm=&orgid=&distr=&rfa=&om=n&pid=&view=statedetail

$250 million of NIH funding, which currently supports nearly 1,200 separate grants and more than 2,400 employees. Its previously-negotiated rate agreement with HHS set the rate for F&A costs at 57% of modified total direct costs for on-campus research. Applying a 15% rate would have an immediate impact on Rutgers' ability to pay for infrastructure used to support research, eliminating approximately $21.6 million in funding for this fiscal year ending June 30, 2025 and a projected $57.5 million for the fiscal year ending June 30, 2026.

133.    In New Mexico, the University of New Mexico has a NICRA with NIH, effective as of Juy 1, 2022.  The Indirect Cost Rate in the University of New Mexico NICRA is 52.5%. The University of New Mexico's total blended indirect cost rate for NIH funding is 26.47%. NIH's reduction of University of New Mexico's indirect cost rates will eliminate approximately $14.5 million in funding per year that University of New Mexico uses to support its research programs to advance the health and economy of New Mexico.

134.    The loss of these funds will immediately impact University of New Mexico's ability to draw critical funds used to pay expenses associated with facilities, administrative costs including associated salaries and benefits, technology and related infrastructure, and regulatory compliance costs, in support of research.  The loss of indirect costs will result in inadequate support systems for clinical trials.

135.    In New York, at present, there are over $5 billion in open NIH grants to institutions within New York state. A preliminary analysis indicates that, if the NIH Rate Change Notice goes into effect, New York institutions stand to lose approximately $850 million.

136.    The State University of New York ("SUNY") system alone faces a possible $21 million in lost revenue from February 10, 2025, through June 30, 2025.  The SUNY system

**J.A. 51**

ultimately will lose over $78 million through the life of current grants, if the NIH Rate Change goes into effect.

137.    In Oregon, research institutions in the State of Oregon, including Oregon Health and Science University ("OHSU"), University of Oregon, and Oregon State University, received more than $400 million in NIH grant awards in recent years. OHSU, Oregon's only academic health center and a leader in medical research, received more than $297 million in NIH grants and contracts in 2023.  OHSU's NICRA is 56% for on-campus organized research. Implementation of the Rate Change Notice would deprive OHSU of approximately $80 million in funding.  That loss of funds would have an immediate impact on OHSU's ability to fund critical facilities, research compliance, and animal care.  It would also compromise OHSU's ability to carry out ongoing clinical trials and could immediately and directly impact patient care.

138.    In Rhode Island, the new 15% cap on NIH indirect cost reimbursement rate will have significant impacts on the University of Rhode Island and its ability to be an economic engine for the State of Rhode Island.  Based on indirect costs received to date in FY 25, the 15% NIH cap is estimated to impact the University of Rhode Island at a monthly loss of $240,000 and $2.8 million per year.

139.    In Vermont, the University of Vermont and State Agricultural College (the "University of Vermont" or "UVM") is an instrumentality of the State of Vermont. It is Vermont's flagship research university, and is being awarded a Research 1 ("R1") designation through the Carnegie classification system. In recent years, UVM has received over $50 million per year in NIH grants.  Its current top negotiated indirect cost rate with NIH is 53%, and its current blended indirect cost rate across all supported activities is around 29%.

140.    The reduction proposed in the NIH notice would eliminate approximately $8 million in NIH funding per year in research support for costs not currently allowed under federal guidance, but which are necessary to allow research to take place. The lowering of NIH indirect support will immediately impact UVM's ability to draw critical funds used to pay expenses associated with necessary grant administration tasks in compliance with federal spending and reporting guidelines, and to pay critical facility costs such as utilities and building safety.

141.    Absent adequate federal support for these functions, alternative sources of support will be required. This could mean greater state investment in UVM or a rise in tuition rates to UVM students, which would either create additional educational affordability problems or impose additional costs on the State.  Alternatively, loss of funding will result in a decline in UVM's ability to support research, which would lead to fewer grant dollars coming to Vermont. This would have a significant impact on UVM's ability to continue to drive economic development in Vermont. The normally accepted economic impact multiplier of 3 implies that a 20% decline in UVM's research activity (approximately $40 million total) would result in an economic loss to Vermont of $120 million annually.

142.    In addition, NIH-supported clinical trials at the University of Vermont and the University of Vermont Medical Center help bring novel treatment opportunities to Vermont. Indirect costs associated with NIH-funded trials are a main source of support for UVM's clinical trials facility. As the state's only research university and university affiliated hospital/health network, declines in NIH indirect support for clinical trials facilities will lessen UVM's ability to provide medical advancement to the people of Vermont. This impact will be felt state-wide.

143.    The loss of the negotiated indirect cost rate and significant decline in UVM's ability to support research there would also cause lasting harm to the University's research

**J.A. 53**

program. The University forthcoming elevation to Carnegie Research 1 ("R1") status has significantly elevated the University's ability to recruit high performing researchers and research trainees to Vermont. Doctoral degrees granted by UVM are up 20% and research expenditures are up more than 70% over the last 5 years. Numerous UVM "spin-out" companies have received significant investment from private funders. All of these results have had a significant impact on Vermont communities and the state's economy, and elevated UVM's ongoing ability to attract high performing students to Vermont. A reversal of this research success and growth will undermine many years of university and state investment at a time where demographic challenges in the northeastern United States are undermining higher education enrollment and access to affordable, high-quality education.

144.    In Washington, the University of Washinton ("UW"), with its flagship campus located in Seattle, WA, has a negotiated indirect cost rate with the NIH of 55.5% (blended) for on-campus activities, with organized research rates (excluding training grants) varying from 26% for research off campus to 83.1% for research in the Washington National Primate Research Center (WaNPRC).  A broad, immediate, and inflexible cap of 15% for all indirect costs would instantly deprive UW of hundreds of millions of dollars it currently puts toward conducting the vital research and medical care contemplated by the NIH grant awards.  UW has long relied on being able to negotiate these rates for years, and has built out its research facilities and headcount accordingly—nothing could have prepared UW for a sudden and stinging rebuke of the federal government's previous positions.  The impacts would be devastating not only to the many staff members and faculty who would likely lose their livelihood, but could also prove deadly.

145.    For instance, the UW School of Medicine is one of the top academic institutions to receive NIH, covering approximately 657 grants and more than $385 million in FY 2024 alone.

146.    NIH's indirect cost rate reduction will eliminate approximately $90 to $110 million in funding that UW Medicine uses to support its research and clinical treatment programs.  Because of these drastic funding reductions, UW would likely be forced to not only stop admitting new patients to some clinical trials, but to scale back ongoing clinical trials, such as those for kidney disease, diabetes, Alzheimer's, and pediatric cancer.  While UW would do so only as is safe and ethical for currently enrolled participants, for patients that have placed their trust in UW for what is in many cases their last option at lifesaving care, and for those who held off of other treatment and clinical trial opportunities to pursue treatment at UW, any scaling back in their level of care would be a devastating breach of trust.  The damage to these patients' lives and their relationship with their care team at UW would be nearly impossible to rectify.

147.    Additionally, the inability to start new trials will delay lifesaving treatments that rely on decades of research.  The indirect cost rate caps would also cripple UW Medicine's ability to continue its vital ongoing research efforts into Alzheimer's disease diagnosis, gene therapy treatments for Duchenne muscular dystrophy, pain management for traumatic brain injury patients, and identification of new markers that predict diabetic kidney disease in young adults with type 2 diabetes.

148.    Similarly, UW's WaNPRC, one of only seven National Primate Research Centers in the world, would be particularly devastated.  WaNPRC supports 800 nonhuman primates, employs 170 people with expertise in veterinary care and animal research and provides the specialized lab spaces and equipment unique to nonhuman primate research.  A cut in indirect

35

**J.A. 55**

cost rate will result in loss of nearly $5 million per year in resources needed to support WaNPRC's infrastructure—costs that it cannot afford to bear.  If WaNPRC facilities are shuttered, WaNPRC will also have to reduce or eliminate the 800 nonhuman primates in its care. WaNPRC has performed vital research, including brain-interface research that enables people to control robotic limbs with brain activity coded by a computer; the first controlled brain-function study in a nonhuman primate, which led to technology restoring movement in people with spinal cord injuries; and the first cochlear implants that provided a cure for deafness.

149.    As a result of the Rate Change Nottice, ongoing, lifesaving research would likely be halted and potentially lost, such as current research into a novel gene therapy strategies into a cure for chronic HIV infection; stem-cell based therapy used to repair damaged heart muscle; and development of a novel tool to study the causes of stroke that could lead to new interventions to prevent or treat strokes in people.

150.    Washington State University ("WSU"), with five physical campuses and four Research Extension Centers located throughout the State of Washington, has a negotiated indirect cost rate for NIH funding of 53% for on-campus research, and 26% for off-campus research. Immediately capping WSU's rate at 15% for all NIH projects would instantly cut over $5 million from WSU this year alone, sending shockwaves throughout WSU, and significantly disrupting the substantial progress WSU has made to serve its students and its community as a prominent research institution.  WSU relied on these negotiated rates when building out its facilities, budgeting for research projects and equipment, deciding on which and how many students to admit and faculty/staff to employ, and determining how to prioritize its own institution-wide funding allocations.

151.    Certain WSU departments, such as the Office of the Campus Veterinarian, which supports nearly all projects in WSU's large animal-based research portfolio (and all of its veterinary services), are almost wholly dependent on these indirect costs to stay afloat, as costs associated with much of the housing and care of animals cannot be charged back as direct costs. NIH costs also represent 30% of the research portfolio at WSU's College of Veterinary Medicine, which is home to the Washington Animal Disease Diagnostic Laboratory, the only accredited veterinary medical laboratory within Washington, and a facility that regularly detects, monitors, and conducts responses to current and potential future disease outbreaks such as rabies, tularemia, and including the current avian flu outbreak.  Without the indirect costs that largely pay for animal care, WSU's animal researchers would likely be forced to significantly reduce or eliminate research animal colonies.  This loss would set WSU researchers back decades, endangering not just the livelihoods of the dozens of employees and staff WSU who would likely have to be laid off or furloughed, but also denying the public at large the benefit of the critical research and real-time data that these facilities give, such as the regular testing of eggs, poultry, and milk for diseases (including avian influenza).

152.    As a result of the Rate Change Notice, WSU would also likely be forced to close facilities like the Spokane vivarium and the analytical core services that support WSU's biomedical, drug discovery, and drug delivery programs, including high impact cancer research. WSU would likely have to diminish or shutter the work of its Biosafety laboratory that is crucial for detection and treatment of emerging viruses and pathogens in the Pacific Northwest, like the emerging avian influenza pandemic.  WSU's Elson S. Floyd School of Medicine would be decimated, grinding to a halt their lifesaving research into Alzheimer's disease, cancer, speech pathology, and substance abuse, endangering the viability of WSU's clinical trials and the

J.A. 57

wellbeing of their patients, and severely hindering the ability of WSU to provide effective education to the next generation of doctors. Critical NIH-funded programs like Sharma Lab's Targeted Nanotherapies for the Treatment of Prostate Cancer, in the College of Arts and Sciences, are in active testing right now for a novel drug treatment for advanced prostate cancer, the second leading cause of cancer-related deaths among men in the U.S. If their work is disrupted, they risk potentially irreplaceable data loss and endangering the ultimate viability of potentially lifesaving treatments.

153.    In Wisconsin, UW-Madison is Wisconsin's flagship research university. It operates under the premise that research and education should influence the lives of others beyond the boundaries of the campus. Research at UW-Madison drives innovation related to treating adult and pediatric cancer, Alzheimer's, diabetes, degenerative neurologic diseases, and more. Further, the research enterprise supports training and development of UW-Madison students. This research is supported by $513 million from the HHS, which primarily comes from the NIH.

154.    UW-Madison has a NICRA with HHS, covering all federal agencies, and effective as of January 17, 2025. The indirect cost rate in UW-Madison's NICRA is 55.5%. This rate is composed of 26% for administrative costs and 29.5% for facility costs. Administrative costs are the general costs to administer research, such as accounting, payroll, and research oversight and are capped by federal law at 26%. Facility costs include the maintenance and depreciation of the research facilities.

155.    NIH's reduction of UW-Madison's negotiated indirect cost rate would eliminate approximately $65 million in funding in the current year, and result in a similar reduction in resources available to support research each year. The loss of these funds will immediately

38

**J.A. 58**

impact the university's ability to draw critical funds used to pay expenses associated with its research enterprise.  This includes the costs to support strict federal regulatory compliance mandated for federally funded research that are intended to, for example, promote national security interests and maintain the nation's competitive edge through export controls and measures to prevent malign foreign influence; protect human and animal participants in research; protect public investments in research; ensure the safe conduct of research involving hazardous biological agents, recombinant DNA, and radiation; and ensure the integrity of research funded by American taxpayers.

156.     In sum, across all Plaintiff states, implementing this 15% cap will mean the abrupt loss of hundreds of millions of dollars that are already committed to employing tens of thousands of researchers and other workers, putting a halt to countless life-saving health research and cutting-edge technology initiatives.  Not only that, but the sudden cut of funding will have ripple effects into the private sector as it disrupts numerous partnerships with private institutions.

## CAUSES OF ACTION

### Count I
### Substantive Violation of the Administrative Procedure Act
### Agency Action That Is Arbitrary and Capricious and an Abuse of Discretion
### 5 U.S.C. § 706(2)(A)

157.     Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

158.     Defendants include "agenc[ies]" under the APA, 5 U.S.C. § 551(1), and the Rate Change Notice is an agency action subject to review under the APA.

159.     The Rate Change Notice marks the consummation of NIH's decisionmaking process because it announces the agency's decision to immediately implement a policy that will

**J.A. 59**

dramatically change the awarding of funds, and disbursement of go forward expenses "for all current grants . . . as well as for all new grants issued."

160.    The Rate Change Notice is an action by which rights or obligations have been determined or from which legal consequences will flow because it purports to immediately change indirect rates paid pursuant to pre-existing federal grants that have already been awarded to recipients and incorporated in budgets.

161.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

162.    The Rate Change Notice is arbitrary and capricious because it does not identify a basis for setting an across-the-board rate of 15%.  The Rate Change Notice makes no effort to determine that 15% is the accurate rate at which indirect costs are actually incurred by Plaintiff States in general or any institution of higher education in particular.

163.    The Rate Change Notice is arbitrary and capricious because it fails to account for the substantial reliance interests grant recipients have in the terms of grants awarded by the NIH, all of which include specifically negotiated indirect cost rates expressly accepted by the government upon the commencement of each budget period of every grant-funded project. Changing political considerations or priorities are not alone sufficient to justify significant changes in policy.  Rather, an agency must weigh reliance interests against policy concerns. There is no indication that the Acting Director meaningfully weighed those reliance interests against the putative policy concerns laid out in the Rate Change Notice.

164.    The Rate Change Notice is arbitrary and capricious because it fails to recognize the practical consequences that an immediate, across-the-board, categorical cap on the indirect cost rate will produce, let alone justify why such consequences could possibly be warranted.

165.    The Rate Change Notice is arbitrary and capricious because it indicates the reversal of factual findings of grantmaking agencies, memorialized in NICRAs and agreed upon by Plaintiff States, and thus the NIH must provide an even more substantial justification than would usually be required to reverse long-standing policy.  Previously established indirect cost rates were not arbitrarily-selected by recipient institutions; rather, they are the result of extensive, data-driven negotiation and engagement between Plaintiff States and teams of cost accounting experts representing the interests of government granting agencies.  These rates are intended to reasonably reflect the true and genuine indirect costs incurred by Plaintiff States to deliver their obligations under federal grant awards and finance critical university infrastructure from utilities to building maintenance to disposal of hazardous waste.

166.    By lowering the indirect cost rate, the NIH is implicitly asserting that the indirect costs incurred by institutions conducting research are different from the rates it had previously identified through actual examination of the institutions' accounting systems and operating costs.

167.    If an agency's new interpretive guidance leads to new factual findings that contradict an agency's previous conclusions, more substantial justification is required by the agency to justify its new position.  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015).

168.    The Rate Change Notice is arbitrary and capricious because it fails to articulate why immediate implementation should be imposed upon activity conducted in current budget periods under current awards, notwithstanding the immense disruption that will cause.

41

**J.A. 61**

169.    The Rate Change Notice is arbitrary and capricious because it fails to consider alternatives to the agency action that might lesson the impact of the agency action on grant recipients.

170.    The Rate Change Notice is arbitrary and capricious because it does not provide an explanation or basis for the timing of its announcement, one business day before the effective date of the rate change.

171.    The Rate Change Notice is arbitrary and capricious because it does not explain the reasons why rates used by non-governmental funding organizations pertain to the indirect cost rates used and negotiated by NIH with its grant recipients, and why rates used by such organizations should serve as benchmarks for NIH's indirect cost rates.

172.    The Rate Change Notice is arbitrary and capricious because it does not explain why NIH has departed from its past practice of negotiating indirect cost rates with grant recipients and complying with the terms of such negotiated agreements.

173.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Rate Change Notice violates the APA because it is arbitrary and capricious.

174.    Plaintiff States are also entitled to vacatur of the Rate Change Notice pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction preventing Defendants from enforcing the Rate Change Notice.

175.    Plaintiff States are also entitled to vacatur of the Rate Change Notice pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction preventing Defendants from enforcing the Rate Change Notice.

**J.A. 62**

**Count II**
**Substantive Violation of the Administrative Procedure Act**
**Agency Action Not in Accordance with Law (Further Consolidated Appropriations Act)**
**5 U.S.C. § 706(2)(A)**

176.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

177.    Defendants include "agenc[ies]" under the APA, 5 U.S.C. § 551(1), and the Rate Change Notice is an agency action subject to review under the APA.

178.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).

179.    Section 224 of the Further Consolidated Appropriations Act, 2024, Public Law 118-47 ("Section 224"), provides:  "In making Federal financial assistance, the provisions relating to indirect costs in part 75 of title 45, Code of Federal Regulations, including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017.  None of the funds appropriated in this or prior Acts or otherwise made available to the Department of Health and Human Services or to any department or agency may be used to develop or implement a modified approach to such provisions, or to intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter."

180.    As a result of continuing resolutions, Section 224 remains in effect.  Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, §§ 101, 106; Further Continuing Appropriations Act, 2025, Pub. L. No. 118-158, § 101.

**J.A. 63**

181.    By radically slashing payment of indirect costs, the Rate Change Notice violates the statutory requirement that the regulatory "provisions relating to indirect costs … continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017."  Section 224.

182.    The Rate Change Notice violates Section 224's prohibition of a "modified approach" to the "provisions relating to indirect costs."

183.    The Rate Change Notice has the effect of "intentionally or substantially expand[ing] the fiscal effect of the approval of" deviations from negotiated rates "beyond the proportional effect of such approvals in such quarter."  The "fiscal effect" of the deviation in negotiated rates down to 15% across all projects is vastly greater than the "fiscal effect" of any prior deviations, which were individualized and program-specific.

184.    Plaintiff States are also entitled to vacatur of the Rate Change Notice pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction preventing Defendants from enforcing the Rate Change Notice.

**Count III**
**Substantive Violation of the Administrative Procedure Act**
**Agency Action Not in Accordance with Law (45 C.F.R. § 75.414)**
**5 U.S.C. § 706(2)(A)**

185.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

186.    Defendants include "agenc[ies]" under the APA, 5 U.S.C. § 551(1), and the Rate Change Notice is agency action subject to review under the APA.

187.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).

**J.A. 64**

188.    45 C.F.R. § 75.414(c)(1) states: "Negotiated indirect cost rates must be accepted by all Federal agencies.  A Federal agency may use a rate different from the negotiated rate for either a class of Federal awards or a single Federal award only when required by Federal statute or regulation, or when approved by the awarding Federal agency in accordance with paragraph (c)(3) of this section."  In other words, using a different rate than the negotiated indirect cost rate (absent a statutory or regulatory requirement to do so) requires compliance with 45 C.F.R. § 75.414(c)(3).

189.    45 C.F.R. § 75.414(c)(3) states: "The HHS awarding agency must implement, and make publicly available, the policies, procedures and general decision making criteria that their programs will follow to seek and justify deviations from negotiated rates."

190.    By pronouncing a single, uniform and categorical "policy" setting indirect cost rates at 15% regardless of the otherwise applicable negotiated rate, NIH violated 45 C.F.R. § 75.414(c)(3).

191.    Under the plain text of Section 75.414(c)(3), "policies, procedures, *and* general decision making criteria" must all be present for a departure from the negotiated rate to be authorized under Section 75.414(c)(3).  Here, NIH published no "procedures" and no "general decision making criteria."  Instead, it prescribed a single, uniform "policy" setting indirect cost rates at 15%.

192.    The phrase "policies, procedures, and general decision making criteria that … programs will follow to seek and justify deviations from negotiated rates" implies that NIH will announce a policy that it will use to *seek* an altered rate.  The NIH's new policy, set out in the challenged Guidance, did not do that—instead, the policy unilaterally *sets* a rate.

193. The phrase "seek and justify deviations from negotiated rates" implies an individualized analysis of whether deviations are appropriate, not a unilateral declaration of a 15% rate that applies across the board. The word "programs" also implies that deviations will occur at a program level, which supports the view that there will be an individualized analysis. The phrase "justify deviations from negotiated rates" further indicates that negotiated rates are the default and the "deviation" is the exception—not that negotiated rates will be abandoned across the board.

194. Section 75.414(c)(4) states: "As required under § 75.203(c), the HHS awarding agency must include in the notice of funding opportunity the policies relating to indirect cost rate reimbursement, matching, or cost share as approved." The Federal Register notice promulgating the provision on which Section 75.414(c) is modeled makes clear that any attempt to depart from negotiated rates must first be "established" and then "inclu[ded] … in the announcement of funding opportunity."

195. Defendants did not comply with the requirements of 45 C.F.R. § 75.414(c)(4). Defendants' notice of funding opportunities did not include HHS's new policy, and HHS cannot retroactively alter existing grant agreements.

196. Plaintiff States are also entitled to vacatur of the Rate Change Notice pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction preventing Defendants from enforcing the Rate Change Notice.

**Count IV**
**Substantive Violation of the Administrative Procedure Act**
**Agency Action in Excess of Statutory Authority and Ultra Vires**
**5 U.S.C. § 706(2)(C)**

197. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

198.    Defendants also include "agenc[ies]" under the Administrative Procedure Act, 5 U.S.C. § 551(1), and the Rate Change Notice is agency action subject to the APA.

199.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

200.    Defendants may only exercise authority conferred by statute.

201.    In addition, "APA, as a general matter, forbids retroactive rulemaking."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).

202.    The Rate Change Notice represents a retroactive action, because it "impair[s] rights a party possessed when [it] acted, increase[s] a party's liability for past conduct, [and] impose[s] new duties with respect to transactions already completed."  *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994).

203.    "Retroactivity is not favored in the law."  *Bowen*, 488 U.S. at 208.  Agencies cannot "promulgate retroactive rules unless that power is conveyed by Congress in express terms."  *Id.*

204.    No statute allows NIH to unilaterally alter all current grants retroactively.

205.    No such power was conveyed by Congress here.  Indeed, Congress has explicitly limited the NIH's authority to modify indirect cost rates retroactively.  Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 224, 138 Stat 460.

206.    NIH does not rely on any statutory authority for such an exercise of authority.

207.    NIH's action was therefore in excess of its statutory authority and unlawful.

208.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Defendants lack legal authority to 15% limit on indirect costs contrary to the negotiated rates and has, in so doing, acted contrary to law and in violation of the APA.

209.    Plaintiff States are also entitled to vacatur of the Rate Change Notice pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction preventing Defendants from enforcing the Rate Change Notice.

**Count V**
**Procedural Violation of the Administrative Procedure Act**
**Without Observance of Procedure Required by Law**
**5 U.S.C. § 706(2)(D)**

210.    Plaintiff States hereby incorporate by reference the foregoing paragraphs of this Complaint.

211.    Under the APA, a court "shall . . . hold unlawful and set aside agency action, findings and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

212.    Subject to enumerated exceptions not applicable here, federal agencies must complete the process of agency rulemaking before issuing a rule. 5 U.S.C. § 553(b).

213.    The Rate Change Notice is a rule for purposes of the APA because it is an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

214.    "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal. 5 U.S.C. § 553. Failure to abide by these requirements renders a rule procedurally invalid." *New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018). Notice, and comment requirements, do not

apply, however, to interpretive rules intended mere "merely to 'advise the public of the agency's construction of the statutes and rules which it administers.'"  *Id.*

215.    On the other hand, a legislative, or substantive, rule that "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself" must go through notice-and-comment procedures.  *Id.*

216.    Defendants' issuance of the Rate Change Notice without notice and comment rulemaking, and without good cause to proceed without notice and comment rulemaking, is in violation of the APA.

217.    The Rate Change Notice imposes "a standard indirect cost rate on all grants of 15% pursuant to its 45 C.F.R. § 75.414(c) authority," and thus plainly imposes a new obligation on recipient organizations that did not previously exist.  As a result, it constitutes a substantive rule and can only be promulgated through notice-and-comment procedures.

218.    The Rate Change Notice relies on 45 C.F.R. § 75.414(c)(1) and 45 C.F.R. § 75.414(c)(3) to justify a wholesale change in indirect cost rate determination policies, including to existing grants, that have previously been conducted through notice and comment rulemaking and imposed on a prospective basis only.  *See, e.g.*, 56 Fed. Reg. 29530 (June 17, 1991) (proposing a revision to rules to impose a cap of 26 percent of modified total direct costs as reimbursement for administrative costs); 56 Fed. Reg. 50224 (Oct. 3, 1991) (finalizing the proposed revision and summarizing almost 300 comments).

219.    HHS has voluntarily agreed to abide by the APA's notice and comment requirements for provisions governing grants and contracts because it "believes that its decision-making ought to be as transparent as appropriate to better enable the citizenry to comment on its proposed rules and demonstration projects," 45 C.F.R. Subpart A, furthering the objective of the

"Richardson Waiver," *see id.*, 36 Fed. Reg. 2,532 (Feb. 5, 1971) (requiring all agencies and offices within HHS to abide by the APA's public participation requirements in the formulation of rules related to grants).

220.    Because the Rate Change Notice did not follow notice-and-comment procedures, as required by the APA, it is procedurally invalid.

221.    Plaintiff States are also entitled to vacatur of the Rate Change Notice pursuant to 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction preventing Defendants from enforcing the Rate Change Notice.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff States pray that the Court:

a.  Declare unlawful and set aside the Rate Change Notice (NOT-OD-25-068) as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C), and without observance of procedure required by law under 5 U.S.C. § 706(2)(D);

b.  Issue a temporary restraining order and preliminary injunction barring the NIH, HHS and all of their officers, employees, and agents from taking any steps to implement, apply, or enforce the Rate Change Notice (NOT-OD-25-068) within Plaintiff States;

c.  Order Defendants to file a status report with the Court within 24 hours of entry of a temporary restraining order, and at regular intervals thereafter, confirming the regular disbursement and obligation of federal financial assistance funds and reporting all steps that NIH, HHS and their officers, employees, and agents have taken to comply with the Court's temporary restraining order;

d.  Issue a preliminary injunction barring the NIH, HHS and all of its officers, employees, and agents from taking any steps to implement, apply, or enforce the Rate Change Notice (NOT-OD-25-068) in any form or under any name within Plaintiff States;

e.  Issue a permanent injunction barring the NIH, HHS and all of its officers, employees, and agents from taking any steps to implement, apply, or enforce the the Rate Change Notice (NOT-OD-25-068) in any form or under any name within Plaintiff States; and

f.  Award such additional relief as the interests of justice may require.

Dated:  February 10, 2025    Respectfully submitted,

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: /s/ Katherine Dirks
Katherine Dirks (BBO # 673674)
 *Deputy Chief, Government Bureau*
Amanda Hainsworth (BBO # 684417)
 *Senior Legal Advisor to the AG*
Yael Shavit (BBO # 695333)
 *Chief, Consumer Protection Division*
Chris Pappavaselio (BBO # 713519)
 *Assistant Attorney General*
1 Ashburton Pl.
Boston, MA 02108
617.963.2277
katherine.dirks@mass.gov
*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

By: /s/ Linus Banghart-Linn
Linus Banghart-Linn*
Chief Legal Counsel
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 281-6677
Banghart-LinnL@michigan.gov
*Attorneys for the People of the State of Michigan*

**KWAME RAOUL**
Attorney General of Illinois

By: /s/ Alex Hemmer
Alex Hemmer*
Deputy Solicitor General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
alex.hemmer@ilag.gov
*Counsel for the State of Illinois*

52

**J.A. 72**

**KRIS MAYES**
Attorney General of Arizona

*s/ Joshua D. Bendor*
Joshua D. Bendor*
Solicitor General
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
ACL@azag.gov
*Counsel for the State of Arizona*


**ROB BONTA**
Attorney General of California

NELI PALMA*
Senior Assistant Attorney General

/s/ Emilio Varanini
EMILIO VARANINI*
Supervising Deputy Attorney General
SOPHIA TONNU*
DANIEL AMBAR*
Deputy Attorneys General
California Attorney General's Office
455 Golden Gate Avenue
San Francisco, CA 94102
(415) 510-3541
Emilio.Varanini@doj.ca.gov
*Counsel for the State of California*

53

**J.A. 73**

**PHILIP J. WEISER**
Attorney General of Colorado

/s/ Shannon Stevenson*
Shannon Stevenson, CO Reg. No. 35542
Solicitor General
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6749
Shannon.Stevenson@coag.gov
*Counsel for the State of Colorado*


**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov
*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Ian R. Liston*
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov
*Counsel for the State of Delaware*

54

**J.A. 74**

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

*/s/Kalikoʻonālani D. Fernandes*
David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Counsel for the State of Hawaiʻi*


**AARON M. FREY**
Attorney General for Maine

/s/ Sean D. Magenis
SEAN D. MAGENIS
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145
sean.d.magenis@maine.gov
*Counsel for the State of Maine*


**ANTHONY G. BROWN**
Attorney General of Maryland

/s/ Adam D. Kirschner
Adam D. Kirschner*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
akirschner@oag.state.md.us
410-576-6424
*Counsel for the State of Maryland*

55

**J.A. 75**

**KEITH ELLISON**
Attorney General of Minnesota

By: /s/ Liz Kramer*
Solicitor General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010
liz.kramer@ag.state.mn.us
*Counsel for the State of Minnesota*


**AARON D. FORD**
Attorney General of Nevada

/s/ Heidi Parry Stern
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov
*Counsel for the State of Nevada*


**MATTHEW J. PLATKIN**
Attorney General of New Jersey

By: /s/ Angela Cai
Angela Cai*
    *Executive Assistant Attorney General*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-3377
Angela.Cai@njoag.gov
*Counsel for the State of New Jersey*

56

**J.A. 76**

**LETITIA JAMES**
Attorney General of New York

By: /s Rabia Muqaddam
Rabia Muqaddam*
*Special Counsel for Federal Initiatives*
Molly Thomas-Jensen*
*Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-8883
Rabia.Muqaddam@ag.ny.gov
Molly.Thomas-Jensen@ag.ny.gov
*Counsel for the State of New York*


**RAÚL TORREZ**
Attorney General of New Mexico

/s/ Anjana Samant
Anjana Samant*
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
asamant@nmdoj.gov
*Counsel for the State of New Mexico*


**JEFF JACKSON**
Attorney General of North Carolina

LAURA HOWARD*
Chief Deputy Attorney General
By /s/ Daniel P. Mosteller*
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov
*Counsel for State of North Carolina*

57

**J.A. 77**

**DAN RAYFIELD**
Attorney General of Oregon

By: /s Christina L. Beatty-Walters
Christina L. Beatty-Walters
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Tina.BeattyWalters@doj.oregon.gov
*Counsel for the State of Oregon*


**PETER F. NERONHA**
Attorney General of Rhode Island

/s/ Jordan Broadbent
Jordan Broadbent*
*Special Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2060
Jbroadbent@riag.ri.gov
*Counsel for the State of Rhode Island*


**CHARITY R. CLARK**
Attorney General of Vermont

By: /s/ Jonathan T. Rose
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov
*Counsel for the State of Vermont*

58

**J.A. 78**

**NICHOLAS W. BROWN**
Attorney General of Washington

*s/ Spencer W. Coates*
SPENCER W. COATES*
ELLEN RANGE*
Assistant Attorneys General
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
spencer.coates@atg.wa.gov
ellen.range@atg.wa.gov
*Counsel for the State of Washington*


**JOSHUA L. KAUL**
Attorney General of Wisconsin

/s/ Aaron J. Bibb
Aaron J. Bibb*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
bibbaj@doj.state.wi.us
*Counsel for the State of Wisconsin*


*\*pro hac vice forthcoming*

**J.A. 79**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, ATTORNEY
GENERAL DANA NESSEL ON BEHALF
OF THE PEOPLE OF THE STATE OF
MICHIGAN, STATE OF ILLINOIS,
STATE OF ARIZONA, STATE OF
CALIFORNIA, STATE OF
CONNECTICUT, STATE OF COLORADO,
STATE OF DELAWARE, STATE OF
HAWAI'I, STATE OF MAINE, STATE OF
MARYLAND, STATE OF MINNESOTA,
STATE OF NEW JERSEY, STATE OF
NEW YORK, STATE OF NEVADA,
STATE OF NEW MEXICO, STATE OF
NORTH CAROLINA, STATE OF
OREGON, STATE OF RHODE ISLAND,
STATE OF VERMONT, STATE OF
WASHINGTON, and STATE OF
WISCONSIN,

       Plaintiffs,

           v.

NATIONAL INSTITUTES OF HEALTH;
MATTHEW MEMOLI, M.D., M.S., in his
official capacity as Acting Director of the
National Institutes of Health; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and DOROTHY
FINK, in her official capacity as Acting
Secretary of the U.S. Department of Health
and Human Services,

       Defendants.

Case No. 1:25-cv-10338

**DECLARATION OF KATHERINE DIRKS**

    I, Katherine Dirks, an attorney admitted to practice before this Court, do hereby state the

following under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1

1.      I am Deputy Chief of the Government Bureau in the Office of the Attorney

General for the Commonwealth of Massachusetts, and I appear on behalf of the Commonwealth

of Massachusetts in this action.

2.      I submit this declaration in support of Plaintiff States' Motion for a Temporary

Restraining Order, pursuant to Federal Rule of Civil Procedure 65.

3.      The facts set forth herein are based upon my personal knowledge or a review of

the files in my possession.

4.      I have attached to this declaration true and correct copies of publicly promulgated

or issued documents and factual declarations, as follows:

5.      Attached hereto as Exhibit 1 is NIH Notice NOT-OD-25-068, available at

https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html#_ftnref1.

6.      Attached hereto as Exhibit 2 is OMB, *Major Savings and Reforms: Budget of the*

*U.S. Government, Fiscal Year 2018* (2017) (excerpts), available at

https://www.govinfo.gov/content/pkg/BUDGET-2018-MSV/pdf/BUDGET-2018-MSV.pdf.

7.      Attached hereto as Exhibit 3 is OMB, *Major Savings and Reforms, Budget of the*

*U.S. Government, Fiscal Year 2020* (2019) (excerpts), available at

https://www.govinfo.gov/content/pkg/BUDGET-2020-MSV/pdf/BUDGET-2020-MSV.pdf.

8.      Attached hereto as Exhibit 4 is NIH Notice NOT-OD-24-110, *Notice of*

*Legislative Mandates in Effect for FY 2024*, available at

https://grants.nih.gov/grants/guide/notice-files/NOT-OD-24-110.html.

9.      Attached hereto as Exhibit 5 is a statement posted on social media by NIH on Feb.

9, 2025, available at https://x.com/NIH/status/1888004759396958263.

10.    Attached hereto as Exhibit 6 is a *Why Should I Participate in a Clinical Trial?,* Nat'l Insts. of Health, https://www.nih.gov/health-information/nih-clinical-research-trials-you/why-should-i-participate-clinical-trial (last visited Feb. 9, 2025).

11.    Attached hereto as Exhibit 7 is a Declaration of Ken A. Dill, of the State University of New York.

12.    Attached hereto as Exhibit 8 is a Declaration of Rafael Jaime, of the United Automobile, Aerospace and Agricultural Implement Workers of America, Local 4811.

13.    Attached hereto as Exhibit 9 is a Declaration of Theresa A. Maldonado, of the University of California.

14.    Attached hereto as Exhibit 10 is a Declaration of Cassandra Mosely, of Colorado State University.

15.    Attached hereto as Exhibit 11 is a Declaration of Donald M. Elliman, Jr., of Colorado Anschutz Medical Campus.

16.    Attached hereto as Exhibit 12 is a Declaration of Justin Schwartz, of the University of Colorado Bouder.

17.    Attached hereto as Exhibit 13 is a Declaration of Dr. Pamir Alpay of the Univresity of Connecticut.

18.    Attached hereto as Exhibit 14 is a Declaration of Michael C. Crair of Yale University.

19.    Attached hereto as Exhibit 15 is a Declaration of Dr. Tony Allen, of Delaware State University.

20.    Attached hereto as Exhibit 16 is a Declaration of Miguel Garcia-Diaz, of the University of Delaware.

3

21.     Attached hereto as Exhibit 17 is a Declaration of Dr. Gireesh Gupchup, of Southern Illinois University.

22.     Attached hereto as Exhibit 18 is a Declaration of Dr. Joseph T. Walsh, Jr., of the University of Illinois System.

23.     Attached hereto as Exhibit 19 is a Declaration of Denise Barton, of the University of Massachusetts.

24.     Attached hereto as Exhibit 20 is a Declaration of Dr. Bruce E. Jarrell, of the University of Maryland, Baltimore.

25.     Attached hereto as Exhibit 21 is a Declaration of Dr. Darryl J. Pines, of the University of Maryland, College Park.

26.     Attached hereto as Exhibit 22 is a Declaration of Ryan Low, of the University of Maine System.

27.     Attached hereto as Exhibit 23 is a Declaration of Arthur Lupia, of the University of Michigan.

28.     Attached hereto as Exhibit 24 is a Declaration of Douglas A. Gage, Ph.D., of Michigan State University.

29.     Attached hereto as Exhibit 25 is a Declaration of Ezemanari M. Obasi, Ph.D., of Wayne State University.

30.     Attached hereto as Exhibit 26 is a Declaration of Jennifer Redford, of Princeton University.

31.     Attached hereto as Exhibit 27 is a Declaration of J. Michael Gower, of the State University of New Jersey ("Rutgers").

32.    Attached hereto as Exhibit 28 is a Declaration of James Paul Holloway of the University of New Mexico.

33.    Attached hereto as Exhibit 29 is a Declaration of Gloria J. Walker, of Nevada State University.

34.    Attached hereto as Exhibit 30 is a Declaration of David W. Hatchett, of the University of Nevada, Las Vegas.

35.    Attached hereto as Exhibit 31 is a Declaration of Ben Friedman, of the State University of New York.

36.    Attached hereto as Exhibit 32 is a Declaration of Peter Barr-Gillespie, Ph.D., of Oregon Health and Science University.

37.    Attached hereto as Exhibit 33 is a Declaration of Dr. Bethany Diane Jenkins, of the University of Rhode Island.

38.    Attached hereto as Exhibit 34 is a Declaration of Dr. Greg Hirth, of Brown University.

39.    Attached hereto as Exhibit 35 is a Declaration of Todd Conklin, of Care New England Health System.

40.    Attached hereto as Exhibit 36 is a Declaration of Bharat Ramratnam, M.D., of Lifespan Corporation d/b/a Brown University Health.

41.    Attached hereto as Exhibit 37 is a Declaration of Katherine Tracy, of the University of Nevada.

42.    Attached hereto as Exhibit 38 is a Declaration of Kirk Dombrowski, of the University of Vermont and State Agricultural College.

43.     Attached hereto as Exhibit 39 is a Declaration of Mari Ostendorf, of the University of Washington.

44.     Attached hereto as Exhibit 40 is a Declaration of Leslie Anne Brunelli, of Washington State University.

45.     Attached hereto as Exhibit 41 is a Declaration of Dorota Grejner-Brzezinska, of the University of Wisconsin-Madison.

46.     Attached hereto as Exhibit 42 is a Declaration of Kristian O'Connor, of the University of Wisconsin-Milwaukee.

47.     Attached hereto as Exhibit 43 is a Declaration of Jeni Kitchell, of California State University.


Dated:          February 10, 2025
                Boston, MA


                                /s/ Katherine Dirks
                                Katherine Dirks
                                Deputy Chief, Government Bureau
                                Office of the Attorney General, Massachusetts

## <u>CERTIFICATE OF SERVICE</u>

I, Chris Pappavaselio, certify that on February 10, 2025, I provided a copy of the foregoing document and its attachments to the following individuals at the U.S. Department of Justice:

Eric J. Hamilton
Deputy Assistant Attorney General, Federal Programs Branch
eric.hamilton@usdoj.gov

Alex Haas
Co-Director, Federal Programs Branch
alex.haas@usdoj.gov

Diane Kelleher
Co-Director, Federal Programs Branch
diane.kelleher@usdoj.gov

John Griffiths
Co-Director, Federal Programs Branch
john.griffiths@usdoj.gov

Rayford Farquhar
Chief, Defensive Litigation, Civil Division
U.S. Attorney's Office for the District of Massachusetts
rayford.farquhar@usdoj.gov

/s/ Chris Pappavaselio
Chris Pappavaselio
Assistant Attorney General

7

**J.A. 86**

# EXHIBIT 1

Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates
Notice Number:
NOT-OD-25-068

# Key Dates

Release Date:

February 7, 2025

# Related Announcements

None

# Issued by

Office of The Director, National Institutes of Health (OD)

# Purpose

**Purpose**

The National Institutes of Health (NIH) awards a large number of grants providing substantial federal funding for research purposes.  These grants include significant payments for "indirect costs," defined as "facilities" and "administration."    45 CFR 75.414(a).  The "facilities" category is "defined as depreciation on buildings, equipment and capital improvements, interest on debt associated with certain buildings, equipment and capital improvements, and operations and maintenance expenses."  *Id.*  And the "administration" category is defined as "general administration and general expenses such as the director's office, accounting, personnel, and all other types of expenditures not listed specifically under one of the subcategories of 'Facilities'" (including cross allocations from other pools, where applicable).  *Id.*

In issuing grants, NIH generally uses the indirect cost rate negotiated by an "agency with cognizance for F&A/indirect cost rate (and other special rate) negotiation." Grants Policy Statement at IIA-68; *see* 45 C.F.R. 75.414(c)(1).  NIH may, however, use "a rate different from the negotiated rate for either a class of Federal awards or a single Federal award."  45 C.F.R. 75.414(c)(1).  NIH may deviate from the negotiated rate both for future grant awards and, in the case of grants to institutions of higher education ("IHEs"), for existing grant awards.  *See* 45 CFR Appendix III to Part 75, § C.7.a; *see* 45 C.F.R. 75.414(c)(1).

In deviating from the negotiated indirect cost rate, NIH must "implement, and make publicly available, the policies, procedures, and general decision-making criteria that their programs will follow to seek and justify deviations from negotiated rates." 45 C.F.R § 75.414(c)(3).

In accordance with 45 CFR 75 and its accompanying appendices, this Guidance implements and makes publicly available NIH's updated policy deviating from the negotiated indirect cost rate for new grant awards and existing grant awards, effective as of the date of this Guidance's issuance. Pursuant to this Supplemental Guidance, there will be a standard indirect rate of 15% across all NIH grants for indirect costs in lieu of a separately negotiated rate for indirect costs in every grant.

**Providing Indirect Cost Rates that Comport with Market Rates**

**J.A. 88**

[NIH's mission](#) is to "seek fundamental knowledge about the nature and behavior of living systems" in order to enhance health, lengthen life, and reduce illness and disability.  In furtherance of this mission, NIH spent more than \$35 Billion in Fiscal Year 2023 on almost 50,000 competitive grants to more than 300,000 researchers at more than 2,500 universities, medical schools, and other research institutions across all 50 states and the District of Columbia.[1] Of this funding, approximately \$26 billion went to direct costs for research, while \$9 billion was allocated to overhead through NIH's indirect cost rate.

Although cognizant that grant recipients, particularly "new or inexperienced organizations," use grant funds to cover indirect costs like overhead, *see* [89 FR 30046–30093](#), NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life.  Indirect costs are, by their very nature, "not readily assignable to the cost objectives specifically benefitted" and are therefore difficult for NIH to oversee.  *See* Grants Policy Statement at I-20.  Yet the average indirect cost rate reported by NIH has averaged between 27% and 28% over time.[2]  And many organizations are much higher— charging indirect rates of over 50% and in some cases over 60%.

Most private foundations that fund research provide substantially lower indirect costs than the federal government, and universities readily accept grants from these foundations.  For example, a recent study found that the most common rate of indirect rate reimbursement by foundations was 0%, meaning many foundations do not fund indirect costs whatsoever.  In addition, many of the nation's largest funders of research—such as the Bill and Melinda Gates Foundation—have a maximum indirect rate of 15%.  And in the case of the Gates Foundation, the maximum indirect costs rate is 10% for institutions of higher education.

A sample list of foundations that provide indirect cost funding and their respective maximum indirect rate is below:[3]

| Maximum Indirect Cost Rate | Organizations |
|---|---|
| **10%** | • Gates Foundation (for institutions of higher education)<br>• Smith Richardson Foundation |
| **12%** | • Gordon and Betty Moore Foundation<br>• Robert Wood Johnson Foundation |
| **15%** | • Carnegie Corporation of New York<br>• Chan Zuckerberg Initiative<br>• John Templeton Foundation<br>• Packard Foundation<br>• Rockefeller Foundation (for institutions of higher education) |

Indeed, one recent analysis examined what level of indirect expenses research institutions were willing to accept from funders of research. Of 72 universities in the sample, 67 universities were willing to accept research grants that had 0% indirect cost coverage.  One university (Harvard University) required 15% indirect cost coverage, while a second (California Institute of Technology) required 20% indirect cost coverage. Only three universities in the sample refused to accept indirect cost rates lower than their federal indirect rate. These universities were the Massachusetts Institute of Technology, the University of Michigan, and the University of Alabama at Birmingham.

The United States should have the best medical research in the world. It is accordingly vital to ensure that as many funds as possible go towards direct scientific research costs rather than administrative overhead.  NIH is accordingly imposing a standard indirect cost rate on all grants of 15% pursuant to its 45 C.F.R. 75.414(c) authority.  We note in doing so that this rate is 50% higher than the 10% de minimis indirect cost rate provided in 45 C.F.R. 75.414(f) for NIH grants.  We have elected to impose a higher standard indirect cost rate to reflect,

**J.A. 89**

among other things, both (1) the private sector indirect cost rates noted above, and (2) the de minimis cost rate of 15% in 2 C.F.R. 200.414(f) used for IHEs and nonprofits receiving grants from other agencies.

**NIH Implementation**

For any new grant issued, and for all existing grants to IHEs retroactive to the date of issuance of this Supplemental Guidance, award recipients are subject to a 15 percent indirect cost rate. This rate will allow grant recipients a reasonable and realistic recovery of indirect costs while helping NIH ensure that grant funds are, to the maximum extent possible, spent on furthering its mission. This policy shall be applied to all current grants for go forward expenses from February 10, 2025 forward as well as for all new grants issued. We will not be applying this cap retroactively back to the initial date of issuance of current grants to IHEs, although we believe we would have the authority to do so under 45 CFR 75.414(c).

[1] NIH, *Budget* (Oct. 3, 2024), https://www.nih.gov/ABOUT-NIH/WHAT-WE-DO/BUDGET.

[2] NIH, Fiscal Year 2021 Overview Supplementary Tables at 87, https://officeofbudget.od.nih.gov/pdfs/FY21/br/5-SupplementaryTables.pdf.

[3] *See* Bill & Melinda Gates Found., Indirect Cost Policy (Feb. 2017), https://docs.gatesfoundation.org/Documents/Indirect_Cost_Policy.pdf; Smith Richardson Found., Strategy and Policy Fellows Program, https://www.srf.org/wp-content/uploads/2014/04/2021-SPFP-Application-Requirements-and-Proposal-Template.pdf; Gordon & Betty Moore Found., Moore Inventor Fellows: 2024-2025 FAQ, https://www.moore.org/docs/default-source/moore-inventor-fellows/moore-inventor-fellows-faq.pdf; Robert Wood Johnson Found., Policies for Action:Grants FAQs, https://anr.rwjf.org/templates/external/P4A_FAQS.pdf; Carnegie Corp. of New York, Grantee FAQs, https://www.carnegie.org/grants/grantee-faqs/#:~:text=What%20is%20your%20indirect%20cost,think%20tanks%2C%20and%20government%20entities; Chan Zuckerberg Initiative, Application Instructions, https://chanzuckerberg.com/wp-content/uploads/2020/06/CZI_Imaging_Scientists_2_Detailed_Instructions.pdf; John Templeton Found., Grant FAQ, https://www.templeton.org/grants/grant-faq;The Packard Found., Fostering Equitable Grantmaking through Indirect Cost Coverage, https://www.packard.org/insights/perspective/fostering-equitable-grantmaking-through-indirect-cost-coverage/; The Rockefeller Found., Guidance: Preparing a Project Grant Budget for the Rockefeller Foundation, https://www.rockefellerfoundation.org/wp-content/uploads/2024/06/The-Rockefeller-Foundation-Project-Budget-Guidance-v2024.pdf.

# Inquiries

Please direct all inquiries to:

NIH Office of Policy for Extramural Research Administration (OPERA)

Division of Grants Policy

grantspolicy@nih.gov

Weekly TOC for this Announcement
NIH Funding Opportunities and Notices

# EXHIBIT 2



# Major Savings and Reforms

## BUDGET OF THE U. S. GOVERNMENT

### Fiscal Year 2018



**Office of Management and Budget**

# Major Savings and Reforms

## BUDGET OF THE U. S. GOVERNMENT

### Fiscal Year 2018



Office of Management and Budget

# REDUCTION: NATIONAL INSTITUTES OF HEALTH TOPLINE
## *Department of Health and Human Services*

The Budget proposes to reduce funding for the National Institutes of Health (NIH) to better target funding to support the highest priority biomedical research.

### Funding Summary
(In millions of dollars)

|  | 2017 CR | 2018 Request | 2018 Change from 2017 |
|---|---|---|---|
| Budget Authority................................................................................................................ | 31,674 | 25,883 | -5,791 |

**Justification**

In 2018, NIH would receive nearly $26 billion to improve public health by advancing our knowledge of disease and cures.  NIH would improve agency management by reducing duplication, and reducing both agency and grantee administrative costs.

The Budget proposes NIH structural reforms, including the elimination of the Fogarty International Center which supports international research capacity and training of researchers overseas.  International research will be prioritized, as appropriate, by other NIH Institutes as part of their research portfolios.  For example, NIH's National Institute of Allergy and Infectious Disease conducts international research that has important implications for U.S. health improvements.  However, duplicative and unnecessary global health research will be curtailed.

The Budget also proposes to reduce reimbursement of grantee administrative and facilities costs, referred to as "indirect costs", so that available funding can be better targeted toward supporting the highest priority research on diseases that affect human health.  As a result of these changes to the reimbursement structure, significant reductions in 2018 will come from lower indirect cost payments.  Increasing efficiencies within the NIH is a priority of the Administration.  The Budget includes an indirect cost rate for NIH grants that will be capped at 10 percent of total research.  This approach would be applied to all types of grants with a rate higher than 10 percent currently and will achieve significant savings in 2018.  It would also bring NIH's reimbursement rate for indirect costs more in line with the reimbursement rate used by private foundations, such as the Gates Foundation, for biomedical research conducted at U.S. universities.  In addition, the Budget proposes that NIH will streamline select Federal research requirements for grantees through targeted approaches.  In tandem, the Budget supports burden reduction measures that will further reduce grant award recipient costs associated with research.

# EXHIBIT 3



A BUDGET FOR A

# Better
# America

**PROMISES KEPT. TAXPAYERS FIRST.**

# Major Savings and Reforms

**FISCAL YEAR 2020**
**BUDGET OF THE U.S. GOVERNMENT**

J.A. 96

# A BUDGET FOR A

# Better America

## PROMISES KEPT. TAXPAYERS FIRST.

# Major Savings and Reforms

**FISCAL YEAR 2020**
**BUDGET OF THE U.S. GOVERNMENT**

J.A. 97

# REDUCTION: NATIONAL INSTITUTES OF HEALTH TOPLINE
## *Department of Health and Human Services*

The Budget proposes to reduce funding for the National Institutes of Health (NIH) to better target funding to support the highest priority and most critical biomedical research.

### Funding Summary
(In millions of dollars)

|  | 2019 Enacted | 2020 Request | 2020 Change from 2019 |
|---|---|---|---|
| Budget Authority........................................................................................... | 38,015 | 33,477 | -4,538 |

## Justification

Since 2016, NIH has received more than $108 billion in total funding, including approximately $2 billion in increases in each year for the past three years. In 2020, NIH would receive nearly $34 billion more to improve public health by investing in the highest priority and most critical biomedical research and advancing our knowledge of diseases and cure.

At the proposed level, NIH would continue to support research in the highest priority areas and manage resources more strategically. The Administration believes NIH can improve efficiencies to maximize the return of its investments.

For example, the Budget would support continued implementation of the largest change management effort in NIH's history, to harmonize operational functions that advance scientific innovation. These reforms would ensure all Institutes and Centers operate efficiently and effectively by aligning management with best practices and break down administrative silos through standardization of structures and processes agency-wide.

In addition, NIH would take other steps to increase the impact of its resources. For example, the Budget proposes to decrease the cost of research by capping the percentage of investigator salary that can be paid with grant funds, and by reducing the limit for salaries paid with grant funds from $189,600 to $154,300. Currently, there are NIH grant recipients whose salaries are entirely paid for by the Federal Government, despite being employed by major universities. This policy provides for appropriate compensation for researchers while enabling NIH to redirect savings to support additional research. This and other steps NIH would take would enable available funding to be better targeted toward supporting the highest priority research on diseases that affect human health while making research institutes less reliant on Federal dollars.

For the past two years, NIH has been prohibited by law from reducing grantee administrative costs and shifting these resources to support direct research on high impact areas, such as cancer, Alzheimer's disease, and heart disease. The Congress imposed this prohibition, which limits NIH's ability to maximize its support of direct biomedical research. The Budget proposes to eliminate the current prohibition, which would give NIH the flexibility to support more direct research while encouraging research institutions to improve the efficiency of operations.

In 2020, NIH would continue to support the highest priority biomedical research and accomplish its mission to improve health.

# EXHIBIT 4

Notice of Legislative Mandates in Effect for FY 2024
Notice Number:
NOT-OD-24-110

# Key Dates

Release Date:

April 30, 2024

# Related Announcements

- **April 30, 2024** - Notice of Fiscal Policies in Effect for FY 2024. See Notice NOT-OD-24-109.
- **January 29, 2024** - Guidance on Salary Limitation for Grants and Cooperative Agreements FY 2024. See Notice NOT-OD-24-057.
- **March 8, 2024** - NIH Operates Under a Continuing Resolution. See Notice NOT-OD-24-073.
- **February 5, 2024** - NIH Operates Under a Continuing Resolution. See Notice NOT-OD-24-059.
- **December 14, 2023** - NIH Operates Under a Continuing Resolution. See Notice NOT-OD-24-039.
- **October 4, 2023** - NIH Operates Under a Continuing Resolution. See Notice NOT-OD-24-007.

# Issued by

NATIONAL INSTITUTES OF HEALTH (NIH)

# Purpose

The Further Consolidated Appropriations Act, 2024 (Public Law No: 118-47), signed into law on March 23, 2024, provides funding to NIH for the Fiscal Year ending September 30, 2024. The intent of this notice is to provide current requirements outlined in the following statutory provision that limits or conditions the use of funds on NIH grant, cooperative agreement, and contract awards for FY 2024.

**FY 2024 Legislative Mandates in effect are as follows:**

*Division D, Title II - Department of Health and Human Services*

- Salary Limitation (Section 202)
- Gun Control (Section 210)
- Indirect Costs (Section 224)

*Division D, Title V - General Provisions, Departments of Labor, Health and Human Services, and Education*

- Anti-Lobbying (Section 503)
- Acknowledgment of Federal Funding (Section 505)
- Restriction on Abortions (Section 506)
- Exceptions to Restriction on Abortions (Section 507)
- Ban on Funding Human Embryo Research (Section 508)
- Limitation on Use of Funds for Promotion of Legalization of Controlled Substances (Section 509)
- Restriction on Disclosure of Political Affiliation for Federal Scientific Advisory Committee Candidates (Section 515(a))
- Restriction on Dissemination of False or Misleading Information (Section (515(b))
- Restriction of Pornography on Computer Networks (Section 520)

- Restriction on Distribution of Sterile Needles (Section 526)

**Details:**

*Division H, Title II – Department of Health and Human Services*

1. <u>Salary Limitation (Section 202)</u>

    "None of the funds appropriated in this title shall be used to pay the salary of an individual, through a grant or other extramural mechanism, at a rate in excess of Executive Level II: Provided, that none of the funds appropriated in this title shall be used to prevent the NIH from paying up to 100 percent of the salary of an individual at this rate."Further information on the NIH Salary Limitation can be found in NIH Guide Notice <u>NOT-OD-24-057</u>.

2. <u>Gun Control (Section 210)</u>

    "None of the funds made available in this title may be used, in whole or in part, to advocate or promote gun control."

3. <u>Indirect Cost (Section 224)</u>

    "In making Federal financial assistance, the provisions relating to indirect costs in part 75 of title 45, Code of Federal Regulations, including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017. None of the funds appropriated in this or prior Acts or otherwise made available to the Department of Health and Human Services or to any department or agency may be used to develop or implement a modified approach to such provisions, or to intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter."

*Division H, Title V - General Provisions, Departments of Labor, Health and Human Services, and Education*

4. Anti-Lobbying (Section 503)

(a) No part of any appropriation contained in this Act or transferred pursuant to section 4002 of Public Law 111–148 shall be used, other than for normal and recognized executive-legislative relationships, for publicity or propaganda purposes, for the preparation, distribution, or use of any kit, pamphlet, booklet, publication, electronic communication, radio, television, or video presentation designed to support or defeat the enactment of legislation before the Congress or any State or local legislature or legislative body, except in presentation to the Congress or any State or local legislature itself, or designed to support or defeat any proposed or pending regulation, administrative action, or order issued by the executive branch of any State or local government, except in presentation to the executive branch of any State or local government itself.

(b) No part of any appropriation contained in this Act or transferred pursuant to section 4002 of Public Law 111–148 shall be used to pay the salary or expenses of any grant or contract recipient, or agent acting for such recipient, related to any activity designed to influence the enactment of legislation, appropriations, regulation, administrative action, or Executive order proposed or pending before the Congress or any State government, State legislature or local legislature or legislative body, other than for normal and recognized executive-legislative relationships or participation by an agency or officer of a State, local or tribal government in policymaking and administrative processes within the executive branch of that government.

(c) The prohibitions in subsections (a) and (b) shall include any activity to advocate or promote any proposed, pending or future Federal, State or local tax increase, or any proposed, pending, or future

requirement or restriction on any legal consumer product, including its sale or marketing, including but not limited to the advocacy or promotion of gun control.

5. Acknowledgment of Federal Funding (Section 505)

"When issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, all grantees receiving Federal funds included in this Act, including but not limited to State and local governments and recipients of Federal research grants, shall clearly state-

(1) the percentage of the total costs of the program or project which will be financed with Federal money;
(2) the dollar amount of Federal funds for the project or program; and
(3) percentage and dollar amount of the total costs of the project or program that will be financed by non-governmental sources."

6. Restriction on Abortions (Section 506)

"(a) None of the funds appropriated in this Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for any abortion.

(b) None of the funds appropriated in this Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for health benefits coverage that includes coverage of abortion.

(c) The term "health benefits coverage" means the package of services covered by a managed care provider or organization pursuant to a contract or other arrangement."

7. Exceptions to Restriction on Abortions (Section 507)

"(a) The limitations established in the preceding section shall not apply to an abortion—

(1) if the pregnancy is the result of an act of rape or incest; or

(2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed.

(b) Nothing in the preceding section shall be construed as prohibiting the expenditure by a State, locality, entity, or private person of State, local, or private funds (other than a State's or locality's contribution of Medicaid matching funds).

(c) Nothing in the preceding section shall be construed as restricting the ability of any managed care provider from offering abortion coverage or the ability of a State or locality to contract separately with such a provider for such coverage with State funds (other than a State's or locality's contribution of Medicaid matching funds).

(d) (1) None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.

(2) In this subsection, the term "health care entity" includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan."

8. Ban on Funding Human Embryo Research (Section 508)

"(a) None of the funds made available in this Act may be used for—

(1) the creation of a human embryo or embryos for research purposes; or

(2) research in which a human embryo or embryos are destroyed, discarded, or knowingly subjected to risk of injury or death greater than that allowed for research on fetuses in utero under 45 CFR 46.204(b) and section 498(b) of the Public Health Service Act (42 U.S.C. 289g(b)).

(b) For purposes of this section, the term "human embryo or embryos" includes any organism, not protected as a human subject under 45 CFR 46 as of the date of the enactment of this Act, that is derived by fertilization, parthenogenesis, cloning, or any other means from one or more human gametes or human diploid cells."

9. Limitation on Use of Funds for Promotion of Legalization of Controlled Substances (Section 509)

"(a) None of the funds made available in this Act may be used for any activity that promotes the legalization of any drug or other substance included in schedule I of the schedules of controlled substances established under section 202 of the Controlled Substances Act except for normal and recognized executive-congressional communications.

(b) The limitation in subsection (a) shall not apply when there is significant medical evidence of a therapeutic advantage to the use of such drug or other substance or that federally sponsored clinical trials are being conducted to determine therapeutic advantage."

10. Restriction on Disclosure of Political Affiliation for Federal Scientific Advisory Committee Candidates (Section 515(a))

"(a) None of the funds made available in this Act may be used to request that a candidate for appointment to a Federal scientific advisory committee disclose the political affiliation or voting history of the candidate or the position that the candidate holds with respect to political issues not directly related to and necessary for the work of the committee involved."

11. Restriction on Dissemination of False or Misleading Information (Section 515(b))

"(b) None of the funds made available in this Act may be used to disseminate information that is deliberately false or misleading."

12. Restriction of Pornography on Computer Networks (Section 520)

"(a) None of the funds made available in this Act may be used to maintain or establish a computer network unless such network blocks the viewing, downloading, and exchanging of pornography.

(b) Nothing in subsection (a) shall limit the use of funds necessary for any Federal, State, tribal, or local law enforcement agency or any other entity carrying out criminal investigations, prosecution, or adjudication activities."

13. Restriction on Distribution of Sterile Needles (Section 526)

"Notwithstanding any other provision of this Act, no funds appropriated in this Act shall be used to purchase sterile needles or syringes for the hypodermic injection of any illegal drug: Provided, That such limitation does not apply to the use of funds for elements of a program other than making such purchases

if the relevant State or local health department, in consultation with the Centers for Disease Control and Prevention, determines that the State or local jurisdiction, as applicable, is experiencing, or is at risk for, a significant increase in hepatitis infections or an HIV outbreak due to injection drug use, and such program is operating in accordance with State and local law."

# Inquiries

Please direct all inquiries to:

NIH Office of Policy for Extramural Research Administration (OPERA)
Division of Grants Policy
GrantsPolicy@OD.NIH.gov

Weekly TOC for this Announcement
NIH Funding Opportunities and Notices

# EXHIBIT 5

← Post                                    Reply

**NIH** ✓
@NIH

Last year, $9B of the $35B that the National Institutes of Health (NIH) granted for research was used for administrative overhead, what is known as "indirect costs." Today, NIH lowered the maximum indirect cost rate research institutions can charge the government to 15%, above what many major foundations allow and much lower than the 60%+ that some institutions charge the government today. This change will save more than $4B a year effective immediately.

6:19 PM · Feb 7, 2025 · **25.9M** Views

💬 2.1K          ↻ 7.1K          ♡ 26K          🔖 2.9K          ↥

**Post your reply**                        Reply

**JTL** ✓ @phuturize · Feb 7
Explain it to me like i'm 5 yo.

💬 33          ↻ 1          ♡ 21          ᴪ 159K          🔖          ↥

**AnswerOn** ✓ @AnswerOn                    Ad
AnswerOn reduces turnover costs in call centers by 15-30% on average, saving 10-25% in training costs with a program margin upwards of 10-20% per year. #agentattrition #callcenter

0:01 / 0:43

From answeron.com

💬 7          ↻ 4          ♡ 43          ᴪ 940K          🔖          ↥

**8trius** ✓ @8trius · Feb 8
Can someone please help me understand this truthfully and accurately.

My woman is a medical lab scientist working in a stat lab. She said she'd

🔍 Search

### Relevant people

**NIH** ✓                                  Follow
@NIH
Official account of the National Institutes of Health. NIH…Turning Discovery Into Health®.  Privacy Policy: go.usa.gov/x9svN Engagement ≠ endorsement

### Subscribe to Premium to write your own longer posts

Write longer posts and apply text formatting such as bold and italic.

Subscribe

### What's happening

Khloé in Wonder Land
LIVE

#SinnersMovie
Sinners - only in theaters April 18
▸ Promoted by SinnersMovie

Trending
Kelce
192K posts

Trending
Patrick Mahomes
270K posts

Trending in United States
Anne Hathaway
28.7K posts

Show more

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···   © 2025 X Corp.



**J.A. 106**

(1) 15% of 1.25 (a year) was on the $35B that the National Institutes of Health granted... research was used for administrative...
much prefer to work in research but the pay is so terrible.

Are the salaries of the scientists included in this 15%, or does that come
Show more

💬 47          ↻ 5          ♡ 39          �ᵢₗₗ 48K          🔖    ⬆

**Jason Corso** ✔ @_JasonCorso_ · Feb 7                              𝕏  ⋯
Are you joking?  Heaps of necessary costs to conduct research are not
allowed in the direct costs; this money is not arbitrary administrative costs.
It's a necessary component of the research enterprise.

💬 31          ↻ 21          ♡ 514          ᵢₗₗ 58K          🔖    ⬆

**Brian Goldberg** @BrianGoldberg · Feb 7                          𝕏  ⋯
some people at "NIH" (i.e., DOGE invaders) need some work on their BASIC
MATH: 15% of $35B is $5.25B...if it was $9B last year and could be $5.25B
this year, let's see here, 9-5.25...NOT "more than $4B a year"

💬 29          ↻ 2          ♡ 29          ᵢₗₗ 27K          🔖    ⬆



**J.A. 107**

(1) 435 in 1. Last year, 63% of the $35 total in National Institutes of Health (NIH) grant research was used for administrativ...

# EXHIBIT 6

## NIH CLINICAL RESEARCH TRIALS AND YOU

# Why Should I Participate in a Clinical Trial?

Clinical trials are part of clinical research and at the heart of all medical advances. Clinical trials look at new ways to prevent, detect, or treat disease.

Treatments might be new drugs or new combinations of drugs, new surgical procedures or devices, or new ways to use existing treatments.

The goal of clinical trials is to determine if a new test or treatment works and is safe. Clinical trials can also look at other aspects of care, such as improving the quality of life for people with chronic illnesses.

People participate in clinical trials for a variety of reasons. Healthy volunteers say they participate to help others and to contribute to moving science forward. Participants with an illness or disease also participate to help others, but also to possibly receive the newest treatment and to have the additional care and attention from the clinical trial staff.

Clinical trials offer hope for many people and an opportunity to help researchers find better treatments for others in the future.



Why Should I Join a Clinical Trial?

Have you considered participating in a clinical trial? Dr. Griffin Rodgers, director of the National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK) at the National Institutes of Health, discusses the role that clinical trial volunteers play in improving the health of current and future generations.

## Learn More

- The basics about participating in clinical trials
- The impact of NIH research

This page last reviewed on May 30, 2019

NIH…Turning Discovery Into Health®

National Institutes of Health, 9000 Rockville Pike, Bethesda, Maryland 20892

U.S. Department of Health and Human Services

**J.A. 110**

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

       Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

       Defendants.

Civil Action No. _____

<u>**Declaration of Ken A. Dill**</u>

I, Ken A. Dill, hereby declare:

1.  I am a SUNY Distinguished Professor of Physics and Chemistry, Affiliated Distinguished Professor in Applied Math, the Louis and Beatrice Laufer Endowed Chair of Physical and Quantitative Biology, and founding and current Director of the Laufer Center for Physical and Quantitative Biology at Stony Brook University ("Laufer Center"). I am also an elected member of the US National Academy of Sciences. I received my Ph.D. in Biology from the University of California San Diego in 1978.

2.  I study the physics of protein folding, the statistical mechanics of water, principles of nonequilibrium statistical thermodynamics in small systems, and the mechanisms and evolution of cells. I have authored over 360 academic publications, including co-authoring two textbooks, *Molecular Driving Forces*, a textbook in physical chemistry and statistical mechanics with Sarina Bromberg, and *Protein Actions: Principles and Modeling*, an introduction to the biological, chemical, and physical properties of proteins with Ivet Bahar and RL Jernigan.

1

3. I have personal knowledge of the matters set forth below.

4. I am providing this declaration to explain how the National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%, will cost thousands of Americans their lives.

5. Stony Brook University ("SBU") is a flagship research university in the State University of New York ("SUNY") system. Because SBU performs a very high level of research activity, it is one of a select few universities to achieve a R1 rating from the Carnegie Classification of Institutions of Higher Education, the highest rating possible.

6. The research we perform at the Laufer Center provides the building blocks for untangling the complex mystery of neurogenerative diseases like Alzheimer's Disease, Parkinson's Disease, and Huntington's Disease.

7. For example, I received a grant of approximately $6 million from the National Institutes of Health to research the underlying mechanisms of neurodegenerative diseases. My research involves studying the protein structures that underly these diseases, including how proteins group together to form amyloid aggregates. Understanding amyloid aggregates is an essential step towards treatments, and ultimately a cure, for neurodegenerative diseases.

8. These neurogenerative diseases have destroyed millions of American lives, and it is absolutely critical that we continue to make steady progress towards curing them.

9. This kind of painstaking research that, historically, is primarily done by institutions of higher education. The private sector, and in particular, pharmaceutical companies, rarely invest in this type of lifesaving research because it requires decades of steady work and is therefore cost prohibitive.

2

10. This is particularly true for neurodegenerative diseases, in large part because the proteins involved in such diseases behave differently than they typically do.

11. I understand that NIH is proposing to cut the indirect costs rate. If they do so, the consequences for the lifesaving research we conduct at the Laufer Center will be devastating. I believe that the Laufer Center's research could possibly save thousands of lives from the ravages of neurodegenerative diseases.

12. It is not an exaggeration to say that the true cost of the NIH's decision may be that thousands of American lives are needlessly degraded or sacrificed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February, 2025, in Stony Brook, New York.

/s/ *Ken A. Dill*
Ken A. Dill
SUNY Distinguished Professor of Physics and Chemistry; Affiliated Distinguished Professor in Applied Math; the Louis and Beatrice Laufer Endowed Chair of Physical and Quantitative Biology; and founding and current Director of the Laufer Center for Physical and Quantitative Biology
SUNY Stony Brook University

3

# EXHIBIT 8

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, ATTORNEY
GENERAL DANA NESSEL ON BEHALF
OF THE PEOPLE OF THE STATE OF
MICHIGAN, STATE OF ILLINOIS,
STATE OF ARIZONA, STATE OF
CALIFORNIA, STATE OF
CONNECTICUT, STATE OF COLORADO,
STATE OF DELAWARE, STATE OF
HAWAI'I, STATE OF MAINE, STATE OF
MARYLAND, STATE OF MINNESOTA,
STATE OF NEW JERSEY, STATE OF
NEW YORK, STATE OF NEVADA,
STATE OF NEW MEXICO, STATE OF
NORTH CAROLINA, STATE OF
OREGON, STATE OF RHODE ISLAND,
STATE OF VERMONT, STATE OF
WASHINGTON, and STATE OF
WISCONSIN,

      Plaintiffs,

        v.

NATIONAL INSTITUTES OF HEALTH;
MATTHEW MEMOLI, M.D., M.S., in his
official capacity as Acting Director of the
National Institutes of Health; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and DOROTHY
FINK, in her official capacity as Acting
Secretary of the U.S. Department of Health
and Human Services,

      Defendants.

Case No. _____

## DECLARATION OF RAFAEL JAIME

Pursuant to 28 U.S.C. § 1746(2), I, Rafael Jaime, hereby declare as follows:

1.      I am over the age of eighteen and competent to testify herein.

2.      I am President of United Automobile, Aerospace and Agricultural Implement Workers of America, Local 4811 (UAW 4811). UAW 4811 represents 48,000 academic workers at the University of California, including at all 10 UC campuses, 5 medical centers, and Lawrence Berkeley National Lab. UAW 4811 represents 16,000 Graduate Student Researchers, 7,000 Postdoctoral Scholars, and 5,000 Academic Researchers (including Specialists and Independent Researchers). Thousands of these researchers are funded by NIH grants on a range of biomedical research projects including new cures for cancer, and new treatments for diabetes, heart disease, Alzheimer's disease, and many more.

4.      UAW 4811 members are very concerned about the impact of NIH's announcement on February 7, 2025 regarding the immediate lowering of the maximum rate for indirect costs on all current and future NIH grants to a maximum of 15%. Indirect costs (also known as "overhead") fund facilities and administration that support the work of our members in many ways including funding key research support personnel, shared equipment, maintenance of facilities, utilities and other essential overhead costs for completing our research projects. For fiscal year 2024-25, the University of California campuses negotiated indirect cost rates of 56-64% and in FY 2023-24 received a total of $2.6 billion in NIH funding. A reduction of the indirect cost rate to 15% would result in the loss of hundreds of millions in NIH funding. Without this funding for facilities and administrative costs the capacity of our members to continue to do cutting edge research will be jeopardized. The training and education of the next generation of life scientists and medical researchers will be at risk. Further, clinical trials in pursuit of potentially life saving innovations, which are currently being conducted by our members may be disrupted.

5.      Additionally, our members are embedded within their communities; they are tenants and home owners, parents, and neighbors. Threats to the funding that supports their research imperils their livelihood, and deprives California of economic growth. The NIH estimates that for every dollar it distributes in funding, $2.46 is generated in economic activity.

6.      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this day of February 9, 2025

Rafael Jaime

# EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, ATTORNEY
GENERAL DANA NESSEL ON BEHALF
OF THE PEOPLE OF THE STATE OF
MICHIGAN, STATE OF ILLINOIS,
STATE OF ARIZONA, STATE OF
CALIFORNIA, STATE OF
CONNECTICUT, STATE OF COLORADO,
STATE OF DELAWARE, STATE OF
HAWAI'I, STATE OF MAINE, STATE OF
MARYLAND, STATE OF MINNESOTA,
STATE OF NEW JERSEY, STATE OF
NEW YORK, STATE OF NEVADA,
STATE OF NEW MEXICO, STATE OF
NORTH CAROLINA, STATE OF
OREGON, STATE OF RHODE ISLAND,
STATE OF VERMONT, STATE OF
WASHINGTON, and STATE OF
WISCONSIN,

     Plaintiffs,

        v.

NATIONAL INSTITUTES OF HEALTH;
MATTHEW MEMOLI, M.D., M.S., in his
official capacity as Acting Director of the
National Institutes of Health; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and DOROTHY
FINK, in her official capacity as Acting
Secretary of the U.S. Department of Health
and Human Services,

     Defendants.

Case No. _____

## Declaration of Theresa A. Maldonado

I, Theresa A. Maldonado, hereby declare:

1. I am a resident of the State of California. Since 2020, I have been employed by the University of California (UC), Office of the President, as the systemwide Vice President for Research & Innovation. In addition to my current role, I have a Ph.D. in electrical engineering and over 30 years' academic experience.

2. As the UC system's Vice President for Research & Innovation, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by UC staff. If called as a witness, I could and would testify competently to the matters set forth below.

3. As Vice President for Research & Innovation, I lead UC researchers and administrators in research policy, funding for systemwide programs, and the innovation and entrepreneurship ecosystem. We work to build UC-wide partnerships, help shape effective policies and provide a strong voice nationally for research and innovation on behalf of UC.

4. As the systemwide leader for research and innovation, I work very closely with the Vice Chancellors for Research from each UC campus, and I am in regular contact with them to identify any issues impacting UC systemwide research, including concerns related to research funding.

5. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates* ("Notice")*, which purports to immediately reduce facilities and administrative costs payments (also known as indirect costs) to 15%.

2

6. The UC system has 10 research-intensive campuses, six academic medical centers, 21 health professional sciences schools, multiple student health centers, and a statewide agriculture research and extension division. UC also manages three affiliated U.S. Department of Energy national laboratories, including the Lawrence Berkeley National Laboratory, the Lawrence Livermore National Laboratory, and the Los Alamos National Laboratory.

7. UC has more than 200,000 employees, making it California's third-largest employer. Its workforce purchases goods and contributes to local economies across the state.  UC generates more than $80 billion in economic activity statewide.

8. The University's 21 health professional sciences schools, five NCI-designated cancer centers, and six academic medical centers are widely recognized as among the best in the nation, and they are international leaders in the education of health professionals, in research that develops new cures and treatments, and in public service that provides healthcare for all Californians regardless of ability to pay.

9. UC is one of the nation's leading research institutions, with almost 9% of all U.S. academic research being conducted by UC researchers.

10. Biomedical advancements at UC include the first radiation treatment for cancer, research contributing to the first flu vaccine, the discovery of the role of LDL and HDL cholesterol in heart disease, the invention of modern gene editing, and much more.

11. UC's budget relies on federal funding for its research mission.  The research mission at UC includes, but is not limited to, allocated funding for staffing, clinical trials, dissemination of results, public outreach, teaching and training students and others, equipment, and numerous other activities to fulfill the research mission and serve the people of California and the United States.

3

12. Federal funds are UC's single most important source of support for its research, accounting for more than half of UC's total research awards.

13. In FY 2023, the total amount of federal research awards to UC was over $3 billion.

14. NIH research funding supports the United States' scientific competitiveness worldwide and enables the US to be a global innovation leader. NIH research funding has led to scientific breakthroughs that have improved human health, including new treatments for cancer and diabetes, and declining death rates for heart attack and stroke.

15. Recovering costs of research is essential to maintain the operations of a research university like UC. To perform research that is sponsored by federal agencies, UC incurs a variety of other significant costs that it would not otherwise incur. Facilities and administrative cost rates apply to federally-sponsored research, providing a means of recovering some, but not all, of the costs incurred in the conduct of externally sponsored research that are shared across a large number of projects as well as other functions of the university. They include things such as the maintenance of sophisticated, high-tech laboratories designed for cutting-edge federally sponsored research, secured cyberinfrastructure and data repositories, utilities such as light and heat, telecommunications, hazardous waste disposal, and the infrastructure necessary to comply with a broad range of legal, regulatory, and reporting requirements. These resources not only support the infrastructure and buildings that house pioneering research teams, but also the personnel who assure the safety of adults and children enrolling in clinical trials for cancer and chronic disease, the ethics teams that assure those trials are done safely, and the data and privacy teams that protect research subjects' personal data.

16. In FY 2023, UC received a total of over $2 billion in NIH contract and grant funding. A significant portion of that funding is derived from facilities and administrative cost

4

reimbursements, which are set at a higher negotiated rate than set forth in the NIH Notice. UC is likely facing a loss of hundreds of millions of dollars annually in facilities and administrative cost recovery as a result of the NIH Notice. The loss of facilities and administrative cost reimbursements, especially at this level, will have an immediate deleterious impact on the success of the research projects and our ability to maintain the same level of staffing critical to support those research projects.

17. Research funding is typically awarded through competitive grants processes, meaning that the annual research budget varies from year to year and is dependent on the success of UC's researchers in these competitions. Federally supported research comes to UC campuses in a combination of both single- and multi-year awards. NIH awards are typically multi-year projects. UC campuses receive and expend hundreds of millions of dollars annually in multi-year awards for their projects, centers, and institutes, and can proceed with establishing budget estimates for planning purposes in reliance on the facilities and administrative cost recovery rates periodically negotiated between individual campuses and the federal government (the Department of Health and Human Services) that set rates for three to five years.

18. NIH promotes medical research, education, training, and practice at UC and other universities through a strategic combination of funding for many individual research projects, as well as support for a few very large, long-term research programs and centers that involve multiple institutions through subawards. Program awards, unlike the thousands of individual investigator awards to UC from NIH, may receive continuous funding for periods of over five years before NIH again opens the program to competitive renewal. Some of these

5

programs put UC in a grant management role, redistributing NIH's funding through subawards to other institutions nationwide as well as to UC researchers.

19. In developing its annual budget, UC did so with the expectation that it would receive the substantially higher facilities and administrative cost recovery rates that had been negotiated and memorialized in a contract with the Department of Health and Human Services through the designated legal process. The NIH Notice's sudden reduction in anticipated federal funds will cause budgetary and operational chaos that will have an immediate negative impact on the research projects and programs.

20. The NIH Notice creates confusion and uncertainty for UC and the programs we oversee. The reduction in facilities and administrative costs ordered by the NIH Notice will leave gaping holes in the budgets that support the facilities and staff where UC research occurs and will stop us from serving and meeting some of our critical missions, including education, patient care, and research.

21. On an annual basis, the federal government is the largest single sponsor of UC's research enterprise. Because of the cap created by the NIH Notice, many individuals (including faculty, staff, and students), programs, and initiatives receiving federal funding almost certainly would be forced to significantly scale back or halt their research. This outcome will be potentially devastating to the research projects, to the training of new medical personnel, and to the University's research enterprise, regardless of discipline.

22. The reduction of federal funding to the UCs as set forth in the NIH Notice would be devastating for the system. It would result in broad reduction of services, including impact on education, delivery of care to patients, and research.

6

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed this 9th day of February, 2025, in   Oakland  , California.


*Theresa A Maldonado*

Theresa A. Maldonado, Ph.D., P.E.
Vice President for Research & Innovation
University of California, Office of the
President

7

# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| COMMONWEALTH OF MASSACHUSETTS, et al., |
| |
| Plaintiffs, |
| |
| v. |
| |
| NATIONAL INSTITUTES OF HEALTH, et al., |
| |
| Defendants. |

Case No. _____

**<u>Declaration of Cassandra Moseley</u>**

I, Cassandra Moseley, hereby declare:

1.  I am the Vice President for Research at Colorado State University ("CSU"), a position I have held since 2024. As Vice President for Research, I have oversight of the federally sponsored research portfolio at CSU, including the grants management and sponsored project compliance functions. Prior to holding this position, I held multiple administrative and faculty roles, including interim vice president for research and innovation at the University of Oregon

2.  As the Vice President for Research, I have personal knowledge of the matters set forth below and/or have knowledge of the matters based on my review of information and records gathered by my staff.

3.  I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants*

*Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs reimbursements to 15%.

4.  CSU is Colorado's land grant research university. As a comprehensive research institution, CSU's research and research impacts are broad, spanning agricultural sciences, engineering, public health, veterinary medicine, and natural resources. CSU has a robust NIH-funded research portfolio, including public health, veterinary translational medicine, infectious disease, prion-related diseases, and cancer research. This research is supported by approximately $203.3 million from the NIH for grants with active project periods as of 2/10/2025.

5.  CSU has a Negotiated Indirect Cost Rate Agreement ("NICRA") with the Department of Health and Human Services, effective as of 09/29/2022. The current Indirect Cost ("IDC") Rate in CSU's NICRA is 54% for On Campus Organized Research.

6.  CSU's total blended IDC rate for NIH funded grants with active project periods as of 2/10/2025 is 45.3%.

7.  NIH's reduction of CSU's IDC rate for grants will eliminate approximately $4.2 million in funding annually that CSU uses to support its research programs. The reduction of these reimbursements will immediately impact CSU's ability to draw critical funds essential to its ability to perform research. These funds are used to pay actual expenses associated with conducting research, such as: facilities upkeep and maintenance; sponsored program administration and compliance (e.g., human subjects protections, animal welfare, biosafety, select agent control, and research ethics and integrity, responsible conduct of research); interest on research facilities and library services. CSU's NIH-funded research awards were budgeted and obligated to include indirect costs, and reduction of reimbursement of these

facilities and administrative costs could result in the institution being unable to continue to perform critical research.

8. CSU next anticipates drawing funds on or around 02/18/2025 for up to 232 open NIH grants. Abruptly changing the facilities and administration reimbursement rate would delay our regularly scheduled draw as time would be needed to make the modifications necessary to draw according to the new guidance.  More critically, once the university can draw, the reduced IDC rate will have wide-ranging impacts on CSU, including negatively effecting the financial sustainability of NIH-funded research and imperiling the university's ability to continue this critical biomedical research and discovery. CSU's NIH-funding enables research that contributes to foundational understandings and innovative discoveries that address pressing health challenges facing the American people, including infectious diseases, neurogenerative diseases, mental health, and cancer.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February, 2025, in Fort Collins, Colorado.

Cassandra Moseley
Vice President for Research
Colorado State University

# EXHIBIT 11

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, et al.,

   Plaintiffs,

      v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

   Defendants.

Case No. _____

## <u>Declaration of Donald M. Elliman, Jr.</u>

I, Donald M. Elliman, Jr. hereby declare:

1. I am the Chancellor for the University of Colorado Anschutz Medical Campus (AMC), a position I have held since 2012. As Chancellor, I am the Chief Executive Officer and have oversight of all academic, clinical, research, fiscal and administrative duties of the AMC.

2. As the Chancellor, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

1

4.  The AMC is the state's only academic medical research campus. From our academic colleges to our research institutes, NIH is our top federal sponsor. The AMC supports more than 1,000 clinical trials with more than 14,000 enrollments in research studies last year in a broad array of investigations across the health spectrum. Clinical trials allow patients the opportunity to join investigations of the latest innovations in human health. This includes new cancer therapies, studies of novel cardiovascular devices, and new approaches for Alzheimer's disease among many others. Some recent research highlights include:

**Advancing Mental Health Breakthroughs**: Scientists at AMC are on the forefront of interdisciplinary research to help address the mental health crisis. Recent research highlights include groundbreaking clinical trials that are testing the effectiveness of deep brain stimulation—a novel procedure that implants electrodes into the brain as a treatment for OCD and schizophrenia; AMC scientists are studying the underlying causes of depression and anxiety, both genetic and environmental, and how to reduce risk factors across the lifespan.

**Delivering New Cancer Cures:** The AMC is home to the University of Colorado Cancer Center, a world leader in pioneering more effective and personalized cancer treatments that are giving renewed hope to cancer patients. Recent research highlights include: home to leading cellular therapy scientists and a state-of-the-art manufacturing facility, the Gates Institute at AMC is advancing cutting-edge CAR T-cell therapies that are revolutionizing the way we treat leukemia, lymphoma and other cancers—often with fewer side effects than chemotherapy; Basic scientists at AMC are making significant progress in understanding the cellular mechanisms that drive cancer growth, helping to unlock new treatment pathways and cures.

2

**Improving Military and Veteran Health:** AMC is home to renowned researchers on trauma care, brain injuries and PTSD. Today, our researchers are using their expertise to help inform caregivers and military leaders on combat-related injuries, surgical trauma techniques, mental health interventions and more. Recent research highlights include: an AMC team won the 2023 Military Health System Research Symposium research team award for their significant contributions to military medicine. The SAVE O-2 team is studying how much oxygen is needed for critically injured patients, which could reshape military medical supply logistics; Through the Firearm Injury Prevention Initiative, researchers are leading evidence-based interventions to help reduce suicide rates among veterans and active military, including a "Lock to Live" program that promotes safe gun storage for those in crisis.

**Transforming Diabetes Care:** AMC is nationally recognized for its novel research into diabetes detection, causes and prevention, as well as its integrated approach to incorporating new treatments directly into patient care. Researchers are working to reduce diabetes by studying the key drivers of obesity and metabolic disease, as well as the most effective interventions to help patients to live healthier lives.

5. This research is supported by annual awards of $360 million from the NIH in Fiscal Year 2024.

6. The AMC has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of 5/11/2023. The Indirect Cost ("IDC") Rate in the AMC NICRA is 56%.

7. AMC's total effective IDC rate, calculated as the average of active awards, for NIH funding is 34.2%.

8. NIH's reduction of the AMC's IDC rate[s] will eliminate approximately $74 million in annual funding that the AMC uses to support its research programs. The loss of these funds will immediately impact the AMC's ability to draw critical funds used to pay expenses

3

associated with maintaining our critical research infrastructure and support. IDC funds on the AMC campus are critical to providing support for related personnel and other direct research infrastructure and support. A large portion of IDC is used to support the robust facilities provided by AMC to complete our research programs and objectives.

9. The loss of IDC funds will cause partial elimination of clinical trial activity. AMC supports over 1,000 clinical trials with more than 14,000 enrollments in research studies last year.

10. IDC funds on AMC are essential in supporting the research mission, from basic scientific discovery to pre-clinical investigations, to clinical trials to population health. This change for NIH awards would potentially cause a reduction of 47.5% of our total campus IDC. The loss of these funds will delay or halt the hiring of world-class researchers. IDC also funds existing debt service for controlled maintenance. The drastic cuts to NIH F&A will bring the Institute's research and community-based programs to a virtual standstill due to the loss of shared administrative staff and the specialized computing infrastructure essential for the Institute's efforts.

11. The AMC next anticipates to draw funds on or around Monday, February 10, 2025. At that time, the reduced IDC rate will impact the AMC in the following ways:

    a. Potential hiring freezes, furloughs or layoffs of university faculty, staff and student hourly positions.

    b. Potential elimination of clinical trial activity.

    c. Reductions to planned deferred maintenance projects.

    d. Reduction or elimination of planned investments in institutional financial aid.

    e. Reduction or elimination of planned compensation increases for faculty and staff.

    f. Reduced programmatic offerings.

4

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February, 2025, in Aurora Colorado.

DocuSigned by:

*Donald Elliman*

63BDE13B7E47435...

Donald M. Elliman, Jr.
Chancellor
University of Colorado Anschutz Medical Campus (AMC)

5

# EXHIBIT 12

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, et al.,

      Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

      Defendants.

Case No. _____

## Declaration of Justin Schwart

I, Justin Schwartz, hereby declare:

1. I am the Chancellor for the University of Colorado Boulder, a position I have held since July 2024. As Chancellor, I am the Chief Executive Officer and have oversight of all academic, research, fiscal and administrative duties of the campus. Prior to holding this position, I was Executive Vice President and Provost at The Pennsylvania State University.

2. As the Chancellor, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

1

4.  The University of Colorado is Colorado's flagship university. From our academic colleges to our research institutes, NIH is one of the top federal sponsors of the Boulder campus, with annual awards of $77.9 million from NIH in fiscal year 2024. NIH funding supports research in: The **BioFrontiers Institute**, which has biomedical research initiatives in regenerative medicine, developing new biomaterials for restoring tissues to healthy states; degenerative disease, understanding the process of neurological and muscular degeneration with the goal of developing new therapies; pathogens, understanding infectious agents and how to mitigate their impact; computational biology, taking advantage of large datasets to understand biology; and Downs Syndrome. Research in the **College of Engineering and Applied Science** is actively advancing development and novel applications of technologies to health sciences. NIH-funded research includes breakthroughs in medical procedures, medical implant longevity, pharmaceutical developments, circulation and vascular therapies, design of tools for the diagnosis and prevention of movement disorders, interventions for neuromuscular rehabilitation, advances in optogenetic imaging with miniature microscopes, and musculoskeletal repair and regeneration. The **Institute of Behavioral Science** (IBS) is a national leader in interdisciplinary social and behavioral science focused on pressing societal challenges. At IBS, NIH funding fuels research essential to improving health and well-being by understanding cognitive decline, reducing substance abuse, improving access to health care, reducing crime and violence, enhancing resilience and response to natural disasters, and more. The **College of Arts and Sciences, Natural Sciences Division** conducts world-class research that increases our understanding and ability to promote human health and well-being. NIH funds support research to prevent and/or treat diseases and conditions such as cancer, cardiovascular disease, neurodegeneration, infectious diseases, addiction and other

2

mental illnesses, brain and spinal cord injury, loss of limbs, trauma, chronic stress, and disruption of sleep and circadian physiology. The **Institute for Behavioral   enetics** (IBG) is dedicated to understanding the genetic underpinnings of complex behaviors and disorders, including Alzheimer's disease, addiction, and mental health conditions. Its work integrates both human and animal models to unravel the genetic and environmental contributions to these critical health challenges. Through large-scale genome-wide association studies (GWAS), molecular genetic approaches, and behavioral analyses, IBG's research has played a role in identifying genetic risk factors for neurodegenerative diseases and substance use disorders, which inform potential therapeutic targets. Indirect costs for this and other NIH-funded research at the University of Colorado Boulder include infrastructure, equipment, core research facilities, staff to manage funds and meet federal requirements, and the maintenance of safe working conditions. For example, the proposed NIH cap on indirect costs at 15% would result in an estimated 74% reduction in IBG's total budget, likely forcing IBG to essentially cease operations and thus halting the groundbreaking research for which it is internationally recognized. Much of the research in these examples also provides an important training ground for the next generation of investigators (graduate students and postdoctoral scholars) committed to advancing new knowledge.

5. The University of Colorado Boulder has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of 7/1/2021. The Indirect Cost ("IDC") Rate in the University of Colorado Boulder's NICRA is 56.5%.

6. University of Colorado Boulder's total blended IDC rate, calculated as the average IDC rate of active awards, for NIH funding is 46.7%.

3

7. NIH's reduction of the University of Colorado Boulder's IDC rate will eliminate approximately $11.7 million based on fiscal year 2024 expenditures that the University of Colorado Boulder uses to support its research programs. The loss of these funds will immediately impact the University of Colorado Boulder's ability to draw critical funds used to pay expenses associated with maintaining our critical research infrastructure and support. IDC funds on the Boulder campus are critical to providing support for payroll processing and other direct employee support. The loss of these funds will delay or halt hiring, as well as reduce our ability to provide employee services for payroll and benefits. A large portion of IDC is used to support the robust facilities provided by the University of Colorado Boulder to complete our research programs and objectives. This loss of IDC will cause the immediate halt to research building renovation and rehabilitation and force our campus to eliminate building projects that are intended to enhance our research capabilities. Additionally, we anticipate the NIH reduction may require us to limit facility operations and jeopardize our ability to meet institutional obligations.

8. IDC funds on the Boulder campus are a critical component of supporting the research mission. This change for NIH awards would cause a reduction of approximately 10% to our total campus IDC. In addition to the impacts listed in 7 above, some community-based programs will be jeopardized. For example, the **Institute of Behavioral Science** houses a wide variety of community-based programs, many embedded in schools supporting the health and well-being of children and adolescents. The drastic cuts to NIH IDC will bring IBS's research and community-based programs to a virtual standstill due to the loss of shared administrative staff and the specialized computing infrastructure essential for the Institute's efforts.

4

9.  The University of Colorado Boulder next anticipates drawing funds on or around Monday,

February 17, 2025. At that time, the reduced IDC rate will impact the University of Colorado

in the following ways:

   a.  Potential hiring freezes, furloughs or layoffs of university faculty, staff and student

   hourly positions.

   b.  Reductions to planned deferred maintenance projects.

   c.  Across-the-board budget cuts to meet necessary debt service obligations.

   d.  Reduction or elimination of planned investments in institutional financial aid.

   e.  Reduction or elimination of planned compensation increases for faculty and staff.

   f.  Reduced programmatic offerings.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.


Executed this 9th day of February 2025, in Boulder Colorado.


Signed by:

Justin Schwartz

F3C9428C87DC41C...

Dr. Justin Schwartz

Chancellor

University of Colorado Boulder

5

# EXHIBIT 13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

       Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

       Defendants.

Case No. _____

**Declaration of The University of Connecticut and**
**The University of Connecticut Health Center**

I, Dr. Pamir Alpay, hereby declare:

1. I am the Vice President for Research, Innovation, and Entrepreneurship ("VPRIE") for the University of Connecticut ("UConn"), a position I have held since 2022. As VPRIE, I oversee research and other sponsored activities at UConn and the University of Connecticut Health Center ("UCH"). Prior to holding this position, I was Executive Director of the Innovation and Partnership Building at UConn Tech Park, Associate Dean for Research in UConn's College of Engineering, and full professor in the Department of Materials Science and Engineering. I am a Board of Trustees Distinguished Professor of Materials Science and Engineering and Physics.

2. As the VPRIE, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants*

1

*Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

4. UConn is Connecticut's public flagship research university and UCH is Connecticut's only public academic medical center. Active NIH-funded research initiatives at UConn and UCH include, but are not limited to, the following:

- Improving physical and cognitive function in aging;

- Nuclear magnetic resonance (NMR) technology for the diagnosis of a variety of diseases, including cardiovascular disease, preventable causes for newborn death, cancer, and chronic kidney disease;

- Improving outcomes in people with autism;

- Understanding neural mechanisms for language and reading, including in individuals with dyslexia;

- Understanding language acquisition in deaf children;

- Home-based interventions to improve reading;

- Alcohol and opioid addiction;

- Prevention and care for HIV;

- Suicide risk identification and prevention;

- Understanding impact of stress during pregnancy;

- Mind-body interventions to improve emotional well-being;

- Treatments for leading causes of death and disability in the US, including cancer, cardio-metabolic diseases, obesity, Alzheimer's disease, substance use, influenza, depression and substance use/dependence;

2

- Precision medicine approach in treating cardiovascular conditions and cancer based on genomic medicine;

- Treatments for conditions impacting quality of life, such as chronic low back pain, bone and muscle injuries, and temporomandibular ("jaw") disorders;

- Treatments for rare diseases and genetic disorders with significant impact on health, including sickle cell disease, glycogen storage, mitochondrial disorders, Rett syndrome, and Prader-Willi syndrome;

- Prevention of emerging tickborne diseases; and

- Muscle and bone regeneration.

These research initiatives are supported by $620,648,927 (UConn: $249,500,528; UCH: $371,148,399) in active awards from the NIH.

5. NIH is an agency within the U.S. Department of Health and Human Services ("DHHS"). UConn has a Negotiated Indirect Cost Rate Agreement ("NICRA") with DHHS, effective as of September 27, 2024. The current Indirect Cost ("IDC") Rate in UConn's NICRA for on-campus research is 61%. UCH has a Negotiated Indirect Cost Rate Agreement ("NICRA") with DHHS, effective as of March 29, 2022. The current IDC Rate in UCH's NICRA for on-campus research is 66.5%. The DHHS is the federal cognizant agency designated to negotiate, approve, oversee, and coordinate the NICRA for UConn and UCH in connection with all NIH awards.

6. The blended IDC rate for NIH funding across UConn and UCH was 42.73% for fiscal year 2024.

7. NIH's reduction of IDC rates will eliminate approximately $35M annually in funding that is used to support our research programs. The loss of these funds will immediately impact

3

UConn's and UCH's ability to draw funds used to pay for, among other things, maintaining research facilities and supporting administrative functions that ensure compliance with NIH rules and regulations, which are designed to ensure research is conducted safely and lawfully.

8. UConn and UCH clinical trials funded by NIH conduct research on common medical conditions (cardiac, infectious diseases, behavioral disorders, etc.) as well as very rare conditions (e.g., sickle cell anemia, glycogen storage disease) in pursuit of developing lifesaving and/or life extending interventions. This research may involve new or novel medications or devices, surgical procedures, and/or behavioral interventions, and may benefit individuals of all ages. These clinical trials utilize a shared infrastructure, which is partially funded by indirect costs, and is necessary to meet regulatory requirements and provide a safe environment for human subjects participating in clinical trials. Such infrasturcture includes shared services, such as patient recruitment and screening, investigational drug administration, sample processing, testing, and tracking of adverse events. Costs incurred in the clinical trial infrastructure may include maintaining exam/procedure rooms, laboratory facilities, necessary equipment (e.g., beds, ventilators, etc.), and staff. Cuts to the IDCs received by UConn and UCH will put the continued operation of such shared infrastructure in jeopardy.

9. UConn and UCH have made investments in their research infrastructure, relying in part on the continuity of their current funding arrangements with NIH, including the existing IDC rates in the NICRAs. A reduction of indirect cost rates to 15% will create a funding gap of $35M annually. The cut will create a burden on UConn and UCH as many of these costs are unavoidable and committed (such as the facility cost of a laboratory) to conduct NIH research. Such reduction may result in jobs loss.

4

10. UConn and UCH anticipate their next draw down of NIH funds on or around February 17, 2025. At that time, the reduced IDC rate will impact UConn and UCH in the following ways:

    a.   Collectively, UConn and UCH anticipate this will reduce its draw to recover these costs by about $673,000 per week.

    b.   UConn and UCH's fiscal position and cash balances will be negatively impacted and may result in insufficient cash balances to meet obligations.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February 2025, in Storrs, CT.

_____
Dr. Pamir Alpay
Vice President for Research, Innovation and
Entrepreneurship
University of Connecticut

5

# EXHIBIT 14

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, ET AL.,

       Plaintiffs,

v.

NATIONAL INSTITUTES OF HEALTH, ET AL.,

       Defendants.

Case No. _____

## DECLARATION OF MICHAEL C. CRAIR

Pursuant to 28 U.S.C. § 1746, I, Michael C. Crair, declare as follows:

1.      I am the Vice Provost for Research at Yale University ("Yale"), a position I have held since 2020. I am also William Ziegler III Professor of Neuroscience and Professor of Ophthalmology and Visual Science at Yale. I have been authorized and designated by Yale to make this declaration on Yale's behalf in support of Plaintiffs' Complaint and Motion for a Temporary Restraining Order

2.      As Vice Provost for Research at Yale, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Yale personnel, and could testify thereto.

3.      Yale is an educational institution organized and existing under and by virtue of a charter granted by the General Assembly of the Colony and State of Connecticut, and its campus is based in New Haven, Connecticut.

4.      As of June 30, 2024, Yale had 2,264 NIH awards. Based on Fiscal Year 2024 income, Yale estimates that cutting the NIH Facilities & Administration ("F&A") rate to 15

percent would result in an annual loss of approximately $165 million in F&A cost reimbursements on Yale NIH awards.

5.     Cutting the NIH F&A rate to 15 percent would directly impact ongoing collaborations between Yale and state institutions, including public universities. Yale and the University of Connecticut have collaborated on several significant research programs, mutually benefiting each institution and the broader state of Connecticut. There are more than 40 grant-funded research collaborations between Yale and the University of Connecticut, ranging in topic areas from investigation into the causes and treatments of autism to quantum materials to vascular contributions to dementia, totaling at least $24 million in collaborative research funding. Yale and the University of Connecticut are also collaborating with the City of New Haven and several regional academic institutions and real estate developers on the development of an Innovation Cluster in downtown New Haven. This project leverages state and local government funds, as well as contributions from academic partners and real estate developers, to build out an innovation ecosystem in Biotechnology, AI and Quantum Technologies, areas of exceptional research strength at Yale and the University of Connecticut that are ripe for building commercial spinoffs that benefit the New Haven and broader state regional economies. Yale's investments in these collaborations are enabled by federal research agencies continuing to cover the federal government's negotiated share of F&A costs.

6.     A reduction in the F&A rate to 15 percent would imperil the viability of clinical trials to establish the safety and efficacy of new treatments. Yale currently has approximately 500 clinical trials underway, including 280 on therapies related to cancer, 80 involving mental health and behavioral care, and 50 related to heart disease. Yale clinical trials involve more than 38,000 total patients, with nearly 5,200 currently enrolled in therapeutic trials. Clinical trials

require considerable administrative support in patient recruitment as well as oversight of the safety of research volunteers. Yale is fortunate to have an NIH Clinical Translational Science Award, which provides training and mentorship to assist investigators in developing expertise in clinical research. The university supplements the NIH funding, and if the 15-percent cap were imposed, it would require Yale to reconsider allocation of institutional resources that could diminish the range of clinical trials at Yale.

7.      A cut in NIH's F&A rate to 15 percent would have dramatic impacts on the economies of New Haven and Connecticut. Yale is New Haven's largest employer with nearly 20,000 faculty and staff. About 6,000 of them live in New Haven. As a result, any reduction in headcount at Yale would severely damage the local economy. Furthermore, without indirect cost recovery, much direct funded research could be at risk due to the potential loss of necessary infrastructure. This would have broader economic impacts on the local economy, including the many vendors in the New Haven region and across Connecticut who provide goods and services in support of Yale's research enterprise. Such a cut would also impact entrepreneurial activity generated through Yale innovations. In Fiscal Year 2024 alone, Yale investigators launched 14 new companies based on Yale inventions, including multiple bioscience companies. This is on top of numerous licenses of Yale inventions to existing companies, some of which are based in Connecticut.

8.      An NIH indirect cap would be particularly detrimental to the viability and growth of the bioscience industry in the Greater New Haven region. There are about 65 Yale spin-out biotech companies in the New Haven area. These companies have prompted the construction of 1.7 million square feet of laboratory and office space, which has transformed downtown New Haven and its economy. In the future, there would be far fewer bioscience companies in New

Haven, which are a key step in bringing discoveries from the lab to patients, if a 15-percent NIH F&A cap were imposed.

9.     The impact would extend to the broader economy of Connecticut.  By one estimate, in 2023, NIH awards in Connecticut supported over 6,600 jobs, with each $1 million spent on NIH awards in Connecticut generating an estimated 7.6 jobs. https://www.unitedformedicalresearch.org/wp-content/uploads/2024/03/UMR-NIHs-Role-in-Sustaining-the-US-Economy-2024-Update.pdf.  The total economic impact of NIH awards in Connecticut in 2023 was estimated at nearly $1.68 billion.  *Id.*  By these measures, cutting the NIH F&A rate to 15 percent could lead to the loss of hundreds of Connecticut jobs and hundreds of millions of dollars in economic losses to the state's economy.

10.     Beyond the State of Connecticut, these caps would have significant broader impacts on the search for cures, preparedness for health emergencies, and the United States' role as the leader in biomedical research and innovation in health care.  It is estimated that universities perform 45% of all the fundamental research conducted in the United States. The National Science Foundation has reported that two-thirds of the research papers cited in U.S. patent applications were written by faculty.  Hindering the productivity of faculty would impair another channel for knowledge transfer that supports innovation in industry.

11.     This will translate into tangible delays in innumerable research programs that have the potential to dramatically improve health.  Inventions discovered by Yale faculty have led to 36 drugs in preclinical and clinical testing, and eight FDA-approved drugs that are available to patients. Yale research has also resulted in seven medical devices in testing and 12 marketed devices.

12.      Yale research has contributed to helping to alleviate some of America's most pressing health challenges. For example, Yale is at the forefront of diabetes research. The first closed loop implantable pumps were developed at Yale. Yale researchers led the recent development of immune therapy (teplizumab) to delay dramatically the onset of Type 1 diabetes in children at risk for the disease. Yale researchers in immunobiology discovered the innate immune system and have helped to define how the immune system contributes to disease. This has wide applications, including contributing to the discovery of the basic mechanisms underlying long COVID.  Yale's work in basic and clinical neuroscience led to the development of ketamine to treat refractory depression, the development of the first therapy to slow the progression of Alzheimer's disease, and a genetically-directed therapy for Parkinsonism. Advances like these would be impeded if NIH no longer accepts the negotiated F&A rates, to the detriment of Connecticut and the United States as a whole.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ninth day of February, 2025, in New Haven, Connecticut.

*MC C - 02/09/2025*

Michael C. Crair

# EXHIBIT 15

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, et al.,

      Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

      Defendants.

Case No. _____

## <u>Declaration of Dr. Tony Allen</u>

I, Dr. Tony Allen, hereby declare:

1. I am the President of Delaware State University, a position I have held since January 2022. As President, I have oversight of Delaware State University. Prior to holding this position, I served as the University's President.

2. As the President, I have knowledge of the matters based on my review of information based upon the records gathered by my staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

4. Delaware State University is Delaware's emerging research university, with a strong and growing portfolio of biomedical research that includes: investigations into the cellular mechanisms of neurodegenerative diseases such as Alzheimer's and Parkinson's disease; development of new AI tools for analysis of medical imaging to allow faster, more accurate

1

diagnosis of diseases of aging; investigations of the biological basis for disparities in triple

negative breast cancer, and the development of a personalized immunotherapeutic approach

to treat it; and many more.  This research is currently supported by over $9.3 million in

active awards from the NIH.

5. Delaware State University (DSU) has a Negotiated Indirect Cost Rate Agreement

("NICRA") with NIH, effective as of 9/11/2024. The Indirect Cost ("IDC") Rate in DSU's

NICRA is 46% for on-campus work and 26% for work off campus.

6. NIH's reduction of DSU'S IDC rate will eliminate approximately $1.4 million year in NIH

funding that DSU uses to support its biomedical research programs. The loss of these funds

will immediately impact DSU's ability to draw critical funds used to pay expenses associated

with research, including salaries of research support personnel, stipends for doctoral students,

maintenance of facilities, and other infrastructure supporting research.

7. In particular, the loss of these funds will necessitate laying-off three or more research support

personnel, and reductions in or elimination of stipends for institutionally-supported doctoral

students in DSU's Neuroscience PhD program, the only such program offered at an

Historically- Black university.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed this 9th day of February, 2025, in Dover, DE 19901

2/9/2025

Name
Tony Allen, PhD.
Delaware State University

2

# EXHIBIT 16

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

       Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

       Defendants.

Case No. _____

## <u>Declaration of Miguel Garcia-Diaz</u>

I, Dr. Miguel Garcia-Diaz, hereby declare:

1. I am the University of Delaware Vice President for Research, Scholarship, and Innovation, a position I have held since May 1, 2024. As Vice President for Research, Scholarship, and Innovation, I have oversight of all research and scholarship activities taking place at the University, including all research funded by the U.S. Department of Health and Human Services. Prior to holding this position, I was a Professor of Pharmacological Sciences and interim Vice President for Research at Stony Brook University.

2. As the University of Delaware Vice President for Research, Scholarship, and Innovation, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

1

4.  The University of Delaware is Delaware's flagship research university. The University

harbors many research initiatives dedicated to advancing human health. University

researchers perform cutting-edge research in critical areas, including cardiovascular health,

neurological diseases, aging, rehabilitation, child development, nutrition, metabolism, and

biopharmaceutical manufacturing. Importantly, it supports crucial infrastructure for

biomedical and clinical research in the State of Delaware, one of three States without a

medical school. This research is supported by over $50M in annual funds from the NIH.

5.  The University of Delaware has a Negotiated Indirect Cost Rate Agreement ("NICRA") with

NIH, effective as of June 21, 2022. The Indirect Cost ("IDC") Rate in the University of

Delaware NICRA is 60% for on-campus organized research. The University of Delaware

also has negotiated rates for off-campus organized research, organized research related to the

College of Agriculture, and instruction.

6.  NIH's reduction of University of Delaware's IDC Rates will result in a loss of approximately

$12M in funding that University of Delaware needs to support its research programs. The

loss of these funds will immediately impact and undermine the University of Delaware's

ability to support its research programs and meet critical obligations associated with

maintaining its research facilities, servicing debt, covering payroll for associated research

compliance and facilities personnel, and maintaining administrative resources dedicated to

research compliance.

7.  The University of Delaware also plays a critical role in supporting clinical trials in Delaware.

Indirect cost payments are essential for maintaining the infrastructure, personnel, and secure

systems necessary to recruit participants, protect privacy, and ensure compliance with legal

and federal regulations. The negotiated IDC Rate was relied upon by the University in its

2

strategic planning, including hiring of research faculty and staff and decisions around its core facilities and laboratories.

8. IDC funds are essential to cover the critical and necessary infrastructure and administrative costs associated with performing research. These costs are not optional; they are fundamental to maintaining the facilities and systems necessary for federally sponsored research. A reduction in the already negotiated and contracted University IDC Rate, will have immediate and far-reaching consequences, destabilizing the University's ability to conduct essential research.

9. University of Delaware next anticipates drawing funds on or around Monday, February 10, 2025. As a result, the reduced IDC Rate will have an immediate impact on the University. The University's liquidity is dependent on careful planning and budgeting, ensuring that expenses and revenue sources align. The University is already subject to a delay in reimbursement of NIH expenses of 30-45 days, and the IDC Rate cut will further impact the University's liquidity. This unexpected financial pressure threatens the University's ability to effectively plan and execute its research operations and potentially disrupts the ongoing success of the institution as a whole.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

3

Executed this 9th day of February 2025, in Newark, Delaware.

_____

Dr. Miguel Garcia-Diaz

Vice President for Research, Scholarship,

and Innovation

University of Delaware

4

# EXHIBIT 17

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al., | |
| Plaintiffs, | Civil Action No. _____ |
| v. | |
| NATIONAL INSTITUTES OF HEALTH, et al., | |
| Defendants. | |

<u>**Declaration of Dr. Gireesh Gupchup**</u>

I, Gireesh Gupchup, hereby declare:

1. The Board of Trustees of Southern Illinois University (SIU Board) is a body politic and corporate created by Illinois statute (110 ILCS 520/0.01 *et seq*.). The SIU Board governs the Southern Illinois University System (SIU System), which consists of Southern Illinois University Carbondale (SIUC), Southern Illinois University Edwardsville (SIUE), and the Southern Illinois University School of Medicine (SOM).

2. I am the SIU System Vice President for Academic Innovation, Planning and Partnerships, a position I have held since 2020. As the System Vice President for Academic Innovation, Planning and Partnerships, I regularly work with the chief research officers on the SIU System campuses (SIUC, SIUE, and SOM). Prior to holding this position, I was Director of University-Community Relations and Dean of the School of Pharmacy at Southern Illinois University Edwardsville.

1

3.  As the SIU System Vice President for Academic Innovation, Planning and Partnerships, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by university staff.

4.  I am providing this declaration to explain certain impacts of National Institutes of Health (NIH) Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

5.  Through its campuses, the SIU System comprises one of Illinois' premier research universities.  The SIU System research enterprise includes the discovery of treatments for cancer, neurogenerative disorders such as Alzheimer's disease and Parkinson's disease, and diabetes; development and teaching of curricula to increase the pipeline of American students to enter science, technology, engineering, and mathematics (STEM) related fields, among other cutting edge areas.  This research has been supported by approximately $20.2M in currently active awards from the NIH.

6.  The Southern Illinois University System campuses have a Negotiated Indirect Cost Rate Agreements (NICRA) with NIH.  The Indirect Cost (IDC) Rate in the NICRA for SIUC and SOM is 48.5%.  The IDC Rate in the SIUE NICRA is 44.5%.

7.  NIH's reduction of the SIU System's IDC Rates would eliminate approximately $4.5M in funding that the SIU System uses to support its research programs.  The loss of these funds will immediately impact the SIU System's ability to draw critical funds used to pay expenses associated with research.  Every area of the SIU System's research enterprise will be immediately impacted, as IDC is distributed across lab and equipment maintenance, researcher support for investigation and presentation opportunities, research safety protocols,

2

student researcher development, and broad infrastructure support.  Significantly reduced IDC
negatively impacts every area of university research, on every draw to which the new rate
would apply.

8. IDC is used for support of staff, students, and facilities through payroll and required upkeep
   and maintenance.  A loss of these funds would impact the SIU System support of technical
   staff that run and support lab facilities, as well as support for faculty and graduate student
   professional development, enhancement of research skills including internal research
   competitions and workshops to improve competitiveness for external funding opportunities,
   and support of graduate students who work in research labs and research centers.
   Additionally, these dollars support innovative research developments through purchase of
   licenses and permits such as species research permits, etc.

9. A loss of IDC would impact the ability of start-up research projects to establish labs for new
   faculty hires (and, consequently, the ability to hire such faculty), as well as updates of
   essential safety tools and equipment required to meet safety protocols, including work with
   biohazardous materials, and work that requires safe disposal of hazardous waste.  Additional
   impacts would be seen through the inability to perform renovations, upgrades, repairs of
   existing space, as well as purchases of modern lab equipment and other research and tools
   (such as consumables including gases, chemicals, and the like) needed to ensure the ability to
   complete research and maintain high level practices in fields including biology, chemistry,
   engineering, environmental science, nursing, pharmacy, among others.  Lastly, funding
   reductions would impact assurance of research compliance practices including Health
   Insurance Portability and Accountability Act (HIPAA) compliance, institutional review
   board (IRB) compliance through Collaborative Institutional Training Initiative (CITI)

3

trainings, Institutional Animal Care and Use Committee (IACUC) memberships, veterinary training requirements, and the like.

10. The Southern Illinois University System campuses next anticipate to draw funds on NIH grants between February 11, 2025 and March 1, 2025.  At that time, the reduced IDC rate will impact every area of the SIU System research enterprise and will do so immediately, as ICR is distributed across lab and equipment maintenance, researcher support for investigation and presentation opportunities, research safety protocols, student researcher development, and broad infrastructure support. A significantly reduced IDC rate negatively impacts every area of university research, on every draw to which the new rate applies.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February, 2025.

_____

Gireesh Gupchup, PhD
Vice President for Academic Innovation,
Planning and Partnerships
Southern Illinois University System

4

# EXHIBIT 18

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, et al.,

        Plaintiffs,

              v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

        Defendants.

Civil Action No. _____

### Declaration of Dr. Joseph T. Walsh, Jr.

I, Joseph T. Walsh, Jr., hereby declare:

1. I am the Vice President for Economic Development and Innovation at the University of Illinois System, a position I have held since 2020. As the Vice President for Economic Development and Innovation, I work closely with senior leaders across the University of Illinois System, at each of the System's three universities, and with other internal and external stakeholders to lead initiatives in support of the university's research and economic development missions. Prior to holding this position, I was Vice President for Research at Northwestern University from 2007 to 2019.

2. As the University of Illinois System's Vice President for Economic Development and Innovation, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by System staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants*

1

*Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

4. The University of Illinois System is the flagship public higher education research institution in the State of Illinois, consisting of three universities located in Chicago, Springfield, and Urbana-Champaign. The University of Illinois System is a body corporate and politic authorized pursuant to action by the Illinois General Assembly and overseen by the Board of Trustees of the University of Illinois. Its oldest university, the University of Illinois Urbana-Champaign, was established as the state's land grant university in 1867. Across all universities, the System enrolls more than 97,000 students.

5. The University of Illinois has a long and strong history of impactful research, including the innovation of two pharmaceuticals: Prezista and Shingrix. The former has been an important drug for the treatment of HIV; the latter is the current gold standard vaccine for the prevention of shingles in adults. Awards from the National Institutes of Health fund University of Illinois research that improves health and saves lives. In 2024, NIH funding for University of Illinois research led to the development of promising new therapeutics, including a novel antibiotic to fight drug-resistant bacteria and a redesigned drug for acute lymphoblastic leukemia, the most common blood cancer in children. It has helped us develop a new screening method to help physicians detect ovarian tumors early and a new vaccine for lymphatic filariasis, a disease affecting over a 100 million people worldwide. It has funded the launch of a new maternal health research center to reduce maternal death and morbidity and a study site investigating the links between environmental exposures, diabetes, and chronic kidney disease. The full University of Illinois portfolio of NIH-funded research was supported by more than $325M from NIH in FY24.

2

6.  The University of Illinois Chicago ("UIC") and the University of Illinois Urbana-Champaign ("UIUC") have Federal Negotiated Indirect Cost Rate Agreements ("NICRA"), effective as of June 24, 2024, for UIC and June 21, 2024, for UIUC. The nominal base Indirect Cost ("IDC") Rate in UIC's NICRA is 59.9% and UIUC's is 58.6%, with negotiated rates for activities other than "research, on-campus" varying and generally below this rate. Effective indirect cost rates vary, by grant, as a result.

7.  We estimate that NIH's reduction of the University of Illinois System's IDC rates will eliminate approximately $67 million annually (UIC and UIUC combined, annually, calculated on a standard modified total direct cost or MTDC basis) in funding that the System uses to support its research programs. The loss of these funds will immediately impact the University of Illinois System's ability to draw critical funds used to pay expenses associated with support of state-of-the-art laboratories, high-speed data processing, hazardous waste disposal, regulatory compliance staff, patient safety protocols, and maintenance, and basic administrative support, among other expenses. These reimbursed "Facilities and Administrative" ("F&A") expenditures provide the infrastructure and support that are essential to research.

8.  Many of the approximately 400 clinical trials, which are critical in identifying methods to prevent, screen for, diagnose, mitigate, or treat patients who are suffering from a range of health conditions, are supported by the NIH. These trials require very specialized infrastructure and support and are complex and costly to perform. This includes clinical care space, operation of Institutional Review Boards, special instrumentation, and diagnostic equipment. Without the support for the resources needed to perform these trials, currently

3

provided significantly through indirect cost recovery, fewer trials will inevitably be conducted and the overall health of our nation will suffer.

9. In the short term, the inability to recover indirect costs associated with research will require the System to cover these expenses through other internal funds, directly affecting our ability to deliver critical education, research, and service functions. Over time, sustaining this approach will become increasingly difficult, ultimately hindering our capacity to pursue research that serves the public good.

10. The University of Illinois System anticipates continuing to draw funds on a periodic (generally monthly) basis. At the time of the next draw, the reduced IDC rate will impact the University of Illinois System in a multitude of ways including, but not limited to, difficulty in completing ongoing research activities without the requisite support, and an inability to provide the infrastructure and support required to propose continuing or new research in critical areas of innovation that are in the national interest.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February, 2025, in Urbana, Illinois.

_____
        Joseph T. Walsh, Jr.
        University of Illinois System – Vice
        President for Economic Development and
        Innovation

4

# EXHIBIT 19

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.

          Plaintiffs,

   v.

NATIONAL INSTITUTES OF HEALTH;
MATTHEW MEMOLI, M.D., M.S., in his
official capacity as Acting Director of the
National Institutes of Health; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and DOROTHY
FINK, M.D., in her official capacity as
Acting Secretary of the U.S. Department of
Health and Human Services,

         Defendants.

Civil Action No. _____

**<u>DECLARATION OF DENISE BARTON</u>**

     I, Denise Barton, declare as follows:

1.  I am a resident of the Commonwealth of Massachusetts. I am over the age of 18.  I have been

    an attorney since 1994 and am licensed to practice in the Commonwealth of Massachusetts.

    If called as a witness, I could and would testify competently to the matters set forth below.

2.  I am currently employed by the University of Massachusetts, in its Office of the General

    Counsel, as its Chief Deputy General Counsel.

3.  As Chief Deputy General Counsel for the University of Massachusetts, I have personal

    knowledge of the matters set forth below or have knowledge of the matters based on my

    review of information and records provided to me by University of Massachusetts employees

    and believe that information to be true.

4.  The University of Massachusetts includes its five campuses (the University of Massachusetts

1

Amherst, the University of Massachusetts Boston, the University of Massachusetts Chan

Medical School, the University of Massachusetts Dartmouth, and the University of

Massachusetts Lowell), as well as the University of Massachusetts Office of the President.

See M.G.L. ch. 75.  The University of Massachusetts maintains business records in the

ordinary course of University of Massachusetts business which include, *inter alia*, records

concerning funding received from the National Institutes of Health by the University of

Massachusetts.

5. I am providing this declaration to explain certain impacts of National Institutes of Health

("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants*

*Policy Statement: Indirect Cost Rates* ("NIH IDC Notice")*,* which purports to immediately

reduce indirect costs payments to 15%.

6. The NIH IDC Notice severely impacts the University of Massachusetts in its entirety: all five

campuses will suffer short-term and long-term detriment because of the NIH IDC Notice's

impact.  People will lose their livelihoods, research advances in the world's most deadly

diseases will be imperiled in ways that are likely unrecoverable and, as a result, people will

likely needlessly suffer the consequences, including illness and death.  I have provided the

following information, in this foreshortened time period, to explain the NIH IDC Notice's

impact on just two of the University of Massachusetts' campuses and the people whose

research they serve: the University of Massachusetts Chan Medical School ("UMass Chan

Medical School") and the University of Massachusetts Amherst ("UMass Amherst"),

reserving rights to supplement this declaration with further information concerning the

impact on those campuses as well as the impacts on the remainder of the University of

Massachusetts.

2

7.  In Federal fiscal year 2024, University of Massachusetts campuses received NIH funding to support over 501 projects, totaling $248 million dollars, of which more than $80 million dollars were for IDCs.

8.  UMass Chan Medical School is the Commonwealth of Massachusetts' only public medical school.  As such, UMass Chan Medical School serves a unique role in the education of physicians, nurses, and scientists as well as in the performance of research that serves the public good.

9.  In keeping with the University of Massachusetts' public mission, UMass Chan Medical School focuses its research efforts on addressing unmet medical needs in ways that benefit all people in the Commonwealth and beyond.

10. To carry out its public medical research mission, UMass Chan Medical School relies on NIH funding.  NIH funding is divided into direct costs ("DC") and indirect costs ("IDC').  The DC portion of NIH funding pays for such things as the research staff who perform the research, the research reagents they use, and other expenditures made by research staff in performing the work itself.  The IDC portion of the funding supports such things as the expenses associated with the administrative staff, including salaries, required to maintain rigorously compliant research operations and the highly specialized laboratory and clinical research facilities in which the research is performed, including, but not limited to, special air handling requirements, research animal quarters, and research facilities suitable for optimizing biosafety and radiation safety.

11. NIH IDC helps to defray, but does not totally cover, costs associated with the conduct of UMass Chan Medical School research that are not directly paid by a grant.  The NIH's

3

reduction in IDC would severely hamper NIH-funded research at UMass Chan Medical
School in at least the following ways:

    a.  Conduct of many areas of laboratory research relies on the availability of
sophisticated equipment, often provided by an institution, like UMass
Chan Medical School.  Even if an NIH grant covers the cost of a piece of
equipment, the IDC does not cover certain significant expenses related to
that equipment, including the space and cost of installation and
maintenance including renovations to physical structures and wiring.
UMass Chan Medical School also has to provide necessary infrastructure
(for example, some equipment requires the use of distilled water; many
pieces of equipment require linkage to a computer and network for data
transfer) and pay for services to keep the equipment in good shape. Loss
of IDC will curtail the ability of UMass Chan Medical School to provide
and keep necessary equipment in good shape. Malfunctioning equipment
can produce faulty data and loss of equipment would bring research
relying on that equipment to a halt, which could erase several years of
progress on a project or grant.  Though IDC dollars do not cover the total
costs UMass Chan Medical School incurs in completing a project, they do
greatly reduce them.

    b.  IDC also pays a portion of the costs associated with maintaining a
workforce that includes many highly-skilled employees that support
research. These workforce members include veterinarians and technicians
skilled in animal care, technicians skilled in the safe handling and disposal

4

of radioactive substances or toxic chemicals, nurses and study coordinators skilled in clinical trials support and keeping study participants safe, statisticians and individuals skilled in bioinformatics whose skills are critical to effective study design and analyses, and staff members that ensure that human subjects research is compliant with federal and state requirements.  These individuals would lose their jobs if UMass Chan Medical School does not intake adequate IDC to afford their salaries.  Loss of the individuals that comprise this workforce would bring research to a halt.

12. UMass Chan Medical School has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of 6/6/23. Ex. A.

13. The IDC Rate in UMass Chan Medical School's NICRA is 67.5%.

14. UMass Chan Medical School receives approximately $200 million dollars in funding annually from NIH.  Of that total annual amount, approximately $138 million dollars are for DCs and approximately $62 million dollars are for IDCs, based on the NIH IDC rate of 67.5%, with certain direct cost categories (such as equipment, patient care costs, and subcontracts) exempted from calculating the IDC, resulting in a blended IDC rate of just under 45% on the NIH grant portfolio of UMass Chan Medical School.  The need for these IDCs to perform the research funded by NIH grants is evaluated by NIH periodically, and UMass Chan Medical School has calculated and demonstrated to NIH that its IDCs exceed (by approximately 45%) what is paid for through NIH IDC designated funding

5

15. If implemented, the NIH IDC Notice cutting IDC funding to 15% would result in a loss to UMass Chan Medical School of $40 to $50 million annually that UMass Chan Medical School uses to support its research programs.

16. The loss of these funds will immediately impact UMass Chan Medical School's ability to draw critical funds used to pay expenses associated with utilities and basic maintenance on the operational research facilities, debt service, payroll, and other infrastructure associated with UMass Chan Medical School's research and clinical trials, examples of which follow.

17. UMass Chan Medical School's use of IDCs was planned as the primary source of funding for the operating costs (utilities and required maintenance) and for coverage of debt service obligations.  UMass Chan Medical School would be forced to cover those obligations with other funds, which would result in two remaining options, to run operating deficits which would be funded from reserves, or to furlough employees or do across-the-board salary reductions. This could then result in downstream consequences that would damage UMass Chan Medical School's prospects for future success including, but not limited to, an adverse effect on bond ratings. UMass Chan Medical School also is a major stimulatory factor on the economy in Worcester county, which would have adverse consequences to the level of commerce and employment in the community.

18. UMass Chan Medical School draws from committed NIH funds on a biweekly basis.  At the time of the next draw, if the funds are diminished in accord with the NIH IDC Notice, the reduced IDC rate will impact UMass Chan Medical School significantly: it will need to reduce expenditures associated with ongoing medical and scientific research and clinical trials by approximately $4 million per month, which would lead to an operating deficit and the potential for negative consequences including furloughs, layoffs, delayed payments on

6

our debt, adverse impact on the credit rating of the University, and inability to meet other obligations and/or to cease other operations.

19. If UMass Chan Medical School cannot continue to fund payroll with the already-committed NIH IDC funding, this will not only result in people losing their livelihoods and patients losing or suffering consequences to their lives, it will in the near and long term undermine some of the greatest assets that the University of Massachusetts and the Commonwealth possess: the human workforce that drives medical and scientific innovation and saves lives every day.

20. Such a precipitous loss of funding may well force UMass Chan Medical School to reduce its research and clinical study activity to, by way of example only, at or near the "COVID shutdown" level of functioning adopted in April and May of 2020.  At that point in 2020, UMass Chan Medical School staffed the lab facilities only at about 15% of the baseline level of staffing, which was the minimum sufficient to maintain the viability of irreplaceable cell lines and laboratory animals.  It is not possible at this time to determine if such a level of shutdown could ameliorate the financial impact of the implementation of the NIH IDC Notice, but one thing is clear: If UMass Chan Medical School is forced, by the implementation of the NIH IDC Notice, to suspend or cancel ongoing clinical trials for potentially life-saving investigational therapies, the consequences to individual patients could include their death or the advancement of their condition to the point where recovery from it is no longer possible. In almost all circumstances, even a pause will render it difficult if not impossible to continue the work because of numerous factors, not least of which is the loss of the core and highly skilled workforce necessary to conduct the research.

21. NIH funding supports a large segment of  UMass Chan Medical School's research effort.

7

NIH funds are awarded competitively based on rigorously reviewed grant applications that are very selectively awarded to only that research that is impactful on human health and of the highest caliber.

22. Approximately one third of UMass Chan Medical School's clinical trials are funded by the NIH.

23. In addition, UMass Chan Medical School's UMass Center for Clinical and Translational Science is one of 60 leading medical institutions nationwide funded by the NIH-NCATS Clinical and Translational Science Awards (CTSA) Program. The CTSA Program supports a national network of medical institutions that speeds the translation of research discoveries into improved care. The institutions offer expertise, resources and partnerships at the national and local levels to improve the health of individuals and communities. The CTSA Program also provides education, training and career support at all levels. All of this makes use of specialized clinical trial facilities whose operations and maintenance are funded through NIH-IDCs.

24. UMass Chan Medical School's research ranges from basic science breakthroughs to the development and delivery of advanced therapies, like gene therapy and RNA therapeutics. For example, UMass Chan Medical School research has led to breakthroughs in neurologic diseases such as Amyotrophic Lateral Sclerosis (ALS), genetic diseases such as Tay-Sachs, cystic fibrosis, Duchenne muscular dystrophy and sickle cell disease, as well as in diseases such as cancer, cardiovascular disease, and emerging infectious diseases.

25. Also by way of example, UMass Chan Medical School's scientists have developed platform technologies based on discoveries in RNA biology, including the work of UMass Chan Medical School's Nobel Laureates, Craig Mello and Victor Ambros. These platform

8

technologies have, in turn, led directly to novel gene therapies and RNA therapeutics that are being used at UMass Chan Medical School – and around the world – to treat previously incurable diseases.

26. NIH funding also supports a large proportion of the clinical trials integral to UMass Chan Medical School's research work including, but not limited to, supporting the funding of the research staff who oversee and directly perform clinical trials, many addressing diseases for which the current therapy is inadequate.

27. UMass Chan Medical School currently has 529 active clinical trials, with 10,987 people enrolled as clinical trial participants. Those people range in age from newborn to over 65 years old.

28. Of the 529 active clinical trials currently underway at UMass Chan Medical School, 339 (65%) of those clinical trials are therapeutic, meaning that those clinical trials are investigating and currently providing access to innovative new treatments for a broad range of diseases, including cancer, lupus and autoimmune disorders, congenital disorders, psychiatric disorders (such as schizophrenia and severe depression), skin diseases (such as vitiligo and psoriasis), neurological diseases (such as Alzheimer's and other dementias, multiple sclerosis and ALS) and neurodevelopmental disorders (such as autism).

29. The implementation of the NIH IDC Notice will likely result in the suspension and/or cancellation of ongoing clinical trials for potentially life-saving investigational therapies. The consequences to individual patients could include their death or the advancement of their condition to the point where recovery from it is no longer possible.

9

30. A few examples of people who have benefitted from the UMass Chan Medical School clinical trials conducted in facilities maintained with NIH-IDC funding or who are part of research or clinical trials reliant upon NIH-IDC funding include:

    a. *Impact on the lives of patients with rare diseases*. A 12-month-old infant was referred to UMass Chan Medical School after being diagnosed with a rare, fatal genetic disease called Tay-Sachs disease. Researchers at UMass Chan Medical School, supported by NIH funded staff, services, and facilities, provided the infant with a completely novel experimental gene therapy that was not available from any commercial biopharma company because of the market limitations inherent in the rarity of the condition. The infant, along with her family, traveled to UMass Chan Medical School in Worcester, Massachusetts and safely received the therapy using a variety of NIH-supported services. While the therapy has not been a complete cure, the progression of the disease has slowed and the child has survived and has retained some abilities that have allowed her to meaningfully interact with her family approximately a year after the treatment was given.

    b. *Life-saving experimental treatments.* The lives of a western Massachusetts mother and her adult son were saved by UMass Chan Medical School's clinical research support, after they accidentally ate toxic mushrooms. Upon their arrival in Worcester, Massachusetts they began treatment with Dr. Stephanie Carreiro, emergency physician and toxicologist, which, in life-saving part, involved getting special

permission from the FDA to provide an antidote that is currently in investigation. Obtaining and administering the experimental antidote was enabled by infrastructure, services, and procedure provided by the NIH-funded UMass Center for Clinical Science, including the UMass Chan IRB, Office of Clinical Research, and UMMH-UMass Chan Investigational Pharmacy. In addition, Dr. Carreiro also benefitted from CTSA Program funding through a UMCCTS KL2 Scholar Award that provided training in clinical research.

c.  *Improvement in the quality of the lives of patients with chronic conditions.* A 28 year old pharmaceutical scientist from Pennsylvania, diagnosed with lupus at age 22, came to UMass Chan Medical School with lupus symptoms that impacted her ability to attend college classes and work to participate in an individualized clinical research study exploring the use of CAR T cell treatment in lupus nephritis for severe or nonresponsive lupus. This patient is one of only a dozen patients in the United States to have undergone CAR T cell treatment for lupus. This patient's first treatment in March, 2024 required a two-week hospital stay, during which the patient underwent lymphodepletion chemotherapy, an infusion of their CAR T cells, and was monitored by UMass Chan Medical School clinical research personnel in the Blood and Marrow Transplant program.

d.  *Improving treatment options and preventative medicine.* The Individual Genomic Variation Consortium ("IGVP") is a partnership between

11

scientists within the National Human Genome Research Institute (one of NIH's Institutes), industry partners and universities, including UMass Chan Medical School.  UMass Chan Medical School investigators have been pinpointing tens of thousands of positions in the human genome which may influence disease.  In order to apply this knowledge to improve treatment options and preventative medicine, scientists need to have a better understanding of how these regions function and where in the body they are active. The work UMass Chan Medical School is doing in this project is a predictive modeling component of the IGVF Consortium, which aims to systematically study the functional impact of genetic variants and their influence on human diseases and traits by developing and applying cutting-edge computational and statistical methods to predict the functional impacts of disease-associated genetic variants.  The $737,341 total grant award from NIH to UMass Chan Medical School for this work includes both the DCs and the IDCs and the impact of the implementation of the NIH IDC Notice on not just UMass Chan Medical School but on the other grantees working on this project, would be significant.

31. UMass Amherst will also be severely impacted by the implementation of the NIH IDC Notice.  UMass Amherst has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH. Ex. B.

32. In Federal fiscal year 2024, UMass Amherst will receive approximately $44.8 million dollars in funding from NIH.  Of that total amount, approximately $31.7 million dollars are for DCs

12

and approximately $13.1 million dollars are for IDCs, based on the NIH Federal IDC rate of 61%, with certain DC categories (such as equipment and subcontracts) exempted from calculating the IDC, resulting in a blended IDC rate of approximately 41.3 % on the NIH grant portfolio of UMass Amherst.

33. The work done by UMass Amherst on these projects provides education and training in Biomedical Engineering, Chemical Engineering, Civil Engineering, Electrical Engineering, Mechanical Engineering, Agriculture, Biology, Public Health and Health Sciences, Mathematics, Chemistry, Psychology, and other programs. UMass Amherst, along with other UMass campuses, is the largest provider of Science, Technology, Engineering and Mathematics ("STEM") workforce to the Massachusetts economy.

34. In the last decade, UMass Amherst has hired 37 new faculty members and 28 staff members in Life Sciences through strategic investment in the Institute for Applied Life Sciences, established with an investment of $95 million from the Commonwealth and more than $50 million from the University of Massachusetts for the Institute for Applied Life Sciences' facilities and equipment. The Institute relies on a portion of the IDC funding provided to the campus for grants associated with the Institute, including the IDC funding provided by the NIH.

35. There are 30 Life Sciences Core Facilities with professional staffing at UMass Amherst; in total, there are 90 such Core Facilities across the University of Massachusetts. To operate its Core Facilities, UMass Amherst purchases necessary and sophisticated scientific equipment. This equipment, and the professional staff who work there, are administered by UMass Amherst's Institute for Applied Life Sciences. Running the Core Facilities requires significant capital investments and also requires continuous funding for the operations that

13

support hundreds of researchers on not only the UMass Amherst campus, but across all University of Massachusetts campuses as well as small businesses in Massachusetts. Funding for the debt service on the University of Massachusetts' capital investment, staffing, and operations relies in part on the IDCs to which NIH has committed as well as IDCs from other federal agencies.  The implementation of the NIH IDC Notice will likely cause UMass Amherst to reduce the scope and support for Core Facilities which rely on approximately 4% of the IDC funding committed to UMass Amherst for a significant portion of its budget, including the IDC funding provided by the NIH.

36. Another example of the detrimental impact on UMass Amherst, and the people its work serves, that will result from the implementation of the NIH IDC Notice, concerns the NIH-funded National Institute on Aging project "Massachusetts AI and Technology Center for Connected Care in Aging and Alzheimer's Disease (MAITC)".  The project is a collaboration of UMass Amherst and Brigham and Women's Hospital, and also involves Brandeis University, Massachusetts General Hospital, and Northeastern University.  MAITC fosters interdisciplinary research on the development, validation, and translation of AI-enhanced technologies to improve connections between older adults, caregivers, and clinicians in order to more effectively support healthy aging and the care of people living with Alzheimer's disease and related dementias.  MAITC provides support to other universities and private sector entities to support projects that accomplish this mission.  See, e.g., https://massaitc.org/.   Since fiscal year 2021, UMass Amherst has received a total of $18 million dollars to support this work, with $12.2 million dollars in DCs and $5.8 million in IDCs.  UMass Amherst will meet its obligations under the current NIH agreement, but if the IDC rate is reduced to 15%, the IDCs paid by NIH to UMass Amherst will be reduced to

14

$1.83 million, a reduction in IDC reimbursement of nearly $4 million from the amount NIH

agreed to pay. This would eventually require a significant reduction in the scope of the work

and, in doing so, would negatively impact the improvements the research seeks to make in

the lives of the people – those with Alzheimer's disease and dementia – and those who care

for them.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed on February 9, 2025, at Westborough, Massachusetts.

/s/ *Denise Barton*
Denise Barton
Chief Deputy General Counsel
University of Massachusetts, Office of the General Counsel
50 Washington Street
Westborough, MA 01581

15

# EXHIBIT A

# COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN: 1043167352A1

ORGANIZATION:
University of Massachusetts Medical School
55 Lake Ave.
North – S1–858
Worcester, MA 01655

Date: 06/06/2023

FILING REF.: The preceding
agreement was dated
09/16/2022

The rates approved in this agreement are for use on grants, contracts and other agreements
with the Federal Government, subject to the conditions in Section III.

## SECTION I: INDIRECT COST RATES

RATE TYPES:        FIXED      FINAL      PROV. (PROVISIONAL)              PRED. (PREDETERMINED)

| | EFFECTIVE PERIOD | | | | |
|------|------------|--------------|---------|--------------|-------------------------|
| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
| PRED. | 07/01/2022 | 06/30/2026 | 67.50 | On–Campus | Research |
| PRED. | 07/01/2022 | 06/30/2026 | 26.00 | Off–Campus | Research |
| PRED. | 07/01/2022 | 06/30/2026 | 68.00 | On–Campus | Research DOD Contract |
| PRED. | 07/01/2022 | 06/30/2026 | 27.80 | Off–Campus | Research DOD Contract |
| PRED. | 07/01/2022 | 06/30/2026 | 18.25 | All Locations | OSA–CM (SR#3) |
| PRED. | 07/01/2022 | 06/30/2026 | 36.00 | On–Campus | Other Sponsored Activities |
| PRED. | 07/01/2022 | 06/30/2026 | 26.00 | Off–Campus | Other Sponsored Activities |
| PROV. | 07/01/2026 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending June 30, 2026. |

*BASE

Modified total direct costs, consisting of all direct salaries and wages, applicable fringe benefits,
materials and supplies, services, travel and up to the first $25,000 of each subaward (regardless of the
period of performance of the subawards under the award). Modified total direct costs shall exclude
equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships
and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other
items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect
costs, and with the approval of the cognizant agency for indirect costs.

ORGANIZATION: University of Massachusetts Medical School
AGREEMENT DATE: 06/06/2023

## SECTION II: SPECIAL REMARKS

<u>TREATMENT OF FRINGE BENEFITS:</u>
Fringe benefits applicable to direct salaries and wages are treated as direct costs.

<u>TREATMENT OF PAID ABSENCES:</u>
Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal cost for salaries and wages. Separate claims are not made for the cost of these paid absences.

ORGANIZATION: University of Massachusetts Medical School
AGREEMENT DATE: 06/06/2023

1. The following rate applies to research effort performed at the Massachusetts Biologics Laboratory (MBL):

| TYPE | FROM | TO | RATE |
|------|------|-----|------|
| PRED. | 07/01/22 | 06/30/26 | 26.0% |
| PROV. | 07/01/26 | Until Amended | Use same rates and conditions as those cited for fiscal year ending June 30, 2026. |

The 26% rate noted above applies to the administrative costs of research at MBL. The facilities costs are directly charged for the space used by each project.

2. Fringe benefits are claimed using approved rates contained in the Massachusetts State–Wide Cost Allocation Plan. The following additional fixed fringe benefit charges are approved for the University:

|  | FYE 06/30/23 | FYE 06/30/24 |
|--|--------------|--------------|
| Workers' Compensation Insurance | .14%(S&W) | .14%(S&W) |
| Medicare | (1) | (1) |
| Health and Welfare | .85%(S&W) | .77%(S&W) |
| Unemployment | (1) | (1) |

(1) Beginning for Fiscal Year 2008 the State negotiated rate incorporated Unemployment Insurance and Medicare in the Federally negotiated State "6B" rate.

3. Commonwealth Medicine is the public, non–profit consulting and service organization founded by the University of Massachusetts Medical School. The Other Sponsored Acivities – Commonwealth Medicine (OSA–CM) base consists of the direct costs of public service programs that have evolved through partnerships with State agencies.

This separate OSA–CM rate receives an allocation of applicable general and administrative and information services costs only. Departmental administration, sponsored projects administration and facilities costs are not applicable to these programs.

This rate agreement updates fringe benefit rates.

** Your next fringe benefit proposal based on actual costs for fiscal year ending June 30, 2023 will be due in our office by December 31, 2023.

** Your indirect cost rate proposal for the fiscal year ending June 30, 2025 will be due in our office by December 31, 2025.

Equipment means tangible personal property (including information technology systems) having a useful life of more than one year and a per–unit acquisition cost which equals or exceeds $5,000.

ORGANIZATION: University of Massachusetts Medical School
AGREEMENT DATE: 06/06/2023

# SECTION III: GENERAL

A.  LIMITATIONS:

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its indirect cost pool as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as indirect costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B.  ACCOUNTING CHANGES:

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from indirect to direct. Failure to obtain approval may result in cost disallowances.

C.  FIXED RATES:

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D.  USE BY OTHER FEDERAL AGENCIES:

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E.  OTHER:

If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

BY THE INSTITUTION:

University of Massachusetts Medical School
_____
(INSTITUTION)

_____
(SIGNATURE)

John C. Lindstedt
_____
(NAME)

Executive Vice Chancellor, A&F
_____
(TITLE)

June 27, 2023
_____
(DATE)

ON BEHALF OF THE GOVERNMENT:

DEPARTMENT OF HEALTH AND HUMAN SERVICES
_____
(AGENCY)

Darryl W. Mayes -S
Digitally signed by Darryl W. Mayes -S
DN: c=US, o=U.S. Government, ou=HHS, ou=PSC,
ou=People, 0.9.2342.19200300.100.1.1=2000131669,
cn=Darryl W. Mayes -S
Date: 2023.06.26 13:01:57 -04'00'
_____
(SIGNATURE)

Darryl W. Mayes
_____
(NAME)

Deputy Director, Cost Allocation Services
_____
(TITLE)

06/06/2023
_____
(DATE)

HHS REPRESENTATIVE: Kathryn Dissinger

TELEPHONE:          (212) 264-2069

# EXHIBIT B

## COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN: 043167352

ORGANIZATION:
University of Massachusetts at Amherst
340 Whitmore Administration Bldg.
181 Presidents Drive
Amherst, MA 01003-9313

DATE:09/9/2022

FILING REF.: The preceding
agreement was dated
08/09/2021

The rates approved in this agreement are for use on grants, contracts and other
agreements with the Federal Government, subject to the conditions in Section III.

### SECTION I: Facilities And Administrative Cost Rates

RATE TYPES:    FIXED        FINAL        PROV. (PROVISIONAL)    PRED. (PREDETERMINED)

<u>EFFECTIVE PERIOD</u>

| <u>TYPE</u> | <u>FROM</u> | <u>TO</u> | <u>RATE(%)</u> | <u>LOCATION</u> | <u>APPLICABLE TO</u> |
|------|------------|------------|--------|-----------|----------------|
| FINAL | 07/01/2021 | 06/30/2022 | 59.50 | On-Campus | Research |
| PRED. | 07/01/2022 | 06/30/2023 | 60.50 | On-Campus | Research |
| PRED. | 07/01/2023 | 06/30/2024 | 61.00 | On-Campus | Research |
| PRED. | 07/01/2024 | 06/30/2025 | 61.50 | On-Campus | Research |
| PRED. | 07/01/2025 | 06/30/2026 | 62.50 | On-Campus | Research |
| PRED. | 07/01/2026 | 06/30/2027 | 62.50 | On-Campus | Research |
| FINAL | 07/01/2021 | 06/30/2022 | 26.00 | Off-Campus | Research |
| PRED. | 07/01/2022 | 06/30/2027 | 26.00 | Off-Campus | Research |
| FINAL | 07/01/2021 | 06/30/2022 | 61.50 | On-Campus | Research DOD Contract |
| PRED. | 07/01/2022 | 06/30/2023 | 62.50 | On-Campus | Research DOD Contract |
| PRED. | 07/01/2023 | 06/30/2024 | 63.00 | On-Campus | Research DOD Contract |
| PRED. | 07/01/2024 | 06/30/2025 | 63.50 | On-Campus | Research DOD Contract |
| PRED. | 07/01/2025 | 06/30/2026 | 64.50 | On-Campus | Research DOD Contract |

**J.A. 195**

ORGANIZATION: University of Massachusetts
at Amherst AGREEMENT DATE: 9/9/2022

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| PRED. | 07/01/2026 | 06/30/2027 | 64.50 | On-Campus | Research DOD Contract |
| FINAL | 07/01/2021 | 06/30/2022 | 28.00 | Off-Campus | Research DOD Contract |
| PRED. | 07/01/2022 | 06/30/2027 | 28.00 | Off-Campus | Research DOD Contract |
| FINAL | 07/01/2021 | 06/30/2022 | 49.00 | On-Campus | Instruction |
| PRED. | 07/01/2022 | 06/30/2027 | 50.00 | On-Campus | Instruction |
| FINAL | 07/01/2021 | 06/30/2022 | 26.00 | Off-Campus | Instruction |
| PRED. | 07/01/2022 | 06/30/2027 | 26.00 | Off-Campus | Instruction |
| FINAL | 07/01/2021 | 06/30/2022 | 31.50 | On-Campus | OSA |
| PRED. | 07/01/2022 | 06/30/2027 | 32.00 | On-Campus | OSA |
| FINAL | 07/01/2021 | 06/30/2022 | 26.00 | Off-Campus | OSA |
| PRED. | 07/01/2022 | 06/30/2027 | 26.00 | Off-Campus | OSA |
| PROV. | 07/01/2027 | Until Amended | 62.50 | On-Campus | Research |
| PROV. | 07/01/2027 | Until Amended | 26.00 | Off-Campus | Research |
| PROV. | 07/01/2027 | Until Amended | 64.50 | On-Campus | Research DOD Contract |
| PROV. | 07/01/2027 | Until Amended | 28.00 | Off-Campus | Research DOD Contract |
| PROV. | 07/01/2027 | Until Amended | 50.00 | On-Campus | Instruction |
| PROV. | 07/01/2027 | Until Amended | 26.00 | Off-Campus | Instruction |
| PROV. | 07/01/2027 | Until Amended | 32.00 | On-Campus | OSA |
| PROV. | 07/01/2027 | Until Amended | 26.00 | Off-Campus | OSA |

*BASE

Modified total direct costs, consisting of all direct salaries and wages,
applicable fringe benefits, materials and supplies, services, travel and up to
the first $25,000 of each subaward (regardless of the period of performance of
the subawards under the award).  Modified total direct costs shall exclude
equipment, capital expenditures, charges for patient care, rental costs,
tuition remission, scholarships and fellowships, participant support costs and
the portion of each subaward in excess of $25,000.  Other items may only be
excluded when necessary to avoid a serious inequity in the distribution of
indirect costs, and with the approval of the cognizant agency for indirect
costs.

ORGANIZATION: University of Massachusetts
at Amherst AGREEMENT DATE: 9/9/2022

## SECTION II: SPECIAL REMARKS

TREATMENT OF FRINGE BENEFITS:

Treatment of Fringe Benefits: Fringe benefits applicable to direct salaries and wages are treated as direct costs.

TREATMENT OF PAID ABSENCES

Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal cost for salaries and wages. Separate claims are not made for the cost of these paid absences.

OFF-CAMPUS DEFINITION:  The off-campus rate will apply for all activities: a) Performed in facilities not owned by the institution and where these facility costs are not included in the F&A pools; or b) Where rent is directly allocated/charged to the project(s). Actual costs will be apportioned between on-campus and off-campus components. Each portion will bear the appropriate rate.

Fringe benefits are claimed using approved rates contained in the Massachusetts State-Wide Cost Allocation Plan. The following additional fixed fringe benefit charges are approved for the University:

```
                          FYE 06/30/23
Workers' Comp. Ins.    0.19%(S&W)
Health & Welfare(1) : $17.00 per week - GEO
                      $19.00 per week - Post Doc. Fellows through 12/31/21
                      $20.00 per week - Post Doc. Fellows 1/1/22 - 6/30/22
                      $16.50 per week - All Other
Sick Leave Bank        0.20%(S&W)
Post Doc. Fellows     13.78%   (Inclusive of health insurance, terminal leave,
payroll tax and worker's Comp. Ins.)
Graduate Research Assistants 15.63% (Inclusive of health insurance)
```

(1) Health and Welfare - The State negotiated rate with collective bargaining units.  The rate supports dental, and in some cases vision, health benefits which are provided directly by health and welfare trust funds to employees of the Commonwealth of Massachusetts and the University of Massachusetts.


** A fringe benefit rate proposal based on actual expenses for fiscal year ended June 30, 2022 is due by December 31, 2022.

** An indirect cost proposal based on actual expenses for fiscal year ended June 30, 2026 is due by December 31, 2026.

ORGANIZATION: University of Massachusetts at
Amherst AGREEMENT DATE: 9/9/2022

---

Equipment means tangible personal property (including information technology
systems) having a useful life of more than one year and a per-unit acquisition
cost which equals or exceeds the lesser of the capitalization level
established by the non-Federal entity for financial statement purposes, or
$5,000.

**J.A. 198**

ORGANIZATION: University of Massachusetts at
Amherst AGREEMENT DATE: 9/9/2022

## SECTION III: GENERAL

A. <u>LIMITATIONS:</u>

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its facilities and administrative cost pools as finally accepted; such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as facilities and administrative costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B. <u>ACCOUNTING CHANGES:</u>

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from facilities and administrative to direct. Failure to obtain approval may result in cost disallowances.

C. <u>FIXED RATES:</u>

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D. <u>USE BY OTHER FEDERAL AGENCIES:</u>

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E. <u>OTHER:</u>

If any Federal contract, grant or other agreement is reimbursing facilities and administrative costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of facilities and administrative costs allocable to these programs.

BY THE INSTITUTION:

University of Massachusetts at Amherst

(INSTITUTION)

*Andrew Mangels*
3C1AEC93FF6F431...

(SIGNATURE)

Andrew Mangels

(NAME)

Vice Chancellor A&F

(TITLE)

9/27/2022

(DATE)

ON BEHALF OF THE FEDERAL GOVERNMENT:

DEPARTMENT OF HEALTH AND HUMAN SERVICES

(AGENCY)

Darryl W. Mayes -S
Digitally signed by Darryl W. Mayes -S
DN: c=US, o=U.S. Government, ou=HHS, ou=PSC,
ou=People, 0.9.2342.19200300.100.1.1=2000131669,
cn=Darryl W. Mayes -S
Date: 2022.09.23 14:15:25 -04'00'

(SIGNATURE)

Darryl W. Mayes

(NAME)

Deputy Director, Cost Allocation Services

(TITLE)

9/9/2022

(DATE) 7069

HHS REPRESENTATIVE:    Edwin Miranda

Telephone:    (212) 264-2069

# EXHIBIT 20

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **COMMONWEALTH OF MASSACHUSETTS, ET AL.,**<br><br>**PLAINTIFFS,**<br><br>**V.**<br><br>**NATIONAL INSTITUTES OF HEALTH, ET AL.,**<br><br>**DEFENDANTS.** | **CASE NO. _____** |

### Declaration of Dr. Bruce E. Jarrell

I, Bruce E. Jarrell, hereby declare:

1. I am President of the University of Maryland, Baltimore ("UMB"), a constituent institution of the University System of Maryland ("USM"), the State of Maryland's public system of higher education. This is a position I have held since 2020. As President, I have statutory responsibility and accountability to the USM Board of Regents for developing the mission and successful conduct of UMB and for the supervision of each of UMB's departments. From 2012 until my appointment as President I served as UMB's chief academic and research officer and senior vice president, holding the title of Provost and Executive Vice President.

2. As President, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants*

1

*Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15 percent.

4. Opened in 1807, UMB is Maryland's public health, law, and human services university, dedicated to excellence in education, research, clinical care, and service. UMB enrolls nearly 6,700 students in six nationally ranked professional schools — dentistry, law, medicine, nursing, pharmacy, and social work — and an interdisciplinary School of Graduate Studies. The University offers 97 doctoral, master's, baccalaureate, and certificate programs and confers most of the professional practice doctoral degrees awarded in Maryland.

5. UMB is a thriving academic health center combining cutting-edge biomedical research and exceptional patient care. UMB's extramural funding totaled $638 million in Fiscal Year 2024. UMB employs more than 8200 employees working toward fulfillment of UMB's mission to improve the human condition and serve the public good of Maryland and society at large through education, research, clinical care, and service.

6. Life-saving research at UMB is supported annually by $245 million in direct funding from the NIH and $75 million in passthrough funding from NIH. For example:

   a. The University of Maryland School of Medicine at UMB is home to the Marlene & Stewart Greenebaum Comprehensive Cancer Center, designated as one of about 50 U.S. comprehensive cancer centers by the National Cancer Institute. Our cancer investigators conduct groundbreaking cancer research taken from the lab to the treatment clinic, saving lives and giving patients access to novel, life-saving treatments.

   b. UMB is also home to the world-renowned Shock, Trauma and Anesthesiology Research organized research center, a multi-disciplinary research and educational

2

center focusing on critical care and organ support, resuscitation, surgical outcomes, patient safety and injury prevention. The focus of tens of millions of NIH-funded research dollars includes traumatic brain injury and spinal cord injury, sepsis and dementia.

    c.  UMB is a leader in research in the areas of neuroscience, microbiology, immunology, and vaccinology which are supported by tens of millions of dollars in NIH-funding each year. Among other things, NIH-funded research in these areas includes life-saving vaccines; addiction science, prevention, and treatment; neurodegeneration; traumatic brain injury; organ transplant; and the development of artificial blood products.

7.  UMB has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of October 24, 2023. The Indirect Cost ("IDC") Rate in UMB's NICRA is 55.5 percent.

8.  NIH's reduction of UMB's IDC rate(s) will eliminate $49.5 million annually in NIH indirect and passthrough funding that UMB uses to support its research programs. Note that all allowable costs were supported by substantial evidence when the most recent NICRA was completed.

9.  The loss of these funds will immediately impact UMB's ability to draw critical funds used to cover administrative (e.g., department, school, & central administrative payroll and operating) and facility costs (e.g., utilities, debt service, maintenance and environmental services personnel and operating costs, facility renewal) in support of NIH research. At a health sciences research-focused, public institution like UMB, the magnitude of this reduction is significant and will severely limit translational and life-saving research and clinical trial programs. Research, and particularly clinical trials, cannot occur absent the

3

critical operational support and compliance infrastructure that IDC dollars fund and that are necessary to perform clinical research safely, ethically, and in compliance with federal regulatory requirements. For example, a reduction in the NIH IDC rate impacts UMB's ability to comply with regulatory oversight responsibilities including but not limited to:

   a. The Human Research Protections Office, including the Institutional Review Board, which protect human research subjects;

   b. The Office of Animal Welfare Assurance, the Institutional Animal Care and Use Committee and Veterinary Resources, which protect animal research subjects;

   c. The Institutional Biosafety Committee which reviews and oversees research involving potentially infectious materials;

   d. The Research Security Program, which safeguards UMB's research enterprise against foreign government interference and the misappropriation of research and development to the detriment of national or economic security;

   e. The Conflict of Interest Office, which protects against conflicts of interest in federally-funded research;

   f. The Research Integrity Office, which manages research misconduct proceedings in compliance with NIH Office of Intramural Research requirements; and

   g. The Office of Environmental Health and Safety, including Radiation Safety, which support the UMB clinical research community in meeting regulatory requirements and managing health and safety risks related to research activities, including but not limited to laboratory and radiation safety.

10. We anticipate NIH's reduction of UMB's IDC rate(s) will disrupt ongoing clinical trials including those testing potentially life-saving treatments for patients with cancer, orthopedic

4

trauma, and addiction, and require furlough of physicians, nurses and staff supporting these patients through their journey toward cure.

11. UMB draws close to $8 million biweekly from 470 active NIH awards across 34 NIH Programs in 24 NIH Institutes. UMB next anticipates drawing funds on or around February 14, 2025. At that time, the reduced IDC rate will impact UMB in irreparable ways by eliminating funds used to support expenses allowable under UMB's NICRA.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February, 2025, in Baltimore, Maryland.

_Bruce E. Jarrell_
Dr. Bruce E. Jarrell, M.D, FACS
President
University of Maryland, Baltimore

5

# EXHIBIT 21

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

      Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

      Defendants.

Case No. _____

**<u>Declaration of Dr. Darryl J. Pines</u>**

I, Dr. Darryll J. Pines, hereby declare:

1. I am the President of the University of Maryland, College Park ("UMCP"), a constituent institution of the University System of Maryland ("USM"), the State of Maryland's public system of higher education.. This is a position I have held since 2020. As President, I have statutory responsibility and accountability to the USM's governing board, the Board of Regents, for developing the mission and successful conduct of UMCP and for the supervision of each of UMCP's schools and colleges. Prior to holding this position, I was the Dean of the A. James Clark School of Engineering at UMCP, a position I held for 11 years.

2. As the President, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

1

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs rates (i.e., Facilities and Administrative ("F&A") rates) to fifteen pecent (15%).

4. UMCP is the State of Maryland's flagship research university and is ranked by Forbes as #12 in the United States among public universities. UMCP enrolls over 40,000 students across twelve schools and colleges and an interdisciplinary Graduate School, and offers over 300 degree programs. UMCP is a global leader in numerous areas of study, including health, data science, climate science, and more. UMCP, along with its sister institution the University of Maryland, Baltimore ("UMB"), engages in cross-cutting research that highlights the intersection of engineering, computer science, AI, and medicine. As one of the nation's leading research universities, UMCP is well positioned to advance and translate public health knowledge to improve health and well-being. Faculty and students are involved in a broad range of scientific endeavors and research centers whose focus spans from the cellular to the societal level. UMPCs laboratories and research programs rely, in part, on NIH funding to make a difference in critical areas, from understanding how respiratory viruses spread through air to climate change's impacts on health, physical activity's benefits to aging brains, innovative approaches to treating cancer, and advancing health equity, among others.

5. UMCP's research is supported by a number of different federal agencies. UMCP's extramural funding totaled over $703 million in State Fiscal Year ("FY") 2024, including $68 million in funding awarded directly by the NIH and $9 million in funding awarded on a pass-through basis from the NIH.

2

6.  UMCP has a Negotiated Indirect Cost Rate Agreement ("NICRA") with the U.S. Department of Health and Human Services dated June 24, 2024. The Indirect Cost ("IDC") Rate in UMPC's NICRA is fifty-six percent (56%) for on-campus organized research. All costs included in UMCP's IDC were determined to be allowable (i.e., permitted to be charged to the Federal Government) based on substantial evidence UMCP produced during the most recent NICRA.

7.  UMCP's total blended IDC rate for NIH and other Federal Government funding is already capped by the Federal Government at  twenty-six percent (26%) for Administrative costs and is negotiated at  thirty percent (30%) for Facilities costs.

8.  NIH's reduction of UMCP's IDC rate(s) will eliminate approximately $6 million in funding to UMCP for State FY25 and $16 million for State FY26 – funding that UMCP uses to support its research programs.[1] The loss of these funds will immediately impact UMCP's ability to fund administrative (e.g., department, school, and central administrative payroll and operations) and facilities (e.g., utilities, debt service, maintenance and environmental services personnel and operating costs, and facility renewal) costs in support of NIH research. A reduction in the NIH IDC rate impacts research administration centrally at UMCP and also at the unit level (e.g., colleges/schools and departments).

9.  The reduction in IDC rates will directly and severely impact UMCP's ability to submit proposals, negotiate subawards, engage in subrecipient monitoring, comply with financial,

---

[1] These are estimated numbers only and are not provided for audit purposes.

audit, and internal control requirements, and comply with regulatory oversight responsibilities. Those regulatory compliance obligations include but are not limited to operations of:

(a) the Human Research Protections Office, including the Institutional Review Board, which protects human research subjects;

(b) the Institutional Animal Care and Use Committee and Department of Laboratory Animal Resources, which protect animal research subjects;

(c) the Institutional Biosafety Committee, which reviews and oversees research involving potentially infectious materials;

(d) the Research Security Office, which protects UMCP's research enterprise against malign foreign influence;

(e) the Disclosure Office, which protects against conflicts of interest in federally-funded research;

(f) the Office of Integrity and Responsible Conduct, which handles research misconduct proceedings in compliance with the NIH Office of Intramural Research requirements; and

(g) the Office of Research Safety, which supports the UMCP research community in meeting regulatory requirements and managing health and safety risks related to research activities, including but not limited to biosafety, laboratory safety, and radiation safety.

4

10. UMCP's sister campus, UMB, performs NIH-funded clinical trials, and UMCP performs other crucial research funded by NIH.  At UMCP, NIH funding accounted for nearly ten percent (10%) of UMCP's total funding in FY24.

11. The magnitude of this level of reduction in IDC rates will decimate UMCP's translational and life saving research programs. Research cannot occur absent the critical support structures that IDC reimbursement funds. The existing Federal Government cap of twenty-six percent (26%) on the administrative component of IDC rates, coupled with increasing federal compliance regulations, has put pressure on UMCP to maintain a culture of compliance with limited resources. Imposing yet another cut to both the facilities and administrative cost rates that make up the IDC rate will force a decrease in the compliance oversight structure associated with these regulations, unnecessarily creating more challenges to ensure the safety and integrity of the research enterprise, as well as compliance with increasing regulatory requirements to protect and preserve U.S. national security.

12. With regard to the facilities rate component of IDC rates, the ever-changing landscape of research priorities is always constrained by an institution's ability and agility to stand up the infrastructures needed to support that research –  the buildings and equipment that NIH's facilities costs help support and which allow faculty, staff, and graduate students to perform critical work. That infrastructure is needed to maintain the highest quality of outcomes that benefit the public, which is the core mission of the NIH – to provide a public good.

13. I believe that these reductions in IDCs will not just harm UMCP's research enterprise and the research enterprises of other universities, but will result in U.S. research falling further

5

behind that of other countries. It will be difficult for the U.S. to overcome challenges related

to the elimination of faculty, staff, and graduate assistant positions funded directly and

indirectly by research dollars, the resulting safety and compliance issues, and the lack of

current facilities and equipment to support and spur cutting edge research activities.  All will

have an immediate and lasting negative impact on UMCP's mission to improve the human

condition and to serve the public good of Maryland and society at large through education,

research, clinical care, and service.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

Executed this 9th day of February, 2025, in College Park, Maryland.

Dr. Darryll J. Pines

President and Glenn L. Martin Professor of
Aerospace Engineering
University of Maryland College Park

6

# EXHIBIT 22

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, *et al.*

                    Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH;
MATTHEW MEMOLI, M.D., M.S., in his
official capacity as Acting Director of the
National Institutes of Health; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and DOROTHY
FINK, M.D., in her official capacity as
Acting Secretary of the U.S. Department of
Health and Human Services,

                    Defendants.

Civil Action No. _____

## DECLARATION OF RYAN LOW

I, Ryan Low, hereby declare:

1. I am the Vice Chancellor for Finance and Administration for the University of Maine
   System, a position I have held since 2017. As Vice Chancellor for Finance and
   Administration, I have oversight of the University of Maine System operating budget;
   treasury and accounting; general services, including facilities and procurement, information
   technology, and government relations.

2. As the Vice Chancellor for Finance and Administration, I have personal knowledge of the
   matters set forth below, or have knowledge of the matters based on my review of information
   and records gathered by university staff.

1

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

4. The University of Maine, one of seven universities within the University of Maine System, is Maine's flagship research university. It conducts research in areas such as treatments for infectious diseases, neuromuscular disorders, and muscle aging. This research is conducted by the University of Maine Center for Biomedical Research Excellence (COBRE), which plays a key role in supporting the biomedical research industry in Maine as a biomedical research and training hub. COBRE is supported by a $11.3 million award from NIH, consisting of 3 Phases, with the current Phase 1 initiated in 2023.

5. The University of Maine System has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of April 23, 2024. The Indirect Cost ("IDC") Rates in the NICRA range from 26.00% to 47.70%.

6. The University of Maine System's on campus research IDC rate for NIH funding is 47.70%.

7. NIH's reduction of the University of Maine System's IDC rate will eliminate approximately $1,376,804 in funding that the university uses to support its research programs. The loss of these funds will immediately impact the university's ability to draw critical funds used to pay expenses associated with operation and maintenance of complex facilities and critical research equipment, procurement of goods, compliance with applicable laws and grant provisions, payroll related to individuals not directly associated with the awards, and similar costs.

2

8. NIH's reduction of the University of Maine System's IDC rate could disrupt anticipated clinical trials for research in progress related to treatment for infectious diseases, neuromuscular disorders, and muscle aging.

9. The loss of IDC funds from NIH grants would impact a planned update and maintenance of environmental systems crucial to its bio-medical research facility. The anticipated annual debt and interest obligation to be covered by IDCs is $850,000.

10. The University of Maine next anticipates to draw funds immediately related to the COBRE program described above and other university research programs.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 9th day of February, 2025, in Monmouth, Maine.


/s/ Ryan Low_____

Ryan Low
Vice Chancellor for Finance and Administration
University of Maine System

3

# EXHIBIT 23

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et. al.

                    Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH, et.
al.

                    Defendants.

Civil Action No. _____

**Declaration of Arthur Lupia**

I, Arthur Lupia, hereby declare:

1. I am Interim Vice President of Research and Innovation at the University of Michigan, a position I have held since 2024. As Interim Vice President, I have oversight of the university's entire research enterprise. Prior to holding this position, I was an Assistant Director at the National Science Foundation (2018-2022) and I co-chaired the Open Science subcommittee for the White House Office of Science and Technology Policy (2019-2021).

2. As Interim Vice President, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

1

4.  The University of Michigan is Michigan's flagship research university. Its research saves lives through medical breakthroughs and drug discoveries, supports national security through research in areas like engineering, and creates thousands of jobs in technology areas that are critical to the nation. The university partners extensively with the private sector, including world-leading American medical device and pharmaceutical companies, job-creating startups and innovative small businesses to transform groundbreaking research into outcomes that save lives and improve quality of life for people across our state and the nation as a whole. In 2024, the University of Michigan conducted approximately $801 million in NIH-funded research.

5.  The University of Michigan's currently Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH sets the Indirect Cost ("IDC") Rate at 56%.

6.  NIH's reduction of the University of Michigan's  IDC rate[s] will eliminate approximately $181 million in funding that the University of Michigan uses to support its research programs.

7.  Based on data from clinicaltrials.gov, there are currently 425 NIH-funded interventional clinical trials underway and not yet completed at the University of Michigan. Of these, 139 are testing a drug, 105 a procedure, 23 a device, and the remainder another type of intervention. Prevention of "death" and "mortality" and pursuit of improved "survival" are described as primary outcomes being tested in 161 of these trials.

8.  The University of Michigan next anticipates drawing funds on or around March 7, 2025. The loss of these funds will immediately impact the University of Michigan's ability to draw critical funds used to pay expenses associated with these programs (e.g., facilities costs, mortgages, payroll, infrastructure used to support research, clinical trials).

2

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February, 2025, in Ann Arbor, Michigan.

_____

Arthur Lupia

Interim Vice President for Research & Innovation

University of Michigan

3

# EXHIBIT 24

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

       Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

       Defendants.

Case No. _____

<u>**Declaration of Douglas A. Gage, Ph.D.**</u>

I, Douglas A. Gage, hereby declare:

1. I am the Vice President for Research and Innovation at Michigan State University (MSU), a position I have held since 2020.  As Vice President for Research and Innovation, I oversee strategic initiatives and support for the university's research enterprise and approximately $932 million in annual research expenditures.  Prior to holding this position, I was an Assistant Vice President in the university's Office for Research and Innovation.  I am also a professor in the Department of Biochemistry and Molecular Biology.

2. As the Vice President for Research and Innovation and having been a researcher for more than 30 years, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15% from 57%.

1

4. MSU is Michigan's State University and a leading research university.  Founded in 1855, MSU was the nation's pioneer land-grant university leading a bold nationwide experiment to democratize higher education and bring science and innovation into the everyday lives of communities across the United States.

5. MSU's human health research initiatives include translational neuroscience (with a focus on Alzheimer's and Parkinson's diseases); pediatric and human development (including autism); obstetrics, gynecology, and reproductive health; cancer; and stroke.  The backbone of this research is supported and directed by the NIH.

6. MSU receives NIH funding and has annual NIH expenditures of approximately $136 million.

7. MSU has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of July 1, 2024.  The Indirect Cost ("IDC") Rate in MSU's NICRA is 57%.

8. MSU's total blended IDC annual funding for NIH funding is $39 million.

9. NIH's reduction of MSU's IDC rate will eliminate approximately $27 million in yearly funding that MSU uses to support its research programs.  The loss of these funds will immediately impact MSU's ability to draw critical funds used to pay expenses associated with the reimbursement for activities supporting research, including debt service, cost of federal compliance and oversight, salaries and benefits, waste removal, insurance, utilities in research facilities, and other facility maintenance costs.  These costs are directly incurred on behalf of research activities, but they are required to be incorporated into the indirect cost recovery rate calculation.

10. These reimbursement changes will impact MSU by reducing support for the costs directly required for research, but which are included in the federal indirect cost recovery structure.  These include support for personnel involved in federally mandated oversight for

2

increasingly complex compliance requirements, funding for debt service, and other costs as listed above, none of which can be included in direct costs. The reduction in funding will not eliminate these costs; therefore, reductions in staffing, as well as potential stoppage of construction projects, will be required to cover these costs. The reduction in staffing will make compliance increasingly more difficult to ensure.

11. The NIH's reduction will, as one example, impact MSU's Grand Rapids Innovation Park. MSU's Grand Rapids Innovation Park is a vital hub for biomedical research and health technology, and it fosters collaborations that lead to transformative health discoveries and improves the quality of life for ALL Michiganders, and potentially all Americans. The NIH's reduction of critical dollars will disrupt, and likely fully stall, critical patient research projects and delay the development of life-savings therapies, including those that involve neurodegenerative diseases (such as Alzheimer's disease and related dementias and Parkinson's disease) and cancer. One example is MSU's collaboration with BAMF Health, a cutting-edge cancer diagnostic and therapeutic company in the Grand Rapids Innovation Park. MSU provides BAMF Heath with leased access to a cyclotron MSU built for radiopharmaceutical research. BAMF uses this access to provide novel treatment for cancer patients. The NIH's reduction will also impact the region, leading to the loss of jobs that provide direct care to the Grand Rapids, Michigan community, as well as diminish the healthcare advancements that the community celebrates.

12. The NIH's reduction will also disrupt MSU's MIRACLE Center. The MIRACLE Center is one of 12 Centers of Excellence nationwide funded by the NIH's IMPROVE (Implementing a Maternal health and Pregnancy Outcomes Vision for Everyone) initiative, which uses indirect costs to deliver care and information to mothers and children. The NIH's reduction

3

would immediately and negatively impact 20 counties in Michigan that the MIRACLE
Center serves.

13. The NIH's reduction will also harm the transformative Henry Ford Health (HFH) + MSU
partnership.  To expand and enhance clinical education, biomedical research, and clinical
care throughout Michigan, and after years of planning, MSU and HFH are constructing a new
$330M research building in Detroit, Michigan.  When complete in 2027, the building will
house 80 research teams, with a total of nearly 500 new jobs to support innovative research
efforts in cancer, cardiovascular, and neurosciences (including stroke, Alzheimer's, and
neurofibromatosis).  The NIH's reduction will require an immediate response by MSU and
HFH, likely causing the project to be at least paused and even ultimately abandoned, which
will have real economic (up to 1,000 construction jobs will be lost) and clinical impacts.

14. MSU next anticipates to draw funds on or around Friday, February 14, 2025.  At that time,
the reduced IDC rate will reduce reimbursement for actual expenditures incurred, and MSU
must begin to reduce staffing and identify other reductions, which will be detrimental to
attaining committed research goals.

I declare under penalty of perjury that the foregoing is true and correct to the best of my
knowledge.

Executed this 9th day of February 2025, in East Lansing, Michigan

Douglas A. Gage

Vice President of Research and Innovation,
Michigan State University

4

# EXHIBIT 25

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

       Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

       Defendants.

Civil Action No. _____

<u>**Declaration of EZEMANARI M. OBASI, PhD**</u>

I, Ezemenari M. Obasi, PhD, hereby declare:

1. I am the Vice President for Research and Innovation, a position I have held since 2024. As Vice President for Research and Innovation, I have oversight of Wayne State University's Division of Research and Innovation, which includes sponsored programs administration, research integrity, technology commercialization, research and development programming, core facilities, university research centers/institutes, and federal affairs. Prior to holding this position, I was the Associate Vice President for Research and Professor at the University of Houston.

2. As the Vice President for Research and Innovation, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants*

1

*Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

4. Wayne State University is one of Michigan's public Carnegie Research I universities. Over 80% of grants awarded to Wayne State University during FY2024 were funded by the United States Department of Health and Human Services – 86% of those were awarded funding from the National Institutes of Health. Wayne State University is leading cutting-edge research in cancer biology and treatment, infectious diseases, cardiology, drug discovery, mental health, and population health studies focused on addressing the nation's most pressing health challenges that have a high prevalence in our region. This research is supported by $80 million from the NIH.

5. Wayne State University has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of June 6, 2024. The Indirect Cost ("IDC") Rate in Wayne State University's NICRA is 54% for on-campus organized research.

6. Wayne State University's total blended IDC rate for NIH funding is 54% for on-campus organized research.

7. NIH's reduction of Wayne State University's IDC rate[s] will eliminate approximately $18 million in funding that Wayne State University's uses to support its research programs. The loss of these funds will immediately impact Wayne State University's ability to draw critical funds used to pay expenses associated with facilities operational costs and debt service, research personnel, clinical trials, grants management, regulatory compliance, core research facilities and services, equipment and supplies, to name a few.

8. Wayne State University next anticipates to draw funds on or around February 15, 2025. At that time, the reduced IDC rate will impact Wayne State University's capacity to pay for

2

research personnel, debt service, facility costs, equipment maintenance agreements, grants

management and regulatory functions that are required by notice of award terms and

conditions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.


Executed this 9th day of February, 2025, in Detroit, Michigan.

_____

Ezemenari M. Obasi, PhD

Vice President for Research and Innovation

Wayne State University

3

# EXHIBIT 26

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al., | |
| Plaintiffs, | |
| v. | Case No. _____ |
| NATIONAL INSTITUTES OF HEALTH, et al., | |
| Defendants. | |

1

## DECLARATION OF JENNIFER REXFORD

I, Jennifer Rexford, declare as follows:

1.      I am the Provost and the Gordon Y.S. Wu Professor in Engineering and Professor of Computer Science at Princeton University ("Princeton" or the "University") in Princeton, New Jersey.  I joined Princeton's Department of Computer Science as a full professor in 2005, became acting chair of computer science in 2013, and was named chair in 2015.  I assumed the role of Provost in 2023.

2.      I make this declaration in support of Plaintiffs' Complaint and Motion for a Temporary Restraining Order.

3.      As Provost, I serve as Princeton's chief academic officer and chief budget officer. I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Princeton University personnel, and could testify thereto.

4.      Princeton is a non-profit educational institution, dedicated to research, teaching, and service.  The University's longstanding commitment to service is reflected in its informal motto — Princeton in the nation's service and the service of humanity — and exemplified by the extraordinary contributions that our faculty, staff, and students make to society, including through their groundbreaking research.  That research is supported by substantial funding from the federal government, including the National Institutes of Health ("NIH").

5.      In fiscal year 2024, for example, Princeton's main campus received $252 million of government grant and contract funding, of which $71 million came from NIH.  By the end of the fiscal year—which ended on June 30, 2024—Princeton had approximately 254 active NIH-funded awards across the University, many of which were multi-year awards.

6.     The funding that Princeton receives from NIH supports research and drives innovation in many critical fields, including:

    a.  Cancer research

    b.  Brain and mental health

    c.  Heart health

    d.  Child wellbeing

    e.  Antibiotics and antivirals

    f.  Autism research

    g.  Machine learning

    h.  Genetic engineering (CRISPR)

7.     Several of Princeton's many current and pending NIH-funded research initiatives involve collaborations with New Jersey colleges, universities, or research institutes, including Rutgers University, Rutgers Cancer Institute of New Jersey, and Rowan University.  Prominent examples include:

    a.  The Consortium Cancer Center, through which Rutgers Cancer Institute and Princeton University partner to make "impactful scientific discoveries and clinical progress" in the areas of cancer metabolism, genomics, and metastasis. *See* https://cinj.org/about-cinj/consortium-cancer-center.

    b.  The New Jersey Alliance for Clinical and Translational Science (NJ ACTS), through which Rutgers, Princeton, NJ Institute for Technology (NJIT), and others collaborate to advance "clinical and translational science to develop new therapies and treatments and improve health and health care in New Jersey." *See* https://njacts.rbhs.rutgers.edu/about/.

    c. A collaboration between Princeton and Rutgers "to enhance the understanding of mental health disorders through the lens of computational psychiatry." *See* https://pni.princeton.edu/news/2024/princeton-rutgers-collaboration-awarded-16m-research-grant-advance-understanding-mental.

    d. A research collaboration between Princeton University and Rutgers New Jersey Medical School to explore using CRISPR-based technology to detect disease.

8.    These collaborations promise to deliver on crucial breakthroughs in science intended to benefit the public.  At Princeton, the cost of carrying out these projects exceeds the federal dollars committed to them, even including indirect cost recovery.  But the recovery of indirect costs at negotiated rates allows Princeton to defray some of the cost associated with such things as:

    a. Capital equipment replacement of scientific equipment needed for cutting edge research.

    b. Investment in secure data infrastructure to support research, including genomics and other health research.

    c. Support for staffing for research data management to make data from research more accessible to the public.

    d. Construction and outfitting of specialized facilities for biomedical research, including specialized biological labs that conduct cancer research.

The NIH's proposal to cut indirect cost rates to 15% would have a substantial negative impact on the University's ability to deliver on these important collaborations.  The drastic reduction in indirect cost recovery proposed by NIH may hinder the development of certain

research projects, or impede the progress of a broad swath of research efforts. Naturally, there would be effects on employment if staffing, including research-related staffing, was impacted.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2025 at Princeton, New Jersey.

_____

Jennifer Rexford, Provost

# EXHIBIT 27

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*, <br><br> Plaintiffs, <br><br><br> v. <br><br> NATIONAL INSTITUTES OF HEALTH, *et al.*, <br><br> Defendants. | Civil Action No. |

**DECLARATION OF J. MICHAEL GOWER**

I, J. Michael Gower, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Executive Vice President – Chief Financial Officer & Treasurer at Rutgers, the State University of New Jersey ("Rutgers"). My educational background includes a BA in Political Science and a MBA, each from Duke University. I have been employed as Rutgers's Chief Financial Officer & Treasurer since September 30, 2013. I have been employed as the Chief Financial Officer at two other universities, each with significant research awards from the National Institutes of Health.  I also served as the Chief Financial Officer at the Duke University School of Medicine.

2. I submit this Declaration to explain certain impacts on Rutgers resulting from the February 7, 2025, National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates*, ("NIH Supplemental Guidance").  I have compiled the information in the statements set forth below through review of Rutgers's records and other documents gathered by Rutgers personnel who

have assisted me and on the basis of documents that have been provided to and/or reviewed by me. I have also familiarized myself with the NIH Supplemental Guidance in order to understand its immediate impact on Rutgers.

3. In addition to providing higher education to students from New Jersey and across the nation, Rutgers also supports significant medical and behavioral research and clinical trials across its colleges and schools. Rutgers conducts vital research across a wide range of areas including heart disease, cancer, neuroscience and brain health, and infectious disease.

4. To fund these crucial medical research programs, Rutgers is the recipient of federal funding, including annual funding from NIH in the total amount of approximately $250 million. NIH funding at Rutgers currently supports nearly 1,200 separate grants and more than 2,400 employees.

5. This funding includes both direct as well as "indirect costs," referred to as Facilities and Administrative costs ("F&A"), which cover expenses including but not limited to research administration, the operation and maintenance of lab facilities, the cost of utilities, maintenance of required regulatory and financial teams and other support staff, and overall operations that enable research institutions to continue to survive.

6. Rutgers's previously-negotiated rate agreement with the U.S. Department of Health and Human Services, for use by most federal agencies, set the rate for F&A costs at 57% of modified total direct costs for on-campus research.

7. On February 7, 2025, through the NIH Supplemental Guidance, NIH informed Rutgers that, effective February 10, 2025, it would be applying a standard indirect (F&A) cost rate of 15% to all grants, including ones already awarded.

8.   NIH's reduction of Rutgers's indirect cost rate will eliminate approximately $21.6 million in funding for this fiscal year, ending June 30, 2025. This is critical funding that Rutgers uses to support its research programs. The loss of these funds will have an immediate impact on Rutgers's ability to pay for the upkeep of research facilities, bonds used to construct research facilities, utilities for research facilities, managing payroll, accounting and research administration, and for other infrastructure used to support research.

9.   If Rutgers's NIH funding remains at $250 million for next fiscal year, with the decrease in the indirect cost rate from 57% to 15%, Rutgers projects an annual loss of approximately $57.5 million for the fiscal year July 1, 2025, through June 30, 2026.

10.  The NIH Supplemental Guidance implementing this significant decrease in the indirect cost rate will have a destabilizing financial impact on how Rutgers advances medical research in support of its patients, communities, and the state of New Jersey, not to mention on the livelihoods of our faculty and staff researchers. For example, the University will not be able to accept or maintain many research awards, thus eliminating entire research initiatives.

11.  The decrease in the indirect cost rate will cause significant disruption to Rutgers's operations. Rutgers will need to take extraordinary measures to address and mitigate the loss of funding, including but not limited to layoffs of personnel, the closing of labs, shuttering research buildings, and the cessation of many, if not most, biomedical research programs.  Rutgers does not have the resources to fund the indirect costs for our existing NIH grant portfolio at the announced flat rate over an extended period.

12.  Included in the NIH-funded projects that would be impacted are those in partnership with other institutions in New Jersey.

a.  That includes the Rutgers Cancer Institute of New Jersey ("CINJ"), a consortium with Princeton University, which is New Jersey's only National Cancer Institute-designated Comprehensive Cancer Center. CINJ conducts groundbreaking cancer research to advance the prevention and treatment of cancer.

b.  That also includes the New Jersey Alliance for Clinical and Translational Science, a partnership among four institutions: Rutgers, Princeton University, the New Jersey Institute of Technology, and RWJBarnabas Health.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of February, 2025, in New Brunswick, NJ.


J. Michael Gower
Executive Vice President – Chief Financial
Officer & Treasurer
Rutgers, The State University of New Jersey

# EXHIBIT 28

# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, et al.

        Plaintiffs,

    v.

NATIONAL INSTITUTES OF HEALTH;
MATTHEW MEMOLI, M.D., M.S., in his
official capacity as Acting Director of the
National Institutes of Health; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and DOROTHY
FINK, M.D., in her official capacity as
Acting Secretary of the U.S. Department of
Health and Human Services,

        Defendants.

Civil Action No. _____

## Declaration of James Paul Holloway

I, James Paul Holloway, hereby declare:

1. I am the Provost and Executive Vice President for Academic Affairs at the University of New Mexico, a position I have held since 2019. As Provost and Executive Vice President for Academic Affairs, I have oversight of academic and research affairs at the University of New Mexico. Prior to holding this position, I was Vice Provost for Global Engagement and Interdisciplinary Academic Affairs at the University of Michigan.

2. As the Provost and Executive Vice President for Academic Affairs, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff. The factual information in this Declaration is based upon records that are maintained in the regular course of the University's business and, in particular, its research functions. It is and was the regular

1

course of the University's business for an employee of the University with knowledge of the act, event, or condition to make the record or to transmit information thereof to be included in such records. The record was made at or near the time of the act, event, or condition or reasonably soon thereafter.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

4. The University of New Mexico is New Mexico's flagship research university. Our broad research portfolio spans the fundamental sciences, technology and engineering research, education, humanities and social sciences, and human health. We are the only academic health system in the state, and pursue research on improving human health, including substance use disorders, cardiovascular and metabolic disease, infectious diseases and immunity, Alzheimer's disease, kidney disease, cancer, and pediatrics, and more. This research was supported by $107 million from the NIH in Fiscal Year 2024, and we estimate NIH funding in Fiscal Year 2025 will be over $126 million.

5. The University of New Mexico has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of Jul 1, 2022. The Indirect Cost ("IDC") Rate in the University of New Mexico NICRA is 52.5%.

6. The University of New Mexico's total blended IDC rate for NIH funding is 26.47%.

7. NIH's reduction of University of New Mexico's IDC rate[s] will eliminate approximately $14.5 million in funding per year that University of New Mexico uses to support its research programs to advance the health and economy of New Mexico. The loss of these funds will

2

immediately impact University of New Mexico's ability to draw critical funds used to pay expenses associated with facilities, administrative costs including associated salaries and benefits, technology and related infrastructure, and regulatory compliance costs, in support of research.

8.   The loss of indirect costs will result in inadequate support systems for clinical trials.

9.   University of New Mexico next anticipates to draw funds on or around February 26, 2025.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 9th day of February, 2025, in Albuquerque, New Mexico.


James Paul Holloway

Provost & Executive Vice President for Academc Affairs

University of New Mexico

3

# EXHIBIT 29

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

      Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

      Defendants.

Case No. _____

### Declaration of Gloria J. Walker

I, Gloria Walker, hereby declare:

1. I am the Vice President for Finance and Business Operations at Nevada State University, a position I have held since 2024. As Vice President of Finance and Business Operations, I have oversight of fiscal, human, physical, and technological resources and administrative units for the institution. Prior to holding this position, I was Vice President for Finance and Administration and Chief Financial Officer at Florida Agricultural and Mechanical University.

2. As the Vice President of Finace and Business Operations, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

1

4. Nevada State University ("NSU") is Nevada's state college. Research at NSU provides students, largely at the undergraduate level, with hands-on educational opportunities and skills to prepare them for graduate school or the professional workforce. This research is supported by $633,871 from the NIH, and is a subaward of the University of Nevada, Reno ("UNR").

5. NSU has a Negotiated Indirect Cost Rate Agreement ("NICRA") with the Department of Health and Human Services ("DHHS"), effective as of October 11, 2023. The Indirect Cost ("IDC") Rate in NSU'S NICRA is 39%.

6. NSU's total blended IDC rate for NIH funding is 30%.

7. NIH's reduction of NSU'S IDC rate[s] will eliminate approximately $15,177 in funding that NSU uses to support its research programs. This would reduce the current rate received by NSU by 50%. The loss of these funds will immediately impact NSU'S ability to draw critical funds used to pay expenses associated with infrastructure used to support research. This reduction is significant and would limit NSU's ability to continue to provide the same level of professional development for academic faculty and start-up funds for new projects. In addition, it would reduce the funding available to develop new academic programs and courses for Nevada's students.  Facilities repairs and maintenance are also paid by indirect cost recovery funds and if these funds are not available, repairs and maintenance will be delayed, increasing deferred maintenance costs and the potential for critical failures.

8. NSU also uses the indirect cost recovery funds to cover costs of software and other technology, which would limit the access for faculty, students and staff to state-of-the-art technology. Classroom and office furnishings are also purchased with funds received through indirect cost recovery. With this reduction, furnishings and equipment will be used well beyond their useful life, with the potential to create safety and health issues for faculty, students, and staff.

2

9. NSU next anticipates to request draw funds from UNR, the primary grantee, on or around February 15, 2025 for the NIH-funded INBRE Program. At that time, the reduced IDC rate will impact NSU significantly. As outlined, this reduction would limit NSU's ability to continue to provide professional development for academic faculty and start-up funds for new projects, reduce the funding available to develop new academic programs and courses for students, reduce funding for software, state-of-the-art technology, and classroom/office furnishings for faculty and students, and delay critical repairs and maintenance that will increase deferred maintenance costs and the potential for critical health and safety issues.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February, 2025, in Henderson, Nevada.

Gloria J. Walker

Vice President, Finance and Business

Operations

Nevada State University

3

# EXHIBIT 30

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

      Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

      Defendants.

Case No. _____

## Declaration of David W. Hatchett

I, David W. Hatchett, hereby declare:

1. I am the Vice President of Research at University of Nevada, Las Vegas ("UNLV"), a position I have held since 2022. As the Vice President of Research, I have oversight of all research activities, grants, contracts, clinical trials, and facilities and service of the Division of Research at UNLV. Prior to holding this position, I was Associate Vice President for Research at UNLV since 2016. I am a full professor of Chemistry and Radiochemistry.

2. As the Vice President of Research, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

1

4.  UNLV is Nevada's  urban research university. UNLV has ongoing NIH funded health research in the areas including genomics, personalized medicine, brain health, and other health areas that impact our region, state, and nation. This research is supported by total of $44.8 million currently awarded by NIH in variable stages of completion.

5.  UNLV has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of July 1, 2023. The Indirect Cost ("IDC") Rate in UNLV's NICRA is 51.0%.

6.  UNLV's total blended IDC rate for NIH funding is 47.2%. The blended IDC is lower than the negotiated rate for UNLV because it includes some grants with lower IDC rates.

7.  NIH's reduction of UNLV'S IDC rate will eliminate approximately $2.7 million in resources for the current funding year that UNLV uses to support its research programs The loss of these funds will immediately impact UNLV'S ability to draw critical funds used to pay expenses associated with facilities costs, payroll, and infrastructure used to support research and clinical trials.

8.  UNLV's Office of Clinical Trials and the Kirk Kerkorian School of Medicine have ongoing clinical trials that are partially supported with IDC funding that would be severely diminished by the reduction of rate to 15%.

9.  UNLV's ability to manage programmatic research infrastructure, payroll, and research facilities, will be severely hindered by a reduction of IDCR. The impact would result in a loss of Division of Research staff, facilities, and infrastructure needed to conduct research and compete for research funding at UNLV.

10. UNLV next anticipates to draw federal and federal pass through funds on or around February 15, 2025 for fifty-nine (59) programs supported by NIH. At that time, the reduced IDC rate will impact UNLV by reducing our ability to support active grants, employ research staff to

2

administer grants, and maintain facilities and core laboratories that are used to support the

funded research. The reduction of indirect funds limits directed funding for laboratory

maintenance, start up fees for new faculty hires, freezing research administration across

departments and central office support with a direct impact on furthering research

infrastructure, and the university's capacity to support research effectively.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.


Executed this 9th day of February, 2025, in Las Vegas, Nevada.

David W. Hatchett

Vice President of Research

University of Nevada, Las Vegas

3

# EXHIBIT 31

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

       Plaintiffs,

          v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

       Defendants.

Civil Action No. _____

## <u>Declaration of Ben Friedman</u>

I, Ben Friedman, hereby declare:

1. I am the Chief Operating Officer of The Research Foundation for The State University of New York (RF), a position I have held since 2024. As Chief Operating Officer, I have oversight of the day-to-day operations of the RF and I work to establish an environment that supports research and discovery across The State University of New York ("SUNY") system. Prior to holding this position, I was Deputy Undersecretary for Operations at the National Oceanic and Atmospheric Administration.

2. As the RF Chief Operating Officer, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to underscore the fact that public health research will be significantly compromised if the National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost*

1

*Rates,* which purports to immediately reduce indirect costs payments to 15%, is implemented.

4.  RF is the largest comprehensive university-connected research foundation in the country. It provides essential administrative services that enable SUNY faculty to devote themselves to SUNY's core mission of educating students and conducting life changing research. RF was chartered in 1951 by the New York State Board of Regents as a non-profit education corporation. RF writes and submits grant proposals to agencies, foundations, and companies; establishes contracts and manages funding awarded to run campus-based research projects; protects and commercializes intellectual property created within those projects; and establishes enduring partnerships to advance research and research commercialization.

5.  The SUNY System is comprised of 64 colleges and universities, 29 of which are directly operated by the State of New York. Of those, four SUNY campuses are designated R1 research institutions: Binghamton University; Stony Brook University; University at Albany; and University at Buffalo. Attached hereto as Exhibit A is a chart prepared by RF showing negotiated Federal Facilities and Administrative Cost Rates (F&A, or "indirect costs") for various SUNY campuses.

6.  Taking into account all the NIH grants that have been awarded to SUNY, our campuses risk losing at least $79 million as a result of NIH's 15% cap on indirect costs, including approximately $21.1 million in costs SUNY campuses will incur to support vital research in the next five months. This is almost certainly an undercount of potential losses, as most SUNY grants are awarded in yearly installments, and these figures count only the current active yearly installment.

2

7.  Indirect cost payments are absolutely essential to SUNY's research programs. They fund a range of important tasks and personnel, without which SUNY's lifesaving research will undoubtedly suffer. Among the work that is funded by indirect cost payments are workstreams that are required by specific grants, including compliance and financial audits. Additionally, indirect cost payments cover SUNY facilities – they quite literally "keep the lights on" – including, lab space, HVAC, custodial service, security costs, computers, and so on. It is not unusual for research universities to decline to accept research funding if the indirect cost payment is too low, as it costs the universities too much to cover facilities and administration costs from some other sources.

8.  If the NIH notice remains in effect, SUNY institutions will face a Sophie's Choice – either redirect funding from other essential programs or be forced to end lifesaving NIH funded research programs prematurely.

9.  Ending these research programs will not only put lives at risk, but also waste the government's prior investments. The advancements already made in critical areas such as cancer and Alzheimer's disease mitigation or that otherwise support the government's objectives of such research will also be lost as a result thereby, causing immediate and irreparable harm to SUNY and the general public.

10. Binghamton University has, currently, a negotiated rate for indirect costs, namely F&A, of 58% for on-campus research. That rate is scheduled to increase to 58.5% on July 1, 2025, and to 59.5% on July 1, 2026. Attached hereto as Exhibit B is the Negotiated Indirect Cost Rate Agreement between RF o/b/o Binghamton University and the U.S. Department of Health & Human Services.

3

11. Stony Brook University has, currently, a negotiated rate for indirect costs, namely F&A, of 59.5% for on-campus research. Attached hereto as Exhibit C is the Negotiated Indirect Cost Rate Agreement between RF o/b/o Stony Brook University and the U.S. Department of Health & Human Services.

12. University at Albany has, currently, a negotiated rate for indirect costs, namely F&A, of 56.5% for on-campus research. Attached hereto as Exhibit D is the Negotiated Indirect Cost Rate Agreement between RF o/b/o University at Albany and the U.S. Department of Health & Human Services.

13. University at Buffalo has, currently, a negotiated rate for indirect costs, namely F&A, of 61% for on-campus research. That rate is scheduled to decrease to 60.10% on July 1, 2025. Attached hereto as Exhibit E is the Negotiated Indirect Cost Rate Agreement between RF o/b/o University at Buffalo and the U.S. Department of Health & Human Services.

14. The current rates were negotiated, and the above referenced rate agreements were executed with HHS, according to NIH's long-established process drawing on years of precedent. The RF and SUNY reasonably relied on these rates in competing for NIH funded awards. The NIH notice had the effect of unilaterally modifying the terms of these awards without notice, thereby jeopardizing lifesaving ongoing publicly funded research.

15. The loss of these funds will immediately impact SUNY's ability to draw critical funds used to pay expenses associated with important research that SUNY institutions conduct (facilities costs, payroll, human resources, information technology infrastructure used to support research, clinical trials management and support, and other indirect expenses).

16. SUNY researchers are conducting groundbreaking research that will cure diseases with the potential to save thousands of lives lives. The proposed sudden cuts imperil that lifesaving

4

research. Among the many lifesaving projects that are funded by NIH grants within SUNY are: a University at Albany project to study the role played by certain enzymes in cell signaling and their impact on the progression of cancer and cardiac disease; a Binghamton University study into ways to "de-risk" drug development programs for muscular dystrophy; a University at Buffalo project to develop a cost-effective blood test to detect potential brain aneurysms; and a Stony Brook University project to prevent and mitigate future infectious disease outbreaks.

17. RF next anticipates to draw funds on or around February 14, 2025.  At that time, the reduced Indirect Cost rate will result in a loss of over $600,000 for recovery of costs SUNY has incurred in just the last two weeks.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 9th day of February, 2025, in Albany, New York.


/s/ *Ben Friedman*
Ben Friedman
Chief Operating Officer
The Research Foundation for The State
University of New York

5

# Friedman Declaration

# Exhibit A

| FEDERAL FACILITIES AND ADMINISTRATIVE COST RATES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Applied to a Modified Total Direct Cost Base (Longform Schools) | | | | | | | | |
| Location | Effective Date | Research (On-campus) | DOD Research (On-campus) | DOD Research (Off-campus) | Instruction (On-campus) | Other Sponsored Activities (On-campus) | IPA | Other |
| Albany | 7/1/23-6/30/24 | 56.5 | 60.5 | 30.0 | 55.0 | 33.0 | 8.0 | |
| SUNYPoly (CNSE) *(SUNYIT see below)* | 7/1/23-6/30/27 | 54.5 | 56.5 | 29.0 | 45.0 | - | 9.0 | |
| Binghamton | 7/1/23-6/30/24 | 57.0 | 60.0 | 29.0 | 50.0 | 38.0 | 9.0 | 19.2 (A) |
| | 7/1/24-6/30/25 | 58.0 | 61.0 | 29.0 | 51.0 | 38.0 | 9.0 | 20.0 (A) |
| | 7/1/25-6/30/26 | 58.5 | 61.5 | 29.0 | 51.0 | 38.0 | 9.0 | 20.0 (A) |
| | 7/1/26-6/30/27 | 59.5 | 62.5 | 29.0 | 51.0 | 38.0 | 9.0 | 20.0 (A) |
| Buffalo | 7/1/24-6/30/25 | 61.0 | 64.0 | 29.0 | 55.5 | 42.0 | 8.5 | |
| | 7/1/25-6/30/29 | 60.10 | 64.0 | 29.0 | 55.5 | 42.0 | 8.5 | |
| Stony Brook | 7/1/18-6/30/23 | 59.5 | 62.5 | 29.0 | 52.0 | 42.0 | 9.0 | |
| Upstate | 7/1/21-6/30/28 | 63.0 | 66.0 | 29.0 | 55.0 | 34.0 | 12.0 | |
| Downstate | 7/1/24-6/30/25 | 63.0 | 66.0 | 29.0 | 50.0 | 34.0 | 11.0 | |
| | 7/1/25-6/30/29 | 62.20 | 66.0 | 29.0 | 50.0 | 34.0 | 11.0 | |
| SUNY ESF | 7/1/20-6/30/28 | 58.0 | 60.0 | 28.0 | 51.0 | 41.0 | 12.0 | |
| System Admin-Provost | 7/1/21-6/30/28 | 26.5 | 26.5 | - | 26.5 | 26.5 | - | |

(A)  Trade adjustment center

Note:  Off-Campus Rate is 26.0%  on  all programs except  for DOD contracts or otherwise noted

| Applied to a Modified Total Dirct Cost Base (Shortform Schools) | | | | | |
|---|---|---|---|---|---|
| Location | Effective Date | On-campus | Off-campus | IPA | Other |
| Brockport | 7/1/22-6/30/26 | 55.0 | 16.0 | | |
| Buffalo State | 7/1/23-6/30/27 | 52.0 | 20.0 | - | - |
| Cortland | 7/1/21-6/30/25 | 59.7 | 19.8 | - | - |
| | 7/1/25-6/30/29 | 59.5 | 19.8 | - | - |
| Fredonia | 7/1/21-6/30/25 | 59.1 | 16.7 | - | - |
| | 7/1/25-6/30/29 | 59.0 | 16.7 | - | - |
| Geneseo | 7/1/16-6/30/24 | 57.0 | 22.0 | | |
| New Paltz | 7/1/22-6/30/26 | 60.0 | 19.0 | - | - |
| Old Westbury | 7/1/21-6/30/25 | 59.7 | 20.7 | - | - |
| | 7/1/25-6/30/29 | 59.6 | 20.7 | - | - |
| Oneonta | 7/1/22-6/30/26 | 60.0 | 22.0 | - | - |
| Optometry | 7/1/22-6/30/26 | 63.5 | 27.4 | - | - |
| Oswego | 7/1/21-6/30/25 | 59.0 | 16.3 | 4.0 | - |
| | 7/1/25-6/30/29 | 58.8 | 16.3 | 4.0 | - |
| Plattsburgh | 7/1/22-6/30/26 | 58.5 | 16.0 | - | - |
| Potsdam | 7/1/21-6/30/25 | 59.0 | 19.3 | - | - |
| | 7/1/25-6/30/29 | 58.7 | 19.3 | - | - |
| Purchase | 7/1/22-6/30/26 | 63.0 | 21.0 | - | - |
| SUNYPoly (SUNYIT) | 7/1/22-6/30/23 | 58.0 | 26.0 | - | - |
| | 7/1/23-6/30/27 | 59.0 | 26.0 | - | - |
| Empire | 7/1/21-6/30/25 | 39.0 | 25.3 | - | - |
| | 7/1/25-6/30/29 | 38.9 | 25.3 | - | - |
| Alfred | 7/1/23-6/30/27 | 59.0 | 26.0 | - | - |
| Canton | 7/1/22-6/30/26 | 63.0 | 22.0 | | |
| Cobleskill | 7/1/22-6/30/26 | 62.0 | 26.0 | - | - |
| Delhi | 7/1/23-6/30/27 | 56.5 | 17.0 | - | - |
| Farmingdale | 7/1/21-6/30/25 | 59.3 | 17.3 | - | - |
| | 7/1/25-6/30/29 | 59.3 | 17.3 | - | - |
| Morrisville | 7/1/20-6/30/24 | 56.0 | 15.0 | - | - |

**J.A. 260**

Friedman Declaration

Exhibit B

J.A. 261

# COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN: 1146013200F5

ORGANIZATION:
RFSUNY and SUNY at Binghamton
35 State Street, 3rd Floor
Albany, NY 12207-2826

Date: 04/15/2024

FILING REF.: The preceding
agreement was dated
10/17/2023

The rates approved in this agreement are for use on grants, contracts and other agreements with the Federal Government, subject to the conditions in Section III.

## SECTION I: INDIRECT COST RATES

RATE TYPES:     FIXED     FINAL     PROV. (PROVISIONAL)     PRED. (PREDETERMINED)

|       | EFFECTIVE PERIOD | | | | |
|-------|------------|------------|---------|------------|---------|
| TYPE  | FROM       | TO         | RATE(%) | LOCATION   | APPLICABLE TO |
| PRED. | 07/01/2023 | 06/30/2024 | 57.00   | On-Campus  | Research |
| PRED. | 07/01/2024 | 06/30/2025 | 58.00   | On-Campus  | Research |
| PRED. | 07/01/2025 | 06/30/2026 | 58.50   | On-Campus  | Research |
| PRED. | 07/01/2026 | 06/30/2027 | 59.50   | On-Campus  | Research |
| PRED. | 07/01/2023 | 06/30/2027 | 26.00   | Off-Campus | Research |
| PRED. | 07/01/2023 | 06/30/2024 | 50.00   | On-Campus  | Instruction |
| PRED. | 07/01/2024 | 06/30/2027 | 51.00   | On-Campus  | Instruction |
| PRED. | 07/01/2023 | 06/30/2027 | 26.00   | Off-Campus | Instruction |
| PRED. | 07/01/2023 | 06/30/2027 | 38.00   | On-Campus  | Other Sponsored Activities |
| PRED. | 07/01/2023 | 06/30/2027 | 26.00   | Off-Campus | Other Sponsored Activities |
| PRED. | 07/01/2023 | 06/30/2024 | 60.00   | On-Campus  | Research DOD Contract |
| PRED. | 07/01/2024 | 06/30/2025 | 61.00   | On-Campus  | Research DOD Contract |
| PRED. | 07/01/2025 | 06/30/2026 | 61.50   | On-Campus  | Research DOD Contract |
| PRED. | 07/01/2026 | 06/30/2027 | 62.50   | On-Campus  | Research DOD Contract |
| PRED. | 07/01/2023 | 06/30/2027 | 29.00   | Off-Campus | Research DOD Contract |
| PRED. | 07/01/2023 | 06/30/2024 | 19.20   | On-Campus  | Trade Adj. Asst. Ctr. |
| PRED. | 07/01/2024 | 06/30/2027 | 20.00   | On-Campus  | Trade Adj. Asst. Ctr. |
| PRED. | 07/01/2023 | 06/30/2027 | 9.00    | On-Campus  | IPA (A) |
| PROV. | 07/01/2027 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending Jun 30, 2027 |

*BASE

ORGANIZATION: RFSUNY and SUNY at Binghamton
AGREEMENT DATE: 04/15/2024

Modified total direct costs, consisting of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). Modified total direct costs shall exclude equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect costs, and with the approval of the cognizant agency for indirect costs.

_____

(A) See Special Remarks (6)

ORGANIZATION: RFSUNY and SUNY at Binghamton
AGREEMENT DATE: 04/15/2024

## SECTION I: FRINGE BENEFIT RATES**

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| FIXED | 7/1/2023 | 6/30/2024 | 40.00 | All | Regular Employees |
| FIXED | 7/1/2023 | 6/30/2024 | 28.00 | All | Post Doctorals |
| FIXED | 7/1/2023 | 6/30/2024 | 14.00 | All | Summer Employees |
| FIXED | 7/1/2023 | 6/30/2024 | 13.00 | All | Graduate Students |
| FIXED | 7/1/2023 | 6/30/2024 | 6.00 | All | Undergraduate Student |
| FIXED | 7/1/2024 | 6/30/2025 | 39.50 | All | Regular Employees |
| FIXED | 7/1/2024 | 6/30/2025 | 31.00 | All | Post Doctorals |
| FIXED | 7/1/2024 | 6/30/2025 | 14.00 | All | Summer Employees |
| FIXED | 7/1/2024 | 6/30/2025 | 13.00 | All | Graduate Students |
| FIXED | 7/1/2024 | 6/30/2025 | 5.50 | All | Undergraduate Student |
| PROV. | 7/1/2025 | 6/30/2028 | 39.50 | All | Regular Employees |
| PROV. | 7/1/2025 | 6/30/2028 | 33.00 | All | Post Doctorals |
| PROV. | 7/1/2025 | 6/30/2028 | 14.50 | All | Summer Employees |
| PROV. | 7/1/2025 | 6/30/2028 | 13.50 | All | Graduate Students |
| PROV. | 7/1/2025 | 6/30/2028 | 5.50 | All | Undergraduate Student |

## ** DESCRIPTION OF FRINGE BENEFITS RATE BASE:

Salaries and wages.

ORGANIZATION: RFSUNY and SUNY at Binghamton
AGREEMENT DATE: 04/15/2024

## SECTION II: SPECIAL REMARKS

TREATMENT OF FRINGE BENEFITS:
The fringe benefits are charged using the rate(s) listed in the Fringe Benefits Section of this Agreement.
The fringe benefits included in the rate(s) are listed below.

ORGANIZATION: RFSUNY and SUNY at Binghamton
AGREEMENT DATE: 04/15/2024

1. These Facilities and Administrative cost rates apply when grants and contracts are awarded jointly to Research Foundation for SUNY and SUNY at Binghamton.

2. For all activities performed in facilities not owned or leased by the institution or to which rent is directly allocated to the project(s), the off–campus rate will apply. Grants or contracts will not be subject to more than one Facilities and Administrative cost rate. If more than 50% of a project is performed off–campus, the off–campus rate will apply to the entire project.

3. The fringe benefit costs listed below are reimbursed to the grantee through the direct fringe benefit rates applicable to Research Foundation employees: Retiree Health Insurance, Retirement Expense, Social Security, NYS Unemployment Insurance, NYS Disability Insurance, Group Health Insurance, Group Life Insurance, Long Term Disability Insurance, Workers' Compensation, Dental Insurance, Vacation & Sick Leave*, and Vision Benefits

*This component consists of payments for accrued unused vacation leave made in accordance with the Research Foundation Leave Policy to employees who have terminated, changed accruing status, or transferred. It also includes payments for absences over 30 calendar–days that are charged to sick leave.

The fringe benefit costs for State University of New York employees are charged utilizing the New York State fringe benefit rate for federal funds. This approved rate is contained in the New York State–Wide Cost Allocation Plan. This rate includes the following costs: Social Security, Retirement, Health Insurance, Unemployment Benefits, Workers' Compensation, Survivors' Benefits, Dental Insurance, Employee Benefit Funds, and Vision Benefits.

4. Equipment means tangible personal property (including information technology systems) having a useful life of more than one year and a per–unit acquisition cost which equals or exceeds $5,000.

5. Treatment of Paid Absences: *Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal cost for salaries and wages. Separate claims for the cost of these paid absences are not made.

6. This rate applies to positions covered under the Intergovernmental Personnel Act (IPA) Mobility Program. This rate includes the applicable administrative costs only.

7. Your next IDC proposal based on actual costs for the fiscal year ending 06/30/2026 is due in our office by 12/31/2026, and your next FB proposal based on actual costs for the fiscal year ending 06/30/2024 is due in our office by 12/31/2024.

8. This rate agreement updates fringe benefit rates only.

**J.A. 266**

ORGANIZATION: RFSUNY and SUNY at Binghamton
AGREEMENT DATE: 04/15/2024

# SECTION III: GENERAL

A.  <u>LIMITATIONS:</u>

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its indirect cost pool as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as indirect costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B.  <u>ACCOUNTING CHANGES:</u>

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from indirect to direct. Failure to obtain approval may result in cost disallowances.

C.  <u>FIXED RATES:</u>

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D.  <u>USE BY OTHER FEDERAL AGENCIES:</u>

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E.  <u>OTHER:</u>

If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

## BY THE INSTITUTION:

RFSUNY and SUNY at Binghamton
_____
(INSTITUTION)

DocuSigned by:

*David Martin*
_____
(SIGNATURE)          C8FC256F18C2403...

David Martin
_____
(NAME)

Associate Director of Cost Accounting
_____
(TITLE)

6/11/2024
_____
(DATE)

## ON BEHALF OF THE GOVERNMENT:

DEPARTMENT OF HEALTH AND HUMAN SERVICES
_____
(AGENCY)

Darryl W. Mayes -S    Digitally signed by Darryl W. Mayes -S
Date: 2024.06.07 15:03:53 -04'00'
_____
(SIGNATURE)

Darryl W. Mayes
_____
(NAME)

Deputy Director, Cost Allocation Services
_____
(TITLE)

04/15/2024
_____
(DATE)

HHS REPRESENTATIVE:  Ryan McCarthy

TELEPHONE:  (212) 264-2069

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Binghamton**

| FY Covered by Rate: | 7/1/23- |
|---|---|
| **Rate type:  Predetermined** | **06/30/27** |

**Rate Component**

| | | |
|---|---|---|
| 1. Depreciation - Bldgs & Improvements | 0.0% | |
| 2. Depreciation - Equipment | 0.0% | |
| 3. Operation & Maintenance | 0.0% | |
| 4. Interest | 0.0% | |
| 5. Library | 0.0% | |
| 6. General Administration | 0.0% | * |
| 7. Departmental Administration | 26.0% | * |
| 8. Sponsored Funds Administration | 0.0% | * |
| 9. Utility Cost Adjustment | 0.0% | |
| Published Off-Campus Rate - Research | 26.0% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**



Name    *David Martin*
DocuSigned by:
C8FC256F18C2403...

Title    Associate Director of Cost Accounting

Date    2/6/2024

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Binghamton**

| FY Covered by Rate:<br>Rate type:  Predetermined | 7/1/23-<br>06/30/24 | 7/1/24-<br>06/30/25 | 7/1/25-<br>06/30/26 | 7/1/26-<br>06/30/27 | |
|---|---|---|---|---|---|
| **Rate Component** | | | | | |
| 1. Depreciation - Bldgs & Improvements | 5.0% | 5.0% | 5.0% | 5.0% | |
| 2. Depreciation - Equipment | 4.0% | 4.0% | 4.0% | 4.0% | |
| 3. Operation & Maintenance | 17.7% | 18.7% | 19.2% | 20.2% | |
| 4. Interest | 4.0% | 4.0% | 4.0% | 4.0% | |
| 5. Library | 2.0% | 2.0% | 2.0% | 2.0% | |
| 6. General Administration | 0.0% | 0.0% | 0.0% | 0.0% | * |
| 7. Departmental Administration | 26.0% | 26.0% | 26.0% | 26.0% | * |
| 8. Sponsored Funds Administration | 0.0% | 0.0% | 0.0% | 0.0% | * |
| 9. Utility Cost Adjustment | 1.3% | 1.3% | 1.3% | 1.3% | |
| **Published On-Campus Rate- Research DOD** | 60.0% | 61.0% | 61.5% | 62.5% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

Name 

DocuSigned by:
*David Martin*
C8FC256F18C2403...

Title   Associate Director of Cost Accounting

Date   2/6/2024

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Binghamton**

| | |
|---|---|
| **FY Covered by Rate:** | **7/1/23-** |
| **Rate type:  Predetermined** | **06/30/24** |

**Rate Component**

| | | |
|---|---|---|
| **1. Depreciation - Bldgs & Improvements** | **0.0%** | |
| **2. Depreciation - Equipment** | **0.0%** | |
| **3. Operation & Maintenance** | **0.0%** | |
| **4. Interest** | **0.0%** | |
| **5. Library** | **0.0%** | |
| **6. General Administration** | **0.0%** | * |
| **7. Departmental Administration** | **29.0%** | * |
| **8. Sponsored Funds Administration** | **0.0%** | * |
| **9. Utility Cost Adjustment** | **0.0%** | |
| **Published Off-Campus Rate- Research DOD** | **29.0%** | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**



| | |
|---|---|
| Name | *David Martin* <br> DocuSigned by: <br> C8FC256F18C2403... |
| Title | Associate Director of Cost Accounting |
| Date | 2/6/2024 |

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Binghamton**

| FY Covered by Rate: | 7/1/23- |
| Rate type:  Predetermined | 06/30/27 |

**Rate Component**

| | | |
|---|---|---|
| 1. Depreciation - Bldgs & Improvements | 3.1% | |
| 2. Depreciation - Equipment | 0.1% | |
| 3. Operation & Maintenance | 6.6% | |
| 4. Interest | 0.7% | |
| 5. Library | 1.5% | |
| 6. General Administration | 0.0% | * |
| 7. Departmental Administration | 26.0% | * |
| 8. Sponsored Funds Administration | 0.0% | * |
| 9. Student Services | 0.0% | |
| Published On-Campus Rate - OSA | 38.0% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**



Name — DocuSigned by: *David Martin*
C8FC256F18C2403...

Title — Associate Director of Cost Accounting

Date — 2/6/2024

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Binghamton**

| | |
|---|---|
| **FY Covered by Rate:** | **7/1/23-** |
| **Rate type:  Predetermined** | **06/30/27** |

**Rate Component**

| | | |
|---|---|---|
| **1. Depreciation - Bldgs & Improvements** | **0.0%** | |
| **2. Depreciation - Equipment** | **0.0%** | |
| **3. Operation & Maintenance** | **0.0%** | |
| **4. Interest** | **0.0%** | |
| **5. Library** | **0.0%** | |
| **6. General Administration** | **0.0%** | * |
| **7. Departmental Administration** | **26.0%** | * |
| **8. Sponsored Funds Administration** | **0.0%** | * |
| **9. Student Services** | **0.0%** | |
| **Published Off-Campus Rate - OSA** | **26.0%** | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**



Name    *David Martin*
DocuSigned by:
C8FC256F18C2403...

Title    Associate Director of Cost Accounting

Date    2/6/2024

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Binghamton**

| FY Covered by Rate: Rate type: Predetermined | 7/1/23-06/30/24 | 7/1/24-06/30/27 | |
|---|---|---|---|
| **Rate Component** | | | |
| 1. Depreciation - Bldgs & Improvements | 7.0% | 7.0% | |
| 2. Depreciation - Equipment | 0.7% | 0.7% | |
| 3. Operation & Maintenance | 8.8% | 9.8% | |
| 4. Interest | 3.1% | 3.1% | |
| 5. Library | 4.4% | 4.4% | |
| 6. General Administration | 0.0% | 0.0% | * |
| 7. Departmental Administration | 26.0% | 26.0% | * |
| 8. Sponsored Funds Administration | 0.0% | 0.0% | * |
| 9. Student Services | 0.0% | 0.0% | |
| Published On-Campus Rate- Instruction | 50.0% | 51.0% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**



Name    *David Martin*
   DocuSigned by:
   C8FC256F18C2403...

Title    Associate Director of Cost Accounting

Date    2/6/2024

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Binghamton**

| | |
|---|---|
| **FY Covered by Rate:** | **7/1/23-** |
| **Rate type:  Predetermined** | **06/30/27** |

**Rate Component**

| | | |
|---|---|---|
| **1. Depreciation - Bldgs & Improvements** | **0.0%** | |
| **2. Depreciation - Equipment** | **0.0%** | |
| **3. Operation & Maintenance** | **0.0%** | |
| **4. Interest** | **0.0%** | |
| **5. Library** | **0.0%** | |
| **6. General Administration** | **0.0%** | * |
| **7. Departmental Administration** | **26.0%** | * |
| **8. Sponsored Funds Administration** | **0.0%** | * |
| **9. Student Services** | **0.0%** | |
| **Published Off-Campus Rate- Instruction** | **26.0%** | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

| | |
|---|---|
| Name | *David Martin* |
| | DocuSigned by: |
| | C8FC256F18C2403... |
| Title | Associate Director of Cost Accounting |
| Date | 2/6/2024 |

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Binghamton**

| FY Covered by Rate:<br>Rate type:  Predetermined | 7/1/23-<br>06/30/24 | 7/1/24-<br>06/30/27 | |
|---|---|---|---|
| **Rate Component** | | | |
| 1. Depreciation - Bldgs & Improvements | 0.0% | 0.0% | |
| 2. Depreciation - Equipment | 0.0% | 0.0% | |
| 3. Operation & Maintenance | 0.0% | 0.0% | |
| 4. Interest | 0.0% | 0.0% | |
| 5. Library | 0.0% | 0.0% | |
| 6. General Administration | 9.0% | 9.0% | * |
| 7. Departmental Administration | 0.0% | 0.0% | * |
| 8. Sponsored Funds Administration | 10.2% | 11.0% | * |
| 9. Student Services | 0.0% | 0.0% | |
| **Published On-Campus Rate - TAAC** | 19.2% | 20.0% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

Name ⎰ *David Martin*
    DocuSigned by:
    C8FC256F18C2403...

Title    Associate Director of Cost Accounting

Date    2/6/2024

**Components of Published Facilities & Administrative Cost Ra**

**Institution : RFSUNY and SUNY at Binghamton**

| | |
|---|---|
| **FY Covered by Rate:** | 7/1/23- |
| **Rate type:  Predetermined** | 06/30/27 |

**Rate Component**

| | | |
|---|---|---|
| **1. Depreciation - Bldgs & Improvements** | **0.0%** | |
| **2. Depreciation - Equipment** | **0.0%** | |
| **3. Operation & Maintenance** | **0.0%** | |
| **4. Interest** | **0.0%** | |
| **5. Library** | **0.0%** | |
| **6. General Administration** | **1.2%** | * |
| **7. Departmental Administration** | **0.0%** | * |
| **8. Sponsored Funds Administration** | **7.8%** | * |
| **9. Student Services** | **0.0%** | |
| **Published Rate - IPA** | **9.0%** | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform G**
**Costs Identification and Assignment, and Rate Determination**
**Education (IHEs), C.8. dated December 26, 2013.**



| | |
|---|---|
| **Name** | David Martin |
| | DocuSigned by: |
| | C8FC256F18C2403... |
| **Title** | Associate Director of Cost Accounting |
| **Date** | 2/6/2024 |

# Friedman Declaration

# Exhibit C

# COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN: 1146013200F7

ORGANIZATION:
RFSUNY and SUNY at Stony Brook
35 State Street
Albany, NY 12207-2826

Date: 04/15/2024

FILING REF.: The preceding
agreement was dated
04/27/2023

The rates approved in this agreement are for use on grants, contracts and other agreements with the Federal Government, subject to the conditions in Section III.

## SECTION I: INDIRECT COST RATES

RATE TYPES:       FIXED     FINAL     PROV. (PROVISIONAL)          PRED. (PREDETERMINED)

|       | EFFECTIVE PERIOD | | | | |
| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| PROV. | 07/01/2023 | Until Amended | 59.50 | On-Campus | Research |
| PROV. | 07/01/2023 | Until Amended | 26.00 | Off-Campus | Research |
| PROV. | 07/01/2023 | Until Amended | 62.50 | On-Campus | Research DOD Contract |
| PROV. | 07/01/2023 | Until Amended | 29.00 | Off-Campus | Research DOD Contract |
| PROV. | 07/01/2023 | Until Amended | 52.00 | On-Campus | Instruction |
| PROV. | 07/01/2023 | Until Amended | 26.00 | Off-Campus | Instruction |
| PROV. | 07/01/2023 | Until Amended | 42.00 | On-Campus | Other Sponsored Programs |
| PROV. | 07/01/2023 | Until Amended | 26.00 | Off-Campus | Other Sponsored Programs |
| PROV. | 07/01/2023 | Until Amended | 9.00 | All | IPA (A) |

*BASE

Modified total direct costs, consisting of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). Modified total direct costs shall exclude equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect costs, and with the approval of the cognizant agency for indirect costs.

------------------------------

(A) See Special Remarks (6)

ORGANIZATION: RFSUNY and SUNY at Stony Brook
AGREEMENT DATE: 04/15/2024

## SECTION I: FRINGE BENEFIT RATES**

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| FIXED | 7/1/2023 | 6/30/2024 | 40.00 | All | Regular Employees |
| FIXED | 7/1/2023 | 6/30/2024 | 28.00 | All | Post Doctorals |
| FIXED | 7/1/2023 | 6/30/2024 | 14.00 | All | Summer Employees |
| FIXED | 7/1/2023 | 6/30/2024 | 13.00 | All | Graduate Students |
| FIXED | 7/1/2023 | 6/30/2024 | 6.00 | All | Undergraduate Student |
| FIXED | 7/1/2024 | 6/30/2025 | 39.50 | All | Regular Employees |
| FIXED | 7/1/2024 | 6/30/2025 | 31.00 | All | Post Doctorals |
| FIXED | 7/1/2024 | 6/30/2025 | 14.00 | All | Summer Employees |
| FIXED | 7/1/2024 | 6/30/2025 | 13.00 | All | Graduate Students |
| FIXED | 7/1/2024 | 6/30/2025 | 5.50 | All | Undergraduate Student |
| PROV. | 7/1/2025 | 6/30/2028 | 39.50 | All | Regular Employees |
| PROV. | 7/1/2025 | 6/30/2028 | 33.00 | All | Post Doctorals |
| PROV. | 7/1/2025 | 6/30/2028 | 14.50 | All | Summer Employees |
| PROV. | 7/1/2025 | 6/30/2028 | 13.50 | All | Graduate Students |
| PROV. | 7/1/2025 | 6/30/2028 | 5.50 | All | Undergraduate Student |

** DESCRIPTION OF FRINGE BENEFITS RATE BASE:

Salaries and wages.

ORGANIZATION: RFSUNY and SUNY at Stony Brook
AGREEMENT DATE: 04/15/2024

## SECTION II: SPECIAL REMARKS

<u>TREATMENT OF FRINGE BENEFITS:</u>
The fringe benefits are charged using the rate(s) listed in the Fringe Benefits Section of this Agreement.
The fringe benefits included in the rate(s) are listed below.

ORGANIZATION: RFSUNY and SUNY at Stony Brook
AGREEMENT DATE: 04/15/2024

1. These Facilities and Administrative cost rates apply when grants and contracts are awarded jointly to Research Foundation for SUNY and SUNY at Stonybrook.

2. OFF–CAMPUS DEFINITION: For all activities performed in facilities not owned or leased by the institution or to which rent is directly allocated to the project(s), the off–campus rate will apply. Grants or contracts will not be subject to more than one Facilities and Administrative cost rate. If more than 50% of a project is performed off–campus, the off–campus rate will apply to the entire project.

3. The fringe benefit costs listed below are reimbursed to the grantee through the direct fringe benefit rates applicable to Research Foundation employees: Retiree Health Insurance, Retirement Expense, Social Security, NYS Unemployment Insurance, NYS Disability Insurance, Group Health Insurance, Group Life Insurance, Long Term Disability Insurance, Workers' Compensation, Dental Insurance, Vacation & Sick Leave*, and Vision Benefits.

*This component consists of payments for accrued unused vacation leave made in accordance with the Research Foundation Leave Policy to employees who have terminated, changed accruing status, or transferred. It also includes payments for absences over 30 calendar–days that are charged to sick leave.

The fringe benefit costs for State University of New York employees are charged utilizing the New York State fringe benefit rate for federal funds. This approved rate is contained in the New York State–Wide Cost Allocation Plan. This rate includes the following costs: Social Security, Retirement, Health Insurance, Unemployment Benefits, Workers' Compensation, Survivors' Benefits, Dental Insurance, Employee Benefit Funds, and Vision Benefits.

4. Equipment means tangible personal property (including information technology systems) having a useful life of more than one year and a per–unit acquisition cost which equals or exceeds $5,000.

5. Treatment of Paid Absences: *Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal cost for salaries and wages. Separate claims for the cost of these paid absences are not made.

6. This rate applies to positions covered under the Intergovernmental Personnel Act (IPA) Mobility Program. This rate includes the applicable administrative costs only.

7. The one year rate extension of the indirect cost rate was granted in accordance with the OMB Memorandum M–20–17.

8. Your next IDC proposal based on actual costs for the fiscal year ending 06/30/2022 is due in our office by 12/31/2022 (proposal in–house), and your next FB proposal based on actual costs for the fiscal year ending 06/30/2024 is due in our office by 12/31/2024.

9. This rate agreement updates the fringe benefit rates only.

ORGANIZATION: RFSUNY and SUNY at Stony Brook
AGREEMENT DATE: 04/15/2024

## SECTION III: GENERAL

A.  <u>LIMITATIONS:</u>

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its indirect cost pool as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as indirect costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B.  <u>ACCOUNTING CHANGES:</u>

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from indirect to direct. Failure to obtain approval may result in cost disallowances.

C.  <u>FIXED RATES:</u>

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D.  <u>USE BY OTHER FEDERAL AGENCIES:</u>

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E.  <u>OTHER:</u>

If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

BY THE INSTITUTION:

ON BEHALF OF THE GOVERNMENT:

RFSUNY and SUNY at Stony Brook
_____
(INSTITUTION)

DEPARTMENT OF HEALTH AND HUMAN SERVICES
_____
(AGENCY)

DocuSigned by:

*David Martin*
_____
(SIGNATURE)    C8FC256F18C2403...

Darryl W. Mayes -S    Digitally signed by Darryl W.
Mayes -S
Date: 2024.06.07 15:09:16 -04'00'
_____
(SIGNATURE)

David Martin
_____
(NAME)

Darryl W. Mayes
_____
(NAME)

Associate Director of Cost Accounting
_____
(TITLE)

Deputy Director, Cost Allocation Services
_____
(TITLE)

6/11/2024
_____
(DATE)

04/15/2024
_____
(DATE)

HHS REPRESENTATIVE:  Ryan McCarthy
_____

TELEPHONE:  (212) 264-2069
_____

**J.A. 282**

RU5711

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Stony Brook**

| FY Covered by Rate:<br>Rate type:  Predetermined | 7/1/19-<br>06/30/23 | |
|---|---|---|
| **Rate Component** | | |
| 1. Depreciation - Bldgs & Improvements | 5.2% | |
| 2. Depreciation - Equipment | 3.0% | |
| 3. Operation & Maintenance | 19.4% | |
| 4. Interest | 3.0% | |
| 5. Library | 1.6% | |
| 6. General Administration | 0.0% | * |
| 7. Departmental Administration | 26.0% | * |
| 8. Sponsored Funds Administration | 0.0% | * |
| 9. Utility Cost Adjustment | 1.3% | |
| Published On-Campus Rate- Research | 59.5% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guida**
**Costs Identification and Assignment, and Rate Determination for**
**Education (IHEs), C.8. dated December 26, 2013.**

Name

DocuSigned by:
Chris Wade
18AE92672369483...

Title        Senior Director Cost Accounting and Procurement

Date         6/23/2020

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Stony Brook**

| | |
|---|---|
| **FY Covered by Rate:** | **7/1/19-** |
| **Rate type:  Predetermined** | **06/30/23** |

**Rate Component**

| | | |
|---|---|---|
| **1. Depreciation - Bldgs & Improvements** | **0.0%** | |
| **2. Depreciation - Equipment** | **0.0%** | |
| **3. Operation & Maintenance** | **0.0%** | |
| **4. Interest** | **0.0%** | |
| **5. Library** | **0.0%** | |
| **6. General Administration** | **0.0%** | * |
| **7. Departmental Administration** | **26.0%** | * |
| **8. Sponsored Funds Administration** | **0.0%** | * |
| **9. Utility Cost Adjustment** | **0.0%** | |
| **Published Off-Campus Rate - Research** | **26.0%** | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**



Name

    Senior Director Cost Accounting and Procurement

Title

    Date        6/23/2020

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Stony Brook**

| FY Covered by Rate: | 7/1/19- |
|---|---|
| Rate type:  Predetermined | 06/30/23 |

**Rate Component**

| Rate Component | | |
|---|---|---|
| 1. Depreciation - Bldgs & Improvements | 5.2% | |
| 2. Depreciation - Equipment | 3.0% | |
| 3. Operation & Maintenance | 19.4% | |
| 4. Interest | 3.0% | |
| 5. Library | 1.6% | |
| 6. General Administration | 10.3% | * |
| 7. Departmental Administration | 11.0% | * |
| 8. Sponsored Funds Administration | 7.7% | * |
| 9. Utility Cost Adjustment | 1.3% | |
| Published On-Campus Rate- Research DOD | 62.5% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

Name


Title    Senior Director Cost Accounting and Procurement

Date    6/23/2020

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Stony Brook**

| FY Covered by Rate: | 7/1/19- |
| Rate type:  Predetermined | 06/30/23 |

**Rate Component**

| | | |
|---|---|---|
| 1. Depreciation - Bldgs & Improvements | 0.0% | |
| 2. Depreciation - Equipment | 0.0% | |
| 3. Operation & Maintenance | 0.0% | |
| 4. Interest | 0.0% | |
| 5. Library | 0.0% | |
| 6. General Administration | 10.3% | * |
| 7. Departmental Administration | 11.0% | * |
| 8. Sponsored Funds Administration | 7.7% | * |
| 9. Utility Cost Adjustment | 0.0% | |
| Published Off-Campus Rate- Research DOD | 29.0% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**



Name

      Senior Director Cost Accounting and Procurement

Title

      6/23/2020

Date

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Stony Brook**

| FY Covered by Rate: | 7/1/19- |
|---|---|
| Rate type:  Predetermined | 06/30/23 |

**Rate Component**

| | | |
|---|---|---|
| 1. Depreciation - Bldgs & Improvements | 2.6% | |
| 2. Depreciation - Equipment | 1.8% | |
| 3. Operation & Maintenance | 9.2% | |
| 4. Interest | 0.9% | |
| 5. Library | 1.5% | |
| 6. General Administration | 0.0% | * |
| 7. Departmental Administration | 26.0% | * |
| 8. Sponsored Funds Administration | 0.0% | * |
| 9. Student Services | 0.0% | |
| Published On-Campus Rate - OSP | 42.0% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

**Name**        DocuSigned by:
                *Chris Wade*
                18AE92672369483...

**Title**    Senior Director Cost Accounting and Procurement

**Date**        6/23/2020

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Stony Brook**

| | | |
|---|---|---|
| **FY Covered by Rate:** | **7/1/19-** | |
| **Rate type:  Predetermined** | **06/30/23** | |

**Rate Component**

| | | |
|---|---|---|
| **1. Depreciation - Bldgs & Improvements** | **0.0%** | |
| **2. Depreciation - Equipment** | **0.0%** | |
| **3. Operation & Maintenance** | **0.0%** | |
| **4. Interest** | **0.0%** | |
| **5. Library** | **0.0%** | |
| **6. General Administration** | **0.0%** | * |
| **7. Departmental Administration** | **26.0%** | * |
| **8. Sponsored Funds Administration** | **0.0%** | * |
| **9. Student Services** | **0.0%** | |
| **Published Off-Campus Rate - OSP** | **26.0%** | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

DocuSigned by:

*Chris Wade*

18AE92672369483...

Name _____

Senior Director Cost Accounting and Procurement

Title _____

6/23/2020

Date _____

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Stony Brook**

| | |
|---|---|
| **FY Covered by Rate:** | **7/1/19-** |
| **Rate type:  Predetermined** | **06/30/23** |

**Rate Component**

| | | |
|---|---|---|
| **1. Depreciation - Bldgs & Improvements** | **4.3%** | |
| **2. Depreciation - Equipment** | **0.6%** | |
| **3. Operation & Maintenance** | **12.0%** | |
| **4. Interest** | **1.6%** | |
| **5. Library** | **7.5%** | |
| **6. General Administration** | **0.0%** | * |
| **7. Departmental Administration** | **26.0%** | * |
| **8. Sponsored Funds Administration** | **0.0%** | * |
| **9. Student Services** | **0.0%** | |
| **Published On-Campus Rate- Instruction** | **52.0%** | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

**Name**
DocuSigned by:
*Chris Wade*
18AE92672369483...

**Title**   Senior Director Cost Accounting and Procurement

**Date**   6/23/2020

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Stony Brook**

| **FY Covered by Rate:** | **7/1/19-** |
| **Rate type:  Predetermined** | **06/30/23** |

**Rate Component**

| | | |
|---|---|---|
| 1. Depreciation - Bldgs & Improvements | 0.0% | |
| 2. Depreciation - Equipment | 0.0% | |
| 3. Operation & Maintenance | 0.0% | |
| 4. Interest | 0.0% | |
| 5. Library | 0.0% | |
| 6. General Administration | 0.0% | * |
| 7. Departmental Administration | 26.0% | * |
| 8. Sponsored Funds Administration | 0.0% | * |
| 9. Student Services | 0.0% | |
| **Published Off-Campus Rate- Instruction** | **26.0%** | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

DocuSigned by:

*Chris Wade*

18AE92672369483...

**Name**

Senior Director Cost Accounting and Procurement

**Title**

6/23/2020

**Date**

**Components of Published Facilities & Administrative Cost R**

**Institution : RFSUNY and SUNY at Stony Brook**

| | |
|---|---|
| **FY Covered by Rate:** | **7/1/19-** |
| **Rate type:  Predetermined** | **06/30/23** |

**Rate Component**

| | | |
|---|---|---|
| **1. Depreciation - Bldgs & Improvement** | **0.0%** | |
| **2. Depreciation - Equipment** | **0.0%** | |
| **3. Operation & Maintenance** | **0.0%** | |
| **4. Interest** | **0.0%** | |
| **5. Library** | **0.0%** | |
| **6. General Administration** | **1.4%** | * |
| **7. Departmental Administration** | **0.0%** | * |
| **8. Sponsored Funds Administration** | **7.6%** | * |
| **9. Student Services** | **0.0%** | |
| **Published Rate - IPA** | **9.0%** | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform G**

**Costs Identification and Assignment, and Rate Determinatior**

**Education (IHEs), C.8. dated December 26, 2013.**

DocuSigned by:

*Chris Wade*

18AE92672369483...

**Name**

Senior Director Cost Accounting and Procurement

**Title**

6/23/2020

**Date**

Friedman Declaration

Exhibit D

## COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN: 1146013200F3

ORGANIZATION:
RFSUNY and SUNY at Albany
35 State Street, 3rd Floor
Albany, NY 12207-2826

Date: 04/15/2024

FILING REF.: The preceding
agreement was dated
04/27/2023

The rates approved in this agreement are for use on grants, contracts and other agreements with the Federal Government, subject to the conditions in Section III.

## SECTION I: INDIRECT COST RATES

RATE TYPES:      FIXED     FINAL     PROV. (PROVISIONAL)          PRED. (PREDETERMINED)

| TYPE | EFFECTIVE PERIOD FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|------|------|------|------|
| PRED. | 07/01/2023 | 06/30/2024 | 56.50 | On-Campus | Research |
| PRED. | 07/01/2023 | 06/30/2024 | 26.00 | Off-Campus | Research |
| PRED. | 07/01/2023 | 06/30/2024 | 55.00 | On-Campus | Instruction |
| PRED. | 07/01/2023 | 06/30/2024 | 26.00 | Off-Campus | Instruction |
| PRED. | 07/01/2023 | 06/30/2024 | 60.50 | On-Campus | Research DOD Contract |
| PRED. | 07/01/2023 | 06/30/2024 | 30.00 | Off-Campus | Research DOD Contract |
| PRED. | 07/01/2023 | 06/30/2024 | 33.00 | On-Campus | Other Sponsored Activities |
| PRED. | 07/01/2023 | 06/30/2024 | 26.00 | Off-Campus | Other Sponsored Activities |
| PRED. | 07/01/2023 | 06/30/2024 | 8.00 | All | IPA (A) |
| PROV. | 07/01/2024 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending June 30, 2024. |

*BASE

J.A. 293

ORGANIZATION: RFSUNY and SUNY at Albany
AGREEMENT DATE: 04/15/2024

Modified total direct costs, consisting of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). Modified total direct costs shall exclude equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect costs, and with the approval of the cognizant agency for indirect costs.

_____

(A) See Special Remarks (5)

ORGANIZATION: RFSUNY and SUNY at Albany
AGREEMENT DATE: 04/15/2024

## SECTION I: FRINGE BENEFIT RATES**

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| FIXED | 7/1/2023 | 6/30/2024 | 40.00 | All | Regular Employees |
| FIXED | 7/1/2023 | 6/30/2024 | 28.00 | All | Post Doctorals |
| FIXED | 7/1/2023 | 6/30/2024 | 14.00 | All | Summer Employees |
| FIXED | 7/1/2023 | 6/30/2024 | 13.00 | All | Graduate Students |
| FIXED | 7/1/2023 | 6/30/2024 | 6.00 | All | Undergraduate Student |
| FIXED | 7/1/2024 | 6/30/2025 | 39.50 | All | Regular Employees |
| FIXED | 7/1/2024 | 6/30/2025 | 31.00 | All | Post Doctorals |
| FIXED | 7/1/2024 | 6/30/2025 | 14.00 | All | Summer Employees |
| FIXED | 7/1/2024 | 6/30/2025 | 13.00 | All | Graduate Students |
| FIXED | 7/1/2024 | 6/30/2025 | 5.50 | All | Undergraduate Student |
| PROV. | 7/1/2025 | 6/30/2028 | 39.50 | All | Regular Employees |
| PROV. | 7/1/2025 | 6/30/2028 | 33.00 | All | Post Doctorals |
| PROV. | 7/1/2025 | 6/30/2028 | 14.50 | All | Summer Employees |
| PROV. | 7/1/2025 | 6/30/2028 | 13.50 | All | Graduate Students |
| PROV. | 7/1/2025 | 6/30/2028 | 5.50 | All | Undergraduate Student |

** DESCRIPTION OF FRINGE BENEFITS RATE BASE:

Salaries and wages.

ORGANIZATION: RFSUNY and SUNY at Albany
AGREEMENT DATE: 04/15/2024

## SECTION II: SPECIAL REMARKS

TREATMENT OF FRINGE BENEFITS:
The fringe benefits are charged using the rate(s) listed in the Fringe Benefits Section of this Agreement. The fringe benefits included in the rate(s) are listed below.

1. These Facilities and Administrative cost rates apply when grants and contracts are awarded jointly to Research Foundation for SUNY and SUNY at Albany.

2. For all activities performed in facilities not owned or leased by the institution or to which rent is directly allocated to the project(s), the off campus rate will apply. Actual costs will be apportioned between on-campus and off-campus components. Each portion will bear the appropriate rate.

3. The fringe benefit costs listed below are reimbursed to the grantee through the direct fringe benefit rates applicable to Research Foundation employees: Retiree Health Insurance, Retirement Expense, Social Security, NYS Unemployment Insurance, NYS Disability Insurance, Group Health Insurance, Group Life Insurance, Long Term Disability Insurance, Workers' Compensation, Dental Insurance, Vacation & Sick Leave*, and Vision Benefits.

*This component consists of payments for accrued unused vacation leave made in accordance with the Research Foundation Leave Policy to employees who have terminated, changed accruing status, or transferred. It also includes payments for absences over 30 calendar-days that are charged to sick leave.

The fringe benefit costs for State University of New York employees are charged utilizing the New York State fringe benefit rate for federal funds. This approved rate is contained in the New York State-Wide Cost Allocation Plan. This rate includes the following costs: Social Security, Retirement, Health Insurance, Unemployment Benefits, Workers' Compensation, Survivors' Benefits, Dental Insurance, Employee Benefit Funds, and Vision Benefits.

4. Treatment of Paid Absences: *Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal cost for salaries and wages. Separate claims for the cost of these paid absences are not made.

5. This rate applies to positions covered under the Intergovernmental Personnel Act (IPA) Mobility Program. This rate includes the applicable administrative costs only.

6. Equipment means tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds $5,000.

7. Your next IDC proposal based on actual costs for the fiscal year ending 06/30/2023 is due in our office by 12/31/2023, and you next FB proposal based on actual costs for the fiscal year ending 06/30/2024 is due in our office by 12/31/2024.

8. This rate agreement updates fringe benefit rates only.

ORGANIZATION: RFSUNY and SUNY at Albany
AGREEMENT DATE: 04/15/2024

# SECTION III: GENERAL

A.  LIMITATIONS:

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its indirect cost pool as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as indirect costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B.  ACCOUNTING CHANGES:

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from indirect to direct. Failure to obtain approval may result in cost disallowances.

C.  FIXED RATES:

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D.  USE BY OTHER FEDERAL AGENCIES:

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E.  OTHER:

If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

## BY THE INSTITUTION:

RFSUNY and SUNY at Albany
_____
(INSTITUTION)

DocuSigned by:

*David Martin*
_____
(SIGNATURE)            C8FC256F18C2403...

David Martin
_____
(NAME)

Associate Director of Cost Accounting
_____
(TITLE)

6/11/2024
_____
(DATE)

## ON BEHALF OF THE GOVERNMENT:

DEPARTMENT OF HEALTH AND HUMAN SERVICES
_____
(AGENCY)

Darryl W. Mayes -S            Digitally signed by Darryl W. Mayes -S
                             Date: 2024.06.07 14:53:14 -04'00'
_____
(SIGNATURE)

Darryl W. Mayes
_____
(NAME)

Deputy Director, Cost Allocation Services
_____
(TITLE)

04/15/2024
_____
(DATE)

HHS REPRESENTATIVE:  Ryan McCarthy

TELEPHONE:  (212) 264-2069

# Components of Published Facilities and Administrative Cost Rate

**Institution:**                 **RFSUNY and SUNY at Albany**
**FY Covered by Rate:**          **Fiscal Year Ending 6/30/20 - 6/30/24**

| Rate Component | FYE 2020 FINAL | FYE 2021 PRED. | FYE 2022-23 PRED. | FYE 2024 PRED. |
|---|---|---|---|---|
| 1. a. Depreciation - Bldgs & Improvements | 4.70% | 4.70% | 5.90% | 6.00% |
| b. Depreciation - Moveable Equipment | 3.20% | 3.20% | 3.20% | 3.30% |
| 2. Interest | 3.20% | 3.20% | 4.40% | 4.50% |
| 3. Operation & Maintenance | 15.10% | 15.10% | 14.20% | 14.40% |
| 4. General Administration | 0.00% | 0.00% | 0.00% | 0.00% * |
| 5. Departmental Administration | 26.00% | 26.00% | 26.00% | 26.00% * |
| 6. Sponsored Projects Administration | 0.00% | 0.00% | 0.00% | 0.00% * |
| 7. Library | 1.80% | 1.80% | 1.80% | 1.80% |
| 8. Student Services | 0.00% | 0.00% | 0.00% | 0.00% |
| 9. Utility Cost Adjustment | 0.50% | 0.50% | 0.50% | 0.50% |
| **Published On-Campus Rate - Organized Research** | **54.5%** | **54.5%** | **56.0%** | **56.5%** |

* Reflects provisions of Uniform Guidance, Appendix III to Part 200, Section C.8.

Name :   *Chris Wade*
DocuSigned by:
18AE92672369483...

Title:   Senior Director Cost Accounting and Procurement

Date:   3/5/2021

## Components of Published Facilities and Administrative Cost Rate

**Institution:** **RFSUNY and SUNY at Albany**
**FY Covered by Rate:** **Fiscal Year Ending 6/30/20 - 6/30/24**

| Rate Component | FYE 2020 FINAL | FYE 2021 PRED. | FYE 2022-23 PRED. | FYE 2024 PRED. |
|---|---|---|---|---|
| 1. a. Depreciation - Bldgs & Improvements | 4.70% | 4.70% | 5.90% | 6.00% |
| b. Depreciation - Moveable Equipment | 3.20% | 3.20% | 3.20% | 3.30% |
| 2. Interest | 3.20% | 3.20% | 4.40% | 4.50% |
| 3. Operation & Maintenance | 15.10% | 15.10% | 14.20% | 14.40% |
| 4. General Administration | 0.00% | 0.00% | 0.00% | 0.00% |
| 5. Departmental Administration | 30.00% | 30.00% | 30.00% | 30.00% |
| 6. Sponsored Projects Administration | 0.00% | 0.00% | 0.00% | 0.00% |
| 7. Library | 1.80% | 1.80% | 1.80% | 1.80% |
| 8. Student Services | 0.00% | 0.00% | 0.00% | 0.00% |
| 9. Utility Cost Adjustment | 0.50% | 0.50% | 0.50% | 0.50% |
| **Published On-Campus Rate -Research DOD Contracts** | **58.5%** | **58.5%** | **60.0%** | **60.5%** |

Name : *Chris Wade* (DocuSigned by: 18AE92672369483...)

Title: Senior Director Cost Accounting and Procurement

Date: 3/5/2021

# Components of Published Facilities and Administrative Cost Rate

**Institution:**        **RFSUNY and SUNY at Albany**
**FY Covered by Rate:**      **Fiscal Year Ending 6/30/20 - 6/30/24**

| Rate Component | FYE 2020 FINAL | FYE 2021-24 PRED. |
|---|---|---|
| 1. a. Depreciation - Bldgs & Improvements | 0.00% | 0.00% |
| b. Depreciation - Moveable Equipment | 0.00% | 0.00% |
| 2. Interest | 0.00% | 0.00% |
| 3. Operation & Maintenance | 0.00% | 0.00% |
| 4. General Administration | 0.00% | 0.00% * |
| 5. Departmental Administration | 26.00% | 26.00% * |
| 6. Sponsored Projects Administration | 0.00% | 0.00% * |
| 7. Library | 0.00% | 0.00% |
| 8. Student Services | 0.00% | 0.00% |
| 9. Utility Cost Adjustment | 0.00% | 0.00% |
| **Published Off-Campus Rate - Organized Research** | **26.0%** | **26.0%** |

* Reflects provisions of Uniform Guidance, Appendix III to Part 200, Section C.8.

Name :      DocuSigned by: *Chris Wade* — 18AE92672369483...

Title:      Senior Director Cost Accounting and Procurement

Date:      3/5/2021

# Components of Published Facilities and Administrative Cost Rate

**Institution:**          **RFSUNY and SUNY at Albany**
**FY Covered by Rate:**   **Fiscal Year Ending 6/30/20 - 6/30/24**

| Rate Component | FYE 2020 FINAL | FYE 2021-24 PRED. |
|---|---|---|
| 1. a. Depreciation - Bldgs & Improvements | 0.00% | 0.00% |
| b. Depreciation - Moveable Equipment | 0.00% | 0.00% |
| 2. Interest | 0.00% | 0.00% |
| 3. Operation & Maintenance | 0.00% | 0.00% |
| 4. General Administration | 0.00% | 0.00% |
| 5. Departmental Administration | 30.00% | 30.00% |
| 6. Sponsored Projects Administration | 0.00% | 0.00% |
| 7. Library | 0.00% | 0.00% |
| 8. Student Services | 0.00% | 0.00% |
| 9. Utility Cost Adjustment | 0.00% | 0.00% |
| **Published Off-Campus Rate -Research DOD Contracts** | **30.0%** | **30.0%** |

Name :  *Chris Wade*
DocuSigned by:
18AE92672369483...

Title:  Senior Director Cost Accounting and Procurement

Date:  3/5/2021

# Components of Published Facilities and Administrative Cost Rate

**Institution:** **RFSUNY and SUNY at Albany**
**FY Covered by Rate:** **Fiscal Year Ending 6/30/20 - 6/30/24**

| Rate Component | FYE 2020 FINAL | FYE 2021 PRED. | FYE 2022-24 PRED. |
|---|---|---|---|
| 1. a. Depreciation - Bldgs & Improvements | 0.30% | 0.30% | 0.30% |
| b. Depreciation - Moveable Equipment | 0.10% | 0.10% | 0.10% |
| 2. Interest | 0.10% | 0.10% | 0.10% |
| 3. Operation & Maintenance | 4.00% | 4.00% | 5.00% |
| 4. General Administration | 0.00% | 0.00% | 0.00% * |
| 5. Departmental Administration | 26.00% | 26.00% | 26.00% * |
| 6. Sponsored Projects Administration | 0.00% | 0.00% | 0.00% * |
| 7. Library | 1.50% | 1.50% | 1.50% |
| 8. Student Services | 0.00% | 0.00% | 0.00% |
| **Published On-Campus Rate -Other Sponsored Activities** | **32.0%** | **32.0%** | **33.0%** |

\* Reflects provisions of Uniform Guidance, Appendix III to Part 200, Section C.8.

Name : *Chris Wade*
DocuSigned by:
18AE92672369483...

Title: Senior Director Cost Accounting and Procurement

Date: 3/5/2021

# Components of Published Facilities and Administrative Cost Rate

**Institution:**    **RFSUNY and SUNY at Albany**
**FY Covered by Rate:**    **Fiscal Year Ending 6/30/20 - 6/30/24**

| Rate Component | FYE 2020 FINAL | FYE 2021-24 PRED. |
|---|---|---|
| 1. a. Depreciation - Bldgs & Improvements | 0.00% | 0.00% |
| b. Depreciation - Moveable Equipment | 0.00% | 0.00% |
| 2. Interest | 0.00% | 0.00% |
| 3. Operation & Maintenance | 0.00% | 0.00% |
| 4. General Administration | 0.00% | 0.00% * |
| 5. Departmental Administration | 26.00% | 26.00% * |
| 6. Sponsored Projects Administration | 0.00% | 0.00% * |
| 7. Library | 0.00% | 0.00% |
| 8. Student Services | 0.00% | 0.00% |
| **Published Off-Campus Rate -Other Sponsored Activities** | **26.0%** | **26.0%** |

* Reflects provisions of Uniform Guidance, Appendix III to Part 200, Section C.8.

Name :    *Chris Wade*
          DocuSigned by:
          18AE92672369483...

Title:    Senior Director Cost Accounting and Procurement

Date:     3/5/2021

## Components of Published Facilities and Administrative Cost Rate

**Institution:**                    **RFSUNY and SUNY at Albany**
**FY Covered by Rate:**      **Fiscal Year Ending 6/30/20 - 6/30/24**

| Rate Component | FYE 2020 FINAL | FYE 2021 PRED. | FYE 2022-24 PRED. |
|---|---|---|---|
| 1. a. Depreciation - Bldgs & Improvements | 3.10% | 3.10% | 3.90% |
| b. Depreciation - Moveable Equipment | 0.20% | 0.20% | 0.20% |
| 2. Interest | 1.30% | 1.30% | 1.80% |
| 3. Operation & Maintenance | 8.40% | 8.40% | 9.10% |
| 4. General Administration | 0.00% | 0.00% | 0.00% * |
| 5. Departmental Administration | 26.00% | 26.00% | 26.00% * |
| 6. Sponsored Projects Administration | 0.00% | 0.00% | 0.00% * |
| 7. Library | 14.00% | 14.00% | 14.00% |
| 8. Student Services | 0.00% | 0.00% | 0.00% |
| **Published On-Campus Rate -Instruction** | **53.0%** | **53.0%** | **55.0%** |

* Reflects provisions of Uniform Guidance, Appendix III to Part 200, Section C.8.

Name :  *Chris Wade*
DocuSigned by:
18AE92672369483...

Title:  Senior Director Cost Accounting and Procurement

Date:  3/5/2021

# Components of Published Facilities and Administrative Cost Rate

**Institution:**          **RFSUNY and SUNY at Albany**
**FY Covered by Rate:**   **Fiscal Year Ending 6/30/20 - 6/30/24**

| Rate Component | FYE 2020 FINAL | FYE 2021-24 PRED. |
|---|---|---|
| 1. a. Depreciation - Bldgs & Improvements | 0.00% | 0.00% |
| b. Depreciation - Moveable Equipment | 0.00% | 0.00% |
| 2. Interest | 0.00% | 0.00% |
| 3. Operation & Maintenance | 0.00% | 0.00% |
| 4. General Administration | 0.00% | 0.00% * |
| 5. Departmental Administration | 26.00% | 26.00% * |
| 6. Sponsored Projects Administration | 0.00% | 0.00% * |
| 7. Library | 0.00% | 0.00% |
| 8. Student Services | 0.00% | 0.00% |
| **Published Off-Campus Rate -Instruction** | **26.0%** | **26.0%** |

* Reflects provisions of Uniform Guidance, Appendix III to Part 200, Section C.8.

Name :   *Chris Wade*
DocuSigned by:
18AE92672369483...

Title:   Senior Director Cost Accounting and Procurement

Date:   3/5/2021

# Components of Published Facilities and Administrative Cost Rate

**Institution:**  **RFSUNY and SUNY at Albany**
**FY Covered by Rate:**  **Fiscal Year Ending 6/30/20 - 6/30/24**

| Rate Component | FYE 2020 FINAL | FYE 2021 PRED. | FYE 2022-23 PRED. | FYE 2024 PRED. |
|---|---|---|---|---|
| 1. a. Depreciation - Bldgs & Improvements | 0.00% | 0.00% | 0.00% | 0.00% |
| b. Depreciation - Moveable Equipment | 0.00% | 0.00% | 0.00% | 0.00% |
| 2. Interest | 0.00% | 0.00% | 0.00% | 0.00% |
| 3. Operation & Maintenance | 0.00% | 0.00% | 0.00% | 0.00% |
| 4. General Administration | 0.50% | 0.50% | 0.50% | 0.50% |
| 5. Departmental Administration | 0.00% | 0.00% | 0.00% | 0.00% |
| 6. Sponsored Projects Administration | 5.50% | 5.50% | 6.50% | 7.50% |
| 7. Library | 0.00% | 0.00% | 0.00% | 0.00% |
| 8. Student Services | 0.00% | 0.00% | 0.00% | 0.00% |
| **Published -Rate -IPA** | **6.0%** | **6.0%** | **7.0%** | **8.0%** |

Name :  *Chris Wade*
DocuSigned by:
18AE92672369483...

Title:  Senior Director Cost Accounting and Procurement

Date:  3/5/2021

Friedman Declaration

Exhibit E

# COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN: 1146013200F6

ORGANIZATION:
RFSUNY and SUNY at Buffalo
35 State Street, 3rd Floor
Albany, NY 12207-2826

Date: 09/04/2024

FILING REF.: The preceding
agreement was dated
04/15/2024

The rates approved in this agreement are for use on grants, contracts and other agreements with the Federal Government, subject to the conditions in Section III.

## SECTION I: INDIRECT COST RATES

RATE TYPES:     FIXED     FINAL     PROV. (PROVISIONAL)          PRED. (PREDETERMINED)

|  | EFFECTIVE PERIOD |  |  |  |  |
| --- | --- | --- | --- | --- | --- |
| **TYPE** | **FROM** | **TO** | **RATE(%)** | **LOCATION** | **APPLICABLE TO** |
| PRED. | 07/01/2024 | 06/30/2025 | 61.00 | On-Campus | Research |
| PRED. | 07/01/2025 | 06/30/2029 | 60.10 | On-Campus | Research |
| PRED. | 07/01/2024 | 06/30/2025 | 64.00 | On-Campus | Research DOD Contract |
| PRED. | 07/01/2025 | 06/30/2029 | 63.10 | On-Campus | Research DOD Contract |
| PRED. | 07/01/2024 | 06/30/2029 | 29.00 | Off-Campus | Research DOD Contract |
| PRED. | 07/01/2024 | 06/30/2029 | 55.50 | On-Campus | Instruction |
| PRED. | 07/01/2024 | 06/30/2029 | 42.00 | On-Campus | Other Sponsored Programs |
| PRED. | 07/01/2024 | 06/30/2029 | 26.00 | Off-Campus | All Prog. exc. DOD Con. |
| PRED. | 07/01/2024 | 06/30/2029 | 8.50 | All | IPA (A) |
| PROV. | 07/01/2029 | Until Amended |  |  | Use same rates and conditions as those cited for fiscal year ending June 30, 2029. |

*BASE

ORGANIZATION: RFSUNY and SUNY at Buffalo
AGREEMENT DATE: 09/04/2024

For all awards beginning 6/30/2025 and earlier, the Base is as follows:

Total direct costs excluding capital expenditures (buildings, individual items of equipment; alterations and renovations), that portion of each subaward in excess of $25,000; hospitalization and other fees associated with patient care whether the services are obtained from an owned, related or third party hospital or other medical facility; rental/maintenance of off–site activities; student tuition remission and student support costs (e,g., student aid, stipends, dependency allowances, scholarships, fellowships).

For all awards beginning 7/1/2025 and later, the Base is as follows:

Total direct costs excluding capital expenditures (buildings, individual items of equipment; alterations and renovations), that portion of each subaward in excess of $50,000; hospitalization and other fees associated with patient care whether the services are obtained from an owned, related or third party hospital or other medical facility; rental/maintenance of off–site activities; student tuition remission and student support costs (e,g., student aid, stipends, dependency allowances, scholarships, fellowships).

------------------------------

(A) See Special Remarks (6)

ORGANIZATION: RFSUNY and SUNY at Buffalo
AGREEMENT DATE: 09/04/2024

## SECTION I: FRINGE BENEFIT RATES**

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|------|---------|----------|---------------|
| FIXED | 7/1/2024 | 6/30/2025 | 39.50 | All | Regular Employees |
| FIXED | 7/1/2024 | 6/30/2025 | 31.00 | All | Post Doctorals |
| FIXED | 7/1/2024 | 6/30/2025 | 14.00 | All | Summer Employees |
| FIXED | 7/1/2024 | 6/30/2025 | 13.00 | All | Graduate Students |
| FIXED | 7/1/2024 | 6/30/2025 | 5.50 | All | Undergraduate Student |
| PROV. | 7/1/2025 | 6/30/2028 | 39.50 | All | Regular Employees |
| PROV. | 7/1/2025 | 6/30/2028 | 33.00 | All | Post Doctorals |
| PROV. | 7/1/2025 | 6/30/2028 | 14.50 | All | Summer Employees |
| PROV. | 7/1/2025 | 6/30/2028 | 13.50 | All | Graduate Students |
| PROV. | 7/1/2025 | 6/30/2028 | 5.50 | All | Undergraduate Student |

** DESCRIPTION OF FRINGE BENEFITS RATE BASE:

Salaries and wages.

J.A. 310

ORGANIZATION: RFSUNY and SUNY at Buffalo
AGREEMENT DATE: 09/04/2024

## SECTION II: SPECIAL REMARKS

<u>TREATMENT OF FRINGE BENEFITS:</u>
The fringe benefits are charged using the rate(s) listed in the Fringe Benefits Section of this Agreement.
The fringe benefits included in the rate(s) are listed below.

ORGANIZATION: RFSUNY and SUNY at Buffalo
AGREEMENT DATE: 09/04/2024

1. These Facilities and Administrative cost rates apply when grants and contracts are awarded jointly to Research Foundation for SUNY and SUNY at Buffalo.

2. For all activities performed in facilities not owned or leased by the institution or to which rent is directly allocated to the project(s), the off–campus rate will apply. Actual costs will be apportioned between on–campus and off–campus components. Each portion will bear the appropriate rate.

3. The fringe benefit costs listed below are reimbursed to the grantee through the direct fringe benefit rates applicable to Research Foundation employees: Retiree Health Insurance, Retirement Expense, Social Security, NYS Unemployment Insurance, NYS Disability Insurance, Group Health Insurance, Group Life Insurance, Long Term Disability Insurance, Workers' Compensation, Dental Insurance, Vacation & Sick Leave*, and Vision Benefits.

*This component consists of payments for accrued unused vacation leave made in accordance with the Research Foundation Leave Policy to employees who have terminated, changed accruing status, or transferred. It also includes payments for absences over 30 calendar–days that are charged to sick leave.

The fringe benefit costs for State University of New York employees are charged utilizing the New York State fringe benefit rate for federal funds. This approved rate is contained in the New York State–Wide Cost Allocation Plan. This rate includes the following costs: Social Security, Retirement, Health Insurance, Unemployment Benefits, Workers' Compensation, Survivors' Benefits, Dental Insurance, Employee Benefit Funds, and Vision Benefits.

4. Equipment means tangible personal property (including information technology systems) having a useful life of more than one year and a per–unit acquisition cost which equals or exceeds:

For all awards beginning 6/30/2025 and earlier, $5,000
For all awards beginning 7/1/2025 and later, $10,000

5. Treatment of Paid Absences: *Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal cost for salaries and wages. Separate claims for the cost of these paid absences are not made.

6. This rate applies to positions covered under the Intergovernmental Personnel Act (IPA) Mobility Program. This rate includes the applicable administrative costs only.

7. Your FB proposal based on actual costs for the fiscal year ended 06/30/2024 is due in our office by 12/31/2024, and you IDC proposal based on actual costs for the fiscal year ending 06/30/2028 is due in our office by 12/31/2028.

J.A. 312
R55710

ORGANIZATION: RFSUNY and SUNY at Buffalo
AGREEMENT DATE: 09/04/2024

## SECTION III: GENERAL

A.    LIMITATIONS:

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its indirect cost pool as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as indirect costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B.    ACCOUNTING CHANGES:

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from indirect to direct. Failure to obtain approval may result in cost disallowances.

C.    FIXED RATES:

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D.    USE BY OTHER FEDERAL AGENCIES:

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E.    OTHER:

If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

BY THE INSTITUTION:                          ON BEHALF OF THE GOVERNMENT:

RFSUNY and SUNY at Buffalo                   DEPARTMENT OF HEALTH AND HUMAN SERVICES
_____              _____
(INSTITUTION)                                (AGENCY)
                                                         Darryl W. Mayes -S    Digitally signed by Darryl W.
                                                                               Mayes -S
_____                                               Date: 2024.11.18 07:27:44 -05'00'
(SIGNATURE)                                  _____
                                             (SIGNATURE)
David Martin                                 
_____              Darryl W. Mayes
(NAME)                                       _____
                                             (NAME)
Assoc. Director Cost Accounting & AP/Purchasing
_____              Deputy Director, Cost Allocation Services
(TITLE)                                      _____
                                             (TITLE)
11/19/2024                                   
_____              09/04/2024
(DATE)                                       _____
                                             (DATE)

                                             HHS REPRESENTATIVE:  Ryan McCarthy
                                                                  _____

                                             TELEPHONE:           (212) 264-2069
                                                                  _____

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Buffalo**

| Rate Type: | Pred. | Pred. |
|---|---|---|
| | 7/1/24- | 7/1/25- |
| FY Covered by Rate: | 06/30/25 | 06/30/29 |
| **Rate Component** | | |
| 1. Depreciation - Bldgs & Improvements | 5.5% | 5.5% |
| 2. Depreciation - Equipment | 4.0% | 3.5% |
| 3. Operation & Maintenance | 17.2% | 16.8% |
| 4. Interest | 6.0% | 6.0% |
| 5. Library | 1.3% | 1.3% |
| 6. General Administration | 0.0% | 0.0% |
| 7. Departmental Administration | 26.0% | 26.0% |
| 8. Sponsored Funds Administration | 0.0% | 0.0% |
| 9. Utility Cost Adjustment | 1.0% | 1.0% |
| **Published On-Campus Rate - Research** | 61.0% | 60.1% |

\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.

Name _____

Title Assoc. Director Cost Accounting & AP/Purchasing

Date 12/12/2024

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Buffalo**

| Rate type: | Pred. |
|---|---|
| FY Covered by Rate: | 7/1/24-06/30/29 |

**Rate Component**

| | | |
|---|---|---|
| 1. Depreciation - Bldgs & Improvements | 0.0% | |
| 2. Depreciation - Equipment | 0.0% | |
| 3. Operation & Maintenance | 0.0% | |
| 4. Interest | 0.0% | |
| 5. Library | 0.0% | |
| 6. General Administration | 0.0% | * |
| 7. Departmental Administration | 26.0% | * |
| 8. Sponsored Funds Administration | 0.0% | * |
| 9. Utility Cost Adjustment | 0.0% | |
| Published Off-Campus Rate - Research | 26.0% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

Name _(signature)_

Title Assoc. Director Cost Accounting & AP/Purchasing

Date 12/12/2024

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Buffalo**

| Rate type: | Pred. | Pred. |
|---|---|---|
| | 7/1/24- | 7/1/25- |
| FY Covered by Rate: | 06/30/25 | 06/30/29 |
| **Rate Component** | | |
| 1. Depreciation - Bldgs & Improvements | 5.0% | 5.0% |
| 2. Depreciation - Equipment | 4.0% | 3.5% |
| 3. Operation & Maintenance | 17.7% | 17.3% |
| 4. Interest | 6.0% | 6.0% |
| 5. Library | 1.3% | 1.3% |
| 6. General Administration | 6.8% | 6.8% |
| 7. Departmental Administration | 14.7% | 14.7% |
| 8. Sponsored Funds Administration | 7.5% | 7.5% |
| 9. Utility Cost Adjustment | 1.0% | 1.0% |
| Published On-Campus Rate - Research DOD | 64.0% | 63.1% |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

Name *[signature]*

Title Assoc. Director Cost Accounting & AP/Purchasing

Date 12/12/2024

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Buffalo**

| Rate type: | Pred. |
| --- | --- |
| FY Covered by Rate: | 7/1/24-06/30/29 |

**Rate Component**

| | | |
| --- | --- | --- |
| 1. Depreciation - Bldgs & Improvements | 0.0% | |
| 2. Depreciation - Equipment | 0.0% | |
| 3. Operation & Maintenance | 0.0% | |
| 4. Interest | 0.0% | |
| 5. Library | 0.0% | |
| 6. General Administration | 6.8% | * |
| 7. Departmental Administration | 14.7% | * |
| 8. Sponsored Funds Administration | 7.5% | * |
| 9. Utility Cost Adjustment | 0.0% | |
| Published Off-Campus Rate - Research DOD | 29.0% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

Name _(signature)_

Title Assoc. Director Cost Accounting & AP/Purchasing

Date 12/12/2024

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Buffalo**

| Rate type: | Pred. |
|---|---|
| | **7/1/24-** |
| FY Covered by Rate: | **06/30/29** |

**Rate Component**

| Rate Component | | |
|---|---|---|
| 1. Depreciation - Bldgs & Improvements | 6.8% | |
| 2. Depreciation - Equipment | 0.6% | |
| 3. Operation & Maintenance | 10.5% | |
| 4. Interest | 3.4% | |
| 5. Library | 8.2% | |
| 6. General Administration | 0.0% | * |
| 7. Departmental Administration | 26.0% | * |
| 8. Sponsored Funds Administration | 0.0% | * |
| 9. Student Services | 0.0% | |
| Published On-Campus Rate - Instruction | 55.5% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

Name

Title Assoc. Director Cost Accounting & AP/Purchasing

Date 12/12/2024

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Buffalo**

| Rate type: | Pred. |
|---|---|
| FY Covered by Rate: | 7/1/24-06/30/29 |

**Rate Component**

| | | |
|---|---|---|
| 1. Depreciation - Bldgs & Improvements | 0.0% | |
| 2. Depreciation - Equipment | 0.0% | |
| 3. Operation & Maintenance | 0.0% | |
| 4. Interest | 0.0% | |
| 5. Library | 0.0% | |
| 6. General Administration | 0.0% | * |
| 7. Departmental Administration | 26.0% | * |
| 8. Sponsored Funds Administration | 0.0% | * |
| 9. Student Services | 0.0% | |
| Published Off-Campus Rate - Instruction | 26.0% | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

Name _~James J Mart~_

Title  Assoc. Director Cost Accounting & AP/Purchasing

Date  12/12/2024

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Buffalo**

| Rate type: | Pred. |
|---|---|
| FY Covered by Rate: | 7/1/24-06/30/29 |

**Rate Component**

| | |
|---|---|
| **1. Depreciation - Bldgs & Improvements** | **2.0%** |
| **2. Depreciation - Equipment** | **2.0%** |
| **3. Operation & Maintenance** | **9.3%** |
| **4. Interest** | **1.6%** |
| **5. Library** | **1.1%** |
| **6. General Administration** | **0.0%** |
| **7. Departmental Administration** | **26.0%** |
| **8. Sponsored Funds Administration** | **0.0%** |
| **9. Student Services** | **0.0%** |
| **Published On-Campus Rate - OSP** | **42.0%** |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

Name *[signature]*

Title  Assoc. Director Cost Accounting & AP/Purchasing

Date  12/12/2024

**Components of Published Facilities & Administrative Cost Rate**

**Institution : RFSUNY and SUNY at Buffalo**

| Rate type: | Pred. |
|---|---|
| FY Covered by Rate: | 7/1/24– 06/30/29 |

**Rate Component**

| | |
|---|---|
| 1. Depreciation - Bldgs & Improvements | 0.0% |
| 2. Depreciation - Equipment | 0.0% |
| 3. Operation & Maintenance | 0.0% |
| 4. Interest | 0.0% |
| 5. Library | 0.0% |
| 6. General Administration | 0.0% |
| 7. Departmental Administration | 26.0% |
| 8. Sponsored Funds Administration | 0.0% |
| 9. Student Services | 0.0% |
| Published Off-Campus Rate - OSP | 26.0% |

**\* Reflects provisions of Appendix III to Part 200 of Uniform Guidance - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), C.8. dated December 26, 2013.**

Name _(signature)_

Title Assoc. Director Cost Accounting & AP/Purchasing

Date 12/12/2024

**Components of Published Facilities & Administrative Cost Ra**

**Institution : RFSUNY and SUNY at Buffalo**

| Rate type: | Pred. |
|---|---|
| FY Covered by Rate: | 7/1/24-<br>06/30/29 |

**Rate Component**

| | | |
|---|---|---|
| 1. Depreciation - Bldgs & Improvement | 0.0% | |
| 2. Depreciation - Equipment | 0.0% | |
| 3. Operation & Maintenance | 0.0% | |
| 4. Interest | 0.0% | |
| 5. Library | 0.0% | |
| 6. General Administration | 1.0% | * |
| 7. Departmental Administration | 0.0% | * |
| 8. Sponsored Funds Administration | 7.5% | * |
| 9. Student Services | 0.0% | |
| **Published Rate - IPA** | **8.5%** | |

**\* Reflects provisions of Appendix III to Part 200 of Uniform G**
**Costs Identification and Assignment, and Rate Determination**
**Education (IHEs), C.8. dated December 26, 2013.**

Name _[signature]_

Title Assoc. Director Cost Accounting & AP/Purchasing

Date 12/12/2024

# EXHIBIT 32

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, et al.,

      Plaintiffs,

         v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

      Defendants.

Case No. _____

### Declaration of Oregon Health and Science University

I, Peter G. Barr-Gillespie, Ph.D., hereby declare:

1.  I am the Executive Vice President and Chief Research Officer of Oregon Health and Science University ("OHSU"). In addition, I am a professor with the Oregon Hearing Research Center and an affiliated scientist with the Vollum Institute. I have been with OHSU since 1999. From 2014-2017, I was associate vice president for basic research; from 2017-2018, I was interim senior vice president for research. In addition, from 2011 through 2020, I was the scientific director of the Hearing Restoration Project, an international consortium with the goal to develop a biological therapy for hearing loss.

2.  I earned my bachelor's degree in chemistry from Reed College in 1981. I received my doctorate in pharmacology at the University of Washington in 1988 and completed a postdoctoral fellowship in physiology, cell biology and neuroscience with Jim Hudspeth, M.D., Ph.D., both at the University of California San Francisco and at the University of Texas Southwestern Medical Center in 1993. Following my fellowship, I joined the faculty at Johns Hopkins.

1

3.  I have published more than 125 scholarly articles, chapters, and reviews, and have been an invited lecturer at dozens of research universities, academic conferences and scientific events.

4.  In my position as Executive Vice President and Chief Research Officer, I have oversight of OHSU's research centers and institutes.  Research conducted by scientists at OHSU covers myriad areas impacting human health.

5.  I am myself an NIH-funded investigator, with research focused on understanding the molecular mechanisms that enable our sense of hearing. Specifically, my lab endeavors to determine how sensory cells in the inner ear, called hair cells, allow people to perceive sound arising from the outside world. I maintain an active, funded research program.

6.  As the Executive Vice President and Chief Research Officer, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

7.  I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect cost recovery to 15%.

8.  OHSU has a long tradition of leading-edge research that has yielded some of the most important innovations in the history of modern medicine, including the first successful mitral valve replacement and the invention of optical coherence tomography. OHSU houses a robust research program with more than 1,415 faculty investigators and 262 postdoctoral scholars. OHSU's faculty includes members of the National Academy of Science, National

2

Academy of Medicine, and National Academy of Inventors, the American Academy of Arts and Sciences, as well as recipients of Lasker-DeBakey Award for Clinical Medical Research.

9. As the state's only academic health center, OHSU has advanced American leadership and innovation in medical research. OHSU scientists have carried out fundamental research that has led to new cures, established new standards of care, and provided a better understanding of the basic science that drives biomedical discovery. OHSU researchers explore every aspect of health and disease, ranging from (to name just a few) retinal degeneration, to imaging technology for nerve damage, to engineered immune cells for cancer treatment. Through its schools, centers and institutes, OHSU offers a comprehensive roster of research centers addressing every aspect of biomedical and clinical research.

10. In 2023, OHSU was awarded more than $413 million in federal research grants and contracts. OHSU ranks as the top Oregon institution to receive National Institutes of Health (NIH) funding, with grants and contracts that same year totaling more than $297 million.

11. Examples of a few of the many hundreds of NIH funded research projects that came to fruition at OHSU during the past year alone includethe following.(1)  A federally funded in-human imaging study at OHSU published in the Proceedings of the National Academy of Sciences that revealed a network of metabolic waste-clearance pathways known as the "glymphatic system" critical for brain health. (2) OHSU researchers at the federally funded Vaccine and Gene Therapy Institute identified a gene that threatens to block immune responses to important vaccines for diseases including HIV, malaria, and certain types of cancer, which was published in the journal Science Immunology. (3) OHSU researchers identified whole brain circuit risk factors to better diagnose ADHD in children, as published in the Journal of Neuroscience.

3

12. NIH funding is essential to OHSU's mission. OHSU research on vaccines made international headlines, with progress on a universal flu vaccine and finding that switching arms for two-dose vaccines improves effectiveness.

13. OHSU has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of October 13, 2023. The Indirect Cost ("IDC") Rate in the OHSU'S NICRA is 56% for on-campus organized research. OHSU has relied on the NICRA, which OHSU negotiated in good faith and which reflect actual indirect costs, in making decisions and investments to support its research mission.

14. OHSU's total blended IDC rate for NIH funding is approximately 35%.

15. NIH's reduction of OHSU's IDC rates will eliminate approximately $80 million in funding that OHSU uses to support its research programs. The loss of these funds will immediately impact OHSU's ability to pay expenses associated with critical facilities costs, mortgages, payroll, infrastructure used to support research, research compliance, animal care, and clinical trials. The reduction in OHSU's IDC rate cut would impact approximately 1,209 federally funded grants and contracts, and would disrupt critical research in areas such as fetal-maternal medicine, cancer, cardiovascular health, infectious disease, Alzheimer's disease, neurology, rural health, behavioral health, and many other areas critical to human health.

16. The reduction in OHSU's IDC rate would impair OHSU's ability to maintain compliance with federal research regulations; to accurately track, oversee and report federal research funds expenditures; to maintain our research physical plant; and to provide basic administrative support to our research laboratories such as effort tracking and payroll.

4

17. The reduced federal IDC reimbursement rate would compromise our ability to carry out ongoing clinical trials that promise advancements in drugs, devices, and clinical protocols. Because these clinical trials could immediately and directly impact patient care, their interruption could jeopardize patient longevity. IDC funded central resources at OHSU for clinical trial research are necessary for contracting, expense tracking, invoicing, human clinical research regulatory compliance and safety, etc.

18. OHSU's next anticipated draw of funds is on or around February 10, 2025. At that time, the reduction in the IDC rate will result in the loss of $1.6M per week in reimbursement that supports the salaries, facility costs, and research infrastructure that allows OHSU to conduct research.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 9th day of February, 2025, in Portland, Oregon.

Peter G. Barr-Gillespie, Ph.D.
Executive Vice President and Chief Research Officer
Oregon Health and Science University

5

# EXHIBIT 33

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

       Plaintiffs,

           v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

       Defendants.

Case No. _____

## DECLARATION OF DR. BETHANY DIANE JENKINS

I, Bethany D. Jenkins, declare as follows:

1. I am a resident of the State of Rhode Island. I am over the age of 18 and have personal knowledge of all the facts stated herein, except those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am currently employed by the University of Rhode Island ("URI") as the University's Vice President for Research and Economic Development (VPRED) and Professor of Cell and Molecular Biology.

3. The Division of Research and Economic Development is responsible for being the University of Rhode Island's authorized unit to oversee our external research funding portfolio, including to submit awards, receive grants and ensure our research integrity. As the Vice

President for Research and Economic Development I help our community receive competitive federal awards that augment significant investments made by Rhode Island as our State's flagship land and sea grant university. The federal research funding at the University of Rhode Island provides myriad experiential learning opportunities for our students, 30% of which are first in their family to attend an institution of higher education.

5.      A recent economic impact study shows that in fiscal year 2019, the University's impact on Rhode Island's economy was considerable. Through the multiplier effect, for every dollar contributed by the state, the University generated $6.25 in statewide economic output. URI, directly and indirectly, generated $824.6 million in statewide economic activity, supported 8,097 jobs, and provided $418.6 million in wages. This included spending nearly $167.7 million on the purchase of goods and services and $150.6 million on the construction and renovation of campus facilities, of which approximately $71.1 million (42.4%) and $133 million (88.3%) was provided to Rhode Island businesses, respectively. URI is also one of the largest employers in the state, employing a total of 3,818 people, an increase of 4.6% (168 jobs) since the fall of 2011. As of 2021, for every dollar of state appropriation, the University's Division of Research returned $1.25, or 25%, in external awards and $3.50, or a 250% return, in economic impact to the state and its constituents.

6.      As the VPRED, I declare that in FY 2024 the University of Rhode Island received more than $131 million in federal research awards (81% of $161 million in total research awards to the University), and URI's average monthly federal research expenditures are estimated at $9.5M. URI has a spectrum of federal research awards that support Rhode Island's blue economy, health care and education sectors, among others. The University of Rhode Island's

contributions to research include institutionally financed research for competitive grants, funds to serve as required match or cost share on active projects and unrecovered direct costs.

7.          Following the Office of Management and Budget's issuance of M-25-13 ("OMB Memo") on January 28, 2025, URI experienced near-immediate disruptions to its ongoing research projects.

8.          URI received stop-work orders on its entire portfolio of USAID-funded awards ($66.7M). URI's Coastal Resources Center has been conducting work in partnership with USAID for over 50 years. These programs focus on food insecurity, a national security threat tracked by the CIA. Almost all the countries where CRC has projects are listed by the CIA as having concerning levels of food insecurity. The five programs employ 15 US based URI personnel and 13 sub-awardees with 244 personnel supported by the project; plus 13 contractors in 13 countries: Philippines, USA, UK, Madagascar, Fiji, Marshall Islands, Federated States of Micronesia, Palau, Papua New Guinea, Solomon Islands, Ghana, The Gambia, Kenya. The programs include the following:

> USAID Fish Right: Philippines. Launched in 2018, $33 million over 8 years (Focuses on fisheries ecosystem biodiversity conservation including fisheries policy and management, illegal, unreported, and unregulated (IUU) fishing, fisheries leadership and capacity development, value chain development, private sector engagement, economics and finance, improved management of Marine Protected Areas, mangrove management, coastal and ocean processes science);

> USAID Our Fish Our Future: Pacific Islands. Consortium led by URI. Launched in 2021, $15 million over 5 years (Addresses the social and ecological drivers of IUU fishing including overfishing, the inability to monitor illegal fishing, and weak compliance with

fisheries regulations across six countries in the Pacific Islands region. By addressing these problems, the project protects critical coastal habitat and supports local livelihoods, food security, and maritime security in both Melanesia and Micronesia);

USAID Riake: Madagascar. Launched in 2024, $13 million over 5 years (Promotes biodiverse, well-managed, secure, and sustainable marine ecosystems and livelihoods through a Blue Economy framework that includes marine spatial planning, improved fisheries policy and management, fisheries leadership and capacity development, value chain development, private sector engagement, improved management of Marine Protected Areas and Locally Managed Marine Areas, and mangrove management);

USAID Women ShellFishers: West Africa. Launched in 2020, $3.1 million over 5 years (Focused on biodiversity conservation, coastal resources governance, strengthening resource user tenure and use rights in fisheries co-management, mangrove conservation, and food security in coastal West Africa);

USAID Feed the Future Innovation Lab for Fish 2 (URI is a sub-awardee of Mississippi State University): URI subaward launched in 2019, $2.6 million over 10 years (Development and management of a fisheries and aquaculture research grant program to reduce poverty and improve nutrition, food security, and livelihoods in partner countries by supporting research on sustainable aquatic food systems.

9.     URI sent communications to USAID Agreement Officers for each of our USAID grants indicating our understanding that the USAID stop work orders were subject to, and effectively rescinded by, the Temporary Restraining Order issued January 31, 2025 by Chief Judge John J. McConnell, Jr. of the United States District Court for the District of Rhode Island in Case No. 25-cv-39-JJM-PAS and requesting confirmation of that understanding. Agreement

Officers who responded indicated that the suspension of award implementation remains in effect until the Agreement Officer issues a rescission and indicates they can provide no time period for when the suspension may be lifted. This uncertainty about funding will lead to irreparable damage to the University, its USAID grant-funded staff and research programs as the university lacks resources to continue funding programs awaiting decisions from USAID with no timeline.

10.        URI also received 90-day hold and pause notices on awards that impact coastal resilience and food waste reduction across Rhode Island. Hold notice: From National Park Service (NPS), for a US based project led by URI's Coastal Resources Center. The total award is $255,035 over 4 years. The project supports NPS Efforts to Improve Operational Resiliency of Coastal Parks.

11.        URI's EPA Inflation Reduction Act Community Challenge Grant "From Food Waste to Opportunity" was paused citing the Unleashing American Energy EO *14154*. This project, awarded in December to the Rhode Island Food Council, would provide $18.7 million to implement a multilevel approach to food waste reduction, donation, and composting in 64 contiguous qualifying census tracts in Providence, Pawtucket, and Central Falls, Rhode Island and 14 in Newport and Middletown, Rhode Island. URI's contribution is through Cooperative Extension's Food Recovery for Rhode Island program.

12.        Most of URI's principal investigators on Federal grant awards have received general notices to cease activities related to DEIA work from agencies including the Department of Energy, NASA, Health Resources and Service Administration, National Science Foundation and others. These notices lack legal definitions of DEIA and provide no substantive guidance.

13.        On information and belief, URI has also seen disruptions in systems disbursing federal funds.

Among these are:

The U.S. Department of Health and Human Services (HHS) grant reimbursement requests submitted through the federal grants payment processing system Payment Management System (PMS) have not been paid;

Federal Emergency Management Agency (FEMA) Payment and Reporting System (PARS) will not allow for payment requests to be submitted; and Certain Department of Interior obligated federal funds accounts have been suspended for disbursement of funds.

14.      On information and belief, the new 15% cap on NIH indirect cost reimbursement rate communicated by the NIH on February 7, 2025 in the Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates (Notice Number: NOT-OD-25-068) will have significant impacts on the University of Rhode Island and our ability to be an economic engine for the state of RI.  Based on indirect costs received to date in FY 25, the 15% NIH cap is estimated to impact URI at a monthly loss of $240K and $2.8M if annualized.

15.      Indirect Cost Rates are also known as facilities and administrative costs or overhead costs. They are the infrastructural and operational costs associated with the conduct of research and include, but are not limited to, such areas as: construction and maintenance of laboratories, utilities, telecommunications, internet, data storage, compliance and safety, radiation safety and hazardous waste, and research administration staffing needed to comply with federal, state, and local regulations related to federally-funded research.

16.      Since 1991, the administrative component of indirect costs has been capped at 26%, despite a 181% increase in the number of compliance and administrative changes impacting sponsored research from 2014-2024 (Council on Governmental Relations; Changes in Federal Requirements Since 1991 (Updated January 2025); https://www.cogr.edu/changes-

federal-research-requirements-1991). At URI, these increases in compliance requirements have meant that URI has had to hire additional compliance staff to ensure we are abiding by the new regulations and changes, despite no increases to our administrative cost portion of indirect cost rates for decades.

17.        Indirect cost rates also include costs for facilities that support research and are derived from a number of factors, condition, age and location of facilities, types of laboratories, and amount of renovation and construction required to maintain certain types of research facilities.

18.        Indirect cost rates are established in partnership with the Department of Health and Human Services through a complex and transparent negotiation process that includes assessing and reporting on these real costs of conducting research.

19.        URI maintains a highly diverse research portfolio, and on information and belief NIH-funded research often involves additional compliance-related costs. For instance, a number of URI's projects in the Colleges of Pharmacy and Health Sciences require animal care and use staff, including technicians and an attending veterinarian. They require the review and oversight of the IACUC (Institutional Animal Care and Use Committee), and sometimes the Institutional Biosafety Committee. Other NIH funded projects involve the use of the Institutional Review Board for the Protection of Human Subjects. Other projects involve the review and monitoring by Export Controls and Research Security, to ensure our national security interests. High inflation over the past few years has increased basic costs related to research and staff supported by indirect costs in unions receiving cost of living adjustments.

20.        Of note, COGR identified the implications and impact if indirect costs were restricted or reduced:

• The inability of universities to accept research awards from, and conduct research on behalf of, federal agencies;

• The deterioration of research facilities as the financial risk to build new facilities or maintain existing ones becomes too great to cover with institutional funds;

• The inability to sustain required support staff and infrastructure required to comply with government regulations; this could threaten the health and safety of patients, researchers and students;

• A reduction in the pipeline of trained scientists and engineers in the workforce due to reduced research training opportunities at universities.

• An increase in tuition rates.

Reference: COGR (2024) Frequently Asked Questions about Facilities and Administrative (F&A) Costs of Federally Sponsored University Research.

[https://www.cogr.edu/sites/default/files/FAQ-Costs-of-Research%20%281%29.pdf](https://www.cogr.edu/sites/default/files/FAQ-Costs-of-Research%20%281%29.pdf))

21.     Federally sponsored research is a critical function of the state's public, flagship, land- and sea-grant university and serves as a major economic engine for URI and the State of Rhode Island. For example, URI and many other Rhode Island institutions of higher education are part of the 28-state NSF-Funded EPSCoR and NIH-funded IDEA programs that support national security, workforce readiness, defense, and broad geographic and socioeconomic access.

URI is the lead institution on the recently-funded $8M NSF EPSCoR E-CORE program that is a partnership of several Ocean State universities and colleges, including URI, Rhode Island College, Brown University, Roger Williams University, and Rhode Island School of Design (RISD).  By leveraging partnerships with diverse

institutions and organizations, the project will boost collaboration, education, and workforce development initiatives in science, technology, engineering and mathematics (fields collectively known as STEM) across the Ocean State.

URI, in partnership with Brown University, Bryant University Johnson and Wales University, Providence College, Rhode Island College, Roger Williams University, Salve Regina University and the Community College of RI, leads the $21M NIH-Funded Rhode Island IDeA Network of Biomedical Research Excellence (RI-INBRE) program that is a statewide network designed to build the biomedical research capacity of Rhode Island institutions, by supporting and developing talented individuals committed to biomedical research careers in Rhode Island particularly in areas of cancer, environmental health sciences, and neuroscience.

22.    On information and belief, the impact of the reduction in NIH indirect cost rates at URI means the university would have to use contingency funds to maintain critical functions (e.g., research operations staff, animal care facilities, and instrumentation too expensive to shut down). Long term consequences would result in consideration of shutting down research projects and labs and laying off staff which will impact RI's workforce.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 09, 2025, at Kingston, RI.

_____
Bethany Diane Jenkins

# EXHIBIT 34

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, ATTORNEY
GENERAL DANA NESSEL ON BEHALF
OF THE PEOPLE OF THE STATE OF
MICHIGAN, STATE OF ILLINOIS,
STATE OF ARIZONA, STATE OF
CALIFORNIA, STATE OF
CONNECTICUT, STATE OF COLORADO,
STATE OF DELAWARE, STATE OF
HAWAI'I, STATE OF MAINE, STATE OF
MARYLAND, STATE OF MINNESOTA,
STATE OF NEW JERSEY, STATE OF
NEW YORK, STATE OF NEVADA,
STATE OF NEW MEXICO, STATE OF
NORTH CAROLINA, STATE OF
OREGON, STATE OF RHODE ISLAND,
STATE OF VERMONT, STATE OF
WASHINGTON, and STATE OF
WISCONSIN,

       Plaintiffs,

             v.

NATIONAL INSTITUTES OF HEALTH;
MATTHEW MEMOLI, M.D., M.S., in his
official capacity as Acting Director of the
National Institutes of Health; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and DOROTHY
FINK, in her official capacity as Acting
Secretary of the U.S. Department of Health
and Human Services,

       Defendants.

Case No. _____

## DECLARATION OF DR. GREG HIRTH

I, Greg Hirth, declare as follows:

1.      I am the Vice President for Research at Brown University ("Brown") in Providence, Rhode Island.  I have held that position since February 4, 2025, after serving as interim Vice President for Research starting in September 2024.  I am also a Professor of Earth, Environmental, and Planetary Science, and a federally funded researcher.  I have been on the faculty at Brown University since 2007.

2.      As Vice President for Research, I have personal knowledge of the contents of this declaration, or have knowledge of the matters based on my review of information and records gathered by Brown University personnel, and could testify thereto.

3.      Brown is a major research institution that receives significant funding from the Department of Health and Human Services ("HHS"), including from the National Institutes of Health ("NIH").   This funding supports cutting-edge, multi-year research projects in furtherance of public health and emerging areas of science and technology.

4.      Specifically, as the university with the only schools of public health and medicine in Rhode Island, Brown conducts critical research directed at major health challenges, including cancer, aging, dementia, heart disease, immune disorders, mental health disorders, and childhood illnesses.  Clinical trials conducted at or through Brown, or involving Brown faculty, bring life-saving medicines to those who are battling cancer, heart disease, opioid addiction, and mental health conditions, as well as vulnerable patients who are newborn, children, or pregnant.

5.      Examples of critical, NIH-funded research projects being conducted by Brown include:

a.   Research funded by $71 million from NIH over six years (July 2019 through June 2025) to accelerate the science of dementia care through embedded pragmatic clinical trials, which impacts millions of Americans and their care partners;

b.   Research funded by $660,000 from the National Institute of Diabetes and Digestive and Kidney Disease for the first year of a 2.5-year project to study methods to improve nutrition and healthy eating habits of preschool-aged children;

c.   Research funded by what is anticipated to be $6.6 million over approximately 3.5 years (August 2024 through May 2029) from the National Heart, Lung and Blood Institute to study the early identification and prevention of coronary heart disease.

d.   Research funded by a total of $133 million from NIH prime awards and subawards to study the many facets and impacts of Alzheimer's disease, including the pathophysiology of Alzheimer's disease and how to improve treatment for patients with Alzheimer's disease.

6.     In addition to advancing scientific and medical innovation in the national interest, Brown's research also supports local and state communities.  As a vital anchor institution and top 10 employer in Rhode Island, Brown plays a major role in the economic well-being of the state and its residents.  Brown employs healthcare professionals and skilled researchers in its own hospitals, research institutions, and schools, and it works with two other major Rhode Island hospital systems—Lifespan Corporation and Care New England—to conduct research in the state. Brown has already made, and intends to continue making, significant financial, intellectual,

contractual, and personnel investments in the Brown Innovation and Research Collaborative for Health ("BIRCH"), a research collaboration between Brown and its affiliate hospitals.

7.      Brown receives federal research funding in the form of sponsored grants and contracts, which normally provide for the recovery of certain indirect costs at contractually negotiated rates.  Overall, in the 2024 fiscal year, Brown's federally sponsored grants and contracts totaled approximately $253 million, or 19% of Brown's operating revenues.  Of that $253 million, approximately $69 million was in the form of indirect costs.  In the current 2025 fiscal year, Brown's operating budget projects approximately $300 million in sponsored research, which represents 19% of the University's net revenue and includes approximately $73 million in indirect costs.

8.      In the 2024 fiscal year, Brown recovered approximately $37 million in Facilities & Administrative ("F&A") costs from HHS for Direct Awards.  In the 2025 fiscal year, to date, F&A costs amount to approximately $22 million fiscal year to date.  In addition, for subawards where the prime awardee is federally sponsored, including by NIH, actual F&A costs for the 2024 fiscal year was approximately $9 million.

9.      Indirect costs support critical infrastructure throughout individual Schools and the University's central administration that are necessary to provide support services to conduct research—such as research capital investments, information technology supporting research computing, facilities operations and maintenance, finance and human resources, as well as other aspects of general administration.

10.      On February 7, 2025, NIH issued guidance directing the lowering of indirect cost rates to a universal 15% rate, applying not only to new grants but also to existing grants.  This

reduction to the indirect cost rate, which is set to become effective on February 10, 2025, will have devastating effects on Brown's ability to conduct research, both short and long term.

11.     Reducing the overhead rate for sponsored grants and contracts to 15% will disrupt Brown's research operations, impact operating budgets, personnel, and core infrastructure, all of which depend upon the current F&A cost recovery rate.  Using FY24 financial data, had the indirect cost rate of Brown's sponsored grants and contracts been reduced to 15%, the University would have experienced a loss of approximately $27 million. For year-to-date FY25 research expenditures, the University would have experienced a loss of approximately $16 million (representing actual costs incurred from July 1, 2024 to February 8, 2025).

12.     While budgets related to research are submitted approximately six months in advance of Brown's next fiscal year, grant awards are considered a major component of the University's multi-year financial plan, so any reduction in the F&A rate has a significant impact on Brown's multi-year planning and long-term strategic decision-making.

13.     Even more immediately, a reduction in the F&A rate to 15% would require Brown to move very quickly to adjust its operations in order to absorb the loss of revenue.  That could include cutting over 200 jobs for personnel that support our research enterprises and facilities, such as administrators, research coordinators, lab managers, animal care staff, custodial staff, security officers, plumbers, electricians, food service employees, clinical coordinators, and research nurses. For example, the University recently broke ground on a new $400 million research facility, which may not be feasible with a 15% overhead rate moving forward. This facility will provide labs and workspace for research in aging, immunity, brain science, cancer and biomedical engineering, among other fields.  As the largest academic laboratory building in Rhode Island, it is expected to help anchor a biomedical ecosystem where innovations can move seamlessly from the laboratory

to patient care.  In addition, if Brown were to pause or abandon that effort, it would eliminate many union constructions jobs; impact purchases of building materials and laboratory equipment that have already been made; and prevent Brown from hiring new faculty or staff that would have worked in the new facility.

14.    It would further threaten Brown's ability to retain the next generation of our healthcare workforce, such as doctors, scientists, and nurses.  Almost all of the School of Public Health's research is supported by NIH grants, so a dramatic reduction in funding would affect everything the School does.  That includes its ability to recruit faculty; provide pilot funding to catalyze research projects; support faculty and research staff in between grants; and provide cost-sharing support for large, complex projects that exceed grant budgets.

15.    There is no simpler way to put it: At a 15% indirect cost rate, many of Brown's current research projects and clinical trials will be forced to cease abruptly.  Conducting research requires laboratory facilities, data processing and research computing equipment, privacy and ethical protections for human subjects, and qualified support staff who can ensure that projects are conducted safely, within budget, and in compliance with all relevant regulations.  Although indirect costs do not cover the full costs of these activities, they are critical to Brown's ability to fund the research enterprise.  Even a temporary interruption of work would threaten clinical trials that supply lifesaving medicine and risk derailing years of careful progress and efforts directed towards major health challenges.

16.    The effects of stopping our research would extend beyond Brown, as the reduced utilization of research supplies, equipment, and services would immediately affect major suppliers, such as Thermofisher, VWR, and Fisher Scientific, that produce lab equipment and other supplies, and have serious ramifications for the entire supply chain that supports the research enterprise.

17.    Even a temporary reduction in the indirect cost rate would have cascading effects on Brown's research projects and clinical trials.  For example, clinical trials must generally be continuous to be effective, due to concerns for both patient care and trial validity.  Such trials take years to set up, create, and perform.  If these trials are forced to undergo a significant pause, they might be difficult, if not impossible, to restart, where the lack of continuity compromises the scientific results.

18.    Forced closure of clinical trials will lead to an accompanying loss of accumulated research and knowledge, as skilled researchers will opt to leave Brown, and potentially the United States, in pursuit of viable work.  This will inevitably lead to lost opportunities to develop U.S. intellectual property and U.S. startup companies.  We also anticipate that existing challenges with training and retaining physicians, nurses, and other healthcare professionals will worsen, with direct impacts on patient care.  For example, a reduction in funding may result in cuts to the training programs for the MD program at the medical school.

19.    A reduction of the indirect cost rate to 15% would be swiftly felt in the local economy as well.  The loss of jobs at Brown's affiliated hospitals and schools—which is estimated to number in the hundreds—not to mention loss of jobs in the private sector that support this work, would have an immediate negative impact on the local economy in Providence and across the state of Rhode Island.  These losses would eventually spill over into other domains, such as restaurants, retail, and the service industry.

20.    The cessation of major capital efforts, such as building new research facilities and labs, will have ripple effects across the economy, including in industries like construction.

21.     Brown's efforts to streamline research in Rhode Island through BIRCH would also be negatively impacted, stymying opportunities for collaboration, patient care improvement, and healthcare and life sciences advancements throughout the state.

22.     More broadly, the ecosystem of American medical, health, and scientific innovation depends upon university research, which in turn, feeds into the private biotechnology and pharmaceutical industries.  This ecosystem would be significantly harmed by disruptions to federally sponsored, university-conducted research, with immense consequences for our nation's competitiveness, economy, and ability to respond to health crises.

23.     Importantly, if NIH's indirect cost rate is reduced to 15%, Brown cannot simply make up for the resulting gap in funding through alternative means.  Brown's full cost of research is already significantly more than what is covered by sponsored direct costs and indirect cost recovery.  In the 2022 fiscal year, for example, Brown's full cost of research was estimated at $315 million, which was $66 million more than sponsored direct costs and indirect cost recovery. Brown made approximately $37 million in additional investments, including through research incentive programs, cost-sharing, and other programs.   And Brown took on $28 million in "unrecovered" indirect costs.    Because Brown's federal awards are capped at 26% for administrative costs, all Brown's administrative costs above 26% go unrecovered and are paid for by the University.

24.     Any further increases in the gap between Brown's current cost of research and federally sponsored funding cannot be recouped from other revenue sources.  Most notably, Brown's endowment, which provides an essential source of support for the University's financial aid, faculty salaries, and academic and co-curricular programs, consists of over 3,800 unique funds

that are legal contracts given as charitable gifts by alumni, parents, students, and friends of the University.

25.    The purpose of Brown's endowment is to support the mission of Brown in perpetuity.  It is managed with a dual mandate to balance the competing demands of current operations and preserve purchasing power to support future operations.

26.    Brown's annual endowment payout, or the amount distributed from the endowment to support each fund's designated purpose, is between 4.5% and 5.5% of the endowment value's 12-quarter trailing average, as approved by the Corporation of Brown University, the institution's highest governing body.  Because all endowments are legally subject to the Uniform Prudent Management of Institutional Funds ACT (UPMIFA), the University's ability to increase this annual payout beyond the Corporation-approved range is limited.  Moreover, the unique funds that make up Brown's endowment are charitable gifts by alumni, parents, students, and friends, and restricted by law and purpose for their designated use.

27.    Therefore, if Brown's indirect cost rate is reduced to 15%, Brown will have no feasible opportunity to avoid the consequences outlined in paragraphs 11–23.  Implementation of the Guidance will significantly and immediately compromise scientific advancement in numerous areas critical to the public interest, particularly the economy, human health, and science and technology.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 9, 2025, at Providence, Rhode Island.

_Greg Hirth_

_____

Greg Hirth

# EXHIBIT 35

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, et al.

                     Plaintiffs,

        v.

NATIONAL INSTITUTES OF HEALTH;
MATTHEW MEMOLI, M.D., M.S., in his
official capacity as Acting Director of the
National Institutes of Health; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and DOROTHY
FINK, M.D., in her official capacity as
Acting Secretary of the U.S. Department of
Health and Human Services,

                  Defendants.

Civil Action No. _____

## Declaration of Todd Conklin

I, Todd Conklin, hereby declare:

1.  I am the Executive Vice President and Chief Financial Officer of Care New England Health System ("CNE"), a position I have held since 2023. As Executive Vice President and Chief Financial Officer, I have oversight of CNE's Department of Sponsored Programs & Research Administration. Prior to holding this position, I was Executive Vice President and Chief Operating Officer of Lifespan Corporation.

2.  As the Executive Vice President and Chief Financial Officer, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3.  I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants*

1

*Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect cost payments to 15%.

4. CNE is a non-profit healthcare system comprising several hospitals and other healthcare entities in Rhode Island (the "State"), including Butler Hospital ("Butler"), the State's premier teaching, treatment, and research hospital for psychiatric and neurologic disorders; Women & Infants Hospital of Rhode Island ("Women & Infants"), one of the nation's leading specialty hospitals for women and newborns; Kent County Memorial Hospital ("Kent Hospital"), an acute care hospital and the second largest hospital in the State; and The Providence Center, Inc. ("TPC"), the State's largest community-based behavioral healthcare organization. Researchers at CNE are transforming the future of healthcare with innovative, cutting-edge treatments focused on improving the health of individuals and the community, including in areas such as pregnancy and women's health; newborn and children's health; behavioral health, including memory and aging and recovery for substance use disorders; and conditions such as diabetes and cardiovascular disease.

5. The foregoing research is supported by funds from the NIH.

6. Butler Hospital has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of October 1, 2024. The Indirect Cost ("IDC") Rate in Butler's NICRA is 49.10% for on-site research.

7. Women & Infants has a NICRA with NIH, effective as of October 1, 2024. The IDC Rate in Women & Infants' NICRA is 75.00% for on-site research.

8. Kent Hospital has a NICRA with NIH, effective as of October 1, 2023. The IDC Rate in Kent Hospital's NICRA is 50.00% for on-site research.

2

9. TPC has a NICRA with NIH, effective as of October 1, 2023. The IDC Rate in TPC's NICRA is 20.80% for on-site programs.

10. CNE's total blended IDC rate for NIH funding is 48.73%.

11. CNE has pending NIH grant applications with budgets totaling approximately $125 Million. It is estimated that NIH's reduction of CNE's IDC rates will eliminate approximately $25 Million of this funding. This estimate assumes all such pending grant applications are awarded as submitted, except that instead of the applicable negotiated IDC Rate being applied, the new 15% rate applies.

12. CNE is a sub-awardee on active NIH grants in which an institution of higher education is the prime awardee. CNE's total budget on these NIH grants amounts to approximately $18.7 Million.  It is estimated that NIH's reduction of CNE's IDC rates will eliminate approximately $1.6 Million of this funding.  This estimate assumes that the projects related to these grants continue through the estimated end date, that indirect costs are incurred at the same rate as they have been incurred through January 31, 2025, and that instead of the applicable negotiated IDC Rate being applied, the new 15% rate applies.

13. The loss of these funds will impact CNE's ability to draw critical funds used to pay expenses associated with infrastructure, such as facilities, and with the individuals who provide regulatory and administrative support, which are crucial to allow research to be performed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February, 2025, in Providence. Rhode Island.

_Todd Conklin_
Todd Conklin
Executive Vice President & Chief Financial Officer
Care New England Health System

3

# EXHIBIT 36

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASACHUSETTS**

COMMONWEALTH OF MASSACHUSETTS, et al.,

Plaintiffs,

v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

Defendants.

Civil Action No. _____

**Declaration of NAME**

I, Bharat Ramratnam, M.D., hereby declare:

1.  I am the Vice President of Research, a position I have held since 2023. As Vice President of Research, I have oversight over all research operations at Lifespan Corporation, dba Brown University Health, Providence, RI ("Brown University Health"), including all governmental and private sponsored and funded research. Prior to holding this position, I was Chief Science Officer at Brown University Health.

2.  As the Vice President of Research, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3.  I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

4.  Brown University Health is Rhode Island's flagship academic research hospital system. As such, both independently and in collaboration with Brown University and/or other research organizations, including the University of Rhode Island and Care New England, conducts numerous patient critical research studies and initiatives. Brown University Health is a leader in advancing new approaches for the diagnosis and treatment of diseases of national importance including cancer, stroke, opiate addiction, injury, diabetes, and adolescent psychiatric disorders. Critical research insights from completed and ongoing clinical studies informs the nation's approach to cardiovascular, neurosurgical and gastrointestinal interventions designed to diagnose, treat, cure and prevent disease. Brown University Health's first-in-human program leads to the development of new treatments in all of the above areas including a broad range of cancer treatments, such as brain tumors, lung cancer, breast cancer, colorectal cancer, kidney cancer, bladder cancer, prostate cancer, leukemia and lymphoma and other solid tumor and hematologic malignancies. This research is supported by total annual NIH revenue of $75,100,000.

5.  Rhode Island Hospital, The Miriam Hospital and Emma Pendleton Bradley Hospital are all part of Brown University Health and each hospital conducts leading research in the diagnosis

1

and treatment of disease. Brown University Health has a negotiated Indirect Cost Rate Agreement ("NICRA") with NIH of 64% for Rhode Island Hospital, 49% for Miriam Hospital and 34% for Bradley Hospital. Rhode Island Hospital's NICRA is effective 10/1/23 to 9/30/26. Miriam Hospital's NICRA is effective 10/1/22 to 9/30/25. Bradley Hospital's NICRA is effective 10/1/23 to 9/30/26.

6. Brown University Health's total blended IDC rate for NIH funding is 55%.

7. Brown University Health is the major provider of first -in-human trials in cancer, offering treatment options to patients who have exhausted all other treatments available. Brown University Health has approximately 60 federal clinical trials that are actively enrolling patients as of today. The loss of indirect funds will lead to immediate workforce layoffs, which could lead to the premature closure of ongoing National Cancer Institute Alliance for Clinical Trials in Oncology among other research clinical programs. Critical support personnel in departments, such as research pharmacy that prepares and distributes experimental and standard of care medications, may lose their jobs.

8. NIH's reduction of Brown University Health's hospital rates will result in the loss of approximately $13,600,000 in funding that Brown University Health uses to support its research programs in the diagnosis and treatment of the acute and chronic diseases noted above. This loss of funding will immediately impact Brown University Health's patients' access to potentially life-saving care, as it will limit the resources needed to cover expenses related to maintaining facilities and employing individuals who support this biomedical research and the associated provision of potentially life-saving care to patients. The loss of funds will not only decrease access to essential care but will lead to job loss, especially among support personnel such as facilities workers, administrative assistants and secretaries, research pharmacy employees and IT support staff. These individuals are critical to maintain a safe environment for conducting basic and clinical research.

9. Brown University Health's next anticipates to draw funds on Feb 14, 2025. At that time, the reduced IDC rate will impact Brown University Health's ability to meet payroll, retain maintenance workers and employ other personnel who support research operations. Additionally, it will hinder the purchase of supplies for clinical trials from national and local vendors. Asa result, this will lead to the premature closure of clinical trials leading to layoffs in nursing staff. **The overall impact will be greatest on patient care with potentially life-saving treatments withdrawn from individuals who have failed all other treatments, especially in cancer.**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February, 2025.

Bharat Ramratnam, M.D.
Vice President of Research
Lifespan Corporation
dba Brown University Health
1 Hoppin St, Suite 1A
Providence, RI 02903

2

# EXHIBIT 37

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

                    Plaintiffs,

            v.

NATIONAL INSTITUTES OF HEALTH, et
al.,

                    Defendants.

Case No. _____

**Declaration of   atherine Tracy**

I,   atherine Tracy, hereby declare:

1.  I am the University of Nevada, Reno's ("UNR") Executive Director, Sponsored Projects ("Executive Director"), a position I have held since 2023. As Executive Director, I have oversight of UNR's sponsored projects. Prior to holding this position, I was University of Arkansas' Director of Research Accounting.

2.  As the Executive Director, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

3.  I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

4.  UNR is Nevada's flagship comprehensive research university. The University of Nevada, Reno advances interdisciplinary research across all academic colleges, fostering innovation,

1

industry collaboration, and scientific discovery in fields such as engineering, health sciences, agriculture, business, education, and the arts. Committed to addressing regional and global challenges, the University's research enterprise supports faculty, staff, and student-driven initiatives, promotes ethical and responsible research practices, and enhances infrastructure to sustain high-impact research, commercialization, and creative endeavors. This research is currently supported by $72,314,064 from the NIH.

5. UNR has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of July 1, 2023. The Indirect Cost ("IDC") Rate in the UNR's NICRA is 47%.

6. UNR's total blended IDC rate for NIH funding is 24.1%.

7. NIH's reduction of UNR'S IDC rate[s] will eliminate approximately $4,172,434 per year in Indirect cost("IDC") (also called Facilities and Adminstrative (F&A) cost recovery) recovery that UNR uses to support its research programs. The loss of IDC recovery will immediately impact UNR'S ability to draw critical funds used to pay expenses associated with NIH projects (facilities costs, mortgages, payroll, infrastructure used to support research, clinical trials).

8. Reduced funding for facilities and administration will directly impact the University's ability to support the infrastructure necessary for conducting clinical trials, including regulatory compliance, research staff, and facility maintenance. While the University does not currently have NIH-funded clinical trials, the hiring of a Clinical Research Director is expected to establish new NIH-sponsored trials, and insufficient administrative support could hinder the University s capacity to manage these studies effectively, meet federal requirements, and sustain long-term clinical research growth.

2

9. A reduction in funding to support the University's facilities and research administration would significantly hinder Nevada's ability to contribute to scientific advances, economic development, and public health progress. UNR is engaged in critical research spanning public health, biomedical sciences, environmental science, and technological innovation, with projects investigating extreme heat effects on pregnancy, tumor immune microenvironments, cardiovascular disease mechanisms, and opioid overdose prevention. Insufficient infrastructure funding would limit the ability to recruit and retain top researchers, invest in cutting-edge technology, and maintain regulatory compliance, ultimately weakening Nevada's position in securing competitive NIH grants. Additionally, reduced support for research administration would create delays in managing complex multi-institutional studies, such as translational research initiatives and personalized medicine advancements, hampering the state s ability to collaborate with national research networks. Without sustained investment, Nevada risks falling behind in (i) providing access to health care to it's citizens, (ii) emerging scientific fields, (iii) reducing its competitiveness for future funding opportunities and (iv) slowing the translation of research discoveries into economic and societal benefits.

10. UNR next anticipates to draw funds on or around March 1, 2025 for all NIH programs. At that time, the reduced IDC rate will impact UNR in sustaining critical research infrastructure, delaying recruitment and retention of top researchers, restricting investments in advanced technology and laboratory facilities, increasing administrative burdens on complex multi-institutional studies, and reducing Nevada's competitiveness in securing future NIH funding and translating scientific discoveries into economic and societal benefits.

3

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this _____ day of February, 2025, in Reno, Nevada_____.

atherine Tracy

Executive Director, Sponsored Projects

University of Nevada, Reno

4

# EXHIBIT 38

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF
MASSACHUSETTS, et al.,

       Plaintiffs,

             v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

       Defendants.

Case No. _____

### DECLARATION OF KIRK DOMBROWSKI

I, Kirk Dombrowski, hereby declare:

1.     I am the Vice President for Research and Economic Development at the University of Vermont and State Agricultural College (University of Vermont or UVM), a position I have held since April 2020. As Vice President of Research and Economic Development, I oversee research strategy, administration, integrity, and technology development at both the University of Vermont and the associated Larner College of Medicine. Prior to holding this position, I was the Associate Dean for Research in the College of Arts and Sciences at the University of Nebraska at Lincoln. Over the last two decades I have served as Principal Investigator of numerous research grants from the National Institutes of Health (NIH), including serving as the Principal Director of the University of Nebraska-Lincoln's Center of Biomedical Research Excellence: Rural Drug Addiction Research Center, funded by the National Institute of General Medicine. I hold a B.A. in Anthropology from the University of Notre Dame and a PhD in Anthropology from the City University of New York.

2.      As the Vice President for Research and Economic Development, I have personal

        knowledge of the matters set forth below, or have knowledge of the matters based on my

        review of information and records gathered by my staff.

3.      I am providing this declaration to explain certain impacts of National Institutes of Health

        ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH*

        *Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce

        indirect costs payments under NIH grants to 15%.

4.      The University of Vermont is Vermont's flagship research university. UVM performs

        externally funded research in biomedical sciences, clinical research, agricultural research,

        basic sciences, engineering, environment, education, and nursing sciences. Extramural

        support for research at UVM has surpassed $260 million in each of the last two years,

        and UVM research serves as a key driver of economic development in Vermont,

        providing support to industry and community that ranges from workforce development to

        industry supporting core facilities, to talent attraction for physicians, scientists and

        engineers. Our biomedical and clinical science research strengths include nationally

        recognized achievements including such areas as cardiovascular, stroke, cancer,

        infectious disease, behavioral health, and lung biology research. UVM currently hosts

        253 active, multiyear research projects that receive more than $310 million of support

        commitments from NIH over the course of those projects. Annual NIH-funded research

        expenditures at UVM have been in excess of $50 million per year over the last several

        years.

5.      The University of Vermont has a cross-agency Negotiated Indirect Cost Rate Agreement

        ("NICRA"). The current indirect cost rate (referred to "F&A" in NIH NOT-OD-25-068

for the "facility" and "administration" components) is derived by Financial & Cost Accounting Services within University Financial Services at UVM in accordance with the White House Office of Management and Budget's Uniform Guidance for federal awards and widely accepted University Costing Standards (DS-2). UVM's current Indirect Cost schedule was negotiated in 2023 and sets approved rates through FY26. Numerous rates are included in this agreement, as appropriate to a range of research and educational conditions. The top Indirect Cost ("IDC") Rate for FY24 for the University of Vermont's NICRA is 53%.

6.    The University of Vermont's total blended IDC rate for NIH funding across all supported activities is approximately 29%.

7.    NIH's reduction of UVM's IDC rates will eliminate approximately $8 million in NIH-funding per year in research support for costs not currently allowed on the federal government's Uniform Guidance, but which are necessary to allow research to take place. Such costs range from accounting/auditing of grant expenditures, personnel and human resources support for researchers employed on federally supported projects, and facilities costs including utilities, depreciation, and upkeep for those facilities in which the research takes place. Were other federal research supporting agencies to follow the lead of NIH in reducing indirect support for research without regard to the actual costs associated with such unreimbursable expenditures, the cost to UVM would likely exceed $25 million per year.

8.    The lowering of NIH indirect support will immediately impact the University's ability to draw critical funds used to pay expenses associated with necessary grant administration tasks in compliance with federal spending and reporting guidelines. Such activities, as

3

well as facility costs such as utilities and building safety, remain necessary to comply with federal laws. UVM's ability to seek patents for new technologies, support emerging local companies, and provide an R&D infrastructure for Vermont are also activities supported by indirect funds.

9.    Absent adequate support for these functions, alternative sources of support will be required. This will require greater state investment in UVM or a rise in tuition rates charged to UVM students. Alternatively, with a decline in UVM's ability to support research, fewer grant dollars will come to Vermont. This will have a significant impact on UVM's ability to continue to drive economic development in the state. The normally accepted economic impact multiplier of 3 implies that a 20% decline in UVM's research activity (~$40 million) would result in an economic loss to Vermont of $120 million annually.

10.    In addition, NIH supported clinical trials at the University of Vermont and the University of Vermont Medical Center help bring novel treatment opportunities to Vermont. Indirect costs associated with NIH-funded trials are a main source of support for UVM's clinical trials facility. As the state's only research university and university affiliated hospital/health network, declines in NIH indirect support for clinical trials facilities will lessen our ability to provide medical advancement to the people of Vermont. This impact will be felt state-wide.

11.    The loss of the negotiated IDC rate and significant decline in our ability to support research at UVM would also cause lasting harm to the University's research program. The University forthcoming elevation to Carnegie Research 1 ("R1") status has significantly elevated our ability to recruit high performing researchers and research

4

trainees to Vermont. Doctoral degrees granted by UVM are up 20% and research expenditures are up more than 70% over the last 5 years. Numerous UVM "spin-out" companies have received significant investment from private funders. All of these results have had a significant impact on Vermont communities and the state's economy, and elevated our ongoing ability to attract high performing students to Vermont. A reversal of this research success and growth will undermine many years of university and state investment at a time where demographic challenges in the northeastern United States are undermining higher education enrollment and access to affordable, high-quality education.

12.    UVM next anticipates to draw funds on or around Friday, February 14. At that time, the reduced IDC rate will impact the University's ability to pay for and maintain its research programs immediately.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February, 2025, at Burlington, Vermont.


_____
Kirk Dombrowski
Vice President for Research and Economic
Development

The University of Vermont

5

# EXHIBIT 39

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al., | |
| Plaintiffs, | Civil Action No. _____ |
| v. | |
| NATIONAL INSTITUTES OF HEALTH; et al., | |
| Defendants. | |

**<u>Declaration of Mari Ostendorf</u>**

I, Mari Ostendorf, hereby declare:

1. I am the Vice Provost for Research in the Office of Research at the University of Washington, a position I have held since 2021. As Vice Provost for Research, I have oversight over the pre-award process, reporting of institution-wide research statistics, and several research compliance offices. In addition, I oversee two major research units: the Applied Physics Laboratory and the Washington National Primate Research Center. Prior to holding this position, I served as Associate Vice Provost for Research in the Office of Research since 2017.

2. As the Vice Provost for Research, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff and colleagues in the School of Medicine and the Office of Finance, Planning and Budgeting.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants*

1

*Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%. In fiscal year 2024 University of Washington received over 1,000 NIH awards, with funding totaling $668,977,129, including flow-through funding via partner institutions.

4. The University of Washington has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective July 1, 2024, until amended. The Indirect Cost ("IDC") Rate in the University of Washington's NICRA varies based on the costs associated with the specific location. The 2024 on-campus rate is 55.5%. Federal organized research rates (excluding training grants) vary from 26% for research off campus to 83.1% for research in the Primate Center. For research at the School of Medicine South Lake Union facilities, the rate is 76.5%. For the Applied Physics Lab, the rate is 19%, because they have a special arrangement with the federal government to charge administrative costs as direct costs. Training grants have lower rates as specified by NIH, since they primarily cover educational costs.

5. The University regularly draws federal funds in alignment with agreed to statements of work inclusive of indirect expenses borne by the University and recovered from the federal government that support the scopes of work obligated by both the University and the NIH.

6. The University bears expenses that are attributable to federal grants and contracts and recoverable as indirect costs. Examples of these expenses include:

- Water, sewer, electrical, gas;
- Debt service for research buildings for which we would be threatened by a default on our debt without indirect cost recovery on federal grants and contracts;
- Cost of insuring, maintaining and renewing those buildings;
- Rent, maintenance and operations of facilities that exclusively accommodate research;
- Our compliance and regulatory infrastructure;
- The proper handling and disposal of hazardous waste, in accordance with applicable federal and state laws;
- The cost of insurance and our captive management; and

2

- Administrative costs, such as the award lifecycle management process, human resources, payroll, information technology, cyber security program, and financial management.

Notably, **time and again, our required federal facilities and administrative cost studies prove** that the University's total calculated indirect cost, which adheres to federal uniform guidance, is higher than the rates we've negotiated with the federal government. Therefore, like most of our peers, the University is providing the federal government a discount from the true cost of conducting research activities at the University of Washington. **We are already subsidizing federal grants and contracts on the administrative side.** In addition, the federal facilities and administrative cost calculations follow federal requirements and exclude, or cap, activities deemed outside of the scope of the federal government's responsibilities.

7. NIH's reduction of University of Washington's IDC rate(s) will eliminate approximately $90-$110 million in funding that University of Washington uses to support its active NIH research programs. Should the University of Washington lose this funding, it will have to scale back ongoing clinical trials and stop enrolling new patients in clinical trials for diseases where there is no good treatment available outside of trials. While UW would only take such measures in a manner that is safe and ethical for currently enrolled participants, for patients that have placed their trust in UW for what is in many cases their last option at lifesaving care, and for those who held off of other treatment and clinical trial opportunities to pursue treatment at UW, any scaling back in their level of care would be a devastating breach of trust. The damage to these patients' lives and their relationship with their care team at UW would be nearly impossible to rectify. Additionally, any limit on our ability to start new trials will delay lifesaving treatments that rely on decades of research and development.

3

8.   Similarly, the loss of indirect costs will limit our ability to continue many studies that rely on animal research to ensure treatments are safe for clinical trials, since animal research oversight is sustained by IDC funds. We will need to close down facilities and euthanize animals intended for studies that are no longer viable, limiting future innovation in translational medicine, therapeutic development, and other critical advancements in human and animal health.

9.   If IDC is reduced, UW will be able to support less research and reduced staffing levels will delay work from hiring researchers, to getting the supplies they need, keeping the IT systems running, and processing bills, etc.  This will lead to layoffs of staff and damage to the local economy.

10.  In this declaration I highlight the impact on loss of indirect cost funds on two programs, the UW School of Medicine and The Washington National Primate Research Center. However, the impact will be felt across the University, including the School of Public Health, School of Arts and Sciences, School of Dentistry, School of Pharmacy, School of Nursing, School of Social Work, and College of Engineering, as well our state's economy. Based on a Fiscal Year 2023 economic impact study, University of Washington research impacts for the State of Washington include: $2.6 billion generated in the Washington economy from UW research; 10,641 total jobs supported sustained statewide by UW research (direct, indirect and induced); and $93.5 million in Washington state ($63 million) and local ($30.5 million) tax revenue. The biomedical research at UW, much of which is supported by NIH, is a major contributor to that impact. The reduced rate will cause significant effects on the level of supporting workforce the University of Washington is able to employ.

**UW School of Medicine**

4

11. UW Medicine ranks among the top academic research institutions to receive National Institutes of Health (NIH) funding. In fiscal year 2024, for instance, NIH funded 657 UW School of Medicine grants, totaling more than $385 million.

12. The UW School of Medicine is a leader in regional medical education and conducts world-leading research across 31 clinical and biomedical research departments and multiple research institutes and centers with areas of focus including behavioral health, neuroscience and Alzheimer's disease, heart disease and stroke, infectious diseases, cancer, health metrics, genomics and precision medicine, protein design and regenerative medicine.

13. From making kidney dialysis possible to winning the Nobel Prize for bone-marrow transplantation and most recently, the Nobel Prize for computational protein design, UW Medicine has a long tradition of leading-edge research that has yielded some of the most important innovations in the history of modern medicine.

14. NIH federal research grants have enabled incredible medical advances by UW School of Medicine faculty, including these recent developments:

- Identification of how a new area of the brain is impacted by Alzheimer's disease, potentially allowing for an earlier diagnosis via MRI;
- Development of a new gene therapy treatment for Duchenne muscular dystrophy;
- Development of a new care model to treat pain more effectively for traumatic brain injury patients; and
- Identification of new markers that predict diabetic kidney disease in young adults with type 2 diabetes.

15. NIH funding currently supports the following key UW School of Medicine clinical trials and centers:

- **Kidney disease:** A clinical trial testing whether home blood pressure monitoring is more effective than monitoring only before dialysis in improving treatment and preventing cardiovascular disease events, especially for patients in rural areas. This is a multi-center clinical trial (UW-prime and UCSF). It is recruiting patients all across Washington state, including rural areas.

5

- **Diabetes:** A clinical trial testing whether using continuous glucose monitoring to guide lifestyle modification and medications to reduce blood sugar will improve kidney and cardiovascular disease outcomes.
- **Alzheimer's:** The National Alzheimer's Coordinating Center, based at the UW School of Public Health, collates and distributes the data from the nation's 35 Alzheimer's Disease Research Centers. This allows thousands of researchers across the country study the key questions in cognitive disease across all sites.
- **Pediatric cancer:** A clinical trial to test a method to determine whether CART immunotherapy alone will work for children and young adults with B Lineage Acute Lymphoblastic or whether they will need a stem cell transplant to avoid relapse.

## <u>The Washington National Primate Research Center</u>

16. The Washington National Primate Research Center (WaNPRC) is an example program that would be significantly impacted by the reduced indirect cost rate. WaNPRC is one of only seven National Primate Research Centers in the world and the University of Washington has served as the steward of this national resource for over 60 years. WaNPRC provides critical infrastructure that has and continues to support thousands of scientists, and their NIH funded research projects focused on developing new medical innovations. No other animal model more closely models humans and the proof of the value of non-human primate research is in WaNPRC's record of directly advancing new medical interventions that have and continue to save lives and improve human health.

17. WaNPRC's pioneering biomedical advances that benefit human health today include: brain-interface research that enables people to control robotic limbs with brain activity coded by a computer; the first controlled brain-function study in a nonhuman primate, which led to technology restoring movement in people with spinal cord injuries; and the first cochlear implants that provide a cure for deafness.

18. Ongoing biomedical research at WaNPRC that will be crippled from loss of NIH funding, includes: a novel gene therapy strategies that have successfully shrunk the HIV reservoir, paving the way toward a cure for chronic HIV infection and a platform that could be used to

6

cure other chronic viral infections; stem-cell based therapy used to repair damaged heart muscle; and development of a novel tool to study the causes of stroke that could lead to new interventions to prevent or treat stroke in people.

19. The cut in IDC rates will cripple WaNPRC's life-saving research. WaNPRC is supported by two base grants from the NIH totaling over $15 million. These grants, including both direct and indirect costs, and the fees charged to individual investigator research grants comprise its total operating budget of $30.5 million. WaNPRC supports 800 nonhuman primates, employs 170 people with expertise in veterinary care and animal research and provides the specialized lab spaces and equipment unique to nonhuman primate research. A cut in IDC will result in loss of nearly $5 million per year in resources needed to support our infrastructure. To make up for this cost, WaNPRC would have to substantially increase the rates it charges to NIH-funded grants. We estimate this will result in charging each grant about $100,000 more in direct costs. Researchers do not have sufficient funds on their NIH projects to cover these costs, which jeopardizes both the research and the support of students on the project.

20. With a reduction of administrative funding for compliance and facilities costs and the constraints of current investigator budgets, the WaNPRC would be required to shut down facilities, directly impacting the 170 individuals employed by the Center. In addition, with other NPRCs impacted, there will be animals that cannot be sold or relocated to other research facilities. There is limited sanctuary space available, and the UW would not be able to cover the high costs associated with lifetime sanctuary care, so these animals would have to be euthanized. Currently, at least 300 researchers are supported on NIH-funded grants that depend on WaNPRC infrastructure. Without this infrastructure, both basic and translational

7

biomedical research in the region will be greatly limited, as well as the training of our future workforce.

21. The *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates*, NOT-OD-25-068, states: "The United States should have the best medical research in the world. It is accordingly vital to ensure that as many funds as possible go towards direct scientific research costs." As described above, the net impact of this new policy would have the opposite of what is intended. It will directly reduce the resources needed to support the research and cripple the ability of the United States to continue to support the best biomedical research in the world. Moreover, it will compromise the training and development of future generations of scientists in the United States.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 9th day of February 2025, in _____ Seattle, WA _____.

*Mari Ostendorf*

Mari Ostendorf
Vice Provost for Research
University of Washington

8

# EXHIBIT 40

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

        Plaintiffs,

    v.

NATIONAL INSTITUTES OF HEALTH; et
al.,

        Defendants.

Civil Action No. _____

**<u>Declaration of Leslie Anne Brunelli</u>**

I, Leslie Anne Brunelli, hereby declare:

1. I am a resident of the State of Washington. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am currently employed by Washington State University (WSU) as Executive Vice President for Finance and Administration and Chief Financial Officer. In my role, I am responsible for the financial management, planning and budgeting activities of the Washington State University, including oversight of post award administration and federal cash management.

3. I am providing this declaration to explain certain impacts of NIH Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which appears to immediately reduce indirect costs payments to 15%.

4. The National Institutes of Health (NIH) are a major source of federal funds at WSU. WSU was awarded approximately $44 million by the NIH (including flowthrough) in FY24,

1

making up 66% of awards from the Department of Health and Human Services (HHS) in

FY24 and over 13% of all external award funds and 17.7% of all federal funding. Currently,

there are 134 active grants from NIH to 98 principal investigators (PIs) at WSU with a total

remaining value of $52,420,589.

5. These grants fund critical applied and foundational research in the health sciences—

including in addiction and substance use, health service delivery in rural and other

underserved areas, pain management, Alzheimer's disease, cancers, and nutrition—as well as

providing for the training of the next generation of researchers and clinicians.

6. Typically, NIH grants awarded to WSU do not include "direct" cost items for institutional

costs like facilities (including utilities and maintenance), administrative staff, and other WSU

resources. In essence, the NIH grant direct costs WSU receives cover only the actual research

WSU is tasked to perform; the indirect cost portions of their awards cover the infrastructure

costs WSU incurs to perform the research under the grant, such as laboratory and building

maintenance and upkeep, data processing, library subscriptions, security, human and animal

participant protections, lab safety equipment, hazardous waste disposal, information

technology costs, ethics review board costs, grant administration, and compliance costs.

7. WSU is only able to conduct the research provided for under the NIH grants because the

"indirect" costs provide a reliable set of funds for the duration of the grant to cover these

additional expenses. Coverage of these indirect costs are critical to WSU's ability to

effectively conduct research in conjunction with the federal government.

8. WSU does not, and cannot, "profit" off of these indirect costs paid by the federal

government. These costs cover only expenses incurred by research activities, and **do not

even fully reimburse the expenses that result from providing necessary infrastructure**

2

**and support to conduct research activities**. Additionally, these costs are *only* based on funded research space and related research activities. Accordingly, WSU's indirect costs are carefully calculated, and WSU takes great pains to ensure their accuracy when transmitting them to the federal government. WSU's indirect costs are arrived at after yearslong surveys of WSU's available resources and research-related costs.

9.  WSU has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of July 1, 2019. The Indirect Cost ("IDC") Rate in WSU's NICRA is 53% for on-campus research, and 26% for off-campus research. WSU's total blended IDC rate for NIH funding is 30.44%.

10. WSU relied on these longstanding negotiated rates when building out its facilities, budgeting for research projects, deciding on which and how many students to admit and faculty/staff to employ, and deciding how to prioritize its own institution-wide funding allocations. NIH's sudden, overnight change of these agreements that have been in place for years would send shockwaves throughout WSU and significantly disrupt the substantial progress WSU has made to better serve its students and its community as a research institution.

11. With the NIH indirect cost percentage capped at 15%, WSU projects it will receive $1,592,199 less in the remainder of state FY25, or $412,840 monthly. Annualized, this would total an estimated $4,954,084 of lost revenue for facilities and administration. These projections take into account only direct awards from NIH, excluding passthrough awards where NIH is the prime sponsor. The actual total losses are therefore much greater.

12. For FY 2026, NIH's reduction of WSU'S IDC rates will eliminate approximately $5,118,961 in funding that WSU uses to support its research programs.

3

13. The loss of these funds will immediately impact WSU'S ability to draw critical funds used to pay expenses associated with several of its component schools and campuses. WSU does not have the funds available to cover the immediate loss of millions of dollars in indirects from its research grant budget.

14. Certain WSU departments, such as the Office of the Campus Veterinarian (the "Office"), which supports nearly all projects WSU's large animal-based research portfolio (and all of its veterinary services), are almost wholly dependent on these indirect costs to stay afloat, as costs associated cannot be charged back as direct costs. The indirect costs are also used to ensure regulatory compliance, such as the 404 approved animal use protocols and 155 PIs that must be used in any proposed research. They cover training faculty and staff on compliance and animal care, proper animal handling, vaccination and respiratory administration, and other mandates required by federal and state law. These costs are not passed on to the researchers, but are necessary to proceed with any animal research.

15. Similarly, cuts to NIH's indirect costs would devastate WSU's College of Veterinary Medicine (CVM), where NIH funding accounts for 30% of CVM's research portfolio. This percentage equates to just under $15 million in annual research expenditures and supports a range of areas important for societal health and wellbeing including reproductive health, substance abuse and addiction, infectious disease, among many others. The indirect costs from NIH grants support nearly all aspects of biomedical research in CVM including students, animal costs, equipment support, and staff. In addition, indirect costs provide the vast majority of funding for CVM's strategic research fund, which is used for rejuvenating essential equipment, seed grants to spur innovation and collaboration, and bridge funding for faculty. Reduction in indirect rates will devastate the biomedical research enterprise in CVM,

4

severely hamstringing CVM's faculty and crippling ongoing research. Facilities like the Washington Animal Disease Diagnostic Laboratory (WADDL) the only accredited veterinary medical laboratory within Washington, would be hamstrung in their ability to detect, research, and conduct responses to current and future disease outbreaks such as the current highly pathogenic avian influenza (HPAI) virus, rabies, tularemia, and the plague.

16. Without funds for animal care through the Office of the Campus Veterinarian, combined with the loss of indirects for the research projects themselves within CVM, research animal colonies will have to be severely reduced or eliminated. The loss of life would be massive: in 2023, WSU accounted for use of 90,000 animals of which 50% were fish and 39% were mice. The remaining 11% include amphibians, reptiles, birds and other mammals. The results would be horrific. Animals such as mice with short life spans will "age out" or the cost of holding them until they can be used would be too expensive. WSU cares for valuable gene-edited strains of cattle, rodents and fish which are irreplaceable, and elimination of animal colonies will take potentially years to replace even the ones that are capable of replacement.

17. Even if some funding could be later restored, the massive loss of animal life cannot be easily replaced, and some projects are unlikely to restart. Moreover, the loss of the animal population would require layoffs of professional animal care and veterinary staff that are nearly impossible to replace, given the current disparity in opportunities in veterinary medicine that are available in the private sector. Moreover, reducing staff to a bare minimum will increase risk of safety violations and noncompliance with federal and state animal care requirements, further endangering WSU to liability and financial impositions it cannot afford to incur. The staff reduction would also severely hinder WSU's extension activities in its local communities, such as its safe food initiatives and its support of statewide disease

5

surveillance and detection efforts – a concern of immense and immediate consequence, as our facilities regularly test eggs, poultry, and milk for diseases like avian influenza.

18. If the NIH proceeds with its indirect cost guidance, the reduced coverage would also likely force WSU to close some of its other research facilities, like the Spokane vivarium and the analytical core services that support our biomedical, drug discovery, and drug delivery programs, including some high impact cancer research. WSU would lose faculty, postdocs and graduate students. WSU would essentially have to eliminate all of the research support services at WSU Spokane and would have to downsize its research facilities statewide, making it difficult to impossible to retain and recruit research-active faculty. It would also greatly impact WSU's IT services that support human subjects research across all campuses.

19. Certain WSU-sponsored research laboratories would be in serious danger of closing. For example, WSU is home to the only Biosafety Level 3 laboratory available for public health use in Washington east of Seattle. This lab does critical infectious disease research and was called on to serve eastern and central Washington during the COVID-19 outbreak and currently provides the facilities needed for critical avian influenza research.  Without indirect cost elements of NIH research grants to support the maintenance and continual upgrade of the laboratory, this capability to serve the state and nation would be lost. As our country sees cases of avian flu (including mutations) rising nationwide, this continued research will be critical in avoiding another viral pandemic.

20. Capping the indirect costs 15% would also decimate WSU's Medical School, the Elson S. Floyd College of Medicine relies heavily on NIH funding. It is difficult to overestimate the immediate impact this would have on the College, resulting in substantial impact across most departments and programs (such as Team Mentoring Program, Community and Behavioral

6

Health, Nutrition and Exercise Physiology, Speech and Heating Sciences, and many more) that would likely incur:

- Devastating faculty, staff, and post-graduate position reductions;

- Closure of specific research programs, such as our community-based human subjects research in the Promoting Research Initiatives in Substance Use and Mental Health Collaborative (PRISM), the Institute for Research and Education to Advance Community Health (IREACH), and those within our Sleep and Performance Research Laboratory;

- Patient care clinical service loss, including elimination or clinical trials for potential life-saving care, especially for vulnerable populations;

- Substantial research infrastructure reductions to support remaining faculty;

- Loss of mentorship for junior faculty for appropriate faculty development, hindering WSU's ability to provide effective education to its medical students and the next generation of doctors;

- Faculty reduction jeopardizing WSU's ability to provide accreditation-required mentors for student research; and

- Potential adverse accreditation determination impact (e.g., probation) for insufficient research, among others.

21. WSU's College of Nursing would also be in serious jeopardy of serious downsizing or potentially shuttering, as it is heavily dependent on indirect funds to support its library fees, access to journals that support our grants applications, IT support (which ensures regulated data is secure), faculty recruitment and retention (a serious challenge in the current

7

environment), and our research-related services, essential to conducting research with human subjects ethically.

22. With the mass loss of facilities, employees, and staff that will result from NIH's guidance, WSU would be functionally unable to proceed with many of the life-saving research projects that are currently the subject of NIH's various grants, like the College of Pharmacy and Pharmaceutical Sciences' research into carcinogen interactions and lung cancer risk, the College of Medicine's research into childhood obesity and alcoholism, the College of Arts and Sciences' research into pediatric pain, anxiety disorders, and prostate cancer; and the College of Veterinary Medicine's research into the neurogenealogical causes of obesity and sterility.

23. While any disruption to this critical research will ultimately hinder delivery of lifesaving services in the months and years to come, the impacts of NIH's guidance are in many cases much more immediate. For instance, one ongoing NIH-funded study in the College of Art and Sciences deals with the Sharma Lab's Targeted Nanotherapies for the Treatment of Prostate Cancer (NIH NIC R21 CA286235), and focuses on developing a novel treatment of advanced prostate cancer. If the study is not completed, this novel form of cancer therapy will not be investigated and developed into a drug to help treat the second leading cause of cancer-related deaths among men in the U.S. Importantly, the Sharma lab has already developed nanotherapeutics and is actively testing them on prostate cancer cells and organoids. This is time-sensitive work, and any disruption would result in immediate and potentially irreplaceable data loss on these active tests, which would delay and could ultimately eliminate the viability of the treatment they are researching.

8

24. WSU regularly draws down funds per the allowable grant terms, including its indirect costs, for its NIH (and other federal agencies) projects, and anticipates making its next draw on our regular cycle on February 12, 2025.  WSU sincerely hopes it will be able to collect indirect costs at the rate it negotiated years ago to avoid the immediate devastation the NIH's guidance would have on the institution, its people, and the animals in its care if it remains in effect.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this ___ day of February 2025, in _____ .

LESLIE ANNE BRUNELLI
Executive Vice President for Finance and
Administration and Chief Financial Officer
Washington State University

9

# EXHIBIT 41

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASACHUSETTS**

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al. <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL INSTITUTES OF HEALTH; MATTHEW MEMOLI, M.D., M.S., in his official capacity as Acting Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and DOROTHY FINK, M.D., in her official capacity as Acting Secretary of the U.S. Department of Health and Human Services, <br><br> Defendants. | Civil Action No. _____ |

### <u>Declaration of Dorota Grejner-Brzezinska</u>

I, Dorota Grejner-Brzezinska, hereby declare:

1. I am the Vice Chancellor for Research at the University of Wisconsin-Madison ("UW-Madison"), a position I have held since 2024. In this role, I have responsibility for overseeing the university's research enterprise with more than $1.7 billion in annual research expenditures. My office also includes administration of 20 cross-campus research and service centers. The mission of the Office of the Vice Chancellor for Research is to advance excellence in research and scholarship, to support our multidisciplinary research centers and institutes, and to provide campus-wide administrative infrastructure to support and advance the research enterprise. Prior to holding this position, I was the Vice President of the Office of Knowledge Enterprise and a Professor of civil, environmental and geodetic engineering at The Ohio State University.

1

2. As the Vice Chancellor for Research, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by university staff.

3. I am providing this declaration to explain certain impacts on UW-Madison of the National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which UW-Madison became aware of at approximately 5 p.m. on Friday, February 7, 2025.  NIH's *Supplemental Guidance* purports to impose, beginning on Monday, February 10, 2025, a standard indirect costs (IDC) rate of 15% to all grants awarded by the agency.  The newly announced rate would apply to "new grant awards and existing grant awards," giving it retroactive application to research already occurring at the university in reliance on the previously negotiated rate.

4. UW-Madison is Wisconsin's flagship research university. It operates under the premise that research and education should influence the lives of others beyond the boundaries of the campus. Research at UW-Madison drives innovation related to treating adult and pediatric cancer, Alzheimer's, diabetes, degenerative neurologic diseases, and more. Further, the research enterprise supports training and development of UW-Madison students. This research is supported by $513 million from the Department of Health and Human Services (DHHS), which primarily comes from the NIH.

5. UW-Madison has a Negotiated Indirect Cost Rate Agreement ("NICRA") with DHHS, covering all federal agencies, and effective as of January 17, 2025. The IDC rate in UW-Madison's NICRA is 55.5%.  This rate is composed of 26% for administrative costs and 29.5% for facility costs. Administrative costs are the general costs to administer research,

2

such as accounting, payroll, and research oversight and are capped by federal law at 26%. Facility costs include the maintenance and depreciation of the research facilities.

6. UW-Madison's federally negotiated IDC rate has remained steady, with slight increases since 2013; at that time the negotiated rate was 53%, just marginally lower than the current 55.5%. UW-Madison reasonably relies on a generally consistent rate of negotiated IDC reimbursement in making its financial plans.

7. NIH's reduction of UW-Madison's negotiated IDC rate would eliminate approximately $65 million in funding in the current year, and result in a similar reduction in resources available to support research each year.  UW-Madison depends on this source to support its research programs and general infrastructure. The loss of these funds will immediately impact the university's ability to draw critical funds used to pay expenses associated with its research enterprise. This includes the costs to support strict federal regulatory compliance mandated for federally funded research that are intended to, for example, promote national security interests and maintain the nation's competitive edge through export controls and measures to prevent malign foreign influence; protect human and animal participants in research; protect public investments in research; ensure the safe conduct of research involving hazardous biological agents, recombinant DNA, and radiation; and ensure the integrity of research funded by American taxpayers.

8. UW-Madison's campus includes over 17 million gross square feet dedicated to education and general purposes. Many of its buildings are highly technical, and more than half are over 50 years old. Funding from IDC recovery goes directly toward maintenance, utilities, and renovations in these buildings, particularly for updating laboratories where much of the federally sponsored research is conducted. These projects ensure campus laboratories are not

3

only properly equipped to support sophisticated, cutting-edge research, but to protect the safety of university scientists, students, and the surrounding community and meet federal compliance obligations. State law prevents the use of other sources of unrestricted revenue for campus-funded renovation projects and donor support for infrastructure upgrades is challenging to secure. Therefore, IDC revenue plays a critical role in maintaining the adequacy of our facilities; any revenue loss would only exacerbate our deferred maintenance backlog. The sudden loss of IDC funding imperils not just research space, as research and academic facilities at the University share buildings; reduced maintenance resources will affect the entire university physical environment.

9.  Reduction of UW-Madison's IDC rate will also negatively and specifically impact the institution's ability to conduct clinical research related to cancer treatment (including pediatric), Alzheimer's Disease and other types of dementia, cardiac conditions, fetal heart conditions, maternal–fetal health, autism, addiction recovery, diabetes, asthma, adolescent and adult depression and post-traumatic stress, infectious diseases, Huntington's Disease, HIV, conditions affecting nursing home patients, veteran's health, and more. Many research participants are on treatment trials, which means they are patients actively receiving innovative treatments that may impact their disease process or alleviate symptoms. More than 20,000 patients that have been in our care for at least a year are part of this research and the university has had 3,461 new enrollments so far in this fiscal year. IDCs are central among the funds that support infrastructure necessary for the conduct of this research, including laboratories and clinical space for the work, protocol review and secure data storage and transfer systems, and personnel tasked with ensuring regulatory compliance for the protection of human participants and their data. Sophisticated and extensive infrastructure

4

is necessary to meet federal requirements related to protection of participants' rights, welfare, and safety, and data integrity; data security for participants' confidential and sensitive health information; data management and sharing with clincaltrials.gov and NIH/other repositories; financial reporting, including effort reporting, to demonstrate appropriate use of federal funds; and progress reporting to federal agencies. The unanticipated and abrupt loss of $65 million will place the university in the sudden, untenable position of no longer being able to rely on promised federal funding to support the daily activities and operations that support life-saving clinical and translational research at UW-Madison. If alternative sources of funding cannot be secured to fill this void, the reduction in IDC could necessitate programmatic downsizing at the university, including potentially terminating some clinical trials, thereby leaving a population of patients with no viable alternative. At a minimum, the decrease will constrain our growth trajectory in clinical research, preventing us from fully serving the sickest and most vulnerable individuals in the region.

10. In addition to clinical research, NIH-funded fundamental science provides the building blocks to predict, prevent, diagnose, and treat disease. Medicines to treat cancer, neurodegenerative disease, diabetes, and numerous other ailments have been developed by leveraging breakthroughs made in basic science laboratories. Advancements in imaging technologies led by medical physicists now allow doctors to visualize diseased tissues in the body and ultimately treat them. In combination with genomics approaches developed by basic scientists, personalized medicine is now becoming a reality. The IDCs associated with these fundamental studies are essential to supporting the research infrastructure and the personnel who enable scientific discoveries in the lab. Maintaining and equipping buildings

5

to conduct research is essential to keeping the U.S. at the forefront of knowledge and medical discoveries.

11. The timing of receipt of NIH's announcement—late on Friday, February 7—of its intent to significantly curtail its IDC rate particularly strains the university and its researchers with respect to decisions about applications for grant awards. The submission deadline for NIH Research Training and Career Development (series K) awards is Wednesday, February 12, 2025. These grants are often instrumental in fostering the success of early career scientists. Additionally, the deadline for small research grants (R03), exploratory grants (R21/R33, UH2/UH3), planning grants (R34), dissertation awards (R36), and planning cooperative projects (U34) is Sunday, February 16, 2025. NIH's eleventh-hour change in available funding forces researchers and university administrators to reconsider whether to submit grant applications, many of which they have been fine-tuning for months, given uncertainty about whether the institution can afford to sustain these projects at a 15% IDC rate. The sense of whiplash is particularly acute, given that UW-Madison had finalized its most recent NICRA with DHHS less than three weeks prior.

12. UW-Madison typically draws down funds for NIH-funded projects twice per month and next anticipates drawing funds on or around February 17, 2025. At that time, if allowed to be implemented, the reduced IDC rate will result in UW-Madison experiencing a $3.9 million loss in IDC recovery for this upcoming draw.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

6

Executed this 9th day of February, 2025, in Madison, Wisconsin.

/s/ *Dorota Grejner Brzezinska*
Dorota Grejner-Brzezinska
Vice Chancellor for Research
University of Wisconsin-Madison

7

# EXHIBIT 42

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, et al.,

                Plaintiffs,

      v.

NATIONAL INSTITUTES OF HEALTH,
et al.,

            Defendants.

Case No. _____

**<u>Declaration of Kristian O'Connor</u>**

I, Kristian O'Connor, hereby declare:

1. I am the Interim Vice Provost for Research and Dean of the Graduate School, a position I have held since 2023. As Interim Vice Provost for Research and Dean of the Graduate School, I serve as UWM's Chief Research Officer and have oversight of the Office of Research, which is responsible for the administration of research activity, oversight of research policy, and compliance with federal and state requirements. The Office of Research also provides pre- and post-award administrative support for sponsored projects. Prior to holding this position, I was the Associate Vice Provost for Research.

2. As the Interim Vice Provost for Research and Dean of the Graduate School, I have personal knowledge of the matters set forth below or have knowledge of the matters based on my review of information and records gathered by my staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants*

1

*Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs payments to 15%.

4. The University of Wisconsin-Milwaukee (UWM) is one of Wisconsin's two Carnegie Foundation R1 (very high research activity) classified research universities. Among other research outcomes, UWM's researchers enhance quality of life by improving physical and mental health interventions, disease prevention strategies, and public health policies. Examples include understanding the effects of hormones on the neuroscience of aging, the behavioral effects of substance abuse, improving the health and quality of life for children with developmental disabilities, and the relationship between environmental toxins and children's health.  This research is currently supported by approximately $7.9 million in active awards from the NIH.

5. UWM has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of October 31, 2023. The Indirect Cost ("IDC") Rate in UWM's NICRA for on-campus organized research is fifty-four (54) percent.

6. NIH's reduction of UWM's IDC rate[s] will eliminate approximately $2.4M in annual funding that UWM uses to support its research programs. The loss of these funds will immediately impact UWM's ability to draw critical funds used to pay expenses associated with facilities and services that support research, that are not reimbursed directly through grant funds. This includes but is not limited to research facilities and laboratory infrastructure, utilities, payroll for administrative and compliance support and other staff necessary to all research, and other infrastructure used to support research. UWM's ability to support its research enterprise would be significantly hampered by a reduction in a change to the negotiated indirect rate. Each UWM school, college, department, and individual

2

researchers cannot support the staffing and other costs necessary for these functions, and the indirect costs are essential to providing that support at UWM.

7. UWM next anticipates drawing funds on or around February 28, 2025. At that time, the reduced IDC rate will impact UWM by causing a sudden loss in revenue and the need for UWM to choose between immediately cutting needed operating functions or creating an operating deficit and impairing the university's financial position.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed this 9th day of February, 2025, in Milwaukee, Wisconsin.

Kristian O'Connor

Interim Vice Provost for Research and Dean of the Graduate School

University of Wisconsin-Milwaukee

3

# EXHIBIT 43

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, STATE OF CALIFORNIA, et al. | |
| Plaintiffs, | Civil Action No. _____ |
| v. | |
| NATIONAL INSTITUTES OF HEALTH; MATTHEW MEMOLI, M.D., M.S., in his official capacity as Acting Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and DOROTHY FIN , M.D., in her official capacity as Acting Secretary of the U.S. Department of Health and Human Services, | |
| Defendants. | |

1

## DEC_ARATION OF JENI_ITCHE__

I, Jeni_itchell, hereby declare:

1. I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated here or have knowledge of the matters based on my review of information and records gathered by California State University ("CSU") staff. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am currently employed by the California State University as the Assistant Vice Chancellor, Finance & Budget Administration and Controller.

3. As the Assistant Vice Chancellor, Finance & Budget Administration/Controller, I am responsible for oversight of financial operations at the CSU and financial reporting from all sources, including all federal grant funding.

4. The CSU receives extensive federal funding for research. A hallmark of CSU research is immersive student learning and discovery that addresses society's most urgent challenges, including those in health care, agriculture, water, fire prevention and cybersecurity. Undergraduate students who participate in faculty-mentored research are better prepared for future careers, graduate education and leadership roles that contribute to their respective communities.

5. The CSU is the largest four-year public university system in the United States and is the state's greatest producer of bachelor's degrees    awarding nearly 127,000 degrees each year    and drives the economy in health care, agriculture, information technology, business, hospitality, life sciences, public administration, education, media and entertainment.

6. The California State University is responsible for the provision of higher education services to students across the state of California and throughout the United States. Consisting of 23

2

university campuses, nearly a dozen off-campus centers, and over 90 auxiliary organizations (several that are dedicated to sponsored research), the CSU educates more than 450,000 undergraduate and graduate students each year, and serves each of California's regions, from Humboldt to San Diego. The CSU offers more than 4,000 degree programs that align with workforce demands, including in health care and the sciences. CSU alumni make up a global network that is over four million strong. One in twenty Americans with a college degree earned it at the CSU. The CSU has more than 63,000 employees.

7.  The CSU also has 10 multi-campus research consortia that provide experiential learning opportunities for students, to prepare them for the workforce and address vital needs in California and across the country.

8.  I am providing this declaration to explain certain impacts of the National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates ("Notice"), which purports to immediately reduce facilities and administrative costs payments (also known as indirect costs) to 15% to all NIH grants.

9.  CSU's budget relies on federal grant funding for its teaching and research mission, including, but not limited to, allocated funding for staffing, clinical trials, dissemination of results, public outreach, teaching and training students and others, equipment, and numerous other activities to fulfill its teaching and research mission, and serve the people of California and the United States.

10. Federal funds are CSU's single most important source of support for its research, accounting for more than 60% of CSU's total research awards.

3

11. For the fiscal year ending June 30, 2024, the total amount of all federal research awards to the CSU was $599,688,000.

12. For the 2023-24 audited fiscal year, the CSU expended over $158 million in NIH contract and grant funding. A sizable portion of that funding is derived from facilities and administrative cost reimbursements, which are set at a higher negotiated rate than set forth in the NIH Notice. The CSU's NIH grant contracts have varying negotiated rates for reimbursement of indirect costs that range from 20% to 50% or more. The CSU estimates a loss of tens of millions of dollars annually in facility and administrative cost recovery as a result of the NIH Notice. The loss of facilities and administrative cost reimbursements, especially at this level, will have an immediate deleterious impact on the success of research projects and the CSU's ability to maintain the same level of staffing critical to support those research projects.

13. NIH research funding supports the United States' scientific competitiveness worldwide and enables the U.S. to be a global innovation leader. NIH research funding has led to scientific breakthroughs that have improved human health, including new treatments for cancer and diabetes, and declining death rates for heart attack and stroke.

14. Recovering costs of research is essential to maintain the operations of CSU's research. To perform research that is sponsored by federal agencies, the CSU incurs a variety of other significant costs that it would not otherwise incur. Facilities and administrative cost rates apply to federally sponsored research, providing a means of recovering some, but not all, of the costs incurred in the conduct of externally sponsored research that are shared across a large number of projects as well as other functions of the university. They include things such as the maintenance of sophisticated, state of the art high-tech laboratories designed for

4

innovative federally sponsored research, secured cyberinfrastructure and data repositories, utilities such as light and heat, telecommunications, hazardous waste disposal, and the infrastructure necessary to comply with a broad range of legal, regulatory, and reporting requirements. These resources not only support the infrastructure and buildings that house pioneering research teams, but also the personnel who assure the safety of those participating in clinical trials, the ethics teams that assure those trials are done safely, and the data and privacy teams that protect research subjects' personal data. This funding model recognizes the importance of both direct project costs and the essential indirect costs that sustain the research ecosystem.

15. Research funding is typically awarded through competitive grants processes, meaning that the annual research budget varies from year to year and is dependent on the success of CSU's researchers in these competitions. Federally supported research comes to CSU universities in a combination of both single- and multi-year awards. NIH awards are typically multi-year projects. CSU's 23 universities receive and expend hundreds of millions of dollars annually in multi-year awards for their projects, centers, and institutes, and can proceed with establishing budget estimates for planning purposes in reliance on the facilities and administrative cost recovery rates periodically negotiated between individual campuses and the federal government (the Department of Health and Human Services) that set rates for three to five years.

16. NIH promotes medical research, education, training and practice at the CSU and other universities through a strategic combination of funding for many individual research projects, as well as support for a few large, long-term research programs and centers that involve multiple institutions through subawards. Program awards, unlike the thousands of individual

5

investigator awards to the CSU from the NIH, may receive continuous funding for periods of over five years before the NIH again opens the program to competitive renewal.

17. In developing its annual budget, the CSU did so with the expectation that it would receive the higher facilities and administrative cost recovery rates that had been negotiated and memorialized in a contract through a designated legal process. The NIH Notice's sudden reduction in anticipated federal funds will cause significant budgetary and operational chaos that will have an immediate negative impact on the research projects and programs.

18. The NIH Notice creates confusion and uncertainty for the CSU and the programs it oversees. The reduction in facilities and administrative costs ordered by the NIH Notice will leave gaping holes in the budgets that support the facilities and staff where CSU research occurs and will stop us from serving and meeting some of our critical missions, including education and research.

19. On an annual basis, the federal government is the largest single sponsor of CSU's research enterprise. Because of the low cap created by the NIH Notice, many individuals (including faculty, staff, and students), programs, and initiatives receiving federal funding almost certainly would be forced to significantly scale back or halt their research. This outcome will be potentially devastating to the research projects, to the education and training of new medical professionals and personnel, and to the CSU's entire research enterprise. Without adequate indirect cost recovery, universities cannot maintain the essential infrastructure, administrative support, and research environment necessary to attract and retain top researchers, conduct high-quality research, and promote innovation.

6

20. The reduction of federal funding to the CSU as set forth in the NIH Notice would be

devastating for the entire system. It would result in broad reduction of services, including

impacts on education, training, and research.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge.

Executed this 10th day of February, 2025, in Long Beach, California.


Jeni Kitchen (Feb 10, 2025 08:11 PST)

Jeni  itchell
Assistant Vice Chancellor, Finance &
Budget Administration and Controller,
California State University, Office of the
Chancellor

7

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No. 25-CV-10338-AK |
| NATIONAL INSTITUTE OF HEALTH, *et al.*, | ) ) ) | |
| Defendant[s]. | ) ) ) | |

**ORDER GRANTING PLAINTIFF STATES' *EX PARTE*
EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

**ANGEL KELLEY, D.J.**

Plaintiff States' *Ex Parte* Emergency Motion For Temporary Restraining Order [Dkt. 4]

is **GRANTED**.  Defendants and their officers, employees, servants, agents, appointees, and

successors are hereby enjoined from taking any steps to implement, apply, or enforce the Rate

Change Notice (NOT-OD-25- 068) within Plaintiff States until further order is issued by this

Court. Counsel for Defendants shall file a status report with the Court within 24 hours of the

entry of this Order, and at biweekly intervals thereafter, confirming the regular disbursement and

obligation of federal financial assistance funds and reporting all steps that NIH, HHS and their

officers, employees, servants, agents, appointees, and successors have taken to comply with the

Court's temporary restraining order.

Defendants' opposition to the Motion is due by **Friday, February 14, 2025**.  Plaintiff

States may file a reply brief, limited to ten pages in length, by **Tuesday, February 18, 2025**.

Counsel shall appear in-person for a hearing on the Motion at **10:00 AM** on **Friday, February**

1

**21, 2025**.  Counsel for the Plaintiff States shall provide a copy of this Order, along with copies of the motion papers, to the following by **6:00 PM** today: Brad P. Rosenberg, Special Counsel, Federal Programs Branch, Civil Division, U.S. Department of Justice; Leah Foley, U.S. Attorney for the District of Massachusetts; and the Chief of the Civil Division of the U.S. Attorneys Office for the District of Massachusetts.  Electronic service suffices.

This Temporary Restraining Order shall become effective immediately upon entry by this Court.  It shall remain in effect until further order of this Court.

**SO ORDERED.**

Dated: February 10, 2025                                     /s/ Angel Kelley
                                                            Hon. Angel Kelley
                                                            United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*, <br><br>       Plaintiffs, <br><br> v. <br><br> NATIONAL INSTITUTES OF HEALTH, *et al.*, <br><br>       Defendants. | Civil Action No. 25-CV-10338-AK |

### DEFENDANT'S STATUS REPORT

On February 10, 2025, this Court entered an *ex parte* temporary restraining order (TRO, Doc No. 25) in the above captioned matter. The TRO provides (among other things):

- Defendants and their officers, employees, servants, agents, appointees, and successors are hereby enjoined from taking any steps to implement, apply, or enforce the Rate Change Notice (NOT-OD-25- 068) within Plaintiff States until further order is issued by this Court.

- Counsel for Defendants shall file a status report with the Court within 24 hours of the entry of this Order, and at biweekly intervals thereafter, confirming the regular disbursement and obligation of federal financial assistance funds and reporting all steps that NIH, HHS and their officers, employees, servants, agents, appointees, and successors have taken to comply with the Court's temporary restraining order.

In accordance with the TRO, Defendants respectfully submit this status report, along with the attached Declaration of Dr. Michael S. Lauer.

The Department of Justice received notice of the TRO yesterday evening and forwarded the TRO to Acting General Counsel for the Department of Health and Human

Services (HHS), along with agency contacts at HHS Office of General Counsel and the

National Institutes of Health (NIH). As indicated in Dr. Lauer's attached declaration,

Defendants have not yet implemented, applied, or enforced the Rate Change Notice. Dr.

Lauer's declaration explains that Defendants will not implement or enforce the Rate

Change Notice in the Plaintiff States pending further order of this Court. Dr. Lauer also

confirms that confirms that NIH has instructed all HHS components responsible for

disbursement, including the Program Support Center, which manages the disbursement of

NIH grant award funding, not to implement Rate Change Notice within the Plaintiff

States. As a result, the regular disbursement and obligation of federal financial assistance

funds will continue in the Plaintiff States as required under the TRO, again pending

further order of this Court.

<div style="margin-left: 40%;">

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General

LEAH B. FOLEY
United States Attorney

BRIAN C. LEA
Deputy Associate Attorney General

</div>

Dated: February 11, 2025

<div style="margin-left: 40%;">

*/s/ Marc S. Sacks*
BRIAN C. LEA
*Deputy Associate Attorney General*
MARC S. SACKS (GA Bar No. 621931)
*Deputy Director*
KEVIN P. VANLANDINGHAM
*Assistant Director*
THOMAS PORTS
*Trial Attorney*
U.S. Department of Justice
Civil Division

</div>

<div style="text-align: center;">2</div>

Corporate/Financial Section
P.O. Box 875
Ben Franklin Stations
Washington D.C. 20044-0875
Tel: (202) 307-1104
Email: marcus.s.sacks@usdoj.gov
*Attorneys for Defendants*

3

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  February 11, 2025            *<u>/s/ Marc S. Sacks</u>*
                                        Marc S. Sacks

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| COMMONWEALTH | ) | |
| OF MASSACHUSETTS et. al. | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. 25-CV-10338-AK |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL INSTITUTES OF HEALTH | ) | |
| et al. | ) | |
| | ) | |
| Defendants,. | ) | |
| | ) | |

_____

DECLARATION OF MICHAEL LAUER

I, Michael S. Lauer, hereby declare as follows:

1. I am the Deputy Director of the Division of Extramural Research at the National Institutes of Health (NIH), an operating division of the United States Department of Health and Human Services (DHHS). I have held this position since 2015. In this position, I am responsible for overseeing the NIH's grants program and ensuring that NIH grant awards comply with applicable laws, regulations, and policies.

2. On February 10, 2025, I was informed that the United States District Court for the District of Massachusetts had issued a Temporary Restraining Order enjoining the NIH

from implementing, applying, or enforcing the Rate Change Notice contained in NIH

Grants Notice NOT-OD-25- 068 within Plaintiff States until further order is issued by

this Court.  The referenced Guide Notice establishes an indirect cost rate of 15% on all

institutions of higher learning that receive NIH grant funding.

3.  I confirm that NIH has not implemented or enforced the indirect cost rate described in the

Guide Notice and that the agency will not do so with respect to grantees in the Plaintiff

states pending further instructions from the court.  I also confirm, as far as the steps the

agency has taken, that NIH has instructed all components responsible for disbursement

not to implement the rate change within the Plaintiff States.

4.  I am aware that Notice of the Court's Order has been provided to the Program Support

Center, the component of DHHS that manages the disbursement of NIH grant award

funding.


I HEREBY DECLARE TO THE BEST OF MY KNOWLEDGE AND BELIEF,

UNDER PENALTY OF PERJURY under the laws of the United States of America,

that the foregoing is true and correct.


EXECUTED this _11th__ day of February 2025 at __4:49 PM_____.


Michael S.
Lauer -S

Digitally signed by Michael
S. Lauer -S
Date: 2025.02.11 16:50:17
-05'00'

Michael S. Lauer, M.D.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al*. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-10338 |
| NATIONAL INSTITUTES OF HEALTH, *et al*., | ) ) ) | |
| Defendants. | ) ) ) | |

|  |  |  |
|---|---|---|
| ASSOCIATION OF AMERICAN MEDICAL COLLEGES, *et al*. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-10340 |
| NATIONAL INSTITUTES OF HEALTH, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

|  |  |  |
|---|---|---|
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al*. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-10346 |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al*., | ) ) ) ) | |
| Defendants. | ) ) ) | |

## <u>DEC ARATION OF  I A BUNDESEN</u>

I, Liza Bundesen, hereby declare as follows:

1.      I am the Acting Director of the Office of Extramural Research at the

National Institutes of Health (NIH), an operating division of the United States

Department of Health and Human Services. I have held this position since February 14,

2025. In this position, I am responsible for overseeing the NIH's grants program and

ensuring that NIH grant awards comply with applicable laws, regulations, and policies.

Prior to this, I served as the Deputy Director of the Office of Extramural Research since

2021, and before that a Science Policy Advisor to the Director of the Office of

Extramural Research since 2014.

2.      Attached as Exhibit A is an unaltered copy of the September 27, 2024

Negotiated Indirect Cost Rate Agreement (NICRA) for the University of Connecticut. On

page 5, the document contains the following term:

> If any Federal contract, grant or other agreement is reimbursing indirect
> costs by a means other than the approved rate(s) in this Agreement, the
> organization should (1) credit such costs to the affected programs, and (2)
> apply the approved rate(s) to the appropriate base to identify the proper
> amount of indirect costs allocable to these programs.

The above-quoted term is a standard term that should be included in all NICRAs.

3.      Attached as Exhibit B is an unaltered copy of the August 1, 2024 Notice

of Award to the University of Connecticut, Award No. 1R01GM155651-01. On page 3

1

under "Standard Terms and Conditions" the document contains, in part, the following

term:

> This award is based on the application submitted to, and as approved by, NIH on the above-title project and is subject to the terms and conditions incorporated either directly or by reference in the following:
>
> a. The grant program legislation and program regulation cited in this Notice of Award.
> b. Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
> c. 45 CFR Part 75.
> d. National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
> e. Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
> f. This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.
>
> (See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

The above-quoted term is a standard term that should be included in all Notices of

Award.

I HEREBY DECLARE TO THE BEST OF MY    NOWLEDGE AND BELIEF, UNDER

PENALTY OF PERJURY under the laws of the United States of America, that the

foregoing is true and correct.

E   ECUTED this 14th day of February, 2025 at Washington, DC.

Liza Q. Bundesen
-S

Digitally signed by Liza Q.
Bundesen -S
Date: 2025.02.14 16:48:54 -05'00'

_____

Liza Bundesen, Ph.D.

2

Exhibit A

## COLLEGES  AND  UNIVERSITIES  RATE  AGREEMENT

EIN: 060772160
ORGANIZATION:
University of Connecticut
343 Mansfield Road, Unit 2074
Storrs, CT 06269–2112

Date: 09/27/2024
FILING REF.: The preceding
agreement was dated
06/16/2023

The rates approved in this agreement are for use on grants, contracts and other agreements with the Federal Government, subject to the conditions in Section III.

## SECTION  I: INDIRECT  COST  RATES

RATE TYPES:        FIXED      FINAL      PROV. (PROVISIONAL)          PRED. (PREDETERMINED)

### EFFECTIVE PERIOD

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| FINAL | 07/01/2023 | 06/30/2024 | 61.00 | On–Campus | Research |
| PRED. | 07/01/2024 | 06/30/2025 | 61.00 | On–Campus | Research |
| PRED. | 07/01/2025 | 06/30/2027 | 62.50 | On–Campus | Research |
| PRED. | 07/01/2027 | 06/30/2028 | 63.50 | On–Campus | Research |
| FINAL | 07/01/2023 | 06/30/2024 | 57.00 | On–Campus | Instruction |
| PRED. | 07/01/2024 | 06/30/2028 | 57.00 | On–Campus | Instruction |
| FINAL | 07/01/2023 | 06/30/2024 | 35.00 | On–Campus | Other Sponsored Programs |
| PRED. | 07/01/2024 | 06/30/2025 | 35.00 | On–Campus | Other Sponsored Programs |
| PRED. | 07/01/2025 | 06/30/2028 | 37.00 | On–Campus | Other Sponsored Programs |
| FINAL | 07/01/2023 | 06/30/2024 | 26.00 | Off–Campus | All Programs |
| PRED. | 07/01/2024 | 06/30/2028 | 26.00 | Off–Campus | All Programs |
| PROV. | 07/01/2028 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending June 30, 2028 |

.
.
.
.
.
.
.
.

J.A. 418

U27028

ORGANIZATION: University of Connecticut
AGREEMENT DATE: 09/27/2024

<u>*BASE</u>

* For all awards beginning 6/30/2025 and earlier, the Base is as follows:
Modified total direct costs, consisting of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). Modified total direct costs shall exclude equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect costs, and with the approval of the cognizant agency for indirect costs.

* For all awards beginning 7/1/2025 and later, the Base is as follows:
Modified total direct costs, consisting of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel and up to the first $50,000 of each subaward (regardless of the period of performance of the subawards under the award). Modified total direct costs shall exclude equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $50,000. Other items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect costs, and with the approval of the cognizant agency for indirect costs.

ORGANIZATION: University of Connecticut
AGREEMENT DATE: 09/27/2024

## SECTION I: FRINGE BENEFIT RATES**

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| FIXED | 7/1/2024 | 6/30/2025 | 28.70 | All | Professional/Faculty/Post Docs |
| FIXED | 7/1/2024 | 6/30/2025 | 15.40 | All | Graduate Assistants |
| FIXED | 7/1/2024 | 6/30/2025 | 7.50 | All | Special Payroll |
| FIXED | 7/1/2024 | 6/30/2025 | 1.90 | All | Student Labor |
| PROV. | 7/1/2025 | Until Amended | 27.90 | All | Professional/Faculty/Post Docs |
| PROV. | 7/1/2025 | Until Amended | 15.40 | All | Graduate Assistants |
| PROV. | 7/1/2025 | Until Amended | 7.40 | All | Special Payroll |
| PROV. | 7/1/2025 | Until Amended | 2.90 | All | Student Labor |

** DESCRIPTION OF FRINGE BENEFITS RATE BASE:

Salaries and wages.

**J.A. 420**

U27028

ORGANIZATION: University of Connecticut
AGREEMENT DATE: 09/27/2024

## SECTION II: SPECIAL REMARKS

TREATMENT OF FRINGE BENEFITS:
The fringe benefits are charged using the rate(s) listed in the Fringe Benefits Section of this Agreement. The fringe benefits included in the rate(s) are listed below.

TREATMENT OF PAID ABSENCES:
Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal cost for salaries and wages. Separate claims are not made for the cost of these paid absences.

(1) OFF-CAMPUS DEFINITION: The off-campus rate will apply for all activities: a) Performed in facilities not owned by the institution and where these facility costs are not included in the F&A pools; or b) Where rent is directly allocated/charged to the project(s). Grants or contracts will not be subject to more than one F&A cost rate. If more than 50% of a project is performed off-campus, the off-campus rate will apply to the entire project.

(2) The Fringe Benefit rates include the following: Pension, Unemployment Compensation, Worker's Compensation, Health Services, Group Life Insurance, Social Security, and Medical Insurance.

(3) The following is a list of the locations to which the On-Campus indirect cost rate is applicable to:
Storrs - Main Campus
Greater Hartford Campus:
Hartford Branch
School of Law
School of Social Work
Innovations Institute

Avery Point (Groton, CT) Branch, Waterbury Branch, Stamford Branch

(4) Equipment means tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds $5,000.

** Your next fringe benefit proposal based on actual costs for the fiscal year ending June 30, 2024 is due by December 31, 2024.

**Additionally, Your indirect cost proposal based on actual costs for the fiscal year ending June 30, 2027 is due by December 31, 2027.

ORGANIZATION: University of Connecticut
AGREEMENT DATE: 09/27/2024

## SECTION III: GENERAL

A.  **LIMITATIONS:**

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its facilities and administrative cost pools as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as facilities and administrative costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B.  **ACCOUNTING CHANGES:**

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from facilities and administrative to direct. Failure to obtain approval may result in cost disallowances.

C.  **FIXED RATES:**

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D.  **USE BY OTHER FEDERAL AGENCIES:**

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E.  **OTHER:**

If any Federal contract, grant or other agreement is reimbursing facilities and administrative costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of facilities and administrative costs allocable to these programs.

BY THE INSTITUTION:                           ON BEHALF OF THE GOVERNMENT:

University of Connecticut
_____              DEPARTMENT OF HEALTH AND HUMAN SERVICES
(INSTITUTION)                                 (AGENCY)

*Margaret McCarthy*                           Darryl W. Mayes -S    Digitally signed by Darryl W.
_____                                    Mayes -S
(SIGNATURE)                                   _____  Date: 2024.10.22 07:26:30 -04'00'
                                              (SIGNATURE)
Margaret McCarthy
_____              Darryl W. Mayes
(NAME)                                        _____
                                              (NAME)
AVP Financial Operations & Controller
_____              Deputy Director, Cost Allocation Services
(TITLE)                                       _____
                                              (TITLE)
10/25/2024
_____              09/27/2024
(DATE)                                        _____
                                              (DATE)

                                              HHS REPRESENTATIVE: Edwin Miranda
                                                                  _____
                                              TELEPHONE:          (212) 264-2069
                                                                  _____

J.A. 422                                                                         U27028

Exhibit B



Department of Health and Human Services
National Institutes of Health
NATIONAL INSTITUTE OF GENERAL MEDICAL SCIENCES

**Notice of Award**
FAIN# R01GM155651
**Federal Award Date**
08/01/2024

| **Recipient Information** | **Federal Award Information** |
|---|---|

**Recipient Information**

**1. Recipient Name**
UNIVERSITY OF CONNECTICUT
438 WHITNEY RD EXTENSION UNIT 1133
STORRS, CT 06269

**2. Congressional District of Recipient**
02

**3. Payment System Identifier (ID)**
1060772160A1

**4. Employer Identification Number (EIN)**
060772160

**5. Data Universal Numbering System (DUNS)**
614209054

**6. Recipient's Unique Entity Identifier**
WNTPS995QBM7

**7. Project Director or Principal Investigator**
KENNETH G CAMPELLONE, PHD

kenneth.campellone@uconn.edu
860-486-3326

**8. Authorized Official**
Tracy Bourassa
preaward@uconn.edu
860-486-3622

**Federal Agency Information**

**9. Awarding Agency Contact Information**
Lan Nguyen

NATIONAL INSTITUTE OF GENERAL
MEDICAL SCIENCES
nguyenla@mail.nih.gov
301 594-2583

**10. Program Official Contact Information**
Baishali  Maskeri
Scientific Review Officer
NATIONAL INSTITUTE OF GENERAL
MEDICAL SCIENCES
maskerib@mail.nih.gov
301-827-2864

**Federal Award Information**

**11. Award Number**
1R01GM155651-01

**12. Unique Federal Award Identification Number (FAIN)**
R01GM155651

**13. Statutory Authority**
42 USC 241  42 CFR 52

**14. Federal Award Project Title**
Cytoskeletal compartmentalization of apoptotic signaling

**15. Assistance Listing Number**
93.859

**16. Assistance Listing Program Title**
Biomedical Research and Research Training

**17. Award Action Type**
New Competing

**18. Is the Award R&D?**
Yes

| **Summary Federal Award Financial Information** | |
|---|---|
| **19. Budget Period Start Date** 08/01/2024 – **End Date** 07/31/2025 | |
| **20. Total Amount of Federal Funds Obligated by this Action** | $322,000 |
| 20 a.  Direct Cost Amount | $200,000 |
| 20 b.  Indirect Cost Amount | $122,000 |
| 21. Authorized Carryover | |
| 22. Offset | |
| 23. Total Amount of Federal Funds Obligated this budget period | $322,000 |
| **24. Total Approved Cost Sharing or Matching, where applicable** | $0 |
| **25. Total Federal and Non-Federal Approved this Budget Period** | $322,000 |
| **26. Project Period Start Date** 08/01/2024 – **End Date** 07/31/2028 | |
| 27. Total Amount of the Federal Award including Approved Cost Sharing or Matching this Project Period | $322,000 |

**28. Authorized Treatment of Program Income**
Additional Costs

**29. Grants Management Officer - Signature**
Karen F. Whitaker

| **30. Remarks** |
|---|

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Notice of Award



RESEARCH
Department of Health and Human Services
National Institutes of Health

NATIONAL INSTITUTE OF GENERAL MEDICAL SCIENCES



---

**SECTION I – AWARD DATA – 1R01GM155651-01**

**Principal Investigator(s):**
KENNETH G CAMPELLONE, PHD

**Award e-mailed to:** spsawards@uconn.edu

Dear Authorized Official:

The National Institutes of Health hereby awards a grant in the amount of $322,000 (see "Award Calculation" in Section I and "Terms and Conditions" in Section III) to UNIVERSITY OF CONNECTICUT STORRS in support of the above referenced project. This award is pursuant to the authority of 42 USC 241  42 CFR 52  and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions.

Acceptance of this award, including the "Terms and Conditions," is acknowledged by the recipient when funds are drawn down or otherwise requested from the grant payment system.

Each publication, press release, or other document about research supported by an NIH award  must include an acknowledgment of NIH award support and a disclaimer such as "Research reported in this publication was supported by the National Institute Of General Medical Sciences of the National Institutes of Health under Award Number R01GM155651. The content is solely the responsibility of the authors and does not necessarily represent the official views of   the National Institutes of Health." Prior to issuing a press release concerning the outcome of this research, please notify the NIH awarding IC in advance to allow for coordination.

Award recipients must promote objectivity in research by establishing standards that provide a reasonable expectation that the design, conduct and reporting of research funded under NIH awards will be free from bias resulting from an Investigator's Financial Conflict of Interest (FCOI), in accordance with the 2011 revised regulation at 42 CFR Part 50 Subpart F.   The Institution shall submit all FCOI reports to the NIH through the eRA Commons FCOI Module. The regulation does not apply to Phase I Small Business Innovative Research (SBIR) and Small Business Technology Transfer (STTR) awards. Consult the NIH website http://grants.nih.gov/grants/policy/coi/ for a link to the regulation and additional important information.

If you have any questions about this award, please direct questions to the Federal Agency contacts.

Sincerely yours,

Karen F. Whitaker
Grants Management Officer
NATIONAL INSTITUTE OF GENERAL MEDICAL SCIENCES

Additional information follows

---

**Cumulative Award Calculations for this Budget Period (U.S. Dollars)**

| | |
|---|---|
| **Federal Direct Costs** | $200,000 |
| **Federal F&A Costs** | $122,000 |
| **Approved Budget** | $322,000 |
| **Total Amount of Federal Funds Authorized (Federal Share)** | $322,000 |
| **TOTAL FEDERAL AWARD AMOUNT** | $322,000 |
| | |
| **AMOUNT OF THIS ACTION (FEDERAL SHARE)** | $322,000 |

| SUMMARY TOTALS FOR ALL YEARS (for this Document Number) | | |
|---|---|---|
| YR | THIS AWARD | CUMULATIVE TOTALS |
| 1 | $322,000 | $322,000 |
| 2 | $322,000 | $322,000 |
| 3 | $322,000 | $322,000 |
| 4 | $322,000 | $322,000 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**Fiscal Information:**

| | |
|---|---|
| **Payment System Identifier:** | 1060772160A1 |
| **Document Number:** | RGM155651A |
| **PMS Account Type:** | P (Subaccount) |
| **Fiscal Year:** | 2024 |

| IC | CAN | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|
| GM | 8020220 | $322,000 | $322,000 | $322,000 | $322,000 |

Recommended future year total cost support, subject to the availability of funds and satisfactory progress of the project

**NIH Administrative Data:**
**PCC:** G315BM / **OC:** 41021 / **Released:** 07/23/2024
**Award Processed:** 08/01/2024 12:39:07 AM

---

**SECTION II – PAYMENT/HOTLINE INFORMATION – 1R01GM155651-01**

For payment and HHS Office of Inspector General Hotline information, see the NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm

---

**SECTION III – STANDARD TERMS AND CONDITIONS – 1R01GM155651-01**

This award is based on the application submitted to, and as approved by, NIH on the above-titled project and is subject to the terms and conditions incorporated either directly or by reference in the following:

   a.  The grant program legislation and program regulation cited in this Notice of Award.
   b.  Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts.
   c.  45 CFR Part 75.
   d.  National Policy Requirements and all other requirements described in the NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
   e.  Federal Award Performance Goals: As required by the periodic report in the RPPR or in the final progress report when applicable.
   f.  This award notice, INCLUDING THE TERMS AND CONDITIONS CITED BELOW.

(See NIH Home Page at http://grants.nih.gov/grants/policy/awardconditions.htm for certain references cited above.)

**Research and Development (R&D):**  All awards issued by the National Institutes of Health (NIH) meet the definition of "Research and Development" at 45 CFR Part§ 75.2. As such, auditees should identify NIH awards as part of the R&D cluster on the Schedule of Expenditures of Federal Awards (SEFA). The auditor should test NIH awards for compliance as instructed in Part V, Clusters of Programs. NIH recognizes that some awards may have another classification for purposes of indirect costs. The auditor is not required to report the disconnect (i.e., the award is classified as R&D for Federal Audit Requirement purposes but non-

research for indirect cost rate purposes), unless the auditee is charging indirect costs at a rate other than the rate(s) specified in the award document(s).

An unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval.

This grant is subject to Streamlined Noncompeting Award Procedures (SNAP).

This award is subject to the requirements of 2 CFR Part 25 for institutions to obtain a unique entity identifier (UEI) and maintain an active registration in the System for Award Management (SAM).  Should a consortium/subaward be issued under this award, a UEI requirement must be included.   See http://grants.nih.gov/grants/policy/awardconditions.htm for the full NIH award term implementing this requirement and other additional information.

This award has been assigned the Federal Award Identification Number (FAIN) R01GM155651. Recipients must document the assigned FAIN on each consortium/subaward issued under this award.

Based on the project period start date of this project, this award is likely subject to the Transparency Act subaward and executive compensation reporting requirement of 2 CFR Part 170. There are conditions that may exclude this award; see http://grants.nih.gov/grants/policy/awardconditions.htm for additional award applicability information.

In accordance with P.L. 110-161, compliance with the NIH Public Access Policy is now mandatory. For more information, see NOT-OD-08-033 and the Public Access website: http://publicaccess.nih.gov/.

Recipients must administer the project in compliance with federal civil rights laws that prohibit discrimination on the basis of race, color, national origin, disability, age, and comply with applicable conscience protections. The recipient will comply with applicable laws that prohibit discrimination on the basis of sex, which includes discrimination on the basis of gender identity, sexual orientation, and pregnancy. Compliance with these laws requires taking reasonable steps to provide meaningful access to persons with limited English proficiency and providing programs that are accessible to and usable by persons with disabilities. The HHS Office for Civil Rights provides guidance on complying with civil rights laws enforced by HHS. See https://www.hhs.gov/civil-rights/for-providers/provider-obligations/index.html and https://www.hhs.gov/.

- Recipients of FFA must ensure that their programs are accessible to persons with limited English proficiency. For guidance on meeting the legal obligation to take reasonable steps to ensure meaningful access to programs or activities by limited English proficient individuals, see https://www.hhs.gov/civil-rights/for-individuals/special-topics/limited-english-proficiency/fact-sheet-guidance/index.html and https://www.lep.gov.
- For information on an institution's specific legal obligations for serving qualified individuals with disabilities, including providing program access, reasonable modifications, and to provide effective communication, see http://www.hhs.gov/ocr/civilrights/understanding/disability/index.html.
- HHS funded health and education programs must be administered in an environment free of sexual harassment; see https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. For information about NIH's commitment to supporting a safe and respectful work environment, who to contact with questions or concerns, and what NIH's expectations are for institutions and the individuals supported on NIH-funded awards, please see https://grants.nih.gov/grants/policy/harassment.htm.
- For guidance on administering programs in compliance with applicable federal religious nondiscrimination laws and applicable federal conscience protection and associated anti-discrimination laws, see https://www.hhs.gov/conscience/conscience-protections/index.html and https://www.hhs.gov/conscience/religious-freedom/index.html.

In accordance with the regulatory requirements provided at 45 CFR 75.113 and Appendix XII to 45 CFR Part 75, recipients that have currently active Federal grants, cooperative agreements and procurement contracts with cumulative total value greater than $10,000,000 must report and maintain information in the System for Award Management (SAM) about civil, criminal, and administrative proceedings in connection with the award or performance of a Federal award that reached final disposition within the most recent five-year period.  The recipient must also make semiannual disclosures regarding such proceedings. Proceedings information will be made publicly available in the designated integrity and performance system (currently

the Federal Awardee Performance and Integrity Information System (FAPIIS)). Full reporting requirements and procedures are found in Appendix XII to 45 CFR Part 75. This term does not apply to NIH fellowships.

**Treatment of Program Income:**
Additional Costs

---

**SECTION IV – GM SPECIFIC AWARD CONDITIONS – 1R01GM155651-01**

Clinical Trial Indicator: No
This award does not support any NIH-defined Clinical Trials. See the NIH Grants Policy Statement Section 1.2 for NIH definition of Clinical Trial.

1. This award is issued in accordance with the NIH fiscal policies described in NIH Guide Notice NOT-OD-24-109.

2. This is a Modular Grant Award without direct cost categorical breakdowns issued in accordance with the guidelines published in the NIH Grants Policy Statement (April 2024) at: (http://grants.nih.gov/grants/policy/nihgps/HTML5/section_13/13.1_general.htm). Recipients have discretion in determining how to allocate and account for costs related to modular awards within their organizational accounting system. However, institutions are still required to ensure that all costs charged to modular awards are in accordance with applicable costs principles, the NIH GPS, and any legislatively imposed restrictions.

3. None of the funds in this award shall be used to pay the salary of an individual at a rate in excess of the current salary cap. Therefore, this award and/or future years are adjusted accordingly, if applicable.

Current salary cap levels can be found at the following URL: http://grants.nih.gov/grants/policy/salcap_summary.htm

4. As appropriate, the awardee is required to follow the sharing plan(s) for unique research resources (i.e. Data, Model Organism, Genomic Data, or other) associated with this project and may not implement any changes to the plan(s) without the written prior approval of the National Institute of General Medical Sciences.

5. Unobligated Balances: As indicated in Section III of this Notice of Award, an unobligated balance may be carried over into the next budget period without Grants Management Officer prior approval. In accordance with section 8.1.1.1 of the NIH GPS, NIGMS staff reserve the right to make budgetary reductions to award commitments in cases where recipients have accrued excessively large unobligated balances.

**NIGMS' OFFICIAL WEBSITE**

For more information, please visit:  http://www.nigms.nih.gov

Data Management and Sharing Policy: Applicable

This project is expected to generate scientific data. Therefore, the Final NIH Policy for Data Management and Sharing applies. The approved Data Management and Sharing (DMS) Plan is hereby incorporated as a term and condition of award, and the recipient shall manage and disseminate scientific data in accordance with the approved plan. Any significant changes to the DMS Plan (e.g., new scientific direction, a different data repository, or a timeline revision) require NIH prior approval. Failure to comply with the approved DMS plan may result in suspension and/or termination of this award, withholding of support, audit disallowances, and/or other appropriate action. See NIH Grants Policy Statement Section 8.2.3 for more information on

data management and sharing expectations.

| Budget | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|
| DMS Costs | $0 | $0 | $0 | $0 |

**SPREADSHEET SUMMARY**
**AWARD NUMBER:** 1R01GM155651-01

**INSTITUTION:** UNIVERSITY OF CONNECTICUT STORRS

| Budget | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|
| TOTAL FEDERAL DC | $200,000 | $200,000 | $200,000 | $200,000 |
| TOTAL FEDERAL F&A | $122,000 | $122,000 | $122,000 | $122,000 |
| TOTAL COST | $322,000 | $322,000 | $322,000 | $322,000 |

| Facilities and Administrative Costs | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|
| F&A Cost Rate 1 | 61% | 61% | 61% | 61% |
| F&A Cost Base 1 | $200,000 | $200,000 | $200,000 | $200,000 |
| F&A Costs 1 | $122,000 | $122,000 | $122,000 | $122,000 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF THE STATE OF MICHIGAN, STATE OF ILLINOIS, STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF CONNECTICUT, STATE OF COLORADO, STATE OF DELAWARE, STATE OF HAWAI'I, STATE OF MAINE, STATE OF MARYLAND, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW YORK, STATE OF NEVADA, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, and STATE OF WISCONSIN,<br><br>     Plaintiffs,<br><br>       v.<br><br>NATIONAL INSTITUTES OF HEALTH; MATTHEW MEMOLI, M.D., M.S., in his official capacity as Acting Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; and DOROTHY FINK, in her official capacity as Acting Secretary of the U.S. Department of Health and Human Services,<br><br>     Defendants. | Case No. 1:25-cv-10338 |

## <u>SUPPLEMENTAL DECLARATION OF KATHERINE DIRKS</u>

I, Katherine Dirks, an attorney admitted to practice before this Court, do hereby state the

following under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1

1.     I am Deputy Chief of the Government Bureau in the Office of the Attorney General for the Commonwealth of Massachusetts, and I appear on behalf of the Commonwealth of Massachusetts in this action.

2.     I submit this declaration in further support of Plaintiff States' Motion for a Temporary Restraining Order, pursuant to Federal Rule of Civil Procedure 65.

3.     The facts set forth herein are based upon my personal knowledge or a review of the files in my possession.

4.     I have attached to this declaration true and correct copies of the following documents and factual declarations (continuing the sequence of exhibits filed with the first Dirks Declaration (Doc No. 6)), as follows:

5.     Attached hereto as Exhibit 44 is the April 2024 NIH Grants Policy Statement, available at https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

6.     Attached hereto as Exhibit 45 is the Indirect Cost Policy of the Bill & Melinda Gates Foundation, available at https://docs.gatesfoundation.org/documents/indirect_cost_policy.pdf.

7.     Attached hereto as Exhibit 46 is the Indirect Cost Rate Policy of the Robert Wood Johnson Foundation, available at https://www.rwjf.org/content/granteeresources/legal-and-policy/Indirect_Cost_Rate.html.

8.     Attached hereto as Exhibit 47 is the Mission and History of the Smith Richardson Foundation, available at https://www.srf.org/our-mission-history/.

9.     Attached hereto as Exhibit 48 is the Carnegie Corporation of New York's Approach to grantmaking, available at https://www.carnegie.org/programs/.

10.    Attached hereto as Exhibit 49 is a Notice titled "Fostering Equitable Grantmaking through Indirect Cost Coverage" of the David and Lucile Packard Foundation, available at https://www.packard.org/insights/perspective/fostering-equitable-grantmaking-through-indirect-cost-coverage/.

11.    Attached hereto as Exhibit 50 is the declaration of Vassilis L. Syrmos, Vice President for Research and Innovation at the University of Hawai'i.

12.    Attached hereto as Exhibit 51 is the declaration of Dr. Penny Gordon-Larsen, Vice Chancellor for Research at the University of North Carolina at Chapel Hill.

13.    Attached hereto as Exhibit 52 is the declaration of Sally Morton, Executive Vice President of the Arizona State University Knowledge Enterprise.

14.    Attached hereto as Exhibit 53 is the declaration of Jason Wilder, Vice President for Research at Northern Arizona University.

15.    Attached hereto as Exhibit 54 is the declaration of Tomas Diaz de la Rubia, Senior Vice President for Research and Innovation at the University of Arizona.


Dated:        February 18, 2025
              Boston, MA


                            /s/ Katherine Dirks
                            Katherine Dirks
                            Deputy Chief, Government Bureau
                            Office of the Attorney General, Massachusetts

3

<u>**CERTIFICATE OF SERVICE**</u>

Counsel for Plaintiffs in the above captioned case certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court.  Counsel for Plaintiffs hereby certify that they have certified all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ Katherine B. Dirks
Katherine B. Dirks, BBO# 673674

Dated: February 18, 2025

4

**J.A. 433**

# EXHIBIT 44



# NIH GRANTS POLICY STATEMENT

## US DEPARTMENT OF HEALTH AND HUMAN SERVICES

## NATIONAL INSTITUTES OF HEALTH

 

## APRIL 2024

# INTRODUCTION

The *National Institutes of Health Grants Policy Statement* (NIHGPS) is intended to make available to NIH recipients, in a single document, the policy requirements that serve as the terms and conditions of NIH grant awards. These terms and conditions apply not only to the recipients of NIH Grant Awards, but also flow down to any subawards as well as to subrecipients unless specified otherwise in the regulation or the terms and conditions of the specific NIH award (see "Consortium Agreements" on page IIB-114).

This document also is designed to be useful to those interested in NIH grants by providing information about NIH, its organization, its staff and its grants process. The NIHGPS is available online. This version includes many links within the document as well as links to some web resources outside of this document. Users are strongly encouraged to use the on-line version of this document to benefit from these links.

## NIHGPS ORGANIZATION

The NIHGPS has three parts, which allows general information, application information, and other types of reference material to be separated from legally binding terms and conditions:

- *Part I: NIH Grants General Information.* Part I (chapters 1 and 2) contains a glossary defining commonly used terms and abbreviations used throughout the document; describes NIH and its relationship to other organizations within the Department of Health and Human Services (HHS); specifies recipient, NIH, and other HHS staff responsibilities and outlines the grant application and review processes.

- *Part II: Terms and Conditions of NIH Grant Awards.* Part II (chapters 3-19) includes generally applicable terms and conditions (Part IIA). This part also specifies the terms and conditions that apply to particular types of grants, recipients, and activities that differ from, supplement, or elaborate on the standard terms and conditions (Part IIB). These requirements, in separate chapters, pertain to multiple PD/PI applications and awards; construction, modernization and major alteration and renovation grants; research training grants and fellowships; career development awards; modular applications and awards; conference grants, consortium agreements; grants to foreign and international organizations (and grants with substantial foreign components awarded to domestic organizations), grants to Federal institutions and payments to Federal employees; grants to for-profit organizations; and research patient care activities.

- *Part III: Points of Contact.* Part III (chapter 20) lists pertinent offices with their contact information.

## CONVENTIONS

Certain conventions are followed throughout this document. The term "grant" is used to mean both grants and cooperative agreements; however, for clarity, certain sections mention both grants and cooperative agreements. The term "recipient" generally is used to refer to recipients of grants and cooperative agreements. "NIH" may be used in this document to refer to the entire organization or to its component organizations, or else to contrast an action by NIH, including actions by its ICs, with an action by a recipient or other organization. A reference to "Part II (IIA or IIB)" or "Part III" without further elaboration means the corresponding part of the NIHGPS.

## SUPERSESSION

The NIHGPS was originally published with an effective date of October 1, 1998. It was subsequently revised several years thereafter with the turn of each new fiscal year (October). This revision of the NIHGPS is an update of the December, 2022 publication. It applies to all NIH grants and cooperative agreements for budget periods beginning on or after October 1, 2023. This version incorporates new and modified requirements, clarifies certain policies, and implements changes in statutes, regulations, and policies that have been implemented through appropriate legal and/or policy processes since the previous version of the GPS from December, 2022. An explanation of the major changes to the NIHGPS since the previous edition is included in the *NIH Guide for Grants and Contracts* notice announcing the reissuance of the NIHGPS.

# ADDITIONAL INFORMATION

The Office of Policy for Extramural Research Administration (OPERA) develops and maintains this document. Changes in statutes, regulations, or policies that take effect before the next revision of the NIHGPS will be published separately in the *NIH Guide for Grants and Contracts*. Recipients are responsible for reviewing the *NIH Guide for Grants and Contracts* for changes and for implementing them, as appropriate. Subscribe to the *NIH Guide for Grants and Contracts* Listserv at http://grants.nih.gov/grants/guide/listserv.htm.

# TABLE OF CONTENTS

**1 GLOSSARY** .................................................................................................. **I-1**

**1.1 Abbreviations** ........................................................................................ **I-1**

**1.2 Definition of Terms** ............................................................................... **I-7**

**2 THE NATIONAL INSTITUTES OF HEALTH AS A GRANT-MAKING ORGANIZATION** ................................................................................. **I-44**

**2.1 Roles and Responsibilities** ................................................................... **I-44**

2.1.1 NIH and HHS Staff ............................................................................ I-44

2.1.2 Recipient Staff ................................................................................... I-45

**2.2 eRA Commons** ...................................................................................... **I-47**

2.2.1 eRA Commons Registration ............................................................... I-47

2.2.1.1 eRA Commons Registration for the Organization ....................... I-48

2.2.1.2 eRA Commons Registration for the PD/PI .................................. I-48

2.2.1.3 eRA Commons Registration for Other Individuals Participating in NIH Application and Research Performance Progress Reports ...................... I-49

**2.3 Application Information and Processes** ................................................. **I-49**

2.3.1 Support Mechanisms .......................................................................... I-49

2.3.2 Eligibility .......................................................................................... I-50

2.3.3 Types of Award Instruments .............................................................. I-50

2.3.4 Types of Applications ........................................................................ I-50

2.3.5 Types of Notices of Funding Opportunities (NOFOs) ....................... I-51

2.3.5.1 Other Funding-Related Notices ................................................. I-53

2.3.6 Legal Implications of Applications ..................................................... I-53

2.3.7 Policies Affecting Applications .......................................................... I-54

2.3.7.1 Direct Cost Limitations for Applications That Include Consortium/Contractual F&A Costs ...................................................... I-54

2.3.7.2 Requirements for Submitting Unsolicited Applications Requesting $500,000 or More in Direct Costs ......................................................... I-54

2.3.7.3 Resubmission of Unfunded RFA Applications ............................ I-55

2.3.7.4 Resubmission of an Unfunded Application ................................. I-55

2.3.7.5 New Investigators and Early Stage Investigators ........................ I-56

2.3.7.6 Program Director/Principal Investigator, Individual Fellowship and Sponsor Assurance ...................................................................................... I-56

2.3.7.7 Post-Submission Grant Application Materials ............................ I-57

2.3.7.8 SAM Registration and Unique Entity Identifier (UEI) Requirements ............ I-60

2.3.7.9 Graduate Student Compensation ............................................... I-61

2.3.7.10 NIH Data Management and Sharing and Genomic Data Sharing ................. I-62

2.3.7.11 Human Fetal Tissue from elective abortions ............................. I-62

2.3.7.12 Biographical Sketches (Biosketches) ....................................... I-62

2.3.8 Application Forms .............................................................................. I-62

2.3.9 Application Receipt Information and Deadlines .................................. I-63

2.3.9.1 Electronic Submission Requirements ......................................... I-63

2.3.9.2 Late Applications .................................................................... I-64

2.3.9.3 Continuous Submission for Appointed Members of NIH Federal Advisory Committees ............................................................................... I-64

2.3.9.4 Similar, Essentially Identical, or Identical Applications ............. I-65

2.3.9.5 Application Non-conformity ..................................................... I-65

2.3.9.6 Natural Disasters and Other Emergencies .................................. I-66

2.3.10 Fraud, Waste and Abuse of NIH Grant Funds .................................. I-66

2.3.11 Availability and Confidentiality of Information ................................................. I-68
    2.3.11.1 Availability of Information .............................................................. I-68
    2.3.11.2 Confidentiality of Information ......................................................... I-68
2.3.12 Protecting Sensitive Data and Information Used in Research ........................... I-71
**2.4 The Peer Review Process** .................................................................... **I-71**
2.4.1 Initial Review ................................................................................. I-71
    2.4.1.1 Responsibilities ........................................................................ I-71
    2.4.1.2 Overall Impact ......................................................................... I-72
    2.4.1.3 Scored Review Criteria ................................................................ I-72
    2.4.1.4 Additional Review Criteria ............................................................ I-73
    2.4.1.5 Additional Review Considerations ..................................................... I-73
2.4.2 Appeals of Initial Scientific Review ..................................................... I-74
2.4.3 National Advisory Council or Board Review ............................................... I-75
2.4.4 Disposition of Applications ............................................................... I-76
**2.5 Completing the Pre-Award Process** .......................................................... **I-77**
2.5.1 Just-in-Time Procedures .................................................................... I-77
2.5.2 Submitting Revised Project Summary/Abstracts, Specific Aims, and/or Public
Health Relevance Statement ..................................................................... I-80
2.5.3 Determining Applicant Organization Eligibility ........................................... I-80
2.5.4 Determining Eligibility of Individuals .................................................... I-81
2.5.5 Cost Analysis and Assessment of Management Systems ...................................... I-82

**3 OVERVIEW OF TERMS AND CONDITIONS** ............................................................ **IIA-1**
    **3.1 Federalwide Standard Terms and Conditions for Research Grants** ...................... **IIA-2**

**4 PUBLIC POLICY REQUIREMENTS, OBJECTIVES AND OTHER**
**APPROPRIATION MANDATES** ........................................................................ **IIA-3**
    **4.1 Public Policy Requirements and Objectives** .......................................... **IIA-3**
    4.1.1 Animal Welfare Requirements ............................................................ IIA-10
        4.1.1.1 Animal Welfare Assurance Requirements ........................................... IIA-11
        4.1.1.2 Verification of IACUC Approval ................................................... IIA-12
        4.1.1.3 Consortiums ..................................................................... IIA-12
        4.1.1.4 Foreign Recipients and Foreign Performance Sites ................................ IIA-13
        4.1.1.5 Reporting to OLAW ............................................................... IIA-13
    4.1.2 Civil Rights Protections ............................................................... IIA-14
        4.1.2.1 Civil Rights Act of 1964 ........................................................ IIA-14
        4.1.2.2 Educational Amendments of 1972 .................................................. IIA-14
        4.1.2.3 Rehabilitation Act of 1973 ...................................................... IIA-14
        4.1.2.4 Age Discrimination Act of 1975 .................................................. IIA-15
        4.1.2.5 Limited English Proficiency ..................................................... IIA-15
    4.1.3 Clinical Trials Registration and Reporting in ClinicalTrials.gov Requirement ...... IIA-15
        4.1.3.1 NIH Policy on Dissemination of NIH-Funded Clinical Trial Information ... IIA-15
        4.1.3.2 Food and Drug Administration Amendments Act (FDAAA) ..................... IIA-17
        4.1.3.3 Good Cause Extension (GCE) Request Requirements ............................. IIA-17
    4.1.4 Confidentiality ......................................................................... IIA-19
        4.1.4.1 Certificates of Confidentiality ................................................. IIA-19
        4.1.4.2 Confidentiality of Alcohol and Substance Use Patient Records ................. IIA-21
        4.1.4.3 Confidentiality of Patient Records: Health Insurance Portability and
        Accountability Act .................................................................... IIA-21
    4.1.5 Controlled Substances .................................................................. IIA-21
    4.1.6 Debarment and Suspension ............................................................... IIA-21

4.1.7 Drug-Free Workplace ...........................................................................IIA-23
4.1.8 Federal Funding Accountability and Transparency Act (FFATA) ........IIA-23
4.1.9 Federal Information Security Management Act ....................................IIA-24
4.1.10 Financial Conflict of Interest .............................................................IIA-24
4.1.11 Fly America Act .................................................................................IIA-27
4.1.12 Health and Safety Regulations and Guidelines .................................IIA-28
4.1.13 Human Stem Cell Research ................................................................IIA-28
    4.1.13.1 Human Pluripotent Stem Cell Research Prohibited with NIH Funding .....IIA-29
4.1.14 Human Fetal Tissue Research ............................................................IIA-29
    4.1.14.1 Research on Transplantation of Human Fetal Tissue ...................IIA-30
    4.1.14.2 Non-Transplantation Research on Human Fetal Tissue from Elective
    Abortions ...............................................................................................IIA-31
4.1.15 Human Subjects Protections ..............................................................IIA-32
    4.1.15.1 Federalwide Assurance Requirements ........................................IIA-34
    4.1.15.2 Certification of IRB Approval ....................................................IIA-35
    4.1.15.3 Reporting to Funding Agency and OHRP .................................IIA-36
    4.1.15.4 OHRP Oversight .........................................................................IIA-36
    4.1.15.5 Education in the Protection of Human Research Participants ....IIA-36
    4.1.15.6 Data and Safety Monitoring .......................................................IIA-36
    4.1.15.7 Inclusion of Individuals Across the Lifespan as Participants in Research
    Involving Human Subjects ....................................................................IIA-37
    4.1.15.8 Inclusion of Women and Minorities as Subjects in Clinical Research and
    Reporting Sex/Gender, Racial, and Ethnic Participation .......................IIA-38
    4.1.15.9 Good Clinical Practice Training for NIH Recipients Involved in NIH-fun-
    ded Clinical Trials .................................................................................IIA-39
    4.1.15.10 NIH Policy on the Use of a Single Institutional Review Board for Multi-
    Site Research .........................................................................................IIA-40
4.1.16 Investigational New Drug Applications/Investigational Device Exceptions ........IIA-40
4.1.17 Lobbying Prohibition .........................................................................IIA-41
4.1.18 Metric System ....................................................................................IIA-42
4.1.19 Military Recruiting and Reserve Officer Training Corps Program Access to
Institutions of Higher Education ..................................................................IIA-42
4.1.20 National Environmental Policy Act ...................................................IIA-42
4.1.21 Nondelinquency on Federal Debt .......................................................IIA-43
4.1.22 President's Emergency Plan for AIDS Relief (PEPFAR) Program ....IIA-43
    4.1.22.1 PEPFAR Agreements ..................................................................IIA-43
    4.1.22.2 PEPFAR Agreements Between the U.S. Government and Foreign Non-
    Governmental Organizations (NGOs) ..................................................IIA-44
4.1.23 Pro-Children Act of 1994 ..................................................................IIA-45
4.1.24 Public Health Security .......................................................................IIA-46
    4.1.24.1 Public Health Security and Bioterrorism Preparedness and Response Act
    (Select Agents) .....................................................................................IIA-46
        4.1.24.1.1.1 Select Agent Awards to U.S. Institutions ...........................IIA-46
        4.1.24.1.1.2 Select Agent Awards to Foreign Organizations and Inter-
        national Organizations .......................................................................IIA-46
        4.1.24.1.1.3 Select Agent Awards to U.S. Institutions with Foreign Sub-
        components .........................................................................................IIA-47
    4.1.24.2 Dual Use Research of Concern ...................................................IIA-47

**J.A. 440**

4.1.24.3 Agents Regulated Under the Chemical Weapons Convention ..................IIA-48
4.1.25 Reporting and Assurance Requirements for Institutions Receiving Awards for
Training of Graduate Students for Doctoral Degrees ................................................IIA-48
4.1.26 Research Involving Recombinant or Synthetic Nucleic Acid Molecules ...........IIA-49
    4.1.26.1 Scope and Availability ........................................................IIA-49
    4.1.26.2 Institutional Biosafety Committee ......................................IIA-49
    4.1.26.3 Investigators and Institutional Staff ..................................IIA-50
4.1.27 Research Misconduct ............................................................IIA-50
4.1.28 Seat Belt Use .........................................................................IIA-51
4.1.29 Smoke-Free Workplace ..........................................................IIA-52
4.1.30 Standards of Conduct ...........................................................IIA-52
4.1.31 Text Messaging While Driving ...............................................IIA-52
4.1.32 Trafficking in Persons ...........................................................IIA-53
4.1.33 USA Patriot Act ....................................................................IIA-53
4.1.34 Responsibility/Qualification Information in SAM.gov .................IIA-53
4.1.35 Mandatory Disclosures ..........................................................IIA-54
4.1.36 Never Contract with the Enemy .............................................IIA-54
4.1.37 Prohibition on Certain Telecommunications and Video Surveillance Services or
Equipment ....................................................................................IIA-55
**4.2 Appropriation Mandates** ..........................................................**IIA-55**
4.2.1 Acknowledgment of Federal Funding ........................................IIA-55
4.2.2 Dissemination of False or Deliberately Misleading Information ........IIA-56
4.2.3 Gun Control ...........................................................................IIA-56
4.2.4 Human Embryo Research and Cloning Ban .................................IIA-56
4.2.5 Lobbying—Appropriation Prohibition .......................................IIA-56
4.2.6 Promotion or Legalization of Controlled Substances ...................IIA-57
4.2.7 Restriction on Abortion Funding ..............................................IIA-57
    4.2.8.1 Exceptions to Restrictions on Abortions ..............................IIA-57
4.2.9 Restriction on Distribution of Sterile Needles ...........................IIA-57
4.2.10 Salary Cap/Salary Limitation .................................................IIA-58
4.2.10 Restriction of Pornography on Computer Networks ...................IIA-58
4.2.11 Restriction on Disclosure of Political Affiliation for Federal Scientific Advisory
Committee Candidates ....................................................................IIA-58
**5 THE NOTICE OF AWARD** ........................................................**IIA-59**
**5.1 Notice of Award Notification** .................................................**IIA-61**
**5.2 Associated Applications and/or Awards** ...................................**IIA-61**
**5.3 Funding** .................................................................................**IIA-61**
**5.4 Budget** ...................................................................................**IIA-62**
**5.5 Additional Terms and Conditions** ...........................................**IIA-63**
**6 PAYMENT** .................................................................................**IIA-64**
**6.1 Smartlink II/ACH** ....................................................................**IIA-64**
**6.2 Cash Request** ..........................................................................**IIA-64**
**6.3 Interest Earned on Advances of Grant Funds** ..........................**IIA-65**
**6.4 Improper Payments Elimination and Recovery Improvement Act** .....**IIA-65**
**7 COST CONSIDERATION** ..........................................................**IIA-66**
**7.1 General** ...................................................................................**IIA-66**
**7.2 The Cost Principles** .................................................................**IIA-66**
**7.3 Direct Costs and Facilities and Administrative Costs** ...............**IIA-67**

**7.4 Reimbursement of Facilities and Administrative Costs** ...........................................**IIA-68**
**7.5 Cost Transfers, Overruns, and Accelerated and Delayed Expenditures** ................**IIA-71**
**7.6 Allocation of Costs and Closely Related Work** .....................................................**IIA-72**
**7.7 Applicable Credits** ...............................................................................................**IIA-72**
**7.8 Services Provided by Affiliated Organizations** ...................................................**IIA-72**
**7.9 Allowability of Costs/Activities** ..........................................................................**IIA-73**
    7.9.1 Selected Items of Cost ...................................................................................IIA-74

**8 ADMINISTRATIVE REQUIREMENTS** ...................................................................**IIA-103**

**8.1 Changes in Project and Budget** ...........................................................................**IIA-103**
    8.1.1 NIH Standard Terms of Award ...................................................................IIA-103
        8.1.1.1 Carryover of Unobligated Balances from One Budget Period to Any Sub-
        sequent Budget Period ...................................................................................IIA-104
        8.1.1.2 Cost-Related Prior Approvals ...............................................................IIA-105
        8.1.1.3 Extension of Final Budget Period of a Previously Approved Project
        Period without Additional NIH Funds ............................................................IIA-106
        8.1.1.4 Transfer of the Performance of Substantive Programmatic Work to a
        Third Party by Means of a Consortium Agreement ........................................IIA-107
        8.1.1.5 Direct Charging Salaries of Administrative and Clerical Staff ................IIA-107
        8.1.1.6 Supplemental Compensation under Written Institutional Policy for IHEs ...IIA-107
        8.1.1.7 Intra-IHE Faculty Consulting that Exceed a Faculty Member's Base
        Salary, Under Certain Conditions. ..................................................................IIA-107
    8.1.2 Prior Approval Requirements .......................................................................IIA-107
        8.1.2.1 Additional No-cost Extension or Extension Greater Than 12 Months or
        Late Notification of Initial No-Cost Extension ...............................................IIA-109
        8.1.2.2 Alterations and Renovations ...............................................................IIA-109
        8.1.2.3 Capital Expenditures .........................................................................IIA-109
        8.1.2.4 Carryover of Unobligated Balances ...................................................IIA-109
        8.1.2.5 Change in Scope ...............................................................................IIA-110
        8.1.2.6 Change in Status, Including Absence of PD/PI and Other Senior/Key Per-
        sonnel Named in the NoA ..............................................................................IIA-112
        8.1.2.7 Change of Recipient Organization .....................................................IIA-113
        8.1.2.8 Change in Recipient Organizational Status ........................................IIA-117
        8.1.2.9 Deviation from Award Terms and Conditions, including Restrictions in
        the NoA .........................................................................................................IIA-118
        8.1.2.10 Foreign Component Added to a Grant to a Domestic or Foreign Organ-
        ization ...........................................................................................................IIA-118
        8.1.2.11 Provide Subawards Based on Fixed Amounts ...................................IIA-119
        8.1.2.12 Need for Additional NIH Funding without Extension of Budget and Pro-
        ject Period ....................................................................................................IIA-119
        8.1.2.13 Need for Additional NIH Funding with Extension of the Final Budget
        Period of a Project Period .............................................................................IIA-120
        8.1.2.14 Pre-Award Costs ..............................................................................IIA-120
        8.1.2.15 Rebudgeting of Funds from Trainee Costs ........................................IIA-120
        8.1.2.16 Rebudgeting of Funds Between Construction and Non-construction
        Work .............................................................................................................IIA-120
        8.1.2.17 Retention of Research Grant Funds When a Career Development Award
        is Issued .......................................................................................................IIA-120
    8.1.3 Requests for Prior Approval ........................................................................IIA-121
**8.2 Availability of Research Results: Publications, Intellectual Property Rights, and
Sharing Research Resources** .................................................................................**IIA-121**

# PART I: NIH GRANTS—GENERAL INFORMATION

This part contains a glossary defining terms and abbreviations commonly used throughout the NIHGPS; describes NIH and its relationship to other organizations within HHS; specifies recipient, NIH, and other HHS staff responsibilities; and outlines the grant application and review processes.

# 1 GLOSSARY

The glossary lists acronyms and other abbreviations used in the NIHGPS. The glossary also defines terms commonly used throughout the NIHGPS. The definitions may be amplified and additional definitions may be found throughout this document and in source documents, such as applicable statutes and grants administration regulations. This is the only location in the NIHGPS where these terms are defined. If an abbreviation used in the NIHGPS is unfamiliar, the reader should consult this list for its meaning.

## 1.1 ABBREVIATIONS

**Exhibit 1: Abbreviation and full language of acronyms used in the Grants Policy Statement**

| Abbreviation | Full Meaning of Abbreviation |
|---|---|
| A&R | Alteration and Renovation |
| ACF | Administration for Children and Families |
| ACH | Automated Clearinghouse |
| ACL | Administration for Community Living |
| AHRQ | Agency for Healthcare Research and Quality |
| AIA | American Institute of Architects |
| AoA | Administration on Aging |
| AOR | Authorized Organization Representative |
| APAC | Annual Payback Activities Certification |
| AREA | Academic Research and Enhancement Award |
| ASHRAE | American Society of Heating, Refrigeration and Air Conditioning Engineers |
| BSO | Biological Safety Officer |
| CAS | Cost Allocation Services |
| CDA | Career Development Award |
| CDC | Centers for Disease Control and Prevention |
| CF | Common Form (previously known as Standard Form) |
| CFR | Code of Federal Regulations |

| Abbreviation | Full Meaning of Abbreviation |
|---|---|
| CGMO | Chief Grants Management Officer |
| CM | Construction Manager |
| CMS | Centers for Medicare and Medicaid Services |
| CoC | Certificate of Confidentiality |
| COR | Career Opportunities in Research Education and Training Program |
| CSR | Center for Scientific Review |
| DAB | Departmental Appeals Board |
| DCGP | Division of Central Grants Processing, OER, NIH |
| DCIS | Departmental Contracts Information System |
| DEA | Drug Enforcement Administration |
| DEITR | Division of Extramural Inventions & Technology Resources, OPERA, OER, NIH |
| DES | Department of Engineering Services, NIH |
| DFAS | Division of Financial Advisory Services, NIH |
| DGCO | Division of Grants Compliance and Oversight, OPERA, OER, NIH |
| DGP | Division of Grants Policy, OPERA, OER, NIH |
| DGSI | Divsion of Grants System Integration, OPERA, OER, NIH |
| DNA | Deoxyribonucleic acid |
| DoC | Department of Commerce |
| DoD | Department of Defense |
| DoL | Department of Labor |
| DPI | Division of Program Integrity, OMA, NIH |
| DRR | Division of Receipt and Referral, CSR |
| DSMB | Data and Safety Monitoring Board |
| EA | Environmental Assessment |
| FFR | Federal Financial Report |
| EIN | Entity Identification Number |
| EIS | Environmental Impact Statement |
| EO | Executive Order |
| eRA | Electronic Research Administration |
| ESI | Early Stage Investigator |

**J.A. 444**

| Abbreviation | Full Meaning of Abbreviation |
|---|---|
| eSNAP | Electronic Streamlined Non-competing Award Process |
| F&A | Facilities and Administrative (costs) |
| FAC | Federal Audit Clearinghouse |
| FAIN | Federal Award Identification Number |
| FAR | Federal Acquisition Regulation |
| FCOI | Financial Conflict of Interest |
| FDA | Food and Drug Administration |
| FDAAA | Food and Drug Administration Amendments Act of 2007 |
| FDP | Federal Demonstration Partnership |
| FEMA | Federal Emergency Management Agency |
| FFATA | Federal Funding Accountability and Transparency Act |
| FFR | Federal Financial Report (SF425) |
| FIC | Fogarty International Center |
| FICA | Federal Insurance Contributions Act |
| FOI | Freedom of Information |
| FOIA | Freedom of Information Act |
| FTR | Federal Travel Regulation |
| FWA | Federalwide Assurance |
| GAAP | Generally Accepted Accounting Principles |
| GAGAS | Generally Accepted Government Accounting Standards |
| GeMCRIS | Genetic Modification Clinical Research Information System |
| GMO | Grants Management Officer |
| GMP | Guaranteed Maximum Price |
| GMS | Grants Management Specialist |
| GPO | Government Printing Office |
| GSA | General Services Administration |
| GWAS | Genome-wide Association Studies |
| hESC | Human Embryonic Stem Cells |
| HHS | U.S. Department of Health and Human Services |
| HIPAA | Health Insurance Portability and Accountability Act |

**J.A. 445**

| Abbreviation | Full Meaning of Abbreviation |
|---|---|
| HPSL | Health Professional Student Loan |
| HRSA | Health Resources and Services Administration |
| HVAC | Heating, Ventilating, and Air Conditioning |
| IACUC | Institutional Animal Care and Use Committee |
| IBC | Institutional Biosafety Committee |
| IBS | Institutional Base Salary |
| IC | Institute or Center |
| IDE | Investigational Device Exception |
| IHE | Institutions of Higher Education |
| IHS | Indian Health Service |
| IND | Investigational New Drug |
| IPA | Intergovernmental Personnel Act |
| IPF | Institutional Profile File |
| IR&D | Independent Research and Development |
| IRB | Institutional Review Board |
| IRG | Integrated Review Group |
| IRS | Internal Revenue Service |
| IVF | In vitro Fertilization |
| K award | Career Award |
| Kirschstein-NRSA | Ruth L. Kirschstein National Research Service Award |
| LWOP | Leave Without Pay |
| MARC-U*STAR | Maximizing Access to Research Careers Undergraduate Student Training in Academic Research Program |
| MOU | Memorandum of Understanding |
| MTDC | Modified Total Direct Cost |
| NCATS | National Center for Advancing Translational Sciences |
| NCT | National Clinical Trial |
| ND | Not Discussed |
| NEARC | National External Audit Review Center, OIG |
| NEI | National Eye Institute |

**J.A. 446**

| Abbreviation | Full Meaning of Abbreviation |
|---|---|
| NEPA | National Environmental Policy Act |
| NFI | Notice of Federal Interest |
| NFPA | National Fire Protection Association |
| NHSC | National Health Service Corps |
| NICHD | *Eunice Kennedy Shriver* National Institute for Child Health and Human Development |
| NIDCR | National Institute of Dental and Craniofacial Research |
| NIGMS | National Institute of General Medical Sciences |
| NIH | National Institutes of Health |
| NIH MSID | NIH manuscript submission reference number |
| NIHGPS | National Institutes of Health Grants Policy Statement |
| NIMH | National Institute of Mental Health |
| NINR | National Institute on Nursing Research |
| NLM | National Library of Medicine |
| NoA | Notice of Award |
| NOFO | Notice of Funding Opportunity |
| NTIS | National Technical Information Service |
| OASH | Office of the Assistant Secretary for Health |
| OCR | Office for Civil Rights, HHS |
| OER | Office of Extramural Research, NIH |
| OFCCP | Office of Federal Contract Compliance Programs, DoL |
| OFM | Office of Financial Management, NIH |
| OHRP | Office for Human Research Protections, HHS |
| OIG | Office of the Inspector General |
| OIR | Office of Intramural Research, NIH |
| OLAW | Office of Laboratory Animal Welfare, NIH |
| OMA | Office of Management Assessment, NIH |
| OMB | Office of Management and Budget |
| ONR | Office of Naval Research |
| OPERA | Office of Policy for Extramural Research Administration, OER, NIH |
| ORI | Office of Research Integrity, HHS |

**J.A. 447**

| Abbreviation | Full Meaning of Abbreviation |
|---|---|
| OSC | Other Significant Contributor |
| P.L. | Public Law |
| PA | Program Announcement |
| PAR | Program Announcement with Special Review Criteria and/or Special Receipt Dates |
| PD/PI | Program Director/Principal Investigator |
| pdf | portable document format |
| PHS | Public Health Service |
| PII | Personally Identifiable Information |
| PMC | PubMed Central |
| PMCID | PubMed Central Identification/reference number |
| PMS | Payment Management System, Payment Management Service, HHS |
| PO | Program Official |
| PSC | Payback Service Center, NIH, or Program Support Center, HHS |
| PTE | Pass-through Entity |
| R&D | Research and Development |
| R&R | Research and Related |
| RePORT | Research Portfolio Online Reporting Tool |
| RFA | Request for Applications |
| RFP | Request for Proposals |
| ROTC | Reserve Officer Training Corps |
| RPPR | Research Performance Progress Report |
| S&W | Salaries and Wages |
| SAM | System for Award Management |
| SAMHSA | Substance Abuse and Mental Health Services Administration |
| SBA | Small Business Administration |
| SBC | Small Business Concern |
| SBIR | Small Business Innovation Research Program |
| SEP | Special Emphasis Panel |
| SEVIS | Student and Exchange Visitor Information System |
| SF | Standard Form |

**J.A. 448**

| Abbreviation | Full Meaning of Abbreviation |
|---|---|
| SF424(R&R) | Standard Form 424 for Research and Research-Related (R&R) |
| SII | Successor-In-Interest |
| SNAP | Streamlined Non-competing Award Process |
| SO | Signing Official |
| SPOC | State Single Point of Contact |
| SRG | Scientific Review Group |
| SRO | Scientific Review Officer |
| STTR | Small Business Technology Transfer Program |
| TVPA | Trafficking Victims Protection Act |
| U.S. | United States |
| U.S.C. | United States Code |
| USCIS | United States Citizenship and Immigration Services |
| USDA | United States Department of Agriculture |
| USPS | United States Postal Service |
| VA | Department of Veterans Affairs |
| VAMC | VA Medical Center |
| VANPC | VA-Affiliated Non-Profit research Corporation |
| VAT | Value Added Tax |
| VHA | Veterans Health Administration |
| WIC | Women, Infants and Children |

# 1.2 DEFINITION OF TERMS

**Exhibit 2: Definitions of terms used in the Grants Policy Statement**

| Term | Definition |
|---|---|
| Acquisition cost | The cost of the asset including the cost to ready the asset for its intended use. Acquisition cost for equipment, for example, means the net invoice price of the equipment, including the cost of any modifications, attachments, accessories, or auxiliary apparatus necessary to make it usable for the purpose for which it is acquired. Acquisition costs for software includes those development costs capitalized in accordance with generally accepted accounting principles (GAAP). Ancillary charges, such as taxes, duty, protective in transit insurance, freight, and installation may be included in or excluded from the acquisition cost in accordance with the non-Federal entity's regular accounting practices. |
| Activity code | A 3-character code used to identify a specific category of extramural research activity, applied to financial assistance mechanisms. NIH uses three funding mechanisms for extramural research awards: grants, cooperative agreements and contracts. Within each funding mechanism, NIH uses 3-character activity codes (e.g., F32, K08, P01, R01, T32, etc.) to differentiate the wide variety of research-related programs NIH supports. A comprehensive list of activity codes is on the Activity Code Search Results webpage. |
| Additive alternative | A use of program income earned during or after the project period that permits income that is generated under a grant to be added to funds committed to the project by the Federal awarding agency and recipient and used to further eligible project or program objectives. (See definitions for deductive alternative and cost sharing or matching alternative and Administrative Requirements—Management Systems and Procedures—Program Income). |
| Administrative supplement | A request for (or the award of) additional funds during a current project period to provide for an increase in costs due to unforeseen circumstances. All additional costs must be within the scope of the peer reviewed and approved project. |
| Advance payment | A payment that a Federal awarding agency or pass through entity makes by any appropriate payment mechanism, including a predetermined payment schedule, before the non-Federal entity disburses the funds for program purposes. |
| Allocation | The process of assigning a cost, or a group of costs, to one or more cost objective(s), in reasonable proportion to the benefit provided or other equitable relationship. The process may entail assigning a cost(s) directly to a final cost objective or through one or more intermediate cost objectives. For additional information, see Cost Considerations—The Cost Principles. |

**J.A. 450**

| Term | Definition |
|---|---|
| Allowable cost | A cost incurred by a recipient that is: (1) reasonable for the performance of the award; (2) allocable; (3) in conformance with any limitations or exclusions set forth in the Federal cost principles applicable to the organization incurring the cost or in the NoA as to the type or amount of cost; (4) consistent with regulations, policies, and procedures of the recipient that are applied uniformly to both federally supported and other activities of the organization; (5) accorded consistent treatment as a direct or indirect cost; (6) determined in accordance with generally accepted accounting principles; and (7) not included as a cost in any other federally supported award (unless specifically authorized by statute). For additional information on each, see Cost Considerations—The Cost Principles. |
| Alteration and renovation | Alteration and renovation (A&R) activities are considered as modernization activities and are typically supported under research grants where the primary purpose for the grant is other than construction or modernization. The determination of whether proposed A&R is major or minor is made by the NIH Program Official. See definition for Modernization. |
| Applicable clinical trial | Applicable clinical trial is the term used in Title VIII of the Food and Drug Administration Amendments Act (FDAAA) of 2007 (P.L. 110-85) to designate the scope of clinical trials that may be subject to the registration and results reporting requirements in FDAAA. |
| Animal Welfare Assurance | The Animal Welfare Assurance is part of the required documentation to receive an award for organizations involved in live, vertebrate animal activity conducted or supported by the Public Health Service (PHS). The Animal Welfare Assurance enumerates the organization's commitment to compliance with the PHS Policy on Humane Care and Use of Laboratory Animals and other incorporated laws and policies. |
| Applicable credit | Those receipts that offset or reduce direct or indirect costs. Typical examples of such transactions include purchase discounts, rebates, or allowances; recoveries or indemnities on losses, insurance refunds; and adjustments of overpayments or erroneous charges. |
| Application | A request for financial support of a project or activity submitted to NIH on specified forms and in accordance with NIH instructions. (See Application Information and Processes for detailed information about the application process, including an explanation of the types of applications). |
| Application type code | A single-digit code identifying the type of application received and processed. Application type codes include the following: 1=New; 2=Renewal; 3=Revision; 4=Extension; 5=Non-Competing Continuation; 6=Change of Organization Status (Successor-In-Interest); 7=Change of Recipient or Training Institution; 8=Change of Institute or Division (Type 5 transfer to another NIH IC); 9=Change of Institute or Division (Type 2 transfer to another NIH IC). |
| Appropriation Act | The statute that provides the authority for Federal agencies to incur obligations to and make payments out of the U.S. treasury for specified purposes. |

**J.A. 451**

| Term | Definition |
|---|---|
| Assistance listing number | A unique number assigned to identify a Federal Assistance Listing, formerly known as the CFDA number. |
| Assistance listing program title | The title that corresponds to the Federal Assistance Listings Number. Formerly known as the CFDA program title. |
| Assurance | A certification by an applicant, normally included with the application or State plan, indicating that the entity is in compliance with, or that it will abide by, a particular requirement if awarded a Federal grant. |
| Audit finding | Deficiencies which an auditor is required by 2 CFR Part 200.516(a) and to report in the schedule of findings and questioned costs. |
| Audit resolution | The process of resolving audit findings, including those related to management and systems deficiencies and monetary findings (that is, questioned costs). |
| Authorized organization representative | The individual, named by the applicant organization, who is authorized to act for the applicant and to assume the obligations imposed by the Federal laws, regulations, requirements, and conditions that apply to grant applications or grant awards. This individual is equivalent to the signing official in the eRA Commons, i.e., holds the SO Role. |
| Award | The provision of funds by NIH, based on an approved application and budget or progress report, to an organizational entity or an individual to carry out a project or activity. |
| Awarding IC | NIH IC responsible for the award, administration, and monitoring of grant supported activities. |
| Budget | The financial plan for the project or program that the Federal awarding agency or pass-through entity approves during the Federal award process or in subsequent amendments to the Federal award. It may include the Federal and non-Federal share or only the Federal share, as determined by the Federal awarding agency or pass through entity. The approved budget specified in the NoA may be shown in detailed budget categories or as total costs without a categorical breakout. Expenditures charged to an approved budget that consists of both Federal and non-Federal shares are deemed to be borne by the recipient in the same proportion as the percentage of Federal/non-Federal participation in the overall budget. |
| Budget period | The time interval from the start date of a funded portion of an award to the end date of that funded portion (usually 12 months) during which recipients are authorized to expend the funds awarded, including any funds carried forward or other revisions. NIH award project periods (periods of performance) are typically divided by budget periods for budgetary and funding purposes. See Project Period. See Period of Performance. |

**J.A. 452**

| Term | Definition |
|---|---|
| Capital assets | Tangible or intangible assets used in operations having a useful life of more than one year which are capitalized in accordance with GAAP. Capital assets include: (1) Land, buildings (facilities), equipment, and intellectual property (including software) whether acquired by purchase, construction, manufacture, lease-purchase, exchange, or through capital leases; and (2) Additions, improvements, modifications, replacements, rearrangements, reinstallations, renovations or alterations to capital assets that materially increase their value or useful life (not ordinary repairs and maintenance). |
| Capital expenditures | Expenditures to acquire capital assets or expenditures to make additions, improvements, modifications, replacements, rearrangements, reinstallations, renovations, or alterations to capital assets that materially increase their value or useful life. (See Administrative Requirements—Changes in Project and Budget—Prior Approval Requirements—Capital Expenditures). |
| Carryover | Unobligated Federal funds remaining at the end of any budget period that, with the approval of the GMO or under an automatic authority, may be carried forward to another budget period to cover allowable costs of that budget period (whether as an offset or additional authorization). Obligated, but unliquidated, funds are not considered carryover. |
| Change in scope | An activity whereby the objectives or specific aims identified in the approved grant application are significantly changed by the recipient after award. GMO prior approval is required for a change in scope to be allowable under an award. See Administrative Requirements—Changes in Project and Budget—Prior Approval Requirements—Change of Scope for additional information. |
| Change of PD/PI | A process, usually initiated by the recipient, whereby the federally approved PD/PI is replaced by another individual, with the approval of the GMO. |
| Change of recipient organization | Transfer of the legal and administrative responsibility for a grant-supported project or activity from one legal entity to another before the completion date of the approved project period (competitive segment). |
| Chief Grants Management Officer | The Grants Management Officer within an awarding agency who is the principal Grants Officer in the Institute or Center. The Chief Grants Management Officer provides leadership to an organizational component that is responsible for the business and fiscal management of an IC's grant portfolio. Generally, the CGMO will have the authority to appoint and exercise line authority over one or more GMOs. At NIH each IC has a CGMO. |
| Claim | Depending on the context, either: (1) A written demand or written assertion by one of the parties to a Federal award seeking as a matter of right: (i) The payment of money in a sum certain; (ii) The adjustment or interpretation of the terms and conditions of the Federal award; or (iii) Other relief arising under or relating to a Federal award. (2) A request for payment that is not in dispute when submitted. |

| Term | Definition |
|------|-----------|
| Clinical research | Research with human subjects that is:<br><br>1) Patient-oriented research. Research conducted with human subjects (or on material of human origin such as tissues, specimens, and cognitive phenomena) for which an investigator (or colleague) directly interacts with human subjects. Excluded from this definition are in vitro studies that utilize human tissues that cannot be linked to a living individual. It includes: (a) mechanisms of human disease, (b), therapeutic interventions, (c) clinical trials, or (d) development of new technologies.<br><br>2) Epidemiological and behavioral studies.<br><br>3) Outcomes research and health services research<br><br>Studies falling under 45 CFR Part 46.101(b)(4) (the "Common Rule" prior to July 19, 2018 and 45 CFR Part 46.104(d)<br><br>4) (the "Revised Common Rule" effective July 19, 2018, Exemption 4) are not considered clinical research by this definition. |

**J.A. 454**

| Term | Definition |
|---|---|
| Clinical trial | A research study in which one or more human subjects are prospectively assigned to one or more interventions (which may include placebo or other control) to evaluate the effects of those interventions on health-related biomedical or behavioral outcomes. |
| | • See 45 CFR Part 46, Subpart A, referred to as the "Revised Common Rule" definition of research at 45 CFR Part 46.102(l). Pre-2018, see 45 CFR Part 46, Subpart A, referred to as the "Common Rule" definition of research at 45 CFR Part 46.102(d) |
| | • See Revised Common Rule definition of human subject at 45 CFR Part 46.102(e)(1). See Common Rule definition of human subject at 45 CFR Part 46.102(f) |
| | • The term "prospectively assigned" refers to a pre-defined process (e.g., randomization) specified in an approved protocol that stipulates the assignment of research subjects (individually or in clusters) to one or more arms (e.g., intervention, placebo or other control) of the clinical trial. |
| | • An *intervention* is defined as a manipulation of the subject or subject's environment for the purpose of modifying one or more health-related processes and/or endpoints. Examples include, but are not limited, to: drugs/small molecules/compounds, biologics, devices; procedures (e.g., surgical techniques); delivery systems (e.g., telemedicine, face-to-face); strategies to change health-related behavior (e.g., diet, cognitive therapy, exercise, development of new habits); and treatment, prevention, and diagnostic strategies. |
| | • A *health-related biomedical or behavioral outcome* is defined as the pre-specified effect of an intervention on the study subjects. Examples include positive or negative changes to physiological or biological parameters (e.g., improvement of lung capacity, gene expression); psychological or neurodevelopmental parameters (e.g., mood management intervention for smokers; reading comprehension and/or information retention); disease processes; health-related behavior; and well-being or quality of life. |
| | Biomedical clinical trials of an experimental drug, treatment, device, or behavioral intervention may proceed through four phases: |
| | Phase I. Tests a new biomedical intervention in a small group of people (e.g., 20-80) for the first time to determine efficacy and evaluate safety (e.g., determine a safe dosage range and identify side effects). |
| | Phase II. Study the biomedical or behavioral intervention in a larger group of people (several hundred) to determine efficacy and further evaluate safety. |
| | Phase III. Study to determine efficacy of the biomedical or behavioral intervention in large groups of people (from several hundred to several thousand) by comparing the intervention to other standard or experimental interventions as well as to monitor adverse effects, and to collect information that will allow the interventions to be used safely. |

| Term | Definition |
|---|---|
| | Phase IV. Studies conducted after the intervention has been marketed. These studies are designed to monitor the effectiveness of the approved intervention in the general population and to collect information about any adverse effects associated with widespread use. |
| Closeout | The process by which the Federal awarding agency or pass-through entity determines that all applicable administrative actions and all required work of the Federal award have been completed and takes actions as described in 2 CFR Part 200.344. |
| Cluster of programs | A grouping of closely related programs that share common compliance requirements. The types of clusters of programs are research and development (R&D), student financial aid (SFA), and other clusters. "Other clusters" are as defined by OMB in the compliance supplement or as designated by a state for Federal awards the state provides to its subrecipients that meet the definition of a cluster of programs. When designating an "other cluster," a state must identify the Federal awards included in the cluster and advise the subrecipients of compliance requirements applicable to the cluster, consistent with 2 CFR Part 200.332(a). A cluster of programs must be considered as one program for determining major programs, as described in 2 CFR Part 200.518, and, with the exception of R&D as described in 2 CFR Part 200.501(c), whether a program-specific audit may be elected. |
| Code of Federal Regulations | The codified regulations of the Federal government based on the final agency regulations published in the Federal Register. |
| Cognizant agency for audit | The Federal agency designated to carry out the responsibilities as described in 2 CFR Part 200.513. The cognizant agency for audit is not necessarily the same as the cognizant agency for indirect costs. A list of cognizant agencies for audit may be found at the FAC web site. |
| Cognizant agency for indirect costs | The Federal agency responsible for reviewing, negotiating, and approving cost allocation plans or indirect cost proposals developed under this part on behalf of all Federal agencies. The cognizant agency for indirect cost is not necessarily the same as the cognizant agency for audit. For assignments of cognizant agencies see the following: (1) For IHEs: 2 CFR Part 200, Appendix III, C.11. (2) For non-profit organizations: 2 CFR Part 200, Appendix IV, C.2. (3) For state and local governments: 2 CFR Pt 200, Appendix V, F.1. (4) For Indian tribes: 2 CFR Pt 200, Appendix VII, D.1. |
| Co-Investigator | An individual involved with the PD/PI in the scientific development or execution of a project. The Co-Investigator (collaborator) may be employed by, or be affiliated with, the applicant/recipient organization or another organization participating in the project under a consortium agreement. A Co-Investigator typically devotes a specified percentage of time to the project and is considered senior/key personnel. The designation of a Co-Investigator, if applicable, does not affect the PD/PI's roles and responsibilities as specified in the NIHGPS, nor is it a role implying multiple PD/PI. |

| Term | Definition |
|------|------------|
| Competitive revision | A request for (or the award of) additional funds during a current project period to support new or additional activities which are not identified in the current award that reflect an expansion of the scope of the grant-approved activities. Competitive revisions require peer review. |
| Competitive segment | The initial project period recommended for support (up to 5 years) or each extension of a project period resulting from a renewal award. |
| Compliance Supplement | Appendix XI to 2 CFR Part 200. See Section 93 for HHS Agency Program Requirements. |
| Component | For the purposes of applications and progress reports, a component is a distinct, reviewable part of a multi-project application or progress report for which there is a business need to gather detailed information identified in the Notice of Funding Opportunity (NOFO). Components typically include general information (component organization, project period, project title, etc.), performance sites, personnel, and budget. The NOFO defines the construction and naming convention for the application; the funded application defines the construction and naming convention for the progress report. Components may also be referred to as "cores" or "projects." Note, for RPPR Question G.9, the term "foreign component" is distinct from "component" as defined here. However, a "foreign component" may also be a "component" in the RPPR. (See definition of foreign component for more information). |
| Computing devices | Machines used to acquire, store, analyze, process, and publish data and other information electronically, including accessories (or ''peripherals'') for printing, transmitting and receiving, or storing electronic information. See also "supplies" and "information technology systems." |
| Conference (domestic or international) | A symposium, seminar, workshop, or any other organized and formal meeting, whether conducted face-to-face or via the Internet, where individuals assemble (or meet virtually) to exchange information and views or explore or clarify a defined subject, problem, or area of knowledge, whether or not a published report results from such meeting. |
| Conference grant | A grant whose purpose is to support activities related to the conduct of a conference(s) or defined set of conference-related activities. |
| Conflict of interest | Conflict of Interest is a cross-cutting issue that affects many policy areas such as peer review, financial conflict of interest, and responsible conduct of research. There are different uses of this term throughout this document. It generally means that a competing personal interest could affect, or could appear to affect, an individual's judgment or could cause the individual's impartiality to be questioned. Conflicts of Interest (actual or potential) may arise in the objective review process or in other activities or phases of the financial assistance process. See also Financial Conflict of Interest for a specific definition covering that policy area. |

**J.A. 457**

| Term | Definition |
|---|---|
| Consortium agreement | A formalized agreement whereby a research project is carried out by the recipient and one or more other organizations that are separate legal entities. Under the agreement, the recipient must perform a substantive role in the conduct of the planned research and not merely serve as a conduit of funds to another party or parties. These agreements typically involve a specific level of effort from the consortium organization's PD/PI and a categorical breakdown of costs, such as personnel, supplies, and other allowable expenses, including F&A costs. The relationship between the recipient and the collaborating organizations is considered a subaward relationship. (See Consortium Agreements chapter in IIB). |
| Construction | Construction of a new building structure or facility, including the installation of fixed equipment, which provides space not presently available. It excludes the purchase of land and ancillary improvements, for example, parking lots or roads. The construction of shell space is not allowable as a construction activity since shell space does not provide usable space for research activities). See Construction chapter in IIB. |
| Consultant | An individual who provides professional advice or services for a fee, but normally not an employee of the engaging party. In unusual situations, an individual may be both a consultant and an employee of the same party, receiving compensation for some services as a consultant and for other work as a salaried employee. To prevent apparent or actual conflicts of interest, recipients and consultants must establish written guidelines indicating the conditions of payment of consulting fees. Consultants also include firms that provide professional advice or services. (See Cost Considerations—Allowability of Costs/Activities—Selected Items of Cost—Consultant Services). |
| Contact PD/PI | When multiple PD/PIs are designated, NIH requires that the applicant organization identify one of the PD/PIs as the Contact PD/PI to serve as a primary point of contact. Serving as Contact PD/PI confers no special authorities or responsibilities within the project team. The Contact PD/PI must meet all eligibility requirements for PD/PI status. However, as with the single PD/PI model, if the Contact PD/PI is not an employee, the applicant organization must have a formal written agreement with the Contact PD/PI that specifies an official relationship between the parties. See Multiple PI chapter in IIB for additional information. |
| Contract | A legal instrument by which a non-Federal entity purchases property or services needed to carry out the project or program under a Federal award. The term as used in 2 CFR Part 200 does not include a legal instrument, even if the non-Federal entity considers it a contract, when the substance of the transaction meets the definition of a Federal award or subaward. See Subaward. |
| Contractor | An entity that receives a contract. See contract. |

| Term | Definition |
|------|-----------|
| Cooperative agreement | A legal instrument of financial assistance between a Federal awarding agency or pass-through entity and a non-Federal entity that, consistent with 31 U.S.C. 6302–6305: (1) Is used to enter into a relationship the principal purpose of which is to transfer anything of value from the Federal awarding agency or pass through entity to the non-Federal entity to carry out a public purpose authorized by a law of the United States (see 31 U.S.C. 6101(3)); and not to acquire property or services for the Federal government or pass-through entity's direct benefit or use; (2) Is distinguished from a grant in that it provides for substantial involvement between the Federal awarding agency or pass-through entity and the non-Federal entity in carrying out the activity contemplated by the Federal award. (3) The term does not include: (i) development agreement as defined in 15 U.S.C. 3710a; or (ii) An agreement that provides only: (A) Direct United States Government cash assistance to an individual; (B) A subsidy; (C) A loan; (D) A loan guarantee; or (E) Insurance. |
| Cost allocation plan | Central service cost allocation plan or public assistance cost allocation plan. |
| Cost objective | A program, function, activity, award, organizational subdivision, contract, or work unit for which cost data are desired and for which provision is made to accumulate and measure the cost of processes, products, jobs, capital projects, etc. A cost objective may be a major function of the non-Federal entity, a particular service or project, a Federal award, or an indirect (Facilities & Administrative (F&A)) cost activity, as described in 2 CFR Part 200, Subpart E—Cost Principles. |
| Cost overrun | Any amount charged in excess of the Federal share of costs for the project period (competitive segment). |
| Cost principles | The government-wide principles established under 2 CFR Part 200 for determining the allowable costs incurred by non-Federal entities under Federal awards. The principles are for the purpose of cost determination and are not intended to identify the circumstances or dictate the extent of Federal Government participation in the financing of a particular program or project. The principles are designed to provide that Federal awards bear their fair share of cost recognized under these principles except where restricted or prohibited by statute. In the case of hospitals, they follow the cost principles in 2 CFR Part 200, Appendix IX, "Hospital Cost Principles." In the case of for-profit organizations, there are no cost principles specifically applicable; the cost principles for for-profit organizations are set forth in the FAR (48 CFR Part 31.2). See Cost Considerations—The Cost Principles for additional details. |
| Cost sharing | See matching or cost sharing definition. |
| Cost sharing or matching alternative | An alternative use of program income whereby income accrued during the period of grant support may be used to satisfy a cost sharing or matching requirement. (See also definitions for additive alternative and deductive alternative and Administrative Requirements—Management Systems and Procedures—Program Income). |
| Cost-type contract | A contract or subcontract under a grant in which the contractor or subcontractor is paid on the basis of the allowable costs it incurs, with or without a fee. |

**J.A. 459**

| Term | Definition |
|---|---|
| Data and safety monitoring plan | For each NIH-supported clinical trial, NIH requires a data and safety monitoring plan that will provide oversight and monitoring to ensure the safety of participants and the validity and integrity of the data. The level of monitoring should be commensurate with the risks and the size and complexity of the clinical trial. A detailed data and safety monitoring plan must be submitted to the applicant's IRB and subsequently to the awarding IC for approval prior to the accrual of human subjects. |
| Data Management | The process of validating, organizing, protecting, maintaining, and processing scientific data to ensure the accessibility, reliability, and quality of the scientific data for its users. |
| Data Management and Sharing Plan (DMS Plan) | A plan describing the data management, preservation, and sharing of scientific data and accompanying metadata. |
| Data Sharing | The act of making scientific data available for use by others (e.g., the larger research community, institutions, the broader public), for example, via an established repository. |
| Debarment and suspension | The actions taken by a debarring official in accordance with OMB guidance at 2 CFR Part 180, "Non-procurement Debarment and Suspension," as implemented by HHS in 2 CFR Part 376, to exclude a person or organization from participating in grants and other non-procurement awards government-wide. If debarred or suspended, the person or organization may not receive financial assistance (under a grant, cooperative agreement, or subaward, or contract under a grant) for a specified period of time. Debarments and suspensions carried out pursuant to 2 CFR Part 376 are distinct from post-award suspension action by an awarding agency. (See also Public Policy Requirements and Objectives—Debarment and Suspension). |
| Debt collection | The process of collecting funds owed by recipients to the Federal government, which, under grants, generally are owed as a result of formal cost disallowances. |
| Debt instrument | A document used to record a legal obligation of one party to pay a financial obligation to another in accordance with predetermined terms and conditions. |
| Deductive alternative | An alternative for the use of program income earned during the period of grant support under which allowable costs of the project or program to be paid by the Federal government are offset by the amount of the program income. (See also definitions for additive alternative and cost sharing or matching alternative and Administrative Requirements—Management Systems and Procedures—Program Income). |
| Departmental Grants Appeals Board | The independent office established in the Office of the Secretary with delegated authority from the Secretary to review and decide certain disputes between recipients of HHS funds and HHS awarding agencies under 45 CFR Part 16 and to perform other review, adjudication and mediation services as assigned. |

| Term | Definition |
|---|---|
| Deviation | A departure on a single-case or class basis from a regulatory or policy requirement. A single-case deviation represents a request for waiver or exception sought for one grant only that arises on a case-by-case basis. A class deviation involves more than one grant for which the same type of deviation action is being requested. |
| Direct costs | Costs that can be identified specifically with a particular sponsored project, an instructional activity, or any other institutional activity, or that can be directly assigned to such activities relatively easily with a high degree of accuracy. |
| Disallowed costs | Those charges to a Federal award that the Federal awarding agency or pass-through entity determines to be unallowable, in accordance with the applicable Federal statutes, regulations, or the terms and conditions of the Federal award. |
| Discretionary Award | An award in which NIH, in keeping with its statutory authority to exercises judgement ("discretion"), selects the recipient and/or the amount of funding through a competitive process. Generally, NIH awards are discretionary. See Non-Discretionary Award. |
| Domestic organization | A public (including a State or other governmental agency) or private non-profit or for-profit organization that is located in the United States or its territories, is subject to U.S. laws, and assumes legal and financial accountability for awarded funds and for the performance of the grant-supported activities. |
| Early Stage Investigator | An individual who is classified as a New Investigator and is within 10 years of completing their terminal research degree or is within 10 years of completing medical residency (or the equivalent) is considered an Early Stage Investigator (ESI). See definition of New Investigator. |
| Entity Identification Number | A three-part coding scheme of 12 characters used in PMS to identify organizations and individuals. The first character identifies the recipient as an organization or an individual. The next nine characters are the Employer Identification Number. The last two characters are a suffix to provide distinction between organizational entities that are assigned a single EIN and those that have more than one. (Also known as Payment System Identifier.) |
| Equipment | Tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds the lesser of the capitalization level established by the non-Federal entity for financial statement purposes, or $5,000. (See also capital assets, computing devices, general purpose equipment, information technology systems, special purpose equipment, and supplies). |
| eRA Commons | The Electronic Research Administration (eRA) Commons is a virtual meeting place where NIH extramural recipient organizations, recipients, and the public can receive and transmit information about the administration of biomedical and behavioral research. The eRA Commons is divided into both unrestricted and restricted portions that provide for public and confidential information, respectively. |

| Term | Definition |
|------|------------|
| Expanded authorities | A standard term of all NIH awards to allow recipients several flexibilities to waive the requirement for prior approval for specified actions. NIH extended expanded authorities to all NIH awards except for the provision to automatically carry over unobligated balances for certain awards. (see Administrative Requirements—Changes in Project and Budget—NIH Standard Terms of Award). |
| Expenditure report | Means: (1) For non-construction grants, the SF-425 Federal Financial Report (FFR) (or other OMB-approved equivalent report); (2) for construction grants, the SF-271 "Outlay Report and Request for Reimbursement" (or other OMB-approved equivalent report) |
| Expenditures | Charges made by a non-Federal entity to a project or program for which a Federal award was received.<br><br>1. The charges may be reported on a cash or accrual basis, as long as the methodology is disclosed and is consistently applied.<br>2. For reports prepared on a cash basis, expenditures are the sum of:<br>  i. Cash disbursements for direct charges for property and services;<br>  ii. The amount of indirect expense charged;<br>  iii. The value of third-party in-kind contributions applied; and<br>  iv. The amount of cash advance payments and payments made to subrecipients.<br>3. For reports prepared on an accrual basis, expenditures are the sum of:<br>  i. Cash disbursements for direct charges for property and services;<br>  ii. The amount of indirect expense incurred;<br>  iii. The value of third-party in-kind contributions applied; and<br>  iv. The net increase or decrease in the amounts owed by the non-Federal entity for:<br>    A. Goods and other property received;<br>    B. Services performed by employees, contractors, sub-recipients, and other payees; and<br>    C. Programs for which no current services or performance are required such as annuities, insurance claims, or other benefit payments. |
| Facilities and Administrative (F&A) costs (or indirect costs) | Necessary costs incurred by a recipient for a common or joint purpose benefitting more than one cost objective, and not readily assignable to the cost objectives specifically benefitted, without effort disproportionate to the results achieved. To facilitate equitable distribution of indirect expenses to the cost objectives served, it may be necessary to establish a number of pools of F&A (indirect) costs. F&A (indirect) cost pools must be distributed to benefitted cost objectives on bases that will produce an equitable result in consideration of relative benefits derived. |
| Federal agency | An "agency" as defined at 5 U.S.C. 551(1) and further clarified by 5 U.S.C. 552 (f). |

| Term | Definition |
|------|-----------|
| Federal Audit Clearinghouse (FAC) | The clearinghouse designated by OMB as the repository of record where non-Federal entities are required to transmit the reporting packages required by Subpart F—Audit Requirements of 2 CFR Part 200 Subpart F – Audit Requirements. The mailing address of the FAC is Federal Audit Clearinghouse, Bureau of the Census, 1201 E. 10th Street, Jeffersonville, IN 47132. Any future updates to the location of the FAC may be found at the Federal Audit Clearinghouse web site. |
| Federal award | Depending on the context, in either paragraph (1) or (2) of this section: <br><br>(1)(i) The Federal financial assistance that a non-Federal entity receives directly from a Federal awarding agency or indirectly from a pass-through entity, as described in 2 CFR Part 200.101; or <br><br>(ii) The cost-reimbursement contract under the Federal Acquisition Regulations that a non-Federal entity receives directly from a Federal awarding agency or indirectly from a pass-through entity, as described in 2 CFR Part 200.101. <br><br>(2) The instrument setting forth the terms and conditions. The instrument is the grant agreement, cooperative agreement, other agreement for assistance covered in paragraph (2) of Federal financial assistance, or the cost-reimbursement contract awarded under the Federal Acquisition Regulations. <br><br>(3) Federal award does not include other contracts that a Federal agency uses to buy goods or services from a contractor or a contract to operate Federal government owned, contractor operated facilities (GOCOs). <br><br>(4) See also definitions of Federal financial assistance, grant agreement, and cooperative agreement. |
| Federal award date | The date when the Federal award is signed by the authorized official of the Federal awarding agency. |
| Federal Award Identification Number | A unique number assigned to a financial assistance award to assist recipients in correctly reporting subawards. The public can use the FAIN and the Assistance listing number together to find one accurate result when searching online in such databases as USASpending.gov and FSRS. The FAIN can be found on the notice of award. NIH implements the FAIN by deriving it from the core elements of the grant number. For example, the FAIN for 1R0IHL654321-01 would be R01HL654321. |
| Federal awarding agency | The Federal agency that provides a Federal award directly to another entity. See also Awarding IC. |
| Federal Demonstration Partnership | A cooperative initiative among some Federal agencies, including NIH, selected organizations receiving Federal funding for research, and certain professional associations. Its efforts include demonstration projects intended to simplify and standardize Federal requirements in order to increase research productivity and reduce administrative costs. |

| Term | Definition |
|------|-----------|
| Federal financial assistance | 1. Federal financial assistance means assistance that non-Federal entities receive or administer in the form of:<br><br>   i. Grants;<br><br>   ii. Cooperative agreements;<br><br>   iii. Non-cash contributions or donations of property (including donated surplus property);<br><br>   iv. Direct appropriations;<br><br>   v. Food commodities; and<br><br>   vi. Other financial assistance (except assistance listed in paragraph (b) of this section).<br><br>2. For 2 CFR Part 200.202 and 2 CFR Part 200 Subpart F, federal financial assistance also includes assistance that non-Federal entities receive or administer in the form of:<br><br>   i. Loans;<br><br>   ii. Loan Guarantees;<br><br>   iii. Interest subsidies; and<br><br>   iv. Insurance.<br><br>3. Federal financial assistance does not include amounts received as reimbursement for services rendered to individuals as described in 2 CFR Part 200.502(h) and (i). |
| Federal institution | A Cabinet-level department or independent agency of the executive branch of the Federal government or any component organization of such a department or agency. For the purposes of this document, this term is used in the context of a Federal institution as a recipient. See also Awarding IC. |
| Federal interest | For purposes 2 CFR Part 200.330 or when used in connection with the acquisition or improvement of real property, equipment, or supplies under a Federal award, the dollar amount that is the product of the: (1) Federal share of total project costs; and (2) Current fair market value of the property, improvements, or both, to the extent the costs of acquiring or improving the property were included as project costs. |
| Federal program | 1. All Federal awards which are assigned a single number in the Assistance listings.<br><br>2. When no Assistance listing number is assigned, all Federal awards to non- Federal entities from the same agency made for the same purpose should be combined and considered one program.<br><br>3. Notwithstanding paragraphs (1) and (2) of this definition, a cluster of programs. The types of clusters of programs are:<br><br>   i. Research and development (R&D);<br><br>   ii. Student financial aid (SFA); and<br><br>   iii. "Other clusters," as described in the definition of Cluster of Programs. |

**J.A. 464**

| Term | Definition |
|------|------------|
| Federal share | The portion of the total project costs that are paid by Federal funds. |
| Federalwide Assurance | The Federalwide Assurance is the only type of assurance of compliance accepted and approved by OHRP for institutions engaged in nonexempt research involving human subjects conducted or supported by HHS. Under a FWA, an institution commits to HHS that it will comply with the requirements set forth in 45 CFR Part 46, as well as the terms of assurance. |
| Fee | An amount, in addition to actual, allowable costs, paid to an organization providing goods or services consistent with normal commercial practice. This payment also is referred to as profit. (See Grants to For-Profit Organizations—Small Business Innovation Research and Small Business Technology Transfer Programs—Allowable Costs and Fee—Profit or Fee). |
| Financial conflict of interest | A financial conflict of interest exists when the recipient's designated official(s) reasonably determines that an investigator's significant financial interest could directly and significantly affect the design, conduct, or reporting of the PHS-funded research. See 42 CFR Part 50, Subpart F, Responsibility of Applicants for Promoting Objectivity in Research for which PHS funding is sought and Public Policy Requirements and Objectives—Financial Conflict of Interest. |
| Foreign component | The performance of any significant scientific element or segment of a project outside of the United States, either by the recipient or by a researcher employed by a foreign organization, whether or not grant funds are expended. Activities that would meet this definition include, but are not limited to, (1) the involvement of human subjects or animals, (2) extensive foreign travel by recipient project staff for the purpose of data collection, surveying, sampling, and similar activities, or (3) any activity of the recipient that may have an impact on U.S. foreign policy through involvement in the affairs or environment of a foreign country. Examples of other grant-related activities that may be significant are: <br><br> • collaborations with investigators at a foreign site anticipated to result in co-authorship; <br><br> • use of facilities or instrumentation at a foreign site; or <br><br> • receipt of financial support or resources from a foreign entity. <br><br> Foreign travel for consultation is not considered a foreign component. (See Grants to Foreign Organizations, International Organizations, and Domestic Grants with Foreign Components chapter in IIB). |

**J.A. 465**

| Term | Definition |
|------|-----------|
| Foreign organization | An entity that is:<br><br>1. A public or private organization located in a country other than the United States and its territories that is subject to the laws of the country in which it is located, irrespective of the citizenship of project staff or place of performance;<br><br>2. A private nongovernmental organization located in a country other than the United States that solicits and receives cash contributions from the general public;<br><br>3. A charitable organization located in a country other than the United States that is nonprofit and tax exempt under the laws of its country of domicile and operation, and is not a university, college, accredited degree granting institution of education, private foundation, hospital, organization engaged exclusively in research or scientific activities, church, synagogue, mosque or other similar entities organized primarily for religious purposes; or<br><br>4. An organization located in a country other than the United States not recognized as a *Foreign Public Entity*. |
| Foreign public entity | (1) A foreign government or foreign governmental entity; (2) A public international organization, which is an organization entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Organizations Immunities Act (22 U.S.C. 288–288f); (3) An entity owned (in whole or in part) or controlled by a foreign government; or (4) Any other entity consisting wholly or partially of one or more foreign governments or foreign governmental entities. |
| For-profit organization | An organization, institution, corporation, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners. A for-profit organization is considered to be a small business if it is independently owned and operated, if it is not dominant in the field in which research is proposed, and if it employs no more than 500 persons. (Also see definition for small business concern). |
| Full-time appointment | The number of days per week and/or months per year representing full-time effort at the applicant/recipient organization, as specified in organizational policy. The organization's policy must be applied consistently regardless of the source of support. |
| General purpose equipment | Equipment which is not limited to research, medical, scientific or other technical activities. Examples include office equipment and furnishings, modular offices, telephone networks, information technology equipment and systems, air conditioning equipment, reproduction and printing equipment, and motor vehicles. See also "Equipment" and "Special Purpose Equipment." |
| Generally Acceptable Accounting Principles (GAAP) | The meaning specified in accounting standards issued by the Government Accounting Standards Board (GASB) and the Financial Accounting Standards Board (FASB). |

| Term | Definition |
|------|------------|
| Generally Accepted Government Auditing Standards (GAGAS) | Also known as the Yellow Book, generally accepted government auditing standards issued by the Comptroller General of the United States, which are applicable to financial audits. |
| Grant number | A grant number is a unique identifier for a grant composed of the application type code, activity code, Institute code, 6-digit serial number, support year and /or suffix code for the support year of the grant, or other information, such as a supplement (S1), resubmission (A1), or a fellowship's institutional allowance. In Federalwide systems (e.g., USASpending.gov, FFATA/FSRS) the Federal Award Identifier Number (FAIN) is used to identify grants for Federalwide implications. Similar to the NIH Grant Number, the FAIN consists of the activity code, Institute code, and 6-digit serial number.<br><br>Sample Grant Number: 1 R01 AI 123456-01 A1 S1<br><br>Sample FAIN: R01 AI 654321 |
| Grant or grant agreement | A legal instrument of financial assistance between a Federal awarding agency or pass-through entity and a non-Federal entity that, consistent with 31 U.S.C. 6302, 6304:<br><br>1. Is used to enter into a relationship the principal purpose of which is to transfer anything of value from the Federal awarding agency or passthrough entity to the non-Federal entity to carry out a public purpose authorized by a law of the United States (see 31 U.S.C. 6101(3)); and not to acquire property or services for the Federal awarding agency or pass-through entity's direct benefit or use;<br><br>2. Is distinguished from a cooperative agreement in that it does not provide for substantial involvement between the Federal awarding agency or passthrough entity and the non-Federal entity in carrying out the activity contemplated by the Federal award.<br><br>3. Does not include an agreement that provides only:<br>  i. Direct United States Government cash assistance to an individual;<br>  ii. A subsidy;<br>  iii. A loan;<br>  iv. A loan guarantee; or<br>  v. Insurance.<br><br>See also Cooperative Agreement. |

**J.A. 467**

| Term | Definition |
|---|---|
| Grants Management Officer | An NIH official responsible for the business management aspects of grants and cooperative agreements, including review, negotiation, award, and administration, and for the interpretation of grants administration policies and provisions. GMOs are delegated the authority from the CGMO to obligate NIH to the expenditure of funds and permit changes to approved projects on behalf of NIH. Each NIH IC that awards grants has one or more GMOs with responsibility for particular programs or awards. See also Chief Grants Management Officer definition. |
| Grants Management Specialist | An NIH staff member who oversees the business and other non-programmatic aspects of one or more grants and/or cooperative agreements. These activities include, but are not limited to, evaluating grant applications for administrative content and compliance with statutes, regulations, and guidelines; negotiating grants; providing consultation and technical assistance to recipients; and administering grants after award. |
| Grants.gov | Grants.gov has been designated by the Office of Management and Budget as the single access point for all grant programs offered by 26 Federal grant-making agencies. It provides a single interface for agencies to announce their grant opportunities and for all applicants to find and apply for those opportunities. |
| Grant-supported project or activity | Those activities specified or described in a grant application or in a subsequent submission that are approved by an NIH IC for funding, regardless of whether Federal funding constitutes all or only a portion of the financial support necessary to carry them out. |
| Honoraria | Payments given in support of professional services for the purpose of conferring distinction or to symbolize respect, esteem, or admiration. In other words, if the service is related to research oversight, research supervision, co-authoring research papers, then the payments are not honoraria but considered research funding. |
| Hospital | A facility licensed as a hospital under the law of any state or a facility operated as a hospital by the United States, a state, or a subdivision of a state. Also includes a non-profit or for-profit hospital or a medical care provider component of a non-profit organization (for example, a foundation). |
| Human Fetal Tissue | Human Fetal Tissue is defined as tissue or cells obtained from a dead human embryo or fetus after a spontaneous or induced abortion or stillbirth. This definition does not include established human fetal cell lines. Research involving the transplantation of human fetal tissue must be conducted in accordance with applicable Federal, State and local laws as well as NIH guidance. See also Human Fetal Tissue from Elective Abortion. |

| Term | Definition |
|---|---|
| Human subject | Revised Common Rule (45 CFR Part 46, effective July 19, 2018): A living individual about whom an investigator (whether professional or student) conducting research:<br><br>  (i)  Obtains information or biospecimens through intervention or interaction with the individual, and uses, studies, or analyzes the information or biospecimens; or<br><br>  (ii)  Obtains, uses, studies, analyzes, or generates identifiable private information or identifiable biospecimens.<br><br>Pre-2018 Common Rule (45 CFR Part 46, effective July 19, 2018): A living individual about whom an investigator (whether professional or student) conducting research:<br><br>  (i)  Data through intervention or interaction with the individual; or<br><br>  (ii)  Identifiable private information.<br><br>Regulations governing the use of human subjects in research extend to use of human organs, tissues, and body fluids from identifiable individuals as human subjects and to graphic, written, or recorded information derived from such individuals. (See Public Policy Requirements and Objectives—Human Subjects Protections). |
| Impact score | The impact score is the rating which is assigned to an individual application by an SRG and designates the reviewers' assessment of scientific and technical merit of the application. For research projects, this is defined as the likelihood for the project to exert a sustained, powerful influence on the research field(s) involved, in consideration of established review criteria. The impact score is one mechanism by which the SRG makes a recommendation to the funding component concerning the application's scientific and technical merit. Impact scores may be numeric ($10 - 90$) or alphabetical (ND, for example). |
| Improper payment | (1) Any payment that should not have been made or that was made in an incorrect amount (including overpayments and underpayments) under statutory, contractual, administrative, or other legally applicable requirements; and<br><br>(2) Includes any payment to an ineligible party, any payment for an ineligible good or service, any duplicate payment, any payment for a good or service not received (except for such payments where authorized by law), any payment that does not account for credit for applicable discounts, and any payment where insufficient or lack of documentation prevents a reviewer from discerning whether a payment was proper. |

| Term | Definition |
|------|-----------|
| Indian tribe (or "federally recognized Indian tribe") | Any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. Chapter 33), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians (25 U.S.C. 450b(e)). See annually published Bureau of Indian Affairs list of Indian Entities Recognized and Eligible to Receive Services. |
| Indirect costs | See facilities and administrative costs definition. |
| Information technology systems | Computing devices, ancillary equipment, software, firmware, and similar procedures, services (including support services), and related resources. See also computing devices and equipment. |
| Innovation | Something new or improved, including research for (1) development of new technologies, (2) refinement of existing technologies, or (3) development of new applications for existing technologies. For the purposes of PHS programs, an example of innovation would be new medical or biological products for improved value, efficiency, or costs. |
| Institute or Center | The NIH organizational component responsible for a particular grant program or set of activities. The terms "NIH IC," or "awarding IC" are used throughout this document to designate a point of contact for advice and interpretation of grant requirements and to establish the focal point for requesting necessary prior approvals or changes in the terms and conditions of award. |
| Institutional Animal Care and Use Committee | The *PHS Policy on Humane Care and Use of Laboratory Animals* incorporates the *U.S. Government Principles for the Utilization and Care of Vertebrate Animals used in Testing, Research, and Training*, and requires the recipient to maintain an animal care and use program based on the Guide for the Care and Use of Laboratory Animals. An Institutional Animal Care and Use Committee (IACUC) appointed by the Chief Executive Officer or designee, is federally mandated to oversee the institution's animal program, facilities, and procedures (Public Law 99-158, Sec. 495). IACUC review and approval is required for all PHS supported activities involving live vertebrate animals prior to funding. |
| Institutional base salary | The annual compensation paid by an organization for an employee's appointment, whether that individual's time is spent on research, teaching, patient care, or other activities. Base salary excludes any income that an individual may be permitted to earn outside of duties for the applicant/recipient organization. Base salary may not be increased as a result of replacing organizational salary funds with NIH grant funds. (See Cost Considerations—Allowability of Costs/Activities—Selected Items of Cost—Salaries and Wages). |
| Institutional Review Board (IRB) | An administrative body established to protect the rights and welfare of human research subjects recruited to participate in research activities conducted under the auspices of the organization with which it is affiliated. The Institutional Review Board has the authority to approve, require modifications in, or disapprove all research activities that fall within its jurisdiction. |

**J.A. 470**

| Term | Definition |
|---|---|
| Institutions of Higher Education (IHEs) | IHE is defined at 20 U.S.C. 1001. |
| Intangible property | Property having no physical existence, such as trademarks, copyrights, patents and patent applications and property, such as loans, notes and other debt instruments, lease agreements, stock and other instruments of property ownership (whether the property is tangible or intangible). |
| Intergovernmental Personnel Act (IPA) | The Intergovernmental Personnel Act Mobility Program provides for the temporary assignment of personnel between the Federal Government and state and local governments, colleges and universities, Indian tribe (or "federally recognized Indian tribe" governments, federally funded research and development centers, and other eligible organizations. The goal of the Intergovernmental Personnel Act mobility program is to facilitate the movement of employees, for short periods of time, when this movement serves a sound public purpose. |
| Internal control over compliance requirements for Federal awards | A process implemented by a non-Federal entity designed to provide reasonable assurance regarding the achievement of the following objectives for Federal award:<br><br>1. Transactions are properly recorded and accounted for, in order to:<br>  i. Permit the preparation of reliable financial statements and Federal reports;<br>  ii. Maintain accountability over assets; and<br>  iii. Demonstrate compliance with Federal statutes, regulations, and the terms and conditions of the Federal award;<br><br>2. Transactions are executed in compliance with:<br>  i. Federal statutes, regulations, and the terms and conditions of the Federal award that could have a direct and material effect on a Federal program; and<br>  ii. Any other Federal statutes and regulations that are identified in the Compliance Supplement; and<br><br>3. Funds, property, and other assets are safeguarded against loss from unauthorized use or disposition. |
| Internal controls | A process, implemented by a non-Federal entity, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (1) Effectiveness and efficiency of operations; (2) Reliability of reporting for internal and external use; and (3) Compliance with applicable laws and regulations. |
| International organization | An organization that identifies itself as international or intergovernmental and has membership from, and represents the interests of, more than one country, without regard to whether the headquarters of the organization and location of the activity are inside or outside of the United States. |

| Term | Definition |
|------|------------|
| Invention reporting | The requirement pursuant to 37 CFR Part 401 that recipients of contracts, grants or cooperative agreements fully disclose any subject inventions made during the performance of work under a funding agreement in order to protect the Federal government's rights. |
| Investigational new drug | A new drug or biological drug that is used in a clinical investigation. |
| Investigator-initiated research | Research funded as a result of an investigator, on their own, submitting a research application in response to Parent Announcements only. Also known as unsolicited research. |
| IPF number | Institutional Profile File (IPF) number is a unique number used by NIH for tracking/reporting awards to recipient institutions. |
| Just-in-Time | NIH policy allows the submission of certain elements of a competing application to be deferred until later in the application process, after review when the application is under consideration for funding. Within the Status module of the eRA Commons, users will find a feature to submit Just-In-Time information when requested by NIH. Through this module, institutions can electronically submit the information that is requested after the review, but before award. See Completing the Pre-Award Process—Just-In-Time Procedures for additional information. |
| Liquidated damages | An amount defined in a contract and chargeable against funds due to the contractor for each day the contractor fails to complete the project beyond the contract completion date. |
| Local government | Any unit of government within a state, including a: (1) County; (2) Borough; (3) Municipality; (4) City; (5) Town; (6) Township; (7) Parish; (8) Local public authority, including any public housing agency under the United States Housing Act of 1937; (9) Special district; (10) School district; (11) Intrastate district; (12) Council of governments, whether or not incorporated as a nonprofit corporation under state law; and (13) Any other agency or instrumentality of a multi-, regional, or intra-state or local government. |
| Major A&R | Alteration and renovation (A&R) activities are considered as modernization activities and are typically supported under research grants where the primary purpose for the grant is other than construction or modernization. The determination of whether proposed A&R is major, or minor is made by the NIH Program Official. Major A&R is an unallowable activity or cost under foreign grants and foreign components in domestic grants. See "Modernization" on page I-32. |
| Matching or cost sharing | The portion of project costs not paid by Federal funds (unless otherwise authorized by Federal statute). This may include the value of allowable third-party in-kind contributions, as well as expenditures by the recipient. |
| Mechanism | Extramural awards are divided into three types of financial assistance: *grants*, *cooperative agreements* and *contracts*. A mechanism is the type of funded application or transaction used by NIH. Within each mechanism NIH includes programs. Programs can be further refined by specific activity codes. |

**J.A. 472**

| Term | Definition |
|---|---|
| Merger | A legal action resulting in the unification of two or more legal entities. When such an action involves the transfer of NIH grants, the procedures for the recognizing a successor-in-interest will apply. When the action does not involve the transfer of NIH grants, the procedures for recognizing a name change will apply. |
| Metadata | Data that provide additional information intended to make scientific data inter-pretable and reusable (e.g., date, independent sample and variable construction and description, methodology, data provenance, data transformations, any inter-mediate or descriptive observational variables). |
| Micro-purchase | A purchase of supplies or services using simplified acquisition procedures, the aggregate amount of which does not exceed the micro-purchase threshold. Micro-purchases comprise a subset of a non-Federal entity's small purchases. Micro-purchase threshold means the dollar amount at or below which a non-Federal entity may purchase property or services using micro-purchase pro-cedures (see § 2 CFR Part 200.320). Generally, the micro-purchase threshold for procurement activities administered under Federal awards is not to exceed the amount set by the FAR at 48 CFR Part 2, Subpart 2.1, unless a higher threshold is requested by the non- Federal entity and approved by the cognizant agency for indirect costs (For NIH DCA for non-profits or DFAS for for-profit organizations). |
| Minor A&R | Alteration and renovation (A&R) activities are considered as modernization activ-ities and are typically supported under research grants where the primary pur-pose for the grant is other than construction or modernization. The determination of whether proposed A&R is major, or minor is made by the NIH Program Official. See "Modernization" on the next page.<br> Minor A&R is not an allowable activity or cost under grants to individuals or grants for limited purposes, such as grants in support of scientific meetings (con-ference grants). Routine maintenance and repair of the organization's physical plant or its equipment is not considered A&R; these types of costs are typically treated as F&A costs. |

| Term | Definition |
|------|------------|
| Modernization | Modernization. Alteration, renovation, remodeling, improvement, expansion or repair of, or completion of shell space in an existing building (whether for storage or for human occupancy), necessary to make the building suitable for use for the purposes of a particular program. Modernization is distinct from construction in that it leaves the existing structure in place. This can range from updating flooring to replacing everything except for the existing mainframe and foundations. When the primary purpose of the award is to modernize biomedical research facilities, the grant cannot support the conduct of any research.<br><br>Alteration and renovation (A&R) activities are considered as modernization activities and are typically supported under research grants where the primary purpose for the grant is other than construction or modernization. The determination of whether proposed A&R is major, or minor is made by the NIH Program Official. Major A&R is an unallowable activity or cost under foreign grants and foreign components in domestic grants.<br><br>Examples of activities of Major A&R are as follows:<br><br>&bull; A structural change (e.g., to the foundation, roof, floor or exterior load-bearing walls of a facility, or extension of an existing facility) to increase the floor area and/or change the function and purpose of a facility<br><br>Examples of activities of Minor A&R are as follows:<br><br>&bull; Changes to physical characteristics (interior dimensions, surfaces, and finishes); internal environments (temperature, humidity, ventilation, and acoustics); or utility services (plumbing, electricity, gas, vacuum, and other laboratory fittings);<br><br>&bull; Installation of fixed equipment (including casework, fume hoods, large autoclaves, biological safety cabinets);<br><br>&bull; Replacement, removal, or reconfiguration of interior non-load bearing walls, doors, frames, or windows in order to place equipment in a permanent location;<br><br>&bull; Making unfinished shell space suitable for purposes other than human occupancy, such as storage of pharmaceuticals; or<br><br>&bull; Alterations to meet requirements for accessibility by physically disabled individuals. |
| Modified Total Direct Cost (MTDC) | All direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and subawards up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect costs, and with the approval of the cognizant agency for indirect costs. |

**J.A. 474**

| Term | Definition |
|---|---|
| Modular application | A type of grant application in which support is requested in specified increments without the need for detailed supporting information related to separate budget categories. When modular procedures apply, they affect not only application preparation but also review of the application, award, and post-award administration. |
| Monitoring | A process whereby the programmatic and business management performance aspects of a grant are assessed by reviewing information gathered from various required reports, audits, site visits, and other sources. |
| Name change | An action whereby the name of an organization is changed without otherwise affecting the rights and obligations of that organization as a recipient. |
| New Investigator | A PD/PI who has not previously competed successfully as a PD/PI for a substantial NIH independent research award is considered a New Investigator. For example, a PD/PI who has previously received a competing NIH R01 research grant is no longer considered a New Investigator. However, a PD/PI who has received a Small Grant (R03) or an Exploratory/Developmental Research Grant Award (R21) retains their status as a New Investigator. A complete list of NIH grants that do not disqualify a PD/PI from being considered a New Investigator can be found at http://grants.nih.gov/grants/new_investigators/#definition. See also the definition of Early Stage Investigator. |
| No-cost extension | An extension of time to a project period and/or budget period to complete the work of the grant under that period, without additional Federal funds or competition. See NIH Standard Terms of Award and Prior Approval Requirements. |
| Non-competing continuation application/award | A financial assistance request (in the form of an application or progress report) or resulting award for a subsequent budget period within a previously approved project period for which a recipient does not have to compete with other applicants. |
| Non-Discretionary Award | An award made by NIH to specific recipients in accordance with statutory, eligibility and compliance requirements, in which NIH has no ability to exercise judgement. The award amount could be determined specifically or by formula. NIH does not typically make non-discretionary awards. See "Discretionary Award" on page I-19. |
| Non-Federal entity | A state, local government, Indian tribe, institution of higher education (IHE), or nonprofit organization that carries out a Federal award as a recipient or subrecipient. |
| Non-Federal share | When cost sharing or matching is required as a condition of an award, the portion of allowable project/program costs not borne by the Federal government. |
| Non-profit organization | Any corporation, trust, association, cooperative, or other organization, not including IHEs, that: (1) Is operated primarily for scientific, educational, service, charitable, or similar purposes in the public interest; (2) Is not organized primarily for profit; and (3) Uses net proceeds to maintain, improve, or expand the operations of the organization. |

**J.A. 475**

| Term | Definition |
|------|------------|
| Notice of Award | The official, legally binding document, signed (or the electronic equivalent of signature) by a Grants Management Officer that: <br><br> 1. notifies the recipient of the award of a grant; <br><br> 2. contains or references all the terms and conditions of the grant and Federal funding limits and obligations; and, <br><br> 3. provides the documentary basis for recording the obligation of Federal funds in the NIH accounting system. |
| Notice of Funding Opportunity (NOFO) | A publicly available document by which a Federal Agency makes known its intentions to award discretionary grants or cooperative agreements, usually as a result of competition for funds. NIH Notices of Funding Opportunities may also be known as program announcements, requests for applications, notices of funding availability, solicitations, or other names as described in 2 CFR 200.204,) depending on the Agency and type of program. Notices of Funding Opportunities can be found at grants.gov and in the NIH Guide for Grants and Contracts. |
| Obligations | When used in connection with a non- Federal entity's utilization of funds under a Federal award, obligations means orders placed for property and services, contracts and subawards made, and similar transactions during a given period that require payment by the non- Federal entity during the same or a future period. |
| Office of Management and Budget (OMB) | The Executive Office of the President, Office of Management and Budget. |
| Offset | IC or awarding agency approval/authorization of the use of unobligated grant funds remaining from a prior budget period to support grant activities of the current budget period. An offset does not change the current budget period authorized amount of funding but does reduce the amount of current fiscal year funds provided to support the authorized award amount. |
| Open Researcher and Contributor Identifiers (ORCID iDs) | Unique, persistent digital identifiers that distinguish individual investigators and can be used to connect researchers with their contributions to science over time and across changes of name, location, and institutional affiliation. These free identifiers are assigned and maintained by the non-profit organization ORCID. |
| Organization | A generic term used to refer to an Institution of Higher Education or other entity, including an individual, which applies for or receives an NIH grant or cooperative agreement. |
| Other Significant Contributors | Individuals who have committed to contribute to the scientific development or execution of the project, but are not committing any specified measurable effort (i.e., person months) to the project. These individuals are typically presented at "effort of zero person months" or "as needed." Individuals with measurable effort may not be listed as Other Significant Contributors (OSCs). Consultants should be included if they meet this definition. |

| Term | Definition |
|---|---|
| Other support | Includes all resources made available to researcher or senior key personnel in support of and/or related to all of their research endeavors, regardless of whether or not they have monetary value and regardless of whether they are based at the institution the researcher identifies for the current grant. Other support does not include training awards, prizes, start-up support from the US based institution, or gifts. <br> (note: Gifts are resources provided where there is no expectation of anything (e.g., time, services, specific research activities, money, etc.) in return). |
| Oversight agency for audit | The Federal awarding agency that provides the predominant amount of funding dir-ectly (direct funding) (as listed on the schedule of expenditures of Federal awards, see 2 CFR Part 200.510(b)) to a non-Federal entity unless OMB des-ignates a specific cognizant agency for audit.. When the direct funding rep-resents less than 25 per-cent of the total Federal expenditures (as direct and subawards) by the non-Federal entity, then the Federal agency with the pre-dominant amount of total funding (direct and subawards) is the designated cog-nizant agency. When there is no direct fund-ing, the Federal awarding agency which is the predominant source of pass-through funding must assume the over-sight responsibilities. The duties of the oversight agency for audit and the pro-cess for any reassignments are described in 2 CFR Part 200.513(b). |
| Parent announcement | Broad NOFO enabling applicants to electronically submit an investigator-initiated grant application for a specific activity code, e.g., Research Project Grant (Parent R01). |
| Participant support costs | Direct costs for items such as stipends or subsistence allowances, travel allow-ances, and registration fees paid to or on behalf of participants or trainees (but not employees) in connection with conferences, or training projects. For the pur-poses of Kirschstein-NRSA programs and Education Grants (e.g., R25), this term does not apply. NIH will continue to use the terms trainees, trainee-related expenses, and trainee travelfor those programs. |
| Pass-through entity | A non- Federal entity that provides a subaward to a subrecipient to carry out part of a Federal program (see 2 CFR 200.1). |
| Payback | Requirement that the recipient of a NRSA postdoctoral fellowship engage in qual-ified health-related research, health-related research training, or health-related teaching activities for a length of time equal to the period of NRSA support received. Only the first year of training incurs a payback obligation. In general, payback activity must involve at least 20 hours per week and be conducted over 12 consecutive months; special exceptions may be considered on a case-by-case basis. See Ruth L. Kirschstein National Research Service Awards—Pay-back for additional information. |
| Payment Management System | The HHS centralized grants payment system operated by the Payment Man-agement Service, Program Support Center. Most HHS (and some other Federal government agencies') recipients receive grant payments through this system. |

**J.A. 477**

| Term | Definition |
|------|------------|
| Peer review | The two-stage process that involves the consistent application of standards and procedures that produce fair, equitable, timely, and objective examinations of applications based on an evaluation of scientific or technical merit or other relevant aspects of the application. The review is performed by experts (Peer Reviewers) in the field of endeavor for which support is requested. Peer review is intended to provide guidance and recommendations to the NIH individuals responsible for making award decisions. |
| Period of performance | The total estimated time interval between the start of an initial Federal award and the planned end date, which may include one or more funded portions, or budget periods. Identification of the period of performance (project period) in the Federal award does not commit the awarding agency to fund the award beyond the currently approved budget period. The period of performance for NIH awards is noted on the Notice of Award. See "Project period" on page I-38 as well as "Budget period" on page I-10. |
| Person months | The metric for expressing the effort (amount of time) PD/PI(s), faculty and other senior/key personnel devote to a specific project. The effort is based on the type of appointment of the individual with the organization; e.g., calendar year, academic year, and/or summer term; and the organization's definition of such. For instance, some institutions define the academic year as a 9-month appointment while others define it as a 10-month appointment. |
| Personal property | Property of any kind except real property. It may be tangible, having physical existence, or intangible, such as copyrights, patents, or securities. |
| Personally Identifiable Information (PII) | Information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information that is linked or linkable to a specific individual. Some information that is considered to be PII is available in public sources such as telephone books, public web sites, and university listings. This type of information is considered to be Public PII and includes, for example, first and last name, address, work telephone number, email address, home telephone number, and general educational credentials. The definition of PII is not anchored to any single category of information or technology. Rather, it requires a case-by-case assessment of the specific risk that an individual can be identified. Non-PII can become PII whenever additional information is made publicly available, in any medium and from any source, that, when combined with other available information, could be used to identify an individual. |
| Phase III clinical trial | As defined by NIH, a broadly based prospective Phase III clinical investigation (usually involving several hundred or more human subjects) to evaluate an experimental intervention in comparison with a standard or control intervention or to compare two or more existing treatments. The definition includes pharmacologic, non-pharmacologic, and behavioral interventions given for disease prevention, prophylaxis, diagnosis, or therapy. Community trials and other population-based intervention trials also are included. (See clinical trial definition). |

**J.A. 478**

| Term | Definition |
|------|------------|
| Pre-award costs | Any cost incurred prior to the beginning date of the project period or the initial budget period of a competitive segment (under a multi-year award), in anti-cipation of the award and at the applicant's own risk, for otherwise allowable costs. |
| Prior approval | Written approval by an authorized HHS official, e.g., a designated IC GMO, evid-encing prior consent before a recipient undertakes certain activities or incurs spe-cific costs (see Administrative Requirements—Changes in Project and Budget— Prior Approval Requirements). |
| Profit | See definition for fee. |
| Program | A coherent assembly of plans, project activities, and supporting resources con-tained within an administrative framework, the purpose of which is to implement an organization's mission or some specific program-related aspect of that mis-sion. For the NIHGPS, "program" refers to those NIH programs that carry out their missions through the award of grants or cooperative agreements to other organizations. |
| Program Director/Principal Investigator | The individual(s) designated by the applicant organization/recipient to have the appropriate level of authority and responsibility to direct the project or program to be supported by the award. The applicant organization may designate multiple individuals as program directors/principal investigators (PD/PIs) who share the authority and responsibility for leading and directing the project, intellectually and logistically. When multiple PD/PIs are named, each is responsible and account-able to the official(s) at the applicant organization/recipient, or as appropriate, to a collaborating organization for the proper conduct of the project, program, or activity including the submission of all required reports. The presence of more than one PD/PI on an application or award diminishes neither the responsibility nor the accountability of any individual PD/PI. |
| Program income | Gross income earned by the non-Federal entity that is directly generated by a sup-ported activity or earned as a result of the Federal award during the period of per-formance except as provided in 2 CFR Part 200.307(f). (See Period of per-formance.) Program income includes but is not limited to income from fees for ser-vices performed, the use or rental or real or personal property acquired under Federal awards, the sale of commodities or items fabricated under a Federal award, license fees and royalties on patents and copyrights, and principal and interest on loans made with Federal award funds. Interest earned on advances of Federal funds is not program income. Except as otherwise provided in Federal statutes, regulations, or the terms and conditions of the Federal award, program income does not include rebates, credits, discounts, and interest earned on any of them. See 2 CFR Part 200.307, 45 CFR Part 200.307, 2 CFR Part 200.407 and 35 USC §§ 200-212 for inventions made under Federal awards. (See Admin-istrative Requirements—Management Systems and Procedures—Program Income). |
| Program Official/Program Officer/Project Officer | The NIH official responsible for the programmatic, scientific, and/or technical aspects of a grant or cooperative agreement. |

**J.A. 479**

| Term | Definition |
|------|-----------|
| Progress report | Periodic, usually annual, report submitted by the recipient and used by NIH to assess progress and, except for the final progress report of a project period, to determine whether to provide funding for the budget period subsequent to that covered by the report. This report may also be called the non-competing continuation progress report. |
| Project period | The total time for which Federal support of a project has been programmatically approved as shown in the NoA; however, it does not constitute a commitment by the Federal government to fund the entire period. The total project period comprises the initial competitive segment, any subsequent competitive segments resulting from a renewal award(s), and extensions. See "Period of performance" on page I-36. Also see "Budget period" on page I-10. |
| Project/performance site | Location(s) of where the work described in the research plan will be conducted. |
| Property | Real property or personal property. |
| Protected Personally Identifiable Information (Protected PII) | An individual's first name or first initial and last name in combination with any one or more of types of information, including, but not limited to, social security number, passport number, credit card numbers, clearances, bank numbers, biometrics, date and place of birth, mother's maiden name, criminal, medical and financial records, educational transcripts. This does not include PII that is required by law to be disclosed. (See Personally Identifiable Information (PII)). |
| Questioned cost | A cost that is questioned by the auditor because of an audit finding:<br><br>1. Which resulted from a violation or possible violation of a statute, regulation, or the terms and conditions of a Federal award, including for funds used to match Federal funds;<br><br>2. Where the costs, at the time of the audit, are not supported by adequate documentation; or<br><br>3. Where the costs incurred appear unreasonable and do not reflect the actions a prudent person would take in the circumstances. |
| Real property | Land, including land improvements, structures and appurtenances thereto, but excludes moveable machinery and equipment. |
| Recipient | An entity, usually but not limited to non-Federal entities, that receives a Federal award directly from a Federal awarding agency. The term recipient does not include subrecipients nor consortiums of the award. See Non-Federal entity. |
| Renewal application | An application requesting additional funding for a period subsequent to that provided by a current award. Renewal applications compete for funds with all other peer reviewed applications, and must be developed as fully as though the applicant is applying for the first time. The previous NIH term was "competing continuation." |

**J.A. 480**

| Term | Definition |
|---|---|
| Renewal award | An award made subsequent to an expiring Federal award for which the start date is contiguous with, or closely follows, the end of the expiring Federal award. A renewal award's start date will begin a distinct period of performance. |
| Research & Development (R&D) | All research activities, both basic and applied, and all development activities that are performed by HHS award recipients. The term research also includes activities involving the training of individuals in research techniques where such activities utilize the same facilities as other research and development activities and where such activities are not included in the instruction function. "Research" is defined as a systematic study directed toward fuller scientific knowledge or understanding of the subject studied. "Development" is the systematic use of knowledge and understanding gained from research directed toward the production of useful materials, devices, systems, or methods, including design and development of prototypes and processes. |
| Research Administrator | The Research Administrator acts as a local agent of the AOR and/or PD/PIs providing day-to-day grant-related support. See also Roles and Responsibilities—Recipient Staff. |
| Research misconduct | Fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results.<br><br>1. Fabrication is making up data or results and recording or reporting them.<br><br>2. Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that research is not accurately represented in the research record.<br><br>3. Plagiarism is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.<br><br>4. Research misconduct does not include honest error or honest differences of opinion. |
| Research patient care costs | Costs of routine and ancillary services provided by hospitals to participants in research protocols. |
| Responsible party | Responsible party is the term used in Title VIII of the Food and Drug Administration Amendments Act (FDAAA) of 2007 (P.L. 110-85) to refer to the entity or individual who is responsible under FDAAA for registering a clinical trial and submitting clinical trial information to ClinicalTrials.gov. |
| Resubmission application | An application that has been previously submitted, but was not funded, and is being resubmitted for new consideration. Applicants must make significant changes to the application and can only resubmit once the summary statement is available from review of the first submission. Applicants must apply and undergo peer review. Additional policies on resubmissions can be found in the applicable Application Instruction Guide. The previous NIH term was "revision." A resubmission has a suffix in its application identification number, e.g., A1. |

| Term | Definition |
|---|---|
| Revision application | As defined in the Federalwide SF424 (R&R): An application that proposes a change in 1) the Federal Government's financial obligations or contingent liability from an existing obligation, or 2) any other change in the terms and conditions of the existing award. Note in general for NIH applicants, #2 would not require the submission of another application. NIH recipients use revision applications to request an increase in support in a current budget period for expansion of the project's approved scope or research protocol. Applicants must apply and undergo peer review. The previous NIH term was "competing supplemental." NOTE: The former NIH term "revision," is now "resubmission". A revision has a suffix in its application identification number; e.g., S1. |
| Scientific Data | The recorded factual material commonly accepted in the scientific community as of sufficient quality to validate and replicate research findings, regardless of whether the data are used to support scholarly publications. Scientific data do not include laboratory notebooks, preliminary analyses, completed case report forms, drafts of scientific papers, plans for future research, peer reviews, communications with colleagues, or physical objects, such as laboratory specimens. |
| Scientific Review Group (SRG) | A peer review committee group of primarily non-government experts (peer reviewers), qualified by training or experience in particular scientific or technical fields, or as authorities knowledgeable in the various disciplines and fields related to the applications under review, to evaluate and give expert advice on the scientific and technical merit of the applications. No more than one-fourth of the members of any SRG may be Federal employees, as noted in 42 CFR Part 52(h). |
| Scientific Review Officer (SRO) | The NIH official who serves as the designated Federal officer having legal responsibility for managing the peer review meeting, the procedures for evaluating the applications assigned to the SRG and the determinations and management of conflicts of interest, as noted in 42 CFR Part 52(h). |
| Scope of work | The aims, objectives, and purposes of a grant; as well as the methodology, approach, analyses or other activities; and the tools, technologies, and time-frames needed to meet the grant's objectives. This includes the research or training plan included with the original grant application, along with any approved modifications. |
| Senior/Key Personnel | The PD/PI and other individuals who contribute to the scientific development or execution of a project in a substantive, measurable way, whether or not they receive salaries or compensation under the grant. Typically, these individuals have doctoral or other professional degrees, although individuals at the masters or baccalaureate level may be considered senior/key personnel if their involvement meets this definition. Consultants and those with a postdoctoral role also may be considered senior/key personnel if they meet this definition. Senior/key personnel must devote measurable effort to the project whether or not salaries or compensation are requested. "Zero percent" effort or "as needed" are not acceptable levels of involvement for those designated as Senior/Key Personnel. |

| Term | Definition |
|------|------------|
| Significant rebudgeting | A threshold that is reached when expenditures in a single direct cost budget category deviate (increase or decrease) from the categorical commitment level established for the budget period by more than 25 percent of the total costs awarded. Significant rebudgeting is one indicator of change in scope. |
| Simplified acquisition threshold | The dollar amount below which a non-Federal entity may purchase property or services using small purchase methods. Non-Federal entities adopt small purchase procedures in order to expedite the purchase of items costing less than the simplified acquisition threshold. The simplified acquisition threshold is set by the Federal Acquisition Regulation at 48 CFR Subpart 2.1. (See also Micro-purchase.) |
| Small business concern | A business that is independently owned and operated and not dominant in its field of operation; has its principal place of business in the United States and is organized for profit; is at least 51 percent owned, or in the case of a publicly owned business, at least 51 percent of its voting stock is owned by U.S. citizens or lawfully admitted permanent resident aliens; has, including its affiliates, not more than 500 employees; and meets other regulatory requirements established by the SBA at 13 CFR Part 121. |
| Special purpose equipment | Equipment which is used only for research, medical, scientific, or other technical activities. Examples of special purpose equipment include microscopes, x-ray machines, surgical instruments, and spectrometers. See also Equipment and General purpose equipment. |
| State | Any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and any agency or instrumentality thereof exclusive of local governments. |
| State government | The government of any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any U.S. territory or possession, or any agency or instrumentality of a State exclusive of local governments. For purposes of NIH grants, federally recognized Indian tribal governments generally are considered State governments. State institutions of higher education and State hospitals are not considered State governments for HHS's general administrative requirements for grants and the NIHGPS. |
| Stipend | A payment made to an individual under a fellowship or training grant in accordance with pre-established levels to provide for the individual's living expenses during the period of training. A stipend is not considered compensation for the services expected of an employee. |
| Subaward | An award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a Federal award received by the pass-through entity. It does not include payments to a contractor or payments to an individual that is a beneficiary of a Federal program. A subaward may be provided through any form of legal agreement, including an agreement that the pass-through entity considers a contract. The term includes consortium agreements. |

| Term | Definition |
|---|---|
| Subrecipient | A non-Federal entity that receives a subaward from a pass-through entity to carry out part of a Federal program; but does not include an individual that is a bene-ficiary of such program. A subrecipient may also be a recipient of other Federal awards directly from a Federal awarding agency. The term includes consortium participants. |
| Subsidiary | An entity in which more than 50 percent of the entity is owned or controlled dir-ectly by a parent corporation or through another subsidiary of a parent cor-poration. |
| Successor-in-interest | Process whereby the rights to and obligations under an NIH grant(s) are acquired incidental to the transfer of all of the assets of the recipient or the transfer of that part of the assets involved in the performance of the grant(s). A SII may result from legislative or other legal action, such as a merger or other corporate change. |
| Supplies | All tangible personal property other than those described in Equipment. A com-puting device is a supply if the acquisition cost is less than the lesser of the cap-italization level established by the non-Federal entity for financial statement purposes or $5,000, regardless of the length of its useful life. See Computing devices and Equipment. |
| Suspension of award activities | An action by the NIH awarding IC requiring the recipient to cease all activities on the award pending corrective action by the recipient. It is a separate action from suspension under HHS regulations (2 CFR Part 376) implementing Executive Orders 12549 and 12689. (See Public Policy Requirements and Objectives—Debarment and Suspension and Administrative Requirements—Enforcement Actions). |
| Termination | The ending of a Federal award, in whole or in part at any time prior to the planned end of period of performance. |
| Terms and conditions of award | All legal requirements imposed on a grant by NIH, whether based on statute, reg-ulation, policy, or other document referenced in the grant award, or specified by the grant award document itself. The NoA may include both standard and specific award conditions that are considered necessary to attain the grant's objectives, facilitate post-award administration of the grant, conserve grant funds, or oth-erwise protect the Federal government's interests. |
| Third-party in-kind contributions | The value of non-cash contributions (i.e., property or services) that: (1) Benefit a federally assisted project or program; and (2) Are contributed by non-Federal third parties, without charge, to a non- Federal entity under a Federal award. |
| Total costs | The total allowable costs (both direct costs and F&A costs) incurred by the recip-ient to carry out a grant-supported project or activity. Total project costs include costs charged to the NIH grant and costs borne by the recipient to satisfy a match-ing or cost-sharing requirement. |
| Uniform Administrative Requirements ("Uniform Guidance") | The administrative requirements, cost principles and audit requirements for Federal awards to non-Federal entities as set forth in Part 200 of CFR Title 2 (Grants and Agreements), also referred to as "Uniform Guidance". |

| Term | Definition |
|---|---|
| Unique Entity Identifier (UEI) | The identifier assigned by the System for Award Management (SAM) to uniquely identify business entities. |
| United States | The 50 States, territories, and possessions of the United States, the Commonwealth of Puerto Rico, the Trust Territory of the Pacific Islands, and the District of Columbia. |
| Unliquidated obligations | For financial reports prepared on a cash basis, obligations incurred by the non-Federal entity that have not been paid (liquidated). For reports prepared on an accrual expenditure basis, these are obligations incurred by the non-Federal entity for which an expenditure has not been recorded. |
| Unobligated balance | The amount of funds authorized under a Federal award that the non-Federal entity has not obligated. The amount is computed by subtracting the cumulative amount of the non-Federal entity's unliquidated obligations and expenditures of funds under the Federal award from the cumulative amount of the funds that the Federal awarding agency or pass-through entity authorized the non-Federal entity to obligate. |
| Withholding of support | A decision by NIH not to make a non-competing continuation award within the current competitive segment. |

**J.A. 485**

# 2 THE NATIONAL INSTITUTES OF HEALTH AS A GRANT-MAKING ORGANIZATION

NIH is the steward of medical and behavioral research for the Nation. Its mission is to seek fundamental knowledge about the nature and behavior of living systems and the application of that knowledge to enhance health, lengthen life, and reduce illness and disability. NIH operates under the general policy guidance of the Department in carrying out its mission, which is accomplished through the conduct and support of biomedical and behavioral research, research training, research infrastructure, and communications. These efforts take place intramurally (primarily at NIH) and extramurally (through grants, cooperative agreements, and contracts awarded to institutions of higher education, governmental organizations, non-profit research organizations,for-profit organizations, and individuals). NIH also works closely with other HHS components and other Federal departments and agencies. HHS components include SAMHSA, FDA, CDC, IHS, AHRQ, HRSA, ACF, ACL, OASH, and CMS, among others.

The rules that govern grants and cooperative agreements detailed at 2 CFR Part 200, and in certain cases further codified through HHS regulation, provide the framework for the terms and conditions of NIH awards, as specified in "Part II: Terms and Conditions of NIH Grant Awards" on page IIA-1.

NIH is organized into ICs, which have their own mission and functions, separate appropriations, and statutory authorities. The ICs that award grants and their points of contact are listed in Part III. Although the ICs operate under the same general grant process and requirements, applicants and recipients need to be aware of differences that may exist. This information may be obtained from NIH IC staff. The policies generally applicable to NIH grants are set forth in the NIHGPS.

## 2.1 ROLES AND RESPONSIBILITIES

NIH, as a Federal grantor agency, is responsible to Congress and the U.S. taxpayer for carrying out its mission in a manner that not only facilitates research but does so cost-effectively and in compliance with applicable rules and regulations. NIH seeks to ensure integrity and accountability in its grant award and administration processes by relying on a system of checks and balances and separation of responsibilities within its own staff and by establishing a similar set of expectations for recipient organizations.

The following subsections highlight the major functions and areas of responsibility of Federal and recipient staffs. NIH recognizes that additional staff members in a number of different organizations may be involved in grant-related activities; however, this section details only the major participants representing the Federal government and the recipient. The responsibilities of CSR and IC staff members, who are involved only in the initial review phase of the peer review process, are described in The Peer Review Process—Initial Review—Responsibilities. The responsibilities of other offices, such as OHRP, are described in Part II as applicable.

### 2.1.1 NIH and HHS Staff

The roles and responsibilities of NIH and HHS participants are as follows:

**J.A. 486**

- **_Grants Management Officer._** The GMO whose name appears in the NoA is the NIH official responsible for the business management and other non-programmatic aspects of the award. These activities include, but are not limited to, evaluating grant applications for administrative content and compliance with statutes, regulations, and guidelines; negotiating grants; providing consultation and technical assistance to applicants and recipients, including interpretation of grants administration policies and provisions; and administering and closing out grants. The GMO works closely with their counterparts in other NIH ICs and with the designated PO. The GMO is the focal point for receiving and acting on requests for NIH prior approval or for changes in the terms and conditions of award, and is the only NIH official authorized to obligate NIH to the expenditure of Federal funds or to change the funding, duration, or other terms and conditions of award. A Chief Grants Management Officer is the principal GMO who provides leadership to an organizational component that is responsible for the business and fiscal management of the ICs grant portfolio. Generally, the CGMO will have the authority to appoint and exercise line authority over one or more GMOs. At NIH each awarding component has a CGMO.

- **_Grants Management Specialist._** The GMS whose name appears in the NoA is an agent of the GMO and is assigned responsibility for the day-to-day management of a portfolio of grants.

- **_Program Official._** The PO is responsible for the programmatic, scientific, and/or technical aspects of assigned applications and grants. The PO's responsibilities include, but are not limited to, development of research and research training programs to meet the IC's mission; coordination with CSR/IC SROs; and post-award administration, including review of progress reports, participation in site visits, and other activities complementary to those of the GMO. The PO and the GMO work as a team on many of these activities.

- **_Scientific Review Officer._** SROs are health science administrators who manage the activities of SRGs, including CSR study sections. The SRO is responsible for conduct of the SRG in accordance with applicable laws, regulations, and policies. For the SRG for which they are responsible, the SRO reviews applications for completeness and conformity to requirements, ensures that adequate numbers of reviewers with appropriate expertise are available for application review, assigns applications to individual reviewers as discussion leaders and for preparation of written critiques, manages conflicts of interest and confidentiality, and serves as the overall point of contact with applicants during the initial phase of the peer review process, i.e., until the conclusion of the SRG meeting.

- **_Other NIH, HHS and Federal Agency Staff._** In addition to the GMO and PO, the recipient may be required to interact with other NIH or HHS staff members or offices with respect to its organization-wide systems and/or individual transactions. These include the office responsible for negotiating F&A costs and research patient care rates, typically the cognizant CAS office, ONR, or DFAS; OIG; OHRP; ORI; OLAW; and OPERA. Staff members in these offices generally coordinate with the GMO, but they are responsible for discrete areas of specialization and are not required to channel their communications with the recipient through the GMO. Part III includes a list of these organizations and their addresses and telephone numbers. ONR is the cognizant agency for negotiation of F&A costs for some NIH recipients.

## 2.1.2 Recipient Staff

Overall responsibility for successfully implementing an NIH grant is a shared responsibility of the PD/PI (s), the AOR, and the Research Administrator. As key members of the grant team, they respectively lead the scientific and administrative aspects of the grant. While communications can be conducted with Research Administrators and other institutional staff, NIH staff members conduct official business only

with the designated PD/PI(s) and AORs. The roles and responsibilities of recipient participants are as follows:

- **_Authorized Organization Representative_**. The AOR is the designated representative of the recipient organization in matters related to the award and administration of its NIH grants, including those that require NIH approval. The AOR should ascertain and assure that the materials the applicant organization are submitting on behalf of the PD/PI are the original work of the PD/PI and have not been used by other individuals in the preparation and submission of a similar grant application. In signing a grant application, this individual certifies that the applicant organization will comply with all applicable assurances and certifications referenced in the application. This individual's signature on the grant application further certifies that the applicant organization will be accountable both for the appropriate use of funds awarded and for the performance of the grant-supported project or activities resulting from the application. (Also see Legal Implications of Applications.) This individual also is responsible to NIH for ensuring that the organization complies with applicable Federal laws and regulations, including required certifications and assurances, its application, and the terms and conditions of individual awards. For applications submitted electronically through Grants.gov, the signature of the AOR is documented as part of the electronic submission process and is authenticated through the Grants.gov registration process. In the eRA Commons, this individual holds the Signing Official role. Although NIH requires that the recipient organization designate such an official, NIH does not specify the organizational location or full set of responsibilities for this official.

- **_Program Director/Principal Investigator._** A PD/PI is an individual designated by the applicant organization to have the appropriate level of authority and responsibility to direct the project or program supported by the award. The applicant organization may designate multiple individuals as PD/PIs who share the authority and responsibility for leading and directing the project, intellectually and logistically. Each PD/PI is responsible and accountable to the recipient organization or, as appropriate, to a collaborating organization, for the proper conduct of the project or program, including the submission of all required reports. The presence of more than one identified PD/PI on an application diminishes neither the responsibility nor the accountability of any individual PD/PI.

When a single PD/PI is designated, that individual is not required to be an employee of the applicant organization. However, because the grant, if awarded, is made to the organization, the applicant organization must have a formal written agreement with the PD/PI that specifies an official relationship between the parties even if the relationship does not involve a salary or other form of remuneration. If the PD/PI is not an employee of the applicant organization, NIH will assess whether the arrangement will result in the organization being able to fulfill its responsibilities under the grant, if awarded.

When multiple PD/PIs are designated, NIH requires identification of one PD/PI who will be designated as the Contact PD/PI. This person is responsible for communication between the PD/PIs and NIH. Serving as Contact PD/PI confers no special authorities or responsibilities within the project team. The Contact PD/PI must meet all eligibility requirements for PD/PI status. They are not required to be an employee of the applicant organization. However, as with the single PD/PI model, if the Contact PD/PI is not an employee, the applicant organization must have a formal written agreement with the Contact PD/PI that specifies an official relationship between the parties. This same principle applies to all PD/PIs at the applicant organization; e.g., they need not be employees; however, the applicant organization must have a formal written agreement in place.

**J.A. 488**

When multiple PD/PIs are involved at different organizations, only the Contact PD/PI is required to have the official relationship with the applicant organization. PD/PIs in the leadership team at other organizations must have a documented relationship with a consortium organization, but need not be employees. Any consortium agreement must address the unique aspects to these individuals holding the PD/PI role. For additional information, see NIHGPS Section 9 Multiple Program Director/Principal Investigator Applications and Awards.

PD/PIs are members of the recipient team responsible for ensuring compliance with the financial and administrative aspects of the award. They work closely with designated officials within the recipient organization to create and maintain necessary documentation, including both technical and administrative reports; prepare justifications; appropriately acknowledge Federal support of research findings in publications, announcements, news programs, and other media; and ensure compliance with other Federal and organizational requirements. NIH encourages PD/PIs to maintain contact with the NIH PO with respect to the scientific aspects of the project and the GMO/GMS concerning the business and administrative aspects of the award. The NIH staff contacts list includes contact information for NIH grants management and program staff at each IC.

- ***Research Administrator***. The Research Administrator acts as a local agent of the AOR and/or PD/PIs providing day-to-day grant-related support. Depending on the structure of the organization, this individual can be located centrally or within an organizational component such as a Department.

## 2.2 ERA COMMONS

eRA Commons is an online interface where grant applicants, recipients and Federal staff at NIH and grantor agencies can conduct their research administration business electronically as well as access and share administrative information relating to research grants. While applicants use Grants.gov to find and apply for grants; the eRA Commons retrieves the application or proposal information from Grants.gov, compiles it into a consistent application format and then makes it available to applicants and NIH staff for electronic research administration purposes.

Access to the eRA Commons is vital for all steps in the NIH grant administration process. Following application submission, the eRA Commons becomes the primary site for accessing grant information such as Institute/Center assignments, review outcomes, Summary Statements, and Notices of Award. The eRA Commons also provides electronic business processes such as Internet Assisted Review, submission of Just-In-Time material, submission of electronic SNAP progress reports (eSNAP), submission of notification of extensions without funds, and submission of Closeout documents. Appropriate user roles are assigned to registered individuals depending on the responsibilities assigned to them by the recipient organization.

### 2.2.1 eRA Commons Registration

An organization and PD/PI(s) must complete a **one-time** registration in the Commons. Institutional/organizational officials are responsible for registering PD/PI(s) in the eRA Commons. PD/PI(s) should work with their AOR (also known as the Signing Official in the eRA Commons) to determine their institutional/organizational process for registration.

IMPORTANT: Organizations registering in the eRA Commons for the first time should allow 2-4 weeks to complete the registration process.

# PART II: TERMS AND CONDITIONS OF NIH GRANT AWARDS

## Subpart A: General

# 3 OVERVIEW OF TERMS AND CONDITIONS

Part II includes the terms and conditions of NIH grants and cooperative agreements and is incorporated by reference in all NIH grant and cooperative agreement awards. Subpart A (IIA) includes those terms and conditions that apply, in general, to NIH awards. Subpart B (IIB) either expands on IIA coverage or specifies additional or alternate terms and conditions for particular types of awards, recipients, or activities.

These terms and conditions are not intended to be all-inclusive. All awards or a specified subset of awards also may be subject to additional requirements, such as those included in executive orders and appropriations acts.

NIH recipients are responsible for complying with all requirements of the Federal award. NIH grants awards are based on the application submitted to, and approved by, the NIH and are subject to the terms and conditions incorporated either directly or by reference in the following:

- The grant program legislation and program regulation cited in the NoA.
- The NIH Grants Policy Statement, including addenda in effect as of the beginning date of the budget period.
- Conditions on activities and expenditure of funds in other statutory requirements, such as those included in appropriations acts. This also includes any recent legislation.
- 2 CFR Part 200.
- The NoA including all terms and conditions cited on the document or attachments.

Notice of requirements not specified in the NIHGPS generally will be provided in the NoA, but such notice is not required for the award to be subject to the requirements of pertinent statutes and regulations. An individual award also may contain award-specific terms and conditions. For example, the GMO may include terms or conditions necessary to address concerns about an applicant's management systems.

Program and administrative policies and the terms and conditions of individual awards are intended to supplement, rather than substitute for, governing statutory and regulatory requirements. Thus, the requirements of the NIHGPS apply in addition to governing statutory and regulatory requirements not cited herein, and award-specific terms apply in addition to the requirements of the NIHGPS.

This NIHGPS is an aid to the interpretation of statutory and regulatory requirements. These terms and conditions are intended to be compliant with governing statutes and the requirements of 2 CFR Part 200, as modified by previously approved waivers and deviations. However, in the case of a conflict, the statutes and regulations govern.

If there is a perceived conflict between or among these three categories of requirements—statutory and regulatory requirements, the terms and conditions in the NIHGPS, and award-specific terms and conditions—or if the recipient has other questions concerning award terms and conditions, the recipient

should request written clarification from the GMO. This may be done at any time; however, if the inclusion of the term or condition would cause the recipient not to accept the award or to be unable to comply, the question should be raised before funds are requested from the HHS payment system. By drawing funds from the HHS payment system, the recipient agrees to the terms and conditions of the award.

# 3.1 FEDERALWIDE STANDARD TERMS AND CONDITIONS FOR RESEARCH GRANTS

In order to create greater consistency in the administration of Federal research awards, all Federal research agencies now utilize a standard core set of administrative terms and conditions on research and research-related awards that are subject to 2 CFR Part 200, to the extent practicable. The core set of administrative requirements for participating Federal research agencies and other pertinent documents are posted on the National Science Foundation's web site. Recipients are encouraged to review the companion documents which include a Prior Approval Matrix, National Policy Requirement Matrix, Subaward Requirement Matrix, and Agency-Specific Requirements. NIH implementation of these Federalwide research terms and conditions is also known as the "NIH Standard Terms of Award".

See Administrative Requirements—Changes in Project and Budget—NIH Standard Terms of Award for more details.

# 6 PAYMENT

The PMS is a centralized grants payment and cash management system, operated by HHS PSC, PMS. HHS grant payments may be made by one of several advance payment methods, including SMARTLINK II/ACH, cash request, or by cash request on a reimbursement basis, as specified in the NoA and as described in this chapter. Payments under NIH grants generally are made as advance payments. NIH grant payments are made by PMS, operated by PSC, in accordance with Department of the Treasury and OMB requirements, as implemented by 2 CFR Part 200.305. These requirements are intended to minimize the time elapsing between the transfer of funds from the Federal government and disbursement by a recipient. Therefore, although the grant may be financed by advance payments, the intent is that recipients draw funds on an as-needed basis—specifically, no more than 3 business days before the funds are needed.

All Federal funds deposited by PMS in a recipient's bank account as an unrestricted advance payment should be fully disbursed (checks written, signed, and issued to the payees) by the close of business the next workday after receipt of the funds. The potential for excessive Federal cash on hand exists each time a recipient does not disburse Federal funds in this manner. The recipient is responsible for determining when the Federal funds have been deposited into its bank account for each drawdown, ensuring that the funds are fully disbursed by the close of business the next workday after they are received, and immediately returning all undisbursed Federal funds to PMS.

The Treasury and OMB policies also establish accountability for interest earned on advances of grant funds and provide for use of the reimbursement method if cash management requirements are not met. Advances made by recipients to consortium participants and contractors under grants must conform to substantially the same standards of timing and amount that govern advances to the recipient.

Operational guidance for recipients is provided through a training CD from PSC. Inquiries regarding drawdown requests, cash management rules, and the disbursement of funds through the Federal Financial Report (SF 425) should be directed to PSC/PMS (see Part III).

## 6.1 SMARTLINK II/ACH

The SMARTLINK II/ACH method of advance payment makes direct deposit of funds to a recipient's bank account and requires recipients to have Internet access to submit a request for funds to PMS. SMARTLINK II/ACH provides funds the day following the request with direct deposit using the Federal Reserve Bank's (Richmond, Virginia) ACH process.

## 6.2 CASH REQUEST

Recipients not eligible for an unrestricted advance of funds by SMARTLINK II/ACH must submit a cash request, usually monthly. The cash request may be on either an advance or reimbursement basis, as specified by the NIH awarding IC. Cash requests are used when a recipient's cash management must be closely monitored (for example, recipients whose financial management systems do not meet the standards specified in 2 CFR Part 200.302) or under programs where reimbursement financing is appropriate. A recipient also may be converted from an unrestricted advance payment method to a cash request basis if, during post-award administration, the GMO determines that a recipient is not complying with the cash management requirements or other requirements of the award, including the submission of complete and timely reports (see Administrative Requirements—Monitoring—Reporting and Administrative Requirements—Enforcement Actions—Modification of the Terms of Award).

If the cash request is for an advance payment, the recipient may request grant funds from PMS monthly on the basis of expected disbursements during the succeeding month and the amount of Federal funds already on hand. A request for reimbursement may be submitted more often, if authorized. For timely receipt of cash, a recipient must submit the request through the awarding IC early enough for it to be forwarded to PMS at least 2 weeks before the cash is needed. PMS makes payment to the recipient electronically through the ACH process upon receipt of the approved payment request from the awarding IC.

## 6.3 INTEREST EARNED ON ADVANCES OF GRANT FUNDS

Except as provided in 2 CFR Part 200.305(b)(8), any NIH recipient subject to the requirements of 2 CFR Part 200 that receives advance payments must maintain those advances in an interest-bearing account.

Recipients are expected to promptly return any funds not spent within three business days. As provided in 2 CFR Part 200.305(b)(9) subject to the requirements of 2 CFR Part 200 and to the extent required by law, interest earned on Federal advance payments deposited in interest-bearing accounts must be remitted annually to the Department of Health and Human Services, Payment Management System, Rockville, MD 20852. Interest amounts up to $500 per year may be retained by the non-Federal entity for administrative expense.

## 6.4 IMPROPER PAYMENTS ELIMINATION AND RECOVERY IMPROVEMENT ACT

The Improper Payments Elimination and Recovery Improvement Act of 2012 (IPERIA) (PL 112-248), signed into law on January 10, 2013, established the Do Not Pay Initiative to reduce improper payments or awards. Improper payments occur when funds go to the wrong recipient, the recipient receives the incorrect amount of funds (including overpayments and underpayments), documentation is not available to support a payment, or the recipient uses funds in an improper manner. Incorrect amounts are overpayments or underpayments that are made to eligible recipients (including inappropriate denials of payment or service, any payment that does not account for credit for applicable discounts, payments that are for an incorrect amount, and duplicate payments). When an agency's review is unable to discern whether a payment was proper as a result of insufficient or lack of documentation, this payment should also be considered an improper payment. When establishing documentation requirements for payments, agencies should ensure that all documentation requirements are necessary and should refrain from imposing additional burdensome documentation requirements. Interest or other fees that may result from an underpayment by an agency are not considered an improper payment if the interest was paid correctly. These payments are generally separate transactions and may be necessary under certain statutory, contractual, administrative, or other legally applicable requirements.

HHS has implemented provisions of IPERIA through integrating use of the Do Not Pay system into the current payment processes managed by the PMS, HHS.

**J.A. 493**

# 7 COST CONSIDERATION

## 7.1 GENERAL

Cost considerations are critical throughout the life cycle of a grant. An applicant's budget request is reviewed for compliance with the governing cost principles and other requirements and policies applicable to the type of recipient and the type of award. Any resulting award will include a budget that is consistent with these requirements.

NIH anticipates that, because of the nature of research, the recipient may need to modify its award budget during performance to accomplish the award's programmatic objectives. Therefore, NIH provides some flexibility for recipients to deviate from the award budget, depending on the deviation's significance to the project or activity. More significant post-award changes require NIH prior approval. Prior approval requirements and authorities are discussed in Administrative Requirements—Changes in Project and Budget.

During post-award administration, the GMO, or a GMO designee, monitors expenditures for conformance with cost policies. The GMO's monitoring includes, among other things, responding to prior approval requests and reviewing progress reports, audit reports, and other periodic reports. The GMO also may use audit findings as the basis for final cost adjustments (see Administrative Requirements—Closeout).

This chapter addresses the general principles underlying the allowability of costs, differentiates direct costs from F&A costs, and highlights a number of specific costs and categories of cost for NIH applicants and recipients. It is not intended to be all-inclusive and should be used as a supplement to the applicable cost principles.

## 7.2 THE COST PRINCIPLES

In general, NIH grant awards provide for reimbursement of actual, allowable costs incurred and are subject to Federal cost principles. The cost principles establish standards for the allowability of costs, provide detailed guidance on the cost accounting treatment of costs as direct or F&A costs, and set forth allowability and allocability principles for selected items of cost. Applicability of a particular set of cost principles depends on the type of organization (regardless whether domestic or foreign) making the expenditure. For example, a for-profit organization collaborating with a university recipient would be subject to the cost principles for for-profit organizations, while the university would be subject to the cost principles for Institutions of Higher Educations (IHEs).

The cost principles are set forth in HHS regulations at 2 CFR Part 200, Subpart E. For-profit organizations are subject to the cost principles located at 48 CFR Part 31.2 Federal Acquisition Regulation.

The cost principles apply to all NIH award instruments, award mechanisms, and special programs and authorities, including modular awards and awards under SNAP with one exception: they do not apply to Kirschstein-NRSA individual fellowship awards. The allowable use of funds under those awards is included in Ruth L. Kirschstein National Research Service Awards in IIB.

Recipients may use their own accounting systems, policies, and procedures to implement the cost principle requirements as long as they meet the standards prescribed in 2 CFR Part 200.302 for financial management systems.

The cost principles address four tests to determine the allowability of costs. The tests are as follows:

- **_Reasonableness (Including Necessity)._** A cost may be considered reasonable if the nature of the goods or services acquired or applied and the associated dollar amount reflect the action that a prudent person would have taken under the circumstances prevailing when the decision to incur the cost was made. The cost principles elaborate on this concept and address considerations such as whether the cost is of a type generally necessary for the organization's operations or the grant's performance, whether the recipient complied with its established organizational policies in incurring the cost or charge, and whether the individuals responsible for the expenditure acted with due prudence in carrying out their responsibilities to the Federal government and the public at large as well as to the organization.

- **_Allocability._** A cost is allocable to a specific grant, function, department, or other component, known as a cost objective, if the goods or services involved are chargeable or assignable to that cost objective in accordance with the relative benefits received or other equitable relationship. A cost is allocable to a grant if it is incurred solely in order to advance work under the grant; it benefits both the grant and other work of the institution, including other grant-supported projects; or it is necessary to the overall operation of the organization and is deemed to be assignable, at least in part, to the grant. A cost is allocable as a direct cost to a grant if it is incurred solely in order to advance work under the grant or meets the criteria for closely related projects determination (see Cost Considerations—Allocation of Costs and Closely Related Work).

- **_Consistency._** Recipients must be consistent in assigning costs to cost objectives. Costs may be charged as either direct costs or F&A costs, depending on their identifiable benefit to a particular project or program, but all costs must be treated consistently for all work of the organization under similar circumstances, regardless of the source of funding.

- **_Conformance._** This test of allowability—conformance with limitations and exclusions as contained in the terms and conditions of award, including those in the cost principles—varies by the type of activity, the type of recipient, and other characteristics of individual awards. Cost Considerations—Allowability of Costs/Activities provides information common to most NIH grants and, where appropriate, specifies some of the distinctions if there is a different treatment based on the type of grant or recipient. IIB contains additional information on allowability of costs for particular types of grants, recipients, and activities.

These four tests apply regardless of whether the particular category of costs is one specified in the cost principles or one governed by other terms and conditions of an award. These tests also apply regardless of treatment as a direct cost or an F&A cost. The fact that a proposed cost is awarded as requested by an applicant does not indicate a determination of allowability.

# 7.3 DIRECT COSTS AND FACILITIES AND ADMINISTRATIVE COSTS

Direct costs are any cost that can be identified specifically with a particular sponsored project, an instructional activity, or any other institutional activity, or that can be directly assigned (allocated) to such activities relatively easily with a high degree of accuracy. Direct costs may include, but are not limited to, salaries, travel, equipment, and supplies directly supporting or benefiting the grant-supported project or activity. If directly related to a specific award, certain costs that otherwise would be treated as indirect costs may also be considered direct costs.

Most organizations also incur costs for common or joint objectives that cannot be readily identified with an individual project or program. These are referred to as indirect costs, also called Facilities and Administrative costs (F&A). Facilities operation and maintenance costs, depreciation, and administrative

expenses are examples of costs that usually are treated as F&A costs. The organization is responsible for the management and accounting of costs consistently and must not include costs associated with its F&A rate as direct costs. Note, the term facilities and administrative costs and the term indirect costs may be used interchangeably to determine applicable policies. For NIH purposes, including the NIHGPS, these costs will be referred to as F&A costs; however, other documents or non-NIH entities may refer to them as indirect costs.

Project costs consist of the allowable direct costs directly related to the performance of the grant plus the allocable portion of the allowable F&A costs of the organization, less applicable credits (as described below and in the cost principles).

The amount NIH awards for each budget period will reflect the total approved budget for the grant, including direct costs and, if applicable, F&A costs. (SBIR and STTR awards also may include a fee as specified in Grants to For-Profit Organizations—Small Business Innovation Research and Small Business Technology Transfer Programs in IIB.) If a recipient waives reimbursement of full F&A costs, NIH will either not award F&A costs or will award only partial F&A costs, as appropriate. The NIH award amount shown in the NoA constitutes NIH's maximum financial obligation to the recipient under that award.

# 7.4 REIMBURSEMENT OF FACILITIES AND ADMINISTRATIVE COSTS

For grant programs that can provide F&A cost reimbursement, NIH will generally not provide F&A costs unless the recipient has established an F&A cost rate covering the applicable activities and period of time, except for awards under which F&A costs are reimbursed at a fixed rate.

In addition, NIH will not require a recipient to establish an F&A rate if the organization's total operations consist of a single grant-supported project or if the organization appropriately and consistently treats all costs as direct costs to projects and accounts for them as such. In the latter case, the GMO must be satisfied that the organization's accounting system can adequately identify and support all costs as direct costs to the project. This includes being able to identify and segregate costs on the basis of a process that assigns costs commensurate with the benefits provided to individual projects (see Administrative Requirements—Management Systems and Procedures—Financial Management System Standards).

F&A rates are negotiated by CAS, DFAS in the Office of Acquisition Management and Policy, NIH (responsible for negotiating F&A cost rates for for-profit entities receiving awards from HHS), or other agency with cognizance for F&A/indirect cost rate (and other special rate) negotiation. If an applicant is advised by the GMO of the need to establish a rate, the GMO will indicate the responsible office to be contacted.

F&A cost proposals must be prepared in accordance with the applicable cost principles and guidance provided by the cognizant office or agency for indirect costs and must conform to cost policies in the NIHGPS. Further information concerning the establishment of F&A rates and the reimbursement of F&A costs may be obtained from DCA or DFAS (see Part III). CAS should be consulted to determine the need to submit a Disclosure Statement (DS-2) pursuant to the requirements of 2 CFR Part 200, Subpart E-Cost Principles.

Consistent with 2 CFR Part 200.414(f), any non-Federal entity, including for-profit organizations, that does not have a current negotiated (including provisional) F&A rate, except for those non-Federal entities described in 2 CFR Part 200, Appendix VII, Section D(1)(b) and 45 CFR Part 75, Appendix VII may elect to charge a de minimis rate of 10% of modified total direct costs (MTDC) which may be used indefinitely. No documentation is required to justify the 10% de minimis indirect cost rate. As described in 2

CFR Part 200.403 and 45 CFR Part 75.403, costs must be consistently charged as either indirect or direct costs but may not be double charged or inconsistently charged as both. If chosen, this methodology once elected must be used consistently for all Federal awards until such time as a non-Federal entity chooses to negotiate for a rate, which the non-Federal entity may apply to do at any time.

If a subrecipient already has a negotiated indirect cost rate established with their cognizant agency for indirect cost, the negotiated rate must be used. If no approved rate exists, the pass-through entity must determine the appropriate rate in collaboration with the subrecipient, which is either: the negotiated indirect cost rate between the pass-through entity and the subrecipient; which can be based on a prior negotiated rate between a different PTE and the same subrecipient. If basing the rate on a previously negotiated rate, the pass-through entity is not required to collect information justifying this rate but may elect to do so; or the de minimis indirect cost rate. The pass-through entity must not require use of a de minimis indirect cost rate if the subrecipient has a Federally approved rate. Subrecipients can elect to use the cost allocation method to account for indirect costs. The cost principles are designed to provide that Federal awards bear their fair share of costs recognized under these principles.(See 2 CFR 200.100(c) and 45 CFR Part 75.100). Pass-through entities may, but are not required, to negotiate a rate with a proposed subrecipient that asks to do so. If the consortium is a for-profit entity, such as a small business, the organization must have an established F&A cost rate before they can charge F&A costs. The default small business rate of 40 percent is only applicable to SBIR and STTR applications.

Regardless of the type of recipient, the rate(s) in effect at the beginning of the competitive segment will be used to determine the amount budgeted for F&A costs for each year of the competitive segment. If the rate agreement does not extend to the end of the project period, the last rate in effect will be used to establish the total cost commitment for any remaining future years. NIH generally will not award additional F&A costs beyond those calculated in the approved budget.

F&A costs awarded may be subject to upward or downward adjustment, depending on the type of rate negotiated and recipient type. Generally, recipients may rebudget between direct and F&A costs (in either direction) without NIH prior approval, provided there is no change in the scope of the approved project. F&A cost reimbursement on grants to IHEs is based on the rates used in the award, which are not subject to adjustment in reimbursement except for the establishment of permanent rates when a provisional rate was used for funding (See 2 CFR 200 Appendix III Section C(7)(b)). Therefore per 2 CFR 200 Appendix IIIIHEs may not rebudget from direct costs to accommodate a rate increase if the F&A costs provided for a period were based on negotiated (final, fixed or predetermined) rates rather than provisional rates (See 2 CFR 200 Appendix III Section C(7)(a)).For recipients other than IHEs, F&A cost reimbursement is based on the negotiated F&A rate agreement consistent with the time period when the cost is incurred, except if F&A costs were limited or not provided. F&A costs are subject to downward adjustment if the proposal that served as the basis for the negotiation included unallowable costs.

Some grants require negotiation of project costs annually, e.g., clinical trials. For these awards, the policies pertain to each year of support rather than to a multiyear competitive segment.

Once NIH awards a grant, it is not obligated to make any supplemental or other award for additional F&A costs or for any other purpose. There are limited circumstances under which the GMO may award F&A costs where none were previously awarded or may increase the amount previously awarded. If an award does not include an amount for F&A costs because the applicant or recipient did not submit a timely F&A cost proposal and the recipient subsequently establishes a rate, the GMO may amend the award to provide an appropriate amount for F&A costs if the amendment can be made using funds from the same Federal fiscal year in which the award was made. However, the amount will be limited to the F&A costs applicable to the period after the date of the recipient's F&A cost proposal submission. This provision does not affect local governmental agencies that are not required to submit their F&A (indir-

ect) cost proposals to the Federal government. They may charge F&A costs to NIH grants based on the rate computations they prepare and keep on file for subsequent Federal review.

If funds are available, a GMO may amend an award to provide additional funds for F&A costs, but only under the following circumstances:

- NIH made an error in computing the award. This includes situations in which a higher rate than the rate used in the grant award is negotiated and the date of the rate agreement for the higher rate is before 1 calendar month prior to the beginning date of the grant budget period.

- NIH restores funds previously recaptured as part of a recipient's unobligated balance.

- The recipient is eligible for additional F&A costs associated with additional direct costs awarded for the supplementation or extension of a project.

NIH does not reimburse indirect costs under the following classes of awards:

- ***Fellowships.*** F&A costs will not be provided on Kirschstein-NRSA individual fellowships or similar awards for which NIH funding is in the form of fixed amounts or is determined by the normal published tuition rates of an institution and for which the recipient is not required to account on an actual cost basis.

- ***Construction and Modernization.*** F&A costs will not be provided on construction or modernization grants.

- ***Grants to Individuals.*** F&A costs will not be provided on awards to individuals.

- ***Grants to Federal Institutions.*** F&A costs will not be provided on grants to Federal institutions.

- ***Grants in Support of Scientific Meetings (Conference Grants).*** F&A costs will not be provided under grants in support of scientific meetings.

- ***Endowment Grants.*** F&A costs will not be provided for endowment grants.

NIH limits the amounts included in the F&A base for the following type of costs:

- ***Genomic Arrays (GA)*** are a high-throughput genetic analysis technology which enables the study of genetic variation and gene expression at high resolution. Approaches such as genome-wide association and gene expression profiling often depend upon manufactured products known as microarrays or bead arrays. These tools are exceptional among laboratory supplies in that they are almost always procured from a commercial source; have a relatively high unit cost and are often utilized in large numbers. The treatment of the costs for purchase of GA as "supplies" in these specialized award budgets at high levels of usage would result in the application of F&A cost recovery that is disproportionate to the actual administrative burden associated with the relatively high cost of the procurement of these GA. Accordingly, for purposes of budgeting for and award of high volume purchases of GA in excess of $50,000 per year, the standard treatment of these resources as supplies in determining the F&A base of an award will be non-applicable. Instead, the requested and reimbursed costs for GA will utilize as a surrogate the concept of sub-contracts (consortium/contractual cost). Therefore, for each budget year, the first $50,000 of GA will be treated as "supplies", and any GA in excess of $50,000 (for high volume requirements) will use as a surrogate the budgeting and reimbursement concept utilized for subcontracts (consortium/contractual cost), providing consistent budgeting, accounting and reimbursement of these costs.

NIH provides F&A costs without the need for a negotiated rate under the following classes of awards:

**J.A. 498**

- **_Research Training and Education Grants (e.g., R25), and K Awards._** F&A costs under Kirschstein-NRSA institutional research training grants, educational and K awards will be budgeted and reimbursed at a rate of 8 percent of modified total direct costs, exclusive of tuition and fees, expenditures for equipment, and consortiums in excess of $25,000. State, local, and Indian tribes (or "federally recognized Indian tribes") may receive full F&A cost reimbursement under NIH Kirschstein-NRSA institutional research training grants and K awards. For this policy, State universities or hospitals are not considered governmental agencies.

- **_Grants to Foreign Organizations and International Organizations._** With the exception of the American University of Beirut and the World Health Organization, which are eligible for full F&A cost reimbursement, F&A costs under grants to foreign and international organizations will be funded at a fixed rate of 8 percent of modified total direct costs, exclusive of tuition and related fees, direct expenditures for equipment, and subawards in excess of $25,000. These funds are paid to support the costs of compliance with federal requirements. Some examples of NIH compliance requirements are the protection of human subjects (including the required education in the protection of human research participants), animal welfare, invention reporting, other post-award reporting requirements, financial conflict of interest and research misconduct. Note, these are just a few representative examples of compliance requirement; this list is not all inclusive. Awards to domestic organizations with a foreign or international consortium participant may include 8 percent of modified total direct costs, exclusive of tuition and related fees, direct expenditures for equipment, and subawards in excess of $25,000. These funds are paid to support the costs of compliance with federal requirements. NIH will not support the acquisition of or provide for depreciation on any capital expenses (facilities) or the normal general operations of foreign and international organizations. Therefore, these expenses may not be requested as a direct cost; however, equipment is an allowable direct cost. *Other items normally treated as F&A costs (e.g., rent) may be requested as direct costs and will be evaluated by NIH for allowability.*

# 7.5 COST TRANSFERS, OVERRUNS, AND ACCELERATED AND DELAYED EXPENDITURES

Cost transfers to NIH grants by recipients, consortium participants, or contractors under grants that represent corrections of clerical or bookkeeping errors should be accomplished within 90 days of when the error was discovered. The transfers must be supported by documentation that fully explains how the error occurred and a certification of the correctness of the new charge by a responsible organizational official of the recipient, consortium participant, or contractor. An explanation merely stating that the transfer was made "to correct error" or "to transfer to correct project" is not sufficient. Transfers of costs from one project to another or from one competitive segment to the next solely to cover cost overruns are not allowable.

Recipients must maintain documentation of cost transfers, pursuant to 2 CFR Part 200.337, and must make it available for audit or other review (see Administrative Requirements—Monitoring—Record Retention and Access). The recipient should have systems in place to detect such errors within a reasonable time frame; untimely discovery of errors could be an indication of poor internal controls. Frequent errors in recording costs may indicate the need for accounting system improvements, enhanced internal controls, or both. If such errors occur, recipients are encouraged to evaluate the need for improvements and to make whatever improvements are deemed necessary to prevent reoccurrence. NIH also may require a recipient to take corrective action by imposing additional terms and conditions on an award(s).

The GMO monitors recipient expenditure rates under individual grants within each budget period and within the overall project period. The funding that NIH provides for each budget period is based on an assessment of the effort to be performed during that period and the recipient's associated budget, including the availability of unobligated balances. Although NIH allows recipients certain flexibilities with respect to rebudgeting (see Administrative Requirements—Changes in Project and Budget), NIH expects the rate and types of expenditures to be consistent with the approved project and budget and may question or restrict expenditures that appear inconsistent with these expectations.

The GMO may review recipient cash drawdowns to determine whether they indicate any pattern of accelerated or delayed expenditures. Expenditure patterns are of particular concern because they may indicate a deficiency in the recipient's financial management system or internal controls. Accelerated or delayed expenditures may result in a recipient's inability to complete the approved project within the approved budget and period of performance. In these situations, the GMO may seek additional information from the recipient and may make any necessary and appropriate adjustments.

# 7.6 ALLOCATION OF COSTS AND CLOSELY RELATED WORK

When salaries or other activities are supported by two or more sources, issues arise as to how the direct costs should be allocated among the sources of support. In general, a cost that benefits two or more projects or activities in proportions that can be determined without undue effort or cost should be allocated to the projects on the basis of the proportional benefit. A cost that benefits two or more projects or activities in proportions that cannot be determined because of the interrelationship of the work involved may be allocated or transferred to the benefiting projects on any reasonable basis as long as the costs charged are allowable, allocable, and reasonable under the applicable cost principles and the recipient's financial management system includes adequate internal controls (for example, no one person has complete control over all aspects of a financial transaction).

# 7.7 APPLICABLE CREDITS

The term applicable credits refers to those receipt or negative expenditure types of transactions that operate to offset or reduce direct or F&A cost items. Typical examples are purchase discounts, rebates or allowances, recoveries or indemnities on losses, and adjustments for overpayments or erroneous charges. Additional information concerning applicable credits is included in the cost principles.

Applicable credits to direct charges made to NIH grants must be treated as an adjustment on the recipient's FFR, whether those credits accrue during or after the period of grant support. (See Administrative Requirements—Monitoring—Reporting and Administrative Requirements—Closeout—Final Federal Financial Reports.) The NIH awarding IC will notify the recipient of any additional actions that may be necessary.

# 7.8 SERVICES PROVIDED BY AFFILIATED ORGANIZATIONS

A number of universities and other organizations have established closely affiliated, but separately incorporated, organizations to facilitate the administration of research and other programs supported by Federal funds. Such legally independent entities are often referred to as "foundations," although this term does not necessarily appear in the name of the organization. Sometimes, the parent organization provides considerable support services, in the form of administration, facilities, equipment, accounting, and other services, to its foundation, and the latter, acting in its own right as an NIH recipient, includes the cost of these services in its F&A proposal.

Costs incurred by an affiliated, but separate, legal entity in support of a recipient foundation are allowable for reimbursement under NIH grants only if at least one of the following conditions is met:

- The affiliated organization is charged for, and is legally obligated to pay for, the services provided by the parent organization.

- The affiliated organizations are subject to State or local law that prescribes how Federal reimbursement for the costs of the parent organization's services will be expended and requires that a State or local official acting in their official capacity approves such expenditures.

- There is a valid written agreement between the affiliated organizations whereby the parent organization agrees that the recipient foundation may retain Federal reimbursement of parent organization costs. The parent organization may either direct how the funds will be used or permit the recipient foundation that discretion.

If none of the above conditions are met, the costs of the services provided by the parent organization to the recipient foundation are not allowable for reimbursement under an NIH grant. However, the services may be acceptable for cost-sharing (matching) purposes.

Foundations that represent already existing recipient organizations should contact DGP, OPERA before attempting to become a separately recognized applicant organization.

# 7.9 ALLOWABILITY OF COSTS/ACTIVITIES

The governing cost principles address selected items of cost, some of which are mentioned in this section for emphasis. This section is not intended to be all-inclusive. The cost principles should be consulted for the complete explanation of whether or not a cost is allowed.

This section also includes NIH-specific requirements concerning costs and activities. The allowability of costs under specific NIH awards may be subject to other requirements specified in the program legislation, regulations, or the specific terms and conditions of an award, which take precedence over the general discussion provided here. Specific program requirement may also be covered in other sections of the NIHGPS. Applicants or recipients that have questions concerning the allowability of particular costs should contact the GMO.

If a cost is allowable, it is allocable as either a direct cost or an F&A cost, depending on the recipient's accounting system. For some costs addressed in this section, the text specifies whether the cost is usually a direct cost or an F&A cost.

Unless otherwise indicated in the NoA, an award based on an application that includes specific information concerning any costs or activities that require NIH prior approval constitutes the prior approval for those costs or activities. The recipient is not required to obtain any additional approval for those costs/activities. Post-award requests to incur costs or undertake activities requiring prior approval that are not described in the approved application are subject to the requirements in Administrative Requirements—Changes in Project and Budget.

Consortium participants and contractors under grants are subject to the requirements of the cost principles otherwise applicable to their type of organization and to any requirements placed on them by the recipient to be able to comply with the terms and conditions of the NIH grant.

The cost principles do not address profit or fee. NIH policy allows the payment of fee on SBIR/STTR grants (see Grants to For-Profit Organizations chapter in IIB) but NIH will not provide profit or fee to any other type of recipient under any other grant program or support mechanism. A fee may not be paid by a recipient to a consortium participant, including a for-profit organization. However, a fee (profit)

may be paid to a contractor providing routine goods or services under a grant in accordance with normal commercial practice.

## 7.9.1 Selected Items of Cost

**Exhibit 5: Selected Items of Cost**

The table presents specific items that may or may not be included in the cost portion of grants

| Items | Explanation of Allowable Costs |
|---|---|
| Advertising and Public Relations | 1. The term advertising costs means the costs of advertising media and corollary administrative costs. Advertising media include magazines, newspapers, radio and television, direct mail, exhibits, electronic or computer transmittals, and the like.<br><br>2. The only allowable advertising costs are those which are solely for:<br><br>  a. The recruitment of personnel required by the non-Federal entity for performance of a Federal award (See also 2 CFR Part 200.463);<br><br>  b. The procurement of goods and services for the performance of a Federal award;<br><br>  c. The disposal of scrap or surplus materials acquired in the performance of a Federal award except when non-Federal entities are reimbursed for disposal costs at a predetermined amount; or<br><br>  d. Program outreach and other specific purposes necessary to meet the requirements of the Federal award.<br><br>3. The term ''public relations'' includes community relations and means those activities dedicated to maintaining the image of the non- Federal entity or maintaining or relations with the community or public at large or any segment of the public.<br><br>4. The only allowable public relations costs are:<br><br>  a. Costs specifically required by the Federal award;<br><br>  b. Costs of communicating with the public and press pertaining to specific activities or accomplishments which result from performance of the Federal award (these costs are considered necessary as part of the outreach effort for the Federal award); or<br><br>  c. Costs of conducting general liaison with news media and government public relations officers, to the extent that such activities are limited to communication and liaison necessary to keep the public informed on matters of public concern, such as notices of funding opportunities, financial matters, etc.<br><br>5. Unallowable advertising and public relations costs include the following:<br><br>  a. All advertising and public relations costs other than as specified in paragraphs (2) and (4) of this section;<br><br>  b. Costs of meetings, conventions, convocations, or other events related to other activities of the entity (see also 2 CFR Part 200.432), including:<br><br>    i. Costs of displays, demonstrations, and exhibits;<br><br>    ii. Costs of meeting rooms, hospitality suites, and other special facilities used in conjunction with shows and other special events; and |

| Items | Explanation of Allowable Costs |
|-------|-------------------------------|
| | iii. Salaries and wages of employees engaged in setting up and displaying exhibits, making demonstrations, and providing briefings; |
| | c. Costs of promotional items and memorabilia, including models, gifts, and souvenirs; |
| | d. Costs of advertising and public relations designed solely to promote the non-Federal entity |
| Alcoholic Beverages | Unallowable as an entertainment expense, but allowable if within the scope of an approved research project. |
| Alteration and Renovation | Individual A&R projects that are treated as direct costs and that are determined to be minor be subject to the A&R policies specified in this exhibit and in the Construction Grants chapter, as applicable. Individual A&R projects determined to be A&R will be subject to the requirements specified in the Construction Grants chapter.

Routine maintenance and repair of the organization's physical plant or equipment, which is allowable and is ordinarily treated as an F&A cost, is not considered A&R for purposes of applying this policy. Certain allowable costs of installing equipment, such as the temporary removal and replacement of wall sections and door frames to place equipment in its permanent location, or the costs of connecting utility lines, replacing finishes and furnishings, and installing any accessory devices required for the equipment's proper and safe utilization, may be considered either equipment costs or A&R costs, depending on the recipient's accounting system.

A&R costs are not allowable under grants to individuals, and grants in support of scientific meetings (conference grants). In all other cases, these costs are allowable unless the program legislation, implementing regulations, program guidelines, or other terms and conditions of the award specifically exclude such activity.

The A&R must be consistent with the following criteria and documentation requirements:

- The building has a useful life consistent with program purposes and is architecturally and structurally suitable for conversion to the type of space required.
- The A&R is essential to the purpose of the grant-supported project.
- The space involved will be occupied by the project.
- The space is suitable for human occupancy before A&R work is started except where the purpose of the A&R is to make the space suitable for some purpose other than human occupancy, such as storage.
- If the space is rented, evidence is provided that the terms of the lease are compatible with the A&R proposed and cover the duration of the project period. |

| Items | Explanation of Allowable Costs |
|-------|-------------------------------|
| | • If the A&R will affect a site listed in (or eligible for inclusion in) the National Register of Historic Places, the requirements specified in "Preservation of Cultural and Historic Resources" have been followed.<br><br>Work necessary to obtain an initial occupancy permit for the intended use is not an allowable A&R cost.<br><br>A recipient may rebudget up to 25 percent of the total approved budget for a budget period into A&R costs without NIH prior approval unless such rebudgeting would result in a change in scope. If the rebudgeting will result in the addition of a major A&R project, NIH will consider the rebudgeting to be a change in scope, and the recipient must submit to the NIH awarding IC the documentation specified in the Construction Grants chapter for prior approval of A&R projects above that dollar level.<br><br>Under foreign grants or foreign components under domestic grants, major A&R is unallowable. Minor A&R is generally allowable on grants made to foreign organizations or to the foreign component of a domestic grant, unless prohibited by the governing statute or implementing program regulations. |
| Animals | Allowable for the acquisition, care, and use of experimental animals, contingent upon compliance with the applicable requirements of the PHS Policy on Humane Care and Use of Laboratory Animals (see Public Policy Requirements and Objectives—Animal Welfare). If the recipient operates an animal resource facility, charges for use of the facility should be determined in accordance with the *Cost Analysis and Rate Setting Manual for Animal Resource Facilities* (PDF, 32 MB) — May 2000. |
| Audiovisual Activities | Allowable for the production of an audiovisual. "Audiovisual" means any product containing visual imagery, sound, or both, such as motion pictures, films, videotapes, live or recorded radio or television programs or public service announcements, slide shows, filmstrips, audio recordings, multimedia presentations, or exhibits where visual imagery, sound, or both are an integral part. "Production" refers to the steps and techniques used to create a finished audiovisual product including, but not limited to, design, layout, scriptwriting, filming or taping, fabrication, sound recording, and editing.<br><br>A recipient with in-house production capability must determine whether it would be more efficient and economical to use that capability or to contract for the production of an audiovisual.<br><br>If an audiovisual intended for members of the general public (i.e., people who are not researchers or health professions personnel or who are not directly involved in project activities as employees, trainees, or participants such as volunteers or patients) is produced under an NIH grant-supported project, the recipient must submit two copies of the finished product along with its annual or final progress report (see Administrative Requirements—Monitoring—Reporting and Administrative Requirements—Closeout). The costs of such copies are allowable project costs.<br><br>Audiovisuals produced under an NIH grant-supported project must bear an acknowledgment and disclaimer, such as the following: |

| Items | Explanation of Allowable Costs |
|---|---|
| | The production of this [type of audiovisual (motion picture, television program, etc.)] was supported by Grant No._____ from [name of NIH awarding IC]. Its contents are solely the responsibility of [name of recipient organization] and do not necessarily represent the official views of [name of NIH awarding IC]. |
| Audit Services | 1. A reasonably proportionate share of the costs of audits required by, and performed in accordance with, the Single Audit Act Amendments of 1996 (31 U.S.C. 7501-7507), as implemented by requirements of 2 CFR Part 200, are allowable. However, the following audit costs are unallowable:<br><br>    a. Any costs when audits required by the Single Audit Act and Subpart F— Audit Requirements of 2 CFR Part 200 have not been conducted or have been conducted but not in accordance therewith; and<br><br>    b. Any costs of auditing a non- federal entity that is exempted from having an audit conducted under the Single Audit Act and Subpart F—Audit Requirements of 2 CFR Part 200 because its expenditures under Federal awards are less than $750,000 during the non- Federal entity's fiscal year.<br><br>2. The costs of a financial statement audit of a non-Federal entity that does not currently have a Federal award may be included in the indirect cost pool for a cost allocation plan or indirect cost proposal.<br><br>3. Pass-through entities may charge Federal awards for the cost of agreed-upon-procedures engagements to monitor subrecipients (in accordance with Subpart D of 2 CFR Part 200.331 through 200.333) which are exempted from the requirements of the Single Audit Act and Subpart F of 2 CFR Part 200. This cost is allowable only if the agreed-upon-procedures engagements are:<br><br>    a. Conducted in accordance with GAGAS attestation standards;<br><br>    b. Paid for and arranged by the pass-through entity; and<br><br>    c. Limited in scope to one or more of the following types of compliance requirements: activities allowed or unallowed; allowable costs/cost principles; eligibility; and reporting. |
| Bad Debts | Bad debts (debts which have been determined to be uncollectable), including losses (whether actual or estimated) arising from uncollectable accounts and other claims, are unallowable. Related collection costs, and related legal costs, arising from such debts after they have been determined to be uncollectable are also unallowable. (See also 2 CFR Part 200.428). |

| Items | Explanation of Allowable Costs |
|---|---|
| Bonding | 1. Bonding costs arise when the Federal awarding agency requires assurance against financial loss to itself or others by reason of the act or default of the non-Federal entity. They arise also in instances where the non-Federal entity requires similar assurance, including: bonds as bid, performance, payment, advance payment, infringement, and fidelity bonds for employees and officials.<br><br>2. Costs of bonding required pursuant to the terms and conditions of the Federal award are allowable.<br><br>3. Costs of bonding required by the non-Federal entity in the general conduct of its operations are allowable as an indirect cost to the extent that such bonding is in accordance with sound business practice and the rates and premiums are reasonable under the circumstances. |
| Books and Journals | Allowable. If an organization has a library, books and journals generally should be provided as part of normal library services and treated as F&A costs. |
| Building Acquisition | Unallowable unless building acquisition or construction is specifically authorized by program legislation and is provided for in the NoA. For real property acquired with NIH grant support, the cost of title insurance may be charged to the grant in proportion to the Federal share of the acquisition cost. Filing fees for recording the Federal interest in the real property in appropriate records of the applicable jurisdiction also may be charged to the grant. (Also see Construction Grants—Allowable and Unallowable Costs and Activities in IIB). |
| Capital Expenditures | See Equipment and Other Capital Expenditures. |
| Child care Costs | Allowable if incurred to assist individuals to participate as subjects in research projects. Such costs also may be allowable as a fringe benefit for individuals working on a grant-supported project (see Fringe Benefits and Travel Costs in this exhibit). NRSA Fellowship Grants may also be allowed to incur these costs (see 11.2.9.7 for specific eligibility criteria). |
| Collection of Improper Payments | The costs incurred by a non-Federal entity to recover improper payments are allowable as either direct or indirect costs, as appropriate. Amounts collected may be used by the non-Federal entity in accordance with cash management standards set forth in 2 CFR Part 200.305. (See Improper Payment). |
| Communications | Allowable. Such costs include local and long-distance telephone calls, express mail, and postage, and usually are treated as F&A costs. |
| Conference Grant Costs | See Support of Scientific Meetings (Conference Grants) chapter in IIB for allowability of costs for scientific meetings (conferences). |
| Consortium Agreements/ Contracts under Grants | Allowable to carry out a portion of the programmatic effort or for the acquisition of routine goods or services under the grant. Such arrangements may require NIH approval as specified in Administrative Requirements—Changes in Project and Budget. (See also Administrative Requirements—Management Systems and Procedures—Procurement System Standards and Requirements for policies that apply to the acquisition of routine goods and services and the Consortium Agreements chapter in IIB for policies that apply to recipient collaboration with |

| Items | Explanation of Allowable Costs |
|---|---|
| | other organizations in carrying out the grant-supported research). |
| Construction | Allowable only when program legislation specifically authorizes new construction, modernization, or major A&R, and NIH specifically authorizes such costs in the NoA. When authorized, construction activities may include construction of a new facility or projects in an existing building that are considered to be construction, such as relocation of exterior walls, roofs, and floors; attachment of fire escapes; or completion of unfinished shell space to make it suitable for human occupancy (see Construction Grants chapter in IIB). |
| Consultant Services | See Professional Services and Salaries and Wages/Intra-IHE Consulting. |
| Contingency Provisions | Unallowable. Payments made by the NIH awarding IC to the non-Federal entity's "contingency reserve" or any similar payment made for events the occurrence of which cannot be foretold with certainty as to the time or intensity, or with an assurance of their happening, are unallowable under non-construction grants. Contingency funds do not include pension funds, self-insurance funds, and normal accruals (also see Reserve Funds in this exhibit). (See also Construction Grants—Allowable and Unallowable Costs and Activities in IIB concerning contingency funds under construction grants). |
| Customs and Import Duties | Allowable under grants to domestic organizations when performance will take place entirely within the United States, its possessions, or its territories, or when foreign involvement in the project is incidental to the overall grant-supported project. Charges may include consular fees, customs surtaxes, value-added taxes, and other related charges. (See Taxes in this exhibit). |
| Depreciation or Use Allowances | Allowable. Such costs usually are treated as F&A costs. Depreciation or use charges on equipment or buildings acquired under a federally supported project are not allowable. |
| Donor Costs | Allowable as payment to volunteers or research subjects who contribute blood, urine samples, and other body fluids or tissues that are specifically project-related. Donor costs are not considered a research patient care expense (see the Research Patient Care Costs chapter in IIB). Also see Incentive Costs in this exhibit. |
| Drugs | Allowable if within the scope of an approved research project.<br><br>Project funds may not be used to purchase drugs classified by FDA as "ineffective" or "possibly effective" except in approved clinical research projects or in cases where there is no alternative other than therapy with "possibly effective" drugs. |
| Dues or Membership Fees | Allowable as an F&A cost for organizational membership in business, professional, or technical organizations or societies.<br><br>Payment of dues or membership fees for an individual's membership in a professional or technical organization is allowable as a fringe benefit or an employee development cost, if paid according to an established organizational policy consistently applied regardless of the source of funds.<br><br>See also Membership, Subscription, and Professional Activity costs. |

**J.A. 508**

| Items | Explanation of Allowable Costs |
|---|---|
| Entertainment Costs | Costs of entertainment, including amusement, diversion, and social activities and any associated costs are unallowable, except where specific costs that might otherwise be considered entertainment have a programmatic purpose and are authorized either in the approved budget for the Federal award or with prior written approval of the NIH awarding IC. |
| Equipment and Other Capital Expenditures | The following rules of allowability must apply to equipment and other capital expenditures: <br><br> 1. Capital expenditures for general purpose equipment, buildings, and land are unallowable as direct charges, except with the prior written approval of the NIH awarding IC or pass-through entity. <br><br> 2. Capital expenditures for special purpose equipment are allowable as direct costs, provided that items that relate to a change in scope (which may be indicated by a unit cost of $25,000 or more) have the prior written approval of the NIH awarding IC or pass-through entity. <br><br> 3. Capital expenditures for improvements to land, buildings, or equipment which materially increase their value or useful life are unallowable as a direct cost except with the prior written approval of the NIH awarding IC, or pass-through entity. See Depreciation for rules on the allowability of depreciation on buildings, capital improvements, and equipment. See also Rental Costs of Real Property and Equipment. <br><br> 4. When approved as a direct charge pursuant to items (1) through (3) above, capital expenditures will be charged in the period in which the expenditure is incurred, or as otherwise determined appropriate and negotiated with the NIH awarding IC. <br><br> 5. The unamortized portion of any equipment written off as a result of a change in capitalization levels may be recovered by continuing to claim the otherwise allowable depreciation on the equipment, or by amortizing the amount to be written off over a period of years negotiated with the Federal cognizant agency for indirect cost. <br><br> 6. Cost of equipment disposal. If the non-Federal entity is instructed by the NIH awarding IC to otherwise dispose of or transfer the equipment the costs of such disposal or transfer are allowable. <br><br> See also Capital Expenditures, Equipment, Special Purpose Equipment, General Purpose Equipment, Acquisition Cost, and Capital Assets. |
| Federal (U.S. Government) Employees | See Grants to Federal Institutions and Payments to Federal Employees under Grants—Allowable and Unallowable Costs in IIB for the allowability of payments made to, or on behalf of, Federal employees under NIH grants, including grants to Federal institutions. |
| Fines, Penalties, Damages and Other Settlements | Costs resulting from non-Federal entity violations of, alleged violations of, or failure to comply with, Federal, state, tribal, local or foreign laws and regulations are unallowable, except when incurred as a result of compliance with specific provisions of the Federal award, or with prior written approval of the NIH awarding IC. |

| Items | Explanation of Allowable Costs |
|---|---|
| Fringe Benefits | Fringe benefits are allowances and services provided by employers to their employees as compensation in addition to regular salaries and wages. Fringe benefits include, but are not limited to, the costs of leave (vacation, family related, sick or military), employee insurance, pensions, and unemployment benefit plans. Except as provided elsewhere in 2 CFR Part 200, Subpart E, the costs of fringe benefits are allowable provided that the benefits are reasonable and are required by law, non-Federal entity-employee agreement, or an established policy of the non-Federal entity.

For policies applicable to tuition remission for students working on grant-supported research projects, see Fringe Benefits / IHE Tuition/Tuition Remission in this exhibit. See Ruth L. Kirschstein National Research Service Awards—Individual Fellowships—Allowable and Unallowable Costs—Tuition and Fees and Ruth L. Kirschstein National Research Service Awards—Institutional Research Training Grants—Allowable and Unallowable Costs—Trainee Tuition and Fees in IIB for the allowability of tuition costs for fellows and trainees. |
| Fringe Benefits / IHE *Tuition/Tuition Remission* | Tuition remission and other forms of compensation paid as, or in lieu of, wages to students under research grants are allowable, provided the following conditions are met:

1. The individual is conducting activities necessary to the Federal award.

2. Tuition remission and other support are provided, in accordance with established institutional policy, of the IHE and consistently provided in a like manner to students in return for similar activities conducted under Federal awards as well as other activities.

3. During the academic period, the student is enrolled in an advanced degree program at a non-Federal entity or affiliated institution and the activities of the student in relation to the Federal award are related to the degree program.

4. The tuition or other payments are reasonable compensation for the work performed and are conditioned explicitly upon the performance of necessary work.

5. It is the IHE's practice to similarly compensate students under Federal awards as well as other activities

Charges for tuition remission and other forms of compensation paid to students as, or in lieu of, salaries and wages are subject to reporting requirements in 2 CFR Part 200.430(i). NIH will determine the allowability and reasonableness of such compensation under a grant on the basis of 2 CFR Part 200, Subpart E.

The maximum amount NIH will award for compensation of a graduate student receiving support from a research grant is the zero-level Kirschstein-NRSA stipend in effect when NIH issues the grant award (see current levels posted at http://grants.nih.gov/training/nrsa.htm).

Payments made for educational assistance (e.g., scholarships, fellowships, and student aid costs) may not be paid from NIH research grant funds even when they would appear to benefit the research project. |

| Items | Explanation of Allowable Costs |
|---|---|
| Fringe Benefits / Insurance | Allowable. Insurance usually is treated as an F&A cost. In certain situations, however, where special insurance is required as a condition of the grant because of risks peculiar to the project, the premium may be charged as a direct cost if doing so is consistent with organizational policy. Medical liability (malpractice) insurance is an allowable cost of research programs at all types of recipients only if the research involves human subjects. If so, the insurance must be treated as a direct cost and must be assigned to individual grants based on the manner in which the insurer allocates the risk to the population covered by the insurance. See also Reserve Funds.<br><br>The cost of insuring equipment, whether purchased with project funds or furnished as federally owned property, normally should be included in F&A costs but may be allowable as a direct cost if this manner of charging is the normal organizational policy.<br><br>Health insurance for trainees and fellows is addressed in the Ruth L. Kirschstein National Research Service Awards chapter in IIB. |
| Fringe Benefits / Pension Plan Costs | Pension plan costs which are incurred in accordance with the established policies of the non-Federal entity are allowable, provided that:<br><br>1. Such policies meet the test of reasonableness.<br><br>2. The methods of cost allocation are not discriminatory.<br><br>3. For entities using accrual-based accounting, the cost assigned to each fiscal year is determined in accordance with GAAP.<br><br>4. The costs assigned to a given fiscal year are funded for all plan participants within six months after the end of that year. However, increases to normal and past service pension costs caused by a delay in funding the actuarial liability beyond 30 calendar days after each quarter of the year to which such costs are assignable are unallowable. Non-Federal entity may elect to follow the "Cost Accounting Standard for Composition and Measurement of Pension Costs" (48 CFR Part 9904.412).<br><br>5. Pension plan termination insurance premiums paid pursuant to the Employee Retirement Income Security Act (ERISA) of 1974 (29 U.S.C. 1301–1461) are allowable. Late payment charges on such premiums are unallowable. Excise taxes on accumulated funding deficiencies and other penalties imposed under ERISA are unallowable.<br><br>6. Pension plan costs may be computed using a pay-as-you-go method or an acceptable actuarial cost method in accordance with established written policies of the non-Federal entity.<br><br>    a. For pension plans financed on a pay-as-you-go method, allowable costs will be limited to those representing actual payments to retirees or their beneficiaries. |

**J.A. 511**

| Items | Explanation of Allowable Costs |
|---|---|
| | b. Pension costs calculated using an actuarial cost-based method recognized by GAAP are allowable for a given fiscal year if they are funded for that year within six months after the end of that year. Costs funded after the six month period (or a later period agreed to by the cognizant agency for indirect costs) are allowable in the year funded. The cognizant agency for indirect costs may agree to an extension of the six month period if an appropriate adjustment is made to compensate for the timing of the charges to the Federal government and related Federal reimbursement and the non-Federal entity's contribution to the pension fund. Adjustments may be made by cash refund or other equitable procedures to compensate the Federal government for the time value of Federal reimbursements in excess of contributions to the pension fund. |
| | c. Amounts funded by the non- Federal entity in excess of the actuarially determined amount for a fiscal year may be used as the non- Federal entity's contribution in future periods. |
| | d. When a non-Federal entity converts to an acceptable actuarial cost method, as defined by GAAP, and funds pension costs in accordance with this method, the unfunded liability at the time of conversion is allowable if amortized over a period of years in accordance with GAAP. |
| | e. The Federal government must receive an equitable share of any previously allowed pension costs (including earnings thereon) which revert or inure to the non-Federal entity in the form of a refund, withdrawal, or other credit. |
| Fringe Benefits / *Severance Pay* | 1. Severance pay, also commonly referred to as dismissal wages, is a payment in addition to regular salaries and wages, by non-Federal entities to workers whose employment is being terminated. Costs of severance pay are allowable only to the extent that in each case, it is required by: |
| | a. law, |
| | b. employer-employee agreement, |
| | c. established policy that constitutes, in effect, an implied agreement on the non- Federal entity's part, or |
| | d. circumstances of the particular employment. |
| | 2. Costs of severance payments are divided into two categories as follows: |

| Items | Explanation of Allowable Costs |
|---|---|
| | a. Actual normal turnover severance payments must be allocated to all activities; or, where the non-Federal entity provides for a reserve for normal severances, such method will be acceptable if the charge to current operations is reasonable in light of payments actually made for normal severances over a representative past period, and if amounts charged are allocated to all activities of the non- Federal entity. |
| | b. Measurement of costs of abnormal or mass severance pay by means of an accrual will not achieve equity to both parties. Thus, accruals for this purpose are not allowable. However, the Federal government recognizes its obligation to participate, to the extent of its fair share, in any specific payment. Prior approval by the Federal awarding agency or cognizant agency for indirect cost, as appropriate, is required. |
| | 3. Costs incurred in certain severance pay packages which are in an amount in excess of the normal severance pay paid by the non-Federal entity to an employee upon termination of employment and are paid to the employee contingent upon a change in management control over, or ownership of, the non-Federal entity's assets, are unallowable. |
| | 4. Severance payments to foreign nationals employed by the non-Federal entity outside the United States, to the extent that the amount exceeds the customary or prevailing practices for the non-Federal entity in the United States, are unallowable, unless they are necessary for the performance of Federal programs and approved by the NIH awarding IC. |
| | 5. Severance payments to foreign nationals employed by the non-Federal entity outside the United States due to the termination of the foreign national as a result of the closing of, or curtailment of activities by, the non-Federal entity in that country, are unallowable, unless they are necessary for the performance of Federal programs and approved by the NIH awarding IC. |
| Fundraising and Investment Management Costs | 1. Costs of organized fund raising, including financial campaigns, endowment drives, solicitation of gifts and bequests, and similar expenses incurred to raise capital or obtain contributions are unallowable. Fund raising costs for the purposes of meeting the Federal program objectives are allowable with prior written approval from the Federal awarding agency. (See also Proposal Costs). |
| | 2. Costs of investment counsel and staff and similar expenses incurred to enhance income from investments are unallowable except when associated with investments covering pension, self-insurance, or other funds which include Federal participation allowed by 2 CFR Part 200. |
| | 3. Costs related to the physical custody and control of monies and securities are allowable. |

| Items | Explanation of Allowable Costs |
|---|---|
| | 4.  Both allowable and unallowable fund raising and investment activities must be allocated as an appropriate share of indirect costs under the conditions described in 2 CFR Part 200.413. |
| Genomic Arrays | Allowable as a direct cost, but with specialized treatment of F&A reimbursement for costs exceeding $50,000 in each budget year. See Cost Considerations-Reimbursement of Facilities and Administrative Costs for more information. |
| Hazardous Waste Disposal | Allowable; usually treated as an F&A cost. |
| Honoraria | Unallowable when the primary intent is to confer distinction on, or to symbolize respect, esteem, or admiration for, the recipient of the honorarium. A payment for services rendered, such as a speaker's fee under a conference grant, is allowable. |
| Hospitalization | See Research Patient Care in this exhibit. |
| Incentive Costs | Incentive payments to volunteers or patients participating in a grant-supported project or program are allowable. Incentive payments to individuals to motivate them to take advantage of grant-supported health care or other services are allowable if within the scope of an approved project. See Salaries and Wages/Incentive Compensation in this exhibit for incentive payments to employees. |
| Indemnification | Absent express statutory authority, unallowable if the indemnification would result in liability that is indefinite, indeterminate or potentially unlimited. In those rare cases where authority does allow this cost, it would be reflected in the NoA. |
| Independent Research and Development Costs | Independent research and development is research and development which is conducted by an organization, and which is not sponsored by Federal or non-Federal awards, contracts, or other agreements. Independent research and development shall be allocated its proportionate share of indirect costs on the same basis as the allocation of indirect costs to sponsored research and development. The cost of independent research and development, including their proportionate share of indirect costs, are unallowable. |
| Intellectual Property (Invention, Copyright, Patent, or Licensing Costs) | Unallowable as a direct cost unless specifically authorized on the grant award. May be allowable as F&A costs, provided they are in accordance with 2 CFR Part 200.448 and are included in the negotiation of F&A cost rates. |
| Interest | Allowable as an F&A cost for certain assets as specified in 2 CFR Part 200.449. Unallowable for hospitals. (2 CFR Part 200, Appendix IX, I.o.). (See Payment—Interest Earned on Advances of Grant Funds). |
| IRB or IACUC Costs | Costs associated with IRB review of human research protocols, or IACUC review of animal research protocols, are not allowable as direct charges to NIH-funded research unless such costs are not covered by the organization's F&A rate. |
| Laboratory Directed Research & | NIH awards to DOE laboratories will not include the proportionate share of F&A costs for Laboratory Directed Research & Development (LDRD) in accordance |

| Items | Explanation of Allowable Costs |
|---|---|
| Development | with the MOU with the Department of Energy dated June 18, 1998, although NIH will not restrict the DOE laboratory contractors from recovering LDRD costs within the total funding included in an award. In addition, DOE has agreed to waive the Overhead Rate on all NIH grant awards to DOE laboratory contractors. |
| Leave | Allowable for employees as a fringe benefit (see Fringe Benefits in this exhibit). See Ruth L. Kirschstein National Research Service Awards—Individual Fellowships—Other Terms and Conditions—Leave and Ruth L. Kirschstein National Research Service Awards—Institutional Research Training Grants—Other Terms and Conditions—Leave in IIB for NIH policy on leave for fellows and trainees. |
| Legal Services | Allowable. Generally treated as an F&A cost but, subject to the limitations described in the applicable cost principles, may be treated as a direct cost for legal services provided by individuals who are not employees of the recipient organization. Before a recipient incurs legal costs that are extraordinary or unusual in nature, the recipient should make an advance agreement regarding the appropriateness and reasonableness of such costs with the GMO.<br><br>Legal costs incurred in defending or prosecuting claims, whether equitable or monetary, including administrative grant appeals, are generally unallowable charges to NIH grant-supported projects, except as expressly permitted in the 2 CFR Part 200. |
| Library Services | General library support is not allowable as a direct cost but may be included in the recipient's F&A pool. However, such services are allowable as a direct cost when specifically required for the conduct of the project and when identifiable as an integral part of the grant-supported activity (e.g., in those programs designed to develop and support such services). |
| Lobbying | Generally unallowable, in accordance with 2 CFR Part 200.450, including costs of lobbying activities to influence the introduction, enactment, or modification of legislation by the U.S. Congress or a State legislature. Under certain circumstances, costs associated with activities that might otherwise be considered "lobbying" that are directly related to the performance of a grant may be allowable. The recipient should obtain an advance understanding with the GMO if it intends to engage in these activities. Unallowable for State and Local governments and for-profit organizations. (Also see Public Policy Requirements and Objectives—Lobbying Prohibition, Appropriation Mandates – Lobbying – Appropriation Prohibition, and Administrative Requirements—Monitoring—Reporting concerning lobbying restrictions, the required certification, and reporting). |
| Maintenance and Repair Costs | Costs incurred for utilities, insurance, security, necessary maintenance, janitorial services, repair, or upkeep of buildings and equipment (including Federal property unless otherwise provided for) which neither add to the permanent value of the property nor appreciably prolong its intended life, but keep it in an efficient operating condition, are allowable. Costs incurred for improvements which add to the permanent value of the buildings and equipment or appreciably prolong their intended life must be treated as capital expenditures (see 2 CFR |

| Items | Explanation of Allowable Costs |
|---|---|
| | Part 200.439 and 45 CFR Part 75.439). These costs are only allowable to the extent that they are not paid through rental or other agreements. |
| Materials and Supplies Costs, including Costs of Computing Devices. | 1. Costs incurred for materials, supplies, and fabricated parts necessary to carry out a Federal award are allowable.<br><br>2. Purchased materials and supplies must be charged at their actual prices, net of applicable credits. Withdrawals from general stores or stockrooms should be charged at their actual net cost under any recognized method of pricing inventory withdrawals, consistently applied. Incoming transportation charges are a proper part of materials and supplies costs.<br><br>3. Materials and supplies used for the performance of a Federal award may be charged as direct costs. In the specific case of computing devices, charging as direct costs is allowable for devices that are essential and allocable, but not solely dedicated, to the performance of a Federal award.<br><br>4. Where federally-donated or furnished materials are used in performing the Federal award, such materials will be used without charge. |
| Meals | Allowable for subjects and patients under study, or where specifically approved as part of the project activity, provided that such charges are not duplicated in participants' per diem or subsistence allowances, if any.<br><br>When certain meals are an integral and necessary part of a meeting or conference (i.e., a working meal where business is transacted), grant funds may be used for such meals only when consistent with terms of award.<br><br>Recurring business meetings, such as staff meetings, should not be broadly considered as meetings for the primary purpose of disseminating technical information in order to justify charging meals or refreshment costs to grants. |
| Membership, Subscription, and Professional Activity Costs | 1. Costs of the non-Federal entity's membership in business, technical, and professional organizations are allowable as an F&A cost.<br><br>2. Costs of the non-Federal entity's subscriptions to business, professional, and technical periodicals are allowable.<br><br>3. Costs of membership in any civic or community organization are allowable with prior approval by the NIH awarding IC or pass-through entity.<br><br>4. Costs of membership in any country club or social or dining club or organization are unallowable.<br><br>5. Costs of membership in organizations whose primary purpose is lobbying are unallowable. See also Lobbying.<br><br>6. Payment of dues or membership fees for an individual's membership in a professional or technical organization is allowable as a fringe benefit or an employee development cost, if paid according to an established organizational policy consistently applied regardless of the source of funds. |

| Items | Explanation of Allowable Costs |
|---|---|
| Moving | See Recruitment Costs, Relocation Costs, and Transportation Costs in this exhibit. |
| Nursery Items | Allowable for the purchase of items such as toys and games to allow patients to participate in research protocols. |
| Overtime | See Salaries and Wages/Extra Service Pay (Overtime) in this exhibit. |
| Participant Support Costs | Only allowable when identified in specific NOFOs. |
| Pre-Award (Pre-Agreement) Costs | Allowable. A recipient may, at its own risk and without NIH prior approval, incur obligations and expenditures to cover costs up to 90 days before the beginning date of the initial budget period of a new or renewal award if such costs: <br><br> • are necessary to conduct the project, and <br><br> • would be allowable under the grant, if awarded, without NIH prior approval. <br><br> If specific expenditures would otherwise require prior approval, the recipient must obtain NIH approval before incurring the cost. NIH prior approval is required for any costs to be incurred more than 90 days before the beginning date of the initial budget period of a new or competing continuation award. Pre-award costs must be charged to the initial budget period of the award, unless otherwise specified by NIH. <br><br> Recipients may incur pre-award costs before the beginning date of a non-competing continuation award without regard to the time parameters stated above. <br><br> The incurrence of pre-award costs in anticipation of a competing or non-competing award imposes no obligation on NIH either to make the award or to increase the amount of the approved budget if an award is made for less than the amount anticipated and is inadequate to cover the pre-award costs incurred. <br><br> NIH expects the recipient to be fully aware that pre-award costs result in borrowing against future support and that such borrowing must not impair the recipient's ability to accomplish the project objectives in the approved time frame or in any way adversely affect the conduct of the project. <br><br> Pre-Award Costs are generally not applicable to training grants or fellowships. See respective sections for Individual Fellowships and Institutional Training Grants in the Ruth L. Kirschstein National Research Service Award chapter in IIB for additional information. |
| Professional Services Costs | 1. Costs of professional and consultant services rendered by persons who are members of a particular profession or possess a special skill, and who are not officers or employees of the non-Federal entity, are allowable, subject to paragraphs (b) and (c) below when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Federal government. In addition, legal and related services are limited under 2 CFR Part 200.435. |

| Items | Explanation of Allowable Costs |
|---|---|
| | 2. In determining the allowability of costs in a particular case, no single factor or any special combination of factors is necessarily determinative. However, the following factors are relevant: |
| |    a. The nature and scope of the service rendered in relation to the service required. |
| |    b. The necessity of contracting for the service, considering the non-Federal entity's capability in the particular area. |
| |    c. The past pattern of such costs, particularly in the years prior to Federal awards. |
| |    d. The impact of Federal awards on the non-Federal entity's business (i.e., what new problems have arisen). |
| |    e. Whether the proportion of Federal work to the non-Federal entity's total business is such as to influence the non-Federal entity in favor of incurring the cost, particularly where the services rendered are not of a continuing nature and have little relationship to work under Federal awards. |
| |    f. Whether the service can be performed more economically by direct employment rather than contracting. |
| |    g. The qualifications of the individual or concern rendering the service and the customary fees charged, especially on non-federally funded activities. |
| |    h. Adequacy of the contractual agreement for the service (e.g., description of the service, estimate of time required, rate of compensation, and termination provisions). |
| | 3. In addition to the factors in paragraph (b) above, to be allowable, retainer fees must be supported by evidence of bona fide services available or rendered. |
| | Recipients, consortium participants, and contractors under grants are encouraged to obtain written reports from consultants unless such a report is not feasible given the nature of the consultation or would not be useful. Documentation maintained by the receiving organization should include the name of the consulting firm or individual consultant; the nature of the services rendered and their relevance to the grant-supported activities, if not otherwise apparent from the nature of the services; the period of service; the basis for calculating the fee paid (e.g., rate per day or hour worked or rate per unit of service rendered); and the amount paid. This information may be included in the consultant's invoice, in the report, or in another document. See Grants to Federal Institutions and Payments to Federal Employees under Grants chapter in IIB for allowable costs associated with consultant payments to Federal employees and the circumstances of allowability. See Salaries and Wages/Intra-IHE Consulting. |
| Profit or Fee | Except for grants awarded under the SBIR/STTR programs, under an NIH grant, no profit or fee will be provided to a for-profit organization, whether as a recipient or as a consortium participant. A profit or fee under a grant is not a cost, but is an |

**J.A. 518**

| Items | Explanation of Allowable Costs |
|---|---|
| | amount in excess of actual allowable direct and F&A costs. In accordance with normal commercial practice, a profit/fee may be paid to a contractor under an NIH grant providing routine goods or services to the recipient. |
| Proposal Costs | Proposal costs are the costs of preparing bids, proposals, or applications on potential Federal and non-Federal awards or projects, including the development of data necessary to support the non-Federal entity's bids or proposals. Proposal costs of the current accounting period of both successful and unsuccessful bids and proposals normally should be treated as indirect (F&A) costs and allocated currently to all activities of the non-Federal entity. No proposal costs of past accounting periods will be allocable to the current period. |
| Public Relations Costs | See Advertising and Public Relations. |
| Publication and Printing Costs | 1. Publication costs for electronic and print media, including distribution, promotion, and general handling are allowable. If these costs are not identifiable with a particular cost objective, they should be allocated as indirect costs to all benefiting activities of the non-Federal entity.<br><br>2. Page charges for professional journal publications are allowable where:<br><br>  a. The publications report work supported by the Federal government; and<br><br>  b. The charges are levied impartially on all items published by the journal, whether or not under a Federal award. If charged to the award, these costs must be charged to the final budget period of the award, unless otherwise specified by NIH<br><br>  c. The non-Federal entity may charge the Federal award before closeout for the costs of publication or sharing of research results if the costs are not incurred during the period of performance of the Federal award.<br><br>Publications and journal articles produced under an NIH grant-supported project must bear an acknowledgment and disclaimer, as appropriate, as provided in Administrative Requirements—Availability of Research Results: Publications, Intellectual Property Rights, and Sharing Research Resources. |
| Rearrangement and Reconversion Costs | See Alteration and Renovation costs. |

| Items | Explanation of Allowable Costs |
|---|---|
| Recruiting Costs | 1. Subject to paragraphs (2) and (3) of this section, and provided that the size of the staff recruited and maintained is in keeping with workload requirements, costs of "help wanted" advertising, operating costs of an employment office necessary to secure and maintain an adequate staff, costs of operating an aptitude and educational testing program, travel costs of employees while engaged in recruiting personnel, travel costs of applicants for interviews for prospective employment, and relocation costs incurred incident to recruitment of new employees, are allowable to the extent that such costs are incurred pursuant to the non-Federal entity's standard recruitment program. Where the non-Federal entity uses employment agencies, costs not in excess of standard commercial rates for such services are allowable.<br><br>2. Special emoluments, fringe benefits, and salary allowances incurred to attract professional personnel that do not meet the test of reasonableness or do not conform with the established practices of the non-Federal entity, are unallowable.<br><br>3. Where relocation costs incurred incident to recruitment of a new employee have been funded in whole or in part as a direct cost to a Federal award, and the newly hired employee resigns for reasons within the employee's control within 12 months after hire, the non-Federal entity will be required to refund or credit the Federal share of such relocation costs to the Federal government. See also Relocation Costs of Employees.<br><br>4. Short-term, travel visa costs (as opposed to longer-term, immigration visas) are generally allowable expenses that may be proposed as a direct cost. Since short-term visas are issued for a specific period and purpose, they can be clearly identified as directly connected to work performed on a Federal award. For these costs to be directly charged to a Federal award, they must:<br><br>   a. Be critical and necessary to conduct the project;<br><br>   b. Be allowable under the applicable cost principles;<br><br>   c. Be consistent with the non-Federal entity's cost accounting practices and non-Federal entity policy; and<br><br>   d. Meet the definition of "direct cost" as described in the applicable cost principles.<br><br>Project funds may not be used for a prospective trainee's travel costs to or from the recipient organization for the purpose of recruitment. However, other costs incurred in connection with recruitment under training programs, such as advertising, may be allocated to a grant-supported project according to the provisions of the applicable cost principles (also see Travel, Relocation Costs, and Visa Costs in this exhibit). |
| Registration Fees (for Symposiums and Seminars) | Allowable if necessary to accomplish project objectives. |

| Items | Explanation of Allowable Costs |
|---|---|
| Relocation Costs of Employees | Allowable—in other than change of recipient organization situations—when such costs are incurred incidental to a permanent change of duty assignment (for an indefinite period or for a stated period of no less than 12 months) for an existing employee working on a grant-supported project, or when a new employee is recruited for work on the project, provided that the move is for the recipient's benefit rather than the individual's and that payment is made according to established organizational policies consistently applied regardless of the source of funds. Relocation costs may include the cost of transporting the employee and their family, dependents, and household goods to the new location and certain expenses associated with the sale of the former home. If relocation costs have been incurred in connection with the recruitment of a new employee, whether as a direct cost or an F&A cost, and the employee resigns for reasons within their control within 12 months after hire, the recipient must credit the grant account for the full cost of the relocation charged to the grant.

When there is a change in the recipient organization, the personal relocation expenses of the PD/PI and others moving from the original recipient to the new recipient are not allowable charges to NIH grants (see Administrative Requirements—Changes in Project and Budget—Prior Approval Requirements). |
| Rental or Lease of Facilities and Equipment | Allowable subject to the limitations below. Rental costs are allowable to the extent that the rates are reasonable at the time of the decision to lease in light of such factors as rental costs of comparable property, if any; market conditions in the area; the type, life expectancy, condition, and value of the property leased; and available alternatives. Because of the complexity involved in determining the allowable amount under certain types of leases, recipients are encouraged to consult the GMO before entering into leases that will result in direct charges to the grant project.

In general, the rental costs for facilities and equipment applicable to each budget period should be charged to that period. However, see Administrative Requirements—Management Systems and Procedures—Procurement System Standards and Requirements for an exception to this general rule.

Rental costs under leases that create a material equity in the leased property, as defined in 2 CFR Part 200 Subpart E, are allowable only up to the amount that would be allowed had the recipient purchased the property on the date the lease agreement was executed. This would include depreciation or use allowances, maintenance, taxes, and insurance, but would exclude unallowable costs.

When a recipient transfers property to a third party through sale, lease, or otherwise, and then leases the property back from that third party, the lease costs that may be charged to NIH projects generally may not exceed the amount that would be allowed if the recipient continued to own the property.

Rental costs under "less-than-arms-length" leases are allowable only up to the amount that would be allowed under 2 CFR Part 200, Subpart E had title to the property been vested in the recipient. A less-than-arms-length lease is one in which one party to the lease agreement is able to control or substantially influence the actions of the other. Such leases include, but are not limited to, those between divisions of an organization; between organizations under |

| Items | Explanation of Allowable Costs |
|---|---|
| | common control through common officers, directors, or members; and between an organization and its directors, trustees, officers, or key employees (or the families of these individuals), directly or through corporations, trusts, or similar arrangements in which they hold a controlling interest. |
| Research Patient Care | The costs of routine and ancillary services provided by hospitals to individuals, including patients and volunteers, participating in research programs are allowable. Incurrence of patient care costs if not previously approved by NIH and rebudgeting additional funds into, or rebudgeting approved amounts out of, the research patient care costs category may be considered a change in scope and require prior approval by the NIH awarding IC.<br><br>Routine services include the regular room services, minor medical and surgical supplies, and the use of equipment and facilities for which a separate charge is not customarily made. Ancillary services are those special services for which charges customarily are made in addition to routine services, e.g., x-ray, operating room, laboratory, pharmacy, blood bank, and pathology. See the Research Patient Care Costs chapter in IIB for NIH policy concerning reimbursement of these costs.<br><br>The following otherwise allowable costs are not classified as research patient care costs: items of personal expense such as patient travel; consulting physician fees; and any other direct payments to individuals, including inpatients, outpatients, subjects, volunteers, and donors. Such costs should be included in the "Other Expenses" category of the grant budget. |
| Reserve Funds | Contributions to a reserve fund for self-insurance are allowable as specified in the governing cost principles (also see Fringe Benefits/Insurance and Contingency Provisions in this exhibit). |
| Salaries and Wages / *IHEs — Part-time faculty* | Charges for work performed on Federal awards by faculty members having only part-time appointments will be determined at a rate not in excess of that regularly paid for part-time assignments. |
| Salaries and Wages / *IHEs — Periods outside the academic year* | 1. Except as specified for teaching activity in paragraph (2) below, charges for work performed by faculty members on Federal awards during periods not included in the base salary period will be at a rate not in excess of the IBS.<br><br>2. Charges for teaching activities performed by faculty members on Federal awards during periods not included in IBS period will be based on the normal written policy of the IHE governing compensation to faculty members for teaching assignments during such periods. |
| Salaries and Wages / *IHEs — Sabbatical Leave Costs* | Sabbatical leave costs may be included in a fringe benefit rate or in the organization's F&A rate. Salary may be charged directly to a project for services rendered to the project by individuals while they are on sabbatical leave, provided the salary is proportional to the service rendered and is paid according to established organizational policies applicable to all employees regardless of the source of funds. Sabbatical leave paid by an individual's employer, in combination with other compensation (e.g., partial salary from an NIH grant), may not exceed 100 percent of that individual's regular salary from their |

| Items | Explanation of Allowable Costs |
|---|---|
| | organization. |
| Salaries and Wages / *Standards for Documentation of Personnel Expenses* | Salary and wage amounts charged to grant-supported projects for personal services must be based on an adequate payroll distribution system that documents such distribution in accordance with Federal Cost Principles and consistently applied institutional policy and practices. See 2 CFR Part 200.430(i). |
| Salaries and Wages | Allowable. Compensation for personal services covers all amounts, including fringe benefits, paid currently or accrued by the organization for employee services rendered to the grant-supported project. Compensation costs are allowable to the extent that they are reasonable, conform to the established policy of the organization consistently applied regardless of the source of funds, and reasonably reflect the percentage of time actually devoted to the NIH-funded project. Direct salary is exclusive of fringe benefits and F&A costs. This salary guidance does not apply to consultant payments or to contracts for routine goods and services but it does apply to consortium participants (see the Consortium Agreements chapter in IIB). Salaries of federal employees with permanent appointments are unallowable except in certain circumstances (see the Grants to Federal Institutions and Payments to Federal Employees Under Grants chapter in IIB). |
| Salaries and Wages / *Extra Service Pay (Overtime)* | Extra Service Pay normally represents overload compensation, subject to institutional compensation policies for services above and beyond IBS. Where extra service pay is a result of Intra-IHE consulting, it is subject to the reasonableness standards for Salaries and Wages above. It is allowable if all of the following conditions are met: |
| | 1. The non-Federal entity establishes consistent written policies which apply uniformly to all faculty members, not just those working on Federal awards. |
| | 2. The non-Federal entity establishes a consistent written definition of work covered by IBS which is specific enough to determine conclusively when work beyond that level has occurred. This may be described in appointment letters or other documentations. |
| | 3. The supplementation amount paid is commensurate with the IBS rate of pay and the amount of additional work performed. |
| | 4. The salaries, as supplemented, fall within the salary structure and pay ranges established by and documented in writing or otherwise applicable to the non-Federal entity. |
| | 5. The total salaries charged to Federal awards including extra service pay are subject to the Standards of Documentation as described in Salaries and Wages/IHEs. |
| Salaries and Wages / *Institutions of higher education (IHEs)* | Certain conditions require special consideration and possible limitations in determining allowable personnel compensation costs under Federal awards. Allowable activities: Charges to Federal awards may include reasonable amounts for activities contributing and directly related to work under an agreement, such as delivering special lectures about specific aspects of the |

| Items | Explanation of Allowable Costs |
|---|---|
| | ongoing activity, writing reports and articles, developing and maintaining protocols (human, animals, etc.), managing substances/chemicals, managing and securing project-specific data, coordinating research subjects, participating in appropriate seminars, consulting with colleagues and graduate students, and attending meetings and conferences. |
| Salaries and Wages / _Intra-IHE Consulting_ | Intra-IHE consulting by faculty is assumed to be undertaken as an IHE obligation requiring no compensation in addition to IBS. However, in unusual cases where consultation is across departmental lines or involves a separate or remote operation, and the work performed by the faculty member is in addition to their regular responsibilities, any charges for such work representing additional compensation above IBS are allowable provided that such consulting arrangements are specifically provided for in the Federal award or approved in writing by the NIH awarding IC.

Recipients, consortium participants, and contractors under grants that want to be able to charge employee consulting costs to grant-supported projects must establish written guidelines permitting such payments regardless of the source of funding and indicating the conditions under which the payment of consulting fees to employees is proper. Under no circumstances may an individual be paid as a consultant and an employee under the same NIH grant.

Authorization for consulting fees paid to individuals serving as both employees and consultants of the same party must be documented in writing, on a case-by-case basis, by the head of the organization (or their designee) incurring the costs – i.e., the recipient organization, consortium participant, or contractor. If the designee is personally involved in the project, the authorization may be given only by the head of the recipient organization, consortium participant, or contractor. This authorization must include a determination that the required conditions are present and that there is no apparent or actual conflict of interest. |
| Salaries and Wages / _Nonprofit Organizations_ | For compensation to members of nonprofit organizations, trustees, directors, associates, officers, or the immediate families thereof, determination should be made that such compensation is reasonable for the actual personal services rendered rather than a distribution of earnings in excess of costs. This may include director's and executive committee member's fees, incentive awards, allowances for off-site pay, incentive pay, location allowances, hardship pay, and cost-of-living differentials. |
| _Salaries and Wages / Professional Activities outside of the Non-Federal Entity_ | Unless an arrangement is specifically authorized by an NIH awarding IC, a non-Federal entity must follow its written non-Federal entity-wide policies and practices concerning the permissible extent of professional services that can be provided outside the non-Federal entity for non-organizational compensation. Where such non-Federal entity-wide written policies do not exist or do not adequately define the permissible extent of consulting or other non-organizational activities undertaken for extra outside pay, the Federal government may require that the effort of professional staff working on Federal awards be allocated between:

1.  Non-Federal entity activities, and |

| Items | Explanation of Allowable Costs |
|---|---|
| | 2. Non-organizational professional activities. If the NIH awarding IC considers the extent of non-organizational professional effort excessive or inconsistent with the conflicts-of-interest terms and conditions of the Federal award, appropriate arrangements governing compensation will be negotiated on a case-by-case basis. |
| Salaries and Wages / *Special Considerations* | Special considerations in determining allowability of compensation will be given to any change in a non-Federal entity's compensation policy resulting in a substantial increase in its employees' level of compensation (particularly when the change was concurrent with an increase in the ratio of Federal awards to other activities) or any change in the treatment of allowability of specific types of compensation due to changes in Federal policy. |
| Salaries and Wages / *Unallowable Costs* | 1. Costs which are unallowable under other sections of these principles must not be allowable under this section solely on the basis that they constitute personnel compensation.<br><br>2. The allowable compensation for certain employees is subject to a ceiling in accordance with statute. For the amount of the ceiling for cost reimbursement contracts, the covered compensation subject to the ceiling, the covered employees, and other relevant provisions, see 10 U.S.C. 2324(e)(1)(P), and 41 U.S.C. 1127 and 4304(a)(16). For other types of Federal awards, other statutory ceilings may apply. |
| Salaries and Wages /*Incentive Compensation* | Incentive compensation to employees based on cost reduction, or efficient performance, suggestion awards, safety awards, etc., is allowable to the extent that the overall compensation is determined to be reasonable and such costs are paid or accrued pursuant to an agreement entered into in good faith between the non-Federal entity and the employees before the services were rendered, or pursuant to an established plan followed by the non-Federal entity so consistently as to imply, in effect, an agreement to make such payment. |
| Salaries and Wages /*Overtime Premiums* | Premiums for overtime generally are allowable; however, such payments are not allowable for faculty members at institutions of higher education. If overtime premiums are allowable, the categories or classifications of employees eligible to receive overtime premiums should be determined according to the formally established policies of the organization consistently applied regardless of the source of funds. |
| Salaries and Wages /*Payments for Dual Appointments* | For investigators receiving compensation from the institution (recipient/contractor) and separately organized clinical practice plans, compensation from such sources may be included in the institutional base salary (IBS) budgeted and charged to NIH sponsored agreements if all of the following criteria are met:<br><br>• Clinical practice compensation must be set by the institution. *<br><br>• Clinical practice activity must be shown on the institution's payroll or salary appointment forms and records approved by the institution.<br><br>• Clinical practice compensation must be paid through or at the direction of the institution. |

| Items | Explanation of Allowable Costs |
|---|---|
| | • Clinical practice activity must be included and accounted for in the institution's effort reporting and/or payroll distribution system.<br><br>• The institution must assure that all financial reports and supporting documents associated with the combined IBS and resulting charges to NIH grants are retained and made available to Federal officials or their duly authorized representatives consistent with the requirements of 2 CFR Part 200.430.<br><br>* "Set by the institution" means the recipient/contractor institution must be in a position to document and certify that the specified amount of clinical practice compensation is being paid in essentially the same manner as other specified amounts of the committed IBS (compensation) of the investigator. Further, this requires that the IBS not vary based on the specific clinical services provided by investigator within the periods for which total IBS is certified by the recipient institution. |
| Salaries and Wages /*Support from Multiple Grants* | See [Cost Considerations—Allocation of Costs and Closely Related Work](#). |
| Selling and Marketing Costs | Costs of selling and marketing any products or services of the non-Federal entity (unless allowed under 2 CFR Part 200.421) are generally not allowable, except as direct costs, with prior approval by the NIH awarding IC when necessary for the performance of the Federal award. |
| Service Charge | Allowable. The costs to a user of organizational services and central facilities owned by the recipient organization, such as central laboratory, technology infrastructure fees, computer services and next generation computing/communication costs, are allowable provided that they are not covered by F&A costs. They must be based on organizational fee schedules consistently applied regardless of the source of funds. |
| Specialized Service Facilities | 1. The costs of services provided by highly complex or specialized facilities operated by the non-Federal entity, such as computing facilities, wind tunnels, and reactors are allowable, provided the charges for the services meet the conditions of either paragraphs (b) or (c) of this section, and, in addition, take into account any items of income or Federal financing that qualify as applicable credits under 2 CFR Part 200.406.<br><br>2. The costs of such services, when material, must be charged directly to applicable awards based on actual usage of the services on the basis of a schedule of rates or established methodology that:<br><br>    a. Does not discriminate between activities under Federal awards and other activities of the non-Federal entity, including usage by the non- Federal entity for internal purposes, and |

| Items | Explanation of Allowable Costs |
|---|---|
| | b. Is designed to recover only the aggregate costs of the services. The costs of each service must consist normally of both its direct costs and its allocable share of all indirect (F&A) costs. Rates must be adjusted at least biennially, and must take into consideration over/under applied costs of the previous period(s). <br><br> c. Where the costs incurred for a service are not material, they may be allocated as indirect (F&A) costs. <br><br> d. Under some extraordinary circumstances, where it is in the best interest of the Federal government and the non-Federal entity to establish alternative costing arrangements, such arrangements may be worked out with the Federal cognizant agency for indirect costs. |
| Stipends | Allowable as cost-of-living allowances for trainees and fellows only under Kirschstein-NRSA individual fellowships and institutional research training grants. These payments are made according to a preestablished schedule based on the individual's experience and level of training. A stipend is not a fee-for-service payment and is not subject to the cost accounting requirements of the cost principles. Additional information, including NIH policy on stipend supplementation, is included in Ruth L. Kirschstein National Research Service Awards—Individual Fellowships—Supplementation of Stipends, Compensation, and Other Income—Stipend Supplementation and Ruth L. Kirschstein National Research Service Awards—Institutional Research Training Grants—Stipend Supplementation, Compensation, and Other Income—Stipend Supplementation in IIB. Stipends are not allowable under research grants even when they appear to benefit the research project. See Fringe Benefits / IHE Tuition/Tuition Remission in this exhibit. |
| Subject Costs | See Research Patient Care and Donor Costs in this exhibit. |
| Taxes | For nonprofit organizations and IHEs: <br><br> 1. In general, taxes which the non-Federal entity is required to pay and which are paid or accrued in accordance with GAAP, and payments made to local governments in lieu of taxes which are commensurate with the local government services received are allowable, except for: <br><br> a. Taxes from which exemptions are available to the non-Federal entity directly or which are available to the non-Federal entity based on an exemption afforded the Federal government and, in the latter case, when the NIH awarding IC makes available the necessary exemption certificates, <br><br> b. Special assessments on land which represent capital improvements, and <br><br> c. Federal income taxes. |

| Items | Explanation of Allowable Costs |
|---|---|
|  | 2. Any refund of taxes, and any payment to the non-Federal entity of interest thereon, which were allowed as Federal award costs, will be credited either as a cost reduction or cash refund, as appropriate, to the Federal government. However, any interest actually paid or credited to a non-Federal entity incident to a refund of tax, interest, and penalty will be paid or credited to the Federal government only to the extent that such interest accrued over the period during which the non-Federal entity has been reimbursed by the Federal government for the taxes, interest, and penalties. |
| Termination or Suspension Costs | Unallowable except as follows. If a grant is terminated or suspended, the recipient may not incur new obligations after the effective date of the termination or suspension and must cancel as many outstanding obligations as possible (see Administrative Requirements—Enforcement Actions—Suspension, Termination, and Withholding of Support). NIH will allow full credit to the recipient for the Federal share of otherwise allowable costs if the obligations were properly incurred by the recipient before suspension or termination—and not in anticipation of it—and, in the case of termination, are not cancelable. The GMO may authorize other costs in, or subsequent to, the notice of termination or suspension. |
| Trailers and Modular Units | Allowable only if considered equipment as provided below. A "trailer" is defined as a portable vehicle built on a chassis that is designed to be hauled from one site to another by a separate means of propulsion and that serves, wherever parked, as a dwelling or place of business. A "modular unit" is a prefabricated portable unit designed to be moved to a site and assembled on a foundation to serve as a dwelling or a place of business. The determination of whether costs to acquire trailers or modular units are allowable charges to NIH grant-supported projects depends on whether such units are classified as real property or equipment. The classification will depend on whether the recipient's intended use of the property is permanent or temporary.

A trailer or modular unit is considered real property when the unit and its installation are designed or planned to be installed permanently at a given location so as to seem fixed to the land as a permanent structure or appurtenance thereto. Units classified as real property may not be charged to an NIH grant-supported project unless authorizing legislation permits construction or acquisition of real property and the specific purchase is approved by the NIH awarding IC.

A trailer or modular unit is considered equipment when the unit and its installation are designed or planned to be used at any given location for a limited time only. Units classified as equipment may be charged to NIH grant-supported projects only if the terms and conditions of the award do not prohibit the purchase of equipment and NIH prior approval is obtained, as appropriate.

A trailer or modular unit properly classified as real property or as equipment at the time of acquisition retains that classification for the life of the item, thereby determining the appropriate accountability requirements under 2 CFR Part 200.439 or 200.465, as applicable. |

| Items | Explanation of Allowable Costs |
|-------|-------------------------------|
| Trainee Costs | Allowable only under predocoral and postdoctoral training grants. (See Ruth L. Kirschstein National Research Service Awards—Institutional Research Training Grants—Allowable and Unallowable Costs in IIB for detailed information). |
| Transportation Costs | Costs incurred for freight, express, cartage, postage, and other transportation services relating either to goods purchased, in process, or delivered, are allowable. When such costs can readily be identified with the items involved, they may be charged directly as transportation costs or added to the cost of such items. Where identification with the materials received cannot readily be made, inbound transportation cost may be charged to the appropriate indirect (F&A) cost accounts if the non-Federal entity follows a consistent, equitable procedure in this respect. Outbound freight, if reimbursable under the terms and conditions of the Federal award, should be treated as a direct cost. |
| Travel | Allowable as a direct cost where such travel will provide direct benefit to the project. |
| Travel/*Employees* | Consistent with the organization's established travel policy, these costs for employees working on the grant-supported project may include associated per diem or subsistence allowances and other travel-related expenses, such as mileage allowances if travel is by personal automobile.

Domestic travel is travel performed within the recipient's own country. For U.S. and Canadian recipients, it includes travel within and between any of the 50 States of the United States and its possessions and territories and also travel between the United States and Canada and within Canada.

Foreign travel is defined as any travel outside of Canada and the United States and its territories and possessions. However, for an organization located outside Canada and the United States and its territories and possessions, foreign travel means travel outside that country.

In all cases, travel costs are limited to those allowed by formally established organizational policy and, in the case of air travel, the lowest reasonable commercial airfares must be used. For-profit recipients' allowable travel costs may not exceed those established by the FTR, issued by GSA, including the maximum per diem and subsistence rates prescribed in those regulations. This information is available at http://www.gsa.gov. If a recipient organization has no established travel policy, those regulations will be used to determine the amount that may be charged for travel costs.

Recipients are strongly encouraged to take advantage of discount fares for airline travel through advance purchase of tickets if travel schedules can be planned in advance (such as for national meetings and other scheduled events).

Recipients must comply with the requirements of the Fly America Act (49 U.S.C. 40118) which generally provides that foreign air travel funded by Federal funds may only be conducted on U.S. flag air carriers and under applicable Open Skies Agreements. For additional information regarding the Fly America Act and its exceptions, see Public Policy Requirements and Objectives—Fly America Act.

Applicants and recipients should consult application instructions to determine how to budget for travel costs under specific mechanisms and for certain types of |

| Items | Explanation of Allowable Costs |
|---|---|
| | travelers, because they are not all required to be budgeted as travel (e.g., research subjects). |
| Travel/*Research Patients* | If research patient care is an approved activity of the grant-supported project, the costs of transporting individuals participating in the research protocol to the site where services are being provided, including costs of public transportation, are allowable. The purchase of motor vehicles for this purpose also may be allowable. (See also Research Patient Care in this exhibit). |
| Value Added Tax (VAT) | Foreign taxes charged for the purchase of goods or services that a non-Federal entity is legally required to pay in country is an allowable expense under Federal awards. Foreign tax refunds or applicable credits under Federal awards refer to receipts, or reduction of expenditures, which operate to offset or reduce expense items that are allocable to Federal awards as direct or indirect costs. To the extent that such credits accrued or received by the non-Federal entity relate to allowable cost, these costs must be credited to the NIH awarding IC either as costs or cash refunds. If the costs are credited back to the Federal award, the non-Federal entity may reduce the Federal share of costs by the amount of the foreign tax reimbursement, or where Federal award has not expired, use the foreign government tax refund for approved activities under the Federal award with prior approval of the NIH awarding IC. For many countries an exemption of this tax for research exists. Consequently, requesting this cost should be unallowable for research grants involving such countries as a performance site. |
| Visa Costs (including short-term travel visa costs) | Generally, allowable direct cost as part of recruiting costs on an NIH grant, as long as the institution has an employee/employer relationship with the individual. Visa costs may also be allowable when identified in specific NOFOs or when within the scope of an approved research project.

Visa renewal costs for employees is not a recruiting cost and would not be an allowable charge to a grant. Expedited processing fees are generally unallowable unless and until they become part of standard processing fees. Fraud prevention and detection fees are allowable if they are required fees. Department of Homeland Security SEVIS Form I-901 is a required fee and is allowable. See also Recruiting Costs in this exhibit. |

# EXHIBIT 45

BILL & MELINDA
GATES *foundation*

# Indirect Cost Policy

<div align="right">Effective  2/1/2017</div>

## Indirect Cost Guidance

### Philosophy

The Bill & Melinda Gates Foundation tackles critical problems primarily affecting the world's poor and disadvantaged, and supports strong and effective partner organizations to do the same. We believe that good stewardship means maximizing our resources, including grant funding and staff time, while building strong partnerships based on trust.

We aim to structure grants in a way that makes sense from a financial perspective while also funding partners for the cost of delivering results efficiently, supported by open and honest dialogue about the resources required. As grant proposals are developed, we try to gain a complete and accurate understanding of the total cost to execute the project efficiently and effectively. However, there may be circumstances when our views of direct and indirect costs may not align with those of our partners, including other funders.

Our expectation is that grantees' executive and board leadership are continually evaluating how to "right size" their organizations' overhead cost to operate efficiently and effectively.

We welcome partners to contact the foundation if they have questions about this policy. Our finance team can help clarify appropriate treatment of costs under the foundation's policy.

### Definitions

The spirit of this policy is to pay for expenses that are directly attributable to project outcomes and outputs as direct costs and expenses associated with general running of the business as indirect costs. Greater specificity on each category is described below.

**Direct Costs**
Direct costs are the expenses required to execute a grant that are directly attributable and can be reasonably allocated to the project. Program staff salaries, travel expenses, materials, and consultants required to execute the grant are examples. Costs that would not be incurred if the grant did not exist are often indicative of direct costs.

**Indirect Costs**
Indirect costs are general overhead and administration expenses that support the entire operations of a grantee and that may be shared across projects. Examples include facilities expenses, e.g. rent, utilities, equipment for the grantee's headquarters, and associated information systems and support and administrative staff such as HR, general finance, accounting, IT, and legal. Additional examples and detail are included in Annex A. Expenses that would be incurred regardless of whether the grant is funded are often indicative of indirect costs. While these costs may not be directly attributable to a project, they are real and necessary to operate as an organization.

**Indirect Cost Rate**
Indirect Cost Rate = Budgeted Indirect costs/ Budgeted Total Direct Costs (e.g. personnel, sub-awards, supplies, equipment, etc.)



<div align="center">J.A. 533</div>

The indirect cost rate proposed in the budget should not exceed the grantee's organizational rate (when defined by the same terms.)

While the definitions above are general guidance for all grants, the requirements and activities of each project should be considered when determining direct and indirect costs. We review budget assumptions and cost categorizations on a grant by grant basis, and treatment of specific costs in one grant should not be considered precedent-setting for other grants.

## Maximum Indirect Cost Rates

Indirect cost rates for grants are subject to the following limitations:

| **0% rate**<br>Government Agencies,<br>Other private foundations | **Up to 10% rate**<br>U.S. Universities,<br>U.S. community<br>colleges | **Up to 15% rate**<br>Non-governmental<br>organizations (NGOs),<br>Multilateral Organizations,<br>Non-U.S. universities<br>For-profit organizations |
| --- | --- | --- |

- The rates provided above are the *maximum* rates allowed under the foundation's policy. A grantee or contractor with an actual indirect cost rate lower than the maximum rate provided above should *not* increase the funding request to the maximum allowed. The intent is to sufficiently fund actual costs, not to generate financial surpluses for grantees.
- The indirect cost rate awarded in a grant budget may vary up to the maximum percentages depending on factors including, but not limited to, the type of project, level of administrative effort required, cost structure of the grantee, overall grant size, and extent of sub-awards or commodity purchases.
  - *Example 1:* A primary grantee will receive grant funds that will be largely sub-granted to other organizations. The foundation may limit indirect costs the primary grantee receives on the sub-granted funds depending on the level of effort required to manage the sub-awards. The overall effective indirect cost rate awarded to the primary grantee may therefore be less than the maximum allowable rate.
  - *Example 2:* A material portion of a project budget is allocated for commodity purchases. A lower overall effective indirect cost rate may be negotiated to remove commodity cost from the indirect cost calculation.
  - *Example 3:* A NGO grantee has an organizational actual indirect cost rate of 8%, i.e., for every $1,000 in direct costs, it has $80 in indirect costs. Rather than defaulting to the maximum rate of 15% in the grant proposal, 8% should be proposed in the grant budget.
- Maximum Indirect Cost Rates and limitations apply to *both* the primary applicant organization and any sub-grantees. Each respective organization may receive indirect costs UP TO the rate applicable to their organization type.
  - *Example:* If a U.S. university is the primary grantee and has an international nonprofit organization sub-grantee, the U.S. university is eligible to receive up to a 10% indirect cost rate, while the international organization is eligible to receive up to a 15% rate.



For external use | IDC Policy and Guidance | February 2017

- We seek consistency across funding mechanisms and thus we reserve the right to apply this philosophy and principles to contracts.
- For profit entities may propose indirect costs as a percentage from 0% up to 15% to the extent that adequate explanation of the cost is provided.
- We reserve the right to request substantiation of any grantee's indirect cost rate.



**J.A. 535**

| For external use | IDC Policy and Guidance | February 2017 |

**APPENDIX A:**

The following is a list of common direct and indirect costs. We recognize that there are categories of cost that can be considered either direct or indirect depending on grantee accounting practices and the nature of the cost relative to the project purpose.

It is the responsibility of grantees to submit proposal materials that allow us to understand the link between project outcomes and *direct* costs. We also expect that grant proposals speak to what is covered by the requested *indirect* cost rate.

**EXAMPLES OF COMMON DIRECT AND INDIRECT COSTS**

| | **DIRECT COSTS:** The following may be included as direct costs if ***DIRECTLY ATTRIBUTABLE and REASONABLY ALLOCABLE*** to and specifically required to execute the project | **INDIRECT COSTS:** The following may be included as indirect costs if ***REASONABLY ALLOCABLE*** the project and not included as a direct cost |
|---|---|---|
| **Personnel** | • Salaries and wages of employees working directly on the project. <br> • Fringe benefits of employees <br> These costs should be substantiated by time keeping and/or an allocation methodology, and can include directly attributable and allocable project management and support, project legal or accounting functions (substantiated by timekeeping) | • Personnel cost of general management and administrative support personnel, such as executive management (CEO, COO, CFO, etc.) or central operational functions (Accounting, HR, IT, Legal, etc.) |
| **Travel** | • Travel expenses for trips directly needed to deliver the project | • Travel not directly related to the project |
| **Consultants** | • Contracted staff working directly on the project | • Contracted staff for general administrative functions, such as accounting or audits |
| **Equipment** | • Costs for equipment directly used by the project (can include purchase/replacement, operation, maintenance; to be pro-rated in case of partial use) | • Costs for equipment or depreciation on equipment[1] incurred by central operational functions |
| **Other Direct Costs** | • Allocable facilities, utilities and communications expenses that are required to execute the project, such as field clinics, laboratories, project office costs <br> • Project-specific supplies | • Costs for facilities, utilities and communications associated with central operational functions such as university headquarters, U.S. office of an international NGO, back office of a biotech firm |
| **Sub-awards** | • Grants or contracts with other organizations that directly contribute to the project outcomes | • Outsourced general operating activities, such as accounting, audits, IT support |

[1]If depreciation is included in the indirect cost pool, the acquisition cost used for computing depreciation must exclude any portion of the cost donated by the foundation or another funder.



## APPENDIX B: Frequently Asked Questions (FAQs)

- **Question: What has changed in the 2017 policy update? The rates still look the same.**
  *Answer:* While the maximum indirect cost rate percentages have not changed, we have adjusted the costs that can be considered direct to better reflect the cost of achieving project outcomes, specifically in the areas of facilities and project support.

- **Question: When will these changes take effect?**
  *Answer:*  The IDC policy will take effect on February 1, 2017 and all new grants made from that date forward will be affected by the new policy.

- **Question: Why doesn't the foundation match my institution's Negotiated Indirect Cost Rate Agreement (NICRA) rate with the U.S. government or other funding organizations?**
  *Answer:* The foundation's position is that whenever possible,  specifically allocable costs should be identified as direct costs, including those for dedicated ongoing project management and support. Please see Appendix A for examples of direct and indirect costs. Please note that  our categorization differs from the U.S. government's instructions to treat project management and support  expenses as indirect costs. The foundation funds these costs as direct costs onto which is added up to 15% for indirect costs which are not directly attributable to the project.

- **Question: Why are headquarters facilities typically not classified as direct costs?**
  *Answer:* Headquarters rent and other centralized facilities costs are part of doing business for an organization and therefore are not  specifically attributable to a project or activity. These facility expenses of the organization should be  categorized as indirect costs. In some cases, we are willing to cover the facility expenses associated with directly attributable personnel that sit in the same headquarters facility but directly support the project funded by the foundation's grant. Facility expenses more than this allocation are considered indirect and are subject to the indirect rate limitations of the primary grantee noted in the Indirect Cost Policy

- **Question: How does the calculation of indirect costs work for the primary grantee and the sub-grantee?**
  *Answer:* The primary grantee receives indirect cost allowances on the total budget which includes its direct internal costs and sub-granted or sub-contracted costs. The 'sub-granted' or 'sub-contracted' funds would also include direct  costs and indirect costs to that respective institution. The calculation may look as follows:
  **Grant to University ABC:**
  - ABC direct internal costs (personnel, supplies, travel, etc.)          -> 5.85M
  - Sub-granted costs to non-profit organization XYZ                  ->$1.15M
    - Includes direct sub-grantee costs - $1.0M
    - Includes indirect cost allowance to sub-grantee (15%) - $150k

  - Total direct costs to non-profit organization ABC               -> $7.0M



> ➤ Indirect cost allowance to primary grantee (10%)     -> $700k
> ➤ **Total grant award**     **-> $7.7M**

- **Question: Why are indirect costs not provided to other foundations and government agencies?**

  ***Answer:*** As a foundation based in the U.S., we generally must ensure that our funds are used for charitable purposes. When the foundation makes a grant or enters into a contract with a U.S. public charity, the organization's status as a charity by the U.S. government is based on an assessment of the organization's mission and activities to confirm the funds will be used for charitable purposes.

  Government entities are typically funded by the citizens of the country for various agencies (e.g. Ministry of Health, Finance, Agriculture, etc.) Government entities are benefiting the communities of which the citizens are a part. Therefore, our policy is to fund the program-specific costs related to our project or activity, but the administrative and general operations costs of the government agency should be funded by the respective country's budgetary funding. Similar logic applies to private foundations.

- **Question: Why do U.S. universities receive a lower rate than international universities?**

  ***Answer:*** The foundation has an important relationship with university grantees to perform valuable work projects, including but not limited to discovery research, vaccine development, and clinical trials. The foundation's policy considers that U.S. universities should request a limited amount of indirect costs from private funders. In the U.S., indirect costs recoveries are negotiated with federal funding agencies because most U.S. funded research is performed on university campuses. Therefore, the foundation's policy is to provide a rate of up to 10% to U.S. universities to allow for additional administrative and overhead costs of the institution to be funded by other sources.

- **Question: How do I determine if a cost is direct or indirect if it is not clear?**

  ***Answer:*** The key differentiating factor should be whether the cost is required and allocable to the project to meet its objectives. Here are several examples to help illustrate the distinction:
  - An audit function could be considered indirect if it is organizational internal audit performing routine activities. However, if extra due diligence is required for new sub-awards on a particular project, the audit function to carry that out may be considered direct.
  - An organization can have accountants that manage the central organizational costs and some that are assigned exclusively or on a percentage basis to specific projects. In this case, the former would be considered indirect and the latter direct.
  - A local NGO has a headquarters in the capital city which also houses project-specific staff for work done in that region. In this case, the portion of the office that houses the headquarters functions would be considered indirect and the space dedicated to specific projects could be considered direct if incrementally needed to achieve project objectives.



# EXHIBIT 46

**RWJF** Grantee Resources

# Indirect Cost Rate Policy

.

# Indirect Cost Rates

Indirect costs are general overhead and administrative expenses that support the entire operations of a grantee. While they might not be directly attributable to a project or program, these are real and necessary costs to operate as an organization.

The rates below are the indirect cost rates allowed under this policy and may be applied to the direct costs of the project or program the Foundation is supporting.

| Indirect Cost Rate | Grantee Organization Type |
|---|---|
| 15% | U.S. colleges/universities and hospital or health systems [see footnote[1]] |
| 30% | Nonprofit organizations [see footnote[2]] |
| 0% | For-profit organizations and government entities [see footnote[3]] |

If consultants/contractors costs (i.e., sub-contracts or sub-grants[4]) constitute more than one-third of the total direct costs of the project or program, the allowable indirect cost rate on those third-party costs is limited to 5 percent. See FAQ #6.

*Note that this policy does not require grantees to substantiate their indirect cost rate. Grantees may simply charge the flat rate that applies to their organization type (i.e., 15% or 30%) even if their actual rate is lower.*

**J.A. 540**

# Definitions

The spirit of this policy is to consider direct costs to be expenses that are directly attributable to project or program outcomes and deliverables, shared costs to be expenses that can be allocated across projects or programs, and indirect costs to be expenses associated with the general running of the applicant organization. Greater specificity on each category is provided below.

### Direct Costs

Direct costs are expenses directly incurred for the specific project or program being funded. Examples include salaries and benefits for staff assigned to work on the project or program, travel expenses, materials, and consultants/contractors required to execute the funded project. They are expenses that would not be incurred if the project or program did not exist.

### Shared costs

Shared costs benefit multiple programs or projects and can be assigned or allocated across programs or projects in a reasonably consistent and accurate way. These costs are just as integral to the delivery of the project or program as direct costs and should be included as part of direct costs in the project budget. Examples of such costs include the cost of project space[5] occupied by the program or project staff (occupancy, utilities, telephone/internet access), the actual costs of additional space needed for the project or program, computing services for project or program staff, grants management or administrative staff, and other administrative costs that are incrementally incurred to directly support the project or program. To support the designation and inclusion of shared costs, the grantee should be able to demonstrate a reasonable allocation method applied consistently across all of its projects and programs.

### Indirect Costs

Indirect costs are general overhead and administration expenses that support the entire operations of a grantee. While these costs may not be directly attributable to a project or program, they are real and necessary to operate as an organization. Examples are administrative costs such as human resources, finance, accounting, information technology, and legal, including salaries, benefits, and facilities expenses (e.g., rent, utilities, supplies, and equipment).

For purposes of this policy, the indirect costs proposed in the grant budget is calculated as the sum of the budget for personnel, other directs costs, and consultants/contractors (i.e., direct costs) times the Foundation's indirect cost rate for the grantee's organization type (i.e., 0%, 15%, or 30%). Our indirect cost rate is inclusive of the total grant amount. See FAQ #6 below and Attachment 2.

# FAQs

**1.  When will this policy take effect?**
The policy applies to new grant proposals submitted to the Foundation on or after January 1, 2024. For proposals submitted in response to a competitive solicitation, you should use the indirect cost rate guidance contained in the call or request for proposal (CFP/RFP) and related application materials.

You may adjust the indirect cost rate on any active awards or for proposals submitted prior to January 1, 2024, provided doing so does not increase the total grant amount or impact your ability to complete the project or program. This would be accomplished by sending an email to your program officer (PO) and program financial analyst (PFA) informing them of this reallocation to include 1) where the funds will come from to cover the additional indirect costs; 2) confirm that this will not increase the total grant amount; and 3) confirm that it will not impact the ability to complete the project or program.

If an adjustment is requested for a pending proposal, contact your program officer or program financial analyst to discuss next steps.

## 2. Are sub-grants or contracts within a grant eligible to take indirect costs as part of their sub-grant or sub-contract budget?

The maximum indirect cost rates apply to both the primary applicant organization and any sub-grantee or sub-contractor costs up to the rate applicable to their organization type. For example: if a U.S. university is the primary grantee and has a U.S.-based nonprofit organization as a sub-grantee, the U.S. university is eligible to receive a 15 percent indirect cost rate, while the U.S.-based nonprofit organization is eligible to receive a 30 percent rate. Similarly, if a U.S. nonprofit organization is the primary grantee and a for-profit organization is a subcontractor, the U.S. nonprofit organization may receive a 30 percent indirect cost rate, while the for-profit subcontractor may not apply indirect costs (0%). See related FAQ #6 for additional information.

## 3. What rate applies to fiscal sponsors of a program or project?

If the grantee is a fiscal sponsor of a project or program, the grant budget should include the fiscal sponsor fee outlined in the fiscal sponsorship agreement that is between the fiscal sponsor and sponsored program or project as part of indirect costs. To the extent that the sponsored project or program incurs indirect costs above what is covered by the fiscal sponsor fee, the grant may include indirect costs up to the indirect cost rate for the organization type. The sum of the fiscal sponsor and additional indirect costs (if any) cannot exceed the indirect rate for the organization type. The indirect cost rate should not be applied to the fiscal sponsor fee.

## 4. Will the Foundation match my institution's Negotiated Indirect Cost Rate Agreement (NICRA) rate with the U.S. government or other funding organizations?

As a private foundation, we are not obligated to match the overhead rate a grantee may have negotiated with the federal government.

## 5. Why do colleges/universities and hospital and health systems receive a lower rate than other nonprofits?

Because colleges/universities and hospital and health systems receive income from other sources, the Foundation applies a lower

**J.A. 543**

indirect cost rate to these organizations. We recognize that this may not be the case for all such institutions and would like to learn from you. Please contact your RWJF program officer or program financial analyst with concerns, information, or suggestions.

## 6.   Why does the Foundation reduce the indirect cost rate to 5 percent on third-party consulting, granting, and contracting costs if they represent more than one-third of the direct costs of the project?

Sub-grantees and contractors may apply the maximum indirect cost rate applicable to their organization type in their project budget. The Foundation believes a 5 percent rate will cover the grantees' administrative costs of managing sub-grants and consultants or contracts. If this is not the case for your award, we would like to hear from you. Please contact your RWJF program officer or program financial analyst with concerns, information, or suggestions.

## 7.   How should shared costs be calculated and where should they be included in the grant budget?

Shared costs should be included in the grant budget under the direct costs category.  The costs of shared resources should be allocated across activities based on an estimate of the utilization of resources by the project or program. Often, shared costs are allocated based on staff level of effort (measured by full-time equivalents). For project space, costs typically are allocated based on the amount of space project or program staff occupy (measured by square-footage). To support the designation and inclusion of shared costs, the grantee should be able to demonstrate a reasonable allocation method that is applied consistently across programs.

## 8.  I don't know the indirect cost rate for my organization. How can I calculate it?

As part of the work of the Funders for Real Cost, Real Change Collaborative, BDO-FMA developed a set of resources that can guide U.S.-based grantees to calculate their IDC rates. Additional resources and tools about indirect costs are available on the FRC website.

**J.A. 544**

## Attachment 1: Categorization of Typical Costs

| Cost Category | Direct Cost | Indirect Cost | Notes |
|---|---|---|---|
| Personnel (salary, benefits) of staff working directly on the project or program | X | | |
| Personnel (salary, benefits) of management and administrative staff (e.g., CEO, CFO, ED, accounting, HR, IT, development/fundraising) | | X | |
| Consultants/contractors working directly on the project | X | | |
| Consultant/contractors supporting the overall organization (e.g., legal, audit, HR, IT, fundraising) | | X | |
| Sub-grants [4] | X | | |
| Project space and related costs (utilities, phone, internet) incurred for staff working directly on the project or program | | X | |
| Project space and related costs (utilities, phone, internet) incurred for management and administrative staff | | X | |
| Project supplies or materials | X | | |
| Insurance, bank fees, interest expense | | X | |

| Staff training and professional development | | X | If project staff members require project-specific training, those costs may be considered direct costs. |
|---|---|---|---|
| Fiscal sponsor fees | | X | Projects or programs that are fiscally sponsored should cover the fiscal sponsor fee from the indirect cost portion of the grant. If the indirect cost rate of the sponsored project or program exceeds the sponsorship fee, the grant may include additional indirect costs up to the maximum indirect cost rate. Both the fiscal sponsor fee and indirect costs percentages should be described in the grant budget narrative. |

## Attachment 2: Budget Examples

**Example A**: A U.S.-based nonprofit is awarded a grant from RWJF. Grantee staff time spent on a project grant includes a project director, 50 percent; two research associates, 100 percent; and the executive director, 10 percent. The project grant also includes direct

**J.A. 546**

travel, meeting, survey, and contract expenses from a for-profit consultant. The project staff use space in the grantee's offices and share in its utilities and telephone/internet services. The grantee has a standard methodology for allocating these shared costs to the project based on the number of project staff working on the grant as a percentage of the total staff in the grantee's offices. In this example, indirect costs of 30 percent are applied to the sum of personnel, other direct costs, and consultants/contractors expenses. Consultants/contractors costs of $75,000 are less than one-third of the sum of personnel, other direct costs and consultants/contractors ($C \div D = 21\%$).

| Project Budget | | |
|---|---|---|
| Budget Category | Budget Amount | |
| Personnel | | |
| Project Director (Executive Director - 10% & Project    Director 50%) | 65,000 | |
| Project Staff (Researchers  2 at 100%) | 100,000 | |
| Total Salaries | 165,000 | |
| Fringe Benefits at 35% | 57,750 | |
| Total Personnel | 222,750 | A |
| | | |
| Other Direct Costs | | |
| Travel | 10,000 | |
| Meetings | 10,000 | |
| Surveys | 10,000 | |
| Project Space (rent, utilities, etc.) | 25,000 | |
| Total Other Direct Costs | 55,000 | B |
| | | |
| Consultants/Contractors | 75,000 | C |
| | | |
| Total Direct Costs (A+B+C=D) | 352,750 | D |
| | | |
| Total Indirect Costs | 105,825 | |
| Indirect Costs = ((A+B+C)*.30) | | |
| | | |

| Total Project Budget | 458,575 | |
|---|---|---|

**Example B**: Same facts as Example A, except consultants/contractors expenses exceed one-third of the sum of personnel, other direct costs and consultants/contractors ($C \div D = 35\%$). Indirect costs are calculated as 30 percent of personnel and other direct costs and 5 percent of the consultants/contractors.

| Project Budget | | |
|---|---|---|
| Budget Category | Budget Amount | |
| Total Personnel | 222,750 | A |
| | | |
| Total Other Direct Costs | 55,000 | B |
| | | |
| Consultants/Contractors | 150,000 | C |
| | | |
| Total Direct Costs (A+B+C=D) | 427,750 | D |
| | | |
| Total Indirect Costs | 90,825 | |
| *Indirect Costs = ((A+B)\*.30)+(C\*.05)* | | |
| | | |
| Total Project Budget | 518,575 | |

**Example C**:  Same facts as Example A, except the grantee is a U.S.-based university. In this case, indirect costs are calculated as 15 percent of the sum of personnel, other direct costs, and consultants/contractors. Consultants/contractors costs are less than one-third of the sum of personnel, other direct costs, and consultants/contractors. If they were greater than one-third, the indirect costs permitted on that line item would be limited to 5 percent as shown in example B.

| Project Budget | | |
|---|---|---|
| Budget Category | Budget Amount | |
| Total Personnel | 222,750 | A |
| | | |

**J.A. 548**

| | | |
|---|---|---|
| **Total Other Direct Costs** | **55,000** | B |
| | | |
| **Consultants/Contractors** | **75,000** | C |
| | | |
| **Total Direct Costs (A+B+C=D)** | **352,750** | D |
| | | |
| **Total Indirect Costs** | **52,913** | |
| *Indirect Costs = ((A+B+C)\*.15)* | | |
| | | |
| **Total Project Budget** | **405,663** | |

**Example D:** Same facts as Example A, except the grantee is a fiscal sponsor of the project and charges a 10 percent fiscal sponsor fee for its services per the fiscal sponsorship agreement that is between the fiscal sponsor and the sponsored program or project. In this example, the indirect costs include the 10 percent fiscal sponsor fee, and an additional 20 percent to support the indirect costs of the sponsored program or project. Here again, consultants/contractors costs are less than one-third of the sum of personnel, other direct costs, and consultants/contractors. If they were greater than one-third, the indirect costs permitted on that line item would be limited to 5 percent as shown in example B.

| **Project Budget** | | |
|---|---|---|
| **Budget Category** | **Budget Amount** | |
| **Total Personnel** | **222,750** | A |
| | | |
| **Total Other Direct Costs** | **55,000** | B |
| | | |
| **Consultants/Contractors** | **75,000** | C |
| | | |
| **Total Direct Costs (A+B+C=D)** | **352,750** | D |
| | | |
| Fiscal Sponsor Fee (D\*.10) | 35,275 | |
| Indirect Costs ((A+B+C)\*.20) | 70,550 | |
| **Total Indirect Costs** | **105,825** | |

**J.A. 549**

| | | |
|---|---|---|
| **Total Project Budget** | **458,575** | |

---

1. Includes universities, colleges, or schools and hospital and health systems that are either tax-exempt under Section 501(c)(3) of the IRS Code or a government agency.

2. Includes nonprofit organizations that are tax-exempt under Section 501(c)(3) except universities, colleges, or schools and hospital or health systems (see footnote [1]). Private foundations, international-based nonprofit organizations and tribal entities (government and other) are eligible for the 30% rate. See FAQ #3 for special guidance for fiscal sponsors.

3. Except universities, colleges, or schools and hospital and health systems that are eligible for an indirect cost rate of up to 15 percent, and tribal entities (government and other) that are eligible for an indirect cost rate of up to 30 percent. If your government entity is facing a barrier to applying for an RWJF award because your costs will not be covered under this policy, please contact your program officer or program financial analyst prior to applying.

4. This aspect of the policy does not apply to grants that have a re-granting component. Re-granting occurs when an organization awards and manages the administration of grants to support charitable activities carried out by public charities that are tax-exempt under Section 501(c)(3) of the Code; and for which the applicant organization exercises discretion and control over the competitive selection process, payment of grant funds, and oversight of the re-grantee. In these cases, the re-granting budget is considered a direct cost and is eligible for the indirect cost rate applicable for the grantee organization type. This is in recognition of the extra administrative burden of re-granting programs. Alternatively, sub-grants are one or a few awards made by the primary grantee to support aspects of the project or program that do not involve a substantive

competitive solicitation process or extensive oversight. Sub-grants should be included under the consultants/contractors budget category.

5. RWJF has a longstanding practice of allowing the inclusion of project space as part of the direct costs of a grant.



---

Contact Us

FAQs for Applicants and Grantees

© 2024 RWJF, All Rights Reserved.

**J.A. 551**

# EXHIBIT 47



(https://www.srf.org)

**Contact Us (https://www.srf.org/contact-us/)**

**APPLY NOW (HTTPS://WWW.SRF.ORG/GRANT-APPLICATION-GUIDELINES/)**

# OUR MISSION AND HISTORY

The mission of the Smith Richardson Foundation is to contribute to important public debates and to address serious public policy challenges facing the United States.  The Foundation seeks to help ensure the vitality of our social, economic, and governmental institutions.  It also seeks to assist with the development of effective policies to compete internationally and to advance U.S. interests and values abroad.

## Mission

The mission of the Smith Richardson Foundation is to contribute to important public debates and to address serious public policy challenges facing the United States.  The Foundation seeks to help ensure the vitality of our social, economic, and governmental institutions.  It also seeks to assist with the development of effective policies to compete internationally and to advance U.S. interests and values abroad.

**J.A. 553**

The Foundation advances its mission through its two principal grant making programs: the International Security and Foreign Policy Program and the Domestic Public Policy Program. The Foundation believes that conflict and change in the international environment continually create needs in the U.S. policy community for analysis and guidance on critical foreign and defense policy issues. In the domestic arena, the Foundation believes that policy makers are seeking innovative and pragmatic solutions to the long-term challenges affecting the well being of all Americans.

# History

The Smith Richardson Foundation was established in 1935 by H. Smith Richardson and his wife Grace Jones Richardson. Mr. Richardson was a remarkable man with a business career successful beyond what anyone could have predicted from the simple beginnings of his firm in a North Carolina town. This firm, the Vick Chemical Company, which had been founded by his father, Lunsford Richardson, grew under his leadership to become one of the leading over-the-counter drug companies in the world. Richardson-Vicks, Inc., as it became known, was sold in 1985 to Procter & Gamble, Inc. Mr. Richardson lived by principles that are often termed old-fashioned, and he gave generously of this wealth. Few people have combined Mr. Richardson's respect for traditional values with his willingness to innovate.

He believed in giving bright young people responsibility commensurate with their abilities. Throughout his life, he maintained a direct interest in people and in the institutions conceived to improve the lives of others. In setting forth his reasons for creating the Foundation in 1935, Mr. Richardson wrote:

From the beginning, America, the new world...has offered to humble families, native born or immigrant, the Opportunity to gain a fortune...if they were diligent and lucky. With this fortune went the Right to remain secure in its possession and enjoyment for themselves and their heirs after them. Unquestionably, for two hundred years this Opportunity has played a large part in the building of the nation.

Mr. Richardson pointed out the incentive that this "Right" and "Opportunity" had given to those who pushed the American frontier westward, as well as the impetus to "invention, discovery, trade and manufacture and all the varied development of our natural resources." It was characteristic of him to capitalize the words "Opportunity" and "Right." These were key words in his personal creed. He believed that "Opportunity" was something to be seized with zeal and pursued with the utmost diligence. His belief in a personal bill of rights was equally strong: a person rightfully owned what his industry brought him, and the free enterprise system permitted the maximum scope for that industry. It was these beliefs that enabled him to transform his father's small mortar-and-pestle drug manufacturing business into an industrial concern of international stature.

By 1935, a strong social consciousness had begun to flourish in this soil of stout individualism. To this end Mr. Richardson wrote of the responsibilities required of a mature and reflective citizenship: I believe the need for the time and thought of able men is that they be applied to the increasingly weighty problems of government and the serious social questions which now confront us and will continue to press for solution in the future...the greater the material wealth of the citizen the greater are his obligations to the State and Nation...the obligations to give his time and thought to these public and social problems.

The Foundation continues to support programs that are consistent with the vision of its Founder.



PAST GRANTS (HTTPS://WWW.SRF.ORG/PAST-GRANTS/)

ANNUAL REPORTS (HTTPS://WWW.SRF.ORG/HISTORY-ANNUAL-REPORTS/)

OUR MISSION AND HISTORY (HTTPS://WWW.SRF.ORG/OUR-MISSION-HISTORY/)

CONTACT US (HTTPS://WWW.SRF.ORG/CONTACT-US/)

Copyright © 2025 SmithRichardson Foundation. All Rights Reserved.

**J.A. 555**

# EXHIBIT 48

# Our Approach

**OVERVIEW**

Carnegie Corporation of New York works to promote democracy, education, and peace across the globe, advancing knowledge and understanding in these areas of central importance. A grantmaking foundation established by Andrew Carnegie in 1911, the Corporation supports innovative projects, organizations, and individuals that are striving to create meaningful change. Explore our program areas to learn more about our strategies and how we approach our work.

## Education

Our grantmaking aims to help young people from all backgrounds move from the classroom to meaningful careers, create greater socioeconomic mobility, and encourage civic participation in communities nationwide. In this way, our Education program works to support the forces of cohesion that build trust in public institutions, reduce political polarization, and strengthen our democracy.

## **Democracy**

Carnegie Corporation of New York's Democracy program supports civic integration of immigrants. The program also supports the protection of voting rights and promotes voter participation of all citizens. We work to foster a fair, diverse, and vibrant democracy that welcomes and offers opportunities to all.

## **International Peace and Security**

To build a more secure, peaceful, and prosperous world through independent analysis and action addressing critical global challenges.

## Higher Education and Research in Africa

To strengthen Africa's higher education sector by improving the training, retention, and research productivity of academics in select countries in sub-Saharan Africa.

# EXHIBIT 49

Case 1:25-cv-10338-AK    Document 82-6    Filed 02/18/25    Page 2 of 4



THE DAVID & LUCILE
*Packard Foundation*

Perspective

# Fostering Equitable Grantmaking through Indirect Cost Coverage



Jennifer Adams

January 18, 2024

**3 min read**



**J.A. 563**

When nonprofit organizations are financially healthy and resilient, they can spend more time focused on achieving their missions and less time worrying about making payroll, paying utility bills, and simply trying to stay afloat.

For the past six years, we have helped to cover our grantees' indirect costs, or the expenses of doing business that are not tied to a particular grant but are necessary for an organization to operate.

As a result, we've taken it a step further and refined our approach. The Packard Foundation now provides a minimum indirect cost rate of 15-25% on project grants based on the grantee organization's budget size.

# How We Got Here

In 2017, the David and Lucile Packard Foundation joined a collaborative now known as Funders for Real Cost, Real Change (FRC), a group of 12 foundations focused on ending practices that inadequately cover the complete costs of project grants and inadvertently undermine the organizational health of our grantees.

As a result of our learnings and involvement, in September 2019, we announced our commitment to intentionally support indirect costs—often referred to as overhead—that are incurred during project work and are essential to the sustainability of any organization. At that time, we removed the cap on indirect cost rates and revised our guidelines to encourage our grantee partners to include the full costs of our project grants in their grant proposals.

Since that time, we learned that this process often created extra work for both grantee partners and staff and still fell short of covering healthy indirect cost rates. We learned many grantees continued to downplay their indirect costs rates because they have been led to believe—or they fear we believe—the myth that low indirect cost rates are an indicator of a more efficient organization.

Providing adequate funding for grantees not only allows organizations to adequately pursue their critical, mission-driven work; it is a critical step toward addressing field-wide issues like the chronic underinvestment in nonprofit organization infrastructure.

We knew we could do more.

**J.A. 564**

2/15/25, 6:28 PM
Case 1:25-cv-10338-AK    Document 82-6    Filed 02/18/25    Page 4 of 4
Fostering Equitable Grantmaking through Indirect Cost Coverage - The David and Lucile Packard Foundation

Just as we have worked to develop and launch our new strategic framework and are evolving our work to address the most pressing issues of our world today, we continue to pursue greater impact and partnership through our grantmaking process itself.

# Evolving Our Commitment to Embed Equity in our Grantmaking Processes

As we develop our new initiatives, the Packard Foundation is fully committed to ensuring that all proposals reflect more accurate direct and indirect costs for the work being funded without additional asks.

Using data from our portfolio of grantees and help from nonprofit financial expert BDO, we settled on a tiered indirect cost rate based on grantee organization annual budget size:

- 25% minimum indirect cost rate for grantees with budgets under $5 million;
- 20% minimum indirect cost rate for grantees with budgets between $5 million and $50 million; and
- 15% minimum indirect cost rate for those with budgets over $50 million.

This new structure covers the reported indirect costs of the majority of our U.S. grantees in each of the tiers.

This tiered approach reflects our commitment to structure awards in ways that equitably support actual costs for projects and to meet organizations' financial needs as small organizations often have less access to unrestricted funding and lower reserves.

We are committed to listening and learning to ensure our operations reflect the just and equitable world we are working to create. It is not enough to support projects that align with our vision—we must also invest in the organizations and people who are working to get us there.

© 2025 The David and Lucile Packard Foundation        Legal

Contact        Creative Commons

**J.A. 565**

# EXHIBIT 50

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| COMMONWEALTH OF<br>MASSACHUSETTS, et al.<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL INSTITUTES OF HEALTH;<br>MATTHEW MEMOLI, M.D., M.S., in his<br>official capacity as Acting Director of the<br>National Institutes of Health; U.S.<br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES; and DOROTHY<br>FINK, M.D., in her official capacity as<br>Acting Secretary of the U.S. Department of<br>Health and Human Services,<br><br>Defendants. | Civil Action No. 1:25-cv-10338. |

## DECLARATION OF VASSILIS L. SYRMOS

I, Vassilis L. Syrmos, declare as follows:

1.    I am a resident of the State of Hawai'i. I am over the age of 18 and have personal

knowledge of all the facts stated herein, except to those matters stated upon information and

belief; as to those matters, I believe them to be true. If called as a witness, I could and would

testify competently to the matters set forth below.

2.    I am currently employed by the University of Hawai'i (UH) as the Vice President

for Research and Innovation.  In addition to my current role, I have a Ph.D. in electrical

engineering and over 30 years of academic experience.

3.    The University of Hawai'i is the only public higher education institution in the

State of Hawai'i.

1

4.      My office (the Office of the Vice President for Research and Innovation) tracks federal funding received by the University of Hawaiʻi through grant awards, cooperative agreements, contracts and other agreements. My office facilitates the research enterprise for our researchers, faculty, students, staff and administrators, funds systemwide initiatives, coordinates and executes our federal funding appropriations and programs, sets and monitors all policies for our research enterprise to comply with federal and state laws and drives the innovation, commercialization and entrepreneurship ecosystem across all campuses.

5.      As the systemwide office for research and innovation, I work closely with all chancellors and provost across all UH campuses. I am in regular contact with our flagship campus at Mānoa and our regional campuses at Hilo and West Oʻahu to identify any issues impacting UH systemwide research, including federal funding and indirect cost allocations for research operations.

6.      I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates,* which purports to immediately reduce indirect costs (also known as facilities and administrative costs) payments to 15 percent.

7.      The University of Hawaiʻi includes the John A. Burns School of Medicine (JABSOM), the University of Hawaiʻi Cancer Center (a National Cancer Institute-designated center), the Daniel K. Inouye College of Pharmacy, the School of Nursing and Dental Hygiene, the Thompson School of Social Work and Public Health, and several more Health Sciences programs across all campuses. All these Schools, Colleges, and Centers conduct fundamental, translational, clinical and community-based participatory research in health sciences and

2

healthcare. This research is supported by 175 awards and subawards from the NIH with a current value of $211M.

8.      As an island community, Hawai'i faces many challenges in the delivery of healthcare, which are exacerbated by its geographic isolation.  Our health professional schools, centers, and colleges are widely recognized as among the best in the country and in the Pacific. These health professional and health sciences schools educate the next generation of doctors, nurses, social workers, and pharmacists who provide much-needed health care in the region, public health experts who keep our communities safe and healthy, and scientists who develop new cures and treatments for all people of Hawai'i, including our veterans and the Pacific.

9.      UH is one of the leading research universities in the nation, ranking in the top 20 percent of all public universities in research expenditures by the National Science Foundation Higher Education Research and Development (HERD) survey.

10.     UH's budget heavily relies on federal funding to advance and maintain a world-renowned research enterprise. The research enterprise of UH includes but is not limited to allocated funding for researchers, graduate and undergraduate students, clinical trials, community-based outreach, equipment, and many other activities to serve the people of Hawai'i and the Pacific.

11.     Federal funding, which can leverage state and other sources, is essential for sustaining and advancing these initiatives and increasing Hawai'i's contributions to the nation's economy and strategic interests. UH's budget for this fiscal year has been prepared on the assumption that it would be reimbursed for the significantly higher rates of facilities and administrative cost recovery that have been negotiated and formalized in an agreement with the Department of Health and Human Services, following a lengthy and meticulous process

3

undertaken by UH and DHHS. The NIH's notice of an arbitrary reduction in reimbursable costs to the university will lead to catastrophic consequences for both our budget and operations.

12.    NIH's reduction of a lower facilities and administrative rate will result in the elimination of approximately $16.5M in funding that the University of Hawai'i uses to support its research programs, including debt service payments for facilities that support translational research and clinical trials. The loss of these funds will immediately impact the University of Hawai'i's ability to draw critical funds for expenses associated with facilities costs, debt services, payroll, and infrastructure used to support research and clinical trials.

13.    On an annual basis, the federal government is the single largest sponsor of UH's research enterprise. As a result of the proposed cap in facilities and administrative cost reimbursements to UH, payroll for many individuals, including researchers, staff, and students, will have to be significantly scaled back or terminated. This outcome will be devastating to our biomedical research enterprise, including, as one example, JABSOM and the critical education it provides and research it performs.

14.    JABSOM is the State of Hawai'i's only medical school, and serves a unique role in the education of physicians and scientists who serve the State of Hawai'i and its unique population base, as well as in the performance of research that serves the broader public health. The loss of these funds will immediately impact JABSOM's ability to draw critical funds used to pay expenses associated with operational research facilities, debt service, payroll, and other infrastructure associated with JABSOM's research.

15.    If JABSOM cannot continue to rely on NIH indirect costs funding, upon information and belief, the negative impact on communities in Hawai'i and elsewhere that already experience the

4

**J.A. 570**

highest rates of chronic disease, more and more severe health conditions, and shortened life expectancies will be severe.

16. For UH as a whole, any cap in UH's legally negotiated indirect cost recovery would trigger cost containment measures that, if enacted for a prolonged period, would make it difficult for the UH to continue and setback its sponsored research and training efforts. The UH has limited resources to cover payroll. Once funds are depleted, the UH will need to implement furlough and layoff procedures. In fiscal crises, this starts with temporary personnel such as casual employees and students, who are generally the most vulnerable financially. Some students may find it financially infeasible to continue their education due to their reduced income and may not return. In addition, UH will need to start canceling subawards, procurements and other contracts, spreading financial hardship to its partners and vendors, which include community partners.

17. UH also relies on subrecipients to conduct part of the scope of work under federal awards and issue approximately $42.3 million in subawards a year to our collaborators in Hawai'i and across the United States. As of January 31, 2025, the UH issued $33 million in subawards and anticipate another $10 million will be issued by the end of the UH fiscal year. A break in service could jeopardize scientific experiments, educational activities, or community services and, in turn, performance under these federal awards.

18. With this uncertainty, it will become difficult to hire or retain personnel on federal funds. Faculty or other senior personnel will need to spend additional time to train new hires and start their experiments or projects over.

5

**J.A. 571**

19. The underlying cause of this uncertainty is the NIH cap, but the UH's reputation in this competitive research space will suffer negatively given that the UH will be the public face of the cuts to its personnel, equipment, facilities, its vendors and its partners in Hawai'i especially, but globally as well.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2025, at Honolulu, Hawai'i.

Vassilis L. Syrmos
Vice President for Research and Innovation
University of Hawai'i

6

# EXHIBIT 51

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **COMMONWEALTH OF MASSACHUSETTS, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **CASE NO. 1:25-CV-10338-AK** |
| **NATIONAL INSTITUTES OF HEALTH, et al.,** | |
| **Defendants.** | |

<u>**Declaration of Dr. Penny Gordon-Larsen, PhD**</u>

I, Dr. Penny Gordon-Larsen, hereby declare:

1. I am the Vice Chancellor for Research and W.R. Kenan, Jr. Distinguished Professor at the University of North Carolina at Chapel Hill ("UNC"), a position I have held since 2023. As Vice Chancellor for Research, I have oversight of UNC's Office of the Vice Chancellor for Research, which includes research administration and support operations. Prior to holding this position, I was Interim Vice Chancellor for Research at UNC and also the Chamblee Distinguished Professor.

2. As the Vice Chancellor for Research, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by staff.

3. I am providing this declaration to explain certain impacts of National Institutes of Health ("NIH") Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates* ("Supplemental Guidance")*,* which purports to immediately reduce indirect costs payments to 15%.

1

4. UNC is North Carolina's flagship research university. Our unique, collaborative campus, in combination with our breadth of science, allows translational thinking and approaches that ultimately yield innovations and action. From developing new technologies that prevent and cure diseases to investigating the spread of disease by ticks and mosquitoes to extracting contamination from water sources to combatting the opioid crisis to tracking and mitigating the risk of extreme events like hurricanes and flooding, UNC's research enterprise creates solutions to today's most critical challenges.

5. In fiscal year 2024, UNC received $675.6M in funding from the NIH.  UNC has a Negotiated Indirect Cost Rate Agreement ("NICRA") with NIH, effective as of September 16, 2021. The Indirect Cost ("IDC") Rates for UNC's NICRA are:

   a.   55.5% for Organized Research, On-Campus;

   b.   50% for Instruction, On-Campus; and

   c.   36% for Other Sponsored Activities, On-Campus.

6. UNC's total blended IDC rate for NIH funding is 47.56% for the current fiscal year. This represents 24.6% of total NIH funds received by UNC for the current fiscal year.

7. NIH's reduction of UNC'S IDC rates would eliminate approximately $123M annually in funding from the NIH that UNC uses to support research infrastructure necessary for its research programs.  If the current injunction in this case is lifted and NIH's Supplemental Guidance is implemented, the loss of these funds will immediately impact UNC's ability to cover expenses associated with, among other items: facilities operations and maintenance, facilities debt service and rent, research equipment purchases, federally-mandated regulatory compliance and grant administration functions, research-specific IT services, and research-specific student support.

2

8. In the event the Supplemental Guidance is implemented, UNC also anticipates, and is planning for, paused or canceled clinical trials due to an inability to maintain the facilities and regulatory support necessary for proper trial execution. This would directly impact patient care in North Carolina.

9. As detailed above, implementation of the Supplemental Guidance would detrimentally impact UNC's ability to meet its payroll obliations, maintain its facilities, and service its research-specific facilities debt. This may lead to layoffs, debt defaults, and shuttering of buildings and associated research programs.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 18th day of February, 2025, in Washington, D.C.

Dr. Penny Gordon-Larsen, PhD
Vice Chancellor for Research
W.R. Kenan, Jr. Distinguished Professor
The University of North Carolina at Chapel Hill

3

# EXHIBIT 52

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS, *et al.*

*Plaintiffs,*

v.

NATIONAL INSTITUTES OF HEALTH, *et al.*

*Defendants.*

No. 1:25-cv-10338

## DECLARATION OF SALLY MORTON

I, Sally Morton, hereby declare:

1. I am a resident of the State of Arizona. I am currently employed by Arizona State University as Executive Vice President of the ASU Knowledge Enterprise and as a Professor in the College of Mathematical and Statistical Sciences and the College of Health Solutions. In my capacity as Executive Vice President, I lead the university's research and economic development portfolio to advance research priorities, oversee ASU's research institutes and initiatives, and drive corporate engagement, strategic partnerships, intellectual property, and technology transfer.

2. As Executive Vice President of the ASU Knowledge Enterprise, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records provided to me by ASU employees and believe that information to be true. If called as a witness, I could and would testify competently to the matters set forth below.

3. I am providing this declaration to explain certain impacts of National Institutes of Health

(NIH) Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates* (Notice), which purports to immediately reduce facilities and administrative costs payments (also known as indirect costs) to 15%.

4. ASU is a comprehensive public research university committed to advancing research and discovery of public value. ASU is one of the fastest-growing research enterprises in the United States, with research expenditures of $904 Million in the fiscal year ending June 30, 2023.

5. Sponsored funding from federal agencies constitutes a significant portion of ASU's annual research expenditures. In the fiscal year ending June 30, 2024, ASU expended $508 Million received from federal agencies to conduct research work under approved agreements (grants, contracts, and cooperative agreements).

6. ASU receives sponsored funding from at least 23 different federal agencies, including NIH.

7. ASU has a Negotiated Indirect Cost Rate Agreement with NIH. Ex. A.

8. The indirect cost rate in ASU's Negotiated Indirect Cost Rate Agreement is 57% for on-campus research.

9. In federal fiscal year 2024, ASU received 98 awards from NIH, totaling approximately $47 million. Of that amount, approximately $33.2 million were for direct costs and approximately $13.9 million were for indirect costs. Because certain direct cost categories are exempted from calculating indirect costs, ASU had a blended indirect cost rate of approximately 41%.

10. Recovering indirect costs of research is essential to sustaining the university's research infrastructure generally, including the specific infrastructure needed to perform the

university's current grant agreements with NIH.  Indirect cost funding pays for critical expenses that keep research programs operational.  These include the costs of operating physical research facilities, such as electricity, water, and utilities, as well as personnel costs for employees who directly support research operations, such as those who are engaged in environmental health and safety, animal care, data management, and grant compliance.

11. The NIH Notice, if implemented, immediately reduces millions of dollars in indirect cost recovery that ASU believed would be available to it when it entered into its grant agreements with NIH and other funding agencies.  The university made personnel and operational plans and decisions, and entered into employment and other contracts, in reliance on that understanding.  The reduction of NIH indirect cost recovery by more than half jeopardizes the university's ability to conduct not only the research work contemplated by its agreement with NIH but other research work that the shared facilities and personnel paid for through indirect cost funds support.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 17th day of February, 2025, in Washington D.C.

Sally Morton
Executive Vice President of the Arizona
State University Knowledge Enterprise

# EXHIBIT A

# COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN:
ORGANIZATION:
Arizona State University
Fulton Center 410, Rm. 4478
P.O. Box 87705
Tempe, AZ 85287–7605

Date: 07/30/2024
FILING REF.: The preceding
agreement was dated
05/24/2023

The rates approved in this agreement are for use on grants, contracts and other agreements with the Federal Government, subject to the conditions in Section III.

## SECTION I: INDIRECT COST RATES

RATE TYPES:     FIXED     FINAL     PROV. (PROVISIONAL)          PRED. (PREDETERMINED)

| TYPE | EFFECTIVE PERIOD FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|------|------|------|------|
| PRED. | 07/01/2020 | 06/30/2023 | 57.00 | On–Campus | Organized Research |
| PRED. | 07/01/2020 | 06/30/2023 | 26.00 | Off–Campus | Organized Research |
| PRED. | 07/01/2020 | 06/30/2023 | 48.00 | On–Campus | Instruction |
| PRED. | 07/01/2020 | 06/30/2023 | 26.00 | Off–Campus | Instruction |
| PRED. | 07/01/2020 | 06/30/2023 | 44.40 | On–Campus | Other Sponsored Activities |
| PRED. | 07/01/2020 | 06/30/2023 | 26.00 | Off–Campus | Other Sponsored Activities |
| PROV. | 07/01/2023 | Until Amended | (1) | | |

*BASE

Modified total direct costs, consisting of all salaries and wages, fringe benefits, materials, supplies, services, travel and subgrants and subcontracts up to the first $25,000 of each subgrant or subcontract (regardless of the period covered by the subgrant or subcontract). Modified total direct costs shall exclude equipment, capital expenditures, charges for patient care, participant support costs, student tuition remission, rental costs of off–site facilities, scholarships, and fellowships as well as the portion of each subgrant and subcontract in excess of $25,000.

(1) Use same rates and conditions as those cited for fiscal year ending June 30, 2023.

ORGANIZATION: Arizona State University
AGREEMENT DATE: 07/30/2024

## SECTION I: FRINGE BENEFIT RATES**

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| FIXED | 7/1/2024 | 6/30/2025 | 30.40 | All (A) | Faculty |
| FIXED | 7/1/2024 | 6/30/2025 | 36.80 | All (A) | Staff |
| FIXED | 7/1/2024 | 6/30/2025 | 10.90 | All (A) | Part Time |
| FIXED | 7/1/2024 | 6/30/2025 | 1.20 | All (A) | Students |
| FIXED | 7/1/2024 | 6/30/2025 | 8.50 | All (A) | RA/TA |
| FIXED | 7/1/2024 | 6/30/2025 | 25.30 | All (A) | Post Doc |
| PROV. | 7/1/2025 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending June 30, 2025. |

## ** DESCRIPTION OF FRINGE BENEFITS RATE BASE:

(A) Salaries and wages including vacation, holiday, sick leave pay and other paid absences.

ORGANIZATION: Arizona State University
AGREEMENT DATE: 07/30/2024

## SECTION II: SPECIAL REMARKS

TREATMENT OF FRINGE BENEFITS:
The fringe benefits are charged using the rate(s) listed in the Fringe Benefits Section of this Agreement.
The fringe benefits included in the rate(s) are listed below.

TREATMENT OF PAID ABSENCES:
Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are
claimed on grants, contracts and other agreements as part of the normal costs for salaries and wages.
Separate claims for the costs of these paid absences are not made except for paid absences that have
been earned but not taken when an individual separates from the university prior to the completion of
the grant, contract or other agreement.

OFF–CAMPUS DEFINITION
An off–campus rate is applicable to those projects conducted in facilities not owned or operated by the
University, which include charges for facility rental as a direct expenditure, and for which more than 50%
of the project salaries and wages are for effort conducted in the rental facility.

DEFINITION OF EQUIPMENT
Equipment means tangible personal property (including information technology systems) having a useful
life of more than one year and a per–unit acquisition cost which equals or exceeds $5,000.

The following fringe benefits are included in the fringe benefit rate(s):
FICA, WORKERS COMPENSATION, HEALTH/DENTAL/LIFE INSURANCE, UNEMPLOYMENT INSURANCE,
DISABILITY INSURANCE, ACCIDENTAL DEATH, RETIREMENT PLANS (STATE RETIREMENT PROGRAMS
AND TIAA/CREF), FLEXIBLE SPENDING PLAN, RETIREE ACCUMULATIVE SICK LEAVE, AND EMPLOYEE
TUITION REMISSION, EMPLOYEE WELLNESS, SABBATICAL PAYMENTS, EMPLOYEE ASSISTANCE, AND
TERMINAL LEAVE.

This agreement updates fringe benefits only.

NEXT PROPOSAL DUE DATE
Your next indirect cost based on actual costs for 06/30/22 is in–house for review, and fringe benefits
proposal based on actual costs for FYE 06/30/24 is due by 12/31/24.

RU1353

ORGANIZATION: Arizona State University
AGREEMENT DATE: 07/30/2024

## SECTION III: GENERAL

A.   LIMITATIONS:

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its indirect cost pool as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as indirect costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B.   ACCOUNTING CHANGES:

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from indirect to direct. Failure to obtain approval may result in cost disallowances.

C.   FIXED RATES:

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D.   USE BY OTHER FEDERAL AGENCIES:

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E.   OTHER:

If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

BY THE INSTITUTION:                 ON BEHALF OF THE GOVERNMENT:

Arizona State University
_____
(INSTITUTION)

DEPARTMENT OF HEALTH AND HUMAN SERVICES
_____
(AGENCY)

*Matthew Smith*
_____
(SIGNATURE)

**Arif M. Karim -S** Digitally signed by Arif M. Karim -S
Date: 2024.08.01 09:25:04 -05'00'
_____
(SIGNATURE)

Matthew J. Smith
_____
(NAME)

Arif Karim
_____
(NAME)

VP for Budget Planning & Management
_____
(TITLE)

Director, Cost Allocation Services
_____
(TITLE)

08/15/2024
_____
(DATE)

07/30/2024
_____
(DATE)

HHS REPRESENTATIVE:   Jeanette Lu

TELEPHONE:          (415) 437-7820

# EXHIBIT 53

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.* | |
| *Plaintiffs*, | |
| v. | No. 1:25-cv-10338 |
| NATIONAL INSTITUTES OF HEALTH, *et al.* | |
| *Defendants*. | |

**<u>DECLARATION OF JASON A WILDER</u>**

I, Jason A. Wilder, hereby declare:

1. I am a resident of the State of Arizona. Since 2021, I have been employed by Northern Arizona University (NAU) as Vice President for Research. In addition to my current role, I have a Ph.D. in Biology and over 23 years of academic experience.

2. As Vice President for Research at NAU, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records provided to me by NAU employees, and believe that information to be true. If called as a witness, I could and would testify competently to the matters set forth below.

3. I am providing this declaration to explain certain impacts of National Institutes of Health (NIH) Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates* (Notice), which purports to immediately reduce facilities and administrative costs payments (also known as indirect costs) to 15%.

4. NAU's talented researchers are always aspiring to be leaders in their fields. They are teacher-scholars who engage in impactful research, scholarship, and creative activities to

provide transformative learning opportunities, engage our diverse students and communities, advance disciplinary and interdisciplinary knowledge, and contribute to solving problems of regional, national, and global relevance.

5. Federal funds are an important source of NAU's support.

6. NAU has a Negotiated Indirect Cost Rate Agreement with NIH. Ex. A.

7. The indirect cost rate in NAU's Negotiated Indirect Cost Rate Agreement is 52.5% for on-campus research.

8. In federal fiscal year 2024, NAU managed 14 awards from NIH, totaling over $12.5 million. Of that amount, approximately $9.3 million were for direct costs and approximately $3.2 million were for indirect costs. Because certain direct cost categories are exempted from calculating indirect costs, NAU had a blended indirect cost rate of approximately 34%.

9. Recovering costs of research is essential to maintaining NAU's operations. NAU incurs significant costs to perform research sponsored by federal agencies, which otherwise would not occur. Indirect cost rates allow NAU to recover some of the costs incurred in conducting research that are shared across a number of projects and university functions. Among these are the maintenance of key research facilities and instrumentation that are shared resources at NAU that empower cutting-edge research, including our Biosafety Level 3 Research Laboratory, our Research Greenhouse, Animal Care Facility, High Performance Computing Cluster, and our Genetics Core & Imaging Facility. Indirect cost revenues also play a role in ensuring research safety and compliance, including by funding our Human Research Protection Program, Institutional Animal Care & Use Committee, Chemical and Biological Safety Programs, and our Export Control Program.

2

Additionally, indirect cost funds help pay expenses for laboratory utilities, library research services, research administration services, and service contracts on shared scientific instruments.

10. The NIH Notice will likely cause NAU to face a loss of more than a million dollars annually in indirect cost recovery. Such a loss will have an immediate and deleterious impact on the success of research projects and the University's ability to maintain the level of staffing and infrastructure critical to support those projects.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 18th day of February, 2025, in Flagstaff, Arizona.

_____
Jason A. Wilder
Vice President for Research
Northern Arizona University

3

# EXHIBIT A

# COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN: 74-2579628
ORGANIZATION:
Northern Arizona University
P.O. Box 4069
Flagstaff, AZ 86011-4070

Date: 06/29/2023
FILING REF.: The preceding
agreement was dated
03/16/2017

The rates approved in this agreement are for use on grants, contracts and other agreements
with the Federal Government, subject to the conditions in Section III.

## SECTION I: INDIRECT COST RATES

RATE TYPES:    FIXED    FINAL    PROV. (PROVISIONAL)        PRED. (PREDETERMINED)

| TYPE | EFFECTIVE PERIOD FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|------|------|------|------|
| PRED. | 07/01/2021 | 06/30/2023 | 52.00 | On-Campus | Organized Research |
| PRED. | 07/01/2023 | 06/30/2027 | 52.50 | On-Campus | Organized Research |
| PRED. | 07/01/2021 | 06/30/2027 | 26.00 | Off-Campus | Organized Research |
| PRED. | 07/01/2021 | 06/30/2027 | 51.20 | On-Campus | Instruction |
| PRED. | 07/01/2021 | 06/30/2027 | 26.00 | Off-Campus | Instruction |
| PRED. | 07/01/2021 | 06/30/2023 | 30.90 | On-Campus | Other Sponsored Activities |
| PRED. | 07/01/2023 | 06/30/2027 | 29.40 | On-Campus | Other Sponsored Activities |
| PRED. | 07/01/2021 | 06/30/2023 | 26.00 | Off-Campus | Other Sponsored Activities |
| PRED. | 07/01/2023 | 06/30/2027 | 23.70 | Off-Campus | Other Sponsored Activities |
| PROV. | 07/01/2027 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending Jun 30, 2027 |

*BASE

Modified total direct costs, consisting of all salaries and wages, fringe benefits, materials, supplies,
services, travel and subgrants and subcontracts up to the first $25,000 of each subgrant or subcontract
(regardless of the period covered by the subgrant or subcontract). Modified total direct costs shall
exclude equipment, capital expenditures, charges for patient care, student tuition remission, rental costs
of off-site facilities, scholarships, and fellowships as well as the portion of each subgrant and
subcontract in excess of $25,000.

ORGANIZATION: Northern Arizona University
AGREEMENT DATE: 06/29/2023

## SECTION II: SPECIAL REMARKS

TREATMENT OF FRINGE BENEFITS:
This organization charges the actual cost of each fringe benefit direct to Federal projects. However, it uses a fringe benefit rate which is applied to salaries and wages in budgeting fringe benefit costs under project proposals. The following fringe benefits are treated as direct costs:
FICA, WORKERS COMPENSATION, HEALTH/DENTAL INSURANCE, BASIC LIFE INSURANCE, UNEMPLOYMENT INSURANCE, LONG–TERM DISABILITY, PENSION PLAN, AND RETIREE ACCUMULATED SICK LEAVE.

TREATMENT OF PAID ABSENCES:
Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts and other agreements as part of the normal cost for salaries and wages. Separate claims are not made for the cost of these paid absences.

OFF–CAMPUS DEFINITION AND APPLICATION
The off–campus rate is applicable to those projects conducted in facilities not owned or leased by the University. However, if the project is conducted in leased space and lease costs are directly charged to the project, then the off–campus rate must be used. A project is considered off–campus if more than 50% of its salaries and wages are incurred at an off–campus facility. If a project is determined to be off–campus, it shall be considered wholly off–campus. Separate on and off–campus rates will not be used for a single project.

DEFINITION OF EQUIPMENT
Equipment is defined as tangible non–expendable personal property having a useful life of more than one year and an acquisition cost of $5,000 or more per unit.

NEXT PROPOSAL DUE DATE
A proposal based on actual costs for fiscal year ending 6/30/26 will be due no later than 12/31/26.

J.A. 592                                                                      U55075

ORGANIZATION: Northern Arizona University
AGREEMENT DATE: 06/29/2023

## SECTION III: GENERAL

A.  **LIMITATIONS:**

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its facilities and administrative cost pools as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as facilities and administrative costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

B.  **ACCOUNTING CHANGES:**

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from facilities and administrative to direct. Failure to obtain approval may result in cost disallowances.

C.  **FIXED RATES:**

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

D.  **USE BY OTHER FEDERAL AGENCIES:**

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

E.  **OTHER:**

If any Federal contract, grant or other agreement is reimbursing facilities and administrative costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of facilities and administrative costs allocable to these programs.

BY THE INSTITUTION:

Northern Arizona University

(INSTITUTION)

*Bjorn Flugstad*

(SIGNATURE)

BJORN FLUGSTAD

(NAME)

Sr Vice President, CFO

(TITLE)

7/6/2023

(DATE)

ON BEHALF OF THE GOVERNMENT:

DEPARTMENT OF HEALTH AND HUMAN SERVICES

(AGENCY)

**Arif M. Karim -S** Digitally signed by Arif M. Karim -S
Date: 2023.07.05 09:39:36 -05'00'

(SIGNATURE)

Arif Karim

(NAME)

Director, Cost Allocation Services

(TITLE)

06/29/2023

(DATE)

HHS REPRESENTATIVE:  Jeanette Lu

TELEPHONE:  (415) 437-7820

# EXHIBIT 54

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS, *et al.*

    *Plaintiffs*,

v.                                                    No. 1:25-cv-10338

NATIONAL INSTITUTES OF HEALTH, *et al.*

    *Defendants*.

## DECLARATION OF TOMÁS DÍAZ DE LA RUBIA

I, Tomás Díaz de la Rubia, hereby declare:

1. I am a resident of the State of Arizona. Since 2024, I have been employed by the University of Arizona (UA), as Senior Vice President for Research and Innovation. In addition to my current role, I have a Doctorate Degree in Physics and over 30 years' academic experience.

2. As Senior Vice President for Research and Innovation, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records provided to me by UA employees and believe that information to be true. If called as a witness, I could and would testify competently to the matters set forth below.

3. I am providing this declaration to explain certain impacts of National Institutes of Health (NIH) Notice Number NOT-OD-25-068, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates* (Notice), which purports to immediately reduce facilities and administrative costs payments (also known as indirect costs) to 15%.

4. UA is a Carnegie-recognized R1 research university that had more than $1 billion in research and development activity in fiscal year 2024. UA's research is evidence of its commitment to expanding human potential, exploring new horizons, and enriching life for all. It is leading the way in tackling the most pressing and complex challenges of our time.

5. Federal funds are an important source of UA's support.

6. UA has a Negotiated Indirect Cost Rate Agreement with the Department of Health and Human Services. Ex. A.

7. The indirect cost rate in UA's Negotiated Indirect Cost Rate Agreement is 54.5% for on-campus research.

8. In federal fiscal year 2024, UA received 313 awards from NIH, totaling over $170 million. Of that amount, approximately $127 million were for direct costs and approximately $44 million were for indirect costs. Because certain direct cost categories are exempted from calculating indirect costs, UA had a blended indirect cost rate of approximately 35%.

9. Recovering costs of research is essential to maintaining UA operations. UA incurs significant costs to perform research sponsored by federal agencies, which it otherwise would not incur. Indirect cost rates allow UA to recover some of the costs incurred in conducting research that are shared across a number of projects and university functions. These include the costs of buildings, interest, equipment, laboratory safety, research security compliance, IP protection, operations and maintenance, library services, general administration, and departmental administration.

10. The NIH Notice will likely cause UA to face a loss of millions of dollars annually in indirect cost recovery. Such a loss will have an immediate and deleterious impact on the

2

success of research projects and the University's ability to maintain the level of staffing critical to support those projects.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 18 day of February, 2025, in Tucson, Arizona.

Tomás Díaz de la Rubia
Senior Vice President for Research and
Innovation
The University of Arizona

3

# EXHIBIT A

# COLLEGES AND UNIVERSITIES RATE AGREEMENT

EIN: 74–2652689
ORGANIZATION:
University of Arizona
University Services Building
888 N. Euclid Ave., Rm. 502F
Tucson, AZ 85721–0158

Date: 05/21/2024
FILING REF.: The preceding
agreement was dated
01/23/2024

The rates approved in this agreement are for use on grants, contracts and other agreements
with the Federal Government, subject to the conditions in Section III.

## SECTION I: INDIRECT COST RATES

RATE TYPES:     FIXED     FINAL     PROV. (PROVISIONAL)          PRED. (PREDETERMINED)

| TYPE | EFFECTIVE PERIOD FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|------|------|------|------|
| FINAL | 07/01/2020 | 06/30/2023 | 53.50 | On–Campus | Organized Research |
| PRED. | 07/01/2023 | 06/30/2024 | 53.50 | On–Campus | Organized Research |
| PRED. | 07/01/2024 | 06/30/2025 | 54.50 | On–Campus | Organized Research |
| PRED. | 07/01/2025 | 06/30/2026 | 55.00 | On–Campus | Organized Research |
| PRED. | 07/01/2026 | 06/30/2027 | 55.50 | On–Campus | Organized Research |
| FINAL | 07/01/2020 | 06/30/2023 | 26.00 | Off–Campus | Organized Research |
| PRED. | 07/01/2023 | 06/30/2027 | 26.00 | Off–Campus | Organized Research |
| FINAL | 07/01/2020 | 06/30/2023 | 50.00 | On–Campus | Instruction |
| PRED. | 07/01/2023 | 06/30/2024 | 50.00 | On–Campus | Instruction |
| PRED. | 07/01/2024 | 06/30/2027 | 40.00 | On–Campus | Instruction |
| FINAL | 07/01/2020 | 06/30/2023 | 26.00 | Off–Campus | Instruction |
| PRED. | 07/01/2023 | 06/30/2027 | 26.00 | Off–Campus | Instruction |
| FINAL | 07/01/2020 | 06/30/2023 | 47.00 | On–Campus | Other Sponsored Activities |
| PRED. | 07/01/2023 | 06/30/2024 | 47.00 | On–Campus | Other Sponsored Activities |
| PRED. | 07/01/2024 | 06/30/2027 | 38.00 | On–Campus | Other Sponsored Activities |
| FINAL | 07/01/2020 | 06/30/2023 | 26.00 | Off–Campus | Other Sponsored Activities |
| PRED. | 07/01/2023 | 06/30/2027 | 26.00 | Off–Campus | Other Sponsored Activities |
| PROV. | 07/01/2027 | Until Amended | | | Use same rates and conditions as those cited for fiscal year ending Jun 30, 2027. |

*BASE

ORGANIZATION: University of Arizona
AGREEMENT DATE: 05/21/2024

Modified total direct costs, consisting of all salaries and wages, fringe benefits, materials, supplies, services, travel, and up to the first $25,000 of each subaward (regardless of the period of performance of the subawards under the award). Modified total direct costs shall exclude equipment, capital expenditures, charges for patient care, student tuition remission, rental costs of off–site facilities, scholarships, and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items may only be excluded when necessary to avoid a serious inequity in the distribution of indirect costs, and with the approval of the cognizant agency for indirect costs.

ORGANIZATION: University of Arizona
AGREEMENT DATE: 05/21/2024

## SECTION I: FRINGE BENEFIT RATES**

| TYPE | FROM | TO | RATE(%) | LOCATION | APPLICABLE TO |
|------|------|-----|---------|----------|---------------|
| FIXED | 7/1/2024 | 6/30/2025 | 32.00 | All | UA Employees |
| FIXED | 7/1/2024 | 6/30/2025 | 17.10 | All | Ancillary Employees |
| FIXED | 7/1/2024 | 6/30/2025 | 2.00 | All | Student Employees |
| FIXED | 7/1/2024 | 6/30/2025 | 13.00 | All | Graduate Assistants |
| PROV. | 7/1/2025 | 6/30/2028 | | | Use same rates and conditions as those cited for fiscal year ending June 30, 2025. |

** DESCRIPTION OF FRINGE BENEFITS RATE BASE:

Salaries and wages including vacation, holiday, sick leave pay and other paid absences.

**J.A. 601**

ORGANIZATION: University of Arizona
AGREEMENT DATE: 05/21/2024

## SECTION II: SPECIAL REMARKS

TREATMENT OF FRINGE BENEFITS:
The fringe benefits are charged using the rate(s) listed in the Fringe Benefits Section of this Agreement. The fringe benefits included in the rate(s) are listed below.

TREATMENT OF PAID ABSENCES:
Vacation, holiday, sick leave pay and other paid absences are included in salaries and wages and are claimed on grants, contracts, and other agreements as part of the normal cost for salaries and wages. Separate claims for the costs of these paid absences are not made, except where vacation benefit leave is accrued and earned but unused at the termination of a project.

OFF-CAMPUS DEFINITION AND APPLICATION
The off-campus rate is applicable to those projects that are conducted in facilities not owned, leased or operated by the University. If the project is conducted in leased space and lease costs are directly charged to the project, then the off-campus rate must be used. A project is considered off-campus if more than 50% of its salaries and wages are incurred at an off-campus facility. If a project is determined to be off-campus, it shall be considered wholly off-campus. Separate on and off-campus rates will not be used for a single project.

DEFINITION OF EQUIPMENT
Equipment is defined as tangible nonexpendable personal property (including information technology systems) having a useful life of more than one year and an acquisition cost of $5,000 or more per unit.

The following fringe benefits are included in the fringe benefit rate(s):
FICA, WORKERS COMPENSATION, UNEMPLOYMENT COMPENSATION, LIABILITY INSURANCE, HEALTH/ACCIDENT/LIFE/DISABILITY INSURANCE (HALD), DEPENDENT CARE ASSISTANCE, RETIREMENT, RETIREE SICK PAY, TERMINATION LEAVE AND QUALIFIED TUITION REDUCTION PROGRAM FOR EMPLOYEES.

This rate agreement updates the fringe benefits only.

NEXT PROPOSAL DUE DATE
Your indirect cost proposal based on your fiscal year ending 06/30/26 is due in our office by 12/31/26, and fringe benefit rate proposal based on fiscal year ending 06/30/24 is due in our office by 12/31/24.

**J.A. 602**

ORGANIZATION: University of Arizona
AGREEMENT DATE: 05/21/2024

## SECTION III: GENERAL

### A.    LIMITATIONS:

The rates in this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract or other agreement only to the extent that funds are available. Acceptance of the rates is subject to the following conditions: (1) Only costs incurred by the organization were included in its indirect cost pool as finally accepted: such costs are legal obligations of the organization and are allowable under the governing cost principles; (2) The same costs that have been treated as indirect costs are not claimed as direct costs; (3) Similar types of costs have been accorded consistent accounting treatment; and (4) The information provided by the organization which was used to establish the rates is not later found to be materially incomplete or inaccurate by the Federal Government. In such situations the rate(s) would be subject to renegotiation at the discretion of the Federal Government.

### B.    ACCOUNTING CHANGES:

This Agreement is based on the accounting system purported by the organization to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the cognizant agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from indirect to direct. Failure to obtain approval may result in cost disallowances.

### C.    FIXED RATES:

If a fixed rate is in this Agreement, it is based on an estimate of the costs for the period covered by the rate. When the actual costs for this period are determined, an adjustment will be made to a rate of a future year(s) to compensate for the difference between the costs used to establish the fixed rate and actual costs.

### D.    USE BY OTHER FEDERAL AGENCIES:

The rates in this Agreement were approved in accordance with the authority in Title 2 of the Code of Federal Regulations, Part 200 (2 CFR 200), and should be applied to grants, contracts and other agreements covered by 2 CFR 200, subject to any limitations in A above. The organization may provide copies of the Agreement to other Federal Agencies to give them early notification of the Agreement.

### E.    OTHER:

If any Federal contract, grant or other agreement is reimbursing indirect costs by a means other than the approved rate(s) in this Agreement, the organization should (1) credit such costs to the affected programs, and (2) apply the approved rate(s) to the appropriate base to identify the proper amount of indirect costs allocable to these programs.

BY THE INSTITUTION:

University of Arizona

(INSTITUTION)
*Nicole Salazar*
Nicole Salazar (May 29, 2024 15:40 PDT)
(SIGNATURE)

Nicole Salazar
(NAME)

Vice President, Financial Services
(TITLE)

May 29, 2024
(DATE)

ON BEHALF OF THE GOVERNMENT:

DEPARTMENT OF HEALTH AND HUMAN SERVICES

(AGENCY)
Arif M. Karim -S    Digitally signed by Arif M. Karim -S
                    Date: 2024.05.23 16:56:09 -05'00'
(SIGNATURE)

Arif Karim
(NAME)

Director, Cost Allocation Services
(TITLE)

05/21/2024
(DATE)

HHS REPRESENTATIVE:    Jeanette Lu
TELEPHONE:             (415) 437-7820

Signature:

Email:

# RU6990-23 University of Arizona RA - V2

Final Audit Report    2024-05-29

| | |
|---|---|
| Created: | 2024-05-29 |
| By: | Andrea Lewis (andrealewis@arizona.edu) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAPs5tzpmKigreHW_Tr0bHgp4kh9ggLML2 |

## "RU6990-23 University of Arizona RA - V2" History

Ø̶₀ Document digitally presigned by Arif M. Karim -S (Arif.Karim@psc.hhs.gov)
  2024-05-23 - 9:56:09 AM GMT- IP address: 72.222.133.86

🔁 Document created by Andrea Lewis (andrealewis@arizona.edu)
  2024-05-29 - 10:38:46 PM GMT- IP address: 72.222.133.86

📨 Document emailed to hinzen@arizona.edu for signature
  2024-05-29 - 10:39:25 PM GMT

🔁 Email viewed by hinzen@arizona.edu
  2024-05-29 - 10:39:48 PM GMT- IP address: 104.47.56.254

Ø̶₀ Signer hinzen@arizona.edu entered name at signing as Nicole Salazar
  2024-05-29 - 10:40:25 PM GMT- IP address: 174.231.89.232

Ø̶₀ Document e-signed by Nicole Salazar (hinzen@arizona.edu)
  Signature Date: 2024-05-29 - 10:40:27 PM GMT - Time Source: server- IP address: 174.231.89.232

✅ Agreement completed.
  2024-05-29 - 10:40:27 PM GMT



THE UNIVERSITY OF ARIZONA    Powered by Adobe Acrobat Sign

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL INSTIUES OF HEALTH, *et al.*, <br><br> Defendant[s]. | Civil Action No. 25-CV-10338-AK |

## <u>STATUS REPORT</u>

On February 10, 2025, the Court entered an *ex parte* temporary restraining order

in the above captioned matter. (Doc No. 25). The TRO provides, among other things:

- Defendants and their officers, employees, servants, agents, appointees, and successors are hereby enjoined from taking any steps to implement, apply, or enforce the Rate Change Notice (NOT-OD-25-068) within Plaintiff States until further order is issued by this Court.

- Counsel for Defendants shall file a status report with the Court within 24 hours of the entry of this Order, and at biweekly intervals thereafter, confirming the regular disbursement and obligation of federal financial assistance funds and reporting all steps that NIH, HHS and their officers, employees, servants, agents, appointees, and successors have taken to comply with the Court's temporary restraining order.

The Court extended the TRO on February 21, 2025. (Doc No. 96).

In accordance with the TRO, Defendants respectfully submit this status report,

along with the attached Declaration of Dr. Liza Bundesen.

In the first status report required by the TRO, Defendants confirmed that they had

not yet implemented, applied, or enforced the Rate Change Notice and that they would

not do so pending further order from the Court. Doc. No. 46-1. They confirmed that the regular disbursement and obligation of federal financial assistance funds in the Plaintiff States would continue as required under the TRO. *Id.*

As indicated in Dr. Bundesen's declaration Defendants have not implemented, applied, or enforced the Rate Change Notice. Dr. Bundesen's declaration explains that, pending further order of the Court, Defendants will not implement the Rate Change Notice. She confirms that the regular disbursement and obligation of federal financial assistance funds will continue in the Plaintiff States.

<div style="margin-left:40%">

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

BRIAN C. LEA
Deputy Associate Attorney General

</div>

Dated: February 25, 2025

<div style="margin-left:40%">

*/s/ Thomas Ports*
BRIAN C. LEA (Ga. Bar No. 213529)
*Deputy Associate Attorney General*
MARCUS S. SACKS (Ga. Bar No. 621937)
*Deputy Director*
KEVIN P. VANLANDINGHAM (NY Reg.
No. 4741799)
*Assistant Director*
THOMAS PORTS (Va. Bar No. 84321)
*Trial Attorney*
U.S. Department of Justice
Civil Division
Corporate/Financial Section
P.O. Box 875
Ben Franklin Stations
Washington D.C. 20044-0875
Tel: (202) 445-8823
Email: thomas.ports@usdoj.gov
*Attorneys for Defendants*

</div>

2

**J.A. 607**

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: February 25, 2025                    */s/ Thomas Ports*
                                            Thomas Ports

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:25-cv-10338 |
| ) | |
| NATIONAL INSTITUTES OF HEALTH, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

DECLARATION OF LIZA BUNDESEN

I, Liza Bundesen, hereby declare as follows:

1.  I am the Acting Director of the Office of Extramural Research at the National Institutes of Health (NIH), an operating division of the United States Department of Health and Human Services. I have held this position since February 14, 2025. In this position, I am responsible for overseeing the NIH's grants program and ensuring that NIH grant awards comply with applicable laws, regulations, and policies. Prior to this, I served as the Deputy Director of the Office of Extramural Research since 2021, and before that a Science Policy Advisor to the Director of the Office of Extramural Research since 2014.

2.  On February 21, 2025, I was informed that the United States District Court for the District of Massachusetts had extended the existing Temporary Restraining Order enjoining the NIH from implementing, applying, or enforcing the Rate Change Notice contained in NIH Grants Notice NOT-OD-25- 068 within Plaintiff States until further

order is issued by this Court.  The referenced Guide Notice establishes an indirect cost rate of 15% on all institutions of higher learning that receive NIH grant funding.

3.  I confirm that NIH has not implemented or enforced the indirect cost rate described in the Guide Notice and that the agency will not do so with respect to grantees in the Plaintiff states pending further instructions from the court.  I also confirm, as far as the steps the agency has taken, that NIH has instructed all components responsible for disbursement not to implement the rate change within the Plaintiff States.

4.  I am aware that Notice of the Court's Order has been provided to the Program Support Center, the component of DHHS that manages the disbursement of NIH grant award funding.

I HEREBY DECLARE TO THE BEST OF MY KNOWLEDGE AND BELIEF, UNDER PENALTY OF PERJURY under the laws of the United States of America, that the foregoing is true and correct.

EXECUTED this 25th day of February 2025 at 2:09 PM.

Liza Q. Bundesen -S

Digitally signed by Liza Q.
Bundesen -S
Date: 2025.02.25 14:10:29 -05'00'

Liza Bundesen, Ph.D.

```
 1                   UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2
                                      )
 3    COMMONWEALTH OF MASSACHUSETTS,   )
      et al.,                          )
 4                     Plaintiffs,     )   Civil Action
      v.                               )   No. 1:25-cv-10338-AK
 5    NATIONAL INSTITUTES OF HEALTH,   )   Pages 1 to 85
      et al.,                          )
 6                     Defendants.     )
      ------------------------------   )
 7    ASSOCIATION OF AMERICAN MEDICAL  )
      COLLEGES, et al.                 )
 8                     Plaintiffs,     )   Civil Action
      v.                               )   No. 1:25-cv-10340-AK
 9    NATIONAL INSTITUTES OF HEALTH,   )   Pages 1 to 85
      et al.,                          )
10                     Defendants.     )
      ------------------------------   )
11    ASSOCIATION OF AMERICAN          )
      UNIVERSITIES, et al.             )
12                     Plaintiffs,     )   Civil Action
      v.                               )   No. 1:25-cv-10346-AK
13    DEPARTMENT OF HEALTH & HUMAN     )   Pages 1 to 85
      SERVICES, et al.,                )
14                     Defendants.     )
                                       )
15
                BEFORE THE HONORABLE ANGEL KELLEY
16                 UNITED STATES DISTRICT JUDGE

17                       MOTION HEARING

18                     February 21, 2025
                          10:04 a.m.
19
             John J. Moakley United States Courthouse
20                      Courtroom No. 8
                       One Courthouse Way
21                Boston, Massachusetts 02210

22
                     Linda Walsh, RPR, CRR
23                   Official Court Reporter
             John J. Moakley United States Courthouse
24                     One Courthouse Way
                  Boston, Massachusetts 02210
25                   lwalshsteno@gmail.com
```

APPEARANCES:

On Behalf of the Plaintiffs, Association of American Medical
Colleges, et al.:

    ROPES & GRAY - MA
    By: John P. Bueker, Esq.
    Prudential Tower
    800 Boylston Street
    Boston, Massachusetts 02199-3600
    617-951-7000
    john.bueker@ropesgray.com

    ROPES & GRAY LLP - DC
    By: Douglas Hallward-Driemeier, Esq.
       Stephanie A. Webster, Esq.
    2099 Pennsylvania Avenue, NW
    Washington, DC 20006
    202-508-4776
    douglas.hallward-driemeier@ropesgray.com
    stephanie.webster@ropesgray.com

On Behalf of the Plaintiffs, Association of American
Universities, et al.:

    JENNER & BLOCK LLP
    By: Adam G. Unikowsky, Esq.
       Elizabeth Lynn Henthorne, Esq.
    1099 New York Avenue NW, Suite 900
    Washington, DC 20001
    202-639-6041
    aunikowsky@jenner.com
    bhenthorne@jenner.com

On Behalf of the Plaintiffs, Commonwealth of Massachusetts, et
al:

    OFFICE OF THE ATTORNEY GENERAL
    By: Katherine B. Dirks, Esq.
       Allyson T. Slater, Esq.
    One Ashburton Place
    Boston, Massachusetts 02108
    617-963-2277
    katherine.dirks@mass.gov
    allyson.slater@mass.gov

(Appearances continued on the next page.)

1  APPEARANCES (Continued):

2  On Behalf of the Defendants:

3       DOJ-OASG
         By: Brian Lea, Esq.
4        950 Pennsylvania Avenue NW
         Washington, DC 22101
5        202-445-8823
         brian.lea@usdoj.gov

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                    Proceedings reported and produced
                       by computer-aided stenography.
23

24

25

P R O C E E D I N G S

THE CLERK:  All rise.

THE COURT:  You may be seated.

Mr. Lara, you can call the case.

10:04   THE CLERK:  Thank you, Your Honor.

The United States District Court for the District of Massachusetts is now in session, the Honorable Angel Kelley presiding.  Today is February 21st, 2025.  Civil Action 25-10338, Commonwealth of Massachusetts, et al. versus National

10:05   Institutes of Health, et al.; Civil Action 25-10340, Association of American Medical Colleges, et al. versus National Institutes of Health, et al.; and Civil Action 25-10346, Association of American Universities, et al. versus the Department of Health and Human Services, et al., will now

10:05   be heard before this Court.

The Court reminds the parties and all those listening to these proceedings that pursuant to Local Rule 83.3(a) no person shall take any photograph, make any recording, or make any broadcast by radio, television, or other means in the

10:05   course of or in connection with any proceedings in this Court.

THE COURT:  All right.  Good morning, everyone.

Counsel, would you please state your appearances for the record, and let's start with counsel for plaintiff in docket order, please.

10:06   MS. DIRKS:  Good morning, Your Honor.  Katherine Dirks

1  from the Massachusetts Attorney General's Office.  I'm here on

2  behalf of the 22 state plaintiffs in the 38 matter.

3       THE COURT:  Thank you.

4       MS. SLATER:  Good morning, Your Honor.  Allyson Slater

10:06 5  from the Massachusetts Attorney General's Office, also in the

6  338 matter on behalf of the state plaintiffs.

7       THE COURT:  All right.  Thank you.

8       MR. BUEKER:  Good morning, Your Honor.  John Bueker

9  from Ropes & Gray in the 340 matter on behalf of the

10:06 10  American -- or the Association of American Medical Colleges,

11  the American Association of Colleges of Pharmacy, the

12  Association of Schools and Public Health, the Conference of the

13  Boston Teaching Hospitals, and the Greater New York Hospital

14  Association.

10:06 15       THE COURT:  Thank you.

16       MR. HALLWARD-DRIEMEIER:  Doug Hallward-Driemeier, Your

17  Honor, from Ropes & Gray, also for the plaintiffs in the AAMC

18  matter.

19       THE COURT:  Thank you.

10:07 20       MR. UNIKOWSKY:  Good morning, Your Honor.  My name is

21  Adam Unikowsky from Jenner & Block.  I'm here on behalf of the

22  AAU plaintiffs in the 346 matter.

23       THE COURT:  Thank you.

24       MS. WEBSTER:  Stephanie Webster, Ropes & Gray, also

10:07 25  here on behalf of the Association of American Medical Colleges,

1  et al.

2         MS. HENTHORE:  Good morning, Your Honor.  Elizabeth

3  Henthorne from Jenner & Block on behalf of all the plaintiffs

4  in the AAU matter.

10:07  5         THE COURT:  Okay.  Thank you.

6         MR. LEA:  Your Honor, Brian Lea on behalf of the

7  defendants in all matters.

8         THE COURT:  All by yourself?

9         MR. LEA:  That's right.  Thank you, Your Honor.

10:07 10         THE COURT:  All right.  So thank you, everyone, for

11 meeting the deadlines.  Because of the nature and circumstances

12 of the events, we were working in a very compressed timeline to

13 address the restraining order, which you know under Rule 65 is

14 14 days.

10:07 15         Thank you for providing your thorough and extensive

16 briefing in this.  I've reviewed those along with the amicus

17 briefs.

18         On February 10th, within just a few hours, three

19 lawsuits were filed that required immediate action because an

10:08 20 order from NIH issued on a Friday was going into effect that

21 Monday when the lawsuits were filed.  So thank you also for

22 working together plaintiffs, in consolidating and organizing

23 your arguments for today.

24         I want to thank all parties for their proposed

10:08 25 schedule for time allotments for argument today.  I'm going to

do my best to stick to that.

        But before we begin, I would like to address a few
questions that I have and give you a brief opportunity to
respond to that.  And so with regards to the plaintiffs, anyone
can respond.

        The president lawfully won the election, and one of
the reasons citizens voted for him is because he campaigned on
eliminating waste, fraud, and abuse from the federal
government.  Why shouldn't he be able to engage in cost-saving
measures by cutting the indirect cost rates across the board on
all NIH grants?  Who would like to respond?

        MS. DIRKS:  Your Honor, Katherine Dirks.  That sounds
like it's within my wheelhouse because I was going to address
the APA claims relating to whether the action is contrary to
law and arbitrary and capricious.  So if you don't mind, and
apparently you do not, Your Honor, I'll jump to those now.

        THE COURT:  I just want you to give a brief response.
I'm going to give you your full 25 minutes later.

        MS. DIRKS:  I'll keep it brief, Your Honor.  It could
be a preview, if you'd like, for what may be to come.

        This case is not about whether as a policy matter the
administration can target waste, fraud, and abuse.  This case
is about a very specific agency action and whether it's
compliant with the APA.

        So in this case, the reason why a flat rate of 15

percent or an across-the-board cut -- an across-the-board rate

that is not individualized for different grant recipients or

institutions is unlawful is because it's contrary to the

statute.  Attorney Unikowsky is going to address that.

10:10  But what I'll be talking about is it's contrary to the

regulations which govern how these costs are determined and how

these payments are disbursed.  So if there were an intention on

the administration's part to change the mechanisms by which

those occur, there's a process for it.  There is a statutory

10:10  process and there's a regulatory process.  Neither of those

were followed here.  And in fact, the issuance of the notice is

squarely within what the case law instructs us is arbitrary and

capricious because of the various things we've identified in

the brief, including the lack of identification of the

10:10  reasoning for it, and in fact, the fact that the notice is

contrary to at least one of the stated purposes that is

expressed in the notice.

So I hope that addresses how policy fits into our

legal claims here.  Happy to rest there unless the Court would

10:11  like to hear more.

THE COURT:  No, that's fine.  Thank you.

All right.  So let me turn to the government.

So this idea to cut or cap indirect cost rates for

federally funded grants is not new.  In fact, it's been a

10:11  bipartisan issue for several presidents, including President

Clinton, Obama, and President Trump in his first term.  They

all tried this.  Each president was unsuccessful.  Some were

blocked by Congress, and that was the authority -- under their

authority controlling the purse.

How is it that President Trump in his second term can

unilaterally slash and cap these previously negotiated indirect

cost rates Congress prevented him from doing previously after

an extensive appropriations hearing?

MR. LEA:  Thank you, Your Honor.

So the short answer is that NIH fully complied with

the regulations in this instance, and that is the bottom line.

But I think your first question highlights the overall policy.

In looking at this and looking at the availability of

injunctive relief, it is important to bear in mind that we are

talking about a broad discretionary power of the executive

branch about how to allocate funding.

And I want to be clear about one thing at the outset.

This is not cutting down on grant funding.  This is about

changing the slices of the pie which fall squarely in the

executive's discretion, and the executive here followed the

regulations and the statute.

THE COURT:  Thank you.  So I think you were

anticipating my next question, which is -- and I think you

indicated on page 1 of your papers, you state that the

supplemental guidance will not change NIH total spending.

1    Rather, it will simply reallocate the funds from the indirect
2    costs to the direct funding of research.  And so do I
3    understand correctly that's simply moving money from one pot to
4    another pot?
10:13 5          MR. LEA:  Your Honor, the way it will work is -- and
6    this is reflected in the guidance when the guidance said that
7    it is crucial that funds be directed to direct costs -- is that
8    the money that is saved -- I'm putting that in quotes because
9    it's not being saved, it's being reallocated -- will be taken
10:13 10   from indirect costs and plowed into new grants that will be
11   using the same funding formula.  And so the new grants will
12   also have the 15 percent cap, but the money is not being
13   pocketed or being shipped somewhere else, it's being plowed
14   back into other research in a way that best fits NIH's
10:13 15   assessment of what will best serve the public health.
16          THE COURT:  Thank you.  And thank you for pointing out
17   that, whether or not it saves money, because in the tweet by
18   NIH, which is Exhibit 5, that morning NIH states, "The change
19   will save more than 4 billion a year effective immediately."
10:14 20   So tell me why those two things seem to conflict.
21          MR. LEA:  I will say that the tweet is at best sort of
22   a misunderstanding of what the guidance does, and I would point
23   back to the guidance language that this is being done because I
24   believe it said it was vastly or exceedingly important that the
10:14 25   money go to direct costs, and that's the official document,

1    that's the official policy, and that's how it's going to work.

2              THE COURT:  Okay.  Thank you.

3              So as you -- we're getting ready to start with your

4    timeline.  I'm going to ask Mr. Lara to keep track and send me

10:14 5    notification when we're getting close.  As you present your

6    legal arguments, aside from the parties' positions with regards

7    to irreparable harm, please let know if there are any disputed

8    facts -- disputed facts surrounding the history, grant process,

9    process for negotiating the indirect cost rates, timeline, and

10:15 10   sequence of events leading up to February 10th when these three

11   lawsuits were filed.  So this applies to everyone if you think

12   that there is a dispute in facts because there seems there's

13   much agreement, but please highlight those for me.

14             And so, let's see.  I believe we have first the

10:15 15   applicability of the Tucker Act, and I think I should start

16   with you, Attorney Lea, with that.

17             MR. LEA:  Thank you, Your Honor.

18             So -- one second.  So as Your Honor knows from the

19   papers, our position is that the Court should deny these

10:15 20   motions because the Tucker Act precludes jurisdiction over this

21   case.  That act gives the Court of Federal Claims, quote,

22   "Jurisdiction over any claim against the United States founded

23   upon any express or implied contract with the United States."

24   We have binding precedent from the First Circuit in the

10:15 25   *Califano* and *Burgos* cases, the jurisdiction is exclusive.  And

so the key question under those cases is whether, quote, "The essence of plaintiffs' actions are in contract."  Plaintiffs' characterization of the relief of the actions does not control.  The question is whether the suit amounts to a claim that the terms of the contract were breached or the plaintiff is actually trying to get money owing under a contract.

We don't have to look far for confirmation these are contract cases.  And the plaintiffs state in the opening brief, they say, quote, "The terms are binding upon acceptance and that failure to adhere to the negotiated indirect cost rates is," quote, "a breach."  That's contract language.  That's about as clear as can be.  We've cited a ton of cases saying grants are contracts so long as there's an offer and acceptance of mutual intent.  I doubt that my friends will suggest otherwise because if they weren't, then grants obviously wouldn't be binding in any way.

So the notice of awards sets out how to accept, sets out the terms, including incorporating regulations and appropriation statutes, and those are the things that plaintiffs say defendants have violated.  So it's a contract case.  It's a contract case with the United States because NIH is an agency.  And so under the binding precedent, the Tucker Act vests exclusive jurisdiction in the Court of Federal Claims.

Now, I know my friends make essentially three,

1     depending on how you look at it, maybe four arguments in

2     response.

3           Their first response is that the APA -- they assert

4     suit under the APA and also allege violations of the statute.

10:17 5     That is the same sort of maneuver that the First Circuit

6     rejected in *Califano* and *Burgos*.  In both of those cases, I

7     believe the Court -- or the plaintiff relied on the APA, and in

8     *Califano* I know they did, and the plaintiff also added

9     constitutional claims.

10:18 10           The First Circuit says you have got to pierce through

11     that, and you look through to see -- basically it's plaintiff

12     saying, look, this contract isn't being honored or I should get

13     something under this contract.  Plaintiffs' remedy, if they get

14     vacatur, will be -- the indirect cost rates will be paid under

10:18 15     the old terms, the same terms that the Massachusetts

16     plaintiffs' claim have been, quote, breached.  Again, contract

17     language.

18           I would add one additional point about the statutory

19     language.  Not only is it not enough to change the essence of

10:18 20     the suit -- I'm talking about the appropriations rider here,

21     Your Honor.  I'm sorry for being unclear.  But that, too, was

22     incorporated in the notice of award which incorporates

23     limitations on appropriations, and this is I believe Exhibit 2

24     of the declaration we submitted in support of our opposition.

10:18 25           Second, plaintiffs say, look, we're seeking

declaratory injunctive relief.  Again, the same thing was true in *Burgos* and *Califano*.

THE COURT:  But was it for a prospective relief?

MR. LEA:  I believe that *Califano* was because it was trying to get an exclusive license awarded to it that it said it was entitled to.  And we do have cases with prospective relief, *Diaz*, which we've cited from the First Circuit.  In that case the plaintiff said, look, you should be funding my project, and if you fund my project, that's going to bring these other contractual benefits to me.

And then *Tortorella* -- and I may be mispronouncing that, and I apologize -- from this district was similar in seeking prospective relief.  Again, in both cases, *Burgos* and *Califano,* and the other cases I've mentioned, courts held that the Tucker Act controlled because ultimately what the plaintiff was seeking was a remedy under the contract even if they were getting at that indirectly.

Also, plaintiffs talk a lot about the remedy, but that sort of misses the point.  They seem to be speaking towards the damages provision of the Tucker Act which is for money damages. We think that would support jurisdiction in the Court of Claims here, exclusive jurisdiction, but our primary argument is about the contracts provision, which doesn't really turn as much on the remedy sought except to the extent that the remedy, if it's granted in the contract, shows that the essence is based on the

1  contract.

2        And finally, I'd add that even under defendants'

3  assessment of the money provision, the fed circuit deals with

4  these issues most often because it hears transfer appeals when

10:20  5  we're in a situation like this and somebody says, well, move

6  me, please, to the Court of Federal Claims.  It gets those

7  appeals so it addresses it all the time.

8        In the *Suburban Mortgage* case we cited, they say the

9  question is ultimately about who gets money under a contract or

10:20  10  how much they get.  That's a Tucker Act claim even under that

11  other source that defendants are -- or plaintiffs are relying

12  on.

13        Finally, plaintiffs' third, broader argument, they

14  invoke the United States Supreme Court's decision in *Bowen*.

10:21  15  They say, look, the Federal Claims Court just isn't suited to

16  handle what we want to do with these suits or grants.  There's

17  a couple of things about that.

18        One, the binding First Circuit opinions in *Califano*

19  and *Burgos* have not been overruled, and so whatever tension

10:21  20  defendants may see with *Bowen* is ultimately a matter for the

21  appellate court, but those remain binding and we would urge the

22  Court to follow them.

23        Second, again, is the court -- the Federal Circuit

24  recognized in *Suburban Mortgages, Bowen* is narrow and

10:21  25  inapposite.  Courts around the country have said, look, the

Supreme Court decided that decision but it was very unique.  It
was a statutory claim.  There was no contract involved.  It was
just a state saying we should get this money under a statute.
And not only that, it was a statute that directly mediated
federal-state relationships, and that wasn't like indirect or
downstream in the sense that maybe a state could be involved.
It actually affirmatively said how the federal and state
governments should interact, and so in that case the Supreme
Court, as recognized by the Federal Circuit, said, look, we're
going to keep these for the District Courts because of that
sensitive federalism issue, and that sort of direct federalism
concern just is not present here.

And then, finally, plaintiffs' concern about a
multiplicity of suits, I'll be very brief.  One, it doesn't
justify deviating from precedent and text of the Tucker Act.
And frankly, two, is overstated.  While --

THE COURT:  Your papers inform me that there are
50,000 grants involving 300,000 researchers and more than
250 -- excuse me -- 2,500 universities, medical schools, and
research institutions across all 50 states.  So are you
proposing that each one of those file a lawsuit in the Court of
Federal Claims?

MR. LEA:  Yes.  But I am saying that that is going to
sound a lot more burdensome than it's actually going to be
because as soon as we get appellate guidance on these issues

1   from the Federal Circuit and appeals from the Tucker Act

2   claims, the issue, assuming it doesn't go to the Supreme Court

3   where the same analysis would apply, would be resolved and this

4   would be streamlined.  So those are not going to be full trials

10:23  5   about the grants.

6          Instead, if the same arguments are asserted, the

7   Federal Circuit will be resolving them, and that will apply

8   basically across the board to every grant.  And of course --

9          THE COURT:  So what happens in the meantime until it

10:23 10   goes up on appeal?

11          MR. LEA:  So that would be up to the Court of Federal

12   Claims' decision with respect to whether to pause in the same

13   sort of posture we're in now, but you know, obviously our

14   position is that there should be no injunctive relief, and so

10:23 15   we would say the same thing should apply there.

16          So in sum, we would urge the Court to deny the motion

17   for lack of jurisdiction.

18          Can I just very briefly address the DC Circuit cases

19   cited by my friends.  I would just say that *Megapulse*, the

10:23 20   plaintiff was not claiming anything under a contract at all.  A

21   contract was mentioned in the case, but they were saying that a

22   statute gave them a right not to have release of information.

23   And then the *Crowley* case --

24          THE COURT:  Are you telling me that's not the test

10:24 25   that this Court should use?

1    MR. LEA:  I'm saying the Court should follow the First

2    Circuit, yes.  So the extent that the DC Circuit has been more

3    aggressive in carving out District Court jurisdiction -- and I

4    think the cases are distinguishable.  If the Court were to

10:24  5    disagree, yes, we would ask the Court to follow the First

6    Circuit's binding precedent.

7    In the *Crowley* case, the Court went out of its way to

8    say the plaintiff's claim is for tortious interference with a

9    contract, which is a tort, which is not a contract claim, and

10:24 10    we just don't have anything like that here.

11    THE COURT:  And so can the Court of Federal Claims

12    issue injunctive relief?

13    MR. LEA:  It cannot at the end of the case.  I frankly

14    do not know whether it can do so on a preliminary basis right

10:24 15    now.  But again, our position is that no injunctive relief

16    should issue.

17    THE COURT:  Okay.  Attorney Unikowsky?

18    MR. UNIKOWSKY:  Thank you, Your Honor.

19    Plaintiffs bring their suit under the

10:25 20    Administrative -- sorry.  Can the Court hear me?  Okay.  Thank

21    you.

22    Plaintiffs bring this suit under the Administrative

23    Procedure Act.  Plaintiffs raise federal claims; therefore,

24    this case falls squarely within the federal subject matter

10:25 25    jurisdiction statute, 28 U.S.C. Section 1331.  The government

claims, however, that the Doctrine of Implied Preclusion
applies.  According to the government, plaintiffs' suit is, in
essence, a breach of contract suit, and therefore, Congress has
vested exclusive jurisdiction in the Court of Federal Claims.
That contention is incorrect.  This suit is not at its essence
a contract claim.

In considering defenses of this nature Courts consider
two points.  First, what is the source of rights upon which the
plaintiff relies; and second, what relief is the remedy -- is
the plaintiff seeking.  And when you consider both points, they
both point in favor to this Court's jurisdiction.

So first, what is the source of rights that plaintiffs
are invoking?  It's not a contractual right.  It's violations
of federal statutes and regulations as well as the federal
Constitution.  This is particularly clear with respect to
plaintiffs' claim that the rate change notice is illegal with
respect to future grants.  Plaintiffs cannot possibly be
relying on a breach of contract theory there because no
contracts exist for grants that haven't been awarded.  Even for
existing grants, plaintiffs' arguments could not possibly be
vindicated in the Court of Federal Claims.

For example, plaintiffs make a statutory argument that
there's an appropriations provision that bans the government
from spending money on promulgating this very guidance.  That's
not a provision of the contract and cannot be asserted in the

1 Court of Federal Claims.  The same goes for plaintiffs'

2 argument that notice and comment rule making was required, that

3 this is arbitrary and capricious.  Really the government is

4 trying to deny review of those claims in any form.  So at core,

10:26 5 plaintiffs are asserting claims not under a contract but under

6 statutes and regulations.

7 The government emphasizes that one of its many legal

8 violations in this case is the violation of a regulation which

9 happens to be incorporated by reference into some of the grant

10:27 10 agreements.  But the mere expedient of incorporating a

11 regulation by reference into a contract does not wipe out

12 plaintiffs' ability to file an APA suit based on the violation

13 of that regulation.  I think the crucial point, Your Honor, is

14 that even if that regulation had never been incorporated into

10:27 15 the contracts, our claims would be identical because we're

16 alleging that the rate change guidance or, excuse me, the rate

17 change notice violates the regulation, not that any contract

18 has been breached.  So this is a classic APA claim.  It's not a

19 breach of contract claim.

10:27 20 Second, Courts look to the relief the plaintiff seeks.

21 And here we're seeking classic Administrative Procedure Act

22 relief.  We're seeking vacatur of illegal agency action and

23 injunctive and declaratory relief.  We're not seeking a money

24 judgment, we're not seeking an injunction directing the payment

10:27 25 of any particular sum of money, we're not seeking specific

1   performance of any particular contract.

2        And so I think this case stands in stark contrast to

3   the two cases that my colleague cited from the First Circuit,

4   the *Burgos* case and the *Califano* case.  Those cases really were

10:28  5   contract cases.  So the *Burgos* case involved the plaintiff who

6   paid $15,000 to the IRS to try to get some land and didn't get

7   the land and alleged that the IRS breached the promise to give

8   him the land, and so he sought a $15,000 judgment against the

9   IRS in this lawsuit.  So that was a pure breach of contract

10:28 10   claim seeking a specific sum of money.  So it's not a surprise

11   the Court held that that's really properly in the Court of

12   Federal Claims.

13        The same goes for the *Califano* case from 1978.  In

14   that case the plaintiff had a license agreement with the

10:28 15   government, the plaintiff alleged that the license was

16   breached, and he sought $100 million in damages and specific

17   performance.  It was a classic breach of contract claim dressed

18   up in the language of an APA claim, and the Court said, look,

19   he's suing for breach of contract, he's seeking money, so of

10:28 20   course it goes to the Court of Federal Claims.  This case is

21   nothing like that.

22        Our complaint is a classic lawsuit alleging illegal

23   agency action.  We're saying the rate change notice itself

24   violates federal statutes and regulations and the Constitution.

10:29 25        If I could make one other point about the adequacy of

the remedy, we think that, as we've explained in our papers,
lawsuits in the Court of Federal Claims are not an adequate
substitute for injunctive relief.  The Court posed the question
as to whether there would have to be tens of thousands of
10:29  lawsuits in the Court of Federal Claims, and the government
attorney said yes.  And the attorney said, well, eventually the
government might give up.  Your Honor, I've litigated against
the government my entire career.  I can say that the government
does not usually give up so easily, and I think this would get
10:29  bogged down into hundreds or thousands of independent lawsuits.
Meanwhile, as we've outlined in our papers --

THE COURT:  I didn't quite hear him say the government
would give up.  What I thought I heard him say is that it will
go up on appellate review, and then we'll get some authority
10:29  from there.

MR. UNIKOWSKY:  Well, I'm sure that authority would
guide the government, but I mean --

THE COURT:  I do think that would take some time to
get that.

10:29  MR. UNIKOWSKY:  It would take time, and even after
that individual grants might present individual issues, and the
government might still rely on the illegal rate change notice
as long as it can, as long as there's no injunction by a Court
against it.  I certainly agree the government would follow
10:30  appellate precedent, but you can certainly see how the

1    existence of the unenjoined rate change notice could cause

2    mischief as thousands of litigations pend in the Court of

3    Federal Claims.

4             Meanwhile, the irreparable harm is going to pile up.

10:30  5    There's a lot of declarations in front of the Court explaining

6    how laboratories will have to be closed, graduate students will

7    have to be fired, clinical trials will stop.  All that will

8    happen if all these plaintiffs are forced for years to slug it

9    out in the Court of Federal Claims, so that's not an adequate

10:30 10   remedy, and so we'd urge the Court to exercise jurisdiction in

11   this case.

12             THE COURT:  Thank you.

13             I'm assuming nothing further.

14             MR. LEA:  Sorry, Your Honor?

10:30 15             THE COURT:  I said, I'm assuming there's nothing

16   further.

17             MR. LEA:  Nothing further.  Thank you.

18             THE COURT:  Very good.  Thank you.  Let's move on.

19   Who would like to speak for our next 25-minute segment?

10:30 20             MS. DIRKS:  Your Honor, for the plaintiffs, turning to

21   the merits, we're actually going to have two attorneys speak.

22   Attorney Unikowsky is going to address the constitutional and

23   statutory claims.  I'll address the remainder of the APA

24   claims.

10:31 25             And before we begin, I just want to put on the record

1  that while we're here for an extension of the TRO, the

2  government flagged in a footnote that it maintains we're in a

3  procedural posture of a preliminary injunction.

4          THE COURT:  And you agree.

10:31  5          MS. DIRKS:  The plaintiffs do not object, Your Honor.

6  We think this is appropriate to reach the preliminary

7  injunction stage at that point.

8          THE COURT:  All right.  So with today being the 11th

9  day and Monday being the 14th day, I'll find good cause to

10:31 10  extend the TRO until I can decide this preliminary injunction,

11  which I will do as quickly as I can, understanding the

12  importance of it.

13          MS. DIRKS:  Thank you, Your Honor.

14          THE COURT:  Thank you.  So who's going first on behalf

10:31 15  of the plaintiffs?

16          MR. UNIKOWSKY:  Thank you, Your Honor.  So I'll be

17  discussing the plaintiffs' statutory claim under Section 224 of

18  the Continuing Appropriations Act as well as the corresponding

19  claim under the appropriations clause of the Constitution.

10:31 20          So as Your Honor noted at the outset of this argument,

21  the extraordinary feature of this case is that the

22  administration actually attempted to impose this change via the

23  budget in 2017.  And then Congress went out of its way to say

24  that the administration could not do that unilaterally in this

10:32 25  appropriations rider.  Indeed, it enacted three separate

provisions that overlap to make it as emphatic as possible that
the administration cannot unilaterally slash indirect costs,
which is exactly what the administration just did, so here we
are today.

10:32    So let me go through each of the three separate
provisions in Section 224 and explain how the government
violated every one of them.

So the first provision states that in making federal
financial assistance, the provisions relating to indirect costs
10:32 in Part 75 of Title 45, Code of Federal Regulations, those are
the costs we're talking about today, including with respect to
the approval of deviations from the negotiated rates shall
continue to apply to the National Institutes of Health to the
same extent and the same manner as such provisions were applied
10:33 in the third quarter of fiscal year of 2017.

So this is a provision that's laser focused on the
specific facts of this case.  So the government takes the view
that all this is doing is saying that the regulations that
already existed stay in force and the regulations let the
10:33 government do whatever it wants and so it's just done whatever
it wanted.  So I agree to some extent with my colleague from
the government that this was in part intended to tell NIH that
the existing regulations must stay as they are and can't be
amended.  But contrary to the government's submission, I think
10:33 that indicates Congress's accurate understanding that the

regulations do not in fact permit this sort of change. My colleague will elaborate on this in a moment, but even if the statute had never been enacted, the regulations do not permit this sort of abrupt change anyway, and Congress, by telling the agency it can't change its regulations, recognized that.

However, this provision goes beyond a mere instruction to the agency not to change its regulations. It says that the regulations have to continue to apply to the same extent and in the same manner as they were in 2017. And I don't see how you can say that the indirect cost regulations are continuing in the same manner when in the past there is these negotiated indirect costs with bespoke occasional deviations and now there's just a unilateral slash in the 15 percent.

I then go on to the second sentence of 224, which is a bar in the government spending money. It says none of the funds appropriated in this or prior acts or otherwise made available to HHS or any department or agency, that includes NIH, may be used to develop or implement a modified approach to such provisions. And I guess I don't see how this rate change notice can be understood as anything other than a modified approach to such provisions. It's a dramatically different approach. That's how it's touted. That's the whole point of it. So if this is not a modified approach, I'm not quite sure what is.

And then the third sentence of 224 says that the NIH

is barred from taking action that would, quote, intentionally

or substantially expand the fiscal effect of the approval of

such deviations from the negotiated rates beyond the

proportional effect of such approvals in such quarter.  So the

10:35  government with respect to this sentence interprets the word

"fiscal" to refer only to the government's finances.  That is

not correct.  As we explain in our brief, if you look at the

surrounding regulations, the word "fiscal" invariably refers to

the universities.  There's fiscal years and fiscal reports by

10:35  the universities.  And it's obvious from the declaration that

we submitted that this new rate change notice will have

cataclysmic effects on universities' budgets.

        But even accepting the government's premise that

"fiscal" refers only to the government, there will still be a

10:35  dramatic change.  As Your Honor noted, that is how the

government touted billions of dollars in cost savings based on

indirect cost reductions.  Now, I understand the government's

argument to be because they're spending this money on something

else anyway it all kind of cancels out so there's no problem.

10:36  That's directly contrary to the plain text of this provision.

It says that the government may not, quote, expand the fiscal

effect of the approval of such deviations from negotiated

rates.  So the Court has to focus on the deviations from

negotiated rates and look to the effect of those deviations,

10:36  and plainly there will be a massive effect, billions of dollars

saved.  I don't think that the government can kind of cancel

that out by saying we'll just spend the money on something

else, especially given that the government's interpretation

would reduce this statute to meaninglessness.  All the

10:36 government is saying is, the NIH has to spend all of its money

on something.  That was already true before this statute was

enacted.  So the government's interpretation would render it

entirely without meaning.

And if I can say one more thing, and then I'll sit

10:36 down, Your Honor, that's a particularly ironic outcome given

that the obvious intent of Congress, when you read the

legislative record, is to ensure that Congress not -- excuse

me -- the NIH not slash indirect cost rates in exactly the way

it did.  After the administration made its proposal, both

10:37 committees had numerous members of Congress saying that it

would be disastrous for research if indirect costs were

slashed, and that's why they took this specific action

specifically referring to indirect costs at NIH.  And so the

government acted impermissibly when it nonetheless acted

10:37 without authorization from Congress.

THE COURT:  What meaning do you give to the phrase

"beyond the proportional effect of such approvals"?

MR. UNIKOWSKY:  So I think that phrase requires a look

to the proportional effect of the approvals in '17.  So if you

10:37 take the total amount of deviations relative to the total

1  amount of indirect costs that were paid out at the time, you

2  have to assess the amount of -- the extent of the deviations of

3  that time and compare it to the extent of the deviations now.

4       There's no dispute that the proportional effect is

10:38  5  much greater now because at the time negotiated rates were

6  almost always used subject to occasional deviations in unusual

7  cases.  Now, in 100 percent of cases there's very large

8  deviations.  So I'm not sure there's a dispute that there is a

9  greater fiscal effect assuming we're just looking at indirect

10:38 10  costs relative to what it was in 2017.

11            THE COURT:  Okay.  Thank you.

12            Counsel?

13            MR. LEA:  Your Honor, you know, I am reluctant to

14  start with the statute because I see the government [sic] to,

10:38 15  for the most part, be saying that the statute is violated

16  because the regulations were violated, but I'm, of course, also

17  happy to take questions in any order Your Honor would like.

18       So starting with the statute, Section 224, as my

19  friend noted, it has three parts.

10:38 20       First, provisions relating to indirect costs in part

21  75 and then dot, dot, dot, including with respect to deviations

22  from negotiated rates shall continue to apply in the same

23  extent and the same manner.  Two phrases there, my friend

24  highlighted that.  "To the extent" just means the same scope,

10:39 25  but it's the whole corpus of regulations.  So it includes

1    Subsection 3, which is the part that the case frankly turns
2    upon in our submission.  Nobody is denying that that provision,
3    I don't think, continues to apply to the same broad scope as it
4    did before.
10:39 5    And then there's "the same manner."  That just means
6    that the power that was reflected in that provision before
7    remains the same as it was then.  The manner is how the
8    provision applies.  It prevents dramatic reinterpretations, end
9    runs, but if you accept our position that NIH was fully
10:39 10   authorized by (c)(3) when it did this, which is, again, the
11   regulatory point that I think logically precedes this, then
12   it's applying in the exact same manner.  The provision
13   continues to apply the way it did even if the government is
14   making a different decision under it so long as the power was
10:39 15   granted.
16   And so, I think, you know, at one point plaintiffs in
17   their brief actually acknowledged, and I think this is the
18   Massachusetts plaintiff, that it just means the regulatory
19   structure remains in place, and that's our whole point.  We
10:40 20   think it does.  We think the supplemental guidance was a lawful
21   exercise.
22   Then "funds made available may not be used to develop
23   or implement a modified approach," that basically means don't
24   use money to change the regulations, either directly or by
10:40 25   reinterpreting the plain language that existed in 2017.  Again,

1   it goes back to the regulatory point.  Our position is that we

2   didn't do that.  NIH instead applied the regulation as written,

3   came up with a supplemental guidance.  No violation of the

4   regulation, no violation of the Section 224 rider my friend has

10:40  5   highlighted.

6          THE COURT:  But is this exactly what was attempted

7   before and was not permitted?

8          MR. LEA:  No.  So what was done before was a flat 10

9   percent cap on indirect costs for the purpose of saving the

10:40 10   overall government money.  It was -- I forget -- I think it was

11   $5 billion, but I could be getting the math wrong.  What is

12   done now, it is a flat cap, so to that extent it is the same

13   even if the number is different, but now it's being plowed back

14   into research.

10:41 15          And that raises the third clause that my friend talked

16   about, and that is the intentionally or substantially expand

17   the fiscal effect approval of deviations from negotiated rates.

18   My friend would have us to essentially preclude any change in

19   indirect costs, which ignores not only Subsection (c)(3) as

10:41 20   existing allowance of deviations but the plain meaning of

21   fiscal effect.

22          Fiscal's primary definition, and I acknowledge with my

23   friend that it does have a secondary definition, is over

24   related to government finances.  To get around that, my friend

10:41 25   looks to the underlying regulations and says, well, they

1    sometimes use fiscal to refer to universities.  When you're

2    talking about a statute, the proper context to consider is the

3    statutory context, and this is an Appropriations Act.  It's

4    about inflows and outflows of government money and allocations

10:42   5    of the same.

6          And so the fiscal effect is looking at the effect on

7    the government, money in, money out.  And then there's the

8    historical background.  As Your Honor rightly raised, this was

9    enacted against a related attempt, but that attempt was to save

10:42  10    money.  Where, again, it's the supplemental guidance, as I said

11    at the outset, makes clear it's about reallocation of funds,

12    and so this is a different situation.

13          Now, my friend raised this idea that NIH was required

14    to spend all of its money anyway.  Two points about that.  One,

10:42  15    there are exceptions to the act that my friend mentions, and

16    that is the Impoundment Control Act.  And so Congress could

17    rightly try to head that off.

18          Two, that provision has been subject to criticisms,

19    both past and recently, and so Congress again might want to

10:42  20    make its position clear.

21          But three, and more importantly, not all NIH funds are

22    subject to that.  The 21st Century Cures Act, Public Law

23    114-255 Sections 1001 to 1004 is a 2016 law that exempted for

24    about a decade, and I may be slightly off on the timing, NIH

10:43  25    funding under certain grant programs from the Impoundment

1    Control Act.

2            And so Congress could rightly be concerned that that

3    provision was not going to compel NIH to spend all its money.

4    And Congress would also rightly be concerned that NIH would be

10:43  5    moving money out of grants and into other things, whereas the

6    whole point of the supplemental guidance is any money, quote,

7    saved, again in quotes, is going to be plowed right back into

8    research.

9            THE COURT:  Was there a prohibition in 2020?

10:43 10            MR. LEA:  The statute that I just mentioned continues

11    to apply through I think it's 2027.  I don't want to be quoted

12    on the exact year, but yes, it was in place as of 2016 forward.

13            And so for all these reasons, we do think it bottoms

14    out on the regulation.  If we complied with the statute, NIH

10:43 15    did -- with the regulation, then it complied with the statute.

16            And I don't want to get ahead of the order Your Honor

17    would prefer, and so I will yield the proverbial podium until

18    we get there.

19            THE COURT:  Okay.  Thank you.  Who do we go back to?

10:44 20    Okay, Counsel.

21            MS. DIRKS:  Your Honor, I'm going to address the

22    remainder of the APA claims.  And because we're here for

23    temporary, soon to become a request for preliminary injunctive

24    relief, we need to show a likelihood of success of the

10:44 25    merits -- on the merits of only one claim.  So we do urge the

1    Court to, when it issues a ruling, to address not only the

2    statutory and constitutional claims but also these other APA

3    claims because any one of them would provide a basis on which

4    to satisfy that element of the TRO standard.

10:44  5         The APA claims that I'm going to address here, Your

6    Honor, are the following:  One, that the notice is contrary to

7    the plain language of the regulation; that's 45 CFR Section

8    75.414.  For today's purposes I'll refer to Section C.

9         Second, Your Honor, that the notice is arbitrary and

10:45 10   capricious for failing to take into account all manner of

11   considerations that NIH was obligated to consider, and I'll be

12   going through those.

13        And three, that the notice was not promulgated in

14   accordance with the notice and comment rule making procedures

10:45 15   that bind the NIH in this context.

16        Turning first, Your Honor, to the reasons that the

17   notice is contrary to law and contrary to the plain language of

18   the regulation, the notice violates three separate and

19   independent requirements that are set out in Section C.

10:45 20        One, the regulation requires the use of a negotiated

21   rate unless certain exceptions apply.  The rule is a negotiated

22   rate.  The notice does not purport to express an exception to

23   that rule.  It clearly changes that rule into a different rule,

24   which is a repudiation of the use of negotiated indirect cost

10:46 25   rates.

1    Two, the regulation tells us that when an agency, and

2 this isn't just NIH, but when an agency intends to deviate from

3 the use of the negotiated rates, there's a process.  It has to

4 develop, it has to implement policies and decision-making

10:46 5 procedures, and it has to make those publicly available.  That

6 clearly did not happen here when notice was issued on a Friday

7 afternoon for implementation on Monday.  And there's a two-step

8 process that's embedded in this part of the regulation, Your

9 Honor, and we know that partly because of how NIH has done this

10:46 10 in the past, and that's Exhibit 44 in the state plaintiffs'

11 supplemental declaration.  It's a very long document, Your

12 Honor.  It's called a grants policy statement, and it

13 identifies all the ways that NIH grants are administered.  And

14 it identifies the policies that NIH follows when it administers

10:46 15 those grants.

16    And once those policies are in place, NIH can then

17 look at a grant applicant and apply those policies to those

18 grant applications.  That clearly cannot be done here if

19 there's an across-the-board uniform rule that applies to every

10:47 20 grant recipient or grant applicant and current grant recipient.

21    Three, Your Honor, the regulation, and this is at

22 (c)(4), the regulation requires that these policies about

23 negotiated rates must go into the notice of funding

24 opportunity.  Now, that's the document that goes out into the

10:47 25 world and announces that an NIH grant opportunity is available

1  so that applicants can consider it and know what they're

2  signing up for in the event that that grant is awarded.  And

3  that clearly has not happened here.  There are thousands of

4  current grant recipients who have already been awarded grants,

10:47  5  and clearly the February 7th notice was not included in that

6  notice of opportunity -- that notice of funding opportunity

7  pursuant to which those grants have already --

8            THE COURT:  That's for the existing grants?

9            MS. DIRKS:  That's for existing grants, Your Honor.

10:48 10  And now it could be -- there's also an issue, though, there's a

11  timing issue in that there are future grants, but even for

12  those future grants there is a current agreement that binds all

13  of the federal government in terms of the indirect cost rate

14  that's applied.  So that's an acronym that you might have seen,

10:48 15  Your Honor, in the briefs, the NICRA, N-I-C-R-A.  So that's an

16  agreement that binds all grant awards that are awarded during

17  that period even if they're not current awards.  But it is true

18  that the notice of funding opportunities might have yet to come

19  for certain grant opportunities in the future.

10:48 20        The government has argued that the regulation is

21  violated in different ways.  On the regulatory interpretation

22  piece, they say that this is a deviation because it's different

23  from the rule of using a negotiated rate.  And we urge the

24  Court to look at just the plain meaning of that word, and we've

10:48 25  cited the sources in our briefing for that plain meaning.  A

deviation is something that is a departure from a rule.  It
does not signify a new rule, a change in the rule, an
advocation of the rule.  The other clause --

          THE COURT:  I just want to be clear --

          MS. DIRKS:  Yes, Your Honor.

          THE COURT:  -- are you disagreeing with the use of the
word "deviated"?

          MS. DIRKS:  I'm disagreeing that the notice qualifies
as a deviation.

          THE COURT:  Okay.

          MS. DIRKS:  Just by way of example, Your Honor, and
this is, again, in that Exhibit 44, which is the NIH grants
policy statement, it actually tells us what deviations have
looked like to date.  For example, if you're a grant recipient
that's a foreign organization, so you're not operating in the
United States, you're capped at an 8 percent indirect cost
rate, and NIH tells us why.

          NIH says -- there's an interesting fact that Attorney
Bueker might be talking about.  There's a regulatory scheme
that applies to conducting public health research, an enormous
amount of regulatory compliance requirements, especially when
you're dealing with animal subjects or human subjects, and the
cost of complying with those federal regulatory systems is very
expensive.

          So the NIH policy statement says if you're a foreign

organization, we'll give you 8 percent because we know you have
to comply with this complex regulatory scheme, but we're not
going to let you negotiate one of these higher rates.
Similarly training grants, training grants are capped at 8
percent.

And this goes to my second interpretation point, Your
Honor, which is the use of the clause "class of federal
awards."  The government argues that class of federal awards
can be, and in this instance is, coterminous with all federal
awards, and that's not only contrary to the plain meaning of
class, which suggests a subgroup within a larger group, but
it's contrary to the definition of that term that appears in
the regulations, and that's in 2 CFR 200 I believe, Your Honor.

And if the Court were to look to that definition, one
would see that class of federal awards is a group of awards,
not the entirety of all awards that are granted by an agency.

THE COURT:  So could that class of federal awards be
universities?

MS. DIRKS:  According to the definition in 2 CFR 200,
no, Your Honor.  And I'm happy to give you some language to
work with.  The definition in 2 CFR 200.1 for class of federal
awards means a group of federal awards either awarded under a
specific program or group of programs or to a specific type of
nonfederal entity or group of nonfederal entities to which
specific provisions or exceptions may apply.  So I think under

1    that definition -- it's a long clause, Your Honor, but any

2    attempt to aggregate it in a way that is not -- that is an

3    attempt to basically get around the fact that there is a rule

4    of negotiated rates, I think would not qualify as a class of

10:51 5    federal awards.  And in any case, it wouldn't satisfy the

6    deviation limitation that's placed on the regulation, all of

7    which, of course, is setting aside the statutory arguments that

8    Attorney Unikowsky addressed.

9         If there are no questions about the contrary to law

10:52 10   piece, I'll move on to arbitrary and capricious, Your Honor.

11        THE COURT:  I do have a question with regards to this

12   regulation.  So if we go to (c)(3), and it states that the HHS

13   awarding agency must implement and make publicly available the

14   policies, procedures, and general decision-making criteria that

10:52 15   their programs will follow -- do you see where I am?

16        MS. DIRKS:  I do.

17        THE COURT:  Can you help me with the next set of

18   words, "to seek and justify deviations from negotiated rates";

19   what does that mean?

10:52 20        MS. DIRKS:  It might be easiest with a hypothetical,

21   Your Honor.  So if you're a foreign organization and you've

22   submitted a grant application and you've identified indirect

23   costs, let's say, that are 50 percent beyond what your direct

24   costs would be, HHS in that instance has already made public

10:53 25   the policies regarding how foreign organizations can be

1    reimbursed for indirect costs.

2         And then the verb tense is interesting here, Your

3    Honor, you'll see there's a present tense and a future tense

4    here.  So the present tense, "must implement and make publicly

10:53 5    available," that's what we see in the NIH grants policy

6    statement, and then "will follow to seek and justify

7    deviations," right?  So if NIH is awarding only 8 percent

8    indirect costs to a foreign organization, that's the process by

9    which it is -- by which it will follow to seek and justify

10:53 10    those deviations.

11         THE COURT:  Okay.  I'm trying to understand the seek

12    and justify.  Does that require some type of approval?

13         MS. DIRKS:  I see what you're saying, Your Honor.

14    That's a good question.  There is a layered regulatory scheme

10:54 15    here which is that these regulations are HHS regulations but

16    the awarding agency is NIH.  I don't know if NIH has to go to

17    HHS to seek various approvals.  We do know that HHS is involved

18    here, they're involved in the auditing process, so this is not

19    completely disaggregated.  I don't know what approvals are

10:54 20    required by HHS before a grant is ultimately awarded or a

21    deviation ultimately occurs.

22         THE COURT:  Okay.  And what do you expect would

23    normally take place and what would it look like, the deviation?

24         MS. DIRKS:  Maybe, actually, the training example

10:54 25    might be even better because that's a domestic institution.  So

1    a domestic institution, UMass has on average a 67.5 indirect

2    cost rate, but if it has training grants, so let's say you're

3    placing someone in a laboratory for training purposes, the

4    administrative and facilities costs are already encompassed

10:54 5    perhaps in a grant recipient, but the additional direct costs

6    that might go with that training component are going to be

7    capped at 8 percent.  So that's a deviation from a negotiated

8    indirect cost rate that exists.

9          And what I don't know of NIH, who is it going to seek

10:55 10    the justification for that grant-specific 8 percent cap, I do

11    not know, but I think that's how the process becomes sequenced

12    out.

13          THE COURT:  Okay.  And what about documented

14    justification?  So I'm going to (c)(1).  It says that when

10:55 15    approved by the federal awarding agency, head or delegate based

16    on documented justification, what should that look like?

17          MS. DIRKS:  I've been trying to find examples of that,

18    Your Honor.

19          THE COURT:  I was looking for that.

10:55 20          MS. DIRKS:  Yes, yes.  What that sounds to me like,

21    Your Honor, is something case-specific.  So the examples I was

22    giving were categories of grants.  But you could imagine a case

23    where it warrants some sort of deviation from a negotiated cost

24    rate.  I deal with state contracts, so what we see in the state

10:56 25    contract world are deviations based on changes in fuel prices,

for instance, right?  There's a huge increase in the price of
oil or maybe a huge dip because those prices vary, and so there
needs to be some sort of a rider, some sort of an adjustment to
a contract price based on the change in world circumstances.
It could be that it's that sort of thing, Your Honor, but we
have not been able to find examples of that.

          THE COURT:  Okay.  Was there anything further from you
on this?

          MS. DIRKS:  Not on contrary to law.  I did want to
make sure we have time for arbitrary and capricious, Your
Honor, and I can do that now or I can do that after counsel --

          THE COURT:  I want to follow up on this, particular
questions I have regarding this regulation.

          MR. LEA:  Thank you, Your Honor.

          On the regulation, I think we've all identified the
key provisions are (c)(1) and (c)(3).  (C)(3) sets out the
exception referred to in (c)(1).  I would just add, kind of as
an aside before moving to (c)(3), nothing about documented says
anything about case-specific.  It just means providing the
explanations and justifications for the deviations.

          THE COURT:  So do you have an example to share?

          MR. LEA:  I do not.  I will add that my understanding
is the training and foreign grants were not done under 414(c)
at all and in fact predate that provision.  So I do not have an
example.  I think we just have the plain words of the

regulation.  And nothing about documented suggests that it
needs to be case by case.  And in fact, the rest of the
regulation shows otherwise.

My friend talked a great deal about the phrase -- I
think it's class of grants and group of grants.  This
regulation applies across HHS.  And so the first point is that
nothing about either of those words requires it to be a subset.
It could be the whole class, but here you don't even have to
get there because it's not.  This is limited to NIH grants.
They themselves are a subset satisfying my friends' test, and
not only that, it's NIH grants limited to institutes of higher
education.  So it's even further narrowed than that.  So the
idea that somehow it can't be across the board under this
provision is just not even an issue you need to reach here
because it's not.

And so then we parse the words of the guidance, we
have the justifications, we have the policy that NIH is going
to follow or, as plaintiffs call it, the new decision-making
criteria, they've set out the reasons, and they've established
the procedure.  And the procedure -- I think it's important
because my friend made a great deal about the timing of this.
The pinch of when this applies comes when folks go to do a
drawdown.  Basically they go to request their money in the
future, and so that is the application.  And nothing in the
plain language of this text suggests that the application --

the justifications and everything announced can't apply across

the board, and then the application comes on instances of

individual payment.  And I think not only is that supported by

the regulatory text but I think logic supports it.

Suppose that NIH had not done this at all and they had

instead come with the exact same justifications on a

case-by-case basis, just dealing with each one individually,

that would satisfy all of my friends' criteria, and yet it

would be the exact same result.  So I think that that just

confirms --

THE COURT:  But doesn't that give them notice and an

opportunity and justification?

MR. LEA:  They could announce that before, but then

just wait, or define it more generally and then apply it later.

So my point is aggregating it can't make a difference.

And then we talk about (c)(3).  We've mentioned the

case-by-case approach.  We could talk about the other

regulations.  My friends in the brief talk a lot about the

provision of audits; they will continue to apply.  Less time

and expense will be taken up in focusing on indirect costs but

they continue to apply.

THE COURT:  Those audits seem to me would be relevant

to the documented justification, that had there been some

audits that justified this modification or deviation from the

rate, then that may satisfy the documented justification.

1     MR. LEA:  So that would be one way to satisfy

2 document3d justification.  But nothing in the word "documented

3 justification" requires that it be through an audit and that it

4 not be other sort of extra specific grants considerations,

11:00 5 which is exactly what the supplemental guidance does.  It

6 documents the justification.

7     I know my friend talked about the idea of seek and

8 approve.  There is no an external decision-maker here.  The

9 head of the department is the one who --

11:00 10     THE COURT:  So seek and justify?

11     MR. LEA:  Seek and justify, yes.  I'm sorry, Your

12 Honor, I misspoke.

13     THE COURT:  That's okay.

14     MR. LEA:  There's no external decision-maker that's

11:00 15 playing referee other than the head of the agency.  And so then

16 we have the discussion about deviation and the idea that this

17 conflicts with the regulations dealing with how negotiations

18 occur when they occur.  And nothing requires adherence to the

19 negotiation process.  Those provisions remain there when and if

11:01 20 NIH or another agency decides to negotiate, but you can deviate

21 across the board and not on a case-by-case basis.  You could

22 say this is the norm but I'm no longer following this norm for

23 the foreseeable future.  And nothing about the plain language

24 of the word "deviate" changes that so those provisions remain

11:01 25 valid.  They govern when and if there are negotiations.

1       The point here is under the policies and

2   justifications and procedures that NIH has announced, there is

3   no need to apply them.  Or another way of saying it is to apply

4   would be moot.  I mean, I guess NIH could go through that

11:01  5   process, if that's what my friends want, and then say for the

6   reasons we've given we're adhering to our 15 percent rate, but

7   that seems incredibly wasteful.

8       THE COURT:  I understand what you just said, but why

9   wasn't President Trump able to do that the first time he tried

11:01 10   based on that theory?

11       MR. LEA:  I can say only that he may not have seen the

12   availability of the regulatory process at the time, but the

13   plain language gives the agency the power.  The first time he

14   went to Congress to actually lower the budget, and that's where

11:02 15   he got stonewalled, which goes back to our statutory argument.

16       THE COURT:  Okay.  Counsel, did you want to resume?

17       MS. DIRKS:  Yes, Your Honor.  I'll turn to arbitrary

18   and capricious, except to pick up on one point that the

19   government just noted, which is that they could go through the

11:02 20   negotiation process but it would kind of be meaningless, and I

21   think that's exactly our point, which is that the

22   interpretation of the regulation renders (c)(3) and (c)(4)

23   meaningless, and that's a point we've made in our reply.

24       Moving on to arbitrary and capricious, Your Honor, I

11:02 25   think the list of things we've identified in our brief is quite

long for different ways in which this action is arbitrary and
capricious, and if I had my druthers, I probably would have
started there today, but this was the more orderly way to
proceed.

I would like to highlight four, four aspects in which
this agency action is arbitrary and capricious, and I'll take
them in turn but just to highlight.

One, the notice fails to explain why a 15-percent cap
and why across the board, and that's the question that the
Court began our proceedings with today, and I will address
that.

Two, the notice failed to consider the effect that it
would have on the public health research that is the entire
purpose of this regulatory structure.

Three, the notice failed to explain the agency's
assertion that these indirect costs are difficult to oversee.

And, four, the notice fails to consider the
significant and undisputed reliance interests of the
plaintiffs.

And before I proceed, Your Honor, just I think the two
foundational hooks that we would urge the Court to consider in
all of this is the fact that the law prohibits post hoc
rationalizations. So we are limited to the reasons that are
identified in the notice.

And two, the Court cannot provide its own reasons that

might exist for an agency.  We are limited to what the

agency -- for this action.  We are limited to what the agency

has offered itself.

So first, Your Honor, and I --

THE COURT:  That's in the supplemental guidance.

MS. DIRKS:  Pardon me, Your Honor?

THE COURT:  They're limited to what's contained in the

supplemental guidance.

MS. DIRKS:  That's correct, Your Honor.

For the first one identified, we've addressed a little

bit already, but just the fact that the notice doesn't explain

why 15 percent and why across the board, and those are two

different but related decisions that are in the notice that

simply aren't explained.  The only thing that the notice points

to is the fact that there are private foundations, some of

which use a 15 percent cap, but it does not explain any

independent reasons that the NIH used to draw this conclusion.

And if we think about negotiated cost rates, it's

important to remember that these are not numbers plucked out of

the air.  These are numbers based on actual costs and not just

administrative overhead, which is what the government refers to

it as, but there's an F and an A, there's facilities and

administration.  And actually, administration costs are capped

in their own way, I think at 26 percent.  So for the

institutions that have the larger indirect cost rates, it's

really mostly facilities that are driving that number.

And when NIH negotiates these rates, they have to do two things. One, they confirm that the costs, that are these indirect costs, are necessary for the research; and two, they have to confirm that all of those costs are directly related to the research. So there will be no subsidy of the student gym, there won't even be a subsidy of the classrooms. These are only costs that are necessary and directly related to the research.

So the 15 percent number is not tethered in that way to the actual indirect costs that are incurred. It's just a number. And there's no justification for why that number and not another, and there's no justification for why it should be across the board given that we are dealing with actual costs and those are highly variable, not only by institution but by research type.

So if you're dealing with public health research that involves advanced cutting-edge medical research, you can imagine, and we see it in the declarations, how expensive some of that equipment is, how expensive facility maintenance can be, maintaining the right air quality, right, for some of these various sensitive experiments that depend on their environment, again, the human and the animal controls that exist, all of those are very, very expensive which are different from an NIH grant that might involve sociology research, social sciences

that are dealing with public health questions that don't occur
in a lab.  So the numbers are different.  That's why.  That's
why we don't have an across-the-board rate.

Just -- I could -- I don't know if I want to waste my
time, Your Honor, touching on the foundations too much.  I'll
just simply make two points, and these are in our reply.  One,
the foundations use different definitions for direct and
indirect costs than NIH used.

THE COURT:  You are talking about the private
foundations?

MS. DIRKS:  The private foundations, the Gates --

THE COURT:  Some of the indirect costs may already be
built into the direct costs.

MS. DIRKS:  Exactly, Your Honor.

THE COURT:  Understood.

MS. DIRKS:  And then the other point about the
foundations is that they often fund different kinds of
research.  So not necessarily these expensive labs that we are
talking about.

THE COURT:  I think you could spend a little bit more
time on discussing why the rates are so different with certain
institutions.

MS. DIRKS:  Yes, Your Honor.  And again, these are all
documented, and Attorney Bueker will be able to talk more of
the facts.  And I believe the Court encouraged us to identify

any disputed facts.  This is definitely an area where I don't

think the facts are disputed.  The types of things that go into

these rates are going to be things like building a new

building, right, and sometimes debt service on that building,

11:07 HVAC systems, regulatory compliance, right?  All of this is

going to depend on the type of research conducted and in a way

how it can in some ways depend on how large the institution is

because there's some information -- I don't think it's in the

regulations.  I think it's in the grants policy statement.  No.

11:08 I'm sorry.  It was Appendix 3 of Part 75 talks about some

different rules for smaller institutions.

A lot of this is driven by economies of scale, right?

The larger the institution you have, the bigger the building

you have, the more you can house multiple projects within that

11:08 one building; that's going to change your ratio of direct costs

to indirect costs.

Remember, an indirect cost is not just overhead.  It's

not -- it's not something that is unknowable.  It's simply a

cost that can't be allocated to just one project.  So if you

11:08 have a huge building in which 50 projects are occurring, you

are going to have a larger amount of indirect costs than a

building that houses one or two projects.

THE COURT:  Okay.

MS. DIRKS:  The second piece of arbitrary and

11:08 capricious I wanted to highlight, Your Honor, is the failure to

consider the impact this action will have on the research that
the funds support, and this gets at something that counsel said
at the beginning about how these funds will be redirected to
new grants.  One, there's simply no explanation for that in the
notice.  So to the extent the government would like us to
consider that, the materials have not been provided by the
agency that would explain how that would happen.  Even if there
were some sort of evidence in the record to support that, it's
simply contrary to what we know about how this industry works.

Now, think about a new grant recipient who's in the
queue, maybe didn't get the NIH grant last year but is hoping
to get it this year because there's some more money available
but the indirect cost rates are capped at 15 percent.
Remember, indirect cost rates are necessary for the research.
So if the costs that are necessary for your research are no
longer going to be provided, then you're not going to go into
that line of research.  Again, maybe something out in the
community might be fundable but not the ones that are more
expensive from the infrastructure point of view.  So it cannot
be assumed that this money can be redirected in that way to new
research.

What will happen is that less research will be
conducted and the resources that Congress has appropriated for
this will be directed in that way.

Third, Your Honor, there is no basis for the assertion

1   that negotiated rates are difficult to oversee.  And the

2   government offers no basis for that assertion, either in the

3   notice or elsewhere.  What do we know on the other side of the

4   ledger?  We have that the regulation defines the categories of

11:10  5   indirect costs in great detail.  We know that there's an

6   Appendix 3 to Part 75, which, again, goes through the

7   negotiation process in great detail, from how those indirect

8   costs are determined and applied, how they are documented, and

9   the certification requirements that come with the submission of

11:10 10  those as part of the negotiation process.  Universities and

11  research institutions have to certify that the costs they

12  submitted are correct.

13        We also see the grants policy statement.  This is at

14  Roman numeral ii(a), 68 through 71, which details what is in,

11:11 15  what is out, and how to calculate it.  And we haven't mentioned

16  this yet, Your Honor, but I would like to highlight the Tran

17  declaration, which is attached as Exhibit 4, I believe, to the

18  AAU submission as part of its reply, which is, he's one of the

19  accountants that supports research institutions in the grants

11:11 20  application process, and he goes through all of the details of

21  how the audit process works and all the monitoring that goes on

22  to make sure these costs are properly accounted for.

23        And finally, Your Honor, and I think I can end here,

24  unless the Court wants to hear about notice and comment, but in

11:11 25  the interest of time, I'll just end on the reliance interest

1    because it would be a good segue to irreparable harm, which is
2    our next topic after the government talks.
3                THE COURT:  I am interested in the notice and
4    comments.
11:11   5            MS. DIRKS:  I'm sorry?
6                THE COURT:  I am interested in hearing --
7                MS. DIRKS:  Very good.  So I'll just briefly say on
8    the reliance interests, and I'll keep this short because it
9    does overlap so much with irreparable harm.  But there is no
11:11  10    dispute of the reliance interest.  The government does not
11    dispute that in their reply.  It's simply a conclusory
12    statement that those reliance interests are outweighed by these
13    other policy considerations.  And we know from the Supreme
14    Court, *Encino Motorcars*, that conclusory statements simply do
11:12  15    not suffice.
16                Moving on to notice and comment, Your Honor?
17                THE COURT:  Please.
18                MS. DIRKS:  There are two points here.  One is whether
19    grant rules require notice and comment.  And the government
11:12  20    argues that under the APA notice and comment is not required
21    for grant rules.  But what we know is that in 1971 HHS decided
22    we know that that is the baseline rule, but we, HHS, not NIH
23    but HHS, we've decided that we are going to comply with notice
24    and comment for grant making for all good reasons, right?  So
11:12  25    the grant applicants can understand the process.  There can be

1  transparency, there can be predictability, especially in

2  industries like this which are incredibly expensive and require

3  such long-term investments.  There was a voluntary decision 54

4  years ago to comply with notice and comment for grant making

11:13  5  rules in this space.

6         The Supreme Court put this very colorfully, the *Fox*

7  *Television Stations* case that we've cited, which says that the

8  requirement that an agency provide a reasoned explanation for

9  its action would ordinarily demand that it display awareness

11:13  10  that it is changing position, and that seems to be what is

11  absent here, is an acknowledgment that there is a change in the

12  position, that HHS has complied with grant -- applying with

13  notice and comment to grant making, and this is an abrupt

14  reversal that would be evidenced here that has simply been

11:13  15  unexplained and unjustified.

16         Two, Your Honor -- this is the easier one, perhaps --

17  is this the type of rule that requires notice and comment, and

18  it clearly is.  What we know from the *New Hampshire Hospital*

19  *Association* case in the First Circuit, it provides a definition

11:13  20  of what a legislative rule is or a substantive rule, and it's

21  one where it creates rights, assigns duties or imposes

22  obligations.  Here we're talking about clear rights, duties,

23  obligations, both on the part of NIH and the grant recipients.

24  So this is clearly a substantive rule, not an interpretive

11:14  25  rule, right, that would require notice and comment.

1        THE COURT:  Thank you.

2        Counsel?

3        MR. LEA:  Thank you, Your Honor.  I'm happy to go in

4   any order you'd like.  I could pick up with notice and comment

11:14 5   and work back.

6        THE COURT:  That's fine.  Why don't you do that.

7        MR. LEA:  So on notice and comment, you know, I think

8   the starting point should always be the statutory text, and

9   Section 553 of the -- (a), excuse me -- of the APA exempts

11:14 10   management of grants from notice and comment.  Now, I know here

11   we wind up talking about the policy statement from the 1970s,

12   1971.  For a few reasons that doesn't make notice and comment

13   apply here.  First and foremost, it was just, quote, as a

14   matter of policy.  It was a voluntary choice.  Nobody had any

11:15 15   assurances.  It didn't itself go through notice and comment,

16   and so it's not a binding regulation that a party can then come

17   in later and say, well, we didn't get our notice and comment

18   quote as a matter of policy.

19        Second, especially post-Loper, a court should not let

11:15 20   an agency extend a statute to a context that Congress plainly

21   didn't want it to go to.  Congress said, look, we don't want

22   the APA to cover grant-related regulations.  And so an agency

23   simple policy statement that, oh, well, we're going to go ahead

24   and ignore you, Congress, that shouldn't be binding.

11:15 25        Second, even if it was binding, it has been repealed

by Section 75.414(c), at least with respect to deviations from indirect cost rates.

Like I said earlier, you know, in our view everything really does go back to the regulations. If the regulations allowed this, well, then, (c)(3) went through notice and comment itself. So to that extent, that policy statement has been repealed and (c)(3) sets out the policy without any need for notice and comment. And again, I would reiterate, (c)(3) is a regulation that we're debating the meaning of, but I don't think anybody is challenging it or saying it's invalid somehow.

And then, finally, plaintiffs here agreed to application of (c)(3) and all the other regulations within the same part in their notices of awards which incorporate those provisions. So principles of waiver and estoppel would likewise prevent plaintiffs or the entities they represent from doubling down on notice and comment now. And so we don't think notice and comment is a bar.

And then we can move on to the substance of the APA argument, which is the idea of arbitrary and capricious review. If you could give me just one second. There we go.

So you know, I think it's important here to start with a statement of the standard. Arbitrary and capricious is not supposed to require a treatise. It is not, in the words of the Supreme Court, supposed to require somebody to state in detail all policy alternatives. That's the *State Farm* case we cite.

You don't have to explore every possible thought that would

occur to man.  That's *Vermont Yankee*.  And in the words of *Fox*,

all that's required is that you can reasonably discern the

course that the agency took.

11:17     Here, I saw it in some of their briefs, I heard it

less in argument, but NIH set out three separate reasons for

what it did in the supplemental guidance.

     First, it said it wanted to put more money directly

towards research, directly towards the thing it's funding, less

11:17 of attenuated relationship.  That's certainly a rational thing

to do.  If you're buying something, it's certainly rational to

decide you want to apply your money directly into that thing as

opposed to some overhead that might support that thing.

     Second, it reduces the amount allocated to difficult

11:18 to oversee indirect costs.  I heard my friend suggest

otherwise, but in doing that, I feel like the point was kind of

proven.  We talked in detail about these extensive regulations,

these needs for auditors, the need for the government to come

in after the auditors and double-check and reconcile finances

11:18 and make sure that projects were being properly divvied up in

the same building.  That's much more difficult than deciding,

well, was the test tube being used for your experiment?  Well,

that's a direct cost, good to go.  And so it's certainly

rational to conclude that it is difficult and burdensome

11:18 overhead to try to oversee indirect cost rates.  I know my

1    friends disagree, but again, that's not the standard.

2          And then --

3          THE COURT:  Can we just go back to that test tube

4    example that you gave.  You said that would go into the direct

11:18  5    costs?

6          MR. LEA:  My understanding is if you bought equipment

7    for your experiment, that's a direct cost.  If it's the

8    overhead of the building or an administrator who's overseeing

9    multiple different grants, that's an indirect cost.  But the

11:19  10   point more broadly is that if you're directly paying say the

11   one person that works in the lab who only does this research,

12   that's a direct cost.  If you are broadening it out, it applies

13   to multiple grants, that's an indirect cost, and those are more

14   difficult to oversee.

11:19  15         And then, third, there's the reason of bringing

16   indirect cost rates into line with amounts paid by private

17   foundations.  NIH documented with specific examples.  I heard

18   my friend suggest, well, the Gates Foundation might define

19   direct costs a little differently or maybe the indirect cost

11:19  20   rates allowed by the Packard Foundation are slightly higher.

21   Those are quibbles around the edges.  I mean, the Packard

22   Foundation moved from 12 to 15 percent, which is exactly the

23   rate the government set.  So they do nothing to undercut the

24   broader point rationale, which is easily discernible from the

11:20  25   supplemental notice, that the government was trying or NIH was

1    trying to avoid disproportionately funding or participating in

2    the funding market by disproportionately funding indirect cost

3    rates.

4            And so then there's the argument about reliance

11:20  5    interests.  NIH did consider them.  I mean, it is directly in

6    the supplemental guidance.  I admit that we are bound by what

7    is in the supplemental guidance here.  That's what we have.

8    But there is a reference, and this isn't a math formula.

9            THE COURT:  Where is that reference?

11:20 10            MR. LEA:  Although cognizant that grant recipients,

11    particularly new or inexperienced organizations, use grant

12    funds to cover indirect costs, like overhead, NIH is obligated

13    to carefully steward grant awards to ensure taxpayer dollars

14    are used in ways that benefit the American people and improve

11:20 15    their quality of life.  And then it goes on to explain the

16    various rationales that it thinks trump those reliance

17    interests.  So it was considered.  And the idea that it's not,

18    I understand that's a policy disagreement.  But Justice

19    Ginsburg put it in one of her opinions, reliance interests

11:21 20    don't get to -- they get to get considered but they don't get

21    to trump everything else automatically.  And so they were

22    considered here, and you can see the reasons that NIH put

23    forward for not adhering to them.  And so that satisfies the

24    arbitrary and capricious standard.

11:21 25            I would add a subsidiary point, that even if the Court

thought that the reliance interests were not considered

adequately, that would speak only to existing grants.  I know

my friends cite the *Encino Motorcars* case as the idea that,

well, you know, future expectations can be considered.  But if

you look at that case, it was about car dealerships, and what

the Court was saying was these car dealerships have

contractual relationships they have already set with service

providers and things like that.  So it was speaking to a

situation more like existing grants.

And the two applications here are clearly separable

because there is every reason to believe and no reason to

disbelieve that NIH would have wanted this policy and would

have promulgated it separately moving forward.  And I don't

want to bleed into retroactivity, but the new grant, even if it

couldn't apply it to existing grants, because nothing in the

policy justification somehow suggests the need diminishes or

the desire diminishes with respect to future grants.

I believe that covers all the points my friend raised,

but there was the reference to 15 percent across the board.  So

that is a policy disagreement and plea --

THE COURT:  But I just want to stop for a moment.  It

makes reference to -- this guidance makes reference to both

existing and future grants, right?

MR. LEA:  That is correct.

THE COURT:  And the NICRA applies to the future grants

1    as well.

2         MR. LEA:  Sorry.  I missed the NICRA part.  I just

3    didn't follow.

4         THE COURT:  That applies to the future grants as well,

11:23 5    right?

6         MR. LEA:  So the supplemental guidance?

7         THE COURT:  The negotiated indirect cost rates.

8         MR. LEA:  Yes, yes.  So they apply except for they are

9    subject to the Appendix 3 of Part C, and we cite this in our

11:23 10   brief, so I may get the cite slightly wrong.  But that gives a

11   heads up that, yes, those apply generally moving forward for

12   their term, but you can have deviations within the life of the

13   grant, and it points us right back to (c)(3), which again goes

14   to my point that it really is all about what (c)(3) does and

11:23 15   does not allow here.

16        So having complied with (c)(3) changes with respect to

17   existing grants are perfectly permitted under the regulations,

18   and certainly my friends had a heads up about that because

19   that's one of the regulations incorporated into the notices of

11:23 20   awards.

21        THE COURT:  Okay.  Were you wrapping up?

22        MR. LEA:  I think that is it, other than to say the 15

23   percent cost rate my friend suggested was not considering other

24   alternatives.  The other alternative was the case-by-case

11:24 25   approach that he's touting.  I mean, that was the starting line

and that was the genesis of all the policy issues that NIH had

with the way things were working, and then, also, the fact that

they selected the 15 percent rate that was reflected in rates

of private foundations, and it was frankly more generous than

11:24 rates accepted by grantees supported the across-the-board

approach, even putting aside the fact that, you know, they

clearly considered the case-by-case approach and then wanted to

adopt something different.

So this was all considered, and we'd urge the Court

11:24 that the arbitrary and capricious standard requires no more.

THE COURT:  Okay.  Counsel, did you want the last

word?

MS. DIRKS:  I'm going to decline, Your Honor.

THE COURT:  All right.  Wonderful.  All right.  Let's

11:24 move on to the next section.  I think we're at irreparable

harm.

MR. BUEKER:  We are, Your Honor.  Thank you.

I am going to address the irreparable harm that will

result if this notice is allowed to take effect.  In order to

11:25 explain why the plaintiffs here and their members will suffer

imminent concrete irreparable harm, I think it's important to

stop and just spend a minute and talk about how grants work.

And we got into this a little bit in the back and forth on the

APA.

11:25 I think it's important to note a couple of things

about indirect costs.  Indirect costs are real costs associated
with doing the research.  They're audited costs.  They're costs
that are established by historical documented cost information.
That's in the Tran declaration that counsel referred to.

11:25    The primary difference between direct and indirect
costs is whether they can be assigned to a specific grant.  So
take the example of somebody -- the salary of somebody who
works only on a particular project; that's a direct cost.
Take, for example, the salary of somebody who disposes of
11:26 hazardous medical waste that may be generated by a variety of
research projects; that salary is spread across a variety of
grants.  It is equally important to the research that both of
those people are paid to do their work.  The research couldn't
happen without that.  Nevertheless, one is classified as a
11:26 direct cost, one is an indirect cost.

When a grant recipient goes to do the budget for a
particular grant, they take into account not only the salary of
that researcher who's going to work exclusively on a grant but
all the other costs that are associated with being able to do
11:26 that research.  That's the reliance interest we're talking
about and that's what's calculated and baked into that indirect
cost rate.

So when one starts to appreciate this kind of reliance
interest and how that indirect rate is set, and then
11:27 universities and other research institutions are counting on

that budgeting on the basis of relying on those dollars and
cents, it becomes quite apparent, I think pretty quickly, why,
if the notice were to go into effect and they were not to
receive their negotiated indirect cost rate, there would be
irreparable harm, and I will talk about those irreparable harms
in just a second.  And counsel alluded to the fact that I was
going to get maybe more deeply into the facts.

Look at the Caltech declaration, for example.  They
completed a state-of-the-art neuroscience research building in
2020 at the cost of more than $200 million.  Caltech had to
finance a portion of the cost of the building that shared
laboratory space expecting to recover the financing costs as a
part of its indirect cost rate.  If Caltech's indirect cost
rate is slashed, it's still going to have to make its debt
payments.  Those aren't going to go away.  And the money is
going to have to come from somewhere else.  There's going to be
a hole in the research budget at Caltech, and actually a big
one.

Likewise, look at the University of Washington's
declaration.  They maintain a very expensive primate research
lab.  It's expensive to care for those animals.  If this rate
cut -- and as a result their IC rate is much higher on average
than some others.  We talked about why, because they're
specialized people, specialized care that has to go into taking
care of those animals.  If this rate goes into effect, if it's

1  slashed, it's not going to cost any less to care for those

2  animals.  There's going to be a gap or a hole in the budget.

3  And the University of Washington is going to have to, and they

4  say this in their declaration, take steps to fill that hole.

11:29  5  They're going to have to euthanize valuable research animals,

6  some may be in the middle of a particular experiment, and

7  that's going -- that value of that experiment is going to be

8  lost.  That's an irreparable harm.

9      I want to note one other thing because it came up

11:29 10  briefly this morning about the way these grants work.  You

11  heard the term "drawdown."  Research institutions under these

12  grants draw down on a periodic basis, and I make this point

13  because it shows how imminent this harm is.  But UMass, for

14  example, draws down on a biweekly basis.  And if you look

11:30 15  across the declarations, many of the declarants talk about

16  their next drawdown date.  Most of those dates are February

17  dates.

18      And what happens when an institution draws down?  When

19  an institution draws down, they collect not only their direct

11:30 20  costs, but they collect a portion of their indirect costs as

21  well.  For example, if an institution had $100 direct cost and

22  a negotiated rate of 35 percent, when they draw down, they draw

23  down $135.  So this explains why this is an immediate impact

24  that's going to occur in not sometime in the distant future but

11:30 25  as these universities who are counting on these indirect funds

1   and as these hospitals and academic medical centers who are

2   counting on these funds start to draw down not sometime in the

3   future but in February, why they're going to be harmed.

4           Now, with that as kind of background, let me touch on

11:31 5   they're about six broad categories of irreparable harm that I

6   think you see throughout the declarations.  The first and

7   probably the most common and direct concrete irreparable harm

8   that's going to result here appears from the declarations to

9   be, and this is as a human toll, but the loss of jobs.  And I'm

11:31 10  not talking about just the loss of jobs, I'm talking about the

11  loss of skilled, highly skilled workers who enable this

12  research to go on.

13          I mentioned the Caltech financing and those costs

14  being unavoidable.  Unfortunately, Your Honor, one of the

11:31 15  easiest ways to control costs is to eliminate people.  I made a

16  list of nine different institutions who mentioned job cuts as

17  an imminent risk before I stopped counting.  Those included

18  Morehouse College of Medicine, the University of Florida,

19  Tulane, University of Pennsylvania, Columbia, Duke, the

11:32 20  University of Oregon, the University of Kansas, Rutgers, and

21  then I lost track.  There are -- that is a theme that appears

22  throughout.  Some of them even go so far as Morehouse College

23  of Medicine says it will lose 66 people.  That's pretty

24  definite.  And the declarations themselves also go on to talk

11:32 25  about the inability to recruit, if the rate cut is reversed,

1   these people to come back.  These are highly skilled vet techs

2   who take care of animals.  They're highly skilled nurses.

3   There's a shortage of nurses.  That's well known, to help

4   recruit people to clinical trials.  This is human capital that

11:32 5   cannot be replaced if these people need to be laid off.

6       We talked about the -- the declarations talk about the

7   negative impacts this will have on facilities and the ability

8   to maintain their expensive equipment.  MIT in its declaration

9   talks about having to forgo necessary maintenance.  Rutgers

11:33 10   talks about not being able to afford the upkeep of its

11   facility.  Beth Israel Hospital here in Boston talks about the

12   need to immediately terminate leases for research space.  The

13   University of Michigan -- I'm sorry.  Michigan State University

14   talks about having to halt construction on a project.

11:33 15       There are costs that are associated with having to

16   halt construction on a project when you go to resume it.  There

17   are consequential costs that you actually couldn't recover in a

18   Court of Federal Claims.

19       There are untold costs associated with this impact on

11:34 20   human health.  Those include clinical trials.  There are

21   several of the declarants, including the University of

22   Washington, University of Vermont, Beth Israel Deaconess,

23   University of Pennsylvania, University of Chicago, who talk

24   about having to stop or not enroll patients in a clinical

11:34 25   trial.  Let's think about that.  A clinical trial is, for a lot

1    of people, a last hope.  There's not an FDA-approved medicine

2    that will treat their condition, and it's a last hope.  Any

3    minute that they're not enrolled in that trial brings the risk

4    of irreparable harm.  And this isn't just about the patients.

11:34  5    These institutions, part of their mission is actually serving

6    these patients, and this cut will irreparably harm their

7    ability to fulfill that mission.

8         Likewise, if you look at -- there are other kinds of

9    health effects just beyond the clinical trials.  There are --

11:35 10    there are patient care at kind of several of these medical

11    schools, and I point out both Morehouse and Meharry, where the

12    researchers for whom the funding will be cut also teach medical

13    students.  And those colleges also -- of medicine also do

14    outreach to the community.  The impact here is going to affect

11:35 15    their mission and the people in the communities they serve.

16    Those are declarations I commend to the Court.

17         There are impacts on research even more broadly than

18    any of this.  We talked a little bit about kind of the future

19    versus the present grants.  Caltech and Columbia talk about the

11:36 20    fact that right now as we speak they're enrolling next year's

21    Ph.D. class, the people who are going to do the research, and

22    they don't know whether they're going to have the indirect

23    costs in their grants to be able to cover those Ph.D.s, and

24    they may have to make the choice not to admit Ph.D. students,

11:36 25    which will have, again, a harm that cannot be compensated by

money later.

Now, the government's critical of our showing on irreparable harm because it's not imminent or not likely to occur or we don't say in the declarations that it's likely to occur. I'd submit that they look at six paragraphs in 83 declarations in reaching that conclusion. I'd actually urge you to read paragraph 17 of the University of Massachusetts' declaration. We don't say there that this is a cost that we're going to be able to fill. That declaration says they're going to have to run an operating deficit or cut salaries across the board or furlough employees.

THE COURT: Isn't part of their argument that you get the money from elsewhere, you get private funding rather than federal funding, and I suspect also would be hire new people rather than the ones that you lost, or do more with less people.

MR. BUEKER: There are certain things that have to be done on these grants, like the medical waste has to be properly disposed of, the animals have to be properly cared for. There's no -- if you lose these people, there's no necessarily getting them back.

In terms of do more with less, read the MIT declaration. They're already funding dollar for dollar the research that's happening. There are state universities or University of Oregon, for example, talks about the fact that it

1   is a tuition-driven institution and that if this research

2   funding is cut and they have costs that they can't shift,

3   student education is going to suffer.

4           This is not a situation -- Morehouse and Meharry don't

11:38 5   have the endowments to be able to fill the gap.  There are

6   countless examples among the 83 where it is just not possible

7   to fill the gap.

8           THE COURT:  Okay.

9           MR. BUEKER:  As I thought about the job you have to

11:38 10  digest this, Your Honor, I have two things I can offer the

11  Court, if it would be helpful.  I do have a list of all of the

12  declarations and where they appear in the record, so if that

13  would be helpful.  Or I've picked out section -- a selection of

14  15 declarations that I think represent a cross-section of

11:39 15  public and private universities, big and small, an academic

16  medical center, Beth Israel here in Boston, the Joslin Diabetes

17  Center where you have higher costs because it's an independent

18  entity, and they're all on the record.  I'd be happy to hand

19  those up if the Court will find that helpful.

11:39 20          THE COURT:  I'll have my own list, but I'll receive

21  yours as well.

22          MR. BUEKER:  Okay.

23          THE COURT:  Just make sure counsel receives a copy.

24          All right.  So Attorney Lea, why don't you talk to me.

11:39 25  Are you willing to agree that the plaintiff will suffer harm?

1      MR. LEA:  Not irreparable harm.

2      THE COURT:  Okay.

3      MR. LEA:  We have no doubt --

4      THE COURT:  That there will be harm and it will be

11:39  5  immediate, right?

6      MR. LEA:  I think you have to go declaration by

7  declaration.  So I do agree that the loss of funds, it's a

8  harm, a delayed receipt of funds.

9      I do want to be clear up front and kind of structure

11:40 10  this.  One of the issues that's more in their briefs and less

11  in my friend's oral presentation is loss of money.  Second is

12  the downstream effects.

13      Loss of money, I want to be clear, first, this is not

14  a permanent loss of money.  There are ways to get this money

11:40 15  back.  There's the Tucker Act suit that we already mentioned.

16  And there's a reimbursement process that would be handled

17  through the payment management system for NIH where basically

18  the funds, were the Court to vacate any injunctive relief or

19  not issue further relief, they'd be embargoed.  Whenever this

11:40 20  case reached its resolution, they'd be distributed.

21      So now we know we're talking about delay.  And delay

22  in receiving funds in and of itself is a quintessential example

23  of nonirreparable harm.  That's a feature of every case where

24  somebody says I should have this money now, and the court

11:41 25  process has to run its course.

1       So that brings us to the other issue, which is the

2  downstream harms.  I think it's important to frame the issue at

3  the outset.  Injunctive relief is supposed to be rare, it's

4  supposed to be truly -- as Your Honor said, it needs to be

11:41  5  imminent.  And imminence here has an additional qualification

6  which it has to be imminent before this Court can resolve the

7  merits because we're talking about preliminary relief, not some

8  open-ended one day if this continues we eventually won't be

9  able to undo the harm.

11:41 10       Secondly, it has to be irreparable.  It's right there

11 in the name.  It has to be something that can't be fixed later,

12 and it has to be likely.  So I mean, in looking at that, I

13 think there is some real problems with the declarations.  The

14 problem is that there's so many that, you know, different ones

11:41 15 suffer from different problems.  But many of them don't mention

16 a time horizon at all.  They say these bad things will happen

17 or some bad things will happen, but they don't say, well, look,

18 this -- we need preliminary relief now because they're going to

19 happen before this suit can even be adjudicated.

11:42 20       And I would point the Court to Massachusetts doc 6,

21 Exhibit 7, that's the Dill declaration; Exhibit 8, that's the

22 Jaime declaration; and Exhibit 19, which is Barton.  I'm sure

23 there are others.  Like my friend, I have selected some

24 examples.

11:42 25       THE COURT:  Do you have a list, too?

1    MR. LEA:  I do not have a preprepared list, Your

2  Honor.  I wish I did.

3    And then other declarations mention a time horizon.

4  They say things like immediate, but they don't specify what's

11:42  5  going to happen in the immediate term.  So it's kind of a

6  nonspecific kind of aura of urgency but nothing that would

7  allow a finding that, oh, there's imminent and irreparable harm

8  that's going to occur without preliminary injunctive relief.

9    Second, many of them are speculative.  If you look at

11:42  10  the words, it says things like, well, it's possible this could

11  happen, it may happen, potentially it will happen, and those

12  are all quotes that I pulled, without actually showing.  Like

13  show us, since injunctions are supposed to be rare, how there's

14  harm, why it will occur when you say it will occur, and why it

11:43  15  can't be fixed.

16    And as explained in the *Telex* and *Steir* cases we've

17  cited in our brief, that sort of open-ended possibility can't

18  support injunctive relief.

19    Third, when they do identify harm, it's often not

11:43  20  irreparable.  A lot of declarations mention furloughs or pauses

21  in hiring.  Absent of a specific showing about why, that's not

22  an irreparable thing or else every business that was in a money

23  pinch could just come in and get an injunction, which is not

24  the traditional equitable rule.

11:43  25    Again, Massachusetts doc 6, Exhibit 24, and AAU doc 2,

1    Exhibit 13 and 17 are just some examples that use that

2    language.

3         A pause in building renovation, I mean, I suppose it's

4    possible to say more why that couldn't be resumed later, but

11:44 5    it's not self-evident that a pause in building renovation can't

6    be remedied at a later point in time.

7         And fourth, some declarations conjecture it

8    disruptive.  This will be disruptive.  And disruptive itself on

9    its own, all litigation is disruptive.  As anybody who has had

11:44 10    the misfortune of going through the litigation process knows,

11    it's a very disruptive thing, but disruption alone is not

12    enough for irreparable harm.  It needs to be something that's a

13    little more concrete that shows me why it can't be fixed and

14    why it's going to happen so quickly and become unfixable so

11:44 15    quickly that you need interim relief.

16         And finally, some of the declarations recognize the

17    institution because of lost funds.  In the short term,

18    Massachusetts doc 6, Exhibit 14 and 18 are pretty good

19    examples.  I think one of those are the Yale declaration.  They

11:44 20    acknowledge, look, we'll have to shuffle things around, but I

21    mean, that is true of all harm.  So unless you show that you

22    can't shuffle the thing around and get the money, it doesn't

23    matter that you'll suffer some mild harm elsewhere because then

24    it's not irreparable.

11:45 25         And so the bottom line is that -- I understand that

many institutions would prefer to use endowments for other
purposes and tuition, but unless they're barred from doing so
and the inability to fill the gap will itself cause some
nonmonetary harm, that's not irreparable harm.  And so, you
know, our position is that plaintiffs haven't shown irreparable
harm.

I do want to bleed into the next section just a little
bit, which is that, to the extent the Court disagrees, to the
extent the Court looks at some of the declarations and says,
you know, I'm convinced that there's irreparable harm here,
injunctive relief should be limited to the entity for which
irreparable harm is shown.

I'll say a little bit -- I want to keep Your Honor's
structure and honor that, but I'll say a little bit about that
in a moment.  But there's actually a case, and I don't believe
it's in our brief -- and because I can't easily put my hands on
it, I will address it in a moment, Your Honor.

That's our position is that the injunction should be
appropriately tailored to any irreparable harm you find.

THE COURT:  Thank you.

Counsel?

MR. BUEKER:  I will move on and talk about the scope
of relief.

THE COURT:  Yes.

MR. BUEKER:  And I want to just be clear, I'm

1    appearing on behalf of the Association plaintiffs who are

2    arguing for the broader scope of the relief.  The states, as

3    you know, came in.  Your Honor entered a temporary restraining

4    order.  The Association plaintiffs followed and asked for a

11:46   5    broader scope of relief to include all NIH grant recipients

6    nationwide.  I'm going to argue for the continuation of that,

7    Your Honor, for five separate reasons.

8         In an APA case, Your Honor, like this one, an agency

9    action, the result, if it's found to be invalid, is typically

11:46  10    to vacate that agency action.  It will apply across the board

11    to all of the people.  That's the relief we seek here, and the

12    injunction would be consistent with that scope of relief.  I

13    think through the Tran declaration you've heard about, we've

14    established that all of our association members are adversely

11:47  15    affected in the same manner, and it's in the same manner that's

16    important.  All of them would experience a deficit in funding

17    and the kinds of irreparable harm that I've described.  To

18    anticipate counsel's argument, we don't have to show that every

19    person who would be covered by the injunction has suffered the

11:47  20    same irreparable harm or an irreparable harm, otherwise

21    everybody would have to be here.

22         This is an adverse agency action that affects a group

23    of people, and the Tran declaration actually establishes that

24    it affects our members nationwide in the same manner.  And I

11:48  25    talk about that same manner test because it's one that Judge

1  Sorokin picked up on in his recent decision in the birthright

2  citizenship case.  Judge Laplante up in New Hampshire also

3  picked up on the same, where you have a categorical -- Judge

4  Laplante's language, we have a categorical government policy

11:48  5  that's going to impact everyone, the injunction relief ought to

6  apply nationwide here.

7  Third, there are both manageability and judicial

8  economy considerations, and there's Supreme Court case law that

9  we cite in our brief that gives teeth to these two

11:49 10  considerations.

11  On the manageability front, the association plaintiffs

12  here themselves represent more than 2,000 members.  There's

13  probably not an easier practical way of carving them out.  I

14  will say from a judicial economy perspective that since this

11:49 15  lawsuit has been filed, I've received calls from dozens of

16  other associations who are in line or who would like to be in

17  line to bring this case, the Association of Dental Schools, the

18  Association of Nursing Schools.  This is something that will

19  continue to be an issue and should be -- the scope of the

11:49 20  relief here really should apply to all NIH grant recipients.

21  There's also the practical reality, and this is borne

22  out in the declarations, that these research institutions

23  collaborate, and -- with one another.  The URI declaration, the

24  University of Chicago declaration, the University of Kansas

11:50 25  declaration all establishes, and if the injunction were to

cover only some of the institutions and not their partners in

performing the research, those partners may not be able to

perform their aspect of the particular project.

And finally I'd say, and this gets back to kind of the

11:50 5 categorical point from Judge Laplante's recent decision, the

government shouldn't be heard to complain here when it adopts a

categorical approach to an injunction that would bar that

approach to all NIH grant recipients.

THE COURT:  All right.  Any last words?  I think we're

11:50 10 beyond our time.

MR. LEA:  May I address the discovery relief, Your

Honor?

THE COURT:  I thought you touched on it already, but

go ahead.

11:50 15 MR. LEA:  That was a preview, Your Honor.  I'll be

very brief.

THE COURT:  You told me you were going into it.

MR. LEA:  I apologize.

Four points or five, and I do want to start with the

11:51 20 last one, which is the idea that because this is a categorical

rule you can have categorical relief.  That proves far too much

because laws often speak broadly across the board to all

citizens.  That would make universal injunctions like the

default remedy, which we know that even for people who accept

11:51 25 them, they are not, they're extraordinary.

1        First point, you know, I think, Your Honor, obviously

2   should you deny the motions, we hope this is moot.

3        Second, the parties are in agreement that the pending

4   motions are preliminary injunction motions, and so I understand

11:51  5   Your Honor to have ruled on that.  And to the extent you

6   haven't, I would further urge you.

7        Third, this really should not be nationwide but

8   limited only to those entities that are covered by plaintiffs

9   here and that have shown irreparable harm.

11:51 10        Universal injunctions are inconsistent with

11   traditional rules of equity, which is relief only to parties or

12   in this case real parties in interest who have proved

13   irreparable harm.  They stop the proper workings of the courts.

14   Things usually percolate.  This idea of multiple suits, A,

11:52 15   would again be largely resolved as other courts address the

16   issue and work this out.  But, B, there is actually value in

17   that, which is why the Supreme Court has cautioned against and

18   suggested that one day it might get rid of universal

19   injunctions, precisely because having different people look at

11:52 20   issues and the diversity of viewpoints ultimately helps make a

21   better decision, or at least that's the Supreme Court's

22   opinion.

23        They read to rush emergency litigation because every

24   case is now going to be, we have got an executive politically

11:52 25   authorized branch's funding decision on freeze across the

1  country now because of this, which is why we've had such

2  expedited briefing and such consolidated briefing, making

3  things more complicated.

4          It's not confusing to limit the injunction.  Basically

11:52  5  the Court could just list any entity, with the parties' help,

6  of course, if it's helpful to the Court, that the Court thinks

7  is represented by one of these plaintiffs and has shown

8  irreparable harm.  Those are the entities the injunction would

9  apply to.  It might be a long list, but there's nothing

11:53 10  particularly hard about that.

11          And collaboration with other entities, that violates

12  long-established rules against third-party standing.  It is for

13  those entities to assert their own rights.  Generally speaking,

14  with rare exceptions that the Supreme Court has been cabining,

11:53 15  you don't get to go into court and say, government, stop doing

16  this because I get an incidental benefit based on the actions

17  you're taking against somebody else.

18          In this case, nobody has suggested it falls into any

19  of the exceptions.  I don't think it conceivably does.  And so

11:53 20  a relief based on collaboration would be inappropriate.

21          Finally, if the Court does grant the motions -- well,

22  let me say three very brief final things.  We do object to an

23  extending of the TRO.  I understand Your Honor has already made

24  a finding of good cause.  We do think --

11:53 25          THE COURT:  It's necessary.

1          MR. LEA:  Your Honor, I won't concede that, but I

2     understand what you're saying.  And precisely because it's

3     freezing an executive funding decision for an extra 14 days, so

4     it's going to be a full month before the political branches

11:54 5     accomplish their objective.

6          Second, we would request for a bond and move for a

7     bond under text of Rule 65(c), which is supposed to be

8     mandatory, because if this money goes out, there's no guarantee

9     that we're going to ever get this money -- "we" being the

11:54 10     government, NIH, going to get this money back, and so that's

11     exactly why bonds exist, and we do think we're entitled to one.

12          And finally, we would request a stay of the

13     injunction, recognizing that you've already agreed to extend

14     the TRO, pending any appeal that's authorized by the Solicitor

11:54 15     General for precisely the same reasons:  The fear that the

16     government is never going to get these funds back and be able

17     to redeploy them to grants in the way that NIH has concluded is

18     best supportive of public health.

19          And with those points, you know, I thank you for your

11:55 20     time and allowing me a little indulgence over the time limit.

21          THE COURT:  Thank you.  I think I have to hear their

22     response.

23          MS. DIRKS:  Yes, Your Honor.  Especially given that

24     we're facing the preliminary injunction next week, first,

11:55 25     before -- directly addressing what the government raised there,

1    I just want to state clearly on the record that we support the

2    finding of good cause for extension of the TRO.  It simply

3    extends the pause, Your Honor, given the magnitude of and the

4    scale of what we're talking about here.

11:55   5          And then on the preliminary injunction piece, because

6    the standard is really the same as the TRO, we feel that the

7    plaintiffs in their different ways, which we're not

8    consolidated cases but we're good friends here in related

9    cases, we feel that we've clearly shown a likelihood of success

11:55  10   on the merits of all of our claims even though we only need to

11   show one.

12          The irreparable harms are really undisputed here.  The

13   balance of the equities are in the plaintiffs' favor, and

14   obviously the public interest issues are embedded in all of

11:55  15   those as well.

16          On the points that the government just raised, the

17   government has asked for a stay of the injunction.  Obviously

18   we oppose that, but we would ask for any such motion -- any

19   such request be filed as a motion so that we'd have an

11:56  20   opportunity to respond, and the same would go for a request

21   articulated here today that the plaintiffs post a bond, we

22   would press an opportunity to have that briefed and properly

23   presented to the Court.

24          THE COURT:  That makes sense.

11:56  25          MS. DIRKS:  Thank you, Your Honor.  That's all, Your

1  Honor.  Thank you so much.

2        THE COURT:  All right.  Thank you all for your time.

3  I have a lot of work to do.

4        MS. DIRKS:  Your turn, Your Honor.

11:56  5        THE COURT:  Oh, trust me, I've been working.

6        THE CLERK:  We're adjourned.  All rise.

7        (Adjourned at 11:56 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Linda Walsh, Registered Professional Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that the foregoing transcript is a true and correct

 7    transcript of the stenographically reported proceedings held in

 8    the above-entitled matter, to the best of my skill and ability.

 9              Dated this 26th day of February, 2025.

10

11

12              /s/ Linda Walsh

13              Linda Walsh, RPR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al*. | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:25-cv-10338 |
| NATIONAL INSTITUTES OF HEALTH, *et al*., | ) ) ) | |
| Defendants. | ) ) ) | |
| ASSOCIATION OF AMERICAN MEDICAL COLLEGES, *et al*. | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 1:25-cv-10340 |
| NATIONAL INSTITUTES OF HEALTH, et al., | ) ) ) | |
| Defendants. | ) ) ) | |
| ASSOCIATION OF AMERICAN UNIVERSITIES, *et al*. | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 1:25-cv-10346 |
| v. | ) ) | |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al*., | ) ) ) | |
| Defendants. | ) ) ) | |

1

**J.A. 696**

## NOTICE OF APPEAL

Pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Defendants

National Institutes of Health, Jay Bhattacharya, in his official capacity as Director of the

National Institutes of Health,[1] the U.S. Department of Health and Human Services, and Robert F.

Kennedy, Jr., in his official capacity as Secretary of the U.S. Department of Health and Human

Services,[2] hereby appeal to the United States Court of Appeals for the First Circuit from the

Final Judgment and Permanent Injunction entered in these cases on April 4, 2025,[3] as well as

from all interlocutory orders merged into that judgment, including the court's preliminary

injunction of March 5, 2025.[4]

Dated: April 8, 2025

<div style="margin-left:40%">

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

BRIAN C. LEA
Deputy Associate Attorney General

 /s/ *Thomas W. Ports, Jr.*
MARC S. SACKS (Ga. Bar No. 621931)
*Deputy Director*
KEVIN P. VANLANDINGHAM (NY Reg No.
4741799)
*Assistant Director*
THOMAS PORTS (Va. Bar No. 84321)
*Trial Attorney*
U.S. Department of Justice

</div>

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Acting Director Matthew Memoli's successor, Director Bhattacharya, is automatically substituted as a party.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Acting Secretary Dorothy Fink's successor, Secretary Kennedy, is automatically substituted as a party.

[3] No. 1:25-cv-10338 (Doc. No. 112); No. 1:25-cv-10340 (Doc. No. 56); and No. 1:25-cv-10346 (Doc. No. 100).

[4] No. 1:25-cv-10338 (Doc. No. 105); No. 1:25-cv-10340 (Doc. No. 51); and No. 1:25-cv-10346 (Doc. No. 95).

Civil Division, Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington D.C. 20044-0875
Tel: (202) 307-1134
Email: thomas.ports@usdoj.gov
*Attorneys for Defendants*

3

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  April 8, 2025                    _/s/ Thomas W. Ports, Jr._
                                         Thomas W. Ports, Jr.

**CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2025, I electronically filed the foregoing joint appendix with the Clerk of Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Jeffrey E. Sandberg*
Jeffrey E. Sandberg
*Counsel for Defendants-Appellants*