# United States Court of Appeals
## for the First Circuit

No. 25-1343

COMMONWEALTH OF MASSACHUSETTS; DANA NESSEL, on behalf of the people of the State of Michigan; STATE OF ILLINOIS; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF COLORADO; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF DELAWARE; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs - Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants - Appellants*.

No. 25-1344

ASSOCIATION OF AMERICAN MEDICAL COLLEGES; THE AMERICAN ASSOCIATION OF COLLEGES OF PHARMACY; THE ASSOCIATION OF SCHOOLS AND PROGRAMS OF PUBLIC HEALTH; THE CONFERENCE OF BOSTON TEACHING HOSPITALS, INC.; GREATER NEW YORK HOSPITAL ASSOCIATION,

*Plaintiffs - Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants - Appellants*.

No. 25-1345

ASSOCIATION OF AMERICAN UNIVERSITIES; AMERICAN COUNCIL ON EDUCATION; ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES; BRANDEIS UNIVERSITY; BROWN UNIVERSITY; CARNEGIE MELLON UNIVERSITY; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; THE UNIVERSITY OF CHICAGO; CORNELL UNIVERSITY; THE GEORGE WASHINGTON UNIVERSITY; JOHNS HOPKINS UNIVERSITY; MASSACHUSETTS INSTITUTE OF TECHNOLOGY; TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA; UNIVERSITY OF ROCHESTER; TRUSTEES OF TUFTS COLLEGE; THE CALIFORNIA INSTITUTE OF TECHNOLOGY,

*Plaintiffs - Appellees*,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services; JAY BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health,

*Defendants - Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

## BRIEF FOR PLAINTIFFS-APPELLEES IN NO. 25-1343

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*

David C. Kravitz, 1st Cir. No. 41870
   *State Solicitor*
Katherine Dirks, 1st Cir. No. 114060
   *Chief State Trial Counsel*
Allyson Slater
   *Chief, Reproductive Justice Unit*
Chris Pappavaselio, 1st Cir. No. 1215989
   *Assistant Attorney General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2277
katherine.dirks@mass.gov
*Counsel for the Commonwealth of
Massachusetts*


KWAME RAOUL
Attorney General of Illinois

Alex Hemmer
   *Deputy Solicitor General*
R. Sam Horan
   *Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
alex.hemmer@ilag.gov
*Counsel for the State of Illinois*

DANA NESSEL
Attorney General of Michigan

Linus Banghart-Linn
   *Chief Legal Counsel*
Neil Giovanatti
Joshua S. Smith
Michigan Department of Attorney
General
525 W. Ottawa St.
Lansing, MI 48933
(517) 281-6677
Banghart-LinnL@michigan.gov
*Counsel for the People of the State of
Michigan*

*Additional Counsel Listed on Signature Page*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ........................................................................................... 1

JURISDICTIONAL STATEMENT ..................................................................... 3

STATEMENT OF THE ISSUES.......................................................................... 3

STATEMENT OF THE CASE............................................................................. 4

    A.    Statutory and regulatory framework ..................................................... 4

        1.    NIH's mission and support for extramural research.................. 4

        2.    HHS's regulation of indirect costs ............................................. 5

        3.    Limitations on NIH's ability to deviate from a NICRA's indirect cost rate. ..................................................................... 7

        4.    Congress's repudiation of the President's proposal to restrict NIH's reimbursement of indirect costs.......................... 8

    B.    NIH's notice on indirect cost rates. .................................................... 10

    C.    Procedural history.............................................................................. 11

SUMMARY OF THE ARGUMENT .................................................................. 13

ARGUMENT .................................................................................................. 15

I.    Plaintiffs' claims fall within the APA's waiver of sovereign immunity....... 15

    A.    Plaintiffs have stated an APA case, not a contract case...................... 16

        1.    Plaintiffs' claims are founded upon statutory and regulatory provisions, not upon contract. ................................ 17

        2.    Plaintiffs seeks specific relief under the APA, not contract remedies. ................................................................... 22

i

B. The Tucker Act does not expressly or impliedly forbid the relief plaintiffs seek. ...................................................................25

C. Divesting the district court of jurisdiction over plaintiffs' claims would create an intolerable jurisdictional void. ..................................27

D. The Supreme Court's recent per curiam order does not resolve the jurisdictional question presented. ..................................................30

II. The Notice violates the APA in multiple respects. .........................................32

A. The Notice was arbitrary and capricious.............................................33

1. NIH failed to account for reliance interests. .............................34

2. The decision to cap all indirect cost rates at 15% was neither reasonable nor reasonably explained. ...........................37

B. The Notice violates HHS's regulations...............................................41

1. The Notice's across-the-board rate is not a "deviation" from negotiated rates................................................................41

2. The Notice did not comply with the regulation's limitation to a "class" of awards or with its procedural requirements...............................................................................43

C. The Notice violated Section 224 of the governing appropriations statute. .........................................................................47

D. The Notice failed to comply with notice-and-comment rulemaking required by the APA. .......................................................50

1. The Notice required notice-and-comment rulemaking.............51

2. The assertion that HHS rescinded its commitment to follow notice-and-comment rulemaking was not timely raised below and provides no basis for relief. .........................53

CONCLUSION....................................................................................................55

CERTIFICATE OF COMPLIANCE WITH RULE 32...........................................62

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ........................................................................28

*Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.,*
    357 F.3d 62 (D.C. Cir. 2004) .........................................................21

*American Sci. & Eng'g, Inc. v. Califano,*
    571 F.2d 58 (1st Cir. 1978) ....................................16–18, 20, 22, 25

*Amerijet Intl., Inc. v. Pistole,*
    753 F.3d 1343 (D.C. Cir. 2014) .................................................38, 39

*Biden v. Nebraska,*
    600 U.S. 477 (2023) ........................................................................42

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) ................................................20–25, 30–32

*Burgos v. Milton,*
    709 F.2d 1 (1st Cir. 1983) ..............................................................25

*California v. U.S. Dep't of Educ.,*
    132 F.4th 92 (1st Cir. 2025) ...........................................................31

*Carruth v. United States,*
    627 F.2d 1068 (Fed. Cir. 1980) .....................................................28

*Cheshire Hosp. v. N.H.-Vt. Hospitalization Serv., Inc.,*
    689 F.2d 1112 (1st Cir. 1982) .......................................................52

*Clarian Health W., LLC v. Hargan,*
    878 F.3d 346 (D.C. Cir. 2017) .......................................................51

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
    38 F.4th 1099 (D.C. Cir. 2022)........................................................21

iii

*Dep't of the Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999) ...................................................................23, 24

*Dep't of Educ. v. California*,
    145 S. Ct. 966 (2025) ........................................................16, 30–33

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) .....................................................................34, 37

*Eldridge v. Gordon Bros. Grp.*,
    863 F.3d 66 (1st Cir. 2017) ...............................................................53

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ............................................................36, 40, 41

*FCC v. Fox Television Stations*,
    556 U.S. 502 (2009) ..........................................................................33, 36

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ...........................................................................34

*FDA v. Wages & White Lion Invs., LLC*,
    145 S. Ct. 898 (2025) ..............................................................33, 37, 54

*Ferreiro v. United States*,
    501 F.3d 1349 (Fed. Cir. 2007) ...........................................................25

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002) ...........................................................................22

*Housatonic River Initiative v. U.S. Env't Prot. Agency, New England Region*,
    75 F.4th 248 (1st Cir. 2023) ...............................................................38

*Hubbard v. Adm'r, EPA*,
    982 F.2d 531 (D.C. Cir. 1992) ...........................................................33

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ...........................................................50

iv

*Iverson v. City of Boston*,
  452 F.3d 94 (1st Cir. 2006) ...............................................................44

*Katz v. Cisneros*,
  16 F.3d 1204 (Fed. Cir. 1994) ...............................................20, 24, 26

*LeBlanc v. United States*,
  50 F.3d 1025 (Fed. Cir. 1995) .........................................................19

*Martinez v. United States*,
  333 F.3d 1295 (Fed. Cir. 2003) .......................................................19

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ........................................................................26

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
  763 F.2d 1441 (D.C. Cir. 1985) ......................................................21

*Me. Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ..................................................................19, 23

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ......................... 16, 17, 20–22, 27, 29

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022) ......................................................................32

*Michigan v. EPA*,
  576 U.S. 743 (2015)........................................................................39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins.*,
  463 U.S. 29 (1983) ....................................................................34, 38

*N.H. Hosp. Ass'n v. Azar*,
  887 F.3d 62 (1st Cir. 2018) .......................................................50, 52

*Perez v. Mortg. Bakers Ass'n*,
  575 U.S. 92 (2015) ..........................................................................51

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591(D.C. Cir. 2017) ..........................................................21

*Service v. Dulles*,
   354 U.S. 363 (1957) ......................................................................54

*Tootle v. Sec'y of the Navy*,
   446 F.3d 167 (D.C. Cir. 2006) ...............................................26, 29

*United Aeronautical Corp. v. U.S. Air Force*,
   80 F.4th 1017 (9th Cir. 2023) ......................................................27

*U.S. ex rel. Ge v. Takeda Pharm. Co.*,
   737 F.3d 116 (1st Cir. 2013) ........................................................45

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ......................................................................52

