**Nos. 25-1343, 25-1344, 25-1345**
# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

COMMONWEALTH OF MASSACHUSETTS; DANA NESSEL, on behalf of the people of the State of Michigan; STATE OF ILLINOIS; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF COLORADO; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF DELAWARE; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs-Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., PH.D. in their official capacity as Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants-Appellants*.

ASSOCIATION OF AMERICAN MEDICAL COLLEGES; THE AMERICAN ASSOCIATION OF COLLEGES OF PHARMACY; THE ASSOCIATION OF SCHOOLS AND PROGRAMS OF PUBLIC HEALTH; THE CONFERENCE OF BOSTON TEACHING HOSPITALS, INC.; GREATER NEW YORK HOSPITAL ASSOCIATION,

*Plaintiffs-Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., PH.D. in their official capacity as Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants-Appellants*.

ASSOCIATION OF AMERICAN UNIVERSITIES; AMERICAN COUNCIL ON EDUCATION; ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES; BRANDEIS UNIVERSITY; BROWN UNIVERSITY; CARNEGIE MELLON UNIVERSITY; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; THE UNIVERSITY OF CHICAGO; CORNELL UNIVERSITY; THE GEORGE WASHINGTON UNIVERSITY; JOHNS HOPKINS UNIVERSITY; MASSACHUSETTS INSTITUTE OF TECHNOLOGY; TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA; UNIVERSITY OF ROCHESTER; TRUSTEES OF TUFTS COLLEGE; CALIFORNIA INSTITUTE OF TECHNOLOGY,

*Plaintiffs-Appellees*,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the Department of Health and Human Services; JAY BHATTACHARYA, M.D., PH.D., in their official capacity as Director of the National Institutes of Health,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Massachusetts

# AMICUS BRIEF FOR THE AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

*(Counsel listed on next page)*

David J. Zimmer
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for the American Association of University Professors*

June 16, 2025

# RULE 26.1 DISCLOSURE STATEMENT

*Amicus curiae* American Association of University Professors states that it is a non-profit association, with no parent company, and no publicly held corporation owns 10 percent or more of its stock.

/s/ David J. Zimmer  
David J. Zimmer

# TABLE OF CONTENTS

                                                                                                           **Page**

TABLE OF AUTHORITIES ................................................................................ iii

INTEREST OF AMICUS CURIAE ........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................3

ARGUMENT ...........................................................................................................4

      I.        If Allowed to Take Effect, NIH's Fifteen-Percent Cap on Indirect Research Costs Would Devastate the Careers of Up-and-Coming Scientists. ......................................................................................................4

      II.      NIH's Unlawful Cap on Indirect Research Funding Would Accelerate the "Brain Drain" of Promising Young Scientists ...............................6

CONCLUSION .......................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bd. of Regents v. Roth*,
　408 U.S. 564 (1972) ................................................................................................1

*Duquesne Univ. of the Holy Spirit v. Nat'l Lab. Rels. Bd.*,
　947 F.3d 824 (D.C. Cir. 2020) ................................................................................2

*Freyd v. Univ. of Oregon*,
　990 F.3d 1211 (9th Cir. 2021) .................................................................................2

*Hulen v. Yates*,
　322 F.3d 1229, 1239 (10th Cir. 2003) .....................................................................1

*McAdams v. Marquette University*,
　914 N.W.2d 708 (Wis. 2018) ..................................................................................2

*Otero-Burgos v. Inter Am. Univ.*,
　558 F.3d 1 (1st Cir. 2009) ....................................................................................1, 2

*Tilton v. Richardson*,
　403 U.S. 672 (1971) ................................................................................................1

*Univ. of Pennsylvania v. E.E.O.C.*,
　493 U.S. 182 (1990) ................................................................................................2

**Other Authorities**

Aatish Bhatia et al., *Trump Has Cut Science Funding to Its Lowest Level in Decades*, N.Y. Times (May 22, 2025), https://www.nytimes.com/interactive/2025/05/22/upshot/nsf-grants-trump-cuts.html ....................................................................................................................8

