# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

No. 25-1343

COMMONWEALTH OF MASSACHUSETTS; DANA NESSEL, on behalf of the people of the State of Michigan; STATE OF ILLINOIS; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF COLORADO; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF DELAWARE; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs-Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants-Appellants.*

---

No. 25-1344

ASSOCIATION OF AMERICAN MEDICAL COLLEGES; THE AMERICAN ASSOCIATION OF COLLEGES OF PHARMACY; THE ASSOCIATION OF SCHOOLS AND PROGRAMS OF PUBLIC HEALTH; THE CONFERENCE OF BOSTON TEACHING HOSPITALS, INC.; GREATER NEW YORK HOSPITAL ASSOCIATION,

Plaintiffs-Appellees,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., PH.D. in their official capacity as Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services,

Defendants-Appellants.

---

No. 25-1345

ASSOCIATION OF AMERICAN UNIVERSITIES; AMERICAN COUNCIL ON EDUCATION; ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES; BRANDEIS UNIVERSITY; BROWN UNIVERSITY; CARNEGIE MELLON UNIVERSITY; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; THE UNIVERSITY OF CHICAGO; CORNELL UNIVERSITY; THE GEORGE WASHINGTON UNIVERSITY; JOHNS HOPKINS UNIVERSITY; MASSACHUSETTS INSTITUTE OF TECHNOLOGY; TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA; UNIVERSITY OF ROCHESTER; TRUSTEES OF TUFTS COLLEGE; CALIFORNIA INSTITUTE OF TECHNOLOGY,

*Plaintiffs-Appellees*,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the Department of Health and Human Services; JAY BHATTACHARYA, M.D., PH.D. in their official capacity as Director of the National Institutes of Health,

*Defendants-Appellants.*

---

On Appeal from the United States District Court for the District of Massachusetts

---

## BRIEF OF AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

---

*(Counsel listed on next page)*

Joshua B. Shiffrin
Jacob Karabell
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street NW,
Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600
Fax: (202) 842-1888
jshiffrin@bredhoff.com
jkarabell@bredhoff.com
*Counsel for United Auto Workers*

Dated: June 16, 2025

## CORPORATE DISCLOSURE STATEMENT

The International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America ("UAW") does not have any
parent corporation or any stockholders.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................... iii

INTEREST OF AMICUS CURIAE............................................................1

ARGUMENT ...........................................................................................4

   I.   As the District Court found, many university employees have substantial reliance interests that NIH did not consider in its Rate Change Notice. ....................................................................................4

      A.  D.F. ........................................................................................7

      B.  L.E. ........................................................................................9

      C.  G.B. ......................................................................................11

      D.  R.W. ....................................................................................12

CONCLUSION ......................................................................................14

# TABLE OF AUTHORITIES

Page(s)

## Cases

*DHS v. Regents of Univ. of Cal.,*
591 U.S. 1 (2020)........................................................... 4, 5, 14

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ........................................................... 4

## Regulations

45 C.F.R. § 75.2 ........................................................... 5

# INTEREST OF AMICUS CURIAE[1]

The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") submits this brief with the consent of all parties pursuant to Federal Rule of Appellate Procedure 29(a)(2). UAW is one of the largest and most diverse unions in North America, with nearly 1,000,000 active and retired members throughout the United States, Canada and Puerto Rico and in virtually every sector of the economy. UAW and its affiliated locals represent approximately 120,000 workers in higher education—graduate students, postdoctoral scientists, researchers, university staff, and faculty—at more than 27 institutions across the country, including the University of California, the University of Washington, Harvard University, University of Pennsylvania, Princeton University, Columbia University, Icahn School of Medicine at Mt. Sinai, and many others. More than

---

[1] UAW certifies, under Fed. R. App. P. 29(a)(4)(E), this brief was not written in whole or in part by counsel for any party, that no party or party's counsel made a monetary contribution to the preparation and submission of this brief, and that no person or entity, other than UAW, has made such a monetary contribution.

75,000 UAW-represented workers depend on federal research grant funding for their jobs.

In addition to supporting workers' rights and civil rights in legislative battles since the 1930s, UAW has advocated for continued and increased federal funding for scientific research due to its importance for innovation, economic growth, and public health.

