Nos. 25-1343, 25-1344, 25-1345

# UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

COMMONWEALTH OF MASSACHUSETTS; DANA NESSEL, on behalf of the people of the State of Michigan; STATE OF ILLINOIS; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF COLORADO; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF DELAWARE; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs - Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants - Appellants.*

ASSOCIATION OF AMERICAN MEDICAL COLLEGES; THE AMERICAN ASSOCIATION OF COLLEGES OF PHARMACY; THE ASSOCIATION OF SCHOOLS AND PROGRAMS OF PUBLIC HEALTH; THE CONFERENCE OF BOSTON TEACHING HOSPITALS, INC.; GREATER NEW YORK HOSPITAL ASSOCIATION,

*Plaintiffs - Appellees*,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services,

*Defendants - Appellants.*

ASSOCIATION OF AMERICAN UNIVERSITIES; AMERICAN COUNCIL ON EDUCATION; ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES; BRANDEIS UNIVERSITY; BROWN UNIVERSITY; CARNEGIE MELLON UNIVERSITY; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; THE UNIVERSITY OF CHICAGO; CORNELL UNIVERSITY; THE GEORGE WASHINGTON UNIVERSITY; JOHNS HOPKINS UNIVERSITY; MASSACHUSETTS INSTITUTE OF TECHNOLOGY; TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA; UNIVERSITY OF ROCHESTER; TRUSTEES OF TUFTS COLLEGE; THE CALIFORNIA INSTITUTE OF TECHNOLOGY,

*Plaintiffs - Appellees*,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the U.S. Department of Health and Human Services; JAY

BHATTACHARYA, M.D., Ph.D. in their official capacity as Director of the National Institutes of Health,

*Defendants - Appellants.*

On Appeal from the United States District Court for the District of Massachusetts

**BRIEF OF *AMICI CURIAE* MEMBERS OF THE U.S. CONGRESS IN SUPPORT OF APPELLEES AND AFFIRMANCE**

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594
Email:      Steve@hbsslaw.com

John M. DeStefano
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, AZ  85003
Telephone:  (602) 840-5900
Facsimile:   (602) 840-3012
Email:      Johnd@hbsslaw.com

Lauriane Williams
Sophia Weaver
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone:  (617) 482-3700
Facsimile:   (617) 482-3700
Email:      laurianew@hbsslaw.com
               sophiaw@hbsslaw.com

*Counsel for Proposed Amici Curiae*

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................... 2

II.   BACKGROUND ............................................................................ 4

III.  ARGUMENT ................................................................................. 6

    A.  The United States Constitution forbids the Executive from
        withholding funding for NIH grants that Congress
        appropriated through the legislative process. ............................. 6

        1.  The Constitution vests the power of the purse in
            Congress, not the Executive Branch. ................................... 6

        2.  It is the duty of the Executive Branch to faithfully
            execute the statutory appropriations Congress has
            enacted. .................................................................................. 7

    B.  The plain, express, and unambiguous NIH appropriations
        statute passed by Congress bars the agency's proposed
        changes to its calculation of indirect cost reimbursement ...... 10

        1.  Since 2018, each appropriations statute signed into
            law has expressly prohibited NIH from altering
            negotiated indirect cost reimbursements. .......................... 10

        2.  Congress has repeatedly rejected the very cuts to
            indirect funding that the Executive now pursues. ........... 13

        3.  The uninterrupted re-enactment of the indirect costs
            rate every year since 2017 confirms Congress's will
            that funding continue. ....................................................... 16

    C.  The balance of policy interests considered by Congress
        weighs in favor of maintaining the negotiated indirect
        funding ................................................................................... 17

        1.  Cuts to indirect cost reimbursements will slow down
            or stop vital scientific and medical progress. .................. 17

i

2.  Cuts to indirect cost reimbursements threaten economic growth and local economies that depend on research institutions. ........................................................20

3.  Cuts to indirect funding will defund a generation of scientists. ..............................................................................23

IV.   CONCLUSION ........................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013) ....................................................9, 10, 15

*City & Cty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ...................................................10

*Clinton v. City of New York*,
   524 U.S. 417, 468 (1998) ...........................................................9

*Food Mktg. Inst. v. Argus Leader Media*,
   588 U.S. 427 (2019) ...................................................................13

*Louisiana ex rel. Guste v. Brinegar*,
   388 F. Supp. 1319 (D.D.C. 1975) .............................................8

*Kendall v. United States ex rel. Stokes*,
   37 U.S. 524 (1838) .....................................................................8

*Maine v. Fri*,
   486 F.2d 713 (1st Cir. 1973) ......................................................8

*McKenna v. First Horizon Home Loan Corp.*,
   475 F.3d 418 (1st Cir. 2007) ....................................................13

*Mundell v. Acadia Hosp. Corp.*,
   92 F.4th 1 (1st Cir. 2024) .........................................................13

*Off. of Pers. Mgmt. v. Richmond*,
   496 U.S. 414 (1990) ...................................................................6

*Pierce v. Underwood*,
   487 U.S. 552 (1988) .................................................................16

*Simmons v. Galvin*,
   575 F.3d 24 (1st Cir. 2009) ......................................................13

*State Highway Comm'n of Missouri v. Volpe*,
   479 F.2d 1099 (8th Cir. 1973) ...................................................8

*Succar v. Ashcroft,*
    394 F.3d 8 (1st Cir. 2005) ................................................................13

*Train v. City of New York,*
    420 U.S. 35 (1975) ........................................................................8, 9

**Constitutions, Statutes, Rules, and Legislative Materials**

45 C.F.R. § 75 ...................................................................................... 5, 11

Cong. Rec. H2697 (daily ed. Mar. 22, 2028)
    https://www.congress.gov/115/crec/2018/03/22/CREC-2018-03-
    22-bk3.pdf#page=1. ......................................................................14

Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132
    Stat. 348 ................................................................................... 2, 5, 10

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 224, 134
    Stat. 1182, 1594 (2020) ................................................................10

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 224, 136
    Stat. 49, 470-71 (2021) .................................................................10

Department of Defense and Labor, Health and Human Services, and
    Education Appropriations Act, 2019 and Continuing Appropriations
    Act, 2019, Pub. L. No. 115-245, § 224, 132 Stat. 2981, 3094 (2018) ........................10

Fed. R. App. P. 29 ....................................................................................1

Fed. R. App. P. 32 ..................................................................................26

Federal Water Pollution Control Act Amendments ...........................................9

Full-Year Continuing Appropriations Act, 2025 (2025 Continuing
    Resolution), Div. A Pub. L. No. 119-4, §§ 1101(a) & (a)(8) ................. 2, 10

Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, §
    224, 133 Stat. 2534, 2582 (2019) ............................................... 10, 16

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, §
    224, 138 Stat. 460, 677 (2023) .................................................... 2, 10

H.R. Rep. No. 115-244 (2017) .................................................................14

Impoundment Control Act, Pub. L. 93-344, 88 Stat. 297 (1974) ....................................9

Pub. L. No. 118-47, §224 Division H, 138 Stat. 677 ............................................10, 11, 12

S. Rep. No. 115-150 (2017)...............................................................................................14

Testimony of Dr. Kelvin K. Droegemeier, Indirect Costs Hearing
    (2017), 7,
    https://docs.house.gov/meetings/AP/AP07/20171024/106525/H
    HRG-115-AP07-Wstate-DroegemeierK-20171024.pdf...............................................4

U.S. Const. art. I, § 7. cls. 2, 3 ........................................................................................7

U.S. Const. art. I, § 8, cl. 1 ..............................................................................................6

U.S. Const. art. I, § 9, cl. 7 ..............................................................................................6

U.S. Const. art. II, § 3 ......................................................................................................7

U.S. Constitution Spending Clause..................................................................................6