## Statutes

5 U.S.C. § 553 ..................................................................14, 51

5 U.S.C. § 553(a)(2) ...................................................................51

5 U.S.C. § 553(b) ........................................................................50

5 U.S.C. § 702 .......................................................3, 13, 15, 26

5 U.S.C. § 706............................................................................3

5 U.S.C. § 706(2) ........................................................................13

5 U.S.C. § 706(2)(A) ..............................................13, 14, 17, 41

5 U.S.C. § 706(2)(C) ...................................................................17

5 U.S.C. § 706(2)(D) ..................................................14, 17, 50

28 U.S.C. § 1331 .........................................................................3

28 U.S.C. § 1291 ................................................................3

28 U.S.C. § 1491 ..............................................................13

28 U.S.C. § 1491(a) ...........................................15, 18, 24, 27

42 U.S.C. § 241(a) .............................................................4

42 U.S.C. § 284(b) .............................................................4

Pub. L. No. 115-141, 132 Stat. 348 (2018) ............................9

Pub. L. No. 116-94, 133 Stat. 2582 (2019) ............................9

Pub. L. No. 118-47, 138 Stat. 460 (2024).................10, 14, 48

Pub. L. No. 118-83, 138 Stat. 1524 (2024) ..........................10

Pub. L. No. 118-158, 138 Stat. 1722 (2024) .........................10

Pub. L. No. 119-4, 139 Stat. 9 (2025) ..................................10

## Rules and Regulations

45 C.F.R. § 75.2 ..............................................................44

45 C.F.R. § 75.203(c).........................................................8

45 C.F.R. § 75.402 ............................................................5

45 C.F.R. § 75.412 ..........................................................40

45 C.F.R. § 75.413(a) ........................................................5

45 C.F.R. § 75.414 ..........................................................17

45 C.F.R. § 75.414(a) ...........................................5, 39, 40

45 C.F.R. § 75.414(c).....................................................6, 41

45 C.F.R. § 75.414(c)(1) .............................................7, 42, 43

45 C.F.R. § 75.414(c)(2) ..................................................42

45 C.F.R. § 75.414(c)(3) ..........................................7, 42, 43, 46, 47, 49

45 C.F.R. § 75.414(c)(4) ...................................................................8

45 C.F.R. § 75.414(g) ....................................................................42

45 C.F.R. Pt. 75, Appx. III, § A ........................................................5

45 C.F.R. Pt. 75, Appx. III, § B ........................................................5

45 C.F.R. Pt. 75, Appx. III, § C.1 ...............................................6, 39

45 C.F.R. Pt. 75, Appx. III, § C.2 .....................................................6

45 C.F.R. Pt. 75, Appx. III, § C.4 .....................................................6

45 C.F.R. Pt. 75, Appx. III, § C.8.a ................................................11

45 C.F.R. Pt. 75, Appx. III, § C.11 ...........................................5–7, 42

45 C.F.R. Pt. 75, Appx. III, § F.2....................................................7

**Miscellaneous**

36 Fed. Reg. 2532, 1971 WL 149470 (Feb. 5, 1971) ...............51, 52, 54

78 Fed. Reg. 78590 (Dec. 26, 2013) ...........................................46, 51

90 Fed. Reg. 11029 (Mar. 3, 2025)..................................................51

Nisha Gaind, *How the NIH Dominates the World's Health Research — In Charts*, 639 Nature 554 (2025)..............................................................1

James Glanz, *World Scientists Look Elsewhere as U.S. Labs Stagger Under Trump Cuts*, N.Y. Times, June 1, 2025 .............................................1–2

S. Rep. No. 115-150 (2017) ...............................................................8

Matthew H. Solomson, Court of Federal Claims: Jurisdiction, Practice, and Procedure (2016) ...............................................................18, 19, 28

The American Heritage Dictionary (5th ed. 2016) .................................42

## INTRODUCTION

The National Institutes of Health ("NIH"), an agency within defendant U.S. Department of Health and Human Services ("HHS"), is "by far the world's biggest funder of biomedical research and widely considered the gold standard for a research-funding agency." Nisha Gaind, *How the NIH Dominates the World's Health Research — In Charts*, 639 Nature 554, 554 (2025). As NIH itself boasts, "[a]s the largest public funder of biomedical and behavioral research in the world, NIH is the driving force behind decades of advances that improve health, revolutionize science, and serve society more broadly." NIH, *Impact of NIH Research*, nih.gov.[1] In 2022, NIH spent over $32 billion on grants for health research, roughly 25 times the next-largest funder in the world. Gaind, *supra*, at 554. And as just one example of NIH's impact on biomedical research, a 2023 study showed that "NIH-funded research contributed to 354 of 356 drugs approved by the US Food and Drug Administration in 2010–19." *Id.*

Plaintiffs in this case challenge one of a number of recent actions by the current administration that, together, have placed NIH's stellar reputation in grave peril and threaten to cause lasting damage to America's leadership in scientific research. *See, e.g.*, James Glanz, *World Scientists Look Elsewhere as U.S. Labs Stagger Under Trump Cuts*, N.Y. Times, June 1, 2025, at A21 (reporting that, in

---

[1] https://www.nih.gov/about-nih/what-we-do/impact-nih-research.

light of the current administration's funding and immigration policies, "scientists in the United States are becoming increasingly alarmed. The global supremacy that the United States has long enjoyed in health, biology, the physical sciences and other fields, they warn, may be coming to an end"). The agency action at issue in this case, a "Supplemental Guidance" known as Notice Number NOT-OD-25-068 ("Notice"), purports in three scant pages to implement drastic and devastating across-the-board cuts to reimbursements for "indirect costs," which are essential for virtually all NIH-funded research. Add.82–84.[2] The Notice, if allowed to take effect, would cost public and private institutions across the country billions of dollars and would result in the abrupt cancellation of critical research projects—including ongoing clinical trials in which patients' lives are literally at stake. Yet it was announced with no warning, and the "explanation" for implementing these staggering cuts—as well as for overturning decades of established procedures with respect to the negotiation of indirect cost rates between NIH and grantee institutions—is patently inadequate. The Notice virtually defines arbitrary and capricious agency decisionmaking; it is contrary to statute and to HHS regulations; and it was not accompanied by anything approaching the process required for

---

[2] Citations herein to "Add.__" are to the addendum to Defendants-Appellants' principal brief.

implementing a change of this magnitude. The district court plainly had jurisdiction to consider this case, and its judgment was correct.

## JURISDICTIONAL STATEMENT

This is an appeal from a final judgment of the district court (Kelley, J.) vacating the Notice and permanently enjoining its implementation under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The district court had jurisdiction under 28 U.S.C. § 1331.[3] J.A.25, 718, 860. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the APA's waiver of sovereign immunity, 5 U.S.C. § 702, applies to the plaintiffs' claims that the Notice violates the APA, where plaintiffs seek only vacatur of the Notice and associated declaratory and injunctive relief, and do not rely on the terms of any contract.

2.     Whether the Notice violated the APA, as either an arbitrary and capricious agency action, as contrary to regulation, as contrary to statute, or for a procedural failure to comply with notice-and-comment rulemaking, where the Notice purports to impose a drastic across-the-board cut to reimbursement rates for indirect costs of research with virtually no explanation, contrary to decades of

---

[3] The APA's waiver of sovereign immunity, 5 U.S.C. § 702, applies to this case as discussed *infra* Argument, Part I.

established practice, and without following the procedures outlined in applicable federal statutes and regulations.

## STATEMENT OF THE CASE

### A.   Statutory and regulatory framework

#### 1.   NIH's mission and support for extramural research

NIH is charged by statute to "promote the coordination of[] research, investigations, experiments, demonstrations, and studies relating to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments." 42 U.S.C. § 241(a). NIH carries out its scientific mission through both in-house studies ("intramural" research) and research grants to universities and other institutions ("extramural" research). *Id.* § 241(a)(3); *see also id.* §§ 284(b)(1)(A), 284(b)(2)(A).

The 22 plaintiff states ("States")[4] depend heavily on NIH funding to support public health research.[5] This funding supports groundbreaking, lifesaving research, including the development of new therapies and clinical trials for a range of diseases, including cancer, diabetes, and Alzheimer's Disease.[6]

---

[4] Massachusetts, Illinois, Attorney General Dana Nessel on behalf of the People of Michigan, Arizona, California, Colorado, Connecticut, Delaware, Hawai'i, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin.

[5] *See, e.g.*, J.A.122–24, 129, 156–57, 165, 170, 176, 228, 326, 368–69, 377–78, 402.

[6] J.A.113, 129, 181, 170, 228, 257–58, 326–27, 372–73.

## 2.     HHS's regulation of indirect costs

HHS has promulgated regulations at 45 C.F.R. Pt. 75 to govern grant awards for HHS's awarding agencies, including NIH.  NIH funds extramural research on a reimbursement basis, rather than as lump-sum awards.  Under HHS regulations, "[t]he total cost of a Federal award is the sum of the allowable direct and allocable indirect costs less any applicable credits."  45 C.F.R. § 75.402.

To identify the "sum" of these direct and indirect costs, NIH uses cost-based accounting, under which grant recipients recover their actual, documented costs for conducting research.  *See generally id.* Pt. 75, Appx. III.  Direct costs are attributed to a single research project supported by the grant (e.g., specialized staff, equipment, and materials).  *Id.* § 75.413(a).  Indirect costs are also research expenditures, but cannot be attributed exclusively to a single research project.  *See id.* § 75.414(a); *id.* Pt. 75, Appx. III, § A ("Indirect costs ... are incurred for common or joint objectives and therefore cannot be identified readily and specifically with a particular sponsored project ....").  These include building construction and maintenance, compliance infrastructure, and personnel assigned to multiple projects.  *Id.* Pt. 75, Appx. III, § B.

HHS regulations provide that NIH will work with institutions to identify their indirect costs on an aggregate level, based on those aggregated costs.  *Id.* Pt. 75, Appx. III, § A; *see id.* Pt. 75, Appx. III, § C.11.  These aggregated indirect

5

costs are divided by an institution's total costs to "arrive at" an indirect cost rate, expressed as a percentage. 45 C.F.R. Pt. 75, Appx. III, §§ C.1.a(1), C.2.

The rates are memorialized in a Negotiated Indirect Cost Rate Agreement ("NICRA") between HHS and the institution. The NICRA's terms, usually spanning two to four years, *id.* Appx. III, § C.4, generally apply to grants awarded by any federal agency to the institution during the operation of the agreement, *id.* Pt. 75, Appx. III, § C.11(b); *id.* § 75.414(c). NIH then reimburses indirect costs incurred under individual grants employing the NICRA rate. For example, an institution with a 30% indirect cost rate that receives a grant for $100,000 in direct costs will be reimbursed for $100,000 in documented direct costs in furtherance of that project, plus $30,000 in indirect costs (based on previously documented indirect costs incurred in furtherance of the institution's research programs collectively). *See* 45 C.F.R. Pt. 75, Appx. III, § C.2.

These rates, calculated to match the needs of each institution, are essential for those institutions to conduct research. Without reimbursement for indirect costs incurred at those rates, research efforts at those institutions would immediately and materially suffer, including through: termination of critical staff, *see, e.g.*, J.A.178 (University of Massachusetts: loss of staff "would bring research to a halt"), J.A.124 (University of California: "immediate deleterious impact" on staffing "critical to support th[e] research projects"); J.A.328 (Oregon Health and

Science University: disruption of "ongoing clinical trials[,] … "jeopardiz[ing]
patient longevity"); J.A.166–67 (Southern Illinois University: inability to maintain
"essential safety tools and equipment required to meet safety protocols" and to
assure compliance with statutory "research compliance practices").  Institutions
depend on indirect-cost reimbursements to meet those research needs.  And
throughout every project, federal agencies conduct audits to compare documented
indirect costs to the indirect cost calculations.  *Id.* Pt. 75, Appx. III, §§ C.11.d,
C.11.h, F.2.b.