Chandelis Duster, *Countries boost recruitment of American scientists amid cuts to scientific funding*, NPR (Mar. 29, 2025), https://www.npr.org/2025/03/29/nx-s1-5343966/countries-boost-recruitment-of-american-scientists-amid-cuts-to-scientific-funding ..................................................................................................7, 9

Christina Larson et al., *Scientists have lost their jobs or grants in U.S. cuts, and others want to hire them*, AP News (May 25, 2025), https://apnews.com/article/trump-research-funding-cuts-brain-drain-f1ac9fe5c8a90f5d5ec9b2726475e10e .............................................................7, 8

Erica Pandey, *The great poaching: America's brain drain begins*, Axios (June 7, 2025), https://www.axios.com/2025/06/07/us-science-brain-drain ..................8, 9

Joel Achenbach et al., *As Trump cuts science budgets, some researchers look abroad*, Washington Post (May 21, 2025), https://www.washingtonpost.com/science/2025/05/21/brain-drain-science-cuts-jobs-trump/?utm .................................................................................. 7, 8, 9

Kate Zernike, *U.S. Scientists Warn That Trump's Cuts Will Set Off a Brain Drain*, N.Y. Times (June 3, 2025), https://www.nytimes.com/2025/06/03/us/trump-federal-spending-grants-scientists-leaving.html ................................................7, 8

Laurie Udesky & Jack Leeming, *Exclusive: a* Nature *analysis signals the beginnings of a U.S. science brain drain*, Nature (Apr. 22, 2025), https://media.journoportfolio.com/users/381240/uploads/e5d47fca-197c-4d9b-b72a-0d50b00e2164.pdf ................................................................... 7, 8, 9

Olivia Le Poidevin et al., *Brain drain? Trump cuts spur U.S. scientists to seek jobs in Europe*, Reuters (Apr. 11, 2025), https://www.reuters.com/world/scientists-us-harried-by-trump-cuts-turn-towards-europe-2025-04-11/ ................................7

Tom Whipple, *Trump brain drain starts global tug-of-war for American scientists*, The Times (Apr. 25, 2025), https://www.thetimes.com/us/news-today/article/trump-brain-drain-starts-global-tug-of-war-for-american-scientists-tn52fcbr6 ....................................................................................................7

# INTEREST OF AMICUS CURIAE[1]

The American Association of University Professors ("AAUP") is a non-profit organization that represents more than 40,000 faculty, librarians, graduate students, and academic professionals employed at institutions of higher education across the United States. Founded in 1915, the AAUP is committed to advancing academic freedom and shared governance, defining fundamental professional values and standards for higher education, promoting the economic security of faculty and other academic workers, and ensuring higher education's contribution to the common good. In furtherance of these ends, the AAUP has published numerous statements of principle and policy, which represent the collective experience and carefully considered judgment of the academic profession. These statements are widely respected and followed by American colleges and universities and have been recognized by the Supreme Court of the United States, as well as this and other courts. E.g., *Bd. of Regents v. Roth*, 408 U.S. 564, 579 n.17 (1972); *Tilton v. Richardson*, 403 U.S. 672, 681–82 (1971); *Otero-Burgos v. Inter Am. Univ.*, 558 F.3d 1, 10 (1st Cir. 2009); *Hulen v. Yates*, 322 F.3d 1229, 1239 (10th Cir. 2003); *McAdams v. Marquette University*, 914 N.W.2d 708, 730,

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in party; no party or party's counsel contributed money intended to fund this brief's preparation or submission; and no person other than *amicus* contributed money intended to fund the brief's preparation or submission.