The unprecedented announcement in February 2025 by the National Institutes of Health ("NIH") that the portion of NIH grants that may be used for payment of "indirect costs" would be immediately capped at 15% for "expenses from February 10, 2025 forward," ADD. 82-84 (NOT-OD-25-068, or the "Rate Change Notice"), puts thousands of UAW members' jobs at risk.[2] These members' work is funded by pre-existing federal grants to conduct research on cancer, diabetes, traumatic brain injury, muscle regeneration, Alzheimer's disease, airborne pollutants, and chronic disease, among other subjects. All of this work is imperiled by the Rate Change Notice.

---

[2]     UAW is itself a plaintiff in a suit challenging federal research grant terminations. *See* Compl., *Am. Pub. Health Ass'n. v. NIH*, No. 1:25-cv-10787 (D. Mass. Apr. 2, 2025), ECF No. 1 (challenging certain directives issued by NIH that resulted in termination of federal research grants).

UAW files this brief to apprise the Court of the substantial reliance interests that its members have with respect to the NIH's longstanding policy, as prescribed by Congress and the agency's regulations, of funding indirect costs pursuant to agreements that have been negotiated between NIH and the institutions that employ UAW's members. In short, NIH's new policy would wreak havoc in the personal and professional lives of UAW's members, in addition to greatly harming scientific research in this country and beyond.

# ARGUMENT

## I. As the District Court found, many university employees have substantial reliance interests that NIH did not consider in its Rate Change Notice.

"When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up). These reliance interests may include the effects that a change in policy have on affected individuals' careers, finances, families, as well as effects on the national economy. *Id.* at 31. Where individuals or entities have significantly relied on a prior agency policy, the agency must provide a "more detailed justification" to explain why those reliance interests should yield to a change in that policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "It would be arbitrary and capricious to ignore such [reliance interests]." *Regents*, 591 U.S. at 30 (cleaned up); *see generally id.* at 31-33 (holding DHS change in policy "arbitrary and capricious in violation of the APA" because agency did not "address[ ] . . . particular reliance interests").

Prior to February 10, 2025, NIH reimbursed most grant recipients, such as research universities, for a percentage of their "indirect costs"[3] based on a negotiated agreement with each recipient. The February 2025 Rate Change Notice drastically changed that. It limited the ability of grant recipients to use NIH grant funds for indirect costs in the manner and at the levels that had been permitted pursuant to the terms of those negotiated agreements. *See* ADD. 5-6.

Because NIH "was not writing on a blank slate" with respect to the matters addressed in the Rate Change Notice, "it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33 (cleaned up). As the District Court found, NIH did not adequately consider or address the substantial reliance interests that many institutions and individuals have with

---

[3] "Indirect costs" are defined in regulations promulgated by the Department of Health and Human Services as "costs incurred for a common or joint purpose benefitting more than one cost objective, and not readily assignable to the cost objectives specifically benefitted, without effort disproportionate to the results achieved." 45 C.F.R. § 75.2 (reprinted at ADD. 85-86).

respect to the funding of indirect costs in connection with NIH grants under previously-negotiated terms:

> In short, the Notice fails to consider the impact the Rate Change Notice would have on public health, which is the purpose of the entire regulatory regime. The Notice fails to contemplate the budgets of these institutions, formulated months and years before this Notice's sudden implementation. It fails to contemplate the risk to human life as research and clinical trials are suspended in response to the shortfall. It fails to contemplate the life, careers, and advancement that will be lost as these budgets are indiscriminately slashed. Although reticent to consider together, the Rate Change Notice fails to reflect on the health of those whose hopes rely on clinical trials and the financial investment that will be lost as research is disrupted. It fails to consider that public health will suffer.

ADD. 40. For this and other reasons, the District Court concluded that the Rate Change Notice was arbitrary and capricious under the Administrative Procedure Act, and it enjoined its implementation. ADD. 43, 80.