Written Testimony of Dr. Gary Gilliland, Indirect Costs Hearing (2017),
    at 2,
    https://docs.house.gov/meetings/AP/AP07/20171024/106525/H
    HRG-115-AP07-Wstate-GillilandG-20171024.pdf....................................................23

**Other Authorities**

*AACR Statement and Call to Action Regarding the Administration's Recent
    Actions Affecting NIH and the American People*, Am. Ass'n for Cancer
    Rsch (Feb. 18, 2025), https://www.aacr.org/about-the-
    aacr/newsroom/news-releases/aacr-statement-and-call-to-action-
    regarding-the-administrations-recent-actions-affecting-nih-and-the-
    american-people/...........................................................................................................3

Alice Park, *NIH Budget Cuts Are the 'Apocalypse of American Science,' Experts
    Say*, Time (Feb. 11, 2025), https://time.com/7216299/nih-budget-
    cuts-science-research-funding/. ....................................................................................3

Anushree Vashist & Zachary Leiter, *"Flagrantly Unlawful": UChicago Sues
    NIH over Funding Cuts*, Chicago Maroon (Feb. 11, 2025),
    https://chicagomaroon.com/45412/news/flagrantly-unlawful-
    uchicago-sues-nih-over-funding-cuts/ .......................................................................23

Christina Jewett & Sheryl Gay Stolberg, *Trump Administration Cuts Put Medical Progress at Risk, Researchers Say*, New York Times (Feb. 7, 2025).............. 3, 18

Danielle Li, Pierre Azoulay & Bhaven Sampat, *The Applied Value of Public Investments in Biomedical Research*............................................................................4

Irene Hwang et al. *Here are the Nearly 2,500 Medical Research Grants Canceled or Delayed by Trump*, New York Times (Jun 4, 2025).......................................4

Jeff Tollefson & Richard Van Noorden, *How Long Will the US be a Science Superpower?*..................................................................................................................20

Jim Small, *Arizona Universities Face Massive Cuts to Medical Research if Trump's Plan is Implemented*, AZ Mirror (Feb. 11, 2025), https://azmirror.com/briefs/arizona-universities-face-massive-cuts-to-medical-research-if-trumps-plan-is-implemented/. .................................................19

Jocelyn Kaiser, *NIH Plan to Reduce Overhead Payments Draws Fire*, Science (June 2, 2017), https://www.science.org/content/article/nih-plan-reduce-overhead-payments-draws-fire. ....................................................................... 5, 22

Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1394 (1988) ..............................7

Katherine Knott, *Colleges Restrict Graduate Student Admissions After NIH Proposes Rate Cut*, Inside Higher Ed (Feb. 25, 2025), https://www.insidehighered.com/news/ government/science-research-policy/2025/02/25/facing-nih-cuts-colleges-restrict-grad-student................................................................................................................. 23, 24

Maggie Chen, *The Chaos of NIH Cuts has Left Early-Career Scientists Scrambling*, Wired, (Mar. 24, 2025), https://www.wired.com/story/the-chaos-of-nih-cuts-has-left-early-career-scientists-scrambling/;..........................................................................................3

Megan L. Blonigen & Frances Y. Yong, *Harvard's Indirect Cost Rate, Explained*, Harvard Crimson (Apr. 2, 2025), https://www.thecrimson.com/article/2025/4/2/ harvard-indirect-cost-rate-explained/ .........................................................................................5

Megan Molteni, Usha Lee McFarling & Angus Chen, *Graduate Student Admissions Paused and Cut Back as Universities React to Trump Orders on Research*..................................................................................................................................20

Mgmt & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018* (2017) ...................................................................................2

Mgmt & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2020* (2019), https://www.govinfo.gov/content/pkg/BUDGET-2020-MSV/pdf/BUDGET-2020-MSV.pdf....................................................................16

Nat'l Inst. of Health, *7.3 Direct Costs and Facilities and Administrative Costs*, NIH Grants Policy Statement (Apr. 2024), https://grants.nih.gov/grants/policy/nihgps/html5/section_7/7.3_direct_costs_and_facilities_and_administrative_costs.htm. ......................5

*National Institutes of Health (NIH): Background and Congressional Issues*, at 2-3 (2025)............................................................................................................4

*NIH Funding Cuts*, The Daily Pennsylvanian (Apr. 15, 2025), https://www.thedp.com/article/2025/04/penn-nih-cuts-interactive-map-annenberg ....................................................................................................21

*NIH's Role in Sustaining the U.S. Economy*, (March 2025), at 1, https://www.unitedformedicalresearch.org/wp-content/uploads/2025/03/UMR_NIH-Role-in-Sustaining-US-Economy-FY2024-2025-Update.pdf. .................................................................................................22

Off. of Dir., Nat'l Inst. of Health, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates*, NOT-OD025-068, Feb. 7, 2025, https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html ("Rate Change Notice"). ....................................................*passim*

*Possible Cuts to NIH Funding Could Affect Research in Alabama*, NPR (Feb. 17, 2025), https://www.npr.org/2025/02/17/nx-s1-5292265/possible-cuts-to-nih-funding-could-affect-research-in-alabama..............................................................................................................21

*Principles of Federal Appropriations Law*, ch. 1, 1-4, n.1 (4th ed. 2016 rev.), https://www.gao.gov/legal/redbook/redbook.html....................................7

*Proposed Federal Research Funding Cuts*, New Mexico Daily Lobo (Feb. 17, 2025), https://www.dailylobo.com/article/2025/02/uncertainty-looms-over-unm-with-proposed-federal-medical-research-cuts; J.A. 17..................................................................................................................22

Rate Change Notice, Off. of Mgmt & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018* ................................................................ 13

*Says UW Research Director*, Wisconsin Public Radio (Feb. 25, 2025), https://www.wpr.org/ news/nih-funding-cuts-travesty-biomedical-research-uw-madison-wisconsin-institute-discover ........................................ 22

*Trump Spending Cuts, Orders*, PublicSource (Feb. 27, 2025), https://www.publicsource.org/research-funding-grant-nih-health-university-pittsburgh-pitt-trump/ ................................................ 19

Twitter (Feb. 7, 2025), https://x.com/NIH/status/ 188800475939695826 ................................................................................ 6

## INTERESTS OF AMICI CURIAE[1]

Proposed *amici* are 152 Members of Congress who are well-acquainted with the National Institutes of Health ("NIH") and the legislative framework Congress has enacted to advance the federal legislature's health research funding priorities. Specifically, Congress, including Members in proposed *amici*, passed a 2018 rider ensuring that NIH must maintain funding for indirect costs of research at their negotiated levels and could not expend appropriated resources to change that grant structure. The proposed *amici* include Members who drafted the 2018 rider, advocated in a 2017 hearing for the importance of indirect costs in NIH grants, and currently serve on committees with jurisdiction over NIH. They thus have an interest in ensuring that NIH adheres to the funding restrictions, priorities, and limitations set by Congress. That interest is directly implicated here: NIH's issuance of its Rate Change Notice, which caps indirect cost reimbursement rates, violates clear statutory limits imposed by Congress, encroaches on the constitutional separation of powers by disregarding Congress's exclusive authority to control federal spending, and interferes with Congress's ability to carry out its mission of funding health research according to priorities and conditions set by law. These efforts to cap indirect costs of NIH grants also threaten losing discoveries for treatments and cures for diseases, harming local economies dependent on research institutions, and defunding the future of American science, which have long been a priority of Congress. *Amici* possess a substantial interest in the outcome of this case.

---

[1] A full list of *amici* appears as an Appendix to this brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than *amici curiae* or their counsel contributed money that was intended to fund preparing or submitting this brief. The parties have consented to the filing of this brief.