### 3. Limitations on NIH's ability to deviate from a NICRA's indirect cost rate.

NIH may deviate from the indirect cost rate that HHS has negotiated with a
research institution only if "required by statute or regulation" or "approved by a
Federal awarding agency head or delegate based on documented justification as
described in [45 C.F.R. § 75.414(c)(3)]."  45 C.F.R. § 75.414(c)(1); *see id.* Pt. 75,
Appx. III, § C.7.  In turn, 45 C.F.R. § 75.414(c)(3) prescribes the limited
circumstances in which NIH's head can approve a deviation from the negotiated
rate:  "The HHS awarding agency must implement, and make publicly available,
the policies, procedures and general decision making criteria that their programs
will follow to seek and justify deviations from negotiated rates."  Agencies must
identify all factors pertinent to allowing a research institution to "make an
informed decision" about whether to seek funding *before* a grant is made available

for competition, *id.* § 75.203(c)(2), including "the policies relating to indirect cost rate reimbursement, matching, or cost share as approved," *id.* § 75.414(c)(4).

### 4. Congress's repudiation of the President's proposal to restrict NIH's reimbursement of indirect costs.

In May 2017, as part of its 2018 budget proposal, the first Trump administration proposed a 10% across-the-board cap on indirect cost rates for NIH grants, asserting without elaboration that NIH's funding of indirect costs should replicate that purportedly provided by private foundations. J.A.94.

Congress rejected the administration's proposal. The Senate Committee on Appropriations reported that the administration's proposal would "radically change the nature of the Federal Government's relationship with the research community," "abandon[]" the government's "long-established responsibility" for research infrastructure, and jeopardize "biomedical research nationwide." S. Rep. No. 115-150, at 109 (2017). The Committee further noted that it "had not seen any details of the proposal" explaining "how it could be accomplished without throwing research programs across the country into disarray." *Id.* "To avoid this possibility," *id.*, Congress enacted a restriction on changing the existing approach to indirect cost reimbursement or to use changes to those reimbursement methods

to have a fiscal effect on NIH's budget.  Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740 (2018).[7]

Two years later, when the administration proposed eliminating what it described as a "prohibit[ion] by law from reducing grantee administrative costs," J.A.98, Congress rejected that proposal, too, *see* Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, § 224, 133 Stat. 2534, 2582 (2019) ("Section 224");[8] *see also* Hr'g before Subcomm. of the House Comm. on Appropriations (116th Cong.), 1st sess., Pt. 5, at 236 (Apr. 2, 2019), *available at* https://www.congress.gov/116/chrg/CHRG-116hhrg37623/CHRG-116hhrg37623.pdf (Rep. Tom Cole, Ranking Member, cautioned against changing indirect cost rates, "a foundational element for research").[9]

---

[7] The restriction reads, in full: "In making Federal financial assistance, the provisions relating to indirect costs in part 75 of title 45, Code of Federal Regulations, including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017.  None of the funds appropriated in this or prior Acts or otherwise made available to the Department of Health and Human Services or to any department or agency may be used to develop or implement a modified approach to such provisions, or to intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter."

[8] The text of Section 224 is identical to the provision quoted *supra* n.7.

[9] Congressman Cole reiterated this caution in 2021.  Hr'g before Subcomm. of the House Comm. on Appropriations (116th Cong.), 2d sess., Pt. 5, at 228 (Mar. 4, 2020), *available at* https://www.congress.gov/116/chrg/CHRG-116hhrg43462/CHRG-116hhrg43462.pdf.  The Committee noted the proposed (and
(footnote continued)

This statutory restriction against modifying indirect cost reimbursements has since been readopted in appropriations provisions year after year, and remains in force today. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 224, 138 Stat. 460, 667 (2024); Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, §§ 101, 106, 138 Stat. 1524, 1524–26 (2024); American Relief Act, 2025, Pub. L. No. 118-158, § 101, 138 Stat. 1722, 1723–26 (2024); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, § 1101, 139 Stat. 9, 10–11 (2025).

## B. NIH's notice on indirect cost rates.

On Friday, February 7, 2025, the Acting Director of NIH issued a notice entitled "Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates Notice Number: NOT-OD-25-068" ("Notice"). Add.82–84. The Notice announced that effective Monday, February 10, 2025—i.e., the next business day—NIH would no longer fully reimburse grant recipients for their allocable indirect costs. *See* Add.84. Instead, "[f]or any new grant issued, and for all existing grants to IHEs [institutions of higher education] retroactive to the date of issuance of this Supplemental Guidance, award recipients are subject to a 15 percent indirect cost rate." Add.84.

---

later adopted) statutory language "continues a provision relating to indirect cost negotiated rates." H. Rep. 116-450 (116th Cong.) (July 15, 2020).

The Notice listed three reasons for restricting reimbursement: NIH should follow the purported approaches of a handful of private foundations that cap indirect cost reimbursements; indirect costs are "difficult for NIH to oversee"; and the cap would help "ensure that as many funds as possible go towards direct scientific research costs rather than administrative overhead." Add.82–84.[10]

The Notice did not elaborate further on these reasons. Add.83. The Notice's discussion of grantee's reliance interests reads, in full: "Although cognizant that grant recipients, particularly 'new or inexperienced organizations,' use grant funds to cover indirect costs like overhead, *see* 89 FR 30046–30093, NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life." Add.83.

### C. Procedural history

The States, whose public institutions receive extramural research funding from NIH, filed suit on February 10, 2025, the date on which the Notice was to go into effect, challenging the Notice on various grounds under the APA and seeking vacatur of the Notice and declaratory and injunctive relief. J.A.59–71. Suits from

---

[10] Reimbursement of indirect administrative costs that support research has been capped at 26 percent of direct research costs since 1991. 45 C.F.R. Pt. 75, Appx. III, § C.8.a.

two other plaintiff groups making similar challenges followed.  J.A.710–35, 855–904.  The three cases were designated as related and heard together.  J.A.1, 18.

The district court (Kelley, J.) entered temporary restraining orders against implementation of the Notice.  J.A.406–07, 740–41.  The court then extended those orders while considering the parties' arguments in a preliminary injunction posture.  J.A.18, 708, 853.

On March 5, 2025, the court entered a preliminary injunction against implementation of the Notice.  Add.1–76.  It found that it had jurisdiction, Add.8–16, and that the requirements for preliminary injunctive relief were satisfied, as plaintiffs were likely to succeed on the merits of their claims, had shown irreparable harm, and had established that the balance of equities and the public interest favored relief, Add.17–75.

On April 4, 2025, the government filed an assented-to motion to convert the preliminary injunction into a permanent injunction and enter final judgment.  J.A.20.  The court allowed the motion and entered final judgment on April 4, 2025, ordering vacatur of the Notice and a permanent injunction against its enforcement.  Add.77–81.

The judgment below should be affirmed because the district court had jurisdiction over the States' claims and because the Notice was unlawful in multiple respects.

This case falls comfortably within the APA's waiver of sovereign immunity from challenges to agency action seeking relief "other than money damages." 5 U.S.C. § 702. The complaint challenges NIH's issuance of the Notice, which defendants concede was a final agency action, and seeks only declaratory and injunctive relief and vacatur of the unlawful agency action. The claims do not sound in contract, and indeed, the district court did not construe any contract terms in reviewing the claims. Accordingly, the Tucker Act, 28 U.S.C. § 1491, has no bearing on this case.

The district court, having correctly found jurisdiction over the claims, also correctly concluded that the Notice was unlawful and must be vacated.

First, the Notice was arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). The Notice utterly failed to account for the monumental reliance interests at stake here, where institutions make long-term plans based on their ability to recover the indirect costs that are incurred to directly support public health research. Furthermore, the decision to depart from decades of practice regarding the negotiation of indirect cost rates and instead impose a flat 15% rate

was neither reasonable nor reasonably explained. The Notice also failed to explain why its comparison of NIH's indirect cost rate to those of certain nonprofit organizations was apt, to explain how an indirect cost rate cap would increase funding for research, and to explain why indirect cost reimbursements are difficult to monitor.

Second, the Notice was contrary to HHS's regulations governing the complex scheme for reimbursements of indirect costs incurred to support research. The applicable regulations provide only limited circumstances and a clear procedure by which NIH may deviate from negotiated indirect cost rates— circumstances that are not present and a procedure that was not followed. By violating these regulations, the Notice was not in accordance with law in violation of 5 U.S.C. § 706(2)(A).

Third, the Notice violated the applicable appropriations statute, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47. That statute required HHS and its awarding agencies to refrain from imposing categorical caps on indirect cost reimbursements.

Fourth, the Notice was procedurally defective because NIH promulgated it without notice-and-comment rulemaking in violation of 5 U.S.C. § 706(2)(D). The Notice was a substantive rule governing the rights of States and other grant recipients requiring notice and comment under 5 U.S.C. § 553. The government's

assertion that it was free to ignore its 54-year-old directive that all substantive rules governing the grant awards process must undergo notice and comment has no support in the APA or precedent. And its alternative argument that HHS's purported rescission of this directive (after NIH promulgated the Notice) renders the procedural error harmless was not raised below, and in any event has no merit.

## ARGUMENT

### I. Plaintiffs' claims fall within the APA's waiver of sovereign immunity.

Plaintiffs' claims fall squarely within the APA's waiver of sovereign immunity, which encompasses challenges to final agency action "seeking relief other than money damages," unless another "statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Plaintiffs here allege statutory and regulatory violations, and they seek declaratory and injunctive relief against the issuance of the Notice and vacatur of the Notice itself. They do not seek any form of money damages; defendants do not argue otherwise (and thus have forfeited the argument). And the Tucker Act, 28 U.S.C. § 1491(a)(1), which gives the Court of Federal Claims jurisdiction over certain claims for damages based on contracts with the United States, does not expressly or impliedly forbid the relief that plaintiffs seek. Because plaintiffs' claims are not founded upon a contract—indeed, the court below did not review any contract terms in rendering its decision—the Court of Federal Claims cannot hear this case, and the remedies available in that court would be entirely inadequate to redress

plaintiffs' harms. Further, defendants' position is essentially that neither a federal district court nor the Court of Federal Claims can enjoin the Notice, which would create a jurisdictional void contrary to the presumption that agency action is reviewable. The per curiam order in *Department of Education v. California*, 145 S. Ct. 966 (2025), is readily distinguishable and thus does not dictate a different result.

### A. Plaintiffs have stated an APA case, not a contract case.

In determining whether a plaintiff's case falls within the APA's waiver of sovereign immunity or instead belongs in the Court of Federal Claims, this Court asks whether a case is "essentially a contract dispute." *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 61 (1st Cir. 1978). In so doing, this Court looks at whether the "core determination" to be made in the case is "whether a breach of contract had occurred," and also at the "relief plaintiff requested." *Id.* Other courts have articulated a similar test. *See, e.g.*, *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) ("The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).").