733 (Wis. 2018). The AAUP frequently submits amicus briefs to this court and others in cases that implicate AAUP policies or that otherwise involve legal issues important to faculty members and the broader higher education community. *E.g.*, *Otero-Burgos*, 558 F.3d 1; *Univ. of Pennsylvania v. E.E.O.C.*, 493 U.S. 182 (1990); *Kilborn v. Amiridis*, 131 F.4th 550 (7th Cir. 2025); *Freyd v. Univ. of Oregon*, 990 F.3d 1211 (9th Cir. 2021); *Duquesne Univ. of the Holy Spirit v. Nat'l Lab. Rels. Bd.*, 947 F.3d 824 (D.C. Cir. 2020).

The AAUP hopes to assist the Court as amicus curiae in the present matter by illuminating how NIH's Supplemental Guidance, if allowed to take effect, would impact faculty—and especially junior faculty—in the life and medical sciences. As an association that includes junior science faculty, the AAUP has a keen interest in protecting junior faculty's access to the resources that enable them to launch their research careers. And the AAUP's senior faculty members—many of whom have themselves benefited from their institutions' indirect funding—know just how crucial such funding is to early-career scientists. American scientific progress depends on the development of new talent, and if reimbursements for indirect costs are reduced, a generation of scientific discovery will either be lost or will take place in other countries.

# INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' briefs make clear the devastating impact the limitation on indirect-cost reimbursement would have on this country's research institutions. AAUP submits this brief to highlight the related and equally devastating impact that limitation would have on research faculty at those institutions—especially junior faculty.

Junior faculty are just launching their research careers, and their employing institutions rely on indirect-cost reimbursement to provide the support necessary for their research. If indirect costs continue to be reimbursed at rates NIH and institutions of higher education have negotiated as appropriate to individual programs, these junior faculty will be tomorrow's leading scientific innovators. But if indirect costs are capped at fifteen percent, these faculty may not be able to accept grants, placing a significant and possibly insurmountable roadblock on the path to a successful career. Indeed, faced with an inability to accept federal grants with an indirect-costs cap, faculty may be forced to accept positions at foreign institutions where funding *is* available. This trend has already begun. AAUP's members are now routinely recruited by foreign institutions. And if the indirect-costs limitation ultimately takes effect, many faculty will have little choice but to take those offers, exacerbating the brain drain that is already threatening the United

States' position at the global forefront of scientific innovation. The judgment of the district court should be affirmed.

## ARGUMENT

I. **If Allowed to Take Effect, NIH's Fifteen-Percent Cap on Indirect Research Costs Would Devastate the Careers of Up-and-Coming Scientists.**

NIH's cap on indirect costs would have a catastrophic impact on crucial scientific work—and in particular on the next generation of scientific innovators. Reduction in indirect-cost reimbursements would affect virtually every aspect of junior faculty's careers, including hiring, retention, training, stipends, facilities, start-up packages, and mentorship. The loss of these funds would be particularly devastating for junior faculty who have not yet established themselves. If institutions of higher education cannot recoup their indirect costs at negotiated rates, they will be unable to retain junior faculty and fund their research, and a generation of scientific discoveries may never be made—or at least will not be made in this country.

Expenditures in the form of indirect costs play an essential role in the work and development of junior faculty, and a fifteen-percent cap on reimbursement of those costs would mean that many of those critical expenditures simply could not be made. Without access to indirect-cost reimbursement at the rates negotiated and appropriate for their programs, institutions of higher education will be unable to

fund and equip the facilities junior faculty need to conduct their research. JA43-44; JA166; JA1129; JA1160. This, in turn, will damage institutions' ability to recruit, hire, and retain new faculty, JA44; JA166; JA938; *see* JA995, who may in any event need to be laid off if indirect-cost reimbursement is cut, JA819. The start-up funds on which new researchers rely to set up their labs and start their research programs will diminish or disappear. JA996; JA1129. And junior faculty would lose access to the stipends and training that are currently funded via indirect-cost reimbursement, and that are crucial to their ability to launch their research careers. *See* JA45; JA117; JA125; JA337; JA378; JA778; JA818-19.