The Appellees' briefs detail the substantial reliance interests of colleges and universities that would be affected *writ large* by the Rate Change Notice, which NIH failed to account for in its determination. *See* Br. for Plaintiffs-Appellees in No. 25-1343 at 34-37, Br. for Plaintiffs-Appellees in Nos. 25-1344 & 25-1345 at 45-47. UAW fully endorses those

arguments, and it submits this brief to underscore the calamitous consequences that implementation of the Rate Change Notice would have on the careers—and lives—of those who work in health science. That group includes many UAW members (as well as those who seek to be represented by the UAW), who relied on the agency's prior funding policy in accepting and remaining in research positions at their employer-institutions. A description of the circumstances of several such individuals illustrates the point well.

A. <u>D.F.</u>

D.F. works as a Research Administrator in the Office of Sponsored Research at the University of California San Francisco ("UCSF").[4] In her role, she supports the research portfolios for 98 principal investigators. Among other things, D.F. assists with the preparation of grant proposals and ensures UCSF complies with a grant's requirements with respect to

[4] D.F. and L.E. (*see infra* at Section I.B) are members of a bargaining unit of research and public service professionals (RPSPs) organizing at the University of California. UAW filed for a representation election for the RPSP bargaining unit on April 11, 2025, and, on May 14, 2025, the California Public Employment Relations Board certified that the threshold of support to hold a representation election has been met. UAW anticipates that a representation election will be held for the RPSP unit in the coming months.

human and animal study components, conflicts of interest, and export controls. D.F. also provides institutional approval for annual grant financial and administrative reporting to grant sponsors, including NIH.

The scientists who D.F. supports primarily work in the fields of hematology, oncology, and general internal medicine. The majority of the grants for the research at UCSF are funded by the federal government, and, of those, a majority are funded by NIH and the Department of Health and Human Services (of which NIH is a part). UCSF has historically received more NIH grant funding than any other public university. *See* https://www.ucsf.edu/news/2024/02/427121/ucsf-tops-public-universities-nih-research-funding-2023 (last accessed June 16, 2025).

D.F. has been told by UCSF management that her work is funded by indirect cost payments made in connection with the grants UCSF receives. Recently, UCSF laid off employees in other departments due to a loss of grant funding. D.F. anticipates that, if the Rate Change Notice were to be implemented, she would be laid off as well.

D.F. has Master's degrees in library systems and information systems. She began working at UCSF thirteen years ago so that she could

contribute to the advancement of health research. If the Rate Change Notice were implemented, it is unclear how UCSF would fund and perform the necessary functions that D.F. provides with respect to grant applications and compliance monitoring. D.F. also provides financial support to two family members suffering from cancer. If D.F. were to be laid off, she anticipates that she would no longer be able to provide financial support to her family members.

B. <u>L.E.</u>

L.E. also works in the Office of Sponsored Research at UCSF. (L.E. estimates that approximately 300-400 people work at UCSF to support the university's grant-funded research.) As a Research Administrator, L.E. regularly supports between 60 and 80 principal investigators, which includes budgeting and accounting for personnel costs and supplies, ensuring that recordkeeping obligations are performed, and ensuring that other compliance obligations attendant to federal grants are met. L.E.'s work is highly skilled and specialized, as it requires the knowledge of myriad federal laws and policies as well as university policies. Many of L.E.'s colleagues have graduate degrees or certifications in Research Administration or related subjects.

L.E. primarily works with surgeons and ophthalmologists, many of whom perform research in connection with the Francis I. Proctor Foundation for Research in Ophthalmology at UCSF. Given surgeons and other clinicians' work schedules and clinical responsibilities, as well as their lack of expertise in research administration, it would be impossible for them to perform the grant support work that L.E. and his colleagues perform at UCSF.

L.E. has been told by his manager that his work is funded by indirect cost payments made in connection with federal grants received by UCSF. He has also been informed that his and other jobs at UCSF would be in jeopardy if the Rate Change Notice were to be implemented.

L.E. has worked at UCSF for more than four years. L.E., who has a 22-month-old child, is the primary earner for his family. L.E.'s family has access to health benefits through his position at UCSF. L.E. anticipates that if the Rate Change Notice were implemented, there would be vastly fewer jobs available in his field of medical research support across the country, and that he would likely need to find a position in a different field or industry.