# I.    INTRODUCTION

Seven years ago, the first Trump Administration proposed to Congress a budget that capped indirect cost reimbursements, a part of the National Institutes of Health ("NIH") funding that pays for necessary costs of biomedical research such as facilities, equipment, and compliance with regulations.[2] Recognizing that a blanket cap would have devastating effects on research in the United States, Congress rejected the proposal and mandated that the Department of Health and Human Services ("HHS") maintain—and not reduce—the reimbursement levels for indirect costs.[3] President Trump signed that appropriations Act into law, and an equivalent provision has been re-enacted every year since, and again by President Trump in March 2025.[4]

The NIH now seeks to disregard Congress's spending power by slashing and capping indirect costs on all present and future NIH grant awards for biomedical research.[5] This attempt to slash and cap research funding violates Congressionally-enacted law. The plain text of the most recent appropriations law—the Further Consolidations Act, 2024—mandates that indirect costs be negotiated rather than capped at a particular percentage and prohibits HHS from using funds to modify this regime. Congress first enacted this framework in 2018, in direct response to the first

---

[2] Off. of Mgmt & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018*, at 43 (2017).

[3] Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348; Role of Facilities and Administrative Costs in Supporting NIH-Funded Research Before the Subcomm. on Labor, Health and Human Services, Education, and Related Agencies of the H. Comm. On Appropriations, 115th Cong. *passim* (2017) ("Indirect Costs Hearing Tr.").

[4] *See* Full-Year Continuing Appropriations Act, 2025 (2025 Continuing Resolution), Div. A Pub. L. No. 119-4, §§ 1101(a) & (a)(8).

[5] Off. of Dir., Nat'l Inst. of Health, *Supplemental Guidance to the 2024 NIH Grants Policy Statement: Indirect Cost Rates*, NOT-OD025-068, Feb. 7, 2025, https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-068.html ("Rate Change Notice").

Trump Administration's attempts to cap indirect costs at 10 percent. And every year since, Congress has passed (and the President has signed) the same appropriations language into law to preserve existing levels of indirect cost funding and the existing negotiated regime. The Congress, not the Executive, controls the power of the purse. And after a bill is passed by Congress and signed by the President, as has been the case here each year since 2018, the Executive must carry out its duly enacted appropriations.

Moreover, the Rate Change Notice undermines Congress's express goals of funding essential biomedical research by stopping that research, cutting local jobs, and defunding a generation of future scientists. Because this funding cannot be replaced easily (or at all),[6] the funding cuts that will necessarily follow the Rate Change Notice's cost cap will force universities to end essential research programs,[7] including critical cancer research.[8] As put by Lawrence O. Gostin, an expert in public health law, these changes are "literally the opposite of the mission of the N.I.H., which is to advance research, not to make it difficult or even unaffordable."[9]

---

[6] Maggie Chen, *The Chaos of NIH Cuts has Left Early-Career Scientists Scrambling*, Wired, (Mar. 24, 2025), https://www.wired.com/story/the-chaos-of-nih-cuts-has-left-early-career-scientists-scrambling/; Alice Park, *NIH Budget Cuts Are the 'Apocalypse of American Science,' Experts Say*, Time (Feb. 11, 2025), https://time.com/7216299/nih-budget-cuts-science-research-funding/.

[7] Indirect Costs Hearing Tr., at 51.

[8] *AACR Statement and Call to Action Regarding the Administration's Recent Actions Affecting NIH and the American People*, Am. Ass'n for Cancer Rsch (Feb. 18, 2025), https://www.aacr.org/about-the-aacr/newsroom/news-releases/aacr-statement-and-call-to-action-regarding-the-administrations-recent-actions-affecting-nih-and-the-american-people/.

[9] Christina Jewett & Sheryl Gay Stolberg, *Trump Administration Cuts Put Medical Progress at Risk, Researchers Say*, New York Times (Feb. 7, 2025), https://www.nytimes.com/2025/02/07/us/politics/medical-research-funding-cuts-university-budgets.html?searchResultPosition=1%2.

Accordingly, the district court's injunction against the Rate Change Notice should be affirmed.

## II.    BACKGROUND

Created by Congress in 1930, the NIH is the leading federal agency for health and biomedical research.[10] The NIH's grant funding represents "a longstanding alliance between the federal government and universities that helped make the United States the world leader in medical science."[11] In the early 1930s, scientific research at universities in the United States was largely funded through philanthropy or private foundations.[12] To bolster national defense interests during World War II, Congress empowered the NIH to establish a grant partnership between research institutions and the government that would support the essential infrastructure of domestic medical research.[13]

Today, the NIH is the largest single funder of biomedical research in the United States.[14] NIH grants are composed of direct and indirect costs. Direct costs are any cost that can be identified with a specific project, and indirect costs are shared

---

[10] Kavya Sekar, Cong. Rsch. Serv., R41705, *National Institutes of Health (NIH): Background and Congressional Issues*, at 2–3 (2025).

[11] Irene Hwang et al. *Here are the Nearly 2,500 Medical Research Grants Canceled or Delayed by Trump*, New York Times (Jun 4, 2025), https://www.nytimes.com/interactive/2025/06/04/health/trump-cuts-nih-grants-research.html?smid=nytcore-android-share.

[12] Written Testimony of Dr. Kelvin K. Droegemeier, Indirect Costs Hearing (2017), 7, https://docs.house.gov/meetings/AP/AP07/20171024/106525/HHRG-115-AP07-Wstate-DroegemeierK-20171024.pdf.

[13] *Id.*, at 8.

[14] Danielle Li, Pierre Azoulay & Bhaven Sampat, *The Applied Value of Public Investments in Biomedical Research*, 356 Science 78, 78 (2017).

facilities and administrative costs.[15] Indirect costs are negotiated with NIH by each institution in a process governed by federal regulations.[16] They are typically set between 40% and 60%.[17] Very few, if any, fall below 15%. The indirect costs are added on top of the direct grant, so if a $1 million grant has an indirect cost of 25%, the full grant is $1.25 million, and only 20% of the full value goes to indirect costs.[18]

In 2018, in direct response to the first Trump administration's efforts to cap indirect costs at 10%, Congress passed legislation (signed by the President) restricting the Executive Branch from changing the above-described approach to indirect cost reimbursements or otherwise altering reimbursement methods for fiscal ends.[19] Since then, Congress has readopted these restrictions against modifying indirect cost reimbursements in appropriations acts each year.[20]

Yet despite these legislative restrictions, on February 7, 2025, the NIH issued a Supplemental Guidance document on indirect costs—*i.e.*, the Rate Change Notice. This Notice eliminates the individually-negotiated-rate regime and in its stead installs a flat cap of 15% across all grants. According to the Notice, this cap is needed to "ensure that as many funds as possible go towards direct scientific research costs

---

[15] Nat'l Inst. of Health, *7.3 Direct Costs and Facilities and Administrative Costs*, NIH Grants Policy Statement (Apr. 2024), https://grants.nih.gov/grants/policy/nihgps/html5/section_7/7.3_direct_costs_and_facilities_and_administrative_costs.htm.

[16] Droegemeier Written Testimony, at 3; 45 C.F.R. § 75.

[17] Megan L. Blonigen & Frances Y. Yong, *Harvard's Indirect Cost Rate, Explained*, Harvard Crimson (Apr. 2, 2025), https://www.thecrimson.com/article/2025/4/2/harvard-indirect-cost-rate-explained/.

[18] Jocelyn Kaiser, *NIH Plan to Reduce Overhead Payments Draws Fire*, Science (June 2, 2017), https://www.science.org/content/article/nih-plan-reduce-overhead-payments-draws-fire.

[19] *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740 (2018).

[20] *See infra* at § III.B.3.

rather than administrative overhead," but NIH has also stated the cap's purpose is to "save" money appropriated for research.[21]  Under either justification—whether reallocating funds away from negotiated indirect costs or withholding them altogether—NIH is engaging in precisely the kind of conduct Congress has expressly prohibited.