Consideration of these two factors—the source of the right (contract on the one hand, statutes and regulations on the other), and the relief requested—brings this case squarely within the APA.

### 1. Plaintiffs' claims are founded upon statutory and regulatory provisions, not upon contract.

The "core determination" to be made in this case, *Am. Sci. & Eng'g*, 571 F.2d at 61, is whether defendants acted lawfully in issuing the Notice. Specifically, the Complaint alleges that the Notice is arbitrary and capricious agency action, in violation of 5 U.S.C. § 706(2)(A); that it is not in accordance with law, namely 45 C.F.R. § 75.414 and Section 224 of the relevant appropriations statute, also in violation of 5 U.S.C. § 706(2)(A); that it was issued in excess of statutory authority in violation of 5 U.S.C. § 706(2)(C); and that it was issued without observance of proper procedure in violation of 5 U.S.C. § 706(2)(D). J.A.59–70.

These claims have nothing to do with the terms of any particular grant or agreement with the federal government. The Notice is independent of any such terms; it is a standalone agency action affecting *all* NIH grants, and plaintiffs' claims are directed solely at the legality of that action. Thus, *American Science & Engineering*, upon which defendants rely, in fact supports APA jurisdiction here. That case explained that where a plaintiff's claim "could not be resolved without reference to the contract, exclusive jurisdiction lay in the Court of Claims." 571

F.2d at 61.  No reference to any contractual term is required to resolve the legality of the Notice.  And, as the district court noted, "Plaintiffs have not requested the Court to examine any contract or grant agreement created between the parties."  Add.13.

Defendants' contrary arguments regarding the source of plaintiffs' claims lack merit.  First, defendants misunderstand the Tucker Act in asserting that "[c]laimed violations of statutory or regulatory provisions do not oust a court from Tucker Act jurisdiction" and noting that "the Tucker Act embraces monetary claims based on 'any Act of Congress or any regulation of an executive department.'"  Br.33 (quoting 28 U.S.C. § 1491(a)(1)).[11]  This assertion conflates two distinct types of Tucker Act jurisdiction: "money-mandating" sources of law on the one hand, and contracts on the other.[12]  For a statute or regulation to underpin Tucker Act jurisdiction, it must be one of the "uncommon" provisions that "mandat[es] compensation by the Federal Government for the damage sustained."  *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 323, 324

---

[11] Citations herein to "Br.__" are to Defendants-Appellants' principal brief.
[12] As one authority explains, the Tucker Act "vests the [Court of Federal Claims] with jurisdiction over three distinct causes of action against the U.S. government: (1) actions brought pursuant to money-mandating statutes, regulations, executive orders, or constitutional provisions; (2) actions to recover illegal exactions of money by the United States; and (3) actions pursuant to contracts with the United States."  Matthew H. Solomson, COURT OF FEDERAL CLAIMS: JURISDICTION, PRACTICE, AND PROCEDURE, at 3-2 (2016) (internal quotation marks and footnotes omitted).

(2020) (citing Solomson, COURT OF FEDERAL CLAIMS, at 4-18; other citations and internal quotation marks omitted); *see also, e.g.*, *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (the Tucker Act confers jurisdiction on the Court of Federal Claims "when the constitutional provision, statute, or regulation in question expressly creates a substantive right enforceable against the federal government for money damages").[13] None of the statutes and regulations upon which plaintiffs rely contains any mandatory compensation provision, and defendants do not (and cannot) suggest otherwise.

Second, defendants err in claiming that plaintiffs have "frame[d] their key allegations in contract language." Br.29. As explained above, plaintiffs' "key allegations" are that defendants violated the APA in issuing the Notice. *See* Complaint ¶¶157–221 (J.A.59–70). The two paragraphs (out of a 221-paragraph complaint) that defendants cherry-pick simply allege facts about plaintiffs' receipt of NIH funding through the NIH grant awards process. Br.29–30 (citing Complaint ¶¶47, 86 (J.A.30–31, 38)). The presence of such factual allegations,

---

[13] One example of such a "money-mandating" statute is the provision of the Affordable Care Act at issue in *Me. Community Health Options*, which provided that the federal government "shall pay" certain amounts. *See* 590 U.S. at 300. Another is the Military Pay Act, 37 U.S.C. § 204, which provides a substantive right to back pay in military discharge cases. *See Martinez v. United States*, 333 F.3d 1295, 1303, 1315 (Fed. Cir. 2003).

even if touching on "contracts,"[14] "does not, by triggering some mystical metamorphosis, automatically transform an action … into one on the contract and deprive the court of jurisdiction it might otherwise have." *Megapulse*, 672 F.2d at 968.

Finally, defendants wrongly assert that plaintiffs' claims are "[a]t bottom" contractual because some of the statutes and regulations on which plaintiffs rely are incorporated by reference into NIH grant agreements as terms and conditions. *See* Br.30. The Federal Circuit has squarely rejected this type of jurisdictional argument, holding that "[m]erely because the challenged regulations are tracked in the language of the contract … does not mean that [plaintiff] seeks a kind of relief different from that in *Bowen* [*v. Massachusetts*, 487 U.S. 879 (1988)]—specific and prospective." *Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994) (remanding case to district court where plaintiff "seeks judicial interpretation of a federal regulation"). The question is the source of the rights and the relief requested, *see Am. Sci. & Eng'g*, 571 F.2d at 61; *see also Megapulse,* 672 F.2d at 968, not whether particular language appears in or is incorporated into a contract

---

[14] Defendants assert that "all agree" that NIH grants are contracts, and that NIH grants have the "hallmarks of a contract" for purposes of the Tucker Act. *See* Br.29. This issue was not squarely presented to the district court, and is one that plaintiffs dispute, as, for instance, NIH grants are a heterogeneous set of financial awards, some of which are for training of professionals with no apparent consideration provided to the government in exchange for the grant. *See, e.g.*, J.A.499.

that is somehow involved in the case. Numerous cases have held similarly. *See, e.g.*, *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1109 (D.C. Cir. 2022) (finding that plaintiff's claim fell within a category of cases in which "[c]ontract issues may arise" but "the action itself is not founded on a contract"); *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) ("[W]e do not think that *any* case requiring *some* reference to ... a contract is necessarily *on the contract* and therefore directly within the Tucker Act." (emphasis in original)); *Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004) (looking to whether the non-contract source of rights speaks to "the issues at stake in this case"); *Megapulse*, 672 F.2d at 969 (plaintiff was "not relying on the contract at all," and "we do not accept the Government's argument that the mere existence of … contract-related issues must convert this action to one based on the contract"); *see also Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (Bork, J.) (holding that where a state's "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties," the state's "claims are not contract claims for Tucker Act purposes").[15]

---

[15] The Supreme Court expressly adopted *Maryland*'s reasoning in *Bowen*, 487 U.S. at 894–96, 899–900.

In short, the district court correctly dismissed defendants' unsupported attempts to recast plaintiffs' claims as founded upon contract. Add.12–13.

### 2. Plaintiffs seeks specific relief under the APA, not contract remedies.

The second part of the analysis, the "relief plaintiff requested," *Am. Sci. and Eng'g*, 571 F.2d at 61; *see also Megapulse*, 672 F.2d at 968, further confirms that the district court properly exercised jurisdiction. Plaintiffs' Complaint asks that the Notice be "[d]eclare[d] unlawful and set aside," that the court "[i]ssue a temporary restraining order and preliminary injunction barring [defendants] from taking any steps to implement, apply, or enforce the Rate Change Notice," and that it further "[i]ssue a preliminary [and permanent] injunction barring the NIH, HHS and all of its officers, employees, and agents from taking any steps to implement, apply, or enforce the Rate Change Notice … in any form or under any name," J.A.70–71.

These classic APA remedies are paradigmatic examples of specific relief, as distinguished from compensatory relief. That is, plaintiffs are seeking remedies that "attempt to give the plaintiff the very thing to which he was entitled," not "[d]amages," which "*substitute* for a suffered loss." *Bowen*, 487 U.S. at 895 (citation and internal quotation marks omitted); *see also, e.g.*, *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) (noting that the relief sought in *Bowen* "was not merely for past due sums, but for an injunction to

correct the method of calculating payments going forward"); *Me. Cmty. Health Options*, 590 U.S. at 327 (holding that plaintiffs could proceed in the Court of Federal Claims where they "do not ask for prospective, nonmonetary relief to clarify future obligations; they seek specific sums already calculated, past due, and designed to compensate for completed labors"). Here, plaintiffs are seeking to vacate an illegal agency action and to require that defendants comply with federal statutes and regulations, and a decision granting their requested relief will give them "the very thing to which [they are] entitled." *Bowen*, 487 U.S. at 895. Thus, plaintiffs' claims all "seek injunctive or declaratory relief with prospective effect," which even the dissenting Justices in *Bowen* agreed fall within the APA's waiver of sovereign immunity. *Id.* at 921 (Scalia, J., dissenting); *see also, e.g.*, *Hubbard v. Adm'r, EPA*, 982 F.2d 531, 536 (D.C. Cir. 1992) (holding that even though a federal employee's reinstatement results in payment of contractually owed wages or salary, it "is unquestionably a form of specific relief" within section 702's waiver of sovereign immunity).

Defendants unsuccessfully attempt to distinguish *Bowen* on the grounds that it "did not *involve* contracts or grant agreements with the government." Br.34 (emphasis added). This attempt fails in two respects. First, as the Supreme Court has explained, "*Bowen*'s interpretation of § 702 … hinged on the distinction between specific relief and substitute relief…." *Dep't of the Army v. Blue Fox,*

*Inc.*, 525 U.S. 255, 262 (1999). It did not hinge on whether contracts or grant agreements were present in the case. Second, the question under the Tucker Act is not whether a contract is "involved" in the case; it is whether the claims are "founded … upon" contract, 28 U.S.C. § 1491(a)(1). *See Katz*, 16 F.3d at 1209 ("The answer to the sovereign immunity and jurisdiction questions depends not simply on whether a case *involves* contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are *founded* only on a contract, or whether they stem from a statute or the Constitution." (emphasis added; citation and internal quotation marks omitted)). Plaintiffs' claims, here as in *Bowen*, 487 U.S. at 885–87, are "founded" upon alleged violations of federal law, not upon contracts, and accordingly may proceed under the APA.