The collaborative nature of scientific research is such that junior faculty will also suffer trickle-down effects from any reduction in indirect-cost reimbursements: As senior, well-established faculty lose the funding that facilitates their work, junior faculty will lose invaluable mentorship, via both the departure of many senior faculty and the inability of those that remain to do work that now provides a foundation for collaboration and tutelage. *See* JA383.

The impact on junior faculty would be especially acute. Senior, established faculty—many of whose accomplishments are traceable in part to early-career indirect funding—have research portfolios and reputations that they could leverage to potentially maintain their careers and research portfolios even were NIH's Supplemental Guidance allowed to take effect. Junior faculty, on the other hand,

5

are just starting their careers. Without access to the research facilities, start-up packages, and training that indirect-cost reimbursements fund, junior faculty will be unable to establish themselves within their professions or to do the work such funding would make possible. Should the Supplemental Guidance go into effect, a generation's worth of progress in American medical and life science might simply never be achieved.

**II.     NIH's Unlawful Cap on Indirect Research Funding Would Accelerate the "Brain Drain" of Promising Young Scientists**

NIH's Supplemental Guidance, if implemented, would not just undermine the careers of those hoping to carry out groundbreaking scientific research in this country, it would also accelerate the flight of scientists—particularly early-career scientists—to other countries where research funding *is* available, further threatening the United States' supremacy in scientific innovation. As Plaintiffs make clear, many universities simply could not accept grants in which indirect funding is capped at fifteen percent. And if U.S. university faculty cannot accept these grants, they could lose access to most if not all of their funding. Notably, there is no indication in the administrative record that the agency considered this issue at all, which makes clear the arbitrary nature of the indirect-funding cap.

Thanks in large part to federal funding of scientific research, the United States has for decades been the undisputed world leader in scientific discovery—

"the international mecca for science."[2]  Beginning with the creation of the NIH and the National Science Foundation in the 1950s, "[f]ederal money enabled scientific discoveries that made American research institutions the envy of the world, and they in turn fueled the rise of the United States as the leader in technology and biotechnology."[3]

But cuts to federal science funding are changing the landscape, and a scientific brain drain is brewing.[4]  *See* JA346; JA1151; JA1163.  In the wake of the

---

[2] Kate Zernike, *U.S. Scientists Warn That Trump's Cuts Will Set Off a Brain Drain*, N.Y. Times (June 3, 2025), https://www.nytimes.com/2025/06/03/us/trump-federal-spending-grants-scientists-leaving.html.

[3] *Id.*

[4] *See, e.g.*, *id.*; Chandelis Duster, *Countries boost recruitment of American scientists amid cuts to scientific funding*, NPR (Mar. 29, 2025), https://www.npr.org/2025/03/29/nx-s1-5343966/countries-boost-recruitment-of-american-scientists-amid-cuts-to-scientific-funding; Olivia Le Poidevin et al., *Brain drain? Trump cuts spur U.S. scientists to seek jobs in Europe*, Reuters (Apr. 11, 2025), https://www.reuters.com/world/scientists-us-harried-by-trump-cuts-turn-towards-europe-2025-04-11/; Laurie Udesky & Jack Leeming, *Exclusive: a* Nature *analysis signals the beginnings of a U.S. science brain drain*, Nature (Apr. 22, 2025), https://media.journoportfolio.com/users/381240/uploads/e5d47fca-197c-4d9b-b72a-0d50b00e2164.pdf; Tom Whipple, *Trump brain drain starts global tug-of-war for American scientists*, The Times (Apr. 25, 2025), https://www.thetimes.com/us/news-today/article/trump-brain-drain-starts-global-tug-of-war-for-american-scientists-tn52fcbr6; Joel Achenbach et al., *As Trump cuts science budgets, some researchers look abroad*, Washington Post (May 21, 2025), https://www.washingtonpost.com/science/2025/05/21/brain-drain-science-cuts-jobs-trump/?utm; Christina Larson et al., *Scientists have lost their jobs or grants in U.S. cuts, and others want to hire them*, AP News (May 25, 2025), https://apnews.com/article/trump-research-funding-cuts-brain-drain-f1ac9fe5c8a90f5d5ec9b2726475e10e; Erica Pandey, *The great poaching:*

new administration's slashing of federal science budgets,⁵ "American scientists are being actively recruited by countries including France, Spain, Germany and China."⁶ AAUP is well aware of foreign institutions' attempts to attract U.S. scientists faced with cuts to or elimination of their federal funding. In recent months, AAUP's members have been repeatedly recruited by schools outside the United States based on promises to support laboratories and other research that could not be supported in this country were the indirect-funding limitation to take effect.