C. <u>G.B.</u>

G.B. is a doctoral student at the University of Alaska Anchorage, as well as a member of UAW Local 1907. He is a lifelong Alaskan who also earned his undergraduate degree at the University of Alaska Anchorage. G.B. works as a graduate research assistant in a laboratory that studies the potential for developing new cancer immunotherapies using nanoparticles. The research may lead to alternatives to chemotherapy.

The University of Alaska receives NIH grant funds through a program called the IDeA Network of Biomedical Research Excellence ("INBRE"). INBRE funds statewide networks of higher education and research in states that historically have received low levels of NIH support—generally rural states with medically underserved communities. *See* https://loop.nigms.nih.gov/2012/05/introducing-the-institutional-development-award-idea-program-2 (last accessed June 16, 2025). INBRE funds are dispersed to University of Alaska institutions throughout the state through the University of Alaska Fairbanks.

The INBRE program uses indirect funds granted to the University of Alaska to pay for stipends and other expenses for graduate research

assistants in university laboratories throughout the state. Graduate research assistants typically perform essential day-to-day scientific work in university laboratories and research centers, provide mentorship and education to undergraduates and technicians, and often act as laboratory managers. G.B. has been told in writing by the University of Alaska that if the Rate Change Notice were to be implemented, Alaska INBRE would no longer be able to sponsor graduate research assistantships. If that were to occur, many students would likely no longer have opportunities to serve as graduate research assistants, and laboratories would lose the benefit of their labor. Further, indirect funds are also used to pay for technicians, maintenance, and facility costs at the University of Alaska. The loss of indirect funds would thus have a catastrophic effect on the capacity of laboratories and research centers to continue to perform research.

D. R.W.

R.W. is a microbiologist at the University of Washington, where he has studied and worked for 15 years. He is a member of UAW Local 4121. R.W. studies antibiotic resistance and the development of new antibiotics. His laboratory is funded by a grant from the National

Institute of Allergies and Infectious Diseases, one of the institutes that make up NIH.

R.W.'s work is supported in essential ways by indirect cost funding from NIH. Specifically, R.W. uses highly technical and expensive shared resources that are made available at the University of Washington through indirect funding. These include, for example, next generation gene sequencing facilities and flow cytometers used to sort individual cells into groups. The use of these resources would be much more expensive if they were to be purchased through the private sector on a project-by-project basis. These resources are operated by highly specialized and skilled employees whose salaries are also paid through indirect funding.

Indirect funding also pays for the physical space of R.W.'s laboratory, as well as the unique costs related to its maintenance—such as sterilization, water purification, and hazardous waste disposal.

\*　　\*　　\*

These accounts are a miniscule fraction of those experienced by employees working in higher education in the United States who have relied on NIH's longstanding policy of reimbursing grant recipients for a

13

portion of their indirect costs at negotiated rates. The reliance interests further multiply when considering the families of those employees, as well as patients who receive treatment through the programs that would be jeopardized by the Rate Change Notice. *See Regents*, 591 U.S. at 31 (describing the types of reliance interests cognizable under the APA). NIH did not consider *any* reliance interests in the Rate Change Notice. For this reason alone, the Notice was arbitrary and capricious, and the District Court correctly enjoined its enforcement.

## CONCLUSION

For the reasons described above, as well for the reasons articulated in the briefs of the Plaintiffs-Appellees in each action, the judgment below should be affirmed.

Dated: June 16, 2025

/s/Joshua B. Shiffrin
Joshua B. Shiffrin
Jacob Karabell
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street NW,
Suite 1000
Washington, D.C. 20005
(202) 842-2600
jshiffrin@bredhoff.com
jkarabell@bredhoff.com

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.     This document complies with the type-volume limitation set forth in the Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because it contains 2,041 words.

2.     This document complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced type-face using 14-point font.

Dated: June 16, 2025                    */s/ Joshua B. Shiffrin*
                                        Joshua B. Shiffrin

## CERTIFICATE OF SERVICE

I certify that on June 16, 2025, I electronically filed this Brief of Amicus Curiae in Support of Plaintiffs-Appellees with the Clerk of Court for the U.S. Court of Appeals for the First Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

Dated: June 16, 2025               */s/ Joshua B. Shiffrin*
                                   Joshua B. Shiffrin