## III.    ARGUMENT

**A.    The United States Constitution forbids the Executive from withholding funding for NIH grants that Congress appropriated through the legislative process.**

### 1.    The Constitution vests the power of the purse in Congress, not the Executive Branch.

The Rate Change Notice violates basic separation-of-powers principles: Once Congress appropriates and directs the use of federal funds, the Executive must follow its command. The Spending Clause of the U.S. Constitution provides that Congress shall have power to "pay the Debts and provide for the common Defence and general Welfare of the United States."[22] The Appropriations Clause of the Constitution reinforces this exclusivity: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."[23] The Supreme Court has underscored the "straightforward and explicit command of the Appropriations Clause. 'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress.'"[24] That authority is not merely fiscal; it is

---

[21] NIH (@NIH), Twitter (Feb. 7, 2025), https://x.com/NIH/status/1888004759396958263.

[22] U.S. Const. art. I, §8, cl. 1.

[23] U.S. Const. art. I, §9, cl. 7.

[24] *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (citing *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)); see also *infra* § III.A.2.

legislative in nature. Congress defines federal policy not only by enacting statutes, but by deciding whether and how to fund them.[25]

By vesting the power of the purse solely in Congress,[26] the Constitution established "both a critical constitutional limitation on the Executive and a constitutional duty of Congress."[27] As James Madison observed, the power of the purse may be regarded as "the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people," namely, the Congress, "for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure."[28] Entrusting the Executive with the duty to take care that the laws be faithfully executed—while vesting the spending power in Congress—has always been essential to the separation of powers.[29]

### 2. It is the duty of the Executive Branch to faithfully execute the statutory appropriations Congress has enacted.

Conversely, the role of the Executive branch is to carry out—and not to tamper with—the appropriations that Congress enacts. At the time that a bill passes both houses of Congress, the Constitution limits the Executive's role through the Presentment Clause, which grants the President only two options: sign the bill into law or veto it in its entirety.[30] Once a law is enacted, the President has no authority to amend or disregard it. Instead, the Constitution imposes a duty: under the Take Care Clause, the President "shall take Care that the Laws be faithfully executed."[31]

---

[25] *See infra* § III.A.2.

[26] *See* U.S. Gov't Accountability Off., *Principles of Federal Appropriations Law*, ch. 1, 1-4, n.1 (4th ed. 2016 rev.), https://www.gao.gov/legal/redbook/redbook.html.

[27] Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1394 (1988).

[28] The Federalist No. 58 (James Madison).

[29] The Federalist No. 48 (James Madison).

[30] U.S. Const. art. I, § 7. cls. 2, 3.

[31] U.S. Const. art. II, § 3.

Consistent with that obligation and the "explicit command" of the Appropriations Clause, the Executive may not unilaterally withhold funds that Congress has directed to be spent. The Supreme Court made this principle clear as early as 1838 in *Kendall v. United States ex rel. Stokes*,[32] where it unanimously rejected the Postmaster General's claim that, as an official of the executive branch, he could withhold money Congress had required him to spend. The Court balked at the assertion that the Executive possessed inherent constitutional authority to rescind appropriated funds: "To contend that the obligations imposed on the President to see the laws faithfully executed, implies a power to forbid their execution; is a novel construction of the constitution, and is entirely inadmissible."[33] Sanctioning such a theory would be "vesting in the President a dispensing power, which has no countenance for its support in any part of the constitution."[34] The Court refused to "assert[] a principle, which, if carried out in its results to all cases falling within it, would be clothing the President with a power to control the legislation of congress."[35]

This principle was reaffirmed in the 1970s, when courts repeatedly invalidated President Nixon's efforts to impound funds.[36] The issue reached the U.S. Supreme Court in *Train v. City of New York*, where President Nixon had attempted to withhold

---

[32] 37 U.S. 524 (1838).

[33] *Id.* at 525.

[34] *Id.* at 612-613.

[35] *Id.* at 613–14.

[36] *See State Highway Comm'n of Missouri v. Volpe*, 479 F.2d 1099, 1112–14 (8th Cir. 1973) (holding Secretary of Transportation could not impound funds for reasons not supplied by Congress)*; Maine v. Fri*, 486 F.2d 713, 716 (1st Cir. 1973) (affirming a preliminary injunction requiring the Environmental Protection Agency to disburse appropriated funds); *Louisiana ex rel. Guste v. Brinegar*, 388 F. Supp. 1319, 1324–25 (D.D.C. 1975) ("[T]he President's express or implied constitutional powers [do not] justify holding back authorized funds," because "Congress, not the President, retains the constitutional role of guardian of the Treasury.").

funds appropriated under the Federal Water Pollution Control Act Amendments of 1972.[37] The Court unanimously rejected the President's attempt to withhold funding based on the absence of discretion in the governing statute.[38] Ultimately, Congress enacted the Impoundment Control Act[39] ("ICA") to establish a narrow process by which the Executive may *propose* a rescission or deferral of spending, subject to congressional approval.

As Justice Scalia later summarized in *Clinton v. City of New York*, "President Nixon, the Mahatma Gandhi of all impounders, asserted at a press conference in 1973 that his 'constitutional right' to impound appropriated funds was 'absolutely clear.'…Our decision two years later in *Train v. City of New York* proved him wrong."[40] Invalidating the Line Item Veto Act—which would have granted the President a unilateral power to veto some provisions of bills while signing other provisions into law—the *Clinton* majority reaffirmed that "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."[41]

Courts have continued to apply these principles. In *In re Aiken County*,[42] then-Circuit Judge Kavanaugh explained: "[T]he President and federal agencies 'may not ignore statutory mandates or prohibitions merely because of policy disagreement with

---

[37] 420 U.S. 35 (1975).

[38] *Id.* at 42–46.

[39] Pub. L. 93-344, 88 Stat. 297 (1974).

[40] 524 U.S. 417, 468 (1998) (Scalia, J., concurring in part and dissenting in part) (citation omitted).

[41] *Id.* at 438.

[42] 725 F.3d 255 (D.C. Cir. 2013).

Congress.'"[43] This principle reinforces a broader constitutional rule: The Executive may not reallocate appropriated funds or unilaterally decline to spend them when such actions are inconsistent with a statutory command.[44]

**B.**     **The plain, express, and unambiguous NIH appropriations statute passed by Congress bars the agency's proposed changes to its calculation of indirect cost reimbursement.**

**1.**     **Since 2018, each appropriations statute signed into law has expressly prohibited NIH from altering negotiated indirect cost reimbursements.**

In 2018, Congress passed an appropriations rider, the Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, which, by its plain language prohibits HHS and, by extension, NIH from spending appropriated funds "to develop or implement a modified approach to" the reimbursement of "indirect costs" and "deviations from negotiated rates." This has remained the law from its passage through the present day.[45]

---

[43] *Id.* at 260 (citing *Lincoln v. Vigil,* 508 U.S. 182, 193 (1993) ("Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes...")).

[44] *See City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, [an agency] may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

[45] *See* Division H of Pub. L. No. 118-47, §224, 138 Stat. 677, as continued in effect by the Full-Year Continuing Appropriations Act, 2025 (division A of Pub. L. No. 119-4) §§1101(a) & (a)(8), 139 Stat. 10, 11; *see also* Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. No. 115-245, § 224, 132 Stat. 2981, 3094 (2018); Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, § 224, 133 Stat. 2534, 2582 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 224, 134 Stat. 1182, 1594 (2020); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 224, 136 Stat. 49, 470-71 (2021); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 224, 136 Stat. 4459, 4883-84 (2022); Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 224, 138 Stat. 460, 677 (2023).

Section 224 of the Further Consolidated Appropriations Act, 2024, Public Law 118-47 ("Section 224"), provides:

> In making Federal financial assistance, the provisions relating to indirect costs in part 75 of title 45, Code of Federal Regulations, including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017. None of the funds appropriated in this or prior Acts or otherwise made available to the Department of Health and Human Services or to any department or agency may be used to develop or implement a modified approach to such provisions, or to intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter.