Defendants also wrongly claim that "plaintiffs seek specific performance of previously existing grant agreements—a prototypical contract remedy." Br.31; *see also* Br.35 ("[P]laintiffs seek specific performance of contractual obligations by the government…."). That is simply incorrect. As explained above, plaintiffs have asked that the Notice be vacated and that defendants be enjoined from implementing it. Affording plaintiffs that remedy does not require examination of any contract's terms to discern how to specifically perform its obligations. It requires, instead, the application of ordinary administrative law principles to the Notice, as set forth *infra* Part II. Of course, if the Notice is vacated, the negotiated

rates for indirect costs will remain in effect rather than the Notice's 15% rate, and

that could result in defendants paying money to plaintiffs after they submit

invoices for reimbursement of research costs.  But "[t]he fact that a judicial remedy

may require one party to pay money to another is not a sufficient reason" to bring

the case outside the APA's waiver of sovereign immunity.  *Bowen*, 487 U.S. at

893.

As the Federal Circuit succinctly put it, "[a]n order compelling the

government to follow its regulations … is beyond the jurisdiction of the Court of

Federal Claims."  *Ferreiro v. United States*, 501 F.3d 1349, 1353 n.3 (Fed. Cir.

2007).  That is what plaintiffs seek here, not the contract-based remedies of

"enforcement of the agreements or monetary damages."  *Am. Sci. & Eng'g*, 571

F.2d at 61; *see also id.* at 63 (holding that case belonged in Court of Federal

Claims where "plaintiff's own prayer for relief makes it clear that enforcement of

the license agreements or money damages was its aim"); *Burgos v. Milton*, 709

F.2d 1, 3 (1st Cir. 1983) (holding that case belonged in Court of Federal Claims

where plaintiff "sought and received a judgment ordering the United States to give

him $15,000").

## B. The Tucker Act does not expressly or impliedly forbid the relief plaintiffs seek.

The "carve-out" to the APA's waiver of sovereign immunity—that it "does

not apply 'if any other statute that grants consent to suit expressly or impliedly

forbids the relief which is sought' by the plaintiff," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702)—is inapplicable here.  Because this case does not fall within any of the three categories of cases that the Tucker Act encompasses, *see supra* n.12, "the Tucker Act is not applicable and cannot forbid the requested relief, either expressly or impliedly." *Katz*, 16 F.3d at 1210; *see also Tootle v. Sec'y of the Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006) ("There cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act.").

As the Supreme Court has explained, "[w]hen a statute is not addressed to the type of grievance which the plaintiff seeks to assert, then the statute cannot prevent an APA suit." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 216 (citation and internal quotation marks omitted).  That principle describes the situation here precisely: for the reasons already stated, the Tucker Act (which in relevant part is addressed to breach of contract claims) is not addressed to the type of grievance plaintiffs have asserted here (namely, that issuance of the Notice violated the APA and other federal laws), and therefore the Tucker Act cannot prevent suit under the APA.  *See id.* at 222 (where plaintiff is "bringing a different claim, seeking different relief, from the kind the [purportedly preclusive statute] addresses," the statute does not bar suit under the APA).  The fact that grants may be affected by this case does not matter: the Court squarely rejected the proposition "that some

general similarity of subject matter can alone trigger a remedial statute's preclusive effect." *Id.* at 223.

Defendants nonetheless urge that "plaintiffs seek specific performance of contractual obligations by the government [and] the Tucker Act 'impliedly forbids' that relief under the APA," but as just explained, plaintiffs are not suing on a contract. A sister circuit "interpret[s] the Tucker Act to 'impliedly forbid' an APA action seeking injunctive and declaratory relief only if that action is a 'disguised' breach-of-contract claim." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023) (quoting *Megapulse*, 672 F.2d at 968). Because, for the reasons already stated, this case is not a disguised breach-of-contract claim, the Tucker Act's limitations on the relief available in contract suits against the United States are irrelevant here.[16]

## C. Divesting the district court of jurisdiction over plaintiffs' claims would create an intolerable jurisdictional void.

Defendants' position would transform every challenge to agency actions regulating the federal grant awards process into a contract claim—which not only fails to comport with the text of the relevant statutes, *see supra* at 16–27, but would also have unacceptable results. It would mean that a federal agency's actions

---

[16] The Tucker Act permits the Court of Federal Claims to award injunctive relief that is "an incident of and collateral to" an award of damages. 28 U.S.C. § 1491(a)(2). It says nothing about injunctive relief that is not "an incident of and collateral to" an award of damages. *See id.*

relating to its grant awards process could not be enjoined in district court, and could not be enjoined in the Court of Federal Claims, whose authority is limited to the award of monetary relief, with certain limited exceptions. *See supra* note 16. Such a result is contrary to the APA's "basic presumption of judicial review" of agency action. *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967). And the record shows that the relief available in the Court of Federal Claims would be inadequate.

Consider, for instance, a hypothetical in which a federal agency issues a policy that no federal payments will be made on current grants with Black grantees. Such a policy would undoubtedly violate the Fifth Amendment's equal protection guarantee. Yet, according to defendants, each Black grantee whose constitutional rights were violated by this policy would have to bring an individual action in the Court of Federal Claims, and no action could be brought in district court challenging the constitutionality of the agency's policy. The Court of Federal Claims, for its part, has no jurisdiction over equal protection claims because the Fifth Amendment's equal protection guarantee is not "money-mandating." *See Carruth v. United States*, 627 F.2d 1068, 1081 (Fed. Cir. 1980); Solomson, *supra* n.12, at 4-19.

The D.C. Circuit has cautioned against this type of jurisdictional gamesmanship that would deprive plaintiffs of a forum for challenging the legality

of agency actions. In *Tootle*, the D.C. Circuit described as "troublesome" the government's "claim that *neither* the Court of Federal Claims *nor* the District Court has jurisdiction to address Tootle's complaint." 446 F.3d at 176 (emphasis in original). Yet that is precisely what the government endorses here. If plaintiffs' claims were filed in the Court of Federal Claims, that court would lack the jurisdiction to review the legality of the Notice as a matter of statutory and regulatory law, and could not enjoin the Notice—an intolerable jurisdictional void contradicting the presumption of judicial review. Accordingly, courts have warned that "[a]lthough it is important on the one hand to preserve the Tucker Act's limited and conditioned waiver of sovereign immunity in contract actions, we must not do so in terms so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Megapulse*, 672 F.2d at 968.

This consideration is especially salient where, as here, the harms caused by defendants' actions are so drastic and the remedy available to plaintiffs in the Court of Federal Claims would be woefully inadequate. As plaintiffs documented extensively below, the harm that the Notice would cause if allowed to go into effect would be extensive, irreparable, and immediate. *See* ECF no. 12, at 25–28 (D. Mass. Feb. 10, 2025). The harms would also be "catastrophic," resulting in the "need to discontinue ongoing clinical trials and pull patients in Plaintiff States

from lifesaving drugs or medicines that substantially improve a patient's quality of life. The loss of access to sufficient indirect cost funding will thus have short- and long-term impacts and potentially dangerous, even fatal, consequences for clinical trial patients." *Id.* at 27–28 (citations omitted).

None of these harms would be remedied by a money judgment months or years from now. By then, the clinical trials will long since have been cancelled, setting back life-saving research by years if not decades; millions of dollars of research support will have been wasted; highly-trained professionals will have lost their jobs; and vulnerable patients' health will have been put in grave peril. *Cf. Bowen*, 487 U.S. at 906–07 (holding that a suit for monetary relief was not an adequate remedy in part because uncertainty would impair States' planning of future programs). A money judgment at the conclusion of a proceeding in the Court of Federal Claims would be akin to repairing a broken barn door long after the horses have bolted.

> **D. The Supreme Court's recent per curiam order does not resolve the jurisdictional question presented.**

The Supreme Court's per curiam order in *Department of Education v. California*, 145 S. Ct. 966 (2025), does not require this Court to find a lack of jurisdiction. Br.28. First, the facts in *California* are readily distinguishable from those presented here. In *California*, where the defendants terminated almost all grants under two statutorily-authorized teacher training programs, the defendants

insisted that "each grant was reviewed on its own terms." Mem. in Supp. of Defs.'
Mot. for Emergency Stay Pending Appeal, No. 1:25-cv-10548, ECF no. 55, at 1
(D. Mass. Mar. 12, 2025); *see also California v. U.S. Dep't of Educ.*, 132 F.4th 92,
96–97 (1st Cir. 2025) (noting that "the terms and conditions of each individual
grant award are at issue"). Defendants here do not (and could not) claim any such
case-by-case consideration of individual grants' terms and conditions. Instead,
defendants admit, as they must, that the Notice at issue here purports to apply to *all*
NIH grants, regardless of any particular grant's terms. Br.13. As in *Bowen*,
plaintiffs here asked the district court to set aside a broadly applicable agency
decision—a categorical policy regarding the reimbursement of indirect costs with
"significant prospective effect." *Bowen*, 487 U.S. at 889. These differences render
*California* inapposite.

Second, the order did not overturn, narrow, or distinguish *Bowen*. Indeed,
the Court cited *Bowen* as good law. 145 S. Ct. at 968. *Bowen* thus applies with
full force here, and as explained above, *see supra* at 20–25, confirms the district
court's jurisdiction.

Third, plaintiffs have not sought to "enforce a contractual obligation to pay
money," as singled out in the order. 145 S. Ct. at 968. As *Bowen* made clear,
challenging an agency action that implements a broadly-applicable policy does not
amount to a request for "money damages"—even if "a judicial remedy may require

one party to pay money to another." 487 U.S. at 893. No "contractual obligation" is at issue here.

Fourth, the per curiam order was based in part on the Court's uncertainty at the TRO stage as to whether the plaintiffs could establish irreparable harm to warrant emergency interim relief. 145 S. Ct. at 968–69. This case is in a different posture: the district court entered a permanent injunction, after a robust showing of irreparable harm that defendants do not contest in this appeal. *See supra* at 12; Br.3.

Finally, "[t]he Court's stay order is not a decision on the merits." *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring). It was an order on an application to stay a temporary restraining order issued by the district court pending further briefing and review. *See* 145 S. Ct. 966; App., No. 24A910 (U.S. filed Mar. 26, 2025). Its discussion of sovereign immunity principles to the district court's order is limited, *see Dep't of Education*, 145 S. Ct. at 968, and it does not generate any categorical rules regarding APA review.

For all these reasons, the district court properly exercised jurisdiction over plaintiffs' claims.

## II. The Notice violates the APA in multiple respects.

The district court correctly concluded that the Notice violated the APA's substantive and procedural requirements. The Notice is arbitrary and capricious;

not in accordance with law; and without observance of procedure required by law. *See* 5 U.S.C § 706.