    AAUP's observation of this phenomenon is supported by numerous published reports. Junior faculty applications to foreign institutions have skyrocketed.⁷ Between January and March 2025, U.S. scientists submitted substantially more applications for jobs than in the same period in 2024.⁸ Promising Ph.D. and postdoctoral students in the United States, "see[ing] the cuts to the [National Science Foundation] and the N.I.H., … worry they will not be able

---

*America's brain drain begins*, Axios (June 7, 2025), https://www.axios.com/2025/06/07/us-science-brain-drain.

⁵ Aatish Bhatia et al., *Trump Has Cut Science Funding to Its Lowest Level in Decades*, N.Y. Times (May 22, 2025), https://www.nytimes.com/interactive/2025/05/22/upshot/nsf-grants-trump-cuts.html.

⁶ Achenbach et al., *supra* note 4.

⁷ Zernike, *supra* note 4; *see* Larson et al., *supra* note 4.

⁸ Udesky & Leeming, *supra* note 4.

to get the early career grants they need to earn tenure."⁹ As a result, many of these students—who could be tomorrow's junior faculty at U.S. institutions, and future scientific leaders—are instead considering leaving the United States altogether.¹⁰

The impending brain drain has the scientific community sounding the alarm. The president of the National Academy of Sciences, Marcia McNutt, noted that the competition to be the global "science powerhouse" is such that the United States will "never fully recover" from the loss of scientific talent.¹¹ Sudip Parikh, CEO of the American Association for the Advancement of Science, expressed concern about the abnormal increase in American scientists considering leaving the country.¹² "[W]e have built the greatest innovation engine that the world's ever seen and it's delivered cures and treatments for diseases[,] …. economic growth and jobs. … [O]ther countries have paid attention," and the United States "shouldn't make it easy for them" to copy that success.¹³

If the NIH is successful in its unlawful attempt to cap indirect-cost reimbursement at 15 percent, the nation's loss of its brightest young scientific minds will only accelerate. "Offers of employment to … NIH-funded investigators

---

⁹ Achenbach et al., *supra* note 4.
¹⁰ Udesky & Leeming, *supra* note 4.
¹¹ Pandey, *supra* note 4.
¹² Duster, *supra* note 4.
¹³ *Id.*

9

from institutions in other countries will be highly attractive, and" American institutions of higher education "will lose [their] best and brightest scientists to other nations." JA1306; *see also* JA1296 ("a 15% indirect cost rate cap would likely result in losing talented scientific faculty to other countries that are investing heavily in research"). Protecting the funding that supports junior faculty—much of which comes in the form of indirect costs—is critical to the United States' retention of its hard-earned role as the global leader in scientific research.

Remarkably, the agency appears to have adopted the indirect-costs limitation without even considering the massive disruption it would cause to U.S. leadership in innovative scientific research. The agency's failure to even *consider* these impacts is arbitrary and capricious and requires affirming the district court's ruling.

## CONCLUSION

The Court should affirm.

Date: June 16, 2025

/s/ David J. Zimmer
David J. Zimmer
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Drive
Cambridge, MA 02139
(617) 676-9421
dzimmer@zimmercitronclarke.com

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 2,115 words. I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO.

Dated: June 16, 2025                            /s/ David J. Zimmer
                                                David J. Zimmer

# CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/EC system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: June 16, 2025 /s/ David J. Zimmer
David J. Zimmer