As the district court correctly observed, "[t]his rider contains three, overlapping provisions meant to restrict NIH's ability to enact an across-the-board rate reduction."[46] The Rate Change Notice "is in direct contravention of Section 224."[47]

First, with respect to the approval of deviations from negotiated rates, the regulations codified at 45 C.F.R. § 75— which provide a framework for determining indirect cost reimbursement, including a process for requesting and approving deviations on a case-by-case basis—"shall continue to apply to the NIH to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017."[48] The Rate Change Notice, by replacing this individualized procedure with a uniformly applied rate, violates this command.

---

[46] Addendum to Defendants-Appellants' Principal Brief, at 25.

[47] *See id.* at 28.

[48] Section 224.

Second, "[n]one of the funds appropriated . . . may be used to develop or implement a modified approach to such provisions."[49] This language is both deliberate and sweeping. It forecloses not only the adoption of a new policy but also the preparatory work that would lead to one—the agency may not even *begin* to engage funds in the development of an alternative framework for indirect cost reimbursement.

Third, "[n]one of the funds appropriated . . . may be used . . . to intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter."[50] The meaning of this language is clear. Congress selected the third quarter of fiscal year 2017 as the benchmark and prohibited NIH from approving deviations that would have a greater overall financial impact than the deviations approved during that quarter.[51]

Taken as a whole, the statute mandates that NIH adheres to the same regulatory framework in place in the third quarter of fiscal year 2017, prohibits any structural deviation from that approach, and forbids any expansion in the fiscal impact of deviation approvals. It also bars the agency from *developing* any modified approach—prohibiting not just the adoption of a new system, but the very use of appropriated funds to design, plan, or prepare one.

---

[49] *Id.*

[50] *Id.*

[51] *See* Appellee Br. Nos. 25-1344, 25-1345, at 29 ("The 'fiscal effect' of a drastic across-the-board deviation to a 15% rate is plainly not 'proportional' to the 'fiscal effect' of any deviations NIH may have approved in 2017, since negotiated rates have historically averaged about 30%.").

The context and legislative history of the 2018 appropriation, reenacted every year since,[52] reflects an unmistakable Congressional intent to preserve the indirect rate methodology that was in place in 2017.

### 2. Congress has repeatedly rejected the very cuts to indirect funding that the Executive now pursues.

Generally, when the plain language of the statute unambiguously reflects the intent of Congress, the Court's work is done.[53] But the context and history of the statute still provides "confirmatory evidence of Congress's intent."[54] That Congress rejected prior attempts by the Trump Administration to cap indirect funding—and restricted the Administration's ability to develop a modified approach to negotiated indirect rates—confirms that the Rate Change Notice is contrary to law.[55]

In 2017, the Trump administration proposed a cap on indirect costs at 10% of total research costs in NIH grants with the same policy justifications as the Rate Change Notice.[56] In support of the proposal, the administration claimed that "available funding can be better targeted,"[57] and that the proposal would bring the NIH indirect cost reimbursement rate more in line with private foundations.[58] As reflected by the statutory text above, Congress rejected both the proposed caps and the suggested policy justifications.

---

[52] *See supra* n.44.

[53] *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019).

[54] *McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418, 424–25 (1st Cir. 2007); *see also Mundell v. Acadia Hosp. Corp.*, 92 F.4th 1, 13 (1st Cir. 2024).

[55] *Simmons v. Galvin*, 575 F.3d 24, 38 (1st Cir. 2009) ("Two points are important. First, Congress rejected each those proposed amendments."); *Succar v. Ashcroft*, 394 F.3d 8, 34 (1st Cir. 2005).

[56] Off. of Mgmt & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2018*, at 43 (2017).

[57] *Id.*

[58] *Id.*

Beyond the text of the statute, both chambers of Congress expressed their intent to reject caps to indirect costs in the 2018 rider.[59] The House report stated that the proposal to cap indirect costs was "misguided and would have a devastating impact on biomedical research across the country," so the 2018 rider included "a new general provision directing NIH to continue reimbursing institutions for F&A costs according to the rules and procedures described" in the regulations and prohibited the NIH from using funds to implement "any further caps" on indirect funding.[60]

Similarly, the Senate report stated "F&A costs are not optional; they are a fundamental part of doing research."[61] The Senate report also explained, "the Committee has included bill language to prohibit HHS from developing or implementing a modified approach to funding F&A costs."[62] As explained above, HHS was not permitted to pursue the project of creating the rate change notice.[63] These reports confirm that both the House and Senate were concerned about the first Trump administration's proposal to severely cut NIH indirect cost rates by capping them at an arbitrary level and the "devastating" consequences that such cuts would have on research.

Additionally, the House of Representatives Subcommittee on Labor, Health and Human Services, Education, and Related Agencies held a hearing on indirect costs where House members supported maintaining the NIH's longstanding approach

---

[59] The Joint Explanatory Statement sets out the instructions for implementation and incorporated the House and Senate reports to the extent they were not contradicted by the Joint Explanatory Statement. 164 Cong. Rec. H2697 (daily ed. Mar. 22, 2028) https://www.congress.gov/115/crec/2018/03/22/CREC-2018-03-22-bk3.pdf#page=1.

[60] H.R. Rep. No. 115-244, at 50 (2017).

[61] S. Rep. No. 115-150, at 8 (2017).

[62] *Id.* at 109.

[63] *See supra* at 12.

to negotiated indirect costs. For example, Representative DeLauro, ranking member on the Appropriations Committee in 2017, explained that the language in the House Bill was added to counter the administration's proposed cap on indirect costs, which she called a "shortsighted proposal."[64] Representative Lowey stated that "[i]f the HHS decides to move unilaterally to cap funds to research facilities, it would be catastrophic for biomedical research in our country…[a] unilateral move by HHS would also be alarming, as it directly opposes congressional intent."[65] During the hearing, none of the members indicated support for a 10 percent cap on indirect costs. These bipartisan statements underline Congress's rejection of the first Trump Administration's proposal to arbitrarily cap indirect cost rates and explain why Congress instead enacted the 2018 rider to maintain negotiated indirect costs.

The Rate Change Notice presents the same policy—a fifteen percent cap on indirect costs—with the same asserted justifications as the Trump administration's 2017 budget proposal: more direct funding to science and lower indirect cost reimbursements associated with private foundation grants.[66] But having failed to meet its goals in the legislative arena, the Executive Branch is bound by the law that Congress has enacted and is not free to "ignore statutory mandates or prohibitions merely because of policy disagreement with Congress"—particularly statutory mandates specifically enacted to reject the Department's position.[67]

---

[64] Indirect Costs Hearing Tr. at 3.

[65] *Id.* at 5.

[66] Rate Change Notice; *see also* Appellant Br. at 43–44, 48, 51.

[67] *In re Aiken County*, 725 F.3d at 260.

### 3. The uninterrupted re-enactment of the indirect costs rate every year since 2017 confirms Congress's will that funding continue.

The intent of Congress has remained unchanged.[68] The language on indirect costs has remained unchanged in every appropriations bill since 2017.[69] In 2019, the first Trump administration itself acknowledged that the language in the appropriation "prohibited [the NIH] by law from reducing grantee administrative costs."[70] In a subsequent budget request, the administration urged Congress to eliminate that prohibition, but Congress declined to do so and maintained the same text on indirect costs.[71] At every opportunity, Congress has repeatedly, consistently, and unambiguously mandated that the NIH maintain negotiated indirect cost rates and not use appropriated funds to even consider deviating from using the negotiated indirect cost rates. Congress's clarity—as reflected in both the text of the Act and the legislative history—refutes any claim that the NIH is now free to cap indirect costs on its own terms, without following legislative directives, across the board.[72]

---

[68] *Pierce v. Underwood*, 487 U.S. 552, 567 (1988) ("Quite obviously, reenacting precisely the same language would be a strange way to make a change.").