### A.     The Notice was arbitrary and capricious.

The Notice was arbitrary and capricious, especially in its failure to comply with the APA's change-in-position doctrine.  As the Supreme Court has recently explained, "[t]he change-in-position doctrine asks two questions.  The first is whether an agency changed existing policy." *FDA v. Wages & White Lion Inv., LLC*, 145 S. Ct. 898, 918 (2025).  Defendants agree that the Notice constitutes a change in policy.  *See, e.g.*, Br.45.  Then, "the doctrine poses a second question: Did the agency display awareness that it *is* changing position and offer good reasons for the new policy?"  145 S. Ct. at 918 (citation and internal quotation marks omitted).  The Court has emphasized that, "[a]t this second step, ... the agency must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (citation and internal quotation marks omitted).  Indeed, the Court has explained, when such reliance interests are present the agency "must" offer "a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).  "It would," the Court explained, "be arbitrary and capricious to ignore such matters"; instead, "a reasoned

explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16.

The Notice utterly failed to meet these requirements. The Notice simply ignored the substantial reliance interests of research institutions whose projects were immediately threatened by NIH's impromptu and drastic transformation of indirect cost reimbursement. In so doing, it abandoned "longstanding policies" that "have engendered serious reliance interests" without "weigh[ing] any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30, 33 (2020) (citations and internal quotation marks omitted). Furthermore, the Notice does not approach even the level of explanation required for a new policy (to say nothing of what is required for a change in position that implicates serious reliance interests). The agency thus did not "reasonably consider[] the relevant issues and reasonably explain[] the decision," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and it "entirely fail[ed] to consider ... important aspect[s] of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### 1. NIH failed to account for reliance interests.

NIH did not account for the serious reliance interests of institutions of higher education that for years have depended on NIH's reimbursement policy. The

Notice barely acknowledges that such interests exist, and does not even attempt to weigh them against the purported reasons for changing course.

The Notice's entire discussion of reliance reads: "Although cognizant that grant recipients, particularly 'new or inexperienced organizations,' use grant funds to cover indirect costs like overhead, NIH is obligated to carefully steward grant awards to ensure taxpayer dollars are used in ways that benefit the American people and improve their quality of life." J.A.89 (citation omitted). The Notice thus displays no awareness that indirect (also known as "facilities and administrative") costs in fact constitute a critical part of research support, without which many research projects could not continue, as the record in this case amply reflects. *See supra* at 4 n.5, 35–36. And the record confirms that grantee institutions relied on NIH's longstanding use of negotiated rates. The University of California, for example, "develop[ed] its annual budget … with the expectation that it would receive the substantially higher facilities and administrative cost recovery rates" previously negotiated. J.A.125. "The NIH Notice's sudden reduction in anticipated federal funds will cause budgetary and operational chaos … leav[ing] gaping holes in the budgets that support the facilities and staff where UC research occurs," and "would be devastating for the system." J.A.125; *see also, e.g.*, J.A.178–79 (University of Massachusetts Chan Medical School's reliance on indirect cost reimbursements for operational costs and debt service

obligations); J.A.209 (University of Maryland College Park's reliance on indirect cost reimbursements for operational support and infrastructure); J.A.223 (Michigan State University's reliance on indirect cost reimbursements for debt service, compliance obligations and other costs).

The Notice does not even acknowledge any of these impacts. And its only proffered justification for ignoring them is NIH's "obligat[ion] to carefully steward grant awards." Add.83. This is a *non sequitur*: the Notice nowhere explains how careful stewardship of taxpayer funds is inconsistent with adhering to negotiated rates for indirect costs that—as the Notice nowhere disputes—support critical research at institutions across the country. Nor does the Notice even attempt to meet its obligation to offer "a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television*, 556 U.S. at 516. "In light of the serious reliance interests at stake, the Department's conclusory statements do not suffice to explain its decision." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

Moreover, while the Notice refers in passing to the government's interest in redirecting funding to "direct scientific research costs," it did not address or discuss the catastrophic impact that this purported redirection would have on *existing* ongoing and planned research projects. *See* Add.83. Indeed, many

research projects would be economically infeasible without the reimbursement of both direct and indirect costs. *See, e.g.*, J.A.123, 219, 345, 1021–22.

As "serious reliance interests" are undeniably present, it was "'arbitrary and capricious to ignore [them].'" *Dep't of Homeland Sec.*, 591 U.S. at 30 (quoting *Fox Television*, 556 U.S. at 515). Under the change-in-position doctrine, NIH's non-consideration of those interests and failure to provide a detailed justification for an abruptly changed policy render the Notice unlawful. *See Wages & White Lion*, 145 S. Ct. at 918.

### 2. The decision to cap all indirect cost rates at 15% was neither reasonable nor reasonably explained.

Beyond NIH's failure to consider reliance, the Notice is arbitrary and capricious because it provides no reasoning for the agency action, does not set forth a satisfactory explanation for imposing a uniform 15% cap on indirect cost rates, and does not explain how the cap would achieve its purported objectives.

Defendants conceded that there is no administrative record beyond the Notice itself and that the Notice alone provides the justification, such as it is, for the new policy. *See* ECF no. 108, at 4. The Notice declares that capping indirect cost rates at 15% would "ensure that as many funds as possible go towards direct scientific research rather than administrative overhead," would reduce "difficult … to oversee" expenses, and would align with "private sector indirect cost rates." Add.83.

The court below correctly concluded that the Notice "failed to provide even the most basic level of 'reasoning'" as to these assertions. Add.36. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation and internal quotation marks omitted). None of that happened here. Furthermore, "conclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quotation omitted) (emphasis original). The Notice offered no logical connection between the actions taken and the three purported explanations for them.

First, the Notice draws no line between capping indirect cost rates and ensuring "that as many funds as possible go towards direct scientific research costs." Add.83. NIH itself publicly stated that the purpose of the Notice was saving money, not redeploying funds as direct costs. J.A.106 (capping the indirect cost rate "will save more than $4B a year effective immediately").[17] And the Notice does not dispute that capping indirect cost rates would render large numbers

---

[17] Documents outside the administrative record may be considered where, as here, consideration is "necessary to determine whether the agency considered all relevant factors in makings its decision" or "facilitate[s] [the Court's] comprehension of the record or the agency's decision." *Housatonic River Initiative v. U.S. Env't Prot. Agency, New England Region*, 75 F.4th 248, 279 (1st Cir. 2023) (citations and quotation marks omitted).

research projects impossible, thereby reducing NIH's support for research. *See* Br.49. For example, nowhere does the Notice address how scientific research could continue absent the laboratories and other facilities components (e.g., safety equipment) that are required for conducting that research and that are funded by indirect cost reimbursements.

Defendants err in describing NIH's failure to address these considerations as a "policy judgment" on whether to "volunteer[] its views" on how institutions should respond to these reductions. Br.49. Defendants' obligation under the APA is to conduct reasoned decision-making. The agency must "pay[] attention to the advantages *and* the disadvantages of agency decisions." *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (emphasis in original). Whether to consider those disadvantages is not a "policy judgment," *see* Br.49, but rather a legal obligation of federal agencies.

Second, the Notice's assertion that indirect costs are difficult to oversee is likewise baseless. *See* Add.83. The components of indirect costs—"facilities" and "administration" costs—are well-defined by regulation, 45 C.F.R. § 75.414(a), and subject to close supervision, 45 C.F.R. Pt. 75, Appx. III, § C.1(a)(3). NIH provided no analysis to support its assertion that indirect costs are harder to oversee than direct costs. Once again, "conclusory statements will not do." *Amerijet*, 753 F.3d at 1350.

Third, the Notice offers no explanation for why the indirect cost rates of private foundations generally—or the identified foundations specifically—bear on NIH's indirect cost rates. *See* Add.83. And several factors indicate that they do not. For instance, several foundations define "direct costs" as including costs that HHS regulations define as "indirect costs," thereby rendering any comparison between indirect cost rates meaningless.[18] *Compare* J.A.536 ("project office costs" are direct costs) *and* J.A.541 (direct costs include "Shared Costs" which "benefit multiple programs or projects") *with* 45 C.F.R. § 75.414(a) (defining indirect costs). Moreover, many of the specific rates identified in the Notice are incorrect or irrelevant. For example, the Packard Foundation's maximum indirect cost rate is 25%, not 15%. *Compare* Add.83 *with* J.A.565. The Robert Wood Johnson Foundation's maximum rate is 15%, not 12%. C*ompare* Add.83 *with* J.A.540. And neither the Smith Richardson Foundation nor the Carnegie Corporation of New York appears to offer any grants related to lab-based research. J.A.553–55, 557–61. NIH cannot justify its action by reliance on non-analogous comparators with no reasoned explication.

When an agency explanation fails to provide enough clarity "that its path may reasonably be discerned," the action "cannot carry the force of law." *Encino*

---

[18] HHS itself recognizes that "[t]here is no universal rule for classifying certain costs as either direct or indirect (F&A) under every accounting system." 45 C.F.R. § 75.412.

*Motorcars* at 221 (quotation omitted).  With no apparent forethought, research, or analysis, NIH attempted to limit indirect cost reimbursements in ways that would cripple research capabilities.  No path to achieve the agency's purported goals was reasonably discernible.

## B.    The Notice violates HHS's regulations.

Modifying indirect cost rates in the manner at issue here is prohibited by 45 C.F.R. Pt. 75, the very regulations pursuant to which NIH claimed to act.  The plain language of 45 C.F.R. § 75.414(c) requires using the rates negotiated between HHS and the grantee institution, and authorizes deviation from those rates only pursuant to specific procedures that were not followed here.  The Notice is therefore "not in accordance with law."  5 U.S.C. § 706(2)(A).

### 1.    The Notice's across-the-board rate is not a "deviation" from negotiated rates.

The regulatory scheme makes clear that negotiated rates are the rule, not the exception, and its narrow authorization to adopt "deviations" from negotiated rates does not encompass an across-the-board flat rate like the one at issue here.  HHS has adopted a comprehensive regulatory system to identify and reimburse indirect costs.  HHS regulations govern in detail how to identify allocable indirect costs and how to negotiate and ultimately agree upon a rate of reimbursement based on those identified costs.  *See, e.g.*, 45 C.F.R. §§ 75.420–475 (what costs are considered indirect costs); *id.* §§ 75.500–521 (auditing of indirect costs); *id.* Pt. 75,

Appx. III, § C.11(c) (correction of "systems deficiencies" after rates are determined); *id.* Pt. 75, Appx. III, § C.11(f) (negotiating and determining indirect cost rates). The regulations also govern extensions of negotiated rates and outline the negotiations that must ensue before such extensions are granted. *Id.* § 75.414(g). Even when negotiations reach an impasse, the regulations do not call for a unilateral cap, but instead create a mechanism to resolve the disagreement. *See id.* Pt. 75, Appx. III, § C.11(h) (requiring an "appeal system" to resolve disagreements over indirect cost rates).