[69] *See supra* n.45.

[70] Off. of Mgmt & Budget, *Major Savings and Reforms: Budget of the U.S. Government Fiscal Year 2020*, at 43 (2019), https://www.govinfo.gov/content/pkg/BUDGET-2020-MSV/pdf/BUDGET-2020-MSV.pdf.

[71] *Id.*; Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, § 224, 133 Stat. 2534, 2582 (2019).

[72] *See e.g.*, Appellant Br. at 8 ("But neither did Congress prohibit NIH from deviating from negotiated indirect-cost rates."); *id.* at 44 ("If Congress had intended to divest NIH of its own regulatory authority to act, it would have said so, rather than directing adherence to HHS regulations that expressly authorize deviations.").

C.  **The balance of policy interests considered by Congress weighs in favor of maintaining the negotiated indirect funding.**

1.  **Cuts to indirect cost reimbursements will slow down or stop vital scientific and medical progress.**

As Congress recognized during the passage of the 2018 rider, caps on indirect costs would "drastically reduce the amount and quality of research conducted in the United States."[73] This reduction would endanger lives by stopping the progress towards treatments and cures for diseases.[74] In the short term, capping indirect costs will have two major consequences for science and medicine in the United States. First, it will halt clinical trials, cutting patients off from lifesaving treatments. Second, research institutions will have to slow down or pause cutting-edge research programs.

Clinical trials at multiple research institutions are at risk. For example, the following research institutions report they may have to suspend clinical trials if the cuts to indirect funding go into effect:

- At the University of Pennsylvania, "[a] 15 percent cap on F&A costs would disrupt numerous ongoing clinical trials in cancer treatment, immunotherapy and bone marrow transplant therapy with enrolled patients, including those who have already started but not yet completed treatment"; these trials include 48 ongoing clinical trials with over 12,000 active enrolled subjects at the Penn Cancer Center.[75]

- At Johns Hopkins University, there are over 600 NIH-funded clinical trials, and some, including a clinical trial on immunotherapy for Hodgkin lymphoma in

---

[73] Indirect Costs Hearing Tr. at 1–2 (Chairman Cole opening statement); *see also id.* at 3.

[74] *Id.* at 3–4 (Rep. DeLauro remarks).

[75] J.A. 1069 (Decl. of Elizabeth Duggins Peloso).

children and adults, could not proceed if the 15 percent caps on indirect funding went forward.[76]

- At the University of Michigan, there are "425 NIH-funded interventional clinical trials underway and not yet completed" with prevention of "death," "mortality," or "improved survival" being the goal of 161 of those trials.[77]

If NIH's indirect rate cut is allowed, researchers will be forced "to suspend or cancel ongoing clinical trials for potentially life-saving investigational therapies, the consequences to individual patients could include their death or the advancement of their condition to the point where recovery from it is no longer possible."[78] Even a pause in federal funds may make resuming trials difficult or impossible in part because of the loss of core workforce and knowledge.[79]

The same cuts would also force many research institutions to pause or cancel vital and groundbreaking research.[80] According to these institutions, areas of research that will be disrupted with a cap on indirect costs include the following:

- At Carnegie Mellon University in Pennsylvania, a cap on indirect funding would end or seriously jeopardize research for restoring sight for patients with corneal blindness, treatments for Parkinson's, paralysis due to stroke, and treatments for epilepsy.[81]

---

[76] J.A. 1020–21 (Decl. of Laurent Heller).

[77] J.A. 1050 (Decl. of Arthur Lupia).

[78] J.A. 180 (Decl. of Denise Barton).

[79] *Id.*

[80] Christina Jewett & Sheryl Gay Stolberg, *Trump Administration Cuts Put Medical Progress at Risk, Researchers Say*, New York Times (Feb. 7, 2025), https://www.nytimes.com/2025/02/07/us/politics/medical-research-funding-cuts-university-budgets.html?searchResultPosition=1%27.

[81] J.A. 959–961 (Decl. of Theresa S. Mayer).

- At Arizona's public universities, research into Alzheimer's treatments, asthma, reversing hearing loss, and preventing cancer for Indigenous people would face shortages and cuts.[82]

- At the University of Wisconsin, Madison, research on "cancer treatment (including pediatric), Alzheimer's Disease and other types of dementia, cardiac conditions, fetal heart conditions, maternal–fetal health…and more" may be disrupted.[83]

A shutdown of research would have irreversible future effects. For example, at UMass Chan Medical School, indirect funding pays for the staff that care for irreplaceable cell lines and laboratory animals, which will be difficult if not impossible for the university to start again.[84] Capping indirect costs also risks stalling or stopping the discovery of treatments and cures for disease.

Cutting research programs now will affect science and medical progress far into the future. In NIH, Congress has invested significant funds into fundamental science for the purpose of improving national health, the economy, and creating world-class research programs in the United States.[85] Fundamental to the establishment of the NIH grant system itself, scientific and medical discovery also promotes national security: NIH funding supports research on antibiotic resistance, vaccines, and preventing the next pandemic.[86] Many worry about the United States' losing its

---

[82] Jim Small, *Arizona Universities Face Massive Cuts to Medical Research if Trump's Plan is Implemented*, AZ Mirror (Feb. 11, 2025), https://azmirror.com/briefs/arizona-universities-face-massive-cuts-to-medical-research-if-trumps-plan-is-implemented/.

[83] J.A. 1178–79 (Declaration of Dorota Grejner-Brzezinska).

[84] J.A. 180 (Decl. of Denise Barton); *See also* J.A. 1070-71 (Decl. of Elizabeth Duggins Peloso).

[85] Indirect Costs Hearing Tr, 2–4.

[86] *Id.* at 58; Venuri Siriwardane & Maddy Franklin, *From Psychosis to Sleep to Drug Resistance, These Pittsburgh Research Efforts are Threatened by Trump Spending Cuts, Orders,*

competitive edge.[87] By comparison, nations like India, China, and South Korea are increasing their governmental investments in science.[88] The United States spent $923 billion on medical research and development in 2022, while China spent $812 billion and that level of funding is still rising.[89] Indirect cost caps would drive the United States further away from the long-established Congressional goal of bolstering science through the NIH.

Drastic cuts to indirect funding would be vast and long-lasting: "[P]ublicly funded research may have applications far from its original area, many years or even decades later."[90] Drugs approved now have been tested in clinical trials over the last decade.[91] Even a temporary pause of certain research programs will very likely result in the loss or delay of beneficial treatments and cures for diseases.

### 2. Cuts to indirect cost reimbursements threaten economic growth and local economies that depend on research institutions.

In preserving the current rate of indirect cost reimbursement, Congress recognized that cuts would reduce economic growth, harm local economies that depend on research institutions, and particularly threaten research programs that are at smaller or publicly-funded institutions.[92] Researchers predict that proposed NIH

---

PublicSource (Feb. 27, 2025), https://www.publicsource.org/research-funding-grant-nih-health-university-pittsburgh-pitt-trump/.

[87] Megan Molteni, Usha Lee McFarling & Angus Chen, *Graduate Student Admissions Paused and Cut Back as Universities React to Trump Orders on Research*, STAT (Feb. 19, 2025), https://www.statnews.com/2025/02/19/trump-funding-freeze-grad-student-postdoc-acceptances-paused-nih-research/.

[88] Indirect Costs Hearing Tr., at 46; Jeff Tollefson & Richard Van Noorden, *How Long Will the US be a Science Superpower?*, 643 Nature 770, 771 (2024).

[89] Tollefson, *supra* note 88, 771.

[90] Li, *supra* note 14, at 78.