The regulations could not be clearer that following this comprehensive scheme for negotiated rates is the general rule: "The negotiated rates *must* be accepted by *all* Federal awarding agencies." *Id.* § 75.414(c)(1) (emphasis added). Of course, the regulations also contemplate that "deviations" from negotiated rates may be permissible in narrow circumstances. *See id.* § 75.414(c)(2)–(3). But a uniformly applicable cap is not a "deviation." A "deviation" is a "[d]ivergence from an accepted idea, policy, or norm of behavior," which requires a standard or norm that *still exists* and is the default rule from which deviations occur. *Deviation*, THE AMERICAN HERITAGE DICTIONARY (5th ed. 2016). "Deviation" cannot mean the replacement of one norm (negotiated rates) with an entirely different approach (15% cap on all indirect cost rates for all grants). *See Biden v. Nebraska*, 600 U.S. 477, 495 (2023) ("The authority to 'modify' statutes and

regulations allows [an agency] to make modest adjustments and additions to existing provisions, not transform them.").

Nowhere do the regulations contemplate that NIH may declare by fiat a single, across-the-board cap on indirect cost rates. And implying such authority would contradict the regulations' detailed system for negotiating indirect cost rates and their evident presumption that negotiated rates are the rule. The inevitable conclusion is that NIH has no such authority, and that the Notice's assertion of such authority was not in accordance with law.

> **2. The Notice did not comply with the regulation's limitation to a "class" of awards or with its procedural requirements.**

As relevant here, deviation from a negotiated rate is permitted only "for a class of Federal awards or a single Federal award … when approved by a Federal awarding agency head or delegate based on documented justification as described in paragraph (c)(3) of this section." 45 C.F.R. § 75.414(c)(1).[19] The Notice fails this requirement twice over: it is not limited to a "class of Federal awards," and it does not comply with the procedural requirements of paragraph (c)(3).

*First*, HHS defines a "[c]lass of Federal awards" as a "group of Federal awards either awarded under a specific program or group of programs or to a specific type of non-Federal entity or group of non-Federal entities." 45 C.F.R.

---

[19] The regulations also permit deviation "when required by Federal statute or regulation," 45 C.F.R. § 75.414(c)(1); that provision does not apply here.

§ 75.2.  The Notice is not limited to a "group" of awards, programs, or non-Federal entities.  Rather, it provides that "there will be a standard indirect rate of 15% across *all* NIH grants for indirect costs."  Add.82 (emphasis added).  The Notice unambiguously directs that "*[f]or any new grant issued*, and for all existing grants to [institutions of higher education] retroactive to the date of issuance of this Supplemental Guidance, award recipients are subject to a 15 percent indirect cost rate."  Add.84 (emphasis added).  As the district court correctly concluded, this across-the-board rate cap "render[s] entirely superfluous and meaningless" the regulations' careful limitation of deviation authority to a "class"—i.e., "a subset, as opposed to all"—of federal awards.  Add.21.

For the first time on appeal, defendants now argue that "even accepting plaintiffs' theory that a 'class' must be a subset of NIH awards, that is true here: the Supplemental Guidance applies only to research grants made to [institutions of higher education]."  Br.42.  This argument is forfeited: "theories not squarely and timely raised in the trial court cannot be pursued for the first time on appeal." *Iverson v. City of Boston*, 452 F.3d 94, 102 (1st Cir. 2006).  In their memorandum opposing the issuance of a temporary restraining order, defendants argued only that the regulations allow it "to deviate from negotiated rates for the *class of Federal awards made by NIH*" and that the regulations do not "in any way limit[] the size of that class."  ECF no. 73, at 12 (emphasis added).  They developed no argument

44

that the applicable "subset" was "grants made to [institutions of higher education],"[20] and the district court did not rule on that argument. *See* Add.21.

In any event, the argument is meritless, as it contradicts the Notice itself. The Notice states that the 15% rate applies to "all NIH grants," not only those issued to institutions of higher education. Add.82. The Notice even goes out of its way to clarify that "*any* new grant issued" and "all *existing grants to IHEs* retroactive to the date of [the Notice's] issuance," will be subject to the cap. Add.84 (emphasis added). Thus, *new* grants to *any* recipients, institutions of higher education or not, are subject to the cap. Defendants cannot now attempt to justify the Notice by departing from its plain text.

*Second*, the Notice failed to comply with the process by which an agency can deviate from a negotiated rate. To apply a "rate different from the negotiated rate," 45 C.F.R. § 75.414(c)(1), the agency "must implement, and make publicly available, the policies, procedures and general decision making criteria that their programs will follow to seek and justify deviations from negotiated rates," *id.* § 75.414(c)(3).

---

[20] While defendants noted this theory in passing at the preliminary injunction hearing, *see* J.A.653, arguments "raised only in cursory fashion before the district court" are "waived." *U.S. ex rel. Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 125 (1st Cir. 2013) (citation and internal quotation marks omitted).

The regulations thus call for a two-part sequence: development of the policy that will govern the deviation decision; and the deviation decision. The regulations' use of tense expresses the logically sequential nature of the requirements: the agency first must "implement and make publicly available" (present tense) the policies, procedures, and decision-making criteria that then "will" (future tense) guide and justify deviations. *See also* Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78590, 78600 (Dec. 26, 2013) (describing the rule's requirement of documented justification, public availability of the policies for deviation, inclusion in the announcement of funding opportunity, and pre-announcement outreach).

Prior to issuing the Notice, NIH neither "implement[ed]" nor "ma[d]e publicly available" the "policies, procedures, and general decision making criteria" that would guide and justify the deviations it planned. 45 C.F.R. § 75.414(c)(3). The government's claim that the Notice itself "fulfills those procedural obligations," Br.39, thus disregards that those obligations must be fulfilled *prior to* the decision to deviate from a negotiated rate.

Indeed, defendants concede that they did not even attempt to implement or publicize the "procedures and decision making criteria" mandated by regulation. Br.41 ("[T]he Supplemental Guidance does not set forth further 'procedures and decision making criteria' for applying its policy.") (quoting 45 C.F.R.

§ 75.414(c)(3)).  Defendants' purported justification for these omissions—that they are not "necessary" to implement the cap because the cap is a "generally applicable 'polic[y]'," Br.41—would allow defendants to end-run the entire elaborate regulatory process for negotiated rates set forth in the regulations.  Section 75.414(c)(3)'s authorization for an agency to create parameters that its "programs will follow to seek and justify deviations from negotiated rates" is irreconcilable with defendants' claimed authority to discard the entire negotiated-rate regulatory scheme.

### C. The Notice violated Section 224 of the governing appropriations statute.

The Notice was also contrary to law in violating the appropriations statute that limits NIH's ability to deviate from established indirect cost rates, and that also expressly and impliedly bars HHS from imposing categorical caps on indirect cost rates.

In 2017, and every year since, Congress has made explicit that indirect cost rates are to follow the reimbursement model based on negotiated rates, rather than any other method.  Section 224 of Further Consolidated Appropriations Act, 2024 provides:

> In making Federal financial assistance, the provisions relating to indirect costs in part 75 of title 45, Code of Federal Regulations, *including with respect to the approval of deviations from negotiated rates*, shall continue to apply to the National Institutes of Health to the

same extent and *in the same manner* as such provisions were applied in the third quarter of fiscal year 2017.

Pub. L. No. 118-47, § 224 (emphasis added).  Congress went further by rejecting the administration's attempt to alter NIH's approach to indirect cost reimbursements:

> None of the funds appropriated in this or prior Acts or otherwise made available to the Department of Health and Human Services or to any department or agency may be used to develop or implement a modified approach to such provisions, or to intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter.

*Id.*  This provision, which directs NIH to maintain its system of reimbursing indirect costs, remains in effect today.  *See supra* at 10.

The Notice does precisely what Section 224 forbids, both procedurally and fiscally.  Procedurally, the Notice's categorical cap on indirect cost rates contradicts 45 C.F.R. Pt. 75's method for negotiating and setting indirect cost rates, as discussed *supra* at 41–47.  By replacing the negotiation of indirect cost provided in 45 C.F.R. Pt. 75 with a categorical cap, the Notice prevents "provisions relating to indirect costs" from "continu[ing] to apply … in the same manner" as in 2017, thus "implement[ing] a modified approach" expressly forbidden by Section 224. The government's only response is to claim, again, that the Notice was consistent with 45 C.F.R. Pt. 75 and is therefore procedurally compliant with Congress's mandate that the regulatory provisions must "continue to apply."  Br.42–43.  The

48

government's position thus collapses into its incorrect interpretation of 45 C.F.R. § 75.414(c). *See supra* at 41–47.

Fiscally, by imposing a 15% cap on indirect cost rates, compared to the near 30% historical average for such rates, *see* Add.83, the Notice obviously went "beyond the proportional effect" of approvals for deviations from negotiated rates in the third quarter of Fiscal Year 2017. Straightforward mathematics belies defendants' assertion to the contrary, Br.44: 30 is greater than 15. And defendants' insistence that the Notice's purpose is "to channel taxpayer funds toward direct research, not to spend less on medical research activities altogether," *id.*, cannot save it. First, even if the Notice actually accomplished that goal (and it does not), the statute expressly forbids NIH from unilaterally changing its approach to indirect costs, as explained above. Second, and relatedly, defendants do not dispute that Section 224 was enacted in direct response to the first Trump administration's proposal for a 10% across-the-board cap on indirect costs, *see* Br.44, which was part of that administration's proposal to *reduce* NIH funding by over $4.5 billion dollars, *see* J.A.98. Especially in light of the current administration's similarly trumpeting the Notice as a means to "save more than $4B a year effective immediately," J.A.106, and the Notice's total failure to explain how funds would be channeled from indirect cost reimbursements to direct cost reimbursements, defendants' litigation position that the Notice does not reflect

an intention to reduce NIH spending is not credible. Third, defendants ignore that so-called indirect costs in fact directly support medical research activities, as explained *supra* at 38–39.

Of course, an agency may not "decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). And indeed, the first Trump administration recognized that, under Section 224, "NIH has been prohibited by law from reducing grantee administrative costs and shifting these resources to support direct research," J.A.98—precisely what the Notice purports to do. Doing so now violates Section 224, just as it did in 2017.