[91] Park, *supra* note 6.

[92] Indirect Costs Hearing Tr., 1–2 (Chairman Cole opening statement).

funding cuts will lead to an estimated loss of $16 billion in the economy and 68,000 jobs nationwide.[93] A researcher at University of Pittsburgh compared it to closing a steel mill: "This is not a steel town anymore; it's a biomedical research town, and those cuts would affect Pittsburgh perhaps more than any other city in the country."[94] Local economies dependent on research institutions will be the hardest hit by these caps in indirect funding, which will cut economic activity and high-quality jobs:[95]

- Michigan State University's partnership with the Henry Ford Health was supposed to bring 500 new jobs to "support innovative research efforts in cancer, cardiovascular, and neurosciences" and 1,000 construction jobs to Detroit, MI, but if the cuts to indirect funding go forward the project will have to be paused or abandoned.[96]

- The University of Alabama, Birmingham estimates that it would lose $70 million per year in indirect funding, impairing many of its functions,[97] and it is the state's largest employer.[98]

- Morehouse School of Medicine in Atlanta, GA, would likely be forced to lay off 66 employees, including research and clinical staff.[99]

---

[93] Sophia Neaman, *Map Co-Developed by Annenberg Researchers Estimates Economic, Job Loss Impact of NIH Funding Cuts*, The Daily Pennsylvanian (Apr. 15, 2025), https://www.thedp.com/article/2025/04/penn-nih-cuts-interactive-map-annenberg.

[94] Siriwardane, *supra* note 86.

[95] Park, *supra* note 6.

[96] J.A. 225. (Decl. of Douglas A. Gage, Ph.D.).

[97] J.A. 785 (Decl. of Dr. Anupam Agarwal).

[98] All Things Considered, *Possible Cuts to NIH Funding Could Affect Research in Alabama*, NPR (Feb. 17, 2025), https://www.npr.org/2025/02/17/nx-s1-5292265/possible-cuts-to-nih-funding-could-affect-research-in-alabama.

[99] J.A. 750–51 (Decl. of Valerie Montgomery Rice, MD, FACOG).

Other state institutions may also have to lay off workers, including the University of New Mexico, the University of Wisconsin-Madison, and the University of Illinois System.[100] Less able to turn to endowments or fundraising, state universities would have to "pick and choose a small number of grants" to support or allow their research programs to "just become derelict."[101] These concerns are not new, and they have informed Congress's decision to adopt the 2018 rider and preserve the NIH's approach to negotiated indirect cost rates every year since.[102]

Meanwhile, the Rate Change Notice would forfeit the large return on investment that publicly funded research provides. It is estimated that for every $1 in NIH research funding, $2.56 in economic activity is created.[103] In 2024, roughly $37 billion in NIH grants supported 407,782 jobs and $94.5 billion in new economic activity.[104] And in the long run, medical research reduces costs by improving the

---

[100] Lauren Lifke & Lily Alexander, *Uncertainty Looms over UNM with Proposed Federal Research Funding Cuts*, New Mexico Daily Lobo (Feb. 17, 2025), https://www.dailylobo.com/article/2025/02/uncertainty-looms-over-unm-with-proposed-federal-medical-research-cuts; J.A. 17 (Decl. of Dr. Joseph T. Walsh); Beatrice Lawrence, *NIH Funding Cuts 'A Travesty to Biomedical Research,' Says UW Research Director*, Wisconsin Public Radio (Feb. 25, 2025), https://www.wpr.org/news/nih-funding-cuts-travesty-biomedical-research-uw-madison-wisconsin-institute-discovery.

[101] Jocelyn Kaiser, *NIH Plan to Reduce Overhead Payments Draws Fire,* Science (June 2, 2017), https://www.science.org/content/article/nih-plan-reduce-overhead-payments-draws-fire.

[102] Indirect Costs Hearing Tr., 14.

[103] United for Medical Research, *NIH's Role in Sustaining the U.S. Economy*, (March 2025), at 1, https://www.unitedformedicalresearch.org/wp-content/uploads/2025/03/UMR_NIH-Role-in-Sustaining-US-Economy-FY2024-2025-Update.pdf.

[104] *Id.*

health of our national population.[105] In terms of marketable products, one study found that 8.4 percent of NIH grants were directly acknowledged in patents for products, and 31 percent of studies produced by NIH-funded research were cited by patents.[106] Caps on indirect funding will lead to job loss and diminishing innovation and economic activity.

### 3. Cuts to indirect funding will defund a generation of scientists.

Finally, the appropriations rider reflects significant concern by Congress about the generational impact that funding cuts would have upon new scientists.[107] The younger generation of researchers and scientists will be most affected by the cap in indirect costs. To set up their laboratories and obtain essential equipment, "[t]hat's all funded by indirect costs from other researchers that [have] been recovered."[108] Cutting and capping indirect costs will reduce and in some cases halt graduate admissions for lack of funding, decreasing available opportunities for up-and-coming scientists in the U.S.[109] Indeed, in response to the Rate Change Notice, multiple universities have already suspended or reduced doctoral admissions.[110] Additionally,

---

[105] Written Testimony of Dr. Gary Gilliland, Indirect Costs Hearing (2017), at 2, https://docs.house.gov/meetings/AP/AP07/20171024/106525/HHRG-115-AP07-Wstate-GillilandG-20171024.pdf.

[106] Li, *supra* note 14, at 78.

[107] Indirect Costs Hearing Tr., at 40.

[108] Anushree Vashist & Zachary Leiter, *"Flagrantly Unlawful": UChicago Sues NIH over Funding Cuts*, Chicago Maroon (Feb. 11, 2025), https://chicagomaroon.com/45412/news/flagrantly-unlawful-uchicago-sues-nih-over-funding-cuts/.

[109] Molteni, *supra* note 87; Chen, *supra* note 6.

[110] Katherine Knott, *Colleges Restrict Graduate Student Admissions After NIH Proposes Rate Cut*, Inside Higher Ed (Feb. 25, 2025), https://www.insidehighered.com/news/government/science-research-policy/2025/02/25/facing-nih-cuts-colleges-restrict-grad-student; Molteni, *supra* note 87.

many research institutions have started hiring freezes.[111] As one researcher at the University of Maryland put it, "It's creating a jolt in the market that is going to be disabling for labs, especially the smaller ones, because they won't have the human capital to do their science…It's going to be a cascading kind of chain effect through the entire ecosystem."[112]

All of Congress's policy concerns point in the same direction: shrinking opportunities for scientists in the United States will slow down science and medicine far into the future to the detriment of all.

## IV.    CONCLUSION

For these reasons, the Court should affirm the district court's injunction.

---

[111] Molteni, *supra* note 87.

[112] *Id.*

Dated:    June 16, 2025        HAGENS BERMAN SOBOL SHAPIRO LLP

By:    */s/ Steve W. Berman*
        Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email:      Steve@hbsslaw.com

John M. DeStefano
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
Telephone: (602) 840-5900
Facsimile:  (602) 840-3012
Email:      Johnd@hbsslaw.com

Lauriane Williams
Sophia Weaver
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
Facsimile:  (617) 482-3700
Email:      laurianew@hbsslaw.com
             sophiaw@hbsslaw.com

*Counsel for Proposed Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.      This document complies with the type-volume limitation set forth in the Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(a)(5) because it contains 6,499 words.