### D. The Notice failed to comply with notice-and-comment rulemaking required by the APA.

The Notice failed to comply with the APA's procedural requirements for promulgating agency rules. Under the APA, a court "shall ... hold unlawful and set aside agency action, findings and conclusions found to be ... without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Federal agencies must generally provide notice and opportunity for comment before issuing a rule, unless an exception applies—and, as explained below, none applies here despite defendants' arguments to the contrary. *Id.* § 553(b); *see also N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (reviewing requirements for procedural validity).

### 1. The Notice required notice-and-comment rulemaking.

Defendants do not and cannot dispute that the Notice was a substantive rule for purposes of 5 U.S.C. § 553. *See* Br.51–55. The Notice purports to impose a new obligation on recipient organizations that did not exist before the Notice went into effect. Add.84. The Notice is thus an agency action that carries the "force and effect of law," and required notice and comment before its promulgation. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

Defendants' principal response—that 5 U.S.C. § 553(a)(2) exempts "matters relating to … grants" from notice-and-comment rulemaking, Br.52—fails to fully account for their own decades-old policy (known as the "Richardson Waiver") that nonetheless "directed" agencies to comply with notice-and-comment rulemaking for the grant awards process. 36 Fed. Reg. 2532, 1971 WL 149470 (Feb. 5, 1971). That policy remained in place at the time of the Notice and was binding on NIH. *See* 90 Fed. Reg. 11029 (Mar. 3, 2025) (Add.94) (acknowledging that "[t]he Richardson Waiver thus *required* the Department to use the APA's notice and comment rulemaking procedures for these types of matters.") (emphasis added).

Defendants' claim that NIH could ignore the Richardson Waiver is, as they concede, rejected by the D.C. Circuit. Br.53 (citing *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 356–57 (D.C. Cir. 2017)). They cite no appellate authority supporting their position—indeed, this Court appears to have rejected it as well.

*See Cheshire Hosp. v. N.H.-Vt. Hospitalization Serv., Inc.*, 689 F.2d 1112, 1122

n.13 (1st Cir. 1982) (noting that, because "the Secretary has waived the so-called

'benefits exception' [of 5 U.S.C. § 553(a)(2)], see 36 Fed. Reg. 2532 (1971) … we

*must* still determine whether applicable procedures were violated") (emphasis

added).  Defendants also wrongly claim that binding an agency to voluntary

policies contradicts the general principle that the APA establishes the "maximum

procedural requirements that Congress was willing to have the courts impose upon

agencies."  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435

U.S. 519, 524 (1978), *cited in* Br.53–54.  *Vermont Yankee* concerned whether the

*courts* could prescribe additional procedures for ventilating factual issues.  435

U.S. at 540–42.  Here, the APA properly binds an agency to *its own* voluntary

commitment to use the APA's process for notice-and-comment rulemaking.

Defendants also wrongly contend that the Notice did not require notice-and-

comment rulemaking because the regulation pursuant to which it was purportedly

issued—45 C.F.R. § 75.414(c)—itself was promulgated via notice and comment.

Br.55.  This argument ignores the APA's basic requirement that legislative rules—

which the Notice is, as defendants do not dispute—require notice and comment.

*See N.H. Hosp. Ass'n*, 887 F.3d at 70.  A regulation cannot exempt an agency from

the APA's requirements.

### 2. The assertion that HHS rescinded its commitment to follow notice-and-comment rulemaking was not timely raised below and provides no basis for relief.

Defendants argue that in March 2025, HHS rescinded the Richardson Waiver, and thus any failure to follow notice-and-comment rulemaking was harmless error. Br.54. Defendants waived this argument by not raising it below, and it is meritless in any event.

The purported rescission was announced on March 3, 2025, *see* Add.94, yet defendants did not raise this issue with the district court, either upon the rescission's issuance or after the March 5, 2025 preliminary injunction order, J.A.19. Defendants did not move for summary judgment. J.A.19. And in their assented-to motion to convert the preliminary injunction to a permanent injunction, filed on April 4, 2025—one month *after* the purported rescission—defendants represented that "[n]o outstanding factual or legal issues remain for disposition by this Court." ECF no. 108. A "party is not at liberty to articulate specific arguments for the first time on appeal," even if "the general issue was before the district court." *Eldridge v. Gordon Bros. Grp.*, 863 F.3d 66, 84 (1st Cir. 2017) (citations omitted).

In any event, defendants are wrong to assert that because of the rescission of the Richardson Waiver, NIH's failure to undergo notice-and-comment rulemaking for the Notice was "harmless error." Br.54–55. Courts have rejected such cavalier

treatment of an agency's self-imposed procedural requirements. *See Service v. Dulles*, 354 U.S. 363, 388 (1957) ("While it is of course true ... the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards, neither was he prohibited from doing so, ... and having done so he could not ... proceed without regard to them."). Indeed, the Supreme Court has recently summarized the harmless-error rule by stating that "[w]hen it is clear that the agency's error had no bearing on *the procedure used* or the substance of the decision reached, a remand would be pointless." *Wages & White Lion*, 145 S. Ct. at 930 (emphasis added; citation and internal quotation marks omitted). Here, the error plainly affected "the procedure used" by depriving plaintiffs of the protections of the notice-and-comment procedure—which was precisely the reason for the Richardson Waiver in the first place. *See* 36 Fed. Reg. 2532, 1971 WL 149470. Furthermore, defendants' argument appears to be that, had NIH waited until after the rescission took effect to issue the Notice, it could have proceeded without notice and comment, Br.54–55—but they cite no authority for the proposition that it can be harmless error to commit a procedural violation as long as the rules change at some later time. Nor do defendants acknowledge the financial reality that, had the Notice been issued on, say, March 4, 2025 (the day after the Richardson Waiver's purported rescission) instead of February 7, that

would have meant nearly a month during which the negotiated rates for indirect cost reimbursement would undisputedly have remained in effect.

## **CONCLUSION**

For the foregoing reasons, the judgment of the district court should be affirmed.

June 9, 2025

Respectfully submitted,

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ David C. Kravitz
David C. Kravitz, 1st Cir. No. 41870
　*State Solicitor*
Katherine Dirks, 1st Cir. No. 114060
　*Chief State Trial Counsel*
Allyson Slater
　*Chief, Reproductive Justice Unit*
Chris Pappavaselio
　*Assistant Attorney General*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2277
email: katherine.dirks@mass.gov
*Counsel for the Commonwealth of Massachusetts*


**KWAME RAOUL**
Attorney General of Illinois

Alex Hemmer
Deputy Solicitor General
R. Sam Horan
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
alex.hemmer@ilag.gov
*Counsel for the State of Illinois*

**DANA NESSEL**
Attorney General of Michigan

Linus Banghart-Linn
　*Chief Legal Counsel*
Neil Giovanatti
Joshua S. Smith
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933
(517) 281-6677
Banghart-LinnL@michigan.gov
*Attorneys for the People of the State of Michigan*

**KRIS MAYES**
Attorney General of Arizona

Joshua D. Bendor
Solicitor General
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Joshua.Bendor@azag.gov
ACL@azag.gov
*Counsel for the State of Arizona*

**ROB BONTA**
Attorney General of California

NELI PALMA
Senior Assistant Attorney General

EMILIO VARANINI
Supervising Deputy Attorney General
SOPHIA TONNU
DANIEL AMBAR
Deputy Attorneys General
California Attorney General's Office
455 Golden Gate Avenue
San Francisco, CA 94102
(415) 510-3541
Emilio.Varanini@doj.ca.gov
*Counsel for the State of California*

**PHILIP J. WEISER**
Attorney General of Colorado

Shannon Stevenson, CO Reg. No.
35542
Solicitor General
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6749
Shannon.Stevenson@coag.gov
*Counsel for the State of Colorado*

**WILLIAM TONG**
Attorney General of Connecticut

Michael K. Skold
Solicitor General
165 Capitol Ave.
Hartford, CT 06106
(860) 808-5020
Michael.skold@ct.gov
*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov
*Counsel for the State of Delaware*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

David D. Day
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes
*Solicitor General*
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
Attorney General for Maine

SEAN D. MAGENIS
THOMAS A. KNOWLTON
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
sean.d.magenis@maine.gov
*Counsel for the State of Maine*

**ANTHONY G. BROWN**
*Attorney General of Maryland*

Julia Doyle
*Solicitor General*
Adam D. Kirschner
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6424
akirschner@oag.state.md.us
*Counsel for the State of Maryland*

**KEITH ELLISON**
Attorney General of Minnesota

Solicitor General
Office of the Minnesota Attorney
General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010
liz.kramer@ag.state.mn.us
*Counsel for the State of Minnesota*

**AARON D. FORD**
Attorney General of Nevada

Heidi Parry Stern
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-3420
HStern@ag.nv.gov
*Counsel for the State of Nevada*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

Angela Cai
*Executive Assistant Attorney General*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-3377
Angela.Cai@njoag.gov
*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

Anjana Samant (1st Cir. No. 1144702)
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
asamant@nmdoj.gov
*Counsel for the State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

Ester Murdukhayeva
*Deputy Solicitor General*
Rabia Muqaddam
*Special Counsel for Federal Initiatives*
Molly Thomas-Jensen
*Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-8883
Ester.Murdukhayeva@ag.ny.gov
Rabia.Muqaddam@ag.ny.gov
Molly.Thomas-Jensen@ag.ny.gov
*Counsel for the State of New York*

**JEFF JACKSON**
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

Daniel P. Mosteller
Associate Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov
*Counsel for State of North Carolina*

**DAN RAYFIELD**
Attorney General of Oregon

Benjamin Gutman
Solicitor General
Robert A. Koch
Senior Assistant Attorney General
1162 Court Street NE
Salem, OR 97301
(503) 378-4402
Robert.A.Koch@doj.oregon.gov
*Counsel for the State of Oregon*

**PETER F. NERONHA**
Attorney General of Rhode Island

Jordan Broadbent
*Special Assistant Attorney General*
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2060
Jbroadbent@riag.ri.gov
*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

Jonathan T. Rose
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov
*Counsel for the State of Vermont*

**NICHOLAS W. BROWN**
Attorney General of Washington

SPENCER W. COATES
ELLEN RANGE
Assistant Attorneys General
Office of the Washington State
Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
spencer.coates@atg.wa.gov
ellen.range@atg.wa.gov
*Counsel for the State of Washington*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

Aaron J. Bibb
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
bibbaj@doj.state.wi.us
*Counsel for the State of Wisconsin*

# CERTIFICATE OF COMPLIANCE WITH RULE 32

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 12,587 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Times New Roman, a proportionally spaced typeface.

/s/ Katherine Dirks
Katherine Dirks
Dated: June 9, 2025