2.      This document complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced type-face using 14-point font.

DATED: June 16, 2025                    */s/ Steve W. Berman*

## CERTIFICATE OF SERVICE

I certify that on June 16, 2025, I electronically filed Brief of Amicus Curiae in Support of Appellees and Affirmance with the Clerk of the Court for the U.S. Court of Appeals for the First Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

DATED: June 16, 2025                    */s/ Steve W. Berman*

# APPENDIX: LIST OF *AMICI CURIAE*

**Jamie Raskin**
  Representative of Maryland

**Rosa L. DeLauro**
  Representative of Connecticut

**Frank Pallone, Jr.**
  Representative of New Jersey

**Hakeem Jeffries**
  Representative of New York

**Katherine Clark**
  Representative of Massachusetts

**Pete Aguilar**
  Representative of California

**Joe Neguse**
  Representative of Colorado

**Gabe Amo**
  Representative of Rhode Island

**Jake Auchincloss**
  Representative of Massachusetts

**Becca Balint**
  Representative of Vermont

**Nanette Barragán**
  Representative of California

**Joyce Beatty**
  Representative of Ohio

**Wesley Bell**
  Representative of Missouri

**Ami Bera, M.D.**
  Representative of California

**Donald S. Beyer Jr.**
  Representative of Virginia

**Suzanne Bonamici**
  Representative of Oregon

**Shontel Brown**
  Representative of Ohio

**Julia Brownley**
  Representative of California

**Nikki Budzinski**
  Representative of Illinois

**Janelle Bynum**
  Representative of Oregon

**Salud O. Carbajal**
  Representative of California

**André Carson**
  Representative of Indiana

**Troy A. Carter, Sr.**
Representative of Louisiana

**Ed Case**
Representative of Hawaii

**Sean Casten**
Representative of Illinois

**Kathy Castor**
Representative of Florida

**Judy Chu**
Representative of California

**Gilbert R. Cisneros, Jr.**
Representative of California

**Emanuel Cleaver, II**
Representative of Missouri

**Steve Cohen**
Representative of Tennessee

**Herbert C. Conaway, Jr.**
Representative of New Jersey

**J. Luis Correa**
Representative of California

**Joe Courtney**
Representative of Connecticut

**Angie Craig**
Representative of Minnesota

**Jasmine Crockett**
Representative of Texas

**Danny K. Davis**
Representative of Illinois

**Madeleine Dean**
Representative of Pennsylvania

**Diana DeGette**
Representative of Colorado

**Suzan K. DelBene**
Representative of Washington

**Chris Deluzio**
Representative of Pennsylvania

**Mark DeSaulnier**
Representative of California

**Maxine Dexter**
Representative of Oregon

**Debbie Dingell**
Representative of Michigan

**Lloyd Doggett**
Representative of Texas

**Sarah Elfreth**
Representative of Maryland

**Veronica Escobar**
Representative of Texas

**Adriano Espaillat**
  Representative of New York

**Shomari C. Figures**
  Representative of Alabama

**Lizzie Fletcher**
  Representative of Texas

**Bill Foster**
  Representative of Illinois

**Lois Frankel**
  Representative of Florida

**Laura Friedman**
  Representative of California

**Maxwell Alejandro Frost**
  Representative of Florida

**John Garamendi**
  Representative of California

**Jesús G. "Chuy" García**
  Representative of Illinois

**Robert Garcia**
  Representative of California

**Sylvia Garcia**
  Representative of Texas

**Dan Goldman**
  Representative of New York

**Jimmy Gomez**
  Representative of California

**Maggie Goodlander**
  Representative of New Hampshire

**Josh Gottheimer**
  Representative of New Jersey

**Al Green**
  Representative of Texas

**Jahana Hayes**
  Representative of Connecticut

**Pablo José Hernández**
  Representative of Puerto Rico

**Chrissy Houlahan**
  Representative of Pennsylvania

**Steny H. Hoyer**
  Representative of Maryland

**Jared Huffman**
  Representative of California

**Glenn F. Ivey**
  Representative of Maryland

**Jonathan L. Jackson**
  Representative of Illinois

**Sara Jacobs**
  Representative of California

**Pramila Jayapal**
  Representative of Washington

**Henry C. "Hank" Johnson, Jr.**
  Representative of Georgia

**Julie Johnson**
  Representative of Texas

**Sydney Kamlager-Dove**
  Representative of California

**Robin L. Kelly**
  Representative of Illinois

**Timothy M. Kennedy**
  Representative of New York

**Ro Khanna**
  Representative of California

**Raja Krishnamoorthi**
  Representative of Illinois

**Greg Landsman**
  Representative of Ohio

**John B. Larson**
  Representative of Connecticut

**George Latimer**
  Representative of New York

**Summer L. Lee**
  Representative of Pennsylvania

**Teresa Leger Fernández**
  Representative of New Mexico

**Mike Levin**
  Representative of California

**Sam T. Liccardo**
  Representative of California

**Ted W. Lieu**
  Representative of California

**Zoe Lofgren**
  Representative of California

**Stephen F. Lynch**
  Representative of Massachusetts

**Seth Magaziner**
  Representative of Rhode Island

**Lucy McBath**
  Representative of Georgia

**Betty McCollum**
  Representative of Minnesota

**Kristen McDonald Rivet**
  Representative of Michigan

**James P. McGovern**
  Representative of Massachusetts

**Gregory W. Meeks**
  Representative of New York

**Robert J. Menendez**
  Representative of New Jersey

**Grace Meng**
  Representative of New York

**Kweisi Mfume**
  Representative of Maryland

**Dave Min**
  Representative of California

**Gwen S. Moore**
  Representative of Wisconsin

**Joseph D. Morelle**
  Representative of New York

**Kelly Morrison**
  Representative of Minnesota

**Jared Moskowitz**
  Representative of Florida

**Seth Moulton**
  Representative of Massachusetts

**Frank J. Mrvan**
  Representative of Indiana

**Kevin Mullin**
  Representative of California

**Jerrold Nadler**
  Representative of New York

**Richard E. Neal**
  Representative of Massachusetts

**Eleanor Holmes Norton**
  Representative of the District of Columbia

**Jimmy Panetta**
  Representative of California

**Chris Pappas**
  Representative of New Hampshire

**Nancy Pelosi**
  Representative of California

**Scott H. Peters**
  Representative of California

**Brittany Pettersen**
  Representative of Colorado

**Chellie Pingree**
  Representative of Maine

**Nellie Pou**
  Representative of New Jersey

**Delia C. Ramirez**
  Representative of Illinois

**Emily Randall**
  Representative of Washington

**Luz M. Rivas**
Representative of California

**Deborah K. Ross**
Representative of North Carolina

**Andrea Salinas**
Representative of Oregon

**Linda T. Sánchez**
Representative of California

**Mary Gay Scanlon**
Representative of Pennsylvania

**Jan Schakowsky**
Representative of Illinois

**Bradley Scott Schneider**
Representative of Illinois

**Robert C. "Bobby" Scott**
Representative of Virginia

**Brad Sherman**
Representative of California

**Mikie Sherrill**
Representative of New Jersey

**Lateefah Simon**
Representative of California

**Adam Smith**
Representative of Washington

**Eric Sorensen**
Representative of Illinois

**Darren Soto**
Representative of Florida

**Melanie A. Stansbury**
Representative of New Mexico

**Greg Stanton**
Representative of Arizona

**Haley Stevens**
Representative of Michigan

**Marilyn Strickland**
Representative of Washington

**Suhas Subramanyam**
Representative of Virginia

**Eric Swalwell**
Representative of California

**Mark Takano**
Representative of California

**Shri Thanedar**
Representative of Michigan

**Bennie G. Thompson**
Representative of Mississippi

**Rashida Tlaib**
Representative of Michigan

**Paul D. Tonko**
Representative of New York

**Norma J. Torres**
Representative of California

**Lori Trahan**
Representative of Massachusetts

**Juan Vargas**
Representative of California

**Nydia M. Velázquez**
Representative of New York

**Debbie Wasserman Schultz**
Representative of Florida

**Maxine Waters**
Representative of California

**Bonnie Watson Coleman**
Representative of New Jersey

**George T. Whitesides**
Representative of California

**Nikema Williams**
Representative of Georgia

**Frederica S. Wilson**
Representative of